PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOHN NEUKOM (SBN 275887)
john.neukom@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:  (650) 470-4500
Facsimile:   (650) 470-4570

Attorney for Defendants
Ripple Labs Inc., XRP II, LLC, Bradley
Garlinghouse, Christian Larsen, Ron Will,
Antoinette O'Gorman, Eric van Miltenburg,
Susan Athey, Zoe Cruz, Ken Kurson, Ben
Lawsky, Anja Manuel, and Takashi Okita

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE RIPPLE LABS INC. LITIGATION | CASE NO.: 4:18-cv-06753-PJH |
| This Document Relates To:<br><br>    ALL ACTIONS. | **DECLARATION OF VIRGINIA F. MILSTEAD IN SUPPORT OF DEFENDANTS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF AVNER GREENWALD'S AND VLADI ZAKINOV'S AND DAVID OCONER'S MOTIONS TO REMAND**<br><br>Date:    February 13, 2019<br>Time:    9:00 a.m.<br>Dep't.:  3<br>Judge:  Hon. Phyllis J. Hamilton |

<u>**DECLARATION OF VIRGINIA F. MILSTEAD**</u>

1.      I am an attorney admitted to practice before the courts of the State of California and have been admitted to this Court. I am counsel in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, which is counsel of record for Defendants Ripple Labs Inc., XRP II, LLC, Bradley Garlinghouse, Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van Miltenburg, Susan Athey, Zoe Cruz, Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita (collectively "Defendants") in the above-captioned matter.  I submit this declaration in support of Defendants' Omnibus Memorandum of Points and Authorities in Opposition to Plaintiff Avner Greenwald's and Vladi Zakinov's and David Oconer's Motions to Remand.  This declaration is based on my own personal knowledge, and if called upon to do so, I could and would testify competently thereto.

2.      Attached as **Exhibit 1** is a true and correct copy of the Complaint filed in <u>Coffey v. Ripple Labs Inc., et al.</u>, No. CGC-18-566271 (Cal. Super. Ct. San Francisco Cty.) on May 3, 2018.

3.      Attached as **Exhibit 2** is a true and correct copy of the Notice of Related Case filed in <u>Greenwald v. Ripple Labs Inc., et al.</u>, No. 18-CIV-03461 (Cal. Super. Ct. San Mateo Cty.) on October 25, 2018

4.      Attached as **Exhibit 3** is a true and correct copy of the Notice of Related case filed in <u>In re Ripple Labs Inc. Litigation</u>, Lead Case No. 18-CIV-02845 (Consolidated with Case No. 18-CIV-03332) (Cal. Super. Ct. San Mateo Cty.) on October 25, 2018.

5.      Attached as **Exhibit 4** is a true and correct copy of Plaintiff Avner Greenwald's Motion to Remand (ECF No. 15), filed in <u>Greenwald v. Ripple Labs Inc., et al.</u>, No. 4:18-cv-04790-PJH (N.D. Cal.) on September 7, 2018.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on December 28, 2018 in Los Angeles, California.

By:  _____*/s/ Virginia F. Milstead*_____
                          Virginia F. Milstead

DECLARATION OF VIRGINIA F. MILSTEAD                          CASE NO.: 4:18-cv-06753-PJH

# Exhibit 1



## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

May-03-2018  2:50 pm

Case Number: CGC-18-566271

Filing Date: May-03-2018 2:47

Filed by:  KALENE APOLONIO

Image: 06321889

COMPLAINT

RYAN COFFEY VS. RIPPLE LABS, INC. ET AL

001C06321889

**Instructions:**
Please place this sheet on top of the document to be scanned.

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

RIPPLE LABS, INC., a Delaware Corporation, Additional Parties
Attachment form is attached

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

RYAN COFFEY, individually and on behalf of all others similarly
situated

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Francisco Superior Court<br><br>400 McAllister St., San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):* **CGC-18-566271** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James Taylor-Copeland, 501 W. Broadway Suite 800, San Diego, CA 92101, 619-400-4944

| DATE: May 3, 2018<br>*(Fecha)* MAY 0 3 2018 | CLERK OF THE COURT<br>*(Secretario)* KALENE AHOLONIO<br>Kalene Arbaun | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL] SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN FRANCISCO

**Page 1 of 1**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | SUMMONS | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Ryan Coffey v. Ripple Labs, Inc. et. al. | CGC-18-566271 |

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff  ☑ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

XRP II, LLC, a South Carolina limited liability company, BRADLEY GARLINGHOUSE, an individual, and DOES 1 through 10, inclusive.

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  James Q. Taylor-Copeland (SBN 284743)
   james@taylorcopelandlaw.com
2  **TAYLOR-COPELAND LAW**
   501 W. Broadway Suite 800
3  San Diego, CA 92101
   Tel:  619-400-4944
4

5  *Attorney for Individual and Representative
   Plaintiff Ryan Coffey*
6

# FILED

San Francisco County Superior Court

**MAY 03 2018**

**CLERK OF THE COURT**
BY _____
Deputy Clerk

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              COUNTY OF SAN FRANCISCO, CIVIC CENTER COURTHOUSE

9

10 RYAN COFFEY, individually and on behalf of all
   others similarly situated

Case No. **CGC-18-566271**

**CLASS ACTION**

11
                              Plaintiff,

**COMPLAINT FOR:**

12 v.

13 RIPPLE LABS, INC., a Delaware corporation,
   XRP II, LLC, a South Carolina limited liability
14 company, BRADLEY GARLINGHOUSE, an
   individual, and DOES 1 through 10, inclusive,
15
                              Defendants.
16

**(1) UNREGISTERED OFFER AND SALE
OF SECURITIES IN VIOLATION OF
SECTIONS 5 AND 12(a)(1) OF THE
SECURITIES ACT**
**(2) UNREGISTERED OFFER AND SALE
OF SECURITIES IN VIOLATION OF
SECTIONS     25110     AND     25503
CALIFORNIA CORPORATIONS CODE**
**(3) VIOLTION OF SECTION 15 OF THE
SECURITIES ACT**
**(4) VIOLATION     OF     CALIFORNIA
CORPORATIONS   CODE   SECTION
25504**

17

18

19

20

21                                              **JURY TRIAL DEMANDED**

22                                              **DEMAND EXCEEDS $25,000**

23

24

25                                                      BY FAX
                                                       ONE LEGAL LLC
26

27

28

────────────────────────────────────────
                        **COMPLAINT**

# TABLE OF CONTENTS

Page No.

I.      SUMMARY OF ACTION.................................................................................1

II.     PARTIES .......................................................................................................3

III.    JURISDICITON AND VENUE ......................................................................4

IV.     SUBSTANTIVE ALLEGATIONS ................................................................4

        A.    XRP Genesis and the Never Ending ICO ..................................................4

        B.    Defendants' Primary Source of Income is the Sale of XRP ........................5

        C.    Defendants Market XRP to Drive Demand and Increase Price..................6

              1.    Defendants Blur Lines Between Ripple Labs' Enterprise Solutions
                    and XRP to Further Drive XRP Demand.............................................8

              2.    Ripple Labs Attempts to Pay Off Exchanges to List XRP ...............12

              3.    Ripple Labs Publicly Limits the Supply of XRP to Drive Price
                    Appreciation.....................................................................................14

        D.    Defendants Acknowledge that Development of the XRP Ledger is
              Dependent on Their Technical, Entrepreneurial and Managerial Efforts..16

              1.    Ripple Labs Promises R3 a 5 Billion XRP Option to Drive Adoption
                    of XRP .............................................................................................17

        E.    Ripple Labs Maintains the Centralized XRP Ledger.................................17

        F.    XRP Is a Security........................................................................................20

              1.    XRP Purchasers Made an Investment of Money in a Common
                    Enterprise ........................................................................................20

              2.    XRP Investors Had a Reasonable Expectation of Profits ................21

              3.    The Success of XRP Requires the Efforts of Ripple Labs and Others
                    ........................................................................................................22

V.      PLAINTIFF RYAN COFFEY'S PURCAHSE OF XRP......................................23

VI.     CLASS ALLEGATIONS ..................................................................................24

VII.    CAUSES OF ACTION .....................................................................................25

VIII.   PRAYER FOR RELIEF .................................................................................29

Plaintiff RYAN COFFEY, individually and on behalf of all others similarly situated ("Plaintiff") complains against defendants RIPPLE LABS, INC. ("Ripple Labs"), its wholly owned subsidiary XRP II, LLC ("XRP II"), Ripple Labs' CEO, BRADLEY GARLINGHOUSE ("Garlinghouse") and Does 1-10 (collectively, "Defendants") as follows:

## I.    SUMMARY OF ACTION

1.    This is a securities class action on behalf of all investors who purchased Ripple tokens ("XRP") issued and sold by Defendants. It arises out of a scheme by Defendants to raise hundreds of millions of dollars through the unregistered sale of XRP to retail investors in violation of the registration provisions of state and federal securities laws.

2.    Unlike cryptocurrencies such as Bitcoin and Ethereum, which are mined by those validating transactions on their networks, all 100 billion of the XRP in existence were created out of thin air by Ripple Labs at its inception in 2013.[1] "In other words, unlike some virtual currencies, XRP was fully generated prior to its distribution."[2] 20 billion XRP, or 20 percent of the total XRP supply, were given to the individual founders of Ripple Labs, with the remaining 80 billion retained by Ripple Labs.

3.    Defendants have since earned massive profits by quietly selling off this XRP to the general public, in what is essentially a never-ending initial coin offering ("ICO"). Like the better-known initial public offering ("IPO"), in an ICO, digital assets are sold to consumers in exchange for legal tender or cryptocurrencies (most often Bitcoin and Ethereum). These tokens generally give the purchaser various rights on the blockchain network and resemble the shares of a company sold to investors in an IPO. Unfortunately, these ICOs have become a magnet for unscrupulous practices and fraud.

4.    In order to increase demand for XRP, and thereby increase the profits it can derive by selling XRP, Ripple Labs has consistently portrayed XRP as a good investment, relayed optimistic price predictions, and conflated Ripple Labs' enterprise customers with usage of XRP. For example,

---

[1] Plaintiff is informed and believes that Ripple was known as OpenCoin, Inc. until September 26, 2013 when it changed its name.
[2] FinCEN Statement of Facts and Violations, https://www.fincen.gov/sites/default/files/shared/Ripple_Facts.pdf (last visited May 3, 2018).

1   in 2014, Ripple Labs publicly stated that "we will engage in distribution strategies that we expect

2   will result in a stable or strengthening XRP exchange rate against other currencies." Ripple Labs

3   greatly increased these efforts to push XRP on the general public in 2017 and 2018.

4        5.    Defendants also reportedly offered to bribe popular U.S.-based cryptocurrency

5   exchanges Coinbase, Inc. ("Coinbase") and Gemini Trust Company, LLC ("Gemini") to list XRP.

6   In or about the fall of 2017, Ripple Labs is reported to have offered Coinbase more than $100 million

7   worth of XRP to start letting users trade XRP. A Ripple executive is also reported to have asked

8   whether a $1 million cash payment could persuade Gemini to list XRP in the third quarter of 2017.

9   Although both Gemini and Coinbase declined to pursue these proposals, in late 2017 and early 2018

10  rumors that XRP would be added to Coinbase fueled its price increase. Plaintiff is informed and

11  believed and based thereon alleges that Ripple Labs was the source of these rumors.

12       6.    Federal securities laws require any security that is offered or sold to be registered with

13  the Securities and Exchange Commission ("SEC"). These laws are designed to protect the public

14  by requiring various disclosures so that investors can better understand the security that is being

15  offered or sold, and risks associated with investment in that security. Under section 2(a)(1) of the

16  Securities Act of 1933 ("Securities Act"), a "security" is defined to include an "investment

17  contract."

18       7.    The SEC has made it clear that digital tokens, such as XRP, often constitute "securities

19  and may not be lawfully sold without registration with the SEC or pursuant to an exemption from

20  registration." *See Investor Bulletin: Initial Coin Offerings*, U.S. Securities and Exchange

21  Commission (July 25, 2017); *see also In re Munchee, Inc.* (No. 3-18304) ("[T]okens, coins or other

22  digital assets issued on a blockchain may be securities under the federal securities laws, and, if they

23  are securities, issuers and others who offer or sell them in the United States must register the offering

24  and sale with the Commission or qualify for an exemption from registration.").

25       8.    Here the XRP offered and sold by Defendants have all the traditional hallmarks of a

26  security. XRP purchasers, including Plaintiff, provided consideration (in the form of fiat, including

27  U.S. dollars, or other cryptocurrencies) in exchange for XRP. XRP purchasers reasonably expected

28

1    to derive profits from their ownership of XRP, and Defendants themselves have frequently

2    highlighted this profit motive.  Finally, the development of the XRP Ledger, and the profits that

3    investors expected to derive therefrom, were, and are, based entirely on the technical, managerial,

4    and entrepreneurial efforts of Defendants and other third parties employed by Defendants.

5         9.     However, Defendants did not register XRP with the SEC, and many of the

6    representations Defendants made regarding XRP were designed to drive demand of XRP, allowing

7    Defendants to obtain greater returns on their XRP sales.

8    **II.   PARTIES**

9         10.    Lead Plaintiff Ryan Coffey is an individual who at all times mentioned, was and is a

10   resident of San Diego, California.  Plaintiff purchased 650 XRP on or about January 6, 2018 at a

11   rate of $2.60 per XRP and sold that same XRP for approximately $1.70 per XRP on or about January

12   18, 2018.

13        11.    Plaintiff is informed and believes, and based thereon alleges, that Defendant Ripple

14   Labs, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

15        12.    Plaintiff is informed and believes, and based thereon alleges, that Defendant XRP II,

16   LLC is a South Carolina limited liability company with its principal place of business in San

17   Francisco, California.

18        13.    Plaintiff is informed and believes, and based thereon alleges, that Defendant Brad

19   Garlinghouse, is an individual who resides in San Francisco, California.  Garlinghouse is the CEO

20   of Ripple Labs, a position he has held since in or about 2015.

21        14.    At all times mentioned herein, each of the defendants named herein, including DOES

22   1 through 10 were the co-conspirators, agents, representatives, alter egos, employers, and/or joint

23   venturers of the other defendants, and, in doing the acts and things herein alleged, were acting within

24   the course, scope, and authority of said agency, service, or employment with knowledge,

25   permission, and consent of the other defendants and each of them.

26        15.    Plaintiff alleges on information and belief that DOES 1-10, inclusive, were

27   individuals, corporations, companies, partnerships, or other business entities. DOES 1-10 were co-

28

conspirators with, or alter egos of, other Defendants in the violations alleged in this Complaint and performed acts or made statements in furtherance thereof. Plaintiff are presently unaware of the true names and identities of DOES 1-10. Plaintiff will amend this Complaint to allege the true names of the DOE defendants when they are able to ascertain them.

**III.  JURISDICTION AND VENUE**

16.    This Complaint is filed, and these proceedings are instituted, to recover damages and to obtain other relief that Plaintiff has sustained due to Defendants' unregistered offer and sale of securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act and Sections 25110, 25503, and 25504 of the California Corporations Code.

17.    Venue is proper in this jurisdiction pursuant to the provisions of California Code of Civil Procedure section 395(a) because all Defendants reside in San Francisco.

18.    This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in and/or aimed at the state of California in connection with Defendants' unregistered offer and sale of securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act and Sections 25110, 25503 and 25504 of the California Corporations Code.

19.    This Court also has personal jurisdiction over Defendants because they reside or have their principal places of business in California.

**IV.  SUBSTANTIVE ALLEGATIONS**

**A.     XRP GENESIS AND THE NEVER-ENDING ICO**

20.    Unlike cryptocurrencies such as Bitcoin and Ethereum, which are mined by those validating transactions on their networks, all 100 billion XRP were created out of thin air by Ripple Labs in 2013. 20 billion XRP, or 20 percent of the total XRP supply, were given to the individual founders of Ripple Labs,[3] with the remaining 80 billion retained by Ripple Labs.

21.    As for the 80 billion XRP held by Ripple Labs, the plan was to sell them and use funds received to fund company operations and improve the XRP Ledger. Ripple Labs' own wiki notes that "Ripple Labs sells XRP to fund its operations and promote the network. This allows Ripple

---

[3] Chris Larsen and Jed McCaleb each received 9.5 billion XRP, with Arthur Britto receiving 1 billion.

1    Labs to have a spectacularly skilled team to develop[e] and promote the Ripple protocol and
2    network."[4]

3        22.    From 2013 to the present Defendants have been engaged in an ongoing scheme to sell
4    XRP to the general public in a never ending ICO.

5        23.    In May 2015, regulatory authorities in the United States fined Ripple Labs and XRP
6    II $700,000 for violating the Bank Secrecy Act by selling XRP without obtaining the required
7    authorization. As part of that settlement, Defendants acknowledged that they had sold XRP to the
8    general public and agreed to a number of remedial measures, including registration with FinCEN.

9        24.    From December 2014 to July 2015, Ripple Labs disclosed on its website the amount
10   of XRP it held and the amount in circulation. The disclosure for June 30, 2015 stated that Ripple
11   Labs held approximately 67.51 billion XRP, more than double the approximately 32.49 billion XRP
12   held by *all others*. The XRP held by others also significantly overstates independent holdings of
13   XRP because it includes the 20 billion provided to founders and an undisclosed amount of XRP
14   used in "business development agreements that are still pending."

15       25.    Defendants sales of XRP to the public accelerated rapidly in 2017 and early 2018.

16   **B.    DEFENDANTS' PRIMARY SOURCE OF INCOME IS THE SALE OF XRP**

17       26.    While publicly touting its xCurrent, xRapid, and xVia enterprise solutions
18   (collectively, "Ripple Enterprise Solutions"), Ripple Labs' primary source of income is, and has
19   been, the sale of XRP. Defendants earned over $342.8 million through XRP sales in the last year
20   alone—XRP which costs Defendants nothing since they created it out of thin air. Defendants sell
21   XRP wholesale to larger investors and also sell significant quantities of XRP directly to the general
22   public on cryptocurrency exchanges.

23
24                                                          |
25
26   _____
     [4]Ripple credits,
27   https://wiki.ripple.com/Ripple_credits#XRP_funds_the_development_and_promotion_of_the_protocol_and_the_netw
     ork (last visited May 3, 2018).
28

                                                5
                                          **COMPLAINT**

27. According to Ripple Labs itself, in the first quarter of 2018, "market participants purchased $16.6 million [of XRP] directly from XRP II. XRP II also "sold $151.1 million worth of XRP" on exchanges.[5]

28. Similarly, in the fourth quarter of 2017, "market participants purchased $20.1 million directly from XRP II," and XRP II sold an additional "$71.5 million worth of XRP" on exchanges.[6]

29. In the third quarter of 2017, "market participants purchased $19.6 million directly from XRP II," and XRP II sold an additional "$32.6 million worth of XRP" on exchanges.[7]

30. In the second quarter of 2017, "market participants purchased $21M directly from XRP II," and XRP II sold an additional "$10.3M worth of XRP" on exchanges.[8]

## C. DEFENDANTS MARKET XRP TO DRIVE DEMAND AND INCREASE PRICE

31. Given its reliance on sales of XRP, it is unsurprising that Ripple Labs aggressively markets XRP to drive demand, increase XRP's price, and thus its own profits.

32. Ripple Labs has an entire section of its website dedicated to providing advice on "How to Buy XRP." This section provides links to exchanges and instructions on "how to buy XRP" on those exchanges.[9] It also has a section titled "Market Performance" which proclaims that Ripple Labs is "committed to the long term health and stability of XRP markets."[10]

33. Ripple Labs also consistently promotes the availability of XRP on exchanges. For example, on May 18, 2017, it's Senior Vice-President for Business Development, Patrick Griffin, tweeted a link to the Kraken exchange with the caption: "Kraken Introduces New Fiat Pairs for XRP Trading! USD, JPY, CAD, EUR @Ripple."[11]

---

[5] Q1 2018 XRP Markets Report, https://ripple.com/insights/q1-2018-xrp-markets-report/ (last visited May 3, 2018).
[6] Q4 2017 XRP Markets Report, https://ripple.com/insights/q4-2017-xrp-markets-report/ (last visited May 3, 2018).
[7] Q3 2017 XRP Markets Report, https://ripple.com/insights/q3-2017-xrp-markets-report/ (last visited May 3, 2018).
[8] Q2 2017 XRP Markets Report, https://ripple.com/insights/q2-2017-xrp-markets-report/ (last visited May 3, 2018).
[9] XRP Buying Guide, https://ripple.com/xrp/buy-xrp/ (Last visited May 3, 2018).
[10] Market Performance, https://ripple.com/xrp/market-performance/ (Last visited May 3, 2018)
[11] @patgriffin9, https://twitter.com/patgriffin9/status/865251321867231233 (last visited May 3, 2018).

34.     Similarly, on or about December 21, 2017 Ripple Labs tweeted in Japanese that XRP was now available on over 50 exchanges.[12]  That tweet linked to an article on Ripple Labs' website which described XRP as "the fastest and most scalable [digital] asset on the market."[13]  It continued, "[t]he market is taking notice of XRP's speed, reliability and scalability — which has strengthened the demand for XRP and where it's listed. In fact, we're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide."  The article also links to a number of exchanges where XRP can be purchased, and states that "XRP's long-term value is determined by its utility — including its ability to help financial institutions source liquidity for payments into and out of emerging markets."

35.     Ripple Labs also hosts conferences to generate interest in XRP.  For example, between October 16 and October 18, 2017 it hosted a conference named "Swell" in Toronto.  Ripple Labs acknowledged that "[a]nticipation around the event spurred a meaningful spike in XRP, pushing it up 100 percent . . ."[14]

36.     On that same day, CoinDesk, a subsidiary of Digital Currency Group, which has an ownership interest in Ripple Labs, published an article titled "Ripple Price Passes Historic $1 Milestone."[15]  This was just one of many instances in which Ripple Labs would promote price movements of XRP.

37.     Ripple Labs' promotion of XRP's price reached new highs in December 2017.  In one instance Ripple's XRP product manager retweeted a tweet exclaiming: "Wow, XRP at all time high! Forget about bitcoin, *we're all in on XRP!*" (emphasis added).[16]

38.     Ripple Labs' CEO, Brad Garlinghouse, has also been a vocal advocate for investing in XRP.  In a December 14, 2017 interview with BNN, when asked if he is personally invested in XRP, the CEO stated "I'm long XRP, I'm very, very long XRP as a percentage of my personal

[12]@Ripple, https://twitter.com/Ripple/status/943999526783905792 (last visited May 3, 2018).
[13]XRP Now Available on 50 Exchanges Worldwide, https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/ (last visited May 3, 2018).
[14]Q3 2017 XRP Markets Report, https://ripple.com/xrp/q3-2017-xrp-markets-report/ (last visited May 3, 2018).
[15]Ripple Price Passes Historic $1 Milestone, https://www.coindesk.com/ripple-price-passes-historic-1-milestone/ (last visited May 3, 2018).
[16]@warpaul, https://twitter.com/yoshitaka_kitao/status/940785785925709829 (last visited May 3, 2018).

1    balance sheet." He continued, stating that he is "not long some of the other [digital] assets, because

2    it is not clear to me what's the real utility, what problem are they really solving." And ended by

3    reiterating "if you're solving a real problem, if it's a scaled problem, then I think you have a huge

4    opportunity to continue to grow that. We have been really fortunate obviously, *I remain very, very,*

5    *very long XRP*, there is an expression in the industry HODL, instead of hold, its HODL . .. I'm on

6    the HODL side." (emphasis added).

7        39.    Later that same day, Garlinghouse tweeted: "Bloomberg welcomes $XRP to

8    @theterminal and gets it right - #2 market cap behind $BTC at ~$80BB!"[17]

9        40.    About a week later, on or about December 22, 2017, Garlinghouse tweeted an article

10   titled "Bitcoin Is So 2017 as Ripple Soars at Year End," with the caption "I'll let the headline speak

11   for itself. $xrp."[18]

12       41.    On or about January 17, 2018, Garlinghouse tweeted a CNBC article titled "Ripple is

13   sitting on close to $80 billion and could cash out hundreds of millions per month – but it isn't," with

14   the caption "A good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."

15       42.    However, the reality was that Ripple Labs was doing exactly that. As laid out in

16   Section IV(B), Defendants sold at least $167.7 million worth of XRP between January 1, 2018 and

17   March 31, 2018.

18           **1.    Defendants Blur Differences Between Ripple Labs' Enterprise Solutions**

19                  **and XRP to Further Drive Demand**

20       43.    Defendants' advertising and social media postings also conflate adoption and use of

21   Ripple Labs' xCurrent and xVia enterprise solutions (collectively, "Ripple Enterprise Solutions")

22   with adoption and use of XRP, even though they often have little to no correlation. Plaintiff is

23   informed and believes and based thereon alleges that Defendants do this to drive demand for XRP

24   and thereby maximize profits from XRP sales.

25       44.    According to its site, "xCurrent is Ripple's enterprise software solution that enables

26   banks to instantly settle cross-border payments with end-to-end tracking. Using xCurrent, banks

27   _____

28   [17]@bgarlinghouse, https://twitter.com/bgarlinghouse/status/941375649549246464 (last visited May 3, 2018).
     [18]@bgarlinghouse, https://twitter.com/bgarlinghouse/status/944325730338357248 (last visited May 3, 2018).

message each other in real-time to confirm payment details prior to initiating the transaction and to confirm delivery once it settles."[19]

45.     xCurrent doesn't operate on the same technology as XRP or even require the use of XRP. In short, there is no reason to believe that adoption of xCurrent would correlate in any way with adoption of XRP.

46.     Nor does use of Ripple Labs' xVia product require adoption of XRP. Ripple Labs states that its xVia product is "for corporates, payment providers and banks who want to send payments across various networks using a standard interface."[20]

47.     Ripple labs nevertheless conflates the adoption of these Enterprise Solutions with adoption of XRP.

48.     For example, on March 20, 2017, Ripple Labs retweeted a Bloomberg article regarding adoption of Ripple Enterprise Solutions, proclaiming "Ripple is the only company in this space with real customers who are really in production."[21]

49.     The price of XRP increased rapidly following this tweet and on March 24, 2017 Ripple labs tweeted: "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."[22]

50.     On April 26, 2017, Ripple labs tweeted a link to an article on its own site, proclaiming: "#Ripple welcomes 10 additional customers to our #blockchain #payments network."[23] Neither this tweet nor the article it linked to informed readers that the blockchain payments network did not refer to the XRP Ledger, but rather Ripple's xCurrent enterprise solution.

51.     Just days later, on May 3, 2017, with the price of XRP continuing to rise, Ripple Labs tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last two months' via @Nasdaq."[24]

---

[19] Process Payments, xCurrent, https://ripple.com/solutions/process-payments/ (last visited May 3, 2018).
[5] Send Payments, xVia, https://ripple.com/solutions/send-payments/ (last visited May 3, 2018).
[21] @Ripple, https://twitter.com/Ripple/status/844009778309357568 (last visited May 3, 2018).
[22] @Ripple, https://twitter.com/Ripple/status/845347809830195200 (last visited May 3, 2018).
[23] @Ripple, https://twitter.com/Ripple/status/857267304618278912 (last visited May 3, 2018).
[24] @Ripple, https://twitter.com/Ripple/status/859904105916923904 (last visited May 3, 2018).

**COMPLAINT**

52.     Ripple Labs conflated the adoption of its Enterprise Solutions and XRP again on May 16, 2017, tweeting: "The appeal that Ripple has towards traditional financial institutions is a big advantage it has over Bitcoin."[25]

53.     On June 29, 2017, Ripple Labs tweeted a clip of an interview its CEO Brad Garlinghouse gave on CNBC with the caption: "#XRP – up 4000% this year – has shown the market favors a real use case for #digitalassets . . ."[26] In that interview, Garlinghouse proclaims that "digital assets are in a position to be more valuable than gold," and describes XRP as "solving a real-world use case, it's not just about speculators."

54.     On November 27, 2017, Garlinghouse tweeted "Ripple & $XRP are giving businesses 'what they want in a #blockchain,'" along with a link to a Motley Fool tweet.[27] That Motley Fool tweet in turn stated that "AmEx and Banco Santander will use Ripple's blockchain network for instant intl. fund transfers. ***Could be a big deal for Ripple's XRP cryptocurrency***. $AXP $SAN." (emphasis added).[28]

55.     Similarly, on December 14, 2017 Ripple Labs tweeted: "The Japan Bank Consortium launched a Ripple pilot with two large Korean banks – the first time money moves from Japan to Korea over RippleNet."[29] The tweet also linked to an article on Ripple Labs' site. Buried inside that article is the fact that "RippleNet" refers to Ripple's xCurrent enterprise solution, which does not require use of XRP. Nevertheless, on that same day Ripple Labs tweeted "@bgarlinghouse [its CEO's twitter handle] on why crypto prices will be driven by real utility, the multi-trillion $ problem @Ripple is solving and why $XRP will come out on top."[30]

56.     Ripple Labs would later acknowledge that "neither the AMEX news nor the Korean bank initiative involved XRP."

57.     Nevertheless, this tweet linked to a BNN interview with Mr. Garlinghouse, in which he says "the reason why XRP has performed so well this year, we're solving a real problem, it's a

---

[25]@Ripple, https://twitter.com/Ripple/status/864635614020251649 (last visited May 3, 2018).
[26]@Ripple, https://twitter.com/Ripple/status/880532198025121793 (last visited May 3, 2018).
[27]@bgarlinghouse, https://twitter.com/bgarlinghouse/status/935225940845711366 (last visited May 3, 2018).
[28]@themotleyfool, https://twitter.com/themotleyfool/status/934850515640471553 (last visited May 3, 2018).
[29]@Ripple, https://twitter.com/Ripple/status/941501026267316224 (last visited May 3, 2018).
[30]@Ripple, https://twitter.com/Ripple/status/941352005058011137 (last visited May 3, 2018).

**COMPLAINT**

multi-trillion dollar problem around cross-border payments. There is a lot of friction its very slow its expensive, we're working with the institutions to deal with that, so people have gotten excited. We now have over 100 customers we've announced publicly." He continues, "at the end of the day the value of digital assets will be driven by their utility. If they are solving a real problem, and that problem has scale, and that problem, you know there is real value there, then there will be demand for the tokens and the price will go up. For XRP we have seen because *its required*, its something that can really reduce the friction, and we're talking about a multi-trillion dollar problem in how cross-border payments flow. And so, I think if you drive real utility, yes there's going to be demand for that." "*XRP is up 100x this year*, and I think it's *because the problem we are solving people realize is a real problem, it's a big problem*." (emphasis added).

58. On January 4, 2018, following XRP's rapid price increase, the New York Times published an article by Nathaniel Popper titled: "Rise of Bitcoin Competitor Ripple Creates Wealth to Rival Zuckerberg."[31] Mr. Popper tweeted a link to this article with the caption: "On the rise of Ripple. If this is a tulip fever, the fever has spread to chrysanthemums and poppies."[32]

59. He further commented, "I've asked several people close to banks if banks are indeed planning to begin using Ripple's token, XRP, in a serious way, which is what investors seem to assume when they buy in at the current XRP prices. This is a sampling of what I heard back:

- Actual use of XRP by banks is not something I've heard about, I find the run up absolutely baffling, as do all the blockchain folks I know at large FIs.

- XRP isn't used for anything. The hope is that some day it will be by banks, but there really aren't banks signaling that yet.

- I would be surprised if there have been any real bank to bank transactions done with it (outside of maybe test transactions), despite people making claims to the contrary.

---

[31]Rise of Bitcoin Competitor Ripple Creates Wealth to Rival Zuckerberg, https://www.nytimes.com/2018/01/04/technology/bitcoin-ripple.html (last visited May 3, 2018).
[32]@nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited May 3, 2018).

- It's not clear to me why XRP would be used by banks at all. XRP could potentially be adopted by consumers as a payment rail, although they don't yet have meaningful traction in that regard.
- I haven't seen a sufficiently large catalyst in the fundamentals of Ripple to justify a greater than 10x move in the price of $XRP in the last month.
- In a few years we're going to look back on 2017 and think WTF were we thinking."

60. Ripple Labs' CEO Garlinghouse publicly responded to this, tweeting: "Over the last few months I've spoken with ACTUAL banks and payment providers. They are indeed planning to use xRapid (our XRP liquidity product) in a serious way. . ." He follows up stating, "I don't think you want to hear about validation for XRP. The @NYTimes should be above spreading anonymous FUD." FUD, which stands for fear, uncertainty, and doubt, is an expression frequently used among crypto-investors to deride or undermine criticism of an asset.

61. Ripple's XRP product manager, also attacked Mr. Popper, tweeting: "Do you think I left #Bitcoin and joined @Ripple to build bank software? Think again. $XRP."[33] This tweet linked to a Ripple Labs tweet stating that "3 of the top 5 global money transfer companies plan to use XRP in payment flows in 2018. Even more in the pipeline."

## 2. RIPPLE LABS ATTEMPTS TO PAY OFF EXCHANGES TO LIST XRP

62. Ripple Labs even attempted to bribe two U.S. cryptocurrency exchanges to list XRP to further drive demand for the token. Coinbase and Gemini provide the easiest ways for U.S.-customers to buy crypto-assets with U.S. dollars.[34] There is thus a perception that being listed on one of these exchanges will accelerate demand for, and thus the price of, a crypto-asset.

63. A listing on Coinbase, in particular, is considered to be a crypto-asset's golden ticket. This proved true when Coinbase listed Litecoin in August 2016 and Bitcoin Cash in December

---

[33]@Warren Paul Anderson, https://twitter.com/warpaul (last visited May 3, 2018).
[34]Many other exchanges do not allow users to make purchases with cash, but rather accept only other cryptocurrencies, like Bitcoin or Ethereum.

2017. When Coinbase listed Bitcoin Cash, its price increased from approximately $2,500 to approximately $3,400 just before Coinbase listed the asset. It then briefly shot up to $9,500 upon being listed on Coinbase before Coinbase temporarily halted trading.

64. Recognizing that getting its XRP listed on these exchanges could spur demand for XRP, and thereby allow it to maximize the profits it derives from XRP sales, Ripple Labs offered to bribe these exchanges to list XRP.

65. Bloomberg reported that "a Ripple executive asked whether a $1 million cash payment could persuade Gemini to list XRP in the third quarter," of 2017.[35]

66. Ripple Labs also, "said it would be willing to lend [Coinbase] more than $100 million worth of XRP to start letting users trade the asset . . ." Gemini and Coinbase both declined to pursue Ripple Labs' proposal.

67. On November 29, 2017 Ripple Labs posted a link to a change.org petition to "Get Ripple on Coinbase," with the caption "[t]he community is mobilizing! [thumbs up emoji]."[36] Ripple's Senior Vice President of Business Development also tweeted a link to the petition.

68. Weeks later on December 13, 2017 Ripple Labs' Senior Vice President of Business Development retweeted a tweet from Arrington XRP Capital (a hedge fund valued in XRP) stating: "It's stunning that coinbase hasn't added XRP yet."[37]

69. During this same late 2017 and early 2018 time period, rumors that XRP would be added to Coinbase fueled a massive price increase. Plaintiff is informed and believed and based thereon alleges that Defendants were the source of these rumors.

---

[35]Ripple is Said to Struggle to Buy U.S.-Listing for Popular Coin, https://www.bloomberg.com/amp/news/articles/2018-04-04/ripple-is-said-to-struggle-to-buy-u-s-listing-for-popular-coin (last visited May 3, 2018).
[36]@Ripple, https://twitter.com/Ripple/status/935923310080045056 (last visited May 3, 2018).
[37]@patgriffin9, https://twitter.com/arrington/status/941377930994769920 (last visited May 3, 2018).

COMPLAINT

3.    **Ripple Labs Publicly Limits the Supply of XRP to Drive Price Appreciation**

70.    Ripple Labs has also publicly limited the available supply of XRP in order to drive price appreciation and allow it to maximize profits from XRP sales.

71.    On or about May 16, 2017, Ripple Labs' CEO posted an article on its website, titled "Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply."[38] Ripple Labs promoted this article in a tweet stating: "We're placing 55B #XRP into a cryptographically secured escrow account to establish certainty around #XRP supply."[39]

72.    In that article Garlinghouse proclaims, "Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity. We engage in distribution strategies that we expect will result in a ***strengthening XRP exchange rate*** against other currencies." (emphasis added).  He continues, noting that "we have heard concerns in the market about uncertainty surrounding our ongoing XRP distribution. The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple! Our self-interest is aligned with building and maintaining a healthy XRP market."

73.    He commits to remove "that uncertainty by committing to place 55 billion XRP into a cryptographically-secured escrow account," which will allow investors to "mathematically verify the maximum supply of XRP that can enter the market."  He ends by stating that "XRP is the only digital asset with a clear use case . . . Designed for enterprise use, XRP can be used by financial institutions for on-demand liquidity for cross-border payments. Payment providers and banks using XRP will gain greater access to emerging markets and much lower settlement costs, and this is why we remain committed to increasing XRP liquidity and continued decentralization of its ledger."

74.    XRP's price increased rapidly following this announcement, and Ripple Labs' "Q2 2017 XRP Markets Report" listed the escrow announcement as "instrumental in helping to drive

---

[38]Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply, https://ripple.com/insights/ripple-to-place-55-billion-xrp-in-escrow-to-ensure-certainty-into-total-xrp-supply/ (last visited May 3, 2018).
[39]@Ripple, https://twitter.com/Ripple/status/864512213289123840 (last visited May 3, 2018).

**COMPLAINT**

1    XRP interest and volume," and noted that the "market responded favorably to the escrow"
2    announcement.

3          75.    On or about December 7, 2017, Ripple Labs announced that it had followed through
4    with its promise and placed "55 billion XRP in a cryptographically-secured escrow account to create
5    certainty of XRP supply at any given time."[40]

6          76.    It published an article detailing this escrow, which explained, "[b]y securing the lion's
7    share of XRP in escrow, people can now mathematically verify the maximum supply that can enter
8    the market. While Ripple has proved to be a responsible steward of XRP supply for almost five
9    years – and has clearly demonstrated a tremendous track record of investing in and supporting the
10   XRP ecosystem – *this lockup eliminates any concern that Ripple could flood the market, which
11   we've pointed out before is a scenario that would be bad for Ripple*!" (emphasis added).

12         77.    The article contained a button to allow readers to share it on twitter with the caption,
13   "Game changer for $XRP! 55 billion XRP now in escrow." Ripple Labs also promoted this article
14   through its own tweet, which proclaimed: "55B $XRP is now in escrow. Interested in what this
15   means for $XRP markets?"[41] Ripple's CEO was even more enthusiastic, tweeting: "Boom! 55B
16   $XRP now in escrow. Good for supply predictability and trusted, healthy $XRP markets. Glad to
17   finally let this #cryptokitty out of the bag!"[42]

18         78.    Ripple Labs' public commitment to limit the supply of XRP had its intended effect.
19   In the weeks that followed the price of XRP exploded upwards, from approximately 25 cents on
20   December 7, 2017 to $3.43 on January 3, 2018. It would then shed nearly all its value in just over
21   three months, falling to a low of approximately 46 cents on April 6, 2018.

22
23
24
25
26
---
27   [40] Ripple Escrows 55 Billion XRP for Supply Predictability, https://ripple.com/insights/ripple-escrows-55-billion-xrp-for-supply-predictability/ (last visited May 3, 2018).
     [41] @Ripple, https://twitter.com/Ripple/status/938933967956389889 (last visited May 3, 2018).
28   [42] @bgarlinghouse, https://twitter.com/bgarlinghouse/status/938933791145336832 (last visited May 3, 2018).

**COMPLAINT**

**D.     Defendants Acknowledge that Development of the XRP Ledger is Dependent on their Technical, Entrepreneurial, and Managerial Efforts**

79.     Defendants acknowledge that development of the XRP Ledger and success of XRP is Dependent on their technical, entrepreneurial, and managerial efforts.

80.     For example, in February 2017 Ripple Labs promoted a deal with BitGo to build an enterprise wallet and treasury management platform for XRP.[43]

81.     Ripple Labs also publishes a quarterly report detailing its efforts grow the "XRP ecosystem."[44]  In one of these reports, discussing its plan for "Q3 2017," Ripple Labs states that it "plans to focus on three areas of liquidity development as we drive XRP towards its natural position as the digital asset standard for international value transfer."  And ends by saying, "[m]ost importantly, we are accelerating the pace of *our investment* in the XRP Ledger to *build on its speed, uptime, and scalability, to ensure XRP is the most trusted enterprise-grade digital asset*." (emphases added).

82.     Three months later, in describing its goals for the fourth quarter of 2017, Ripple Labs proclaimed it would "continue to expand [its] xRapid partnerships."  It states that its "long-term goal is, and always has been, usage of XRP as a liquidity solution for more and more corridors, and partnerships are key to achieving this goal."[45]

83.     In January 2018, Ripple Labs touted "a partnership with MoneyGram—one of the world's largest money transfer companies—to use xRapid and XRP for near real-time cross-border payments.  In addition, there are a number of other xRapid deals at various stages of completion in the pipeline."  It also stated that it wanted "to build the necessary markets infrastructure for eventual direct usage of XRP by financial institutions."

---

[43] @patgriffin9, https://twitter.com/patgriffin9/status/831945571736834048 (last visited May 3, 2018).
[44] Announcing Quarterly XRP Market Operations Report, https://ripple.com/insights/announcing-quarterly-xrp-market-operations-report/ (last visited May 3, 2018).
[45] Q3 2017 XRP Markets Report, https://ripple.com/xrp/q3-2017-xrp-markets-report/ (last visited May 3, 2018).

84.     Its CEO commented on this partnership, saying: "And to be clear: @MoneyGram announcement is one step in a marathon ahead to truly make $XRP the global liquidity solution for payment providers and banks."[46]

**1.     Ripple Labs Promises R3 a 5 Billion XRP Option to Drive Adoption of XRP**

85.     Ripple Labs has also used XRP to enter into partnerships intended to drive the adoption of XRP, and even structured these agreements so that their partners compensation is tied to appreciation of XRP—just as companies often do with shares to ensure that their interests are aligned. In early 2016 Ripple Labs promised R3 Holdco, LLC ("R3"), an enterprise software firm with a network of banks and financial institutions, the option to purchase five billion XRP in exchange for R3 providing Ripple Labs with access to R3's consortium of member banks and financial institutions—thereby driving adoption of XRP.

86.     When the price of XRP rose rapidly, Ripple Labs repudiated the deal, which had provided R3 the option to purchase 5 billion XRP at $0.085 per XRP. Ripple Labs claimed that R3 had failed to commercialize Ripple's technology in connection with the use of XRP as the parties had agreed.

**E.     Ripple Labs Maintains the Centralized XRP Ledger**

87.     Defendants, and Ripple Labs in particular, are also entirely responsible for maintaining the XRP Ledger.

88.     Unlike cryptocurrencies such as Bitcoin and Ethereum, which use a Proof of Work ("PoW") consensus mechanism to verify the legitimacy of transactions on the network, the XRP Ledger relies on trusted nodes operated by Ripple Labs to verify the legitimacy of transactions and maintain agreement on the network. The PoW mechanism utilized by Bitcoin and Ethereum helps to ensure the network is decentralized by allowing anyone to use their own hardware and electricity to run the PoW consensus algorithm to verify transactions on the public ledger and send them to be recorded throughout the blockchain. The network's decision-making process is thus placed entirely

---

[46]@bgarlinghouse, https://twitter.com/bgarlinghouse/status/951461582424358912 (last visited May 3, 2018).

**COMPLAINT**

1  in the hands of those who run the consensus algorithm with their own hardware and electricity,

2  rather than any one entity or individual. Bitcoin currently has approximately 9,933 public nodes,

3  while Ethereum has 18,266.

4       89.   The XRP Ledger consensus protocol, on the other hand, relies almost entirely on

5  "trusted nodes" on the Unique Node Lists ("UNL"). The UNL is the set of trusted nodes that

6  communicate "reliable" information to other nodes on the XRP Ledger. Like miners in Bitcoin and

7  Ethereum, these "trusted nodes" validate transactions. However, unlike those miners, the trusted

8  nodes are either selected or controlled by Ripple Labs itself. Ripple Labs provides its own default

9  and recommended UNL—currently comprised of only five Ripple Labs-hosted nodes. Although

10  Ripple Labs claims it plans to decentralize the network, it admits that it will only remove its own

11  "trusted nodes" if it decides that other validator nodes are reliable, reputable, stable, and secure.[47]

12  Ripple Labs' view of decentralization of the XRP Ledger still involves Ripple Labs maintaining full

13  control over the Ledger and deciding who owns and operates any third-party "trusted nodes."

14       90.   In January 2018, BitMex Research, a blockchain research group, installed and ran a

15  copy of Rippled (the software that allows users to run nodes on the XRP Ledger).[48] "The node

16  operated by downloading a list of five public keys from the server v1.ripple.com." "The software

17  indicates that four of the five keys are required to support a proposal in order for it to be accepted

18  [on the XRP Ledger]." However, "[a]ll five keys are assigned to Ripple.com." BitMex Research

19  concludes that "[s]ince the keys were all downloaded from the Ripple.com server, *Ripple is*

20  *essentially in complete control of moving the ledger forward*, so one could say *the system is*

21  *centralized*." (emphasis added).

22       91.   BitMex Research continues, "the Ripple system appears for all practical purposes to

23  be centralized and is therefore perhaps devoid of any interesting technical characteristics, such as

4  censorship resistance, which coins like Bitcoin may have. . ."

25

26  [47]Decentralization Strategy Update, https://ripple.com/dev-blog/decentralization-strategy-update/ (last visited May 3,
    2018); How We Are Further Decentralizing the Ripple Consensus Ledger, https://ripple.com/insights/how-we-are-
27  further-decentralizing-the-ripple-consensus-ledger-rcl-to-bolster-robustness-for-enterprise-use/ (last visited May 3,
    2018).
28  [48]The Ripple Story, https://blog.bitmex.com/the-ripple-story/ (last visited May 3, 2018).

92.     Ripple's own XRP product manager, Warren Paul Anderson, frequently markets the XRP Ledger's dependence on Ripple Labs' continued commitment to it.  For example on December 14, 2016, he tweeted: "Thrilled to have the rippled team in town for a summit to discuss the future of @Ripple Consensus Ledger & XRP as a native digital asset!"[49]  Approximately a year later, in December 2017 he retweeted that, saying "It's that time of year again, and what a year its been! #XRP Ledger (rippled) core developers in town @Ripple for a summit to discuss planning for 2018."[50]

93.     Later that same day he posted a picture of Ripple Labs engineers with the caption, "A great day of reflection & planning @Ripple w/ the greatest C++ engineering team in the world #XRP."[51]  On that same day, Ripple's head of cryptography posted: "Today, all the $XRP Ledger developers at @Ripple are in SF to reflect on 2017 and plan for 2018."[52]

94.     Later in the month, on December 29, 2017, a Ripple software engineer, Nik Bougalis, tweeted: "I've been working on code review for the last couple days.  Excited to get rippled 0.90.0 out the door,"[53] indicating that Ripple Labs was working to get a new version of Rippled out and thereby advance the XRP Ledger.

95.     On January 9, 2018, Anderson tacitly admits that the XRP Ledger remains centralized, tweeting that the "[n]ew $XRP Ledger (rippled) 0.81.0 release gets us one-step closer to executing on our aforementioned decentralization strategy. . ."

96.     Following, Ripple's release of a Rippled upgrade, Bougalis tweeted, "[t]he C++ team has released rippled 0.90.0. Cool new features: history sharding, deposit authorizations, checks and more!"[54]  When asked about Rippled, Bougalis continues, "[i]t's the software one uses to run a server that connects to the XRP Ledger."

---

[49]@warpaul, https://twitter.com/warpaul/status/809047284717469696 (last visited May 3, 2018).
[50]@warpaul, https://twitter.com/warpaul/status/940970970759573505 (last visited May 3, 2018).
[51]@warpaul, https://twitter.com/warpaul/status/941087297360994304 (last visited May 3, 2018).
[52]@JoelKatz, https://twitter.com/JoelKatz (last visited May 3, 2018).
[53]@nbougalis, https://twitter.com/nbougalis/status/946829572145741824 (last visited May 3, 2018).
[54]@nbougalis, https://twitter.com/nbougalis/status/966106932925882368 (last visited May 3, 2018).

19
**COMPLAINT**

97.    On March 5, 2015, Bougalis similarly reposted a tweet defending investing in XRP by stating: "So you'd invest in Linux, not Microsoft. In UseNet, not Google. In MySQL, not Oracle. Good luck with your portfolio. ***Ripple is the next Google***. You're stuck in the silly idea that *a company can't build a digital asset, even when it does this right under your nose*," with the caption, "[n]ow that's a mic drop, if I've ever seen one."[55] (emphasis added).

98.    Ripple Labs also owns and maintains the github.com/ripple/rippled GitHub which is used to update the XRP Ledger, and one location where Rippled can be downloaded.

99.    Ripple Labs also pays bounties to those who identify bugs in their software, stating that "we are very generous with the bug bounties we pay. Anyone that found and responsibly disclosed such a bug would get a significant reward."[56]

### F.    XRP IS A SECURITY

#### 1.    XRP Purchasers Made an Investment of Money in A Common Enterprise

100.    Plaintiff and the Class invested fiat and other digital currencies, such as Bitcoin and Ethereum, to purchase XRP. Investment of both fiat and digital currency meets the first prong of *Howey*.

101.    Defendants concede that they sell XRP tokens to the general public through cryptocurrency exchanges.

102.    The profits of each investor in XRP are inextricably intertwined with those of all other purchasers because XRP is fungible. As Defendants note, it can be bought or sold on over 50 exchanges.

103.    The profits of Plaintiff and the Class are also intertwined with the fortunes of Ripple Labs. Ripple Labs concedes that it "sells XRP to fund its operations and promote the network. This allows Ripple Labs to have a spectacularly skilled team to develop[e] and promote the Ripple protocol and network."[57]

---

[55]@nbougalis, https://twitter.com/nbougalis/status/970733741319503872 (last visited May 3, 2018).
[56]@nbougalis, https://twitter.com/nbougalis/status/987052572283318273 (last visited May 3, 2018).
[57]Ripple credits,
https://wiki.ripple.com/Ripple_credits#XRP_funds_the_development_and_promotion_of_the_protocol_and_the_netw ork (last visited May 3, 2018).

104.  Ripple's CEO has conceded that, "Our self-interest is aligned with building and maintaining a healthy XRP market."

105.  As further explained in Section IV(F)(3) below the price of XRP is dependent on development and adoption of the XRP Ledger, which in turn is entirely dependent on the efforts of Defendants and their employees or agents.

**2.    XRP Investors Had a Reasonable Expectation of Profits**

106.  Investors in XRP, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.

107.  Defendants themselves have recognized that XRP investors have a reasonable expectation of profit, and publicly touted XRP's price performance on numerous occasions.  Ripple Labs' website even contains an "XRP Buying Guide" that provides links to exchanges and instructions on "how to buy XRP" on those exchanges.[58]

108.  Ripple's CEO has publicly touted that he himself is "*very, very, very long XRP*," and criticized journalists who suggest that enterprise adoption of XRP may not be as high as Ripple Labs indicates.

109.  Ripple Labs also directly controls the inflation rate of XRP, going so far as to lock more than half the supply of XRP in escrow to provide "supply predictability and trusted, healthy \$XRP markets."  This announcement had its intended effect, driving the price of XRP rapidly upwards.

110.  Defendants also pooled XRP investments to fund projects that would promote "the XRP Ledger and Interledger Protocol," thereby increasing the value of the XRP Ledger and XRP.

111.  For example, on April 11, 2018, Ripple Labs announced that it "had invested \$25 million in XRP to Blockchain Capital Parallel IV, LP," to "support and develop additional [XRP] use cases beyond payments."[59]  Ripple Labs' Senior Vice President of Business Development

---

[58] XRP Buying Guide, https://ripple.com/xrp/buy-xrp/ (Last visited May 3, 2018).
[59] Ripple Invests \$25 Million to Drive Innovation in Blockchain and Digital Assets, https://ripple.com/insights/ripple-invests-25-million-to-drive-innovation-in-blockchain-and-digital-assets/ (Last visited May 3, 2018).

1   promoted this investment, tweeting, "Ripple's $25 million investment in @blockchaincap's new

2   fund is the first and not the last contribution to ventures that further develop the #blockchain and

3   $XRP ecosystems."[60]

4             **3.    The Success of XRP Requires Efforts of Ripple Labs and Others**

5             112.   Lead Plaintiff and the Class have entirely passive roles vis-à-vis the success of the

6   XRP Ledger and XRP.  Rather, as Defendants' own marketing makes clear, the success of the XRP

7   Ledger, and the profits the Class reasonably expected to derive from investing in XRP are dependent

8   solely on the technical, entrepreneurial, and managerial efforts of Defendants and their agents and

9   employees.

10            113.   Lead Plaintiff and the Class reasonably expected defendants to provide significant

11  managerial efforts, to develop and improve the XRP Ledger, to develop and sustain a supportive

12  network, and to secure exchanges through which XRP can be traded or liquidated.  Defendants

13  repeatedly represented that they would provide significant managerial efforts to achieve these

14  objectives and make the XRP Ledger a success.

15            114.   Ripple Labs created the XRP Ledger and all 100 billion XRP in circulation, and

16  concedes that it "sells XRP to fund its operations and promote the network," in order "to have a

17  spectacularly skilled team to develop[e] and promote the Ripple protocol and network."[61]  And as

18  of April 22, 2018, Ripple Labs still holds at least 60.83 billion XRP—more than 60 percent of the

19  XRP in circulation.[62]

20            115.   Ripple Labs touts its control over the XRP Ledger as an advantage for XRP,

21  contending that governance "may be where XRP most significantly distinguishes itself [from

22  Bitcoin, Ethereum, and Litecoin] going forward."  "Building pivotal infrastructure on top of

23  technology that does not have clear governance is not palatable for large established companies."

24

25

26  _____
    [60]@patgriffin9, https://twitter.com/Ripple/status/984061347078987776 (last visited May 3, 2018).
    [61]Ripple credits,
27  https://wiki.ripple.com/Ripple_credits#XRP_funds_the_development_and_promotion_of_the_protocol_and_the_netw
    ork (last visited May 3, 2018).
28  [62]Market Performance, https://ripple.com/xrp/market-performance/ (last visited May 3, 2018).

116.  Ripple Labs also exercises near complete control over the XRP Ledger itself.  XRP Ledger nodes operate "by downloading a list of five public keys from the server v1.ripple.com." "The software indicates that four of the five keys are required to support a proposal in order for it to be accepted [on the XRP Ledger]."  However, "[a]ll five keys are assigned to Ripple.com." "Since the keys were all downloaded from the Ripple.com server, *Ripple is essentially in complete control of moving the ledger forward*, so one could say *the system is centralized*."  (emphasis added).  "[T]he Ripple system appears for all practical purposes to be centralized and is therefore perhaps devoid of any interesting technical characteristics, such as censorship resistance, which coins like Bitcoin may have. . ."

117.  Ripple Labs and its CEO have acknowledged that the value of XRP will be driven by the XRP Ledger's usefulness in solving cross-border payments and its adoption by enterprises. Defendants have similarly touted adoption of Ripple Labs' Enterprise Solutions, even when those Enterprise Solutions do not actually utilize XRP.

118.  XRP therefore derives its value entirely from the usefulness and popularity of the XRP Ledger, which is in turn dependent entirely on the technical, entrepreneurial, and managerial efforts of Defendants.  The purchase of XRP is thus an investment in a common enterprise, with an expectation of profits, solely from the efforts of Defendants.

## V.    PLAINTIFF RYAN COFFEY'S PURCAHSE OF XRP

119.  Plaintiff Coffey purchased 650 XRP on or about January 5, 2018 at a price of $2.60 each, paying a total of $1,690.

120.  Plaintiff Coffey then sold 649.98 XRP on or about January 18, 2018 at a price of approximately $1.70 each, receiving a total of 1,104.96 USDTs for the XRP he paid $1,690 for.

121.  USDT is an acronym for U.S. Dollar Tether, a cryptocurrency which is purportedly backed by U.S. dollars and whose price thus generally tracks that of the actual dollar closely. Records taken from coinmarketcap.com show that one USDT was valued at approximately $1.03 on January 18, 2018.  Mr. Coffey thus received approximately $1,138.15 (1,104.96*1.03) in

exchange for the XRP he sold, sustaining a loss of approximately $551.89, or over 32 percent his initial investment.

## VI.    CLASS ACTION ALLEGATIONS

122.   This suit is brought as a Class action pursuant to section 382 of the California Code of Civil Procedure, on behalf of a Class of:

> **All persons or entities who purchased XRP from January 1, 2013 through the present. Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of Defendants; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.**

123.   Plaintiff reserve the right to maned the Class definition if further investigation and/or discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

124.   Plaintiff does not, as of yet, know the exact size of the Class.  However, Plaintiff is informed and believes that there are thousands of Class members.  The members of the Class are thus so numerous that joinder of all members is impracticable.

125.   The Class is readily ascertainable and identifiable.  It can be identified by reference to Defendants' own databases, the XRP Ledger, and cryptocurrency exchange databases.

126.   Questions of law and fact common to the Class that predominate over any questions that may affect only individual members of the Class, including, but not limited to:

(a)     Whether XRP are securities under the Securities Act;

(b)     Whether Defendants' ongoing sale of XRP violates the registration provisions of the Securities Act;

(c)     Whether Defendants' ongoing sale of XRP violates the registration provisions of the California Corporations Code; and

(d)     The type and measure of damages suffered by Plaintiff and the Class.

127.   Lead Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff's claims are typical and representative of the claims of all members of the Class.  Lead Plaintiff suffered injury in fact when he purchased 650 XRP on or about January 6, 2018 at a rate

of $2.60 per XRP and sold that same XRP for approximately $1.70 per XRP on or about January

18, 2018—a total loss of approximately $551.89.

128. Lead Plaintiff's claims are typical of the claims of all Class members, as all members
of the Class are similarly affected by Defendants' wrongful conduct in violation of state and federal
securities laws.

129. There are no unique defenses that may be asserted against Lead Plaintiff individually,
as distinguished from the other members of the Class, and the relief sought is common to the Class.
Plaintiff is typical of other members of the Class, does not have any interest that is in conflict with
or is antagonistic to the interests of the members of the Class, and has no conflict with any other
members of the Class. Plaintiff has retained competent counsel experienced in securities, consumer
protection, and Class action litigation to represent himself and the Class.

130. A class action is superior to other available methods for the fair and efficient
adjudication of this controversy since joinder of all Class members is impracticable. Furthermore,
as the damages suffered by individual Class members may be relatively small, the expense and
burden of individual litigation make it impossible for Class members to redress individually the
wrongs done to them. In the absence of a class action, Defendants will retain the benefits of their
wrongful conduct.

## VII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a)(1) of the**

**Securities Act (Against All Defendants)**

131. Plaintiff, on behalf of himself and all others similarly situated, realleges and
incorporates herein by reference each and every allegation contained in the preceding paragraphs of
this Complaint, and further alleges as follows:

132. Defendants, and each of them, by engaging in the conduct described above, directly
or indirectly, made use of means or instruments of transportation or communication in interstate

1  commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to
2  be carried through the mails or in interstate commerce for the purpose of sale or for delivery after
3  sale.

4      133.  XRP are securities within the meaning of Section 2(a)(1) of the Securities Act, 15
5  U.S.C. § 77b(a)(1).

6      134.  Plaintiff and members of the Class purchased XRP securities from Defendants.

7      135.  No registration statements have been filed with the SEC or have been in effect with
8  respect to any of the offerings alleged herein.

9      136.  By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c),
10  and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a) , 77e(c), and 77l(a).

11      137.  As a direct and proximate result of Defendants' unregistered sale of securities,
12  Plaintiff and members of the Class have suffered damages in connection with their respective
13  purchases of XRP securities.

14                                    **SECOND CAUSE OF ACTION**

15      **Unregistered Offer and Sale of Securities in Violation of California Corporations Code**
16                        **Section 25110 and 25503 (Against All Defendants)**

17      138.  Plaintiff, on behalf of himself and all others similarly situated, realleges and
18  incorporates herein by reference each and every allegation contained in the preceding paragraphs of
19  this Complaint, and further alleges as follows:

20      139.  XRP are securities within the meaning of the California Corporations Code.

21      140.  Defendants, and each of them, by engaging in the conduct described above within
22  California, directly or indirectly, sold and offered to sell securities.

23      141.  Plaintiff and members of the Class purchased XRP securities from Defendants.

24      142.  No registration statements have been filed with any state or federal government entity
25  or have been in effect with respect to any of the offerings alleged herein.

26      143.  By reason of the foregoing, each of the Defendants have violated Sections and 25110
27  and 25503 of the California Corporations Code.

28

144. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and members of the Class have suffered damages in connection with their respective purchases of XRP securities.

## THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act (Against Ripple Labs and Brad Garlinghouse)**

145. Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

146. This Count is asserted against Defendants Ripple Labs and Brad Garlinghouse (collectively, the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. § 77o.

147. The Control Person Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of XRP securities as described herein.

148. The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XRP II, through ownership of voting securities, by contract, subscription agreement, or otherwise.

149. Defendant Garlinghouse also has the power to direct or cause the direction of the management and policies of Ripple Labs.

150. The Control Person Defendants, separately or together, have sufficient influence to have caused XRP II and/or Ripple Labs to submit a registration statement.

151. The Control Person Defendants, separately or together, jointly participated in, and/or aided and abetted, XRP II and/or Ripple Labs' failure to register XRP.

152.  By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Lead Plaintiff and the Class for recession and/or damages suffered.

## FOURTH CAUSE OF ACTION

### Violation of Section 25504 of the California Corporations Code (Against Ripple Labs and Brad Garlinghouse

153.  Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

154.  This Count is asserted against the Control Person Defendants under Section 25504 of the California Corporations Code.

155.  The Control Person Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 25504 of the California Corporations Code. The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of XRP securities as described herein.

156.  The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XRP II, through ownership of voting securities, by contract, subscription agreement, or otherwise.  Defendant Garlinghouse also has the power to direct or cause the direction of the management and policies of Ripple Labs.

157.  The Control Person Defendants, separately or together, have sufficient influence to have caused XRP II and/or Ripple Labs to submit a registration statement.

158.  The Control Person Defendants, separately or together, jointly participated in, and/or aided and abetted, XRP II and/or Ripple Labs' failure to register XRP.

159. By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Lead Plaintiff and the Class for recession and/or damages suffered.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on his behalf and that of the Class as follows:

1.     Declaring that this action may be maintained as a Class action under California Code of Civil Procedure section 382 and California Rule of Court 3.670, *et seq.*, certifying Plaintiff as representative of the Class and designating his counsel as counsel for the Class;

2.     Declaring that Defendants offered and sold unregistered securities in violation of Sections 5(a), 12 (a), and 15 of the Securities Act;

3.     Declaring that Defendants offered and sold unregistered securities in violation of Section 25110, 25503, and 25504 of the California Corporations Code;

4.     That judgment be entered against Defendants and in favor of Plaintiff and each member of the Class he represents, granting the remedy of recession, and/or awarding compensatory damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

5.     Requiring an accounting of all remaining assets and funds raised by Defendants through the sale of XRP;

6.     Imposing a constructive trust over the assets and funds raised by Defendants through the sale of XRP;

7.     Enjoining and restraining Defendants from violating the securities laws through the continued unregistered sale of XRP;

8.     For punitive damages;

9.     For pre and post-judgment interest;

10.    For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

11.    For attorneys' fees;

COMPLAINT

12.  For costs of suit; and

13.  For such other and further relief as may be deemed just and proper.

Dated: May 3, 2018                    **TAYLOR-COPELAND LAW**

By: _____
James Q. Taylor-Copeland

Attorney for Lead Plaintiff Ryan Coffey

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| James Taylor-Copeland (SBN 284743)<br>Taylor-Copeland Law<br>501 W. Broadway Suite 800<br>San Diego, CA 92101<br>TELEPHONE NO.: 619-400-4944    FAX NO.:<br>ATTORNEY FOR *(Name):* Ryan Coffey | **FILED**<br>*San Francisco County Superior Court*<br>**MAY 03 2018**<br>CLERK OF THE COURT<br>BY: _Chalene Johnio_<br>Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco |
|---|
| STREET ADDRESS: 400 McAllister St.<br>MAILING ADDRESS: 400 McAllister St.<br>CITY AND ZIP CODE: San Francisco, CA 94102<br>BRANCH NAME: Civic Center Courthouse |

| CASE NAME:<br>Ryan Coffey v. Ripple Labs, Inc., et. al. | |
|---|---|

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER:<br>**CGC-18-566271** |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)    [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [✓] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [✓] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action *(specify):* 4
5. This case [✓] is   [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 3, 2018

James Taylor-Copeland
_____
(TYPE OR PRINT NAME)

▶ _/s/_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**BY FAX**
ONE LEGAL LLC

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |
|---|---|---|

CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

To Plaintiffs and Others Filing First Papers. If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

To Parties in Rule 3.740 Collections Cases. A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

To Parties in Complex Cases. In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| James Taylor Copeland, 284743<br>Taylor-Copeland Law<br>1422 Yost Dr.<br>San Diego, CA 92109<br>TELEPHONE NO.: (202)553-7860<br>ATTORNEY FOR *(Name):* Plaintiff | ELECTRONICALLY<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**05/10/2018**<br>Clerk of the Court<br>BY:YOLANDA TABO-RAMII<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, San Francisco County
400 McAllister Street
San Francisco, CA 94102

PLAINTIFF/PETITIONER: Ryan Coffey

DEFENDANT/RESPONDENT: Ripple Labs, Inc., et al.

| | CASE NUMBER: |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | CGC-18-566271 |
| | Ref. No. or File No.:<br>None |

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Complaint, Civil Case Cover Sheet, Summons, Notice to Plaintiff, ADR Package

3. a. Party served: Ripple Labs, Inc., a Delaware corporation

   b. Person Served: Norman Reed - Person Authorized to Accept Service of Process

4. Address where the party was served: 315 Montgomery St., 2nd Fl.
   San Francisco, CA 94104

5. I served the party
   b. **by substituted service.** On (date): 05/04/2018 at (time): 3:28PM I left the documents listed in item 2 with or
   in the presence of: Bernando Diaz - Security Officer - Person In Charge Of Office
   (1) (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the
   person to be served. I informed him or her of the general nature of the papers.

   (4) A declaration of mailing is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   d. on behalf of:
   Ripple Labs, Inc., a Delaware corporation

   under: CCP 416.10 (corporation)

7. **Person who served papers**
   a. Name: J. Alan Constant
   b. Address: One Legal - 194-Marin
      504 Redwood Blvd #223
      Novato, CA 94947
   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 102.75
   e. I am:
      (3) registered California process server.
         (i) Employee or independent contractor.
         (ii) Registration No.: 2015-0001199
         (iii) County San Francisco

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 05/09/2018

J. Alan Constant
(NAME OF PERSON WHO SERVED PAPERS)                                    (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 11949124

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*: | | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|---|
| James Taylor Copeland, 284743<br>Taylor-Copeland Law<br>1422 Yost Dr.<br>San Diego, CA 92109<br>ATTORNEY FOR *(Name):* **Plaintiff** | | **(202)553-7860** | |

Ref. No. or File No.

None

Insert name of court, judicial district or branch court, if any:

San Francisco-McAllister
400 McAllister Street
San Francisco, CA 94102

PLAINTIFF:
Ryan Coffey

DEFENDANT:
Ripple Labs, Inc., et al.

| **PROOF OF SERVICE BY MAIL** | | | | CASE NUMBER:<br>CGC-18-566271 |
|---|---|---|---|---|

## BY FAX

I am a citizen of the United States, over the age of 18 and not a party to the within action. My business address is 504 Redwood Blvd., Suite 223 Novato, CA 94947.

On 05/09/2018, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCP 4(e)(2)(B) or FRCP 4(h)(1)(B) was made (if applicable), I mailed copies of the:

Complaint, Civil Case Cover Sheet, Summons, Notice to Plaintiff, ADR Package

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Ripple Labs, Inc., a Delaware corporation

Norman Reed

315 Montgomery St., 2nd Fl.

San Francisco, CA 94104

I am readily familiar with the firm's practice for collection and processing of documents for mailing. Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

Fee for Service: $ 102.75

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on 05/09/2018 at Los Angeles, California.

One Legal - 194-Marin

504 Redwood Blvd #223

Novato, CA 94947

*Peter Fuster*

Peter Fuster

OL# 11949124

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| James Taylor Copeland, 284743<br>Taylor-Copeland Law<br>1422 Yost Dr.<br>San Diego, CA 92109<br>TELEPHONE NO.: (202)553-7860<br>ATTORNEY FOR (Name): Plaintiff | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**05/14/2018**<br>**Clerk of the Court**<br>BY:YOLANDA TABO-RAMII<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

Superior Court of California, San Francisco County
400 McAllister Street
San Francisco, CA 94102

| PLAINTIFF/PETITIONER: Ryan Coffey | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Ripple Labs, Inc., et al. | CGC-18-566271 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>None |
|---|---|

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Complaint, Civil Case Cover Sheet, Summons, Notice to Plaintiff, ADR Package

3. a. Party served: Bradley Garlinghouse, an individual

   b. Person Served: Deborah McKimmon - Senior Counsel - Person In Charge Of Office

4. Address where the party was served: 315 Montgomery St., 2nd Fl.

   San Francisco , CA 94104

5. I served the party
   b. by substituted service. On (date): 05/09/2018    at (time): 2:12PM    I left the documents listed in item 2 with or
   in the presence of: Deborah McKimmon - Senior Counsel - Person In Charge Of Office
   (1) (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be
   served. I informed him or her of the general nature of the papers.
   (4) A declaration of mailing is attached.
   (5) I attach a declaration of diligence stating actions taken first to attempt personal service.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   a. as an individual defendant.

7. **Person who served papers**
   a. Name: J. Alan Constant
   b. Address: One Legal - 194-Marin
      504 Redwood Blvd #223
      Novato, CA 94947
   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 102.75
   e. I am:
      (3) registered California process server.
         (i) Employee or independent contractor.
         (ii) Registration No.: 2015-0001199
         (iii) County: San Francisco

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 05/10/2018

J. Alan Constant
(NAME OF PERSON WHO SERVED PAPERS)                              (SIGNATURE)

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 11949125

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): | | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|---|
| James Taylor Copeland, 284743<br>Taylor-Copeland Law<br>1422 Yost Dr.<br>San Diego, CA 92109 | | (202)553-7860 | |
| ATTORNEY FOR (Name): Plaintiff | Ref. No. or File No.<br>None | | |

Insert name of court, judicial district or branch court, if any:

San Francisco-McAllister
400 McAllister Street
San Francisco, CA 94102

PLAINTIFF:

Ryan Coffey

DEFENDANT:

Ripple Labs, Inc., et al.

| **DECLARATION OF<br>DILIGENCE** | | | | CASE NUMBER:<br>CGC-18-566271 |
|---|---|---|---|---|

I received the within process on 5/3/2018 and that after due and diligent effort I have been unable to personally serve said party. The following itemization of the dates and times of attempts details the efforts required to effect personal service. Additional costs for diligence are recoverable under CCP §1033.5 (a)(4)(B).

PARTY SERVED: Bradley Garlinghouse, an individual

(1)Business: Ripple Labs 315 Montgomery St., 2nd Fl., San Francisco , CA 94104

# BY FAX

As enumerated below:

On 5/4/2018 3:28:00 PM at address (1) above. Not In Not in.
On 5/7/2018 9:20:00 AM at address (1) above. Not In Not in.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on 05/10/2018 at Los Angeles, California.

Registered California process server.
County: San Francisco
Registration No.: 2015-0001199
J. Alan Constant
One Legal - 194-Marin
504 Redwood Blvd #223
Novato, CA 94947



OL # 11949125

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): | | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|---|
| James Taylor Copeland, 284743<br>Taylor-Copeland Law<br>1422 Yost Dr.<br>San Diego, CA 92109 | | (202)553-7860 | |
| ATTORNEY FOR (Name): Plaintiff | Ref. No. or File No.<br>None | | |

Insert name of court, judicial district or branch court, if any:

San Francisco-McAllister
400 McAllister Street
San Francisco, CA 94102

PLAINTIFF:

Ryan Coffey

DEFENDANT:

Ripple Labs, Inc., et al.

| **PROOF OF SERVICE BY MAIL** | | | | CASE NUMBER:<br>CGC-18-566271 |
|---|---|---|---|---|

**BY FAX**

I am a citizen of the United States, over the age of 18 and not a party to the within action.  My business address is 504 Redwood Blvd., Suite 223 Novato, CA 94947.

On 05/10/2018, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCP 4(e)(2)(B) or FRCP 4(h)(1)(B) was made (if applicable), I mailed copies of the:

Complaint, Civil Case Cover Sheet, Summons, Notice to Plaintiff, ADR Package

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Los Angeles , California, addressed as follows:

Bradley Garlinghouse, an individual

315 Montgomery St., 2nd Fl.
San Francisco , CA 94104

I am readily familiar with the firm's practice for collection and processing of documents for mailing.  Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

---

Fee for Service: $ 102.75

One Legal - 194-Marin
504 Redwood Blvd #223
Novato, CA 94947

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on 05/10/2018 at Los Angeles, California.

*Peter Fuster*

Peter Fuster

OL # 11949125

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **OCT-03-2018**

**TIME:** **10:30AM**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.  **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
(SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3869

See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.

# Exhibit 2

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Peter B. Morrison (SBN 230148)<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>300 South Grand Ave., Ste. 3400<br>Los Angeles, CA 90071<br>TELEPHONE NO.: (213) 687-5000   FAX NO. *(Optional):* (213) 687-5600<br>E-MAIL ADDRESS *(Optional):* peter.morrison@skadden.com<br>ATTORNEY FOR *(Name):* Ripple Labs Inc. et al. | **ENDORSED FILED**<br>**SAN MATEO COUNTY**<br>OCT 2 5 2018<br>Clerk of the Superior Court<br>By: ANTONIO R. GERONIMO<br>Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo | |
|---|---|
| STREET ADDRESS: 400 County Center | |
| MAILING ADDRESS: 400 County Center | |
| CITY AND ZIP CODE: Redwood City, CA 94063 | |
| BRANCH NAME: | |

| PLAINTIFF/PETITIONER: Avner Greenwald | CASE NUMBER:<br>18-CIV-03461 |
|---|---|
| DEFENDANT/RESPONDENT: Ripple Labs Inc. et al. | JUDICIAL OFFICER: |

| **NOTICE OF RELATED CASE** | DEPT.: |
|---|---|

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: In Re Ripple Labs Inc. Litigation
   b. Case number: Lead Case No. 18-CIV-02845
   c. Court: [✔] same as above
      [ ] other state or federal court *(name and address):*
   d. Department: 16
   e. Case type: [ ] limited civil [✔] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*
   f. Filing date: 6/5/18; 6/27/18
   g. Has this case been designated or determined as "complex?" [✔] Yes [ ] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [✔] involves the same parties and is based on the same or similar claims.
      [✔] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [ ] involves claims against, title to, possession of, or damages to the same property.
      [✔] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [✔] pending
      [ ] dismissed [ ] with [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: [ ] same as above
      [ ] other state or federal court *(name and address):*
   d. Department:

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courtinfo.ca.gov* |
|---|---|---|

COPY   FAXED

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER:  Avner Greenwald | CASE NUMBER: |
| DEFENDANT/RESPONDENT:  Ripple Labs Inc. et al. | 18-CIV-03461 |

2. *(continued)*

    e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 2h

    i.  Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

3.  a.  Title:

    b.  Case number:

    c.  Court: ☐ same as above

            ☐ other state or federal court *(name and address):*

    d.  Department:

    e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 3h

    i.  Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: October 25, 2018

Peter B. Morrison
<br>(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

*Peter B. Morrison | VFM*
<br>► (SIGNATURE OF PARTY OR ATTORNEY)

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

     I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 300 S. Grand Avenue, Los Angeles, California 90071. My email address is candice.spoon@skadden.com.

On October 25, 2018  I served the  documents described as:

### NOTICE OF RELATED CASE

on the interested parties in this action addressed as follows:

| | |
|---|---|
| BRIAN J. ROBBINS<br>brobbins@robbinsarroyo.com<br>STEPHEN J. ODDO<br>soddo@robbinsarroyo.com<br>ERIC M. CARRINO<br>ecarrino@robbinsarroyo.com<br>ROBBINS ARROYO LLP<br>600 B Street, Suite 1900<br>San Diego, CA 92101<br>Telephone:     (619) 525-3990<br>Facsimile:      (619) 525-3991<br><br>Attorneys for Plaintiffs Vladi Zakinov and David Oconer | David C. Walton<br>Brian 0. O'Mara<br>Brian E. Cochran<br>ROBBINS GELLER RUDMAN<br>& DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423<br>E-mail: davew@rgrdlaw.com<br>bomara@rgrdlaw.com<br>bcochran@rgrdlaw.com<br><br>Attorneys for Plaintiff Vladi Zakinov |
| Shawn A. Williams<br>ROBBINS GELLER RUDMAN<br>& DOWD LLP<br>Post Montgomery Center<br>One Montgomery Street, Suite 1800<br>San Francisco, CA 94104<br>Telephone: (415) 288-4545<br>Facsimile: (415) 288-4534<br>E-mail: shawnw@rgrdlaw.com<br><br>Attorneys for Plaintiff Vladi Zakinov | Andrew J. Ceresney<br>aceresney@debevoise.com<br>Mary Jo White<br>mjwhite@debevoise.com<br>DEBEVOISE & PLIMPTON LLP<br>919 Third Avenue<br>New York, New York  10022<br>Telephone: (212) 909-6000<br>Facsimile: (212) 909-6836<br><br>Attorneys for Defendants<br>Ripple Labs Inc., XRP II, LLC, and Bradley Garlinghouse |
| SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>John T. Jasnoch<br>600 W. Broadway, Suite 3300<br>San Diego, CA  92101<br>Telephone: 619-233-4565<br>Facsimile: 619-233-0508<br>jjasnoch@scott-scott.com<br><br>Attorneys for Plaintiff – Avner Greenwald | SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>Thomas L. Laughlin, IV<br>Rhiana L. Swartz<br>The Helmsley Building<br>230 Park Avenue, 17th Floor<br>New York, NY 10169<br>Telephone: 212-223-6444<br>Facsimile: 212-223-6334<br><br>Attorneys for Plaintiff - Avner Greenwald |

     ☒    **(BY FEDERAL EXPRESS)**  I am readily familiar with the firm's practice for the daily collection and processing of correspondence for deliveries with the Federal Express delivery service and the fact that the correspondence would be deposited with Federal Express that same

day in the ordinary course of business; on this date, the above-referenced document was placed for deposit at Los Angeles, California and placed for collection and delivery following ordinary business practices.

      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 25, 2018 at Los Angeles, California.

_____Candice Spoon_____             _____
     PRINT NAME                               SIGNATURE

# Exhibit 3

CM-015

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Peter B. Morrison (SBN 230148)<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>300 South Grand Ave., Ste. 3400<br>Los Angeles, CA 90012<br>TELEPHONE NO.: (213) 687-5000   FAX NO. *(Optional):* (213) 687-5600<br>E-MAIL ADDRESS *(Optional):* peter.morrison@skadden.com<br>ATTORNEY FOR *(Name):* Ripple Labs Inc. et al. | *FOR COURT USE ONLY*<br><br>**ENDORSED FILED**<br>SAN MATEO COUNTY<br><br>OCT 25 2018<br><br>Clerk of the Superior Court<br>By: ANTONIO R. GERONIMO<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS: 400 County Center
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

| | |
|---|---|
| PLAINTIFF/PETITIONER: Vladi Zakinov & David Oconer | CASE NUMBER:<br>Lead Case No. 18-CIV-02845 |
| DEFENDANT/RESPONDENT: Ripple Labs Inc. et al. | JUDICIAL OFFICER:<br>Judge Richard. H. DuBois |
| **NOTICE OF RELATED CASE** | DEPT.:<br>16 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Greenwald v. Ripple Labs Inc. et al.
   b. Case number: 18-CIV-03461
   c. Court: [✔] same as above
              [ ] other state or federal court *(name and address):*
   d. Department:
   e. Case type: [ ] limited civil [✔] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*
   f. Filing date: July 3, 2018
   g. Has this case been designated or determined as "complex?" [ ] Yes [✔] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [✔] involves the same parties and is based on the same or similar claims.
      [✔] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [ ] involves claims against, title to, possession of, or damages to the same property.
      [✔] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [✔] pending
      [ ] dismissed [ ] with [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: [ ] same as above
              [ ] other state or federal court *(name and address):*
   d. Department:

Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Cal. Rules of Court, rule 3.300<br>www.courtinfo.ca.gov

COPY   FAXED

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER:  Vladi Zakinov & David Oconer<br>DEFENDANT/RESPONDENT: Ripple Labs Inc. et al. | CASE NUMBER:<br>Lead Case No. 18-CIV-02845 |

2. *(continued)*

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 2h

   i. Status of case:
   ☐ pending
   ☐ dismissed ☐ with ☐ without prejudice
   ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above
   ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 3h

   i. Status of case:
   ☐ pending
   ☐ dismissed ☐ with ☐ without prejudice
   ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: October 25, 2018

Peter B. Morrison
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

*Peter B. Morrison / VFM*
_____
(SIGNATURE OF PARTY OR ATTORNEY)

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 300 S. Grand Avenue, Los Angeles, California 90071. My email address is candice.spoon@skadden.com.

On October 25, 2018  I served the  documents described as:

**NOTICE OF RELATED CASE**

on the interested parties in this action addressed as follows:

| | |
|---|---|
| BRIAN J. ROBBINS<br>brobbins@robbinsarroyo.com<br>STEPHEN J. ODDO<br>soddo@robbinsarroyo.com<br>ERIC M. CARRINO<br>ecarrino@robbinsarroyo.com<br>ROBBINS ARROYO LLP<br>600 B Street, Suite 1900<br>San Diego, CA 92101<br>Telephone:     (619) 525-3990<br>Facsimile:      (619) 525-3991<br><br>Attorneys for Plaintiffs Vladi Zakinov and David Oconer | David C. Walton<br>Brian 0. O'Mara<br>Brian E. Cochran<br>ROBBINS GELLER RUDMAN<br>& DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423<br>E-mail: davew@rgrdlaw.com<br>bomara@rgrdlaw.com<br>bcochran@rgrdlaw.com<br><br>Attorneys for Plaintiff Vladi Zakinov |
| Shawn A. Williams<br>ROBBINS GELLER RUDMAN<br>& DOWD LLP<br>Post Montgomery Center<br>One Montgomery Street, Suite 1800<br>San Francisco, CA 94104<br>Telephone: (415) 288-4545<br>Facsimile: (415) 288-4534<br>E-mail: shawnw@rgrdlaw.com<br><br>Attorneys for Plaintiff Vladi Zakinov | Andrew J. Ceresney<br>aceresney@debevoise.com<br>Mary Jo White<br>mjwhite@debevoise.com<br>DEBEVOISE & PLIMPTON LLP<br>919 Third Avenue<br>New York, New York  10022<br>Telephone: (212) 909-6000<br>Facsimile:   (212) 909-6836<br><br>Attorneys for Defendants<br>Ripple Labs Inc., XRP II, LLC, and Bradley Garlinghouse |
| SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>John T. Jasnoch<br>600 W. Broadway, Suite 3300<br>San Diego, CA  92101<br>Telephone: 619-233-4565<br>Facsimile: 619-233-0508<br>jjasnoch@scott-scott.com<br><br>Attorneys for Plaintiff – Avner Greenwald | SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>Thomas L. Laughlin, IV<br>Rhiana L. Swartz<br>The Helmsley Building<br>230 Park Avenue, 17th Floor<br>New York, NY 10169<br>Telephone: 212-223-6444<br>Facsimile: 212-223-6334<br><br>Attorneys for Plaintiff - Avner Greenwald |

☒      **(BY FEDERAL EXPRESS)**  I am readily familiar with the firm's practice for the daily collection and processing of correspondence for deliveries with the Federal Express delivery service and the fact that the correspondence would be deposited with Federal Express that same

2

day in the ordinary course of business; on this date, the above-referenced document was placed for deposit at Los Angeles, California and placed for collection and delivery following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 25, 2018 at Los Angeles, California.

_____Candice Spoon_____                    _____
PRINT NAME                                               SIGNATURE

# Exhibit 4

1    SCOTT+SCOTT ATTORNEYS AT LAW LLP
     JOHN T. JASNOCH
2    600 W. Broadway, Suite 3300
     San Diego, CA  92101
3    Telephone: 619-233-4565
     Facsimile:  619-233-0508
4    jjasnoch@scott-scott.com

5    *Attorneys for Plaintiff*

6    [Additional counsel on signature block.]

7

8

9                    **UNITED STATES DISTRICT COURT**
10                  **NORTHERN DISTRICT OF CALIFORNIA**
                           **OAKLAND DIVISION**
11

12   AVNER GREENWALD, individually and on behalf      Case No. 18-cv-4790-PJH
     of all others similarly situated,
13                                                     <u>**CLASS ACTION**</u>
                                   Plaintiff,
14                                                     **PLAINTIFF'S NOTICE OF**
     vs.                                               **MOTION AND MOTION TO**
15                                                     **REMAND; MEMORANDUM OF**
     RIPPLE LABS INC., *et al.*,                       **POINTS AND AUTHORITIES IN**
16                                                     **SUPPORT THEREOF**
                                   Defendants.
17                                                     Date:  October 17, 2018
18                                                     Time: 9:00 a.m.
                                                       Courtroom:  3
19
                                                       Hon. Phyllis J. Hamilton
20

21

22

23

24

25

26

27

28

1    **NOTICE OF MOTION AND MOTION**

2    TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

3    PLEASE TAKE NOTICE that on October 17, 2018 at 9:00 a.m., before the Honorable

4    Phyllis J. Hamilton, United States District Judge, at the United States District Court, Northern

5    District of California, 1301 Clay Street, Courtroom 3, Oakland, California 94612, Avner Greenwald

6    ("Plaintiff") will move this Court for an order, pursuant to 28 U.S.C. §1447(c), remanding this action

7    to the Superior Court of the State of California, County of San Mateo.  This motion is based on this

8    Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the

9    Declaration of John T. Jasnoch and the Proposed Order filed herewith, all pleadings and papers filed

10   herewith, arguments of counsel, and any other matters properly before the Court.

11   **CONCISE STATEMENT OF RELIEF SOUGHT BY MOVANT**

12   Plaintiff seeks an order remanding this case to the Superior Court of the State of California,

13   County of San Mateo.  This case only asserts claims under the Securities Act of 1933 (the

14   "Securities Act" or "1933 Act") and was improperly removed to this Court by Defendants[1] pursuant

15   to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1453.  Because the 1933 Act bars removal

16   of actions alleging only 1933 Act claims and 9th Circuit precedent, *Luther v. Countrywide Home*

17   *Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008), addresses this precise circumstance and holds

18   that the 1933 Act removal bar prohibits removal under CAFA, this case must be remanded.

19   **QUESTIONS PRESENTED**

20   1.    Does the anti-removal provision in Section 22(a) of the 1933 Act prohibit removal

21   under CAFA of cases asserting only 1933 Act claims?

22   2.    Should this case be remanded given that controlling 9th Circuit precedent, *Luther v.*

23   *Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008), holds that the anti-removal

24

25   _____
[1]    Defendants are Ripple Labs Inc. ("Ripple"), XRP II, LLC ("XRP II"), Bradley Garlinghouse,
26   Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van Miltenburg, Susan Athey, Zoe Cruz,
     Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita (collectively, "Defendants").
27

28

1  provision of the 1933 Act prohibits removal under CAFA of cases asserting only 1933 Act claims,

2  the precise issue to be addressed by the Court in this Motion?

3  <strong>MEMORANDUM OF POINTS AND AUTHORITIES</strong>

4  **I.    INTRODUCTION**

5          This securities class action was commenced in the Superior Court of the State of California,

6  County of San Mateo, on July 3, 2018, on behalf of all persons or entities who purchased XRP

7  tokens, a virtual currency, from July 3, 2015 through the present.  (ECF No. 1-1, Compl., ¶87.)  This

8  action asserts **only** claims brought under §§5, 12(a)(1), and 15 of the Securities Act.  On August 8,

9  2018, Defendants removed the action to this Court under CAFA, 28 U.S.C. §1453(b).  *See* Defs'

10  Removal, ¶¶3-4.[2]  Defendants explicitly do not rely on the general removal statute, 28 U.S.C.

11  §1441(a).  Defs' Removal, ¶25.

12          Removal was improper because, as the U.S. Supreme Court recently confirmed, the 1933 Act

13  explicitly bars removal of actions bringing only 1933 Act claims.  15 U.S.C. §77v(a); *Cyan, Inc. v.*

14  *Beaver County Employees Retirement Fund*, 138 S. Ct. 1061 (2018).  Moreover, Defendants'

15  position that the 1933 Act's removal bar should be disregarded when CAFA is invoked is foreclosed

16  by controlling 9th Circuit law.  In *Luther*, the 9th Circuit squarely held that the 1933 Act's anti-

17  removal bar prohibits removal under CAFA.  533 F.3d at 1034.  The 9th Circuit's holding is directly

18  applicable here and requires the Court to resolve this motion in favor of remand.

19          Accordingly, the Court should grant Plaintiff's motion in full.

20  **II.    ARGUMENT**

21          **A.    Controlling Law of this Circuit Requires Remand**

22          Directly applicable 9th Circuit authority requires this Court to grant remand.  In *Luther*, the

23  9th Circuit held that section 22(a) of the Securities Act of 1933 provides an "express exception to

24

25

26  [2]      *See* Notice of Removal of State Court Action (ECF No. 1) ("Defs' Removal").

27

28
2<br>PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT THEREOF<br>CASE NO. 18-CV-4790-PJH

1    removal" that trumps CAFA, meaning that CAFA does not provide a basis for removal of cases that

2    only assert 1933 Act claims.  533 F.3d at 1034.[3]

3          Section 22(a) of the 1933 Act (enacted as part of the Private Securities Litigation Reform Act

4    of 1998 ("PSLRA")) states, "no case arising under this subchapter and brought in any State court of

5    competent jurisdiction shall be removed to any court of the United States."[4]  15 U.S.C. §77v(a).

6    CAFA authorizes removal of class actions where:  (1) the amount in controversy exceeds

7    $5,000,000; (2) the putative class has more than 100 members; and (3) any member of the class is a

8    citizen of a state different from any defendant.  28 U.S.C. §§1332(d)(2), (d)(2)(A), 5(B), 1453(b).

9    *Luther* held that "CAFA's general grant of the right of removal of high-dollar class actions does not

10   trump §22(a)'s specific bar to removal of cases arising under the Securities Act of 1933."  533 F.3d

11   at 1034.  *Luther* relied on "'a basic principle of statutory construction that a statute dealing with a

12   narrow, precise, and specific subject is not submerged by a later enacted statute covering a more

13   generalized spectrum.'"  *Id.* (citing *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)).

14   As here, *Luther* was a case that alleged only 1933 Act claims.  Applying *Luther*, remand is required.

15         This Court is bound by *Luther*'s interpretation of federal statutes.  "Circuit decisions are *stare*

16   *decisis* unless they are overruled by the court *en banc* or come into conflict with a subsequent

17   decision to which it owes obedience, such as a decision by the Supreme Court." *Hurst v. Prudential*

18   *Sec. Inc.*, 923 F. Supp. 150, 155 (N.D. Cal. 1995) (citing *Spinelli v. Gaughan*, 12 F.3d 853, 855 (9th

19   Cir. 1993); *Atonio v. Wards Cove Packing Co., Inc.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987)). "A

20   district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on his

21   own court of appeals who have ruled on a controlling legal issue[.]"  *Hart v. Massani*, 266 F.3d

22

23

---

24   [3]     In *Cyan*, the Supreme Court recently confirmed that SLUSA provides no basis for removal of

25   pure 1933 Act cases.  *See generally Cyan,* 138 S. Ct. 1061.  Notably, CAFA was not even raised as a
    potential source of defeating the removal ban.  *See id.*

26   [4]     There is an "except clause" to this provision, but it is not applicable here.

27

28
PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF
CASE NO. 18-CV-4790-PJH

1   1155, 1170 (9th Cir. 2001).  Since it was decided 10 years ago, neither the Supreme Court nor the

2   9th Circuit has overruled *Luther*.[5]

3         Indeed, during oral argument in a related case that, unlike this case, involved both 1933 Act

4   claims and state law claims, the Court unequivocally stated that *Luther* requires remand of pure 1933

5   Act cases.  In *Coffey v. Ripple Labs, Inc.*, No. 18-cv-03286-PJH, the Court considered the import of

6   *Luther* on the remand motion of a plaintiff who asserted both state law and 1933 Act claims.  2018

7   WL 3812076, at *1 (N.D. Cal. Aug. 10, 2018).[6]  Because of the presence of state law claims, *Coffey*

8   was materially different from the instant case and the Court's ultimate decision in *Coffey*, that the

9   presence of state law claims allowed for removal under CAFA is inapt.  However, during oral

10  argument, the Court acknowledged that *Luther* was controlling precedent and that *Luther* would

11  have required remand had *Coffey* only asserted 1933 Act claims.  Specifically, the Court stated that it

12  "has no authority to overturn *Luther*" and that, if the case had been brought with only 1933 Act

13  claims, "it wouldn't present a dilemma for me[;] ***I'd remand it, obviously***."  *Coffey* Aug. 1, 2018

14  Hr'g Trans., attached to Declaration of John T. Jasnoch ("Jasnoch Decl."), Ex. A at 13:11-12 and

15  28:17-19, respectively.  This sentiment was echoed in the Court's opinion, which stated, "defendants

16  did not remove this action based on the Securities Act claim satisfying CAFA's requirements –

17  likely a losing proposition under *Luther*."  2018 WL 3812076, at *4.  By this motion, Plaintiff asks

18  no more than that the Court draw the "obvious" conclusion and remand pursuant to *Luther*.

19

20

---

21  [5]      The Supreme Court's decision in *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S.
22  Ct. 547 (2014), is not "clearly irreconcilable" with *Luther*.  *Dart Cherokee* addressed "'whether a
    defendant seeking removal to federal court is required to include evidence supporting federal
23  jurisdiction in the notice removal, or whether alleging the required short and plain statement of the
    grounds for removal [is] enough.'"  *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1183 (9th Cir.
24  2015) (citing *Dart Cherokee*, 135 S. Ct. at 552-53)  This issue is wholly distinct from the issue
    decided in *Luther*.  The 9th Circuit has since made clear that *Dart Cherokee* limited *Luther* only as
25  related to the presumption against removal – a presumption that generally exists under 9th Circuit
    law, but which does not exist for CAFA cases after *Dart Cherokee*.  *Id.* at 1182-83.
26
    [6]      Coffey has since dismissed his case.  (ECF No. 29 in Case No. 18-cv-03286.)
27

28
    PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND
    AUTHORITIES IN SUPPORT THEREOF
    CASE NO. 18-CV-4790-PJH

**B.    Greenwald's Foreign Citizenship Has No Impact on the Effect of the 1933 Act Removal Bar**

In an effort to avoid the result clearly compelled by *Luther*, Defendants put forth a nonsensical argument that Greenwald's "alienage" status somehow impacts this Court's remand analysis and "takes this case outside the purview of *Luther*." Defs' Removal, ¶¶11-15. This fig leaf argument cannot conceal the glaring weakness of Defendants' position or the fact that they ask the Court to ignore controlling precedent. Nothing in the cases cited by Defendants provides a basis for this Court not to follow *Luther* and remand.[7]    To the extent Defendants argue that this case does not properly bring claims under the Securities Act because it addresses "international transactions" (Defs' Removal, ¶14), that issue is separate and apart from Greenwald's citizenship and, most importantly, an argument to be made in a motion to dismiss.    That argument is not ripe for discussion at this jurisdictional stage.

**C.    Defendants' Improper Removal Has Caused Unnecessary Delay and, Unless Promptly Corrected, Will Cause Inefficiency**

Defendants' removal has delayed this case from properly proceeding in state court and threatens to undermine judicial economy.  This case was filed over two months ago, on July 3, 2018. Two related class actions are pending in the same state court, San Mateo County, and the instant case is ripe for coordination with those cases.  *See Zakinov v. Ripple Labs, Inc.*, No. 18CIV02845 (Superior Court, San Mateo) (filed June 5, 2018); *Oconor v. Ripple Labs, Inc.*, No. 18CIV03332 (Superior Court, San Mateo) (filed June 27, 2018).  Indeed, prior to removal, counsel in this case reached out to counsel in *Zakinov* and *Oconor* and discussed coordination.

*Zakinov* and *Oconor* allege state law claims on behalf of a class of California purchasers of XRP during the same class period alleged in the instant complaint, July 3, 2015 through the present. Jasnoch Decl., Exs. B and C.  Like the instant case, *Zakinov* and *Oconor* allege that XRP should have been registered securities – but under California law, rather than federal law.  *See*, *e.g.,* Ex. C,

---

[7]    *New Jersey Carpenters Vacation Fund v. HarborView Mortg. Loan Trust 2006-4* held that CAFA overrode the 1933 Act's anti-removal provision to permit removal of case, unless a CAFA statutory exception applied.  581 F. Supp. 2d 581, 583 (S.D.N.Y. 2008).  This is in direct conflict with *Luther* and thus is contrary to the law of this Circuit.

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 18-CV-4790-PJH

¶¶3-4, 58.  Demonstrating the similarity of the issues raised, *Zakinov* and *Oconor* point to federal SEC guidance in support of their position.  *See*, *e.g.*, Ex. C, ¶¶65-72; *see similarly* Compl., ¶¶84-86. Many of the factual allegations in *Zakinov* and *Oconor* overlap as they both relate to the creation, sale, and solicitation of XRP.  *Compare* Compl., ¶¶29-77 *with* Ex. C, ¶¶14-57. Thus, coordination of dispositive motions and discovery makes sense in order to promote judicial economy.

Notably, Defendants did not seek to remove *Zakinoc* and *Oconor* to this Court.  It makes little sense for this case to proceed in federal court while related cases have been consolidated and are proceeding in state court.  In the consolidated state case, a Consolidated Complaint is due October 15, 2018.  Jasnoch Decl., Ex. D, ¶8.  Defendants have until November 29, 2018 to file a demurrer, and a briefing schedule has been put in place for the demurrer.  *Id.*

The unnecessary delay caused by Defendants, potential for judicial inefficiency if this case is further delayed, and clarity of the *Luther* precedent warrant a prompt remand.  *See similarly Book v. ProNAi Therapeutics, Inc.*, No. 16-7408, 2017 WL 2533664, at *1 (N.D. Cal. June 12, 2017) (holding that a stay pending the Supreme Court's consideration of writs of certiorari related to *Cyan* was not warranted ).

## III.    CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court remand this action to the Superior Court of the State of California, County of San Mateo.

DATED:  September 7, 2018

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

s/ John T. Jasnoch

JOHN T. JASNOCH
600 W. Broadway, Suite 3300
San Diego, CA  92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

– and –

Thomas L. Laughlin, IV
Rhiana L. Swartz
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334

*Attorneys for Plaintiff Avner Greenwald*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ John T. Jasnoch
JOHN T. JASNOCH

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 18-CV-4790-PJH