UNITED STATES DISTRICT COURT   **ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA


Before The Honorable PHYLLIS J. HAMILTON, Judge

| | | |
|---|---|---|
| In re RIPPLE LABS INC. | ) | **Motion to Dismiss** |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | NO. C 18-06753 PJH |
| | | **Pages 1 - 37** |

Oakland, California
Wednesday, January 15, 2020


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


APPEARANCES:

For Plaintiff:          Susman Godfrey L.L.P.
                        1900 Avenue of the Stars, 14th Floor
                        Los Angeles, California  90067
               BY:  OLEG ELKHUNOVICH, ATTORNEY AT LAW

                        Taylor-Copeland Law
                        501 W. Broadway, Suite 800
                        San Diego, California  92101
               BY:  JAMES Q. TAYLOR-COPELAND,
                     ATTORNEY AT LAW


             (Appearances continued next page)


Reported By:          Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1

2                    **A P P E A R A N C E S (CONT'D.)**

3

4    For Defendants:          Boies Schiller Flexner LLP
                              55 Hudson Yards, 20th Floor
5                             New York, New York  10001
                         BY:  DAMIEN J. MARSHALL, ATTORNEY AT LAW
6
                              Boies Schiller Flexner LLP
7                             1401 New York Avenue NW
                              Washington, D.C  20005
8                        BY:  MENNO GOEDMAN, ATTORNEY AT LAW

9                             Boies Schiller Flexner LLP
                              44 Montgomery Street, 41st Floor
10                            San Francisco, California  94104
                         BY:  KATHLEEN R. HARNETT, ATTORNEY AT LAW
11

12

13                              --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Wednesday, January 15, 2020                      11:17 a.m.
 2                        P R O C E E D I N G S
 3          THE CLERK:  Calling civil case 18-6753-PJH, Zakinov,
 4    et al. versus Ripple Labs, Inc., et al.
 5       Counsel, please step forward and state your appearances.
 6          MR. ELKHUNOVICH:  Good morning, Your Honor.  Oleg
 7    Elkhunovich of Susman Godfrey for the plaintiffs.
 8          THE COURT:  All right.  Good morning.
 9          MR. TAYLOR-COPELAND:  Good morning, Your Honor.
10    James Taylor-Copeland also on behalf of plaintiffs.
11          THE COURT:  All right.  Good morning.
12          MR. MARSHALL:  Good morning, Your Honor.  Damien
13    Marshall from Boies Schiller Flexner for the defendants.
14          THE COURT:  Good morning.
15          MR. GOEDMAN:  Menno Goedman also from Boies Schiller
16    on behalf of defendants.
17          THE COURT:  Good morning.
18          MS. HARTNETT:  And Kathleen Harnett, Boies Schiller
19    for defendants.
20          THE COURT:  All right.  Good morning.
21       Who's going to argue the motion?  This matter's on for
22    hearing on motion to dismiss.
23          MR. MARSHALL:  I will argue for defendants, Your
24    Honor.
25          THE COURT:  Okay.
```

 1          **MR. ELKHUNOVICH:**  I will argue for the plaintiffs,

 2   Your Honor.

 3          **THE COURT:**  All right.

 4      All right.  Can we -- let's talk about this statute of

 5   repose first as it -- has been raised with respect to the

 6   federal claims.  And, you know, that's a big chunk, although

 7   there are, what, seven causes of action, two federal and --

 8   yeah, five -- five state claims.

 9          **MR. MARSHALL:**  Yes.

10          **THE COURT:**  All right.

11      So let's talk about the federal claims first then.  And

12   the big argument raised by the defense, as I understand the

13   papers, you're conceding for purposes of this motion that the

14   XRP is a security.

15          **MR. MARSHALL:**  For the purposes of this motion on

16   this procedural posture.

17          **THE COURT:**  Right.

18          **MR. MARSHALL:**  Yeah.

19          **THE COURT:**  All right.  So the only question is

20   whether or not the federal claims are viable.

21      You've made the argument with regard to the statute of

22   repose.  I note that no one cited and we're unaware of any

23   Ninth Circuit authority on this issue.

24      There are some district court cases, and there's the

25   Second Circuit decision in *Stolz.*

1          **MR. MARSHALL:**  Correct.

2          **THE COURT:**  That's the main authority that's been

3     offered on this issue.

4          **MR. MARSHALL:**  Correct, Your Honor.

5          **THE COURT:**  Okay.

6          **MR. MARSHALL:**  So, Your Honor, the -- in this

7     complaint, the plaintiff makes several allegations that we

8     feel compel a finding or conclusion that the claims are barred

9     by the statute of repose.  The first of those is that all of

10    the XRP was created at the same time in 2013.  The next is

11    that from 2013 to 2015, XRP was offered to the public for

12    sale.  These sales, according to paragraph 157, were random

13    and indiscriminate.  They weren't targeted in any way.

14        In paragraphs 128, there is an allegation that all XRP is

15    fungible.  These allegations, we believe, demonstrate that the

16    application of the statute of repose to these claims, which

17    were brought in 2018, more than three years after the security

18    was initially offered to the public, mandates application of

19    the statute of repose.

20        And as you see in our briefs, we've relied primarily on

21    the analysis of the *Stolz* court.  We believe that *Stolz*

22    performed an extremely thoughtful analysis serving the

23    relevant case law, including the *Bestline* series of cases that

24    are relied upon by the plaintiffs, the commentators, and also

25    the -- solicited the views of the SEC.

1        And it addressed sort of all of the arguments that

2   plaintiffs raise regarding what is a bona fide offer.  It

3   addressed the consequence of applying the first offered rule,

4   although that holding of *Stolz* is limited to the facts of the

5   case, as all cases are limited to their facts.

6        It went on to recognize that the application of the first

7   offered rule would lead to a circumstance where a claim was

8   distinguished before the security itself was purchased.

9        And in finding that that consequence is acceptable, that

10  that sequence is what Congress intended, it relied upon the

11  case law.  And it also relied upon the amendments of the

12  statute of repose from a ten-year statute of repose to a

13  three-year statute of repose.

14       And a -- when that change was made, an amendment was

15  offered that would have precluded the situation where a

16  security offered or sold after the statute of repose had run

17  would be immunized, as is the case now.  That amendment was

18  rejected.

19       And the court -- the court inferred from that the

20  statutory intent to have the result that occurs now.

21       There is always going to be tension between the remedial

22  function of a statute in repose.  That's -- that's the nature

23  of repose.  It is a limitation on continuing liability,

24  continuing remedies.  It is up to Congress to draw that line.

25       As Judge Calabresi noted in his concurrence, the outcome

1    mandated by the finding that the first offered rule applies is

2    that there will be circumstances where a security is purchased

3    outside of the repose period and there is no claim.  But that

4    is the congressional intent.

5        I think that the *Stolz* case also addresses in the context,

6    they call it a slow offer.  This -- the situation of the same

7    security being offered throughout a period of time.  If you

8    look in our reply brief at footnote 5, we cite a series of

9    cases where the security was offered -- first offered well --

10   you know, three to five to seven years before the actual

11   purchase.  And the courts in those cases applied the first

12   offered rule, just like here, and precluded a claim under the

13   statute of repose where the statute of repose had run even

14   before the security was purchased.

15       So I think the *ANZ* case, which plaintiff relies upon for a

16   snippet of language regarding the last culpable act.  I think

17   the *ANZ* case supports our position.  And it's supports our

18   position because it expressly finds and holds that equitable

19   concerns should not inform an analysis of a statute of repose.

20       And so in that context, *ANZ* helps us.  The language that

21   is relied upon, we believe, is -- you know, it is dicta.  It

22   was a quote from the *Waldburger* case that was considering a

23   North Carolina statute of repose that had that last culpable

24   act language in it.

25       So we don't think that the Supreme Court's language sort

1    of up ends the *Stolz* line of cases, all of the cases that have

2    relied upon it, you know, especially when the issue wasn't

3    presented.  It wasn't briefed.  They didn't solicit the views

4    of the SEC.

5        So I think all that plaintiff is left with because the --

6    the claims of multiple offers of the same security, *Stolz*

7    expressly says there will be later offerings, plural -- later

8    offerings that are not going to have a remedy.

9        So I think that what plaintiff is left with is an argument

10   that the XRP that was offered in 2017, '18, '19 is different,

11   than the different security than this XRP that was offered in

12   2013, '14, and '15.

13       That runs sort of the headlong into their allegations

14   regarding all XRP was created in 2013.  It runs headlong into

15   the allegations that all XRP is fungible.  And it runs

16   headline (sic) into their class definition of all purchasers

17   of XRP.

18       Their class definition doesn't say all purchasers of this

19   offering.  It doesn't say all purchasers of a certain date.

20   There's no temporal limitation.  The complaint itself

21   recognizes all XRP is the same from the first -- when it was

22   first offered till when it is being offered today.

23              **THE COURT:**  And the XRP II?

24          **MR. MARSHALL:**  XRP is a company.

25              **THE COURT:**  But it was selling the same XRP --

1              **MR. MARSHALL:**  Yes.

2              **THE COURT:**  -- the same virtual currency?

3              **MR. MARSHALL:**  Right.  And that switch happened well

4    before -- in 2013, as alleged in the complaint and

5    incorporated by reference in the settlement agreement with the

6    government.  That switch between Ripple selling and XRP

7    selling happened in 2013.  So even if that did have any sort

8    of impact, that's -- repose would have run by the time this

9    complaint was filed.

10             **THE COURT:**  Um-hmm.  Okay.

11         All right.  Do you want to respond, this issue before we

12   move to California claims?

13             **MR. ELKHUNOVICH:**  Yes.  Thank you, Your Honor.

14         Like many of defendants other arguments, the repose

15   argument raises disputed factual issues that simply cannot be

16   decided at this motion to dismiss stage.

17         Let me start with the *Stolz* case.  Of course, as the court

18   has recognized, the Ninth Circuit hasn't spoken on the issue.

19   The only in district decision, the *Hudson* case adopted the

20   lost (sic) offered rule following the reasoning of the

21   *Bestline* products.

22         But even if the court was to find the reasoning of the

23   Second Circuit in *Stolz* persuasive, to the extent that it

24   adopted the first offered rule, that decision is explicitly

25   limited on page 102 of the opinion where it states, "we need

1    to briefly cabin our discussion structure to the facts of the

2    present case as elucidated in *Stolz*'s pleadings.  We're

3    dealing with a single public offering of unregistered

4    securities that began more than three years before *Stolz* filed

5    its complaint but was concluded within the three years' repose

6    period.  It is not, therefore, the situation of a defendant's

7    being granted immunity to continue illicit offers without

8    civil liability after three years have passed."

9        So *Stolz* is a very different factual circumstance because

10   in *Stolz*, there was no dispute that there was a single

11   offering to the public pursuant to a prospectus.  Here, we

12   have exactly the opposite situation.

13       First of all, defendants continue to sell XRP in multiple

14   offerings to this date.  And starting in 2017, defendants

15   completely changed the way they sold XRP by putting 55 billion

16   of it into escrow and cryptographically releasing 1 billion at

17   a time on the monthly basis and only having that amount being

18   available for sale by the defendants.

19       **THE COURT:**  I don't understand how that has an impact

20   whatsoever.  The way in which they sold it isn't -- doesn't do

21   anything to affect the fact that it was all created at the

22   same time.  It's all the same -- the same product.

23       **MR. ELKHUNOVICH:**  So two things, or maybe three

24   actually.  XRP was all created at the same time, whatever that

25   means --

1      **THE COURT:**  Well, you pled that.

2      **MR. ELKHUNOVICH:**  -- 2013.

3   Yes, we did.  And we're not walking away from that

4   contention.  It was all created in 2013.  But when a security

5   was, quote, unquote, created is not an inquiry on under the

6   statute of repose.  The inquiry is when the security was

7   offered -- bona fide offered to the public.  And *Stolz* case

8   discusses this in great detail.

9      Now, we haven't seen from either the -- we certainly

10  haven't alleged and we haven't seen from the briefing and the

11  counsel didn't tell us today when did -- when do they contend

12  the defendant's bona fide -- made a bona fide offer of XRP to

13  the public.  We didn't know the answer to that.  We know it

14  was created in 2013, but the evidence --

15      **THE COURT:**  Well, doesn't your complaint indeed

16  allege that it was sold between 2013 and 2015?

17      **MR. ELKHUNOVICH:**  So our only allegations with

18  respect to sale in 2013 and 2014 --

19      **THE COURT:**  Or offered.  Offered.

20      **MR. ELKHUNOVICH:**  Offered for sale in 2013 and 2014

21  and sold -- relate to the FinCEN statement of facts and

22  from -- from those facts that we relied on in the FinCEN

23  statement of facts, defendants argue that we are alleging that

24  XRP was offered to the public for sale as a bona fide offer.

25  That is not the case.

1          In fact, the FinCEN statement, which is Exhibit 1 (sic) to

2     the opposition -- to -- I'm sorry -- to the defendant's

3     motion, discusses only three isolated transactions that have

4     all the indicia of the private offerings.  The first --

5     because they're larger transactions with people who appear to

6     be sophisticated in cryptocurrency investments.

7          Nothing in the FinCEN -- FinCEN statement says or admits

8     that in 2013, 2014, or even 2015, there was a bona fide public

9     offering of XRP.  Sure, they sold it.  And it may even be true

10    that members of the public could buy it.  But that's not what

11    a genuine -- which is the word *Stolz* uses for the -- as what

12    bona fide means -- that is not a bona fide or genuine offer of

13    a security -- offering of a security to the public.

14         And -- and then the -- the other issue is, yes, it was all

15    created at the same time.  But my point about escrow is --

16    goes to the nature of the investment.

17         And let me give you an -- an analogy from sort of a

18    regular securities as opposed to cryptosecurities.

19         Take this hypothetical.  A company has 1 million shares

20    that -- of stock that the board has authorized.  But the

21    company chooses not to offer that authorized stock to

22    prospective shareholders, usually referred to as treasury

23    shares.

24         Then at some point, the company -- at that point, the --

25    the shares have been created.  But it really can't be disputed

1    that there is no genuine public offering or bona fide public

2    offering.

3        Then the company offers hundred thousand shares to the

4    public.  That's a bona fide offering of those hundred thousand

5    shares.  And -- but then four years later, the company offers

6    for sale another hundred thousand shares.  The second offering

7    is a separate offering even if the shares are the same.  It

8    doesn't matter when the securities were created.  What matters

9    is when they were offered.  And even under the first offered

10   rule, if the securities are offered in different offerings at

11   different periods of time, they're different offerings.

12       And the other argument with respect to the cryptographic

13   escrow is that by changing way they are selling the security,

14   how much is available for sale at any given time, they changed

15   the nature of the security in 2017.  Whereas before -- again,

16   analogizing it to the shares, to regular shares, the offering

17   is we are offering hundred -- there's hundred billion of XRP

18   available.

19       Here, they created a system by which they have imposed the

20   limitation upon themselves, the company, of how much XRP they

21   will sell at any given time.  And that was done for a purpose

22   because there was a concern that by being able to sell

23   unlimited number -- not unlimited, but a great number of

24   shares that the company has retained after its creation, they

25   will be able to crash the market at any given time.

1      So that change changed the nature of the security, and

2  that happened in 2017.

3      And then, again, going back to the bona fide offer to the

4  public and the *Stolz* case and its discussion, and counsel

5  referenced the SEC brief that was submitted in that case, and

6  it is actually extremely instructive on this point of what it

7  means for a company to make a bona fide offer to the public

8  and -- and the reasoning that the *Stolz* court accepted from

9  the SEC, and -- it's not in the record.  It's referenced in

10  our briefs.  But if the court would like, I have copies of

11  SEC's amicus brief.

12      But on page 13 of that brief, the SEC explained that in

13  order that an offering be made bona fide to the public so

14  that -- so as the three-year repose period begins to run, the

15  offering should be made in a manner that puts the public on

16  notice that a public offering is occurring and, thus, that the

17  registration may be required.

18      Under the plain language of the statute, it is not enough

19  that the security has been offered.  The offer must, in

20  addition, have been bona fide made to the public.

21      The SEC further explained that if an offering is being

22  conducted as a private offering but in violation of the

23  registration provisions, the repose period should not start.

24      The SEC went on further and said the explicit reference to

25  a bona fide offer to the public -- it's in section 13 --

1   indicates that Congress did not intend those who act in a

2   manner consistent with the private offering to benefit from

3   the three-year period of repose when so acting.  Thus, for

4   example, an issuer that represents the investors or suggests

5   through its actions that securities are being sold to only a

6   small group or to only sophisticated investors should not

7   benefit from the repose period reserved by Congress to those

8   who make a bona fide offering to the public.

9       And SEC made this explanation in favor of the first

10  offered construction by explaining that the bona fide offering

11  to the public requirement, quote, ameliorates the anomaly and

12  harshness of the first offered construction by delaying the

13  start of the three-year period in situations where the public

14  lacks notice that public -- public offering has commenced.

15      Now the court cannot determine on the pleadings whether a

16  bona fide offering to the public was made by defendants before

17  the trigger date of three years, whenever -- whenever that is.

18  And there is a dispute over which complaint should be used to

19  measure that.  But even putting that aside, there's -- there's

20  simply no facts in our complaint and no traditionally

21  noticeable facts and we haven't even heard an argument of when

22  the first public offering was made.

23      Instead, defendants misconstrue our allegations to say

24  that from them there is some sort of implication that there

25  must have been a public offering at some point, the point that

1    they haven't explained when -- when exactly there was a public

2    offering.

3        These allegations are quoted on page 7 of their opening

4    brief.  But if you look at those allegations in our complaint,

5    the first is paragraphs -- they reference paragraphs 2 and 4.

6    But there, the complaint merely alleges that, again, Ripple

7    just created hundred billion XRP and how much was given to

8    individual founders and how much was retained by the company.

9        There's nothing there about whether a public offering was

10   made at that time.  It wasn't.

11       In paragraph 5, which is relied on by defendants, the

12   complaint quotes Ripple's statements from 2014 about its

13   intention to distribute XRP in certain distribution

14   strategies.

15       But we do not allege or say that Ripple made a bona fide

16   public offering at that time.  Instead, in those -- in that

17   paragraph, we refer to Ripple's public distribution efforts in

18   2017 and 2018, which are indisputably within the repose

19   period.

20       I already addressed the FinCEN settlement.  If you look at

21   the FinCEN settlement, that is, again -- defendant submitted

22   as Exhibit A, it does not say that Ripple Labs sold XRP as a

23   public offering at this time or any time.

24       In fact, if -- if you look at the examples of transactions

25   that it describes, it talks about minimal sales during a 2013

time frame, and those particular sales are things like a
transaction for $250,000 with an investor in Ripple Labs.
That's not general public.

Oh, the point is the FinCEN statement cannot be used to
make a determination on the pleadings when Ripple or even if
Ripple made a bona fide offer to the public.

They also rely on the Wiki page from 2014.  That's Exhibit
B, but that only says that Ripple sells XRP to fund operations
and promote the network.  That's what we allege.

That doesn't mean they sold it to the public at that time.
They sold it.  But whether or not they sold it to the public
is at a minimum a fact question.  To the contrary, our
complaint alleges that it was not until 2017 when sales to the
public really began and when they started signing up exchanges
to distribute this currency.

They cite our complaint for an allegation that over a 30
billion XRP were in circulation by mid-2016, but the paragraph
they cite, 26, does not alleged -- allege that there were more
than 30 billion XRP in circulation or that Ripple sold
billions of XRP prior to 2017 as defendants' reply claims.

Instead, that paragraph notes that Ripple claimed in June
2015 that it retained 67.51 billion of XRP, more than double
the approximately 32.49 billion XRP held by the others, but
not the public.

To the contrary, the same paragraph notes that the XRP

1  held by others significantly overstates independent holdings

2  of XRP because it's includes the 20 billion provided to

3  founders and an undisclosed and still unknown to us amount of

4  XRP used in business development agreements that are still

5  pending.

6      Defendants take these allegations and read from them that

7  we have alleged that there were 20, 30 billion of XRP offered

8  to the public.  That's not what the complaint says.  So at a

9  minimum, they're fact questions.

10      Defendants have raised an affirmative defense of statute

11  of repose and they created a fact question regarding whether a

12  bona fide public of offering of XRP was made prior to the

13  three-year trigger date.

14      But that question cannot be resolved on the pleadings, and

15  nothing in our allegations can be fairly -- can be fairly

16  categorized as evidence -- indisputable evidence that that has

17  occurred.

18          **THE COURT:**  Okay.  All right.  Thank you.

19      All right.  You get a brief response, and then we're going

20  to move to the California claims.

21          **MR. MARSHALL:**  Your Honor, so a couple of points on

22  the -- on the requirement that there be a genuine or bona fide

23  offer to the public.

24      First, we would -- we would rely on the FinCEN settlement.

25  If the U.S. government has acted on sales to the public, we

1   would -- we would say that those sales are bona fide offers to

2   the public, if it is enough for the U.S. government --

3           THE COURT:  Did the settlement say that they have

4   made the determination that there were sales to the public?

5           MR. MARSHALL:  They say that there were sales.

6           THE COURT:  To the public.

7           MR. MARSHALL:  They say that -- if you read -- if you

8   read the --

9           THE COURT:  Where is it?

10          MR. MARSHALL:  That is Exhibit 1 (sic) to docket

11  entry -- what is the docket entry of this?  Docket entry 70-2.

12  Or Exhibit A.  Sorry.

13          THE COURT:  Okay.

14          MR. MARSHALL:  This says at paragraph 23, by on or

15  about August 4th, 2013, XRP II was engaged in the sale of XRP

16  currency to third-party entities.

17      Paragraph 26A, it was not until September 26, 2013, that

18  XRP developed a written AML program.  Prior that time XRP had

19  no written AML program.

20      28A, on September 30th, 2013, XRP II negotiated an

21  approximately 250,000 transaction by email for the sale of XRP

22  virtual currency to a third-party individual.

23          THE COURT:  Okay.  But does "third-party individual"

24  mean public?  I mean, counsel's arguing it could have been a

25  private sale to a third-party entity.

1      **MR. MARSHALL:**  Your Honor, I think -- I think that

2      the -- the --

3                  (Pause in the proceedings.)

4      **MR. MARSHALL:**  Oh, okay.  So -- yes.  So paragraph 25

5      of the plaintiff's complaint, Your Honor, it says, in May

6      2015, regulatory authorities in the United States fined Ripple

7      and XRP II $750,000 for violating the Bank Secrecy Act by

8      selling XRP without obtaining the required authorization.

9         As part to the settlement, defendants acknowledge that

10     they had sold XRP to the general public and agreed a number of

11     remedial measures, including registration with FinCEN.

12        So in the complaint itself, paragraph 25 alleges sales to

13     the general public.

14                 **THE COURT:**  Okay.

15                 **MR. MARSHALL:**  And then, as you -- as you noted, Your

16     Honor, the reliance on the fact that XRP was created in 2013

17     and that XRP is fungible doesn't go to when it was offered.

18     It goes to that the XRP that is offered today is the same

19     security that was offered then and that there's no new

20     security.

21                 **THE COURT:**  Okay.

22        All right.  Let's move to the state claims.  And let's

23     start with -- well, the 25503, the qualified securities

24     requirement.

25                 **MR. MARSHALL:**  Yes, Your Honor.

1          **THE COURT:**  Actually, you can take them in any order

2     you wish.  It doesn't really matter.

3          **MR. MARSHALL:**  Sure.

4       So, Your Honor, we'll begin with the -- the state

5     securities claims.  And in those claims, much like the federal

6     claims, there is a require- -- requirement of either -- in the

7     federal claims, it's an initial distribution.  In the state

8     claims, it's called an issuer transaction.

9       Here, the complaint has not adequately alleged an issuer

10    transaction to provide the plaintiffs with the cause of

11    action.  The issuer trans- -- the allegations in the complaint

12    are that the plaintiff purchased on a third-party exchange,

13    that that third party -- that -- that Ripple had sold

14    securities at that same time period.

15      But there is -- there is no allegation and it's not a

16    plausible allegation sort of given amount that the plaintiff

17    purchased -- the amount that was offered by Ripple and the

18    amount that was purchased in the entire -- that time period,

19    that the securities that the plaintiff purchased were direct

20    purchases from Ripple.

21      The plaintiff himself engages in secondary market

22    transactions in XRP.  And so we believe that -- hasn't met the

23    *Iqbal* or *Twombly* requirements of plausibly pleading an issuer

24    transaction here, because, while it's possible --

25                    (Off-the-record discussion.)

1          **MR. MARSHALL:**  -- while it's possible that there is

2     an issuer transaction, it's not plausible.

3          And, you know, there's a -- one of the cases that we rely

4     on for this is pretty -- I think is instructive on the point.

5     It is the *Westfall* case, Your Honor.  And in that case -- let

6     me just find it.

7          The amount that -- the court followed the exact same

8     reasoning that -- that we provide here, Your Honor, that the

9     amount issued and offered by the -- the defendant in

10    comparison to the amount purchased and the amount in the

11    market in total is not sufficient to allow a plausible

12    inference that the defendant was -- that there was an issuer

13    transaction.

14          **THE COURT:**  Okay.

15          **MR. MARSHALL:**  We also -- there's -- with regard to

16    the state law claims, Your Honor, there's no privity alleged

17    between the -- the -- the plaintiff and the defendants.  The

18    defendant -- or the plaintiffs conflate the requirement of

19    privity for control person liability with the requirement of

20    privity between the purchaser and the seller.

21          There certainly are plaintiffs out there that would be

22    able to meet these (sic) requirement of privity, but the

23    plaintiff is not one of them, because they did not purchase

24    directly from Ripple and cannot plausibly allege that they did

25    purchase directly from Ripple.  There's no privity between the

1    two of them.

2              THE COURT:  Okay.  And I mean -- and you know that

3    they didn't purchase directly from Ripple.

4              MR. MARSHALL:  They purchased on -- they -- they

5    purchased on a third-party exchange.  And the -- the -- the

6    third point, Your Honor, is with regard to the claims that

7    reply upon misrepresentations or alleged misrepresentations,

8    the complaint does not meet the requirements of 9(b) telling

9    us the sort of who, what, when, where, why it is false for

10   each of these allegations.

11     I could -- I could walk through each of them.  We did it

12   in our reply brief, but I believe that the allegations in the

13   complaint are insufficient to start -- to state a claim based

14   upon misrepresentation.

15             THE COURT:  And then --

16             MR. MARSHALL:  Do you want me to continue with the --

17             THE COURT:  Yeah, please.

18             MR. MARSHALL:  So we also believe that *Bowen* --

19   because plaintiffs here have alleged XRP is a security.

20             THE COURT:  Well, I'm sorry.  They pled fraud and

21   deceit under the Corporations Code --

22             MR. MARSHALL:  Yes.

23             THE COURT:  -- as well as the misrepresentations

24   under the Corporations Code.  And you're applying Rule 9(b) to

25   both of those.

1          **MR. MARSHALL:**  Yes.

2          **THE COURT:**  Right?

3          **MR. MARSHALL:**  Yes.

4          **THE COURT:**  Okay.

5          **MR. MARSHALL:**  And, Your Honor, and with regard to

6     the UCL and FAL claims -- or FLA -- the -- the *Bowen* line --

7     the *Bowen* line of cases precludes those consumer protection

8     claims based on securities transactions.

9          **THE COURT:**  *Bowen* involved 17200, correct?

10         **MR. MARSHALL:**  Yes, Your Honor.

11         **THE COURT:**  Is there any case law that explicitly

12    extends that to the 17500?

13         **MR. MARSHALL:**  I believe there is.  And I believe we

14    cited it in our reply brief, Your Honor.

15       Let me find that for you.

16               (Pause in the proceedings.)

17         **MR. MARSHALL:**  Yes.  Yes, Your Honor, so as we say in

18    our reply brief, the *Bowen* rule applies to the FAL and UCLA

19    (sic) claims.  We cite a *Sharp vs. Arena Pharmacy, Inc.*,

20    Southern District of -- 213 Westlaw 1209 --

21         **THE COURT:**  Yeah, is there any circuit authority, is

22    actually what I meant.

23         **MR. MARSHALL:**  There is no circuit authority that we

24    were able to find, Your Honor.

25         **THE COURT:**  Okay.

1       All right.

2           **MR. MARSHALL:**  And also, Your Honor, we believe that

3   there's a safe harbor for legislative prescribed conduct under

4   the FAL and UCL claims, that if you find that the statute of

5   repose applies and bars the federal claims, plaintiff should

6   not be able to plead around that by using the consumer

7   protection statutes in California.

8           **THE COURT:**  Okay.  All right.  Thank you.

9       All right.  You agree, though, that even if the statute of

10  repose applies to the federal securities claims, they wouldn't

11  apply to the state securities claims but the -- but your safe

12  harbor argument only goes to the consumer claims, correct?

13          **MR. MARSHALL:**  Correct.

14          **THE COURT:**  But the state claims would go forward.

15          **MR. MARSHALL:**  The -- they would not be barred by the

16  federal repose.

17          **THE COURT:**  Right.

18      Okay.  And they would otherwise go forward unless the

19  court found independent bases for dismissing them.

20          **MR. MARSHALL:**  Yes, we believe they would be

21  dismissed on other grounds, like the privity --

22          **THE COURT:**  Right.

23          **MR. MARSHALL:**  -- or lack of an issuer transaction.

24          **THE COURT:**  Right.

25      All right.  Response.

1      **MR. ELKHUNOVICH:** Great. That was a lot.

2      Let me address the initial distribution purchase from

3   defendants' passing of title issues, which are all

4   interrelated and basically go into injecting flawed

5   probability analysis into the legal plausibility analysis.

6      Simply, the math doesn't add up. Defendants use their own

7   report, which we did in our complaint, but I don't believe

8   that entitles them to a presumption that all the facts in that

9   report are true and inferences to be drawn in their favor.

10      But in any event, they take a report that talks about the

11   volume of sales of XRP by defendants in comparison to the

12   overall volume of transactions of XRP, whatever that means.

13   Those are not necessarily the -- that those transactions are

14   not necessarily sales.

15      But in any event, even taking their facts as they state

16   them, they claim that there's 1 in 10,000 chance that any

17   given XRP purchased during that quarter, the same quarter when

18   the plaintiff bought the XRP, comes from them as opposed to

19   somebody else.

20      Well, first of all, how do we extrapolate the average of

21   what happened during any particular quarter to what happened

22   on specific days when the plaintiff made his purchases.

23      It is certainly possible at a minimum that those sales

24   over the first quarter of XRP by Ripple are not equally

25   distributed among days in that quarter.

1    But furthermore, plaintiff bought hundred and twenty-eight

2    thousand nine hundred and seventy-eight XRP, so even if there

3    is 1 in 10,000 chance that any one of those came from XRP --

4    came from Ripple -- I'm sorry -- or XRP II, is really the

5    entity -- if he bought 128,000 of them, there's near certainty

6    from probability standpoint that at least one of them came

7    from the defendants.

8        And the point here, it's a fact question.  They don't know

9    for sure.  We don't know for sure.  And I don't believe they

10   even have that information of whether the XRP that we bought

11   came from them.  So, instead, they rely on this immunity by

12   selling on exchange argument.

13       But just because I buy my groceries at a farmer's market

14   on Sunday doesn't mean that I'm not buying them from a

15   particular vendor.  The fact that we -- that the plaintiff

16   bought XRP on the exchange does not mean that he bought it

17   from the exchange.  Exchange is not a seller.  Exchange

18   facilitates the transactions between the sellers and the

19   buyers.

20       And so he bought it from somebody.  And we allege that

21   somebody is one of the defendants, XRP II.  And it can't be

22   determined on the pleadings.  And it can't be determined

23   through this probabilistic analysis because even if you were

24   to accept it, that means there is almost hundred percent

25   chance that at least some portion of the XRP that our

1    plaintiff bought comes from XRP -- XRP II.

2        Counsel didn't address the solicitation prong of the

3    statutory seller element.  That issue is briefed.  There's

4    certainly allegations in this complaint that defendants

5    solicited purchases of XRP.

6        Paragraph 44 talks about the entire section on Ripple's

7    website telling people how to do it.  Tweets such as "forget

8    about coin.  We are all in on XRP."  Paragraph 48.  The C.E.O.

9    telling the public, "I remain very, very, very long XRP."

10   There is an expression in the industry H-O-D-L -- instead of

11   "hold," it's H-O-D-L -- "I'm on the H-O-D-L side."

12       California's security -- securities laws claims, again,

13   counsel didn't address the in-state transaction requirement.

14   But all the defendants are residents and have a primary place

15   of business in California.  Their activities all emanate from

16   California.  I think this argument really kind of collapses

17   with whether or not plaintiff bought XRP from the defendants.

18   If he did, he bought it from California defendants.

19       We alleged negligent misrepresentation claims under 25401.

20   Rule 9(b) indisputably does not apply there.  With respect to

21   rule 9(b), our briefing -- I believe it's on page 19 through

22   20 of our opposition -- catalogs all the various

23   misrepresentations that we allege were made with

24   particularity.

25           THE COURT:  Did you cite authority for the

1   proposition that Rule 9(b) doesn't apply to misrepresentations

2   under the Corporation Code?

3           **MR. ELKHUNOVICH:**  Negligent misrepresentation.

4           **THE COURT:**  You've only asserted negligent

5   misrepresentation?

6           **MR. ELKHUNOVICH:**  No, we asserted both, Your Honor.

7   We asserted both intentional and --

8           **THE COURT:**  Doesn't 9(b) apply to the intentional

9   misrepresentations?

10          **MR. ELKHUNOVICH:**  Yes, Your Honor.

11      Now, UCL, again, the issues have been briefed.  But just

12  very briefly, defendants' argument is basically that UCL claim

13  should be dismissed because it is based on a sale of

14  securities claim.

15      And counsel admitted that for purposes of this motion, but

16  only for purposes of this motion, they're not arguing that XRP

17  is a security -- is not a security.

18      But believe that if this case proceeds, that will be one

19  of the key issues -- one of the key factual issues that will

20  be hotly disputed.  And assume the court were to find that XRP

21  is not a security, well, certainly at that point, those UCL

22  claims and the false advertising claims are alive and are not

23  preempted by any securities law.

24      And lastly, if I may, I just want to make one point

25  regarding the federal claims and the statute of repose.

1    Counsel cited paragraph 25 of the complaint.  And two things

2    there.

3        One, I must admit that the summary of FinCEN's findings in

4    the statement of facts, as we pleaded them, is not hundred

5    percent accurate.  We did say in paragraph 25 that defendants

6    acknowledge that they had sold XRP to the general public.

7        By that, we were referring to the three transactions

8    discussed in the settlement.  To the extent more can be

9    implied from that, the -- the settlement, which we went

10   over -- which the court went over with counsel simply does not

11   support that, but --

12        THE COURT:  So you're suggesting that I not rely upon

13   what you've pled because it's inaccurate and, instead, rely

14   upon the actual statement -- settlement statement.

15        MR. ELKHUNOVICH:  Well, but -- I'm clarifying the

16   pleading.

17        THE COURT:  I mean, given how careful obviously

18   you're being about the use of "to the public," I mean, that's

19   the sense essence of your argument, why did you include that

20   in your complaint?

21        MR. ELKHUNOVICH:  Well, because we were describing

22   the admissions of the sales to the public.

23        And that was the second part of -- of the argument.  The

24   SEC -- as the SEC amicus brief makes clear, an offering to the

25   public is not enough.  It has to be the type of bona fide

1    public offering that would put the public on notice.  Let me

2    just find the exact language from --

3                    (Pause in the proceedings.)

4          **MR. ELKHUNOVICH:**  In cases where an offering -- and

5    I'm quoting from the SEC amicus brief.  "In cases where an

6    offering is made to the public but is conducted in a manner

7    that appears consistent with the private offering, the public

8    receives no notice that the offering may require

9    registration."

10     And that is exactly the point here.  We were not alleging

11   in -- in that language in paragraph 25 there was a bona fide

12   public offering.  We allege that XRP -- I'm sorry -- the

13   defendants offered to sell XRP to --

14         **THE COURT:**  The public.

15         **MR. ELKHUNOVICH:**  -- certain members of the public.

16         **THE COURT:**  You don't say that.  You said "general

17   public."

18         **MR. ELKHUNOVICH:**  In that respect --

19         **THE COURT:**  Not "certain members."

20         **MR. ELKHUNOVICH:**  In that respect, that's a mistake.

21         **THE COURT:**  Okay.

22         **MR. ELKHUNOVICH:**  And, again, paragraph 25 is a

23   summary of the FinCEN settlement.  I don't think that we (sic)

24   would be a fair summary of the FinCEN statement that there was

25   an admission by defendants there that there was sale to the

```
1    general public in the sense of a public offering.

2        There were sales to the -- members of the general public

3    that are described in the FinCEN --

4            THE COURT:  You don't make that distinction in your

5    complaint.

6            MR. ELKHUNOVICH:  We did not.  No, Your Honor.

7            THE COURT:  All right.

8        All right.  We need to wrap it up.  I have an afternoon

9    calendar.

10           MR. MARSHALL:  Sure.

11       Your Honor, just two -- two points.  In addition to the

12   admission in paragraph 25, the heading in 4A, XRP's

13   generous --

14           THE COURT:  Wait.  Wait.  Still in the complaint?

15           MR. MARSHALL:  In the complaint.

16       XRP's genesis and public offerings, so it is referencing

17   "public offerings" multiple times in the complaint.

18           THE COURT:  I'm sorry.  Where -- where are you

19   reading that?

20           MR. MARSHALL:  It is page 7, right under "Substantive

21   Allegations."

22           THE COURT:  Oh.  I see that.

23           MR. MARSHALL:  Subheading A.

24           THE COURT:  Right.  Right.

25           MR. MARSHALL:  So just very quickly, Your Honor,
```

1    one -- one quick point on the plaintiff's argument regarding

2    the probability analysis, the .01 percent factored in that

3    there were hundred thousand shares.  It wasn't based on the

4    sale of one share, so that is the probability that any one of

5    those 100,000 shares was from XRP.

6        And then I just wanted to point the court to a case we

7    cited in our opening brief that was not responded to in -- in

8    plaintiff's papers, which is the *Welgus vs. TriNet*, 2000 --

9    2017 Westlaw 6466264, and that was affirmed by the Ninth

10   Circuit in 765 Fd.S 239.

11       The court rejected the plaintiff's argument that it was

12   undeniable that the defendant was the seller based on the sale

13   of 2.25 million shares in an IPO out of 15 million and that

14   all 13.8 million shares in the secondary offering, because the

15   allegations do not constitute facts that the plaintiff

16   purchased his shares directly from the defendant as opposed to

17   another seller or intermediary.

18       We think that that analysis is directly on point here and

19   should be instructive on this point.

20           **THE COURT:**  Okay.

21       All right.  To -- to conclude, though, with regard to the

22   essence of plaintiff's counsel's opening argument on the

23   public offering, are you taking the position that these few

24   instances in the complaint in which the word "public" is

25   inserted in the language are enough for the court to make

1    that?  Or do you --

2        Tell me why you disagree with plaintiff's counsel's

3    characterization of these as factual disputes not ripe for a

4    consideration on a 12(b) motion.

5            MR. MARSHALL:  Well, two -- two things Your Honor.

6    One I think that Ninth Circuit law is clear that it is the

7    plaintiff's burden to show that repose does not apply in its

8    pleadings.

9        They have -- I believe they have shown that it does apply

10   in their pleadings, but they certainly haven't met that

11   burden.

12       Secondly, Your Honor, they have to be held to the

13   allegations in their complaint.  They have to be held to the

14   allegations that there were public sales.  They have to be

15   held to the allegation that there was 30 billion in

16   circulation by 2015.

17       All of those facts alleged, they can't walk away from.

18   And all of those facts meet the *Stolz* requirement of a genuine

19   offer to the public.

20           THE COURT:  And do you think that a dismissal on

21   statute of repose grounds is one that should be entered with

22   prejudice?

23           MR. MARSHALL:  I believe it should be entered with

24   prejudice, Your Honor.

25           THE COURT:  Why?

1          MR. MARSHALL:  Because the allegations in the

2    complaint themselves support -- they can't -- I don't believe

3    they could amend around the fact that the purchase date, when

4    it was first offered -- all -- all of those things are things

5    that are -- can't be alleged differently within the confines

6    of requirements of how you have to plead a complaint.

7          They -- they have given us sort of all of the allegations

8    necessary for application of the statute of repose.  And I

9    think that they -- that can't be amended around.  I think that

10   there are certain of their claims, the -- the 9(b) claims or

11   the claims that are -- we think are subjected to 9(b), I think

12   those could be amended possibly.

13         I think that -- although they have not pled in the

14   alternative, I think the UCL claims, the consumer protection

15   claims, possibly could be repled.  It would be a very

16   different complaint without sort of the reliance on the

17   security aspects.  But I believe those might be able to be

18   repled.

19         But this plaintiff, I don't believe, can replead around

20   the statute of repose.

21         THE COURT:  Hmm.

22         Okay.  Did you want to respond to that?

23         MR. ELKHUNOVICH:  Can I address that just briefly?

24         Your Honor if the court were to find a repose issue in the

25   complaint it should allow us an opportunity to amend, and

1    here's why.

2         Even since the briefing of this motion and since the

3    complaint was filed, we have since discovered new facts that

4    would support a -- our contention that up to certain period of

5    time, the offerings that -- that defendants made of XRP are

6    more like private offerings and not like public offerings.

7         For example, Ripple's CTO David Schwartz recently stated

8    that Ripple, quote, started selling XRP only after there was a

9    market price and for negligible amounts compared to other

10   funding.

11        And like he said, now it's all significantly more.

12        Ripple made a submission that we found to the Conference

13   of Bank Supervisors in 2014 stating that it, quote, holds a

14   substantial amount of XRP which it sells from time to time to

15   financial institutions and entities seeking to be

16   market-makers.

17        Ripple relied on this argument to -- relied on these

18   statements to argue that consumer protection rules should not

19   be rigidly applied to them.

20        So there are facts that we have discovered since filing

21   the complaint and since the briefing on this motion that would

22   further support our contention that there was no bona fide

23   public offering until much later, closer to 2017, rather than

24   2013, '14, or '15, as defendant contends.

25             THE COURT:  Hmm.

1          **MR. ELKHUNOVICH:**  And just last question, if Your

2     Honor would like a copy of the amicus brief by the SEC in the

3     *Stolz* case.

4          **THE COURT:**  No.  No.

5          **MR. ELKHUNOVICH:**  Okay.

6          **THE COURT:**  All right.  Matter stands submitted.

7     Thank you.

8          **MR. ELKHUNOVICH:**  Thank you.

9          (Proceedings were concluded at 12:12 P.M.)

10                         --o0o--

11

12

13               **CERTIFICATE OF REPORTER**

14

15          I certify that the foregoing is a correct transcript

16     from the record of proceedings in the above-entitled matter.

17     I further certify that I am neither counsel for, related to,

18     nor employed by any of the parties to the action in which this

19     hearing was taken, and further that I am not financially nor

20     otherwise interested in the outcome of the action.

21

22     _____

23     Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24              Tuesday, February 11, 2020

25