# EXHIBIT A

**34870**    **Federal Register** / Vol. 85, No. 109 / Friday, June 5, 2020 / Rules and Regulations

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Part 1005**

**[Docket No. CFPB–2019–0058]**

**RIN 3170–AA96**

**Remittance Transfers Under the Electronic Fund Transfer Act (Regulation E)**

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final rule; official interpretation.

**SUMMARY:** The Electronic Fund Transfer Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, establishes certain protections for consumers sending international money transfers, or remittance transfers. The Bureau of Consumer Financial Protection's (Bureau) remittance rule in Regulation E (Remittance Rule or Rule) implements these protections. The Bureau is amending Regulation E and the official interpretations of Regulation E to provide tailored exceptions to address compliance challenges that insured institutions may face in certain circumstances upon the expiration of a statutory exception that allows insured institutions to disclose estimates instead of exact amounts to consumers. That exception expires on July 21, 2020. In addition, the Bureau is increasing a safe harbor threshold in the Rule related to whether a person makes remittance transfers in the normal course of its business.

**DATES:** This final rule is effective July 21, 2020.

**FOR FURTHER INFORMATION CONTACT:** David Gettler, Paralegal Specialist, Yaritza Velez, Counsel, or Krista Ayoub, or Jane Raso, Senior Counsels, Office of Regulations, at 202–435–7700. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Summary of the Final Rule**

The Bureau is adopting several amendments to the Remittance Rule,[1] which implements section 919 of the Electronic Fund Transfer Act (EFTA) [2]

governing international remittance transfers. First, the Bureau is adopting amendments to increase a safe harbor threshold in the Rule. Under both EFTA and the Rule, the term "remittance transfer provider" is defined, in part, to mean any person that provides remittance transfers for a consumer in the normal course of its business.[3] As originally adopted, the normal course of business safe harbor threshold stated that a person is deemed not to be providing remittance transfers for a consumer in the normal course of its business if the person provided 100 or fewer remittance transfers in the previous calendar year and provides 100 or fewer remittance transfers in the current calendar year.[4] The Bureau is adopting amendments to increase the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually.[5] These changes to the normal course of business safe harbor threshold appear in the definition of remittance transfer provider in § 1005.30(f) and related commentary.

Second, the Bureau is adopting tailored exceptions to the Remittance Rule to address compliance challenges insured institutions may face in certain circumstances upon the expiration of a statutory exception that allows insured institutions to disclose estimates to consumers of the exchange rate and covered third-party fees instead of exact amounts (the temporary exception). This exception expires on July 21, 2020. Specifically, with respect to the exchange rate, the Bureau is adopting a new, permanent exception that permits insured institutions to estimate the exchange rate for a remittance transfer to a particular country if, among other things, the designated recipient will receive funds in the country's local currency and the insured institution made 1,000 or fewer remittance transfers in the prior calendar year to that country when the designated recipients received funds in the country's local currency. With respect to covered third-party fees, the Bureau is adopting a new, permanent exception that will permit insured institutions to estimate covered third-party fees for a remittance transfer to a designated recipient's institution if, among other things, the insured institution made 500

or fewer remittance transfers to that designated recipient's institution in the prior calendar year.

With respect to both exceptions, the Bureau is adopting a transition period for insured institutions that exceed, as applicable, the 1,000-transfer or 500-transfer thresholds in a certain year. This transition period will allow these institutions to continue to provide estimates for a reasonable period of time while they come into compliance with the requirement to provide exact amounts. Additionally, the Bureau released a statement on April 10, 2020 announcing that in light of the COVID–19 pandemic, for remittance transfers that occur on or after July 21, 2020, and before January 1, 2021, the Bureau does not intend to cite in an examination or initiate an enforcement action in connection with the disclosure of exact third-party fees and exchange rates against any insured institution that will be newly required to disclose exact third-party fees and exchange rates after the temporary exception expires.

The temporary exception and its statutorily mandated expiration date are in existing § 1005.32(a)(1) and (2); the Bureau's amendments to add the new exceptions appear in new § 1005.32(b)(4) and (5) and related commentary, along with conforming changes in existing §§ 1005.32(c), 1005.33(a)(1)(iii)(A), and 1005.36(b)(3) and in the existing commentary accompanying §§ 1005.32, 1005.32(b)(1), (c)(3) and (d), and 1005.36(b). Lastly, the Bureau is adopting technical corrections in § 1005.32(c)(4) and existing commentary that accompany §§ 1005.31(b)(1)(viii) and 1005.32(b)(1). These technical corrections do not change or alter the meaning of the existing regulatory text and commentary.

Due to changes in requirements by the Office of the Federal Register, when amending commentary the Bureau is now required to reprint certain subsections being amended in their entirety rather than providing more targeted amendatory instructions. The sections of commentary included in this document show the language of those sections as amended by this final rule. The Bureau is releasing an unofficial, informal redline to assist industry and other stakeholders in reviewing the changes that it is making to the regulatory text and commentary of the Remittance Rule.[6]

---

[1] 77 FR 6194 (Feb. 7, 2012); as amended on 77 FR 40459 (July 10, 2012), 77 FR 50243 (Aug. 20, 2012), 78 FR 6025 (Jan. 29, 2013), 78 FR 30661 (May 22, 2013), 78 FR 49365 (Aug. 14, 2013), 79 FR 55970 (Sept. 18, 2014), 81 FR 70319 (Oct. 12, 2016), and 81 FR 83934 (Nov. 22, 2016) (together, Remittance Rule or Rule).

[2] 15 U.S.C. 1693 *et seq.* EFTA section 919 is codified at 15 U.S.C. 1693o–1.

[3] EFTA section 919(g)(3), codified at 15 U.S.C. 1693o–1(g)(3); 12 CFR 1005.30(f)(1).

[4] 12 CFR 1005.30(f)(2)(i).

[5] As used in this document, "100 transfers annually" or "500 transfers annually" refers to the normal course of business safe harbor threshold, which is based on the number of remittance transfers provided in the previous and current calendar years.

[6] This redline can be found on the Bureau's regulatory implementation page for the Remittance Rule, at *https://www.consumerfinance.gov/policy-compliance/guidance/remittance-transfer-rule/.* If any conflicts exist between the redline and the text of the Remittance Rule or this final rule, the rules

## II. Background

### A. Market Overview

Consumers in the United States send billions of dollars in remittance transfers to recipients in foreign countries each year. The term "remittance transfers" is sometimes used to describe consumer-to-consumer transfers of small amounts of money, often made by immigrants supporting friends and relatives in other countries. The term may also include, however, consumer-to-business payments of larger amounts, for instance, to pay bills, tuition, or other expenses.

Money services businesses (MSBs) as well as banks and credit unions send remittance transfers on behalf of consumers. MSBs, however, provide the overwhelming majority of remittance transfers for consumers in the United States. For example, in the Bureau's October 2018 Remittance Rule Assessment Report,[7] which is discussed in detail below, the Bureau observed that in 2017, MSBs provided approximately 95.5 percent of all remittance transfers for consumers. The average amount of a remittance transfer sent by MSBs on behalf of consumers was approximately $381.

Banks and credit unions generally send fewer remittance transfers on behalf of consumers than MSBs. The Bureau found that in 2017, banks and credit unions conducted 4.2 and 0.2 percent of all remittance transfers, respectively. However, the average amount that banks and credit unions transferred was much greater than the average amount transferred by MSBs. For example, based on the Bureau's analysis, the average transfer size of a bank-sent remittance transfer was more than $6,500.[8] As such, based on information it received as part of its assessment of the Remittance Rule in connection with the Assessment Report, while banks and credit unions provide a small percentage of the overall number of remittance transfers, because the average amount of the transfers they send is higher than MSBs, banks and credit unions collectively sent approximately 45 percent of the dollar volume of all remittance transfers sent for consumers in the United States (43 percent attributed to banks and 2 percent attributed to credit unions).

In addition, MSBs differ from banks and credit unions in the means by which they provide remittance transfers. Traditionally, MSBs sending remittance transfers have predominantly relied on a storefront model and a network of the MSBs' employees and agents (such as grocery stores and neighborhood convenience stores).[9] Because MSBs receive and disburse funds either through their own employees or agents, the payment system by which MSBs facilitate remittance transfers is typically referred to as a "closed network" payment system. A single entity in this system—the MSB—exerts a high degree of end-to-end control over a transaction. Such level of control means, among other things, that an entity that uses a closed network payment system to send remittance transfers can disclose to its customers precise and reliable information about the terms and costs of a remittance transfer before the entity sends the remittance transfer on its customers' behalf.

In contrast to MSBs, banks and credit unions have predominantly utilized an "open network" payment system made up of the correspondent banking network[10] to send remittance transfers on behalf of consumers.[11] The open network payment system based on the correspondent banking network lacks a single, central operator. This feature distinguishes it from closed network payment systems. The correspondent banking network is a decentralized network of bilateral banking relationships between the world's tens of thousands of banks and credit unions. Most institutions only maintain relationships with a relatively small number of correspondent banks but can nonetheless ensure that their customers' remittance transfers are able to reach a wide number of recipient financial institutions worldwide. Banks and credit unions can reach these institutions even if the banks and credit unions do not have control over, or a relationship with, all of the participants involved in the transmission of a remittance transfer. As discussed in greater detail in the section-by-section analysis of § 1005.32(a) below, the decentralized nature of the correspondent banking system has presented certain challenges to the ability of banks and credit unions to disclose precise and reliable information about the terms and costs of remittance transfers to its customers before these institutions send remittance transfers on their customers' behalf.

### B. Remittance Rulemaking Under Section 1073 of the Dodd-Frank Act

Prior to the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act),[12] remittance transfers fell largely outside of the scope of Federal consumer protection laws. Section 1073 of the Dodd-Frank Act amended EFTA by adding new section 919, which created a comprehensive system for protecting consumers in the United States who send remittance transfers to individuals and businesses in foreign countries. EFTA applies broadly in terms of the types of remittance transfers it covers. EFTA section 919(g)(2) defines "remittance transfer" as the electronic transfer of funds by a sender in any State to designated recipients located in foreign countries that are initiated by a remittance transfer provider; only small dollar transactions are excluded from this definition.[13] EFTA also applies broadly in terms of the providers subject

---

[7] Bureau of Consumer Fin. Prot., *Remittance Rule Assessment Report* (Oct. 2018, rev. Apr. 2019) (Assessment Report), *https:// .consumerfinance.gov///bcfp_remittance-rule- assessment_report_corrected_2019-03.pdf.* The Bureau's initial rule and certain amendments took effect in October 2013. As explained in the Assessment Report, the Assessment Report considers all rules that took effect through November 2014 and refers to them collectively as the Remittance Rule. *See* Assessment Report at 115.

[8] *Id.* at 73.

[9] *Id.* at 54. As noted in the Assessment Report, increased access to digital devices has impacted the traditional MSB model by enabling more MSB-facilitated transfers to be conducted via the internet. *See also id.* at 102.

[10] Generally speaking, a correspondent banking network is made up of individual correspondent banking relationships, which consist of bilateral arrangements under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks. *See, e.g.,* Bank for Int'l Settlements, *Correspondent Banking,* at 9 (2016) (2016 BIS Report), *https://www.bis.org/ cpmi/publ/d147.pdf.*

[11] The Bureau notes that some methods of sending cross-border money transfers, including remittance transfers, include elements of closed and open payment networks and some providers may also rely on both types of systems to facilitate different transfers. For example, the Bureau understands that banks may offer low-cost international fund transfers to its commercial clients through the use of the automated clearing house (ACH) system, and a minority of banks also offer international ACH to their consumer clients. *See* Bd. of Governors of the Fed. Reserve Sys., *Report to Congress on the Use of the ACH System and Other Payment Mechanisms for Remittance Transfers to Foreign Countries,* at 7 (May 2019), *https://www.federalreserve.gov/publications/2019- may-ach-report-other-payment-mechanisms.htm.*

[12] Public Law 111–203, 124 Stat. 1376 (2010).

[13] 15 U.S.C. 1693o–1(g)(2). As adopted in the Remittance Rule, the term "remittance transfer" means: "[The] electronic transfer of funds requested by a sender to a designated recipient that is sent by a remittance transfer provider. The term applies regardless of whether the sender holds an account with the remittance transfer provider, and regardless of whether the transaction is also an electronic fund transfer, as defined in [subpart A of Regulation E]." The Rule's definition specifically excludes (1) transfer amounts of $15 or less and (2) certain securities and commodities transfers. 12 CFR 1005.30(e).

---

themselves, as published in the **Federal Register**, are the controlling documents.

to it, including MSBs, banks, and credit unions.

The Bureau adopted subpart B of Regulation E to implement EFTA section 919 through a series of rulemakings that were finalized in 2012 and 2013, and which became effective on October 28, 2013.[14] The Bureau subsequently amended subpart B several times.[15] The Rule provides three significant consumer protections: It specifies the information that must be disclosed to consumers who send remittance transfers, including information related to the exact cost of a remittance transfer; it provides consumers with cancellation and refund rights; and it specifies procedures and other requirements for providers to follow in resolving errors.

## III. Summary of the Rulemaking Process

### A. 2019 Proposal

On December 3, 2019, the Bureau issued a notice of proposed rulemaking relating to the expiration of the temporary exception and the normal course of business safe harbor threshold, which was published in the **Federal Register** on December 6, 2019 (2019 Proposal).[16] In the 2019 Proposal, the Bureau proposed to increase the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually. The Bureau also proposed tailored exceptions to the Remittance Rule to address compliance challenges that insured institutions might face upon the expiration of the temporary exception on the ability of insured institutions to comply with the Rule's requirements to disclose the exchange rate and covered third-party fees. Specifically, with respect to the exchange rate, the Bureau proposed to adopt a new, permanent exception in the Remittance Rule that would permit insured institutions to estimate the exchange rate for a remittance transfer to a particular country if, among other things, the designated recipient will receive funds in the country's local currency and the insured institution made 1,000 or fewer remittance transfers in the prior calendar year to that country when the designated recipients received funds in the country's local currency. With respect to covered third-party fees, the Bureau proposed to adopt a new, permanent

exception that would permit insured institutions to estimate covered third-party fees for a remittance transfer to a particular designated recipient's institution if, among other things, the insured institution made 500 or fewer remittance transfers to that designated recipient's institution in the prior calendar year.

Along with these amendments, the Bureau proposed to make several conforming changes in the existing Rule and related commentary. The 2019 Proposal proposed an effective date of July 21, 2020 for all these amendments. Finally, the 2019 Proposal sought comment on a permanent exception in the Rule (in § 1005.32(b)(1)) permitting providers to use estimates for transfers to certain countries and the process for adding countries to the safe harbor countries list maintained by the Bureau.

The comment period for the 2019 Proposal closed on January 21, 2020. The Bureau received approximately 100 comments and three *ex parte* communications from a trade association representing large bank remittance providers and a trade association representing credit unions, respectively. Nearly half of the comments were submitted by industry commenters, specifically banks and credit unions, their trade associations, and their service providers. Commenters also included a trade association representing MSBs, several consumer groups, a regional bank of the Federal Reserve System, a virtual currency company, and individuals.

Industry commenters were generally supportive of the Bureau's proposed changes to increase the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually. They were also generally supportive of the Bureau's proposal to adopt new tailored exceptions from the general requirement to disclose exact amounts in order to address the impact of the temporary exception's expiration on July 21, 2020, but some industry commenters also noted that while they generally supported the Bureau's proposal to address the impact of the expiration of the temporary exception, they also thought the Bureau's proposed amendments did not go far enough to preserve the use of the temporary exception. In contrast, consumer groups were opposed to the proposed changes.

There were approximately 60 comment letters submitted by individuals. Credit union members submitted nearly all of these letters and they expressed support for the 2019 Proposal. The Bureau also received one comment letter from an anonymous commenter who did not support the

2019 Proposal and one comment letter from an anonymous commenter who supported it.

Lastly, the Bureau notes that some of the comments the Bureau received raised issues that are beyond the scope of the 2019 Proposal. For example, a number of commenters that represented credit unions, their trade associations, and credit union members urged the Bureau to eliminate the Remittance Rule's cancellation rights or modify the existing requirements to enable consumers to waive their rights. To the extent that a comment was within the scope of the 2019 Proposal, the Bureau has considered it in adopting this final rule.

### B. Other Outreach

Prior to the issuance of the 2019 Proposal, the Bureau received feedback regarding the Remittance Rule through both formal and informal channels. In addition, over the years, the Bureau has engaged in ongoing market monitoring and other outreach to industry and other stakeholders regarding the Remittance Rule. The following is a brief summary of some of this outreach.

#### Assessment and 2017–2018 RFIs

The Bureau conducted an assessment of the Remittance Rule (Assessment), as required pursuant to section 1022(d) of the Dodd-Frank Act.[17] In 2017, the Bureau issued a request for information (RFI) in connection with the Assessment, and received approximately 40 comment letters.[18] As referenced above, in October 2018, the Bureau published the results of the Assessment in the Assessment Report, providing insights into the effectiveness of the Rule and its provisions. Separately, in 2018, the Bureau issued a series of RFIs as part of a call for evidence to ensure the Bureau is fulfilling its proper and appropriate functions to best protect consumers, and received a total of approximately 34 comments on the Remittance Rule in response.[19]

#### 2019 RFI

Based on comments and other feedback from various remittance transfer providers and their trade

---

[14] 77 FR 6194 (Feb. 7, 2012); as amended on 77 FR 40459 (July 10, 2012); 77 FR 50243 (Aug. 20, 2012); 78 FR 6025 (Jan. 29, 2013); 78 FR 30661 (May 22, 2013); and 78 FR 49365 (Aug. 14, 2013).

[15] 79 FR 55970 (Sept. 18, 2014), 81 FR 70319 (Oct. 12, 2016), and 81 FR 83934 (Nov. 22, 2016).

[16] 84 FR 67132 (Dec. 6, 2019).

[17] Section 1022(d) requires the Bureau to conduct an assessment of each significant rule or order adopted by the Bureau under Federal consumer financial law and to publish a report of such assessment not later than five years after the rule or order's effective date. 12 U.S.C. 5512(d).

[18] 82 FR 15009 (Mar. 24, 2017). The comment letters are available on the public docket at *https://www.regulations.gov/document?D=CFPB-2017-0004-0001*. See also Assessment Report at 149.

[19] *https://www.regulations.gov/document?D=CFPB-2017-0004-0001*.

associations in response to the RFIs described above, as well as its own analysis, the Bureau published an RFI on April 20, 2019 (2019 RFI) [20] to seek information and data about the potential negative effects of the expiration of the temporary exception and potential options to address its impact. The 2019 RFI also sought information on possible changes to the current normal course of business safe harbor threshold in and whether an exception for "small financial institutions" may be appropriate.

## IV. Legal Authority

Section 1073 of the Dodd-Frank Act created a new section 919 of EFTA requiring remittance transfer providers to provide disclosures to senders of remittance transfers, pursuant to rules prescribed by the Bureau. In particular, providers must provide a sender a written pre-payment disclosure containing specified information applicable to the sender's remittance transfer, including the amount to be received by the designated recipient. The provider must also provide a written receipt that includes the information provided on the pre-payment disclosure, as well as additional specified information.[21] In addition, EFTA section 919(d) directs the Bureau to promulgate rules regarding appropriate error resolution standards and cancellation and refund policies.

In addition to the Dodd-Frank Act's statutory mandates, EFTA section 904(a) authorizes the Bureau to prescribe regulations necessary to carry out the purposes of EFTA. The express purposes of EFTA, as amended by the Dodd-Frank Act, are to establish "the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems" and to provide "individual consumer rights." [22] EFTA section 904(c) further provides that regulations prescribed by the Bureau may contain any classifications, differentiations, or other provisions, and may provide for such adjustments or exceptions for any class of electronic fund transfers or remittance transfers that the Bureau deems necessary or proper to effectuate the purposes of the title, to prevent circumvention or evasion, or to facilitate compliance. As described in more detail below, the changes herein are adopted pursuant to the Bureau's authority under EFTA section 904(a) and (c).

## V. Section-by-Section Analysis

### Section 1005.30 Remittance Transfer Definitions

30(f) Remittance Transfer Provider

30(f)(2) Normal Course of Business

EFTA section 919(g)(3) defines "remittance transfer provider" to be a person or financial institution providing remittance transfers for a consumer in the "normal course of its business." [23] The Rule uses a similar definition.[24] It states that whether a person provides remittance transfers in the normal course of its business depends on the facts and circumstances, including the total number and frequency of transfers sent by the provider.[25] The Rule currently contains a safe harbor whereby a person that provides 100 or fewer remittance transfers in each of the previous and current calendar years is deemed not to be providing remittance transfers in the normal course of its business, and therefore is outside of the Rule's coverage.[26]

When the Bureau finalized the normal course of business 100-transfer safe harbor threshold in August 2012, it stated that it intended to monitor that threshold over time.[27] The Bureau acknowledged, among other things, that the administrative record contained little data on the overall distribution and frequency of remittance transfers to support treating any particular number of transactions as outside the normal course of business.[28] After explaining the limitations in the data it did have, the Bureau stated that it did not believe it could rely on the data received to describe the number of remittance transfers provided by "typical" entities or to identify a clear pattern in the distribution of providers by the number of transfers provided.[29] The Bureau concluded that the data collected at the time provided some additional support for the 100-transfer normal course of business safe harbor threshold, and that the threshold was "not so low as to be meaningless." [30] The Bureau determined at that time that a normal course of business safe harbor threshold of 100 was high enough that persons would not risk exceeding the safe harbor based on making transfers for just two or three customers each month, while low enough to serve as a reasonable

basis for identifying persons who occasionally provide remittance transfers, but not in the normal course of their business. The Bureau also noted that 100 transfers per year is equivalent to an average of approximately two transfers per week, or the number of transfers needed to satisfy the needs of a handful of customers sending money abroad monthly.[31]

In the 2019 Proposal, the Bureau proposed to raise the normal course of business safe harbor threshold from 100 remittance transfers to 500 remittance transfers, in response to feedback it has received over the years from banks, credit unions, and their trade associations in which these entities asserted that the 100-transfer threshold is too low. For reasons set forth herein, the Bureau is adopting this aspect of the proposal as proposed.

The Bureau's Proposal

The Bureau proposed to raise the normal course of business safe harbor threshold from 100 to 500 remittance transfers by proposing to revise part of existing § 1005.30(f)(2)(i). The proposed revision stated that a person is deemed not to be providing remittance transfers for a consumer in the normal course of its business if the person provided 500 or fewer transfers in the previous calendar year and provides 500 or fewer transfers in the current calendar year. The Bureau also proposed to revise part of existing § 1005.30(f)(2)(ii) regarding the current normal course of business safe harbor transition period to reflect the proposed 500-transfer normal course of business safe harbor threshold and the proposed effective date of July 21, 2020. Specifically, the proposed revision to § 1005.30(f)(2)(ii) stated that if, beginning on July 21, 2020, a person that provided 500 or fewer remittance transfers in the previous calendar year provides more than 500 remittance transfers in the current calendar year, and if that person is then providing remittance transfers for a consumer in the normal course of its business pursuant to § 1005.30(f)(1), the person has a reasonable period of time, not to exceed six months, to begin complying with subpart B of Regulation E. Further, the Bureau proposed to add new § 1005.30(f)(2)(iii) to address the transition period for persons qualifying for the normal course of business safe harbor. Proposed § 1005.30(f)(2)(iii) stated that if a person who previously provided remittance transfers in the normal course of its business in excess of the normal course of business safe harbor threshold set forth in

---

[20] 84 FR 17971 (Apr. 29, 2019).
[21] EFTA section 919(a); 15 U.S.C. 1693o–1(a).
[22] EFTA section 902(b); 15 U.S.C. 1693(b).

[23] EFTA section 919(g)(3); 15 U.S.C. 1693o–1(g)(3).
[24] See 12 CFR 1005.30(f)(1).
[25] Comment 30(f)–2.i.
[26] 12 CFR 1005.30(f)(2)(i).
[27] 77 FR 50243, 50252 (Aug. 20, 2012).
[28] Id. at 50251–52.
[29] Id.
[30] Id. at 50252.

[31] Id. at 50251.

§ 1005.30(f)(2) determines that, as of a particular date, it will qualify for the normal course of business safe harbor, it may cease complying with the requirements of subpart B of Regulation E with respect to any remittance transfers for which payment is made after that date. Proposed § 1005.30(f)(2)(iii) also provided that the requirements of EFTA and Regulation E, including those set forth in §§ 1005.33 and 1005.34, as well as the requirements set forth in § 1005.13, continue to apply to transfers for which payment is made prior to that date.

The Bureau also proposed changes to the existing commentary accompanying § 1005.30(f) to align the commentary with the proposed changes to existing § 1005.30(f)(2) and provide further clarification related to the proposed 500-transfer normal course of business safe harbor threshold. Specifically, the Bureau proposed to revise the last sentence in existing comment 30(f)–2.i to avoid potential conflict or confusion with the proposed normal course of business safe harbor threshold of 500 transfers. The Bureau also proposed to revise existing comments 30(f)–2.ii and iii regarding the normal course of business safe harbor and transition period by changing 100 to 500 throughout for consistency with the proposed changes to § 1005.30(f)(2)(i) and (ii). In addition, the Bureau proposed to add a sentence in comment 30(f)–2.ii stating that on July 21, 2020, the normal course of business safe harbor threshold in § 1005.30(f)(2)(i) changed from 100 transfers to 500 transfers, to incorporate the change in the commentary. The Bureau also proposed to renumber existing comment 30(f)–2.iv as 30(f)–2.iv.A (in order to add two additional examples, described below), revise the heading for this comment to make clear that it provides an example of the normal course of business safe harbor and transition period for the 100-transfer normal course of business safe harbor threshold that was effective prior to the proposed effective date of July 21, 2020, and change the verb tense from present to past throughout the example.

In addition, the Bureau proposed to add new comment 30(f)–2.iv.B to provide an example of how the normal course of business safe harbor applies to a person that provided 500 or fewer transfers in 2019 and provides 500 or fewer transfers in 2020. The Bureau also proposed to add new comment 30(f)–2.iv.C, which provides an example of the normal course of business safe harbor and transition period for the 500-transfer normal course of business safe harbor threshold that would be effective

beginning on the proposed effective date of July 21, 2020. This proposed comment was based on the example in existing comment 30(f)–2.iv, with modifications to reflect the changes the Bureau proposed to § 1005.30(f)(2), which are discussed in detail above.

Finally, the Bureau proposed to add new comment 30(f)–2.v to explain a person's continued obligations under the Rule with respect to transfers for which payment was made before the person qualifies for the normal course of business safe harbor. The proposed comment stated that proposed § 1005.30(f)(2)(iii) addresses situations where a person who previously was required to comply with subpart B of Regulation E newly qualifies for the revised normal course of business safe harbor in proposed § 1005.30(f)(2)(i). It explained that proposed § 1005.30(f)(2)(iii) states that the requirements of EFTA and Regulation E, including those set forth in §§ 1005.33 and 1005.34 (which address procedures for resolving errors and procedures for cancellation and refund of remittance transfers, respectively), as well as the requirements set forth in § 1005.13 (which, in part, governs record retention), continue to apply to transfers for which payment is made prior to the date the person qualifies for the normal course of business safe harbor in § 1005.30(f)(2)(i). The proposed comment also explained that qualifying for the safe harbor in § 1005.30(f)(2)(i) likewise does not excuse compliance with any other applicable law or regulation. For example, if a remittance transfer is also an electronic fund transfer, any requirements in subpart A of Regulation E that apply to the transfer continue to apply, regardless of whether the person must comply with subpart B. Relevant requirements in subpart A of Regulation E may include, but are not limited to, those relating to initial disclosures, change-in-terms notices, liability of consumers for unauthorized transfers, and procedures for resolving errors.

The Bureau sought comment on its proposal to increase the normal course of business safe harbor threshold as well as on its proposed revisions and additions to the accompanying commentary.

Comments Received

Most commenters to the 2019 Proposal responded to the Bureau's proposed changes to the normal course of business safe harbor threshold. Industry commenters, including banks, credit unions, and trade associations, as well as a regional bank in the Federal Reserve System, individuals who

identified themselves as credit union members, and one anonymous commenter generally supported the proposal to increase the normal course of business safe harbor threshold from 100 to 500 remittance transfers annually. The credit union members and about half of the industry commenters, including the credit unions and credit union trade associations, recommended a higher threshold of 1,000 transfers; one community bank trade association recommended 1,200 transfers. In contrast, consumer groups opposed the proposal and urged the Bureau instead to lower the current normal course of business safe harbor threshold.[32]

Similar to the feedback the Bureau has received on the normal course of business safe harbor threshold in the past, industry commenters stated that compliance costs related to the Remittance Rule have caused many credit unions and community banks that provide remittance transfers as an accommodation to their account-holding customers to limit the number of transfers they provide or exit the market altogether. Several of these commenters explained that for them, offering remittance transfer services is not a separate or profit-making line of business, and that many of them do not provide enough transfers to cover their compliance costs. These commenters also stated that the undue burden caused by complying with the Remittance Rule has led to consumer harm in the form of decreased access to remittance transfer services at credit unions and community banks because these entities have limited the number of transfers they provide or increased prices to cover their compliance costs.

The industry commenters and credit union members that recommended a normal course of business safe harbor threshold of 1,000 or 1,200 remittance transfers also generally supported the Bureau's proposal to raise the current threshold from 100 transfers annually to 500 transfers annually. These industry commenters, all of which were credit unions and credit union trade associations, stated that a 1,000-transfer normal course of business safe harbor threshold is more appropriate to alleviate burden for credit unions and would allow credit unions that stopped or limited providing remittance transfers to reenter the market or resume services. Several of these commenters

---

[32] The Bureau also received a letter from an anonymous commenter that generally opposed any changes to the Remittance Rule that would compromise transparency to the public and stated that any cost savings by institutions would not be passed on to consumers.

also asserted that banks and credit unions are not major players in the remittance market, and as such, raising the threshold to 1,000 transfers would result in a minimal impact on the total number of transfers that would be excluded from the Remittance Rule, which would mean that the consumer impact would also be minimal. One credit union trade association stated that providing fewer than 1,000 transfers is not enough to generate meaningful income for most credit unions. One credit union stated that a small increase to the normal course of business safe harbor threshold would only present transitional issues for entities that continue to experience steady organizational growth. The credit union trade association members stated that remittance transfers are significant and popular services offered to credit union members and noted that credit unions believe that the current Remittance Rule is "an unnecessary barrier" to such service. The community bank trade association that recommended raising the normal course of business safe harbor threshold to 1,200 stated that a safe harbor at that threshold would ensure that consumers have access to remittance transfer services at community banks and would allow community banks to compete in the remittance market, thereby preserving it as a safe, convenient, secure, and reasonably priced option for consumers.

In short, the commenters that supported the Bureau's proposal stated that raising the normal course of business safe harbor threshold would ease compliance burden on institutions that provide a low volume of remittance transfers, many of which are credit unions and community banks, and would benefit consumers who are customers at these institutions, particularly those located in rural areas. The regional bank in the Federal Reserve System also stated that the Bureau's proposal would help ensure the engagement of all insured institutions, especially small to mid-size institutions that have occasional remittance transfer demands. Additionally, a few commenters suggested that consumers that are customers of entities that would newly qualify for the proposed normal course of business safe harbor would not necessarily lose their protections related to remittance transfers. For example, one bank trade association stated that based on their membership feedback, entities that are no longer subject to the Remittance Rule will still provide their customers with information about the fees associated with sending a

remittance transfer and will also take steps to help consumers when there are errors related to their transfers. Relatedly, several other industry commenters, including a few credit union trade associations and one community bank trade association, stated that credit unions and community banks have strong connections to the communities they serve and that they exist to serve their customers. One of the credit union trade associations also stated that credit unions do not charge high fees or prevent consumers from having reliable information about their transactions.

In response to the Bureau's request for comment on basing the normal course of business safe harbor threshold on a metric other than the number of remittance transfers, one credit union trade association recommended a two-prong approach, whereby an entity would qualify for the safe harbor if it met either an asset-size threshold of $1 billion or a threshold of 1,000 remittance transfers. One bank commenter opposed using anything other than the number of remittance transfers, stating that using another metric, such as the percentage of an entity's customers that send remittance transfers, would be unduly burdensome to monitor.

A few commenters expressed general support for the Bureau's proposed commentary related to the normal course of business safe harbor transition period. One bank trade association recommended that the Bureau clarify that the current transition period provision in existing § 1005.30(f)(2)(ii) continue to apply to the Rule, as amended, so that when an entity exceeds the normal course of business safe harbor threshold, it will have six months to come into compliance (as set forth in the current Rule). However, one bank commenter suggested that for entities that cease to satisfy the requirements of the Rule's normal course of business safe harbor (and therefore must come into compliance with the Rule), the Bureau should adopt a transition period longer than six months. As noted above, the Bureau proposed to keep the transition period provision in existing § 1005.30(f)(2)(ii) unchanged.[33]

Another bank commenter responded to the Bureau's request for comment on whether the phrase "payment is made" is the appropriate standard on which to hinge various of the Remittance Rule provisions, including those related to the transition period for coming into compliance after ceasing to qualify for the normal course of business safe harbor, and stated that the Bureau should continue using the term as it is an easily understood term that is consistent with the current regulation. One bank and one credit union responded to the Bureau's request for comment on the proposed effective date of July 21, 2020 for the proposed normal course of business safe harbor threshold and agreed that July 21, 2020 should also be the effective date for that threshold.

Several industry commenters urged the Bureau to address coverage under the Remittance Rule using standards other than the normal course of business safe harbor threshold. One credit union trade association and one credit union suggested exempting credit unions entirely from the Rule, stating that the disclosure and error resolution requirements have caused credit unions to discontinue remittance transfer services due to the significant compliance costs, and that such an exemption would cultivate a competitive remittance market, given that only the largest and most technologically sophisticated institutions can afford to comply with the Rule. One trade association representing community banks and another representing credit unions recommended implementing a small financial institution exemption with an asset size threshold of $5 billion or $10 billion. One trade association that represents community banks and credit unions recommended an exemption for recurring remittance transfers and for transfers under a certain dollar amount, such as $10,000.

As noted above, consumer groups were opposed to the Bureau's proposal to raise the normal course of business safe harbor threshold. Consumer groups stated that under the current 100-transfer normal course of business safe harbor threshold, nearly all depository institutions are not required to comply with the Remittance Rule, and that this fact alone justifies implementing a lower threshold.[34] These consumer

---

[33] As described in detail above, the 2019 Proposal would have provided that if a person that provided 500 or fewer remittance transfers in the previous calendar year provides more than 500 remittance transfers in the current calendar year, and if that person is then providing remittance transfers for a consumer in the normal course of its business pursuant to § 1005.30(f)(1), then the person has a reasonable period of time, which must not exceed six months, to begin complying with the Remittance Rule.

[34] Consumer groups specifically cited the Assessment Report, which states that at the time of the report, approximately 80 percent of banks and 75 percent of credit unions that offer remittance transfers were below the 100-transfer normal course of business safe harbor threshold.

groups stated that Congress intended the term ''remittance transfer provider'' to have broad coverage and the normal course of business exemption to be narrow. These commenters stated that an exemption that covers three-quarters of banks and credit unions is not narrow or limited in scope, which contradicts Congress's intent and the Bureau's conclusion from 2012 when it finalized the 100-transfer normal course of business safe harbor threshold. These commenters stated that a 500-transfer normal course of business safe harbor threshold would bring the safe harbor even closer to a complete depository institution exemption and therefore would be more at odds with Congress's intent and the Bureau's earlier determination.

Further, consumer groups stated that the Bureau's proposal would harm consumers by excluding tens or hundreds of thousands of remittance transfers from the Rule's protections, including a consumer's right to accurate disclosures and error resolution. These commenters added that losing these protections would be especially critical for transfers provided by banks, given that bank transfers tend to be higher-value transfers, which would in turn mean that more of the consumer's money would be at stake if there was an error or the money was lost. These commenters stated that the Bureau recognized this type of risk in 2012 when it rejected industry suggestions to exempt all open network transfers above a certain dollar amount, but that now the Bureau appeared to have changed its position without explanation.

Consumer groups also stated that exempting most depository institutions from the Rule's disclosure requirements by raising the normal course of business safe harbor threshold would harm covered providers because the exempted entities would be permitted to appear to offer less expensive and faster remittance services than those offered by the covered providers. In addition, commenters noted that consumers would not be able to compare prices or easily identify which providers were required to comply with the Rule and offer its protections. Consumer groups also stated that any downward price pressure resulting from transparency could be reduced because so many institutions would no longer be providing the required disclosure information.

Consumer groups also stated that the Bureau did not provide data to support the assertion that a 500-transfer normal course of business safe harbor threshold may be more appropriate to identify persons who occasionally provide

remittance transfers, but not in the normal course of business. These commenters noted that the Bureau dismissed suggestions to raise the normal course of business safe harbor threshold to a number higher than 100 in 2012 when it finalized the current threshold, and that the Bureau has not adequately explained or justified its change in position. In addition, these commenters stated that a threshold of 500 remittance transfers annually (or an average of about ten transfers per week) sounds quite normal, not occasional. These commenters added that the issue of the normal course of business safe harbor threshold is whether entities offer remittance transfers normally, not whether they are trying to attract new customers or provide services to current ones. Moreover, consumer groups stated that the Bureau's claim that compliance costs are disproportionate for entities providing 500 or fewer transfers is not supported by the findings in the Assessment Report and does not justify the proposal because the concept of normal course of business does not tie to an entity's cost of doing business. These commenters also noted that the Assessment Report found that prices have decreased since the Rule took effect, and that preliminary analysis of statistically robust data sets suggests that the Rule may have contributed to the price decline.

Finally, consumer groups stated that the Bureau's proposal conflates the expiring temporary exception that allows insured institutions to provide estimates in certain circumstances with the proposed normal course of business safe harbor threshold that would exempt most of these institutions from coverage altogether. These commenters stated that the fact that expanding the normal course of business safe harbor would ease the burden of the expiring temporary exception is immaterial because the cost an entity might bear due to the expiration of the temporary exception has nothing to do with whether the entity provides remittance transfers in the normal course of business. These commenters noted that the temporary exception is not widely used by the entities the Bureau proposed to exempt by expanding the normal course of business safe harbor and cited bank Call Report data indicating that less than 10 percent of the entities providing between 100 and 500 transfers per year use the temporary exception today.

The Final Rule

For the reasons set forth herein, the Bureau is finalizing the changes to § 1005.30(f) and related commentary as

proposed. Specifically, the Bureau is adopting revisions to existing § 1005.30(f)(2)(i) and (ii) and comments 30(f)–2.i through 2.iv, and adding new § 1005.30(f)(iii) and new comments 30(f)–2.iv.B, 30(f)–2.iv.C, and 30(f)–2.v, as proposed.

As discussed below, the Bureau believes that the term ''normal course of business'' is ambiguous. Since the adoption of the current normal course of business safe harbor in 2012, the Bureau has conducted outreach and research and met with industry stakeholders and consumer groups to better understand the remittance transfer market. Based on its experience and expertise, as well as the data and information gained since 2012, the Bureau concludes that a more appropriate understanding of ''normal course of business'' that better reflects Congress's purpose in writing this standard should take into consideration a multitude of factors including disproportionate costs that entities may encounter because of the Remittance Rule; the frequency and regularity of remittance transfers; whether transfers are offered as an accommodation for customers; and a consideration of the extent of consumer harm that could arise from excluding certain providers. Applying these factors, and after considering the comments received, the Bureau concludes that a 500-transfer normal course of business safe harbor threshold better serves the purposes of the normal course of business provision in the statutory definition of remittance transfer provider. The Bureau concludes that this provision is intended to balance several goals, including excluding from coverage providers that do not normally send remittance transfers and would thus bear disproportionate costs to do so, while preserving coverage of providers that service the vast majority of consumers and are more equipped to bear the costs of compliance.

When the Bureau finalized the current 100-transfer normal course of business safe harbor threshold in August 2012, the Bureau did not have the benefit of knowing the information the Bureau knows today regarding industry's experience in the remittance transfer market since the Remittance Rule went into effect in October 2013. As described in the August 2012 final rule, the Bureau primarily considered the frequency of remittance transfers provided when determining the appropriate threshold for whether an entity provides transfers in the normal course of its business. The Bureau stated at the time that it believed that:

[T]he inclusion of the phrase "normal course of business" in the statutory definition of "remittance transfer provider" was meant to exclude persons that provide remittance transfers on a limited basis. As a result, the fact that a person provides only a small number of remittance transfers can strongly indicate that the person is not providing such transfers in the normal course of its business.[35]

The Bureau also stated that it was "concerned that a person who provides more than 100 transfers in a calendar year is more likely than other persons to be providing remittance transfers in the normal course of its business, such as by making transfers generally available to its customers, and by providing them more frequently," and that it did not have "industry-wide information linking commenters' suggested higher thresholds either to the definition of 'normal course of business,' or to other factors that commenters suggested were relevant, such as the cost of compliance" with the Rule.[36]

After more than six years of outreach to industry and other stakeholders examining data and information, including for purposes of the Assessment, the Bureau has a better understanding of the various considerations, as described above, that bear on whether an entity is providing remittance transfers in the normal course of its business and are therefore relevant in determining the appropriate threshold for provision of a safe harbor. In particular, the Bureau is now aware of the disproportionate compliance burden borne by certain entities that provide a limited number of remittance transfers per year. As discussed in the Assessment Report, entities incur ongoing costs, such as those attributed to developing information and compliance systems, training staff, and contracting with other institutions to fulfill certain Rule requirements, when coming into and remaining in compliance with the Remittance Rule.[37] These costs are fixed, in the sense that entities must incur them to provide any remittance transfers that comply with the Remittance Rule. Institutions that provide relatively small numbers of remittance transfers (which tend to be smaller institutions) have fewer transactions to produce revenues through which to recover the fixed compliance costs associated with the Rule.[38] Therefore, based on this information and the feedback from industry over the years regarding

compliance costs, including in response to the 2019 Proposal, the Bureau has better information than it did in 2012 to understand the impact of the Rule and recognizes that certain entities that make a limited number of remittance transfers per year as an accommodation to their customers face challenges complying with the Remittance Rule. The Bureau has determined that the term "normal course of business" is reasonably interpreted to take account of this burden.

Applying these and other relevant considerations to the normal course of business safe harbor threshold, the Bureau concludes that raising the normal course of business safe harbor threshold from 100 to 500 remittance transfers annually appropriately implements, and is a reasonable interpretation of, the statutory definition of remittance transfer provider as a person or financial institution providing remittance transfers in the normal course of its business, whether or not the consumer holds an account with such a person.[39] As stated in the 2019 Proposal, the Bureau believes that a threshold of 500 transfers is more appropriate to identify persons who occasionally provide remittance transfers, but not in the normal course of their business. Five hundred transfers annually is equivalent to an average of approximately 10 transfers per week, which the Bureau believes allows entities to send a relatively limited number of transfers without having to incur the costs of developing and implementing processes and procedures to comply with the Rule or the costs of continued compliance with the Rule. The Bureau believes that, at this volume, entities are generally offering remittance transfers as an accommodation for their account-holding customers.

The Bureau also believes that a 500-transfer normal course of business safe harbor threshold will help ensure participation in the remittance market of all entities, including small and mid-size banks and credit unions that have occasional remittance transfer demands, while minimally impacting consumers. Based on the feedback from industry commenters on their experience in the remittance transfer market and the costs associated with providing remittance transfers, the Bureau understands that an entity that provides a low number of remittance transfers may experience compliance challenges because the limited number of transfers it provides is insufficient to justify, and the

revenues from those transfers are not enough to cover, the level of fixed and variable compliance costs necessitated by the Remittance Rule. As noted above, many of the industry commenters that supported raising the normal course of business safe harbor threshold indicated that compliance costs related to the Remittance Rule have caused many credit unions and community banks that provide remittance transfers as an accommodation to their account-holding customers to limit the number of transfers they provide or exit the market altogether. Several of these commenters also stated that they would consider reentering the market or resuming offering remittance transfer services if the Bureau raised the normal course of business safe harbor threshold because they would not have to bear the costs discussed above. In the Assessment Report, the Bureau explained that it did not find evidence that, on net, banks or credit unions ceased or limited providing remittance transfers because the normal course of business safe harbor threshold was too low.[40] To the extent this has occurred, however, the Bureau expects that raising the normal course of business safe harbor threshold from 100 to 500 remittance transfers annually will encourage at least some entities to reenter the market or resume offering remittance transfer services, which would benefit consumers and allow smaller entities to compete with other providers.

Further, the Bureau believes that raising the normal course of business safe harbor threshold to 500 remittance transfers appropriately balances the goals of ensuring that most transfers remain covered, and that the number of affected consumers overall remain relatively small. As discussed in part VI below, the data now available through Call Reports[41] indicate that a substantial proportion of banks and credit unions make between 101 and 500 remittance transfers per year, although their percentage of the overall annual volume of remittance transfers is quite small.[42] Specifically, based on the Bureau's analysis of the 2018 Call

---

[35] 77 FR 50244, 50249–50 (Aug. 20, 2012).

[36] *Id.* at 50251.

[37] Assessment Report at 117–20.

[38] *See id. See also* 84 FR 17971, 17975 (Apr. 29, 2019) (Remittance RFI 2019).

[39] EFTA section 919(g)(3); 15 U.S.C. 1693o–1(g)(3).

[40] Assessment Report at 133–35.

[41] Banks and credit unions are required to submit quarterly "Call Reports" by the Federal Financial Institutions Examination Council (FFIEC) and the National Credit Union Administration (NCUA), respectively. For a more detailed description of these reporting requirements, *see* Assessment Report at 24.

[42] As used in this document, "between 101 and 500" means 101 or more and 500 or fewer—that is, above the current safe harbor threshold but at or below the new 500-transfer normal course of business safe harbor threshold.

Report data,[43] raising the threshold from 100 to 500 transfers would remove approximately 414 banks and 247 credit unions (which represent 54.6 percent and 62.4 percent of such entities currently covered by the Remittance Rule, respectively). These entities account for 0.83 percent (92,623) of bank transfers, and 6.3 percent (49,347) of credit union transfers, for a total of approximately 141,970 transfers that would no longer be covered by the Rule.[44] Banks overall provided 11.1 million transfers and credit unions provided 790,000 transfers, while MSBs provided 325 million transfers in 2017.[45] Therefore, given that the combined number of bank and credit union transfers that would no longer be covered at a threshold of 500 annual transfers represents only a minimal percentage of all remittance transfers made annually—specifically, less than one-tenth of one percent (0.054 percent)—and based on an extrapolation of this data,[46] the Bureau believes that the total number of consumers that might be impacted by the revised normal course of business safe harbor threshold is relatively small.

The Bureau also concludes, based on the feedback of several industry commenters, that consumers that are customers of the entities that will newly qualify for the revised normal course of business safe harbor threshold might still receive protections similar to those provided under the Remittance Rule. For instance, as noted above, one bank trade association stated that entities that are no longer subject to the Remittance Rule will still provide their customers with information about the fees associated with sending a remittance transfer and will also take steps to help consumers when there are errors related to their transfers. In addition, several other industry commenters, including a few credit union trade associations and one community bank trade association, noted their strong connections to the communities they serve and stated that they exist to serve their customers. One of the credit union trade associations stated that credit unions provide reliable information about remittance transfers and charge reasonable rates.

Further, the Bureau recognizes that raising the normal course of business safe harbor threshold to 500 remittance transfers annually will address compliance challenges separate from the compliance challenges related to the expiration of the temporary exception that the Bureau is addressing in the changes it is adopting in § 1005.32, discussed below. As explained above, the Bureau believes that a 500-transfer normal course of business safe harbor threshold better serves the purposes of the normal course of business provision in the statutory definition of remittance transfer provider and is therefore appropriate.

The Bureau declines at this time to raise the normal course of business safe harbor threshold to a number higher than 500 remittance transfers, as the credit union members and a number of industry commenters recommended. As noted above and based on the discussion herein, the Bureau believes that a threshold of 500 transfers is more appropriate to identify persons who occasionally provide remittance transfers, but not in the normal course of their business. As discussed in the 2019 Proposal, the Bureau proposed a 500-transfer normal course of business safe harbor threshold because it believed that raising the threshold to 500 transfers would appropriately implement the purposes of EFTA section 919, including the statutory definition of remittance transfer provider (and its normal course of business provision), by helping to reduce burden for banks and credit unions that provide remittance transfers only as an accommodation to their customers, thereby ensuring that banks and credit unions continue to offer the service to benefit consumers and do not bear a disproportionate cost to do so. The proposed threshold was based on limited information, and as such, in the 2019 Proposal, the Bureau requested data or other evidence that would have assisted it in determining what number would be most appropriate for the normal course of business safe harbor threshold. The Bureau did not receive data or other evidence indicating that a specific higher number would have been a more appropriate normal course of business safe harbor threshold, and as noted above, the Bureau believes a 500-transfer threshold is a more appropriate threshold, after consideration of the multitude of factors noted above as well as the comments received. For these reasons, the Bureau declines at this time to raise the normal course of business safe harbor threshold to a number other than 500 transfers annually.

The Bureau is also retaining the maximum time period allowed for a person to come into compliance with the Remittance Rule as "not to exceed six months" after the person is deemed to be providing transfers in the normal course of business. As noted above, an industry commenter requested that the Bureau clarify that the existing transition period provision in § 1005.30(f)(2)(ii) continue to apply so that when an entity exceeds the threshold, it has six months to come into compliance. Another industry commenter suggested making the transition period for entities that qualified for the normal course of business safe harbor threshold but then exceed the threshold (and therefore must comply with the Remittance Rule) at least six months. The Bureau believes that the transition period is sufficiently clarified in the changes the Bureau is finalizing in § 1005.30(f)(2)(ii) and (iii) as well as the accompanying commentary, and therefore declines to make additional changes. The Bureau also declines to further extend the transition period because the Bureau is not persuaded that a longer transition period is necessary.

Further, the Bureau is keeping the phrase "payment is made." As discussed in the 2019 Proposal, the Bureau noted that existing language in § 1005.30(f)(2)(ii) regarding the six-month transition period that a person has to come into compliance with the Rule, as well as the proposed language in § 1005.30(f)(2)(iii) regarding the transition period for a person that qualifies for the normal course of business safe harbor, both peg their requirements on the phrase "payment is made." The Bureau also noted that the phrase "payment is made" is used numerous times throughout the Rule and believed that it provided a clear and consistent test as to whether any particular remittance transfer is subject to the Rule. The Bureau solicited comment on this aspect of the proposal, and as noted above, one industry commenter responded to this issue and stated that the Bureau should continue using the phrase as it is easily understood and consistent with the current regulation. Lastly, the Bureau did not receive any comments

[43] Banks and credit unions continue to update their Call Reports over time, so these numbers are current based on the Call Reports as archived in November 2019 following the December 2019 NPRM.

[44] The 414 banks account for 1.98 percent of the $101 billion in remittance transfers provided by banks in 2018. Credit unions do not report the dollar volume of remittance transfers on their Call Reports.

[45] In the Assessment Report, the Bureau estimated the number of remittance transfers in 2017 to be 325 million (see Assessment Report at 63–64) and that more than 95 percent of transfers were provided by MSBs in 2017. The Bureau does not have an estimate of the total transfers in 2018 but assumed that 95 percent of transfers were provided by MSBs in 2018 to calculate this proportion.

[46] The Call Report data track the number of remittance transfers, not the number of consumers. Remittance transfer providers may provide transfers to the same consumer multiple times per year, and consumers may use more than one provider in a year. The number of transfers gives an upper bound for the number of consumers that may be affected by the new normal course of business safe harbor threshold.

suggesting changes to the other proposed revisions to the commentary accompanying § 1005.30(f), and as such, the Bureau is adopting them as proposed.

*Other approaches suggested by commenters.* The Bureau also declines to base the normal course of business safe harbor threshold on a standard other than the number of remittance transfers. As noted above, one industry commenter recommended a two-prong approach, whereby an entity would qualify for the normal course of business safe harbor if it met either an asset-size threshold of $1 billion or a remittance transfer threshold of 1,000. Another industry commenter opposed using any standard other than the number of remittance transfers, stating that using another metric, such as the percentage of an entity's customers that send remittance transfers, would be unduly burdensome to monitor. The Bureau agrees that basing the normal course of business safe harbor threshold on something other than the number of transfers would introduce complexity. In addition, the Bureau believes that a normal course of business safe harbor provides the most certainty if it is based on a bright-line measure that permits entities to identify easily whether they qualify, especially if it is a measure with which industry is already familiar.

## 1005.32   Estimates

As discussed in part II above, a significant consumer protection provided by the Remittance Rule is the requirement that remittance transfer providers disclose certain information to consumers that send remittance transfers. Relatedly, a significant consumer protection established by EFTA section 919 is that remittance transfer providers generally must disclose (both prior to and at the time the consumer pays for the transfer) the exact exchange rate and the amount to be received by the designated recipient of a remittance transfer.[47]

Accordingly, the Rule generally requires that providers disclose to senders the exact amount of currency that the designated recipient will receive. Existing EFTA section 919 and § 1005.32 of the Rule, however, set forth several exceptions to this general requirement, including the temporary exception in existing § 1005.32(a). As such, the Bureau proposed to provide two new permanent, tailored exceptions in light of the expiration of the temporary exception in existing § 1005.32.

### 32(a)   Temporary Exception for Insured Institutions

As noted above, EFTA section 919 sets forth a temporary exception that permits certain financial institutions to disclose estimates instead of exact amounts to consumers under certain circumstances until July 21, 2020. The Bureau implemented the temporary exception in § 1005.32. Section 1005.32(a)(1) provides that a remittance transfer provider may give estimates in compliance with § 1005.32(c) for the exchange rate (if applicable), covered third-party fees, and certain other disclosure information if the provider meets three conditions: (1) The provider must be an insured institution; (2) the provider must not be able to determine the exact amounts to be disclosed for reasons beyond its control; and (3) the transfer generally must be sent from the sender's account with the insured institution. Section 1005.32(a)(2) provides that the temporary exception shall expire on July 21, 2020. Section 1005.32(a)(3) provides that insured depository institutions, insured credit unions, and uninsured U.S. branches and agencies of foreign depository institutions are considered "insured institutions" for purposes of the temporary exception. Importantly, MSBs are not "insured institutions" for purposes of the temporary exception.

EFTA section 919 expressly limits the length of the temporary exception to July 21, 2020, and this rule cannot and does not change that fact. However, this final rule discusses this provision as background to the two new exceptions in § 1005.32(b)(4) and (5) the Bureau is adopting in this final rule to provide tailored exceptions to address compliance challenges that insured institutions may face in certain circumstances upon the expiration of the temporary exception and to preserve consumers' access to certain remittance transfers.

### Challenges of Insured Institutions in Disclosing Exact Amounts

In 2012, when the Bureau adopted § 1005.32(a), it stated the following in the notice of final rulemaking:

Congress specifically recognized that it would be difficult for financial institutions to meet certain disclosure requirements with regard to open network transactions and tailored a specific accommodation to allow use of reasonably accurate estimates for an interim period until financial institutions can develop methods to determine exact disclosures, such as fees and taxes charged by third parties.[48]

As discussed in part II above, banks and credit unions have predominantly utilized an "open network" payment system made up of the correspondent banking network to send remittance transfers on behalf of consumers, and most banks and credit unions only maintain a relatively small number of correspondent banking relationships. As such, in many cases involving remittance transfers sent via the correspondent banking network, the sending institution must find a chain of one or more intermediary financial institutions to transmit funds from the sending institution to the designated recipient's institution.

There are two basic ways such a chain works where the originating (sending) institution has no correspondent banking relationship with the designated recipient's institution: (1) The "serial" method, and (2) the "cover" method (also known as the "split and cover" method).[49] Sending a remittance transfer using the serial method means that the payment instructions are transferred, and the transferred funds are settled,[50] one step at a time between each of the financial institutions in the transmittal route. Each connected pair of financial institutions in the transmittal route have a correspondent banking relationship with each other, which enables fund settlement.[51] By current market practice, each intermediary financial institution typically deducts a fee from the payment amount, which results in the recipient of the payment not receiving the full amount of the original payment order.[52] Sending a remittance transfer using the cover method means that the payment information is conveyed from the sending institution to the designated recipient's institution, while settlement is handled separately through correspondent banks.[53] Further, current market practice is such that correspondent banks typically do not deduct transaction fees from payments sent using the cover method.[54]

---

[47] 15 U.S.C. 1693o–1(a)(1) and (2).

[48] 77 FR 6194, 6208 (Feb. 7, 2012).

[49] *See* 2016 BIS Report at 33–34.

[50] "Settlement" generally refers to the "discharge[ing of] obligations in respect of funds or securities transfers between two or more parties." Bank for Int'l Settlements, *A glossary of terms used in payments and settlement systems,* at 45 (2003), *https://www.bis.org/cpmi/glossary_030301.pdf.*

[51] *Id.* at 34.

[52] *Id.* at 37.

[53] Every cross-border money transfer, including remittance transfers, sent via the correspondent banking network has two components: The payment information and the settlement instruction. Whereas these two components travel together when using the serial method, the cover method separates the payment information from the settlement instructions.

[54] 2016 BIS Report at 37.

As discussed above, the temporary exception permits insured institutions to disclose estimates (rather than exact amounts) of the exchange rate and covered third-party fees (and other amounts that have to be estimated because the exchange rate and covered third-party fees are estimated). With respect to the exchange rate, insured institutions and their trade associations have reported to the Bureau that because exchange rates fluctuate, sending institutions comply with the requirement to disclose exact exchange rates by ''fixing'' the exchange rate at the time a sender requests a remittance transfer. They do this by converting the funds to the applicable foreign currency up-front themselves, or by using their correspondent bank or third-party service provider (instead of having an intermediary financial institution or the designated recipient's institution perform the foreign currency conversion). Insured institutions may face a number of hurdles with respect to converting funds to certain currencies up-front. In such cases, they may rely on the temporary exception with respect to the disclosure of the exchange rate.[55]

With respect to covered third-party fees, insured institutions and their trade associations have told the Bureau that if banks and credit unions send remittance transfers using the serial method (where sending institutions do not have a correspondent relationship with all of the financial institutions in the remittance transfer's transmittal route), they cannot control or even know what transaction fees another financial institution in the payment chain imposes without having a correspondent relationship with that financial institution. As such, they rely on the temporary exception with respect to the disclosure of covered third-party fees.

*Recent market developments and potential solutions.* In the Assessment Report, the Bureau observed that the remittance market has undergone substantial change since the Rule became effective. Specifically, the Assessment Report described several developments regarding the growth and incorporation of innovative technologies by providers of cross-border money transfers and other companies that support such products.[56]

The Bureau has continued to monitor the remittance transfer market since the publication of the Assessment Report and observes that most of these developments continue to progress. Examples include: (1) The continued growth and expanding functionality of the Society for Worldwide Interbank Financial Telecommunication (SWIFT)'s ''global payment innovation'' (gpi) tracking product, which can increase the amount of up-front information available to sending institutions, and the expansion of the major payment card networks' capacity to support cross-border payments;[57] (2) the continued growth of ''fintech'' nonbank remittance transfer providers and their further expansion into partnerships and other relationships with banks and credit unions, which allow such entities to tap into the closed network payment systems that nonbank remittance transfer providers have developed;[58] and (3) the continued growth and expanding partnerships of virtual currency companies, such as Ripple, which offer both a payments messaging platform to support cross-border money transfers as well as a virtual currency, XRP, which can be used to effect settlement of those transfers.[59]

These developments suggest that in the future there may be means by which banks and credit unions could reduce their reliance on estimates, but there are limits on the degree to which the developments can solve the problem. All of the developments apply elements of a closed network payment system to cross-border money transfers sent by banks and credit unions. As discussed in part II above, in a closed network payment system, a single entity generally exerts a high degree of end-to-end control over a transaction. This control generally facilitates standardization and uniformity over terms, conditions, and processes to which participants in a closed network payment system must adhere. That standardization and uniformity, in turn, can provide a great deal of certainty to all participants in such a system as to the terms and conditions that will apply to individual transactions within that system.

To the degree banks and credit unions increase their reliance on closed network payment systems for sending remittance transfers and other cross-border money transfers, the Bureau notes that this could result in greater standardization and ease by which sending institutions can know exact covered third-party fees and exchange rates. The Bureau also believes that expanded adoption of SWIFT's gpi product or Ripple's suite of products could similarly allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent.

However, based on the Bureau's market monitoring and experience as well as feedback the Bureau has received from banks, credit unions, and their trade associations regarding the impending expiration of the temporary exception, the Bureau in the 2019 Proposal stated that it did not believe that it was likely in the short-to-medium term that the developments described above would be able to fully eliminate reliance on the correspondent banking network as the predominant method for banks and credit unions to send remittance transfers. There are thousands of financial institutions worldwide that could receive remittance transfers with new financial institutions being added to the network (or leaving the market) on regular basis. If, as noted above, the different approaches described above share the similarity of replicating some elements of a closed network payment system, the approaches likely would need to enroll all or most of those financial institutions into their platforms to offer banks and credit unions up-front certainty when sending transfers for which they currently rely on the temporary exception. It may be costly, excessively time-consuming, or otherwise difficult to enroll all or even most of these institutions, especially the smaller ones. Accordingly, the Bureau proposed in 2019 to provide tailored permanent exceptions that would allow insured institutions to estimate, as applicable, the exchange rate, covered third-party fees, and other disclosure information impacted by the estimation of those amounts, to address compliance challenges that insured institutions may face in certain circumstances upon the expiration of the temporary exception

[55] Section 1005.32(b) also contains other exceptions that permit the estimation of the exchange rate in certain circumstances.

[56] Assessment Report at 97–106.

[57] SWIFT provides financial messaging services that support a large share of all cross-border interbank payments sent via correspondent banks. *See, e.g.,* Press Release, SWIFT, *SWIFT enables payments to be executed in seconds* (Sept. 23, 2019), *https://www.swift.com/news-events/press-releases/swift-enables-payments-to-be-executed-in-seconds;* John Adams, *Small cross-border deals play a big role for Visa, Mastercard,* PaymentsSource (May 21, 2019), *https://www.paymentssource.com/news/small-cross-border-deals-play-a-big-role-for-visa-mastercard.*

[58] *See, e.g.,* Zoe Murphy, *TransferWise launches TransferWise for Banks in the U.S. with Novo,* Tearsheet (Sept. 26, 2019), *https://tearsheet.co/new-banks/transferwise-launches-transferwise-for-banks-in-the-u-s-with-novo/.*

[59] *See, e.g.,* Press Release, Ripple, *Ripple Announces Strategic Partnership with Money Transfer Giant, MoneyGram* (June 17, 2019), *https://www.ripple.com/insights/ripple-announces-strategic-partnership-with-money-transfer-giant-moneygram/;* Sharon Kimathi, *PNC becomes first US bank on RippleNet,* FinTech Futures (Aug. 29, 2019), *https://www.fintechfutures.com/2019/08/pnc-becomes-first-us-bank-on-ripplenet/.*

and to preserve consumers' access to certain remittance transfers.

Comments Received

Several trade associations and one bank suggested alternatives to proposed § 1005.32(b)(4) and (5) in determining whether insured institutions can estimate the exchange rate or covered third-party fees, respectively. One bank opposed proposed § 1005.32(b)(4) and (5) and instead encouraged the Bureau to make the temporary exception permanent. One trade association representing community banks opposed proposed § 1005.32(b)(4) and (5) and urged the Bureau to utilize its EFTA section 904(c) authority to exempt insured institutions from providing exact exchange rates and covered third-party fees, allowing them to continue to rely on estimates in their disclosures when they are unable to determine accurate information, without attaching a threshold to the exceptions. One credit union and one trade association representing credit unions recommended that the Bureau consider simplified exceptions that treat a sending institution's reliance on exchange rate and covered third-party fee amounts provided by its correspondent bank as sufficient for disclosure purposes. Another trade association urged the Bureau to provide an alternative basis under which an insured institution can rely upon for estimating the exchange rates or covered third-party fees even if the institution exceeds the volume thresholds. For example, this trade association indicated that the Bureau could require additional recordkeeping by insured institutions in the event that they rely upon proposed § 1005.32(b)(4) or (5) after exceeding the thresholds in the prior calendar year.

The Final Rule

As discussed above, the temporary exception will expire on July 21, 2020, and this final rule cannot and does not change that fact. As discussed in the 2019 Proposal, EFTA section 919 expressly limits the length of the temporary exception to July 21, 2020. As such, the exception will expire on July 21, 2020.

For similar reasons, this final rule does not adopt provisions that would replicate the temporary exception, as one trade association commenter and one bank commenter suggested the Bureau should do.[60] This final rule

adopts the two new exceptions in § 1005.32(b)(4) and (5) generally as proposed, to address compliance challenges that insured institutions may face in certain circumstances upon the expiration of the temporary exception and to preserve consumers' access to certain remittance transfers.

Except as discussed in the section-by-section analysis of § 1005.32(b)(5) below, this final rule also does not adopt an alternative basis under which an insured institution can rely upon for estimating the exchange rates or covered third-party fees even if the institution exceeds the volume thresholds set forth in § 1005.32(b)(4) and (5). This final rule does not adopt the alternative basis suggested by the trade association commenter that the Bureau require additional recordkeeping by insured institutions in the event that they rely upon proposed § 1005.32(b)(4) or (5) after exceeding the thresholds in the prior calendar year. The Bureau does not believe this alternative basis is sufficiently objective to be used to determine if an insured institution is in compliance with the Remittance Rule. The Bureau believes that the exceptions in § 1005.32(b)(4) and (5) are better approaches in that these exceptions will create bright-line thresholds to estimating exchange rates and covered third-party fees and that the Bureau's exceptions are better tailored to address the problems faced by institutions in determining exact amounts. The Bureau believes that the clarity of the two new exceptions in § 1005.32(b)(4) and (5) are more likely than the suggested alternative to reduce uncertainty and promote compliance.

32(b)   Permanent Exceptions

32(b)(4)   Permanent Exception for Estimation of the Exchange Rate by an Insured Institution

Proposed § 1005.32(b)(4) provided that insured institutions may estimate the exchange rate (and other disclosure information that depend on the exchange rate) that must be provided in the disclosures required by §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2) in certain circumstances. This proposed exception was designed to provide a tailored permanent exception to address compliance challenges that insured institutions may face in certain

circumstances upon the expiration of the temporary exception and to preserve consumers' access to certain remittance transfers. For reasons set forth herein, the Bureau is adopting the proposed exception generally as proposed.

The Bureau's Proposal

Proposed § 1005.32(b)(4)(i) provided that for disclosures described in §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2), estimates may be provided for a remittance transfer to a particular country in accordance with § 1005.32(c) for the amounts required to be disclosed under § 1005.31(b)(1)(iv) through (vii) if the designated recipient of the remittance transfer will receive funds in the country's local currency and all of the following conditions are met: (1) The remittance transfer provider is an insured institution as defined in § 1005.32(a)(3); (2) the insured institution cannot determine the exact exchange rate for that particular remittance transfer at the time it must provide the applicable disclosures; (3) the insured institution made 1,000 or fewer remittance transfers in the prior calendar year to the particular country for which the designated recipients of those transfers received funds in the country's local currency; and (4) the remittance transfer generally is sent from the sender's account with the insured institution.

Proposed § 1005.32(b)(4) applied only if the designated recipient of the remittance transfer receives funds in the country's local currency. Proposed § 1005.32(b)(4)(i) also generally applied to the following disclosures set forth in § 1005.31(b)(1)(iv) through (vii) respectively: (1) The exchange rate (as applicable); (2) if ''covered third-party fees'' as defined in § 1005.30(h) are imposed, the total amount that will be transferred to the recipient inclusive of the covered third-party fees; (3) the amount of any covered third-party fees; and (4) the amount that will be received by the designated recipient (after deducting any covered third-party fees). Proposed § 1005.32(b)(4)(ii) provided, however, that the total amount that will be transferred to the recipient inclusive of covered third-party fees, the amount of covered third-party fees, and the amount that will be received by the designated recipient (after deducting covered third-party fees) may be estimated under proposed § 1005.32(b)(4)(i) only if the exchange rate is permitted to be estimated under proposed § 1005.32(b)(4)(i) and the estimated exchange rate affects the amount of such disclosures. For example, if a remittance transfer will be received by the designated recipient in

---

[60] As noted above, one trade association commenter urged the Bureau to utilize its EFTA section 904(c) authority by exempting insured institutions from providing exact estimates of exchange rates and covered third-party fees and

allowing them to continue relying on estimates in their disclosures when they are unable to determine accurate information, without attaching a threshold to the exemptions. Also, a bank commenter asked the Bureau to adopt simplified exceptions that treat a sending institution's reliance on exchange rate and covered third-party fee amounts provided by a correspondent as sufficient for disclosure purposes.

the same currency as the one in which the transfer is funded, the insured institution would not disclose an exchange rate for the transfer, and the total amount that will be transferred to the recipient inclusive of covered third-party fees, the amount of covered third-party fees, and the amount that will be received by the designated recipient (after deducting covered third-party fees) will not be affected by an exchange rate. In that case, an insured institution could not have used proposed § 1005.32(b)(4) to estimate those disclosures. The insured institution, however, may be able to use another permanent exception set forth in § 1005.32(b), including the exception in proposed § 1005.32(b)(5), to estimate those disclosures if the conditions of those provisions are met.

Proposed comment 32(b)(4)–1 provided guidance on whether an insured institution cannot determine the exact exchange rate applicable to a remittance transfer at the time the disclosures must be given. Specifically, proposed comment 32(b)(4)–1 stated that for purposes of proposed § 1005.32(b)(4)(i)(B), an insured institution cannot determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) for a remittance transfer to a particular country where the designated recipient of the transfer will receive funds in the country's local currency if the exchange rate for the transfer is set by a person other than (1) the insured institution; (2) an institution that has a correspondent relationship with the insured institution; (3) a service provider for the insured institution; or (4) a person that acts as an agent of the insured institution. The Bureau believed that proposed comment 32(b)(4)–1 set forth the circumstances in which an insured institution could not determine the exchange rate for a particular transfer sent through correspondent banks in an open network payment system and sought comment on this provision.

Proposed comment 32(b)(4)–1.i set forth an example of when an insured institution cannot determine an exact exchange rate under proposed § 1005.32(b)(4)(i)(B) for a remittance transfer. Proposed comment 32(b)(4)–1.ii would set forth two examples of whether an insured institution could determine an exact exchange rate under proposed § 1005.32(b)(4)(i)(B) for a remittance transfer, and thus the insured institution may not use the proposed exception in proposed § 1005.32(b)(4) to estimate the disclosures required under § 1005.31(b)(1)(iv) through (vii) for the remittance transfer.

Proposed comment 32(b)(4)–2.i set forth that for purposes of determining whether an insured institution made 1,000 or fewer remittance transfers in the prior calendar year to a particular country pursuant to proposed § 1005.32(b)(4)(i)(C), the number of remittance transfers provided includes transfers in the prior calendar year to that country if the designated recipients of those transfers received funds in the country's local currency regardless of whether the exchange rate was estimated for those transfers. The proposed comment provided an example to illustrate. Also, proposed comment 32(b)(4)–2.ii provided that for purposes of the 1,000-transfer threshold, the number of remittance transfers does not include remittance transfers to a country in the prior calendar year if the designated recipients of those transfers did not receive the funds in the country's local currency. The proposed comment contained an example to illustrate.

The Bureau also proposed conforming changes to the following provisions to reference the proposed exception in § 1005.32(b)(4) if the temporary exception in § 1005.32(a) currently is referenced and pertains to the estimation of the exchange rate: (1) § 1005.32(c); (2) § 1005.33(a)(1)(iii)(A); (3) § 1005.36(b)(3); (4) comment 32–1; (5) comment 32(b)(1)–4.ii; (6) comment 32(d)–1; and (7) comment 36(b)–3.

Comments Received

The Bureau received a significant number of comments on proposed § 1005.32(b)(4) from banks, credit unions, their trade associations, and their service providers. The Bureau received approximately 60 comment letters from individual consumers; nearly all of whom were credit union members. The Bureau received two comments from consumer groups.

*Comments from credit unions, banks, their trade associations, and their service providers.* Many industry commenters provided the same comments for both proposed § 1005.32(b)(4) related to estimating the exchange rate and proposed § 1005.32(b)(5) related to estimating covered third-party fees. These comments generally are addressed in this section in relation to § 1005.32(b)(4) and are addressed in the section-by-section analysis of § 1005.32(b)(5) in relation to § 1005.32(b)(5).

Many industry commenters encouraged the Bureau to adopt proposed § 1005.32(b)(4) and (5) to permit insured institutions to estimate the exchange rate and covered third-party fees in certain circumstances. For example, one credit union indicated that these proposed exceptions would help financial institutions to reenter the international funds transfer system without placing undue risk and burdens on the institution for issues outside their control. A trade association representing credit unions indicated that it supported these proposed exceptions and appreciated the Bureau's efforts to manage consumer protection while fostering an environment in which credit unions can provide and develop affordable products and services to their members. One service provider indicated that the proposed exceptions would help ensure that entities that make a limited number of remittance transfers can remain competitive in the global payments space without incurring the burden of compliance costs.

Several trade associations representing credit unions urged the Bureau to revise proposed § 1005.32(b)(4) and (5) to increase the threshold amount for exchange rates and covered third-party fees to 2,000 transfers in the prior calendar year. Several of these trade associations indicated that to align proposed exceptions in proposed § 1005.32(b)(4) and (5) with their recommendation that the Bureau raise the normal course of business safe harbor threshold to 1,000 transfers, the Bureau should correspondingly increase the thresholds for proposed § 1005.32(b)(4) and (5) to 2,000 or fewer transfers in the prior calendar year. Another trade association representing credit unions indicated that a 2,000-transfer threshold in the prior calendar year would allow more institutions that are not primarily remittance transfer businesses to be positioned to continue to offer remittances without incurring the higher costs (normally passed through to the consumer) that will likely result should the temporary exception simply expire in July 2020. Another trade association representing credit unions suggested that the threshold amounts in proposed § 1005.32(b)(4) and (5) should be the same, and the Bureau should raise both thresholds to 2,000 in the prior calendar year. This trade association indicated that having the same threshold for both proposed exceptions would be easier to implement from an operational perspective because the adoption of differing thresholds on a per member basis could introduce complicated tracking issues.

With respect to the threshold amounts in proposed § 1005.32(b)(4) and (5), one trade association indicated that the Bureau should exclude correspondent

remittance transfers serviced by a financial institution from the threshold amounts. Another trade association indicated that the Bureau should exclude closed loop transfers from being considered for purposes of the thresholds under § 1005.32(b)(4) and (5). This trade association indicated that closed loop offerings involve agency-type relationships with recipient institutions and do not require estimation, but they are distinct from wire transfers and should not be counted towards the threshold amounts. One trade association representing credit unions indicated that the Bureau should commit to revisiting the sufficiency of the thresholds in proposed § 1005.32(b)(4) and (5) shortly after implementation of a final rule to ensure that costs borne by correspondents ineligible to use estimates are not passed on to community institutions that do not themselves exceed the thresholds.

One bank requested that the Bureau provide guidance regarding application of thresholds set forth in proposed § 1005.32(b)(4) and (5) if an institution merges with another or acquires another institution. This bank indicated that the Bureau should provide a grace period of at least six months when this occurs, as the combination of two remittance transfer providers could result in the number of transfers exceeding a threshold and thereby imposing requirements that had not applied before. The bank indicated that when this happens, the institution that remains should be afforded sufficient time to adjust its processes and procedures to the Remittance Rule's requirements.

Two trade associations indicated that the Bureau should establish a six-month transition period after an insured institution exceeds the threshold amounts in proposed § 1005.32(b)(4) and (5) during which the institution could still avail itself of the new proposed exceptions. They asserted this would ease the compliance burden for institutions that cross a threshold towards the end of a calendar year.

In the 2019 Proposal, the Bureau solicited comment on whether the proposed exceptions in proposed § 1005.32(b)(4) and (5) should contain a sunset provision. Several banks and a trade association urged the Bureau not to sunset proposed § 1005.32(b)(4) and (5). They asserted that sunset provisions create unnecessary uncertainty for consumers and institutions.

Several industry commenters provided comments that related specifically to proposed § 1005.32(b)(4) for estimating the exchange rate. One

trade association supported proposed § 1005.32(b)(4) and indicated that the cost of keeping up with all of the potential exchange rates is an additional regulatory burden that has discouraged smaller community banks from offering this service.

One trade association believed that the 1,000 transfer-threshold under proposed § 1005.32(b)(4) was appropriate if, as discussed below, the Bureau encourages broader use of the permanent exception for transfers to certain countries in existing § 1005.32(b)(1). This trade association indicated that a remittance transfer provider's ability to disclose an exchange rate is not necessarily tied to the number of transfers in local currency that it sends to a particular country. This trade association indicated that, even if a provider sends more than the prescribed number of transfers in local currency to a country, depository institutions may still need to estimate exchange rates due to the idiosyncrasies of certain currencies. This trade association believed that their members could address these idiosyncrasies without the need to increase the 1,000-transfer threshold if, as discussed below, the Bureau encourages broader use of the permanent exception for transfers to certain countries in existing § 1005.32(b)(1).

One trade association requested that the Bureau clarify whether remittance transfer providers must disclose an exchange rate in situations in which the sender instructs the remittance transfer provider to send the transfer in U.S. dollars, but the provider knows that the general market practice in the recipient country is to convert transfers received in U.S. dollars into the local currency. The Bureau received no comments from industry specifically on proposed comment 32(b)(4)–1 that set forth guidance on whether, under proposed § 1005.32(b)(4)(i)(B), an insured institution cannot determine the exact exchange rate applicable to a remittance transfer at the time the disclosures must be given.

*Individual commenters.* Nearly all of the individual commenters were credit union members. These individual commenters suggested that the Bureau should increase the thresholds for the proposed exceptions in § 1005.32(b)(4) and (5) to 2,000 or fewer transfers. These individual commenters indicated that to align proposed exceptions in proposed § 1005.32(b)(4) and (5) with their recommendation that the Bureau raise the normal course of business safe harbor threshold to 1,000 transfers, the Bureau should correspondingly increase

the thresholds for proposed § 1005.32(b)(4) and (5) to 2,000 or fewer transfers in the prior calendar year to reflect a "normal course of business" threshold set at 1,000 transfers. One individual commenter supported the proposed exceptions in proposed § 1005.32(b)(4) and (5), asserting that they would benefit insured institutions but not likely harm consumers. One individual commenter opposed the proposed exceptions in § 1005.32(b)(4) and (5), asserting that these exceptions prevent transparency for the public and consumers.

*Consumer groups.* The Bureau received two comment letters from consumer groups. These consumer groups opposed both the proposed exceptions in proposed § 1005.32(b)(4) and (5), citing three primary concerns: (1) Market data, including data related to financial institution remittance transfers, do not support the need for the rule changes; (2) there is insufficient legal justification for the broad changes proposed in the 2019 Proposal; and (3) the Bureau has not sufficiently studied the impact of the proposed amendments on consumers to assess the need for the amendments and any possible negative impacts. These consumer groups also asserted that these proposed exceptions would further harm consumers and contradict congressional intent by, in effect, converting an exception that Congress designated as temporary (ending in July 2020) into exceptions that are permanent, for many of the financial institutions that use it today. They thus asserted that adopting the exceptions as proposed would harm consumers by limiting the protections and benefits they receive from the Rule, including the ability to know precisely how much money a recipient will receive, the ability to accurately identify the cheapest provider, and access to full error resolution protections when the amount received is different from the amount disclosed. These consumer groups suggested that the Bureau should withdraw its proposal in its entirety and instead consider ways to expand the applicability of EFTA's protections for remittances.

The consumer groups also indicated that, if the Bureau does adopt proposed § 1005.32(b)(4) and (5), the Bureau should not make these exceptions permanent. They indicated that the Bureau's analysis recognizes that market evolutions are giving financial institutions more options for disclosing exact exchange rates and fees, but inexplicably creates exceptions that lasts forever. They indicated that in doing so, the Bureau ignores the important forcing effect of a compliance

deadline, the existing trend away from reliance on the temporary exception, and the evolution of methods for sending money.

In the 2019 Proposal, the Bureau requested comment on whether proposed § 1005.32(b)(4) and (5) should apply to providers that are not insured institutions. The consumer groups indicated that the Bureau should not extend these proposed exceptions to non-insured institutions. They indicated that rolling back already-required protections in other segments of the market would harm consumers and undermine the purpose of EFTA. They believed there is no reason or authority for extending any new exceptions to non-insured entities.

The Final Rule

As set forth herein, this final rule adopts § 1005.32(b)(4) and comments 32(b)(4)–1 and –2 as proposed. As explained in more detail below, this final rule adds comment 32(b)(4)–3 to provide a transition period for insured institutions that exceed the 1,000-transfer threshold under § 1005.32(b)(4) in a certain year, which would allow them to continue to provide estimates of the exchange rate for a reasonable period of time while they come into compliance with the requirement to provide exact exchange rates. This final rule also adopts conforming changes as proposed to the following provisions to reference the exception in § 1005.32(b)(4) where the temporary exception in § 1005.32(a) currently is referenced and pertains to the estimation of the exchange rate: (1) § 1005.32(c); (2) § 1005.33(a)(1)(iii)(A); (3) § 1005.36(b)(3); (4) comment 32–1; (5) comment 32(b)(1)–4.ii; (6) comment 32(d)–1; and (7) comment 36(b)–3.

Based on the comments received on the 2019 Proposal and prior outreach and research, the Bureau believes that the data it has collected support the adoption of § 1005.32(b)(4) and comments 32(b)(4)–1 through –3. The Bureau's legal authority to adopt these provisions is discussed below.

Based on the comments received on the 2019 Proposal and prior outreach and research, the Bureau determines that if an insured institution is sending 1,000 or fewer remittance transfers to a particular country in the country's local currency, it may be unduly costly for the institution to establish and maintain currency-trading desk capabilities and risk management policies and practices related to foreign exchange trading of that currency. It also may be unduly costly to use service providers, correspondent institutions, or persons that act as the insured institution's agent

to obtain exact exchange rates for that currency. Based on the comments received on the 2019 Proposal and other outreach and research, the Bureau determines that the disproportionate cost of sending to certain countries is a primary factor in whether an insured institution will perform the currency exchange and thus whether it would know the exact exchange rate to provide in its disclosures. In cases in which the volume is less than the proposed 1,000-transfer threshold in the previous calendar year to a particular country in the country's local currency, the Bureau concludes that if the insured institution cannot estimate the exchange rate for a particular transfer to that country, the institution would no longer continue to make transfers to that country in the country's local currency because the costs associated with performing the currency exchange upfront outweigh the benefits given the relatively few transfers sent to the country. The Bureau determines that if these institutions discontinued providing such transfers, consumer access to remittance transfer services for certain countries may be reduced or eliminated. As discussed in more detail above in the section-by-section analysis of § 1005.32(a), it appears increasingly unlikely that any new technologies or partnerships will be able to fully eliminate insured institutions' reliance on estimates in the short-to-medium term. The Bureau concludes that some financial institutions may lack the scale for it to be practicable to cover the costs of establishing and maintaining currency-trading desks and managing the risk of exchange rate trading of currency for certain countries, or to use service providers, correspondent institutions, or persons that act as the insured institution's agent to obtain exact exchange rates for those currencies.

Also, the Bureau determines that, when the temporary exception expires, if the Rule did not allow estimates of the exchange rate in certain circumstances, some insured institutions that continue to offer remittance transfer services may see costs increase when sending transfers to certain countries because these institutions may have to change how they provide remittance transfers to disclose exact exchange rates. This would lead to increased prices for consumers. In addition, the Bureau concludes that prices for consumers may also increase for transfers to certain countries due to reduced competition if the number of remittance transfer providers offering remittance transfers to such countries were reduced due to

some insured institutions eliminating or curtailing remittance transfer services because they could not determine and disclose exact exchange rates for those countries.

Each of the four conditions set forth in § 1005.32(b)(4)(i)(A) through (D) is discussed in more detail below.

*The remittance transfer provider is an insured institution.* This final rule adopts § 1005.32(b)(4)(i)(A) as proposed to provide that the remittance transfer provider must be an insured institution as defined in § 1005.32(a)(3). In the 2019 Proposal, the Bureau solicited comment on whether the proposed exception in § 1005.32(b)(4) should be extended to apply to remittance transfer providers that are not insured institutions, including MSBs and broker-dealers. This final rule does not extend the exception in § 1005.32(b)(4) to apply to remittance transfer providers that are not insured institutions. In response to the 2019 Proposal, the consumer group commenters did not support extending the exception in § 1005.32(b)(4) to providers that are not insured institutions. No industry commenters commented on this issue. The Bureau believes that it is appropriate to apply the exception in § 1005.32(b)(4) only to insured institutions. The exception in § 1005.32(b)(4) is primarily designed to address providers' concerns about knowing the exact exchange rate at the time disclosures are provided for remittance transfers sent via correspondent banks in an open network payment system. The Bureau believes that the great majority of these transfers are provided by insured institutions and that, in turn, these open network transfers are the most common type of remittance transfer provided by insured institutions.

*The insured institution cannot determine the exact exchange rate for the transfer at the time it must provide the applicable disclosures.* This final rule adopts § 1005.32(b)(4)(i)(B) as proposed to require that, at the time the insured institution must provide the disclosure required by § 1005.31(b)(1) through (3) or § 1005.36(a)(1) or (2), as applicable, the insured institution cannot determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) for that remittance transfer. This final rule also adopts comment 32(b)(4)–1 as proposed to provide guidance on whether an insured institution cannot determine the exact exchange rate applicable to a remittance transfer at the time the disclosures must be given. The Bureau did not receive any specific comments on § 1005.32(b)(4)(i)(B) or comment 32(b)(4)–1. The Bureau notes that if the

insured institution can determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) for the remittance transfer, the insured institution may not use the exception in § 1005.32(b)(4) to estimate the exchange rate, even if the insured institution made 1,000 or fewer remittance transfers in the prior calendar year to the particular country as set forth in § 1005.32(b)(4)(i)(C).

*The insured institution made 1,000 or fewer remittance transfers in the prior calendar year to the particular country for which the designated recipients of those transfers received funds in the country's local currency.* This final rule adopts § 1005.32(b)(4)(i)(C) as proposed to provide that, with respect to the country to which the remittance transfer is being sent, the insured institution must have made 1,000 or fewer remittance transfers in the prior calendar year to the particular country for which the designated recipients of those transfers received funds in the country's local currency. Several industry commenters suggested that the Bureau should increase this threshold amount to 2,000 transfers in the previous year. Nonetheless, these commenters did not provide specific data on why this higher threshold is needed to protect access to transfers to certain countries. The Bureau determines that the 1,000-transfer threshold adopted in § 1005.32(b)(4) is consistent with its goal to provide a tailored permanent exception to address compliance challenges that insured institutions may face in certain circumstances upon the expiration of the temporary exception and to preserve consumers' access to remittance transfers sent to certain countries.

With respect to the threshold amount for proposed § 1005.32(b)(4)(i)(C), one trade association indicated that the Bureau should exclude correspondent remittance transfers serviced by a financial institution from the count. The Bureau agrees and further believes that the 2019 Proposal was, and this final rule is, clear that the 1,000-transfer threshold set forth in § 1005.32(b)(4)(i)(C) only includes transfers in the previous year that are made by the insured institution in its role as the remittance transfer provider. The 1,000-transfer threshold does not include transfers where an insured institution is acting as a correspondent on behalf of a sending institution.

The Bureau is not excluding closed loop transfers from being included in the number of transfers that count toward the threshold under § 1005.32(b)(4)(i)(C). The Bureau understands that with respect to closed loop transfers, the insured institution does not need to estimate the exchange rate because it has set up currency-trading desk capabilities and risk management policies and practices related to foreign exchange trading of that currency, or arranged to use service providers, correspondent institutions, or persons that act as the insured institution's agent to obtain exact exchange rates for that currency. The Bureau does not believe that these closed loop transfers should be excluded from the 1,000-transfer threshold because those transfers might make it more likely that it is cost effective for the insured institution to extend these existing capabilities to cover additional transfers.

In this final rule, the Bureau also declines to commit to revisit the sufficiency of the thresholds in proposed § 1005.32(b)(4) and (5) shortly after implementation of a final rule to ensure that costs borne by correspondents ineligible to use estimates are not passed on to community institutions that do not themselves exceed the thresholds. The Bureau expects that larger insured institutions that cannot estimate the exchange rate or covered third-party fees for their own transfers under the exceptions in § 1005.32(b)(4) or (5) will continue to act as correspondent banks for sending institutions that can continue to estimate the exchange rate or covered third-party fees under the exceptions in § 1005.32(b)(4) or (5) for their transfers. The Bureau will continue to monitor the remittance market, including monitoring the impact of the new exceptions in § 1005.32(b)(4) and (5), and will revisit the thresholds if it concludes that it may be appropriate to change them.

*The remittance transfer is sent from the sender's account with the insured institution.* This final rule adopts § 1005.32(b)(4)(i)(D) as proposed to provide that the remittance transfer must be sent from the sender's account with the insured institution; provided, however, for the purposes of § 1005.32(b)(4)(i)(D), a sender's account does not include a prepaid account, unless the prepaid account is a payroll card account or a government benefit account. The Bureau did not receive any comments on this provision.

*Transition period.* In response to comments received on the 2019 Proposal, the Bureau is adding a new comment 32(b)(4)–3 to provide a transition period for institutions that exceed the 1,000-transfer threshold under § 1005.32(b)(4) in a certain year, which would allow them to continue to provide estimates of the exchange rate for a reasonable period of time while they come into compliance with the requirement to provide exact exchange rates. Specifically, comment 32(b)(4)–3 provides that if an insured institution in the prior calendar year did not exceed the 1,000-transfer threshold to a particular country pursuant to § 1005.32(b)(4)(i)(C), but does exceed the 1,000-transfer threshold in the current calendar year, the insured institution has a reasonable amount of time after exceeding the 1,000-transfer threshold to begin providing exact exchange rates in disclosures (assuming it cannot rely on another exception in § 1005.32 to estimate the exchange rate). The reasonable amount of time must not exceed the later of six months after exceeding the 1,000-transfer threshold in the current calendar year or January 1 of the next year. Comment 32(b)(4)–3 also provides an example to illustrate this guidance.

The Bureau concludes that this transition period will facilitate compliance with the Remittance Rule by allowing institutions a reasonable amount of time to establish currency-trading desk capabilities and develop risk management policies and practices related to foreign exchange trading of that currency, or to enter into agreements with service providers, correspondent institutions, or persons that act as the insured institution's agent to obtain exact exchange rates for that currency. Without this provision, insured institutions may find it difficult or impossible to comply with the requirement to provide exact exchange rate disclosures starting January 1 of the next year if they exceed the 1,000-transfer threshold late in the current year. The Bureau determines this transition period also may help to address issues raised by industry commenters related to mergers and acquisitions, if the combination of two remittance transfer providers could result in the number of transfers exceeding a threshold and thereby imposing requirements that had not applied before.

*Permanent exception.* In the 2019 Proposal, the Bureau solicited comment on whether the Bureau should adopt a sunset provision with respect to the exception in proposed § 1005.32(b)(4). Consumer group commenters indicated that if the Bureau does adopt proposed § 1005.32(b)(4), the Bureau should not make this exception permanent. They indicated that the Bureau's analysis recognizes that market evolutions are giving financial institutions more options for disclosing exact exchange rates and fees and noted the important forcing effect of a compliance deadline,

the existing trend away from reliance on the temporary exception, and the evolution of methods for sending money. Several banks and a trade association urged the Bureau not to sunset proposed § 1005.32(b)(4). They asserted that sunset provisions create unnecessary uncertainty for consumers and institutions.

The Bureau is not adopting a sunset provision with respect to § 1005.32(b)(4). The Bureau agrees certain developments in the market could make it practicable for insured institutions to disclose exact exchange rates for transfers, but the Bureau cannot forecast when technological and market developments will permit this to occur. Instead of setting a specific sunset date, the Bureau will continue to monitor the market and make any changes to the exception as necessary through the notice and comment process. The Bureau concludes that this process will allow it to respond better to changes in market conditions, rather than adopting a specific sunset date in the face of technological and market uncertainty.

*Guidance on when the disclosure of an exchange rate is required.* One trade association requested that the Bureau clarify if remittance transfer providers must disclose an exchange rate in situations in which the sender instructs the remittance transfer provider to send the transfer in U.S. dollars, but the provider knows that the general market practice in the recipient country is to convert transfers received in U.S. dollars into the local currency. As discussed in the 2019 Proposal, current comment 31(b)(1)(iv)–1 provides guidance on how a remittance transfer provider can determine in which currency the designated recipient will receive the funds. The comment provides that for purposes of determining whether an exchange rate is applied to the transfer, if a remittance transfer provider does not have specific knowledge regarding the currency in which the funds will be received, the provider may rely on a sender's representation as to the currency in which funds will be received. For example, if a sender requests that a remittance transfer be deposited into an account in U.S. dollars, the provider need not disclose an exchange rate, even if the account is denominated in Mexican pesos and the funds are converted prior to deposit into the account. Thus, under the existing commentary, a remittance transfer provider may rely on a sender's representation as to the currency in which funds will be received for purposes of determining whether an exchange rate is applied to the transfer,

unless the remittance transfer provider has actual knowledge regarding the currency in which the funds will be received for the transfer. Actual knowledge does not include knowledge that the general market practice in the recipient country is to convert transfers received in U.S. dollars into the local currency. If a sender does not know the currency in which funds will be received, the provider may assume that the currency in which funds will be received is the currency in which the remittance transfer is funded.

*Legal authority.* To effectuate the purposes of EFTA and to facilitate compliance, the Bureau is using its EFTA section 904(a) and (c) authority to adopt a new exception under § 1005.32(b)(4). Under its EFTA section 904(c) authority, the Bureau "may provide for such adjustments and exceptions for any class of electronic fund transfers or remittance transfers, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith." [61] The Bureau believes that this exception would facilitate compliance with EFTA, preserve consumer access, and effectuate its purposes. Specifically, the Bureau interprets "facilitate compliance" to include enabling or fostering continued operation in conformity with the law. The Bureau believes that this exception is targeted to facilitate compliance in those circumstances where it may be infeasible or impracticable (due to disproportionate cost) for insured institutions to determine the exchange rate because of an insufficient number of transfers to a particular country. Moreover, in the circumstances where institutions may be able to take advantage of this disclosure exception, the insured institutions remain subject to the Remittance Rule's other requirements, including the continued obligation to provide disclosures and the requirements related to error resolution and cancellation rights. The Bureau's authority, therefore, is tailored to providing an adjustment for the specific compliance difficulties or challenges that insured institutions face in providing exact disclosures that could cause those institutions to reduce or cease offering transfers to certain countries, which in turn could mean that consumers have less access to remittance transfer services or have to pay more for them. By preserving such access, the exception could also help maintain competition in the

marketplace, therefore effectuating one of EFTA's purposes. If the temporary exception expired without the Bureau taking any mitigation measures, the Bureau concludes that certain insured institutions may stop sending transfers to certain countries, therefore potentially reducing competition for those transfers. This potential loss of competition could be detrimental to consumers because the price of transfers could increase or because it could become less convenient to send them.[62]

32(b)(5)    Permanent Exception for Estimation of Covered Third-Party Fees by an Insured Institution

Proposed § 1005.32(b)(5) provided that in certain circumstances, insured institutions may estimate covered third-party fees (and other disclosure information that depend on the covered third-party fees) that must be included in the disclosures required by §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2). This proposed exception was designed to provide a tailored permanent exception to address compliance challenges that insured institutions may face in certain circumstances upon the expiration of the temporary exception and to preserve consumers' access to certain remittance transfers. For the reasons set forth herein, the Bureau is adopting the proposed exception generally as proposed.

The term "covered third-party fees" is defined in § 1005.30(h)(1) to mean any fees (other than "non-covered third-party fees" described in § 1005.30(h)(2)) that a person other than the remittance transfer provider imposes on the transfer. Fees imposed on a remittance transfer by an intermediary institution are covered third-party fees. In addition, fees imposed by a designated recipient's institution on a remittance transfer are covered third-party fees if the designated recipient's institution acts as an agent for the remittance transfer provider.

In contrast, the term "non-covered third-party fees" is defined in § 1005.30(h)(2) as any fees imposed by the designated recipient's institution for receiving a remittance transfer into an account except if the institution acts as an agent of the remittance transfer provider. Fees a designated recipient's institution imposes on a remittance transfer are non-covered third-party fees if the designated recipient's institution

---

[61] 15 U.S.C. 1693b(c).

[62] As the Bureau stated in the 2019 RFI, the Bureau recognizes the value to consumers of being able to send remittance transfers directly from a checking account to the account of a recipient in a foreign country through their bank or credit union. 84 FR at 17974.

does not act as an agent of the remittance transfer provider. The term "agent" is defined in § 1005.30(a) to mean an agent, authorized delegate, or person affiliated with a remittance transfer provider, as defined under State or other applicable law, when such agent, authorized delegate, or affiliate acts for that remittance transfer provider.

The Bureau's Proposal

Proposed § 1005.32(b)(5)(i) generally provided that for disclosures described in §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2), estimates may be provided for a remittance transfer to a particular designated recipient's institution in accordance with § 1005.32(c) for the amounts required to be disclosed under § 1005.31(b)(1)(vi) through (vii), if all of the following conditions are met: (1) The remittance transfer provider is an insured institution, as defined in § 1005.32(a)(3); (2) the insured institution cannot determine the exact covered third-party fees for a remittance transfer to a particular designated recipient's institution at the time it must provide the applicable disclosures; (3) the insured institution made 500 or fewer remittance transfers in the prior calendar year to that designated recipient's institution; and (4) the remittance transfer generally is sent from the sender's account with the insured institution.

Proposed § 1005.32(b)(5)(i) generally applied to the following disclosures set forth in § 1005.31(b)(1)(vi) through (vii) respectively: (1) The amount of any covered third-party fees; and (2) the amount that will be received by the designated recipient (after deducting any covered third-party fees). Proposed § 1005.32(b)(5)(ii) provided, however, that the amount that will be received by the designated recipient (after deducting covered third-party fees) may be estimated under proposed § 1005.32(b)(5)(i) only if covered third-party fees are permitted to be estimated under proposed § 1005.32(b)(5)(i) and the estimated covered third-party fees affect the amount of such disclosure. For example, if the covered third-party fees for a remittance transfer may not be estimated under proposed § 1005.32(b)(5), the amount that will be received by the designated recipient (after deducting any covered third-party fees) may not be estimated under proposed § 1005.32(b)(5). The insured institution, however, could be able to use another permanent exception set forth in § 1005.32(b), including the proposed exception in § 1005.32(b)(4),

to estimate that disclosure if the conditions of those exceptions are met.

Proposed comment 32(b)(5)–1 provided guidance on when an insured institution cannot determine the exact covered third-party fees as applicable to a remittance transfer at the time the disclosures must be given. Specifically, proposed comment 32(b)(5)–1 provided that for purposes of § 1005.32(b)(5)(i)(B), an insured institution cannot determine, at the time it must provide the applicable disclosures, the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(vi) for a remittance transfer to a designated recipient's institution when all of the following conditions are met: (1) The insured institution does not have a correspondent relationship with the designated recipient's institution; (2) the designated recipient's institution does not act as an agent of the insured institution; (3) the insured institution does not have an agreement with the designated recipient's institution with respect to the imposition of covered third-party fees on the remittance transfer (*e.g.,* an agreement whereby the designated recipient's institution agrees to charge back any covered third-party fees to the insured institution rather than impose the fees on the remittance transfer); and (4) the insured institution does not know at the time the disclosures are given that the only intermediary financial institutions that will impose covered third-party fees on the transfer are those institutions that have a correspondent relationship with or act as an agent for the insured institution, or have otherwise agreed upon the covered third-party fees with the insured institution. The Bureau initially concluded that proposed comment 32(b)(5)–1 set forth the circumstances in which an insured institution cannot determine the exact covered third-party fees for remittance transfers sent through correspondent banks in an open network payment system and sought comment on this provision.

In contrast, proposed comment 32(b)(5)-2 provided that for purposes of proposed § 1005.32(b)(5)(i)(B), an insured institution can determine, at the time it must provide the applicable disclosures, exact covered third-party fees for a remittance transfer, and thus the insured institution may not use the exception in proposed § 1005.32(b)(5) to estimate the disclosures required under § 1005.31(b)(1)(vi) or (vii) for the transfer, if any of the following conditions are met: (1) An insured institution has a correspondent relationship with the designated recipient's institution; (2) the designated

recipient's institution acts as an agent of the insured institution; (3) an insured institution has an agreement with the designated recipient's institution with respect to the imposition of covered third-party fees on the remittance transfer; or (4) an insured institution knows at the time the disclosures are given that the only intermediary financial institutions that will impose covered third-party fees on the transfer are those institutions that have a correspondent relationship with or act as an agent for the insured institution, or have otherwise agreed upon the covered third-party fees with the insured institution. The Bureau initially concluded that proposed comment 32(b)(5)–2 set forth the circumstances in which an insured institution can determine the exact covered third-party fees for remittance transfers sent through correspondent banks in an open network payment system and sought comment on this provision.

Proposed comment 32(b)(5)–3.i provided that for purposes of determining whether an insured institution made 500 or fewer remittance transfers in the prior calendar year to a particular designated recipient's institution pursuant to proposed § 1005.32(b)(5)(i)(C), the number of remittance transfers provided includes remittance transfers in the prior calendar year to that designated recipient's institution regardless of whether the covered third-party fees were estimated for those transfers. The proposed comment provided an example to illustrate.

Proposed comment 32(b)(5)–3.ii provided that for purposes of the proposed 500-transfer threshold, the number of remittance transfers includes remittance transfers provided to the designated recipient's institution in the prior calendar year regardless of whether the designated recipients received the funds in the country's local currency or in another currency. The proposed comment provided an example to illustrate.

The Bureau also proposed conforming changes to the following provisions to reference the proposed exception in § 1005.32(b)(5) where the temporary exception in § 1005.32(a) currently is referenced and pertains to the estimation of covered third-party fees: (1) § 1005.32(c); (2) § 1005.33(a)(1)(iii)(A); (3) § 1005.36(b)(3); (4) comment 32–1; (5) comment 32(c)(3)–1; and (6) comment 36(b)–3.

Comments Received

Similar to proposed § 1005.32(b)(4), the Bureau received a significant

number of comments on proposed § 1005.32(b)(5) from banks, credit unions, their trade associations, and their service providers. The Bureau also received approximately 60 comments from individual consumers, nearly all of whom were credit union members. The Bureau received two comments from consumer groups.

*Comments from credit unions, banks, their trade associations, and their service providers.* As discussed in more detail in the section-by-section analysis of § 1005.32(b)(4), many industry commenters provided the same comments for both proposed § 1005.32(b)(4) related to estimating the exchange rate and proposed § 1005.32(b)(5) related to estimating covered third-party fees. Many industry commenters encouraged the Bureau to adopt proposed § 1005.32(b)(4) and (5) to permit insured institutions to estimate the exchange rate and covered third-party fees, respectively, in certain circumstances. Several trade associations representing credit unions urged the Bureau to revise both proposed § 1005.32(b)(4) and (5) to increase the threshold amounts to 2,000 transfers in the prior calendar year. Another trade association indicated that the Bureau should exclude closed loop transfers from being considered for purposes of the thresholds under proposed § 1005.32(b)(4) and (5). One bank requested that the Bureau provide guidance regarding application of the thresholds set forth in proposed § 1005.32(b)(4) and (5) if an institution merges with another or acquires another institution. Two trade associations indicated that the Bureau should establish a six-month transition period after an insured institution exceeds the threshold amounts in proposed § 1005.32(b)(4) and (5) during which the institution could still avail itself of the new proposed exceptions. In the 2019 Proposal, the Bureau solicited comment on whether the proposed exceptions in proposed § 1005.32(b)(4) and (5) should be sunset. Several banks and a trade association urged the Bureau not to sunset proposed § 1005.32(b)(4) and (5). These comments are addressed with respect to § 1005.32(b)(5) below.

One trade association representing credit unions indicated that the Bureau should commit to revisiting the sufficiency of the thresholds in proposed § 1005.32(b)(4) and (5) shortly after implementation of a final rule to ensure that costs borne by correspondents ineligible to use estimates are not passed on to community institutions that do not themselves exceed the thresholds. This

comment is addressed in the section-by-section analysis of § 1005.32(b)(4).

Several industry commenters provided comments that related specifically to proposed § 1005.32(b)(5) for estimating covered third-party fees. Two trade associations requested that the Bureau increase the threshold to 1,000 or fewer transfers to a particular designated recipient's institution in the prior calendar year. These trade associations indicated that a 1,000-transfer threshold is more appropriate due to repetitive requests by consumer to send transfers to a single institution. One credit union urged the Bureau to increase the threshold to 3,000 or fewer transfers to a particular designated recipient's institution in the prior calendar year. This credit union indicated that the 3,000-transfer threshold amount is a more accurate number that reflects when an institution is unable to determine an exact amount of covered third-party fees.

One trade association suggested that insured institutions should be permitted to send more than 500 transfers in the prior year to a particular designated recipient's institution and still qualify for the exception, if one of the following conditions applies: (i) Establishing a relationship management application (RMA) or correspondent or agency arrangement with a recipient institution would exceed the provider's risk tolerance; (ii) regulatory compliance challenges posed by another rule or guideline that prevent the provider from establishing these relationships or other regulatory restrictions; (iii) a recipient institution refuses to have an RMA or correspondent or agency arrangement with the provider; (iv) a recipient institution is in a jurisdiction where instructions (such as OUR codes) [63] are routinely disregarded; or (v) the remittance transfer is instructed in a currency that is not the local currency. This trade association indicated that during an examination, a regulator can evaluate that the provider did in fact document risk or regulatory compliance reasons for being unable to establish an RMA.

Several industry commenters suggested that the Bureau exclude certain transfers from the 500-transfer threshold or clarify whether certain transfers are included within the threshold. One trade association indicated that the Bureau should

exclude remittance transfers delivered in U.S. dollars from the threshold count, regardless of whether money is converted into local currency before final delivery in U.S. dollars. Two trade associations indicated that the Bureau should count recipient institutions by the first eight digits in a bank identifier code, which identify a bank at a country level. These trade associations urged the Bureau to count transfers at a country, rather than global level, given that multinational banks typically have very different policies from one country to the next.

The Bureau did not receive any comments from industry specifically on proposed comments 32(b)(5)–1 and –2 that set forth guidance on whether under proposed § 1005.32(b)(5)(i)(B) an insured institution cannot determine the exact covered third-party fees applicable to a remittance transfer at the time the disclosures must be given.

*Individual commenters.* Nearly all of the individual commenters were credit union members. These individual commenters suggested that the Bureau should increase the thresholds for the proposed exceptions in § 1005.32(b)(4) and (5) to 2,000 or fewer transfers. These individual commenters indicated that to align proposed exceptions in proposed § 1005.32(b)(4) and (5) with their recommendation that the Bureau raise the normal course of business safe harbor threshold to 1,000 transfers, the Bureau should correspondingly increase the thresholds for proposed § 1005.32(b)(4) and (5) to 2,000 or fewer transfers in the prior calendar year to reflect a "normal course of business" threshold set at 1,000 transfers. One individual commenter supported the proposed exceptions in proposed § 1005.32(b)(4) and (5), asserting that they would benefit insured institutions but not likely harm consumers. One individual commenter opposed the proposed exceptions in § 1005.32(b)(4) and (5), asserting that these exceptions prevent transparency for the public and consumers.

*Consumer groups.* The Bureau received comment letters from two consumer groups. As discussed in more detail in the section-by-section analysis of § 1005.32(b)(4), these consumer groups opposed both of the proposed exceptions in proposed § 1005.32(b)(4) and (5). These consumer groups indicated that the Bureau should withdraw its proposal in its entirety and instead consider ways to expand the applicability of EFTA's protections for remittances. The consumer groups also indicated that if the Bureau does adopt proposed § 1005.32(b)(4) and (5), the Bureau should not make these

[63] As discussed in greater detail in the 2019 Proposal, the OUR code instructs financial institutions that receive payment instructions sent via SWIFT that the sending institution will bear all of the payment transaction fees and the recipient of the payment will not pay any such fees. 84 FR 67132, 67148 (Dec. 6, 2019).

exceptions permanent. The consumer groups also indicated that the Bureau should not extend these proposed exceptions to non-insured institutions.

The Final Rule

This final rule adopts § 1005.32(b)(5) and comments 32(b)(5)–1 and –2 generally as proposed with one revision to § 1005.32(b)(5). As revised, § 1005.32(b)(5) permits an insured institution to continue to use § 1005.32(b)(5) to provide estimates of covered third-party fees for a remittance transfer sent to a particular designated recipient's institution even if the insured institution sent more than 500 transfers to the designated recipient's institution in the prior calendar year, if a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees, and the insured institution meets the other conditions set forth in § 1005.32(b)(5).[64] This final rule adopts comment 32(b)(5)–3 as proposed with one revision to clarify that the 500-transfer threshold applicable to a particular designated recipient's institution in the past calendar year only includes transfers to the designated recipient's institution and any of its branches in the country to which the particular transfer described in § 1005.32(b)(5) is sent. This final rule also adds a new comment 32(b)(5)–4 to provide additional guidance on the provision related to United States Federal statutes or regulations as discussed above. This final rule also adds new comment 32(b)(5)–5 to provide a transition period for institutions that exceed the 500-transfer threshold-amount under § 1005.32(b)(5) in a certain year, which would allow them to continue to provide estimates of covered third-party fees for a reasonable period of time while they come into compliance with the requirement to provide exact covered third-party fees. Each of these revisions are discussed in more detail below. This final rule also adopts conforming changes to the following provisions to reference the exception in § 1005.32(b)(5) where the temporary exception in § 1005.32(a) currently is referenced and pertains to the estimation of covered third-party fees:

(1) § 1005.32(c); (2) § 1005.33(a)(1)(iii)(A); (3) § 1005.36(b)(3); (4) comment 32–1; (5) comment 32(c)(3)–1; and (6) comment 36(b)–3.

In light of the comments received on the 2019 Proposal and prior outreach and research, the Bureau concludes that the data it collected support the adoption of § 1005.32(b)(5) and comments 32(b)(5)–1 through –5. The Bureau's legal authority to adopt these provisions is discussed below.

Based on the comments received on the 2019 Proposal and prior outreach and research, the Bureau determines that if an insured institution is sending 500 or fewer transfers annually to a given designated recipient's institution, it may be unduly costly for the insured institution to establish the necessary relationships to know the covered third-party fees that would apply to a remittance transfer at the time the disclosures must be given. For example, based on comments received on the 2019 Proposal and prior outreach and research, the Bureau understands that insured institutions sending remittance transfers through correspondent banks in an open network payment system would know the exact amount of covered third-party fees that will apply to a remittance transfer at the time disclosures are given if the insured institution has a correspondent relationship with the designated recipient's institution. The Bureau understands that another way in which the insured institution may know at the time the disclosures must be given the exact amount of covered third-party fees for a particular remittance transfer is through using the cover method under the SWIFT network, as discussed above. To use the cover method, the insured institution would need an RMA with the designated recipient's institution.

The Bureau understands that there are costs to maintaining the relationships that are needed to enable insured institutions to provide exact disclosures of covered third-party fees for remittance transfers.[65] Based on comments on the 2019 Proposal, and prior outreach and research, the Bureau determines that anticipated transfer volume from an insured institution to a particular designated recipient's institution is an important factor in the insured institution's decision about whether to form and maintain such relationships.

Based on the comments received on the 2019 Proposal, and prior outreach

and research, the Bureau concludes that if it does not provide any additional exceptions that allow estimates of covered third-party fees after the temporary exception expires, some insured institutions may choose to stop sending remittance transfers to recipients with accounts at certain designated recipient's institutions. These insured institutions may choose to stop providing certain remittance transfers because they deem the costs of determining exact covered third-party fees to be prohibitively expensive. The Bureau concludes that if these institutions discontinue providing such transfers, consumer access to remittance transfer services for certain designated recipient's institutions may be reduced or eliminated. As discussed in more detail above in the section-by-section analysis of § 1005.32(a), it appears unlikely in the short-to-medium term that any new technologies or partnerships will be able to fully eliminate insured institutions' reliance on estimates.

Also, the Bureau concludes that in a scenario in which the Bureau provides no new exception to allow estimates of covered third-party fees when the temporary exception expires, insured institutions that continue to offer remittance transfer services may see costs increase when sending transfers to certain designated recipient's institutions if insured institutions have to change the ways they provide remittance transfers in order to disclose exact covered third-party fees. The Bureau expects that this could lead to increased prices for consumers. In addition, the Bureau determines that prices for consumers may also increase for transfers to certain designated recipient's institutions (due to reduced competition) if the number of remittance transfer providers offering remittance transfers to such designated recipient's institutions is reduced due to some providers eliminating or curtailing transfer services because they could not determine and disclose exact covered third-party fees for those designated recipient's institutions.

Each of the four conditions set forth in § 1005.32(b)(5)(i)(A) through (D) is discussed in more detail below.

*The remittance transfer provider is an insured institution.* This final rule adopts § 1005.32(b)(5)(i)(A) as proposed to provide that the remittance transfer provider must be an insured institution as defined in § 1005.32(a)(3). In the 2019 Proposal, the Bureau solicited comment on whether the proposed exception in § 1005.32(b)(5) should be extended to apply to remittance transfer providers that are not insured institutions,

---

[64] This provision only applies if a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees. The Bureau notes, however, that the permanent exception in § 1005.32(b)(1) allows estimates in certain circumstances if a remittance transfer provider cannot determine the exact amounts when the disclosure is required because the laws of the recipient country do not permit such a determination.

[65] *See* Financial Stability Bd., *FSB Correspondent Banking Data Report,* at 4, 44 (2017); 2016 BIS Report at 11.

including MSBs and broker-dealers, and the reasons why the proposed exception should apply to these persons. For the same reasons discussed in the section-by-section analysis of § 1005.32(b)(4), this final rule does not extend the exception in § 1005.32(b)(5) to apply to remittance transfer providers that are not insured institutions.

*The insured institution cannot determine the exact covered third-party fees for a remittance transfer to a particular designated recipient's institution at the time it must provide the applicable disclosures.* This final rule adopts § 1005.32(b)(5)(i)(B) as proposed to provide that, at the time the insured institution must provide, as applicable, the disclosure required by § 1005.31(b)(1) through (3) or § 1005.36(a)(1) or (2), the insured institution cannot determine the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(vi) for that remittance transfer. This final rule also adopts comments 32(b)(5)–1 and –2 as proposed that provide guidance on when an insured institution can or cannot determine the exact covered third-party fees as applicable to a remittance transfer at the time the disclosures must be given. The Bureau did not receive specific comments on § 1005.32(b)(5)(i)(B) and comments 32(b)(5)(i)–1 and –2. The Bureau notes that if the insured institution can determine the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(iv) for the remittance transfer, the insured institution may not use the exception in § 1005.32(b)(5) to estimate the exchange rate, even if the insured institution made 500 or fewer remittance transfers in the prior calendar year to the designated recipient's institution as set forth in § 1005.32(b)(5)(i)(C).

*The insured institution made 500 or fewer remittance transfers in the prior calendar year to that designated recipient's institution.* This final rule adopts the 500-transfer threshold in § 1005.32(b)(5)(i)(C) as proposed but, as discussed below, is providing additional guidance on which transfers count in this threshold. Several industry commenters suggested that the Bureau should increase this threshold amount to 1,000, 2,000, or 3,000 transfers in the previous year. Nonetheless, these commenters did not provide specific data on why these higher thresholds are needed to protect access to transfers to particular designated recipient's institutions because it would not be cost effective to establish the necessary relationships to obtain exact covered third-party fees. The Bureau believes that the 500-transfer threshold adopted

in § 1005.32(b)(5)(i)(C) is consistent with its goal to provide a tailored permanent exception to address compliance challenges that insured institutions may face in certain circumstances upon the expiration the temporary exception and to preserve consumers' access to remittances transfers to certain designated recipient's institutions.

This final rule revises comment 32(b)(5)–3 from the proposal to clarify that the 500-transfer threshold applicable to a particular designated recipient's institution in the past calendar year only includes transfers to the designated recipient's institution and any of its branches in the country to which the particular transfer described in § 1005.32(b)(5) is sent. New comment 32(b)(5)–3.iii provides the following example: If the particular remittance transfer described in § 1005.32(b)(5) is being sent to the designated recipient's institution Bank XYZ in Nigeria, the number of remittance transfers for purposes of the 500-transfer threshold would include remittances transfers in the previous calendar year that were sent to Bank XYZ, or to its branches, in Nigeria. The 500-transfer threshold would not include remittance transfers that were sent to branches of Bank XYZ that were located in any country other than Nigeria. Based on outreach, the Bureau recognizes that correspondent relationships or RMAs with designated recipient's institutions are formed for a particular country and the same relationship does not cover all countries in which that designated recipient's institution operates.

With respect to the threshold amount for proposed § 1005.32(b)(5)(i)(C), one trade association indicated that the Bureau should exclude from the threshold correspondent remittance transfers serviced by a financial institution. The Bureau agrees and further believes that the 2019 Proposal was, and this final rule is, clear that the 500-transfer threshold set forth in § 1005.32(b)(5)(i)(C) only includes transfers in the previous year that are made by the insured institution in its role as the remittance transfer provider. The 500-transfer threshold does not include transfers where an insured institution is acting as a correspondent on behalf of a sending institution.

The Bureau is not excluding closed loop transfers from being included in the threshold amount under § 1005.32(b)(5)(i)(C). The Bureau understands with respect to closed loop transfers, the insured institution does not need to estimate covered third-party fees because they have an agency-type

relationship that allows the insured institution to know the exact covered third-party fees. The Bureau concludes that these closed loop transfers should not be excluded from the 500-transfer threshold because these transfers might make it more likely that it is cost effective for the insured institution to extend these existing relationships to cover additional transfers.

The Bureau also is not excluding remittance transfers delivered in U.S. dollars or in a currency other than the country's local currency from the threshold amount under § 1005.32(b)(5)(i)(C). The Bureau concludes that these transfers are relevant to whether it is cost effective to develop relationships necessary to determine exact covered third-party fees regardless of whether the transfers are delivered in U.S. dollars or in a currency other than the country's local currency.

*A United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees.* One trade association suggested that insured institutions should be permitted to send more than 500 transfers in the prior year to a particular designated recipient's institution and still qualify for the exception, if regulatory compliance challenges posed by another rule or guideline exists that prevent the provider from establishing the necessary relationships to determine exact covered third-party fees, or other regulatory restriction.

The Bureau believes that it is appropriate for an insured institution to be able to estimate covered third-party fees if a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees and the insured institution meets the other conditions set forth in § 1005.32(b)(5). This final rule revises proposed § 1005.32(b)(5)(i)(C) to permit an insured institution to still use § 1005.32(b)(5) to provide estimates of covered third-party fees for a remittance transfer sent to a particular designated recipient's institution even if the insured institution sent more than 500 transfer to the designated recipient's institution in the prior calendar year if a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees and the insured institution meets the other conditions set forth in § 1005.32(b)(5). This final rule also adopts new comment 32(b)(5)–4 to provide additional guidance on the United

States Federal statute or regulation provision in § 1005.32(b)(5)(i)(C).

New comment 32(b)(5)–4 provides that a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees for the remittance transfer if the United States Federal statute or regulation (1) prohibits the insured institution from disclosing exact covered third-party fees in disclosures for transfers to a designated recipient's institution; or (2) makes it infeasible for the insured institution to form a relationship with the designated recipient's institution and that relationship is necessary for the insured institution to be able to determine, at the time it must provide the applicable disclosures, exact covered third-party fees. For example, if a correspondent relationship is necessary for an insured institution to be able to determine the exact covered third-party fees for transfers to a designated recipient's institution and a United States Federal statute or regulation makes it infeasible for the insured institution to establish that relationship, the insured institution may use § 1005.32(b)(5) to provide estimates of covered third-party fees for a remittance transfer sent to the designated recipient's institution even if the insured institution sent more than 500 transfers to the designated recipient's institution in the prior calendar year, as long as the insured institution meets the other conditions set forth in § 1005.32(b)(5). The Bureau is not aware of, nor did commenters identify, any United States Federal statute or regulation that would both make it infeasible for insured institutions to establish such a relationship or the other types of relationships described in comment 32(b)(5)–2 while still allowing the insured institution to make remittance transfers to a designated recipient's institution.

The trade association commenter discussed above also suggested that insured institutions should be permitted to send more than 500 transfers in the prior year to a particular designated recipient's institution and still qualify for the exception, if any of the following conditions apply: (i) Establishing an RMA or correspondent or agency arrangement with a recipient institution would exceed the provider's risk tolerance; (ii) a recipient institution refuses to have an RMA or correspondent or agency arrangement with the provider; or (iii) a recipient institution is in a jurisdiction where instructions (such as OUR codes) are routinely disregarded. The Bureau is not

adopting these suggestions. The Bureau concludes that these conditions do not establish objective criteria that are both outside the provider's control and are sufficiently clear such that the Bureau and the industry would be able to determine whether these conditions are met.

*The remittance transfer is sent from the sender's account with the insured institution.* This final rule adopts § 1005.32(a)(5)(i)(D) as proposed to provide that the remittance transfer must be sent from the sender's account with the insured institution; provided, however, for the purposes of § 1005.32(b)(5), a sender's account would not include a prepaid account, unless the prepaid account is a payroll card account or a government benefit account. The Bureau did not receive specific comments on this provision.

*Transition period.* In response to comments received on the 2019 Proposal, the Bureau is adding a new comment 32(b)(5)–5 to provide a transition period for institutions that exceed the 500-transfer threshold-amount under § 1005.32(b)(5) in a certain year, which would allow them to continue to provide estimates of covered third-party fees for a reasonable period of time while they come into compliance with the requirement to provide exact covered third-party fees. Specifically, comment 32(b)(5)–5 provides that if an insured institution in the prior calendar year did not exceed the 500-transfer threshold to a particular designated recipient's institution pursuant to § 1005.32(b)(5)(i)(C), but does exceed the 500-transfer threshold in the current calendar year, the insured institution has a reasonable amount of time after exceeding the 500-transfer threshold to begin providing exact covered third-party fees in disclosures (assuming that a United States Federal statute or regulation does not prohibit the insured institution from being able to determine the exact covered third-party fees, or the insured institution cannot rely on another exception in § 1005.32 to estimate covered third-party fees). The reasonable amount of time must not exceed the later of six months after exceeding the 500-transfer threshold in the current calendar year or January 1 of the next year. Comment 32(b)(5)–5 also provides an example to illustrate this guidance.

The Bureau determines that this transition period will facilitate compliance with the Remittance Rule by allowing institutions a reasonable amount of time to establish the relationships necessary with designated recipient's institutions to provide covered third-party fees. Without this

provision, insured institutions may find it difficult or impossible to comply with the requirement to provide exact covered third-party fee disclosures starting January 1 of the next year if they exceed the 500-transfer threshold late in the current year. The Bureau concludes that this transition period also may help to address issues raised by industry commenters related to mergers and acquisitions, if the combination of two remittance transfer providers could result in the number of transfers exceeding a threshold and thereby imposing requirements that had not applied before.

*Permanent exception.* In the 2019 Proposal, the Bureau solicited comment on whether the Bureau should adopt a sunset provision with respect to the exception in proposed § 1005.32(b)(5). For the same reasons discussed in the section-by-section analysis of § 1005.32(b)(4), the Bureau is not adopting a sunset provision with respect to § 1005.32(b)(5).

*Legal authority.* To effectuate the purposes of EFTA and to facilitate compliance, the Bureau is using its EFTA section 904(a) and (c) authority to add a new exception under § 1005.32(b)(5). Under its EFTA section 904(c) authority, the Bureau ''may provide for such adjustments and exceptions for any class of electronic fund transfers or remittance transfers, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.''[66] The Bureau determines that the exception would facilitate compliance with EFTA, preserve consumer access, and effectuate its purposes. Specifically, the Bureau interprets ''facilitate compliance'' to include enabling or fostering continued operation in conformity with the law. The Bureau concludes that the exception set forth in § 1005.32(b)(5) is targeted to facilitate compliance in those circumstances where it would be unduly burdensome for an insured institution to determine covered third-party fees (*i.e.,* it may be infeasible or impracticable, due to disproportionate cost or conflict with United States Federal statute or regulation). Moreover, in the circumstances in which institutions may be able to take advantage of this disclosure exception, the insured institutions remain subject to the Remittance Rule's other requirements, including the continued obligation to provide disclosures and the

---

[66] 15 U.S.C. 1693b(c).

requirements related to error resolution and cancellation rules.

The Bureau's authority, therefore, is tailored to providing an adjustment for the specific compliance difficulties or challenges that insured institutions face in providing exact disclosure of covered third-party fees that could cause those institutions to reduce or cease offering transfers to certain institutions, which in turn could mean that consumers have less access to remittance transfer services or have to pay more for them. By preserving such access, the exception also could help maintain competition in the marketplace, therefore effectuating one of EFTA's purposes. If the temporary exception expired without the Bureau taking any mitigation measure, the Bureau concludes certain insured institutions may stop sending transfers to some designated recipient's institutions, therefore reducing sender access and competition for those transfers. This potential loss of market participants could be detrimental to senders because it could result in a reduced ability to send transfers to some designated recipient's institutions or an increase the price of remittance transfers.[67]

Technical Corrections

This final rule adopts several technical corrections to the existing regulatory text and commentary. These technical corrections address clerical errors the Bureau found in the Remittance Rule. First, the Bureau is making a technical correction to existing § 1005.32(c)(4) by italicizing the heading of this subsection ("Amount of currency that will be received by the designated recipient"). Second, the Bureau is making a technical correction to existing comment 31(b)(1)(viii)–2 to fix two misspelled cross-references to other sections of the regulatory text and commentary. Third, the Bureau is making a technical correction to existing comment 32(b)(1)–5 by adding a definite article ("the") that should have been in the commentary text. These technical corrections do not change or alter the meaning of the existing regulatory text and commentary.

The Permanent Exception in § 1005.32(b)(1) and the Bureau's Safe Harbor Countries List

Section 919(c) of EFTA allows the Bureau to write regulations specific to transfers to certain countries if it has

determined that the recipient country does not legally allow, or the methods by which transactions are made in the recipient country do not allow, a remittance transfer provider to know the amount of currency the designated recipient will receive. If these conditions are met, the provider may use a reasonably accurate estimate of the foreign currency to be received, based on the exchange rate the provider conveyed to the sender at the time the sender initiated the transaction.[68]

The Bureau implemented section 919(c) of EFTA in § 1005.32(b)(1), creating a "permanent exception for transfers to certain countries." The exception is available in two situations. First, § 1005.32(b)(1)(i) permits providers to use estimates if they cannot determine exact amounts because (A) the laws of the recipient country do not permit such a determination, or (B) the method by which transactions are made in the recipient country does not permit such determination. Comment 32(b)(1)–2.i explains that, for example, under the first category, the laws do not permit exact disclosures when the exchange rate is determined after the provider sends the transfer or at the time of receipt. Comment 32(b)(1)–3 offers an example of a situation that qualifies for the methods exception. The example provided is a situation where transactions are sent via international ACH on terms negotiated between the U.S. government and the recipient country's government, under which the exchange rate is a rate set by the recipient country's central bank or other governmental authority after the provider sends the remittance transfer. Comments 32(b)(1)–4.i through iii provide additional examples of situations that do and do not qualify for the methods exception.

Second, § 1005.32(b)(1)(ii) offers a safe harbor allowing remittance transfer providers to disclose estimates instead of exact amounts for remittance transfers to certain countries as determined by the Bureau. However, the Rule does not allow a remittance transfer provider to use this safe harbor if the provider has information that a country's laws or the method by which transactions are conducted in that country in fact permits a determination of the exact disclosure amount.

In 2012, the Bureau issued a list of five countries—Aruba, Brazil, China, Ethiopia, and Libya—that qualify for this safe harbor.[69] The list contains

countries whose laws the Bureau has decided prevent remittance transfer providers from determining, at the time the required disclosures must be provided, the exact exchange rate on the date of availability for a transfer involving a currency exchange.[70] The Bureau also explained that the safe harbor countries list was subject to change, and provided instructions for contacting the Bureau to request that countries be added or removed from the list.[71] Since 2012, the Bureau has not added any additional countries to this list.

The Bureau has received feedback over the years from some remittance transfer providers and their trade associations regarding the Bureau's countries list. In the 2019 RFI, the Bureau sought comment on what other countries, if any, should be added to the list because their laws do not permit the determination of exact amounts at the time the pre-payment disclosure must be provided.[72] In response, several industry commenters, including trade associations, banks, and a credit union, made various requests, primarily suggesting that particular countries or regions be added to the list. A few of these commenters requested that the Bureau make other changes to the permanent exception in § 1005.32(b)(1) to address, for example, difficulties in obtaining accurate fee and exchange rate information that they assert occur when sending open network transfers. A group of trade association commenters also suggested that the Bureau loosen and revise its requirements for the inclusion of additional countries on the countries list as a way to mitigate the expiration of the temporary exception.

In the 2019 Proposal, the Bureau did not propose to make any changes to § 1005.32(b)(1) or to the Bureau's safe harbor countries list, but again sought comment on the permanent exception in § 1005.32(b)(1) and on the countries list. The Bureau asked commenters to provide feedback on a number of issues, such as the current composition of the countries list, the substantive criteria by which the Bureau adds countries to the countries list, and the processes and

---

[67] As the Bureau stated in the 2019 RFI, the Bureau recognizes the value to consumers of being able to send remittance transfers directly from a checking account to the account of a recipient in a foreign country though their bank or credit union. 84 FR at 17974.

[68] EFTA section 919(c)(2), codified at 15 U.S.C. 1693o–1(c)(2).

[69] Bureau of Consumer Fin. Prot., *Remittance Rule Safe Harbor Countries List* (Sept. 26, 2012)

(Countries List), *http://files.consumerfinance.gov/f/201209_CFPB_Remittance-Rule-Safe-Harbor-Countries-List.pdf.* The Bureau subsequently published that list in the **Federal Register**. 78 FR 66251 (Nov. 5, 2013).

[70] Countries List at 3.

[71] *Id.* at 3–4.

[72] The Bureau also asked that commenters describe how the relevant laws prevent such a determination, and whether the countries were ones for which remittance transfer services were not currently being provided, or whether providers were relying on estimates. 84 FR 17971, 17977 (Apr. 29, 2019).

standards by which the Bureau considers requests to make changes to the countries list (*e.g.,* whether the Bureau should articulate a more detailed list of information and documents that an applicant should submit to make such a request of the Bureau). The Bureau also solicited comment on whether insured institutions expected that new permanent exceptions would address their concerns regarding providing estimates or whether they would additionally need to rely on § 1005.32(b)(1). The Bureau noted in the 2019 Proposal that its focus in this rulemaking was to address the expiration of the temporary exception and the safe harbor threshold. Accordingly, the Bureau cautioned that, in light of its timeframe for doing so, it would give priority to addressing those issues over the issues relating to the countries list.

Five commenters, including one credit union, one regional bank in the Federal Reserve System, and three trade associations addressed § 1005.32(b)(1) and the countries list. Two of the trade association commenters asked the Bureau to revise the procedures the Bureau uses to evaluate requests to change the countries list. One of these commenters suggested specific changes, such as providing a list of specific evidence required for submission when making requests and publishing the Bureau's determinations. This commenter, which represents large banks, along with two other commenters, including a trade association representing credit unions and a regional bank in the Federal Reserve System, also provided suggestions for revising the substantive criteria to determine whether a country qualifies for the permanent exception. One of the trade association commenters, which represents MSBs, asked the Bureau to add two specific countries to the list and provided information supporting that request. Finally, the credit union commenter stated its belief that finalizing the exceptions in proposed § 1005.32(b)(4) and (5) would obviate the need for the permanent exception set forth in § 1005.32(b)(1).

The Bureau noted in the 2019 Proposal that its focus in this rulemaking was to address the expiration of the temporary exception and the normal course of business safe harbor threshold. Therefore, the Bureau is not amending § 1005.32(b)(1) or the countries list as part of this final rule. However, the Bureau will update the process it uses to consider requests to add or remove countries from the

countries list. The Bureau also will make determinations in response to the pending request to add two countries to the countries list.

Effective Date

In the 2019 Proposal, the Bureau proposed to have the proposed amendments take effect on July 21, 2020 and sought comment on the proposed effective date. The Bureau also sought comment on any compliance issues that might arise for insured institutions when transitioning from use of the temporary exception to use of the two proposed permanent exceptions set forth in proposed § 1005.32(b)(4) and (5). In addition, the Bureau solicited feedback on whether a mid-year change in the normal course of business safe harbor threshold would pose any complications for providers or cause confusion, and if so, whether the Bureau should make the change to the normal course of business safe harbor threshold effective on some later date, such as January 1, 2021.

Five commenters, including three trade associations and two credit unions, addressed the effective date. The two credit union commenters expressed support for the proposed July 21, 2020 effective date. A trade association representing banks urged the Bureau to establish the earliest possible effective date. One credit union commenter stated that a 30-day implementation period would provide ample time for implementation. Two trade associations representing large banks and other financial institutions urged the Bureau to extend the temporary exception for one year to provide entities time to transition to the new permanent exceptions. Both cited the need for providers to have time to assess their eligibility for the new permanent exceptions. One of these commenters also identified specific challenges associated with implementing the expiration of the temporary exception, such as transitioning from providing estimates, entering into new agreements, and establishing new currency desks. No commenters addressed the mid-year effective date of the revised normal course of business safe harbor thresholds.

The Bureau is finalizing the effective date as proposed. As such, the amendments adopted in this final rule will take effect on July 21, 2020. This effective date ensures that providers can take advantage of the revised normal course of business safe harbor threshold and the new permanent exceptions when the temporary exception expires. As discussed above, EFTA section 919

expressly limits the length of the temporary exception to July 21, 2020. The Bureau, therefore, cannot and is not extending the exception. As such, the temporary exception will expire on July 21, 2020.

The Bureau recognizes, however, the serious impact that the COVID–19 pandemic is having on consumers and the operations of many entities. In addition, the Bureau recognizes that, for insured institutions providing remittance transfers for their customers, the expiration of the statutory temporary exception to the Remittance Rule's requirement to disclose the exact costs of remittance transfers will deepen the potential impact on those customers. Moreover, insured institutions that are remittance transfer providers play a vital role in ensuring that consumers can send money abroad. This access is especially critical in responding to the dramatic effects on the finances of consumers, both in the United States and abroad, as a result of the coronavirus crisis. The Bureau therefore issued a statement on April 10, 2020 to announce that, for remittances that occur on or after July 21, 2020, and before January 1, 2021, the Bureau does not intend to cite in an examination or initiate an enforcement action in connection with the disclosure of actual third-party fees and exchange rates against any insured institution that will be newly required to disclose actual third-party fees and exchange rates after the temporary exception expires.[73]

The Bureau's statement is in addition to the actions it is taking in this final rule. As set forth above in greater detail in the section-by-section analyses of § 1005.32(b)(4) and (5), this final rule adopts a transition period for insured institutions that exceed, as applicable, the 1,000-transfer or 500-transfer thresholds in a certain year for the permanent exceptions found in § 1005.32(b)(4) and (5). These transition periods will allow these institutions to continue provide estimates for a reasonable period of time after they cross the relevant thresholds (whenever that occurs, even if beyond January 1, 2021) while they come into compliance with the requirement to provide exact amounts.

VI. Dodd-Frank Act Section 1022(b) Analysis

*A. Overview*

The Bureau has considered the potential benefits, costs and impacts of

[73] *See https://files.consumerfinance.gov/f/ documents/cfpb_policy_statement_remittances-covid-19_2020-04.pdf.*

this final rule.[74] In developing this final rule, the Bureau has consulted with appropriate Federal agencies regarding the consistency of this final rule with prudential, market, or systemic objectives administered by such agencies as required by section 1022(b)(2)(B) of the Dodd-Frank Act.[75]

This final rule amends several elements of the Remittance Rule. (1) It raises the normal course of business safe harbor threshold for providing remittance transfers in the normal course of business from 100 transfers annually to 500 transfers annually. Under this change, a person that provided 500 or fewer remittance transfers in the previous calendar year and provides 500 or fewer remittance transfers in the current calendar year is deemed not to be providing remittance transfers in the normal course of its business and thus is not subject to the Rule. (2) This final rule provides a permanent exception that allows insured institutions to estimate the exchange rate (and other disclosure information that depend on the exchange rate) under certain conditions when sending to a country, principally that (a) the designated recipient of the remittance transfer will receive funds in the country's local currency, (b) the insured institution made 1,000 or fewer transfers in the prior calendar year to that country for which the designated recipients of those transfers received funds in the country's local currency, and (c) the insured institution cannot determine the exact exchange rate for that particular transfer at the time it must provide the applicable disclosures. (3) This final rule provides a permanent exception that permits insured institutions to estimate covered third-party fees (and other disclosure information that depend on the amount of those fees) under certain conditions when sending to a designated recipient's institution, principally that (a) the insured institution made 500 or fewer remittance transfers to that

designated recipient's institution in the prior calendar year, or a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees, and (b) the insured institution cannot determine the exact covered third-party fees for that particular transfer at the time it must provide the applicable disclosures.

The Bureau generally considered the benefits, costs, and impacts of this final rule against a baseline in which the Bureau takes no action. The baseline under this approach includes the following: (1) The expiration of the Rule's existing temporary exception, which allows insured institutions to disclose estimates instead of exact amounts to consumers under certain circumstances, and (2) the normal course of business safe harbor threshold of 100 transfers in the current Rule.

The impact analysis discusses two baselines in sequence, as follows. First, for purposes of considering the normal course of business safe harbor threshold of 500 transfers, the Bureau uses a baseline that assumes the temporary exception will expire and the proposed permanent exceptions are not adopted (first baseline). Second, for purposes of considering the permanent exceptions for exchange rate and covered third-party fees, the Bureau uses a baseline in which the temporary exception has expired and the agency has amended the normal course of business safe harbor threshold, so entities that provide 500 or fewer transfers in the previous and current calendar years are excluded but the proposed permanent exceptions are not adopted (second baseline). Because this final rule increases the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually, certain entities that are currently covered by the Rule and are currently benefitting from the temporary exception will be exempt from the Rule entirely. These entities will obtain no additional reduction in burden from the permanent exceptions for the exchange rate and covered third-party fees that the Bureau is adopting in this final rule, because they will be excepted entirely from the Rule, as amended. Given this, the Bureau determines that it is appropriate to consider the reduction in burden from the permanent exceptions against a baseline in which the Bureau has amended the normal course of business safe harbor threshold. In other words, the Bureau considers the potential benefits, costs, and impacts of the permanent exceptions only on insured institutions that provide more than 500

transfers in the prior and current calendar years.

With respect to the provisions of this final rule, the Bureau's analysis considers the benefits and costs to remittance transfer providers (covered persons) as well as to senders (consumers). The Bureau has discretion in any rulemaking to choose an appropriate scope of analysis with respect to benefits, costs, and impacts, as well as an appropriate baseline or baselines.

*B. Data Limitations and Quantification of Benefits, Costs, and Impacts*

The discussion in this impact analysis relies on data the Bureau gathered prior to issuing the 2019 Proposal, which include data obtained from industry, other regulatory agencies, and publicly available sources, and in response to its 2019 Proposal. Over the years, the Bureau has done extensive outreach on many of the issues that this final rule addresses, including conducting the Assessment and issuing the Assessment Report as required under section 1022(d) of the Dodd-Frank Act, issuing the 2019 RFI, meeting with consumer groups, holding discussions with a number of remittance transfer providers that are banks and credit unions of different sizes and consulting with other stakeholders before the Bureau issued the 2019 Proposal, and requesting comment in the 2019 Proposal. The Bureau received some data in response to each of these outreach efforts. However, as discussed further below, the data with which to quantify the potential costs, benefits, and impacts of this final rule are generally limited.

Quantifying the benefits of this final rule for consumers presents certain challenges. As discussed further below, this final rule will tend to preserve access to wire transfers, a form of remittance transfer provided overwhelmingly by insured institutions, and will tend to hold steady the pricing of wire transfers for certain, but not necessarily all, consumers who send wire transfers. This final rule allows some insured institutions to continue to estimate, as applicable, the exchange rate, covered third-party fees, and other disclosure information that depend on those amounts when certain circumstances are met, while other insured institutions will be required to provide exact amounts in disclosures. Determining the number of consumers experiencing these different effects and the impact on consumers would require representative market-wide data on the prevalence of consumers who receive exact amounts as opposed to estimated amounts in disclosures required by the

---

[74] Specifically, section 1022(b)(2)(A) of the Dodd-Frank Act (12 U.S.C. 5512(b)(2)(A)) requires the Bureau to consider the potential benefits and costs of the regulation to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services; the impact of the proposed rule on insured depository institutions and insured credit unions with $10 billion or less in total assets as described in section 1026 of the Dodd-Frank Act (12 U.S.C. 5516); and the impact on consumers in rural areas.

[75] Section 1022(b)(2)(B) of the Dodd-Frank Act (12 U.S.C. 5512(b)(2)(B)) requires that the Bureau consult with the appropriate prudential regulators or other Federal agencies prior to proposing a rule and during the comment process regarding consistency of the proposed rule with prudential, market, or systemic objectives administered by such agencies.

Rule, information on the difference between the estimated amounts and the actual amounts, as well as information on the costs to remittance transfer providers of providing the exact disclosure amounts. The Bureau would then need to predict the responses of remittance transfer providers to these costs and the prevalence of consumers who would receive exact amounts versus estimated amounts in disclosures under this final rule. The Bureau does not have the data needed to quantify these effects, nor could it readily quantify the benefits to consumers of these effects.

In light of these data limitations, the analysis below provides both a quantitative and qualitative discussion of the potential benefits, costs, and impacts of this final rule. Where possible given the data available, the Bureau makes quantitative estimates based on economic principles. Where the data are limited or not available, the Bureau relies on general economic principles and the Bureau's experience and expertise in consumer financial markets to provide a qualitative discussion of the potential benefits, costs, and impacts of this final rule.

## C. Potential Benefits and Costs to Covered Persons and Consumers

As discussed above in explaining the baselines, the cost to certain insured institutions of the expiration of the temporary exception will be mitigated, although to differing extents, by the increase in the normal course of business safe harbor threshold and the permanent exceptions that permit insured institutions to provide estimates of the exchange rate and covered third-party fees in certain circumstances. In particular, insured institutions that currently provide between 101 and 500 transfers [76] in the prior and current calendar years are no longer covered by the Rule and will therefore no longer be required by the Rule to provide disclosures. The permanent exceptions permitting estimation of exchange rate and covered third-party fees do not have any additional effect on the insured institutions (and their customers) that the Rule no longer covers. The Bureau therefore believes that it is appropriate to consider the benefits and costs to consumers and covered persons of this final rule through considering: (1) The effects of the increase in the normal course of business safe harbor threshold; and (2) the effects of the new permanent exceptions to allow certain insured

institutions to provide estimates for the exchange rate, covered third-party fees, and other disclosure information that depend on those amounts under certain circumstances on banks and credit unions that currently provide more than 500 transfers annually.

As explained above, the Bureau is not aware of any MSB remittance transfer providers that will qualify for the 500-transfer normal course of business safe harbor threshold (and thus will not be subject to the Rule). In particular, the Bureau believes that all MSBs that provide remittance transfers provide more than 500 transfers annually. Further, the two permanent exceptions apply only to insured institutions and do not apply to MSBs.

In light of the above, this final rule overall could affect MSBs only indirectly, through shifts in the volume of remittance transfers sent by MSBs relative to the volume sent by insured institutions. The Bureau determines, however, that these shifts will be limited because MSBs provide a somewhat different service than banks and credit unions to meet different consumer demands. For example, as discussed in part II above, in the Assessment Report, the Bureau found that the dollar value of the average remittance transfer provided by MSBs is typically much smaller (approximately $381 on average) than the dollar value of transfers (more than approximately $6,500 on average) provided by banks or credit unions.[77] Thus, in general, if some insured institutions increase the cost of sending remittance transfers or cease sending remittance transfers to certain countries and/or designated recipient's institutions when the temporary exception expires, the Bureau determines that consumers who had been using these insured institutions to send wire transfers will generally shift to other insured institutions and not to MSBs. The Bureau therefore expects only a modest impact relative to the market today on MSBs from the expiration of the temporary exception, with or without this final rule. Thus, the Bureau expects only a modest impact on MSBs from this final rule relative to either baseline.[78]

## 1. Raising the Normal Course of Business Safe Harbor Threshold to 500 Transfers Annually

This section considers the benefits, costs, and impacts of raising the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually. This analysis proceeds in two steps. First, it examines the information available to the Bureau to determine the likely impact of the change. Second, the analysis then considers the likely benefits, costs, and impacts of this change.

This final rule raises the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually. Under this final rule, a person that provided 500 or fewer remittance transfers in the previous calendar year and provides 500 or fewer remittance transfers in the current calendar year will be deemed not to be providing remittance transfers in the normal course of its business and thus will not be subject to the Rule. Based on their respective Call Reports,[79] 414 banks and 247 credit unions provided between 101 and 500 transfers in either 2017 or 2018, but not more than 500 in either year.[80] As such, due to the increase in the normal course of business safe harbor threshold, although these banks and credit unions are currently covered by the Remittance Rule, they will not be covered after this final rule takes effect. These institutions represent 55 percent of banks providing more than 100 transfers and 62 percent of credit unions providing more than 100 transfers. Thus, under this final rule, 661 previously covered institutions no longer need to provide exact disclosures or meet any of the other requirements of the Rule. Comparing these numbers to calculations from 2017 and earlier in the Assessment Report, the number of banks and credit unions providing between 101 and 500 transfers has not changed much from year to year, so is likely to be representative of the relief in burden when this final rule takes effect.

## Benefits and Costs to Insured Institutions

As discussed above, 414 banks and 247 credit unions subject to the Rule

---

[76] As noted above in the section-by-section analysis of § 1005.30(f), "between 101 and 500" means 101 or more and 500 or fewer.

[77] Assessment Report at 68, 73.

[78] Entities besides insured institutions and traditional MSBs can be remittance transfer providers, including broker-dealers. The Bureau lacks data on the number of remittance transfers sent by these entities. The Bureau understands that broker-dealers may use wire services provided by banks for remittance transfers and that a broker-dealer's reliance on the temporary exception may mirror that of the banks with whom they are associated.

[79] As noted above in the section-by-section analysis of § 1005.30(f), banks and credit unions are required to submit quarterly "Call Reports" by the FFIEC and the NCUA, respectively. For a more detailed description of these reporting requirements, *see* Assessment Report at 24.

[80] The 2018 transfers of a bank or credit union is included in this calculation if it provided between 101 and 500 transfers in either 2017 or 2018, even if, for example, it transferred 100 or fewer transfers in 2018. Similarly, it is excluded if it provided more than 500 transfers in either year.

under the first baseline will no longer incur the compliance costs of the Rule under the 500-transfer normal course of business safe harbor threshold. The Bureau does not have a precise estimate of the costs these institutions will stop incurring. However, the Assessment Report discusses the kinds of compliance costs faced by providers covered by the Rule.[81] These costs include staff training costs, information acquisition costs for disclosures, and error investigation and resolution costs.

In addition, if any banks and credit unions were restricting the number of remittance transfers that they provide to 100 or fewer in order to qualify for the existing normal course of business safe harbor threshold, it is possible they may decide to start providing more remittance transfers after the threshold is increased to 500 transfers. However, the Assessment Report indicates that banks and credit unions did not limit the number of transfers to stay under the existing normal course of business safe harbor threshold, nor did banks or credit unions appear to cease providing remittance transfers because of the Rule.[82] These facts suggest it is unlikely that many institutions will start providing more remittance transfers because of the increase in the normal course of business safe harbor threshold.

Finally, it is possible that some insured institutions will see effects from the increased normal course of business safe harbor threshold because of the preferences of their customers. One possibility is that the customers of insured institutions that are excluded from coverage because of the increase in the normal course of business safe harbor threshold to 500 transfers may decide to use insured institutions that remain subject to the Rule to send remittance transfers. These customers may prefer receiving the protections the Rule affords them (*e.g.*, receiving pre-payment disclosures and receipts, or availing themselves of the Rule's error resolution rights), even if they have to pay more for remittance transfers. Conversely, if the insured institutions that are no longer covered by the Rule due to the increase in the normal course of business safe harbor threshold lower the price they charge to send remittance transfers, some consumers may switch to those institutions. Given the inconvenience of consumers changing from one institution to another institution, such as closing their account at one bank and opening an account at another bank, and the analysis of the impact of the 100-transfer normal course

of business safe harbor threshold on the market for remittance transfers discussed in the Assessment Report,[83] the Bureau expects that the net change in remittance transfers and market participation will likely be small for insured institutions that are no longer covered by the Rule because of the increase in the normal course of business safe harbor threshold to 500 transfers.

Benefits and Costs to Consumers

In 2018, insured institutions that would not have been covered if the normal course of business safe harbor threshold was set at 500 transfers provided approximately 141,900 transfers.[84] These transfers represent 1.2 percent of calendar year 2018 transfers by insured institutions providing more than 100 transfers in either 2017 or 2018.[85] The Assessment Report found that these numbers have been fairly stable from year to year before 2018, so are likely to be representative of the decrease in the number of covered transfers when this final rule takes effect.[86]

This final rule has potential benefits and costs to the customers of banks and credit unions providing between 101 and 500 remittance transfers annually. The benefits include potentially lower prices for consumers if the remittance transfer provider passes on to them any reduction in regulatory compliance costs. As discussed in the Assessment Report, at least some bank and credit union providers reported to the Bureau that in response to the Rule, they increased the price they charged consumers to provide remittance transfers.[87] Excepting such entities from the Rule's coverage could result in decreased prices for these banks and credit unions for sending remittance transfers.

The costs to customers of banks and credit unions providing between 101 and 500 remittance transfers annually are the potential loss of the Rule's pre-payment disclosures, which may facilitate comparison shopping, and other Rule protections, including cancellation and error resolution rights. The Bureau does not have the

information necessary to quantify these costs. The Bureau has received relatively few complaints from consumers arising from transfers provided by banks and credit unions not covered by the Rule.[88] The Assessment Report found that consumers asserted errors for as many as 1.9 percent of transfers and cancelled between 0.29 and 4.5 percent of transfers depending on the provider.[89] Some banks and credit unions providing between 101 and 500 remittance transfers annually may continue to provide certain of these protections to their customers, although perhaps in a more limited manner than required by the Rule. For example, in response to the 2019 Proposal, as noted in the section-by-section analysis of § 1005.30(f)(2), one bank trade association commenter asserted that entities that are no longer subject to the Remittance Rule will still provide their customers with information about the fees and charges associated with sending a remittance transfer and will also take steps to help consumers when there are errors related to their transfers.

As noted above, it is possible that, to the extent any banks and credit unions intentionally provide 100 or fewer transfers (so as to qualify for the existing normal course of business safe harbor threshold), they may decide to increase their transfers under this final rule. The Assessment Report did not find that banks or credit unions were limiting the number of transfers they provided to stay under the existing 100-transfer normal course of business safe harbor threshold or that banks or credit unions had stopped providing remittance transfers because of the Rule.[90] Thus, the Bureau concludes that there will not be much if any increase in access to remittance transfer services resulting from the increase in the normal course of business safe harbor threshold.

---

[81] Assessment Report at 117–20.

[82] *Id.* at 133–38.

[83] *Id.* at 133–37.

[84] These numbers are from the bank and credit union Call Reports. The total represents approximately 92,600 bank transfers and 49,300 credit union transfers.

[85] These numbers are from the bank and credit union Call Reports. The dollar volume of the transfers provided by banks providing between 101 and 500 transfers in either 2017 or 2018, but not more than 500 in either year, was $2 billion. Credit unions do not report their dollar volume.

[86] Assessment Report at 76–77, 83–84.

[87] *Id.* at 94.

[88] From April 1, 2013 through December 31, 2017, about 0.4 percent of complaints the Bureau has received are about ''international money transfers'' including remittance transfers. *Id.* at 113–16. The number of complaints may be low because providers are complying with the law. Another possibility is that some consumers who send remittance transfers may have limited English proficiency, and therefore, be less likely to know that they can submit complaints to the Bureau or may be less likely to seek help from a government agency than other consumers. These percentages are based on all complaints about international transfers, not just complaints made when the provider is an insured institution.

[89] *Id.* at 126, 131. These percentages were calculated with data on both insured institutions and other providers. The Assessment Report cautions that the data is not necessarily representative of a particular set of institutions.

[90] *Id.* at 133–38.

Alternatives

In the 2019 Proposal, the Bureau considered an alternative 200-transfer threshold for the normal course of business safe harbor threshold. There were 156 banks and 138 credit unions in 2018 that provided between 101 and 200 transfers in either 2017 or 2018, but not more than 200 in either year, based on their respective Call Reports. As reported above, the corresponding numbers under this final rule are 414 banks and 247 credit unions. Thus, this final rule more than doubles the number of banks that are not subject to the Rule relative to an alternative normal course of business safe harbor threshold of 200 remittance transfers. The corresponding relative increase under this final rule for credit unions is 79 percent. Under the alternative, the banks and credit unions that would not be subject to the Rule represent 21 percent of banks providing more than 100 transfers in either 2017 or 2018 and 35 percent of credit unions providing more than 100 transfers in either 2017 or 2018. As reported above, the corresponding numbers under this final rule are 55 percent for banks and 62 percent for credit unions. The other impacts as described above for a normal course of business safe harbor threshold of 500 transfers would follow for a threshold of 200 transfers.

The total number of transfers in 2018 for banks and credit unions that provided between 101 and 200 transfers in either 2017 or 2018, but not more than 200 in either year, were 19,900 bank transfers and 18,200 credit union transfers. As reported above, the corresponding numbers under this final rule are approximately 92,600 bank transfers and 49,300 credit union transfers. Thus, this final rule more than quadruples the number of bank transfers and more than doubles the number of credit union transfers that are not subject to the Rule relative to the alternative. Under the alternative, the bank and credit union transfers in 2018 that would not be subject to this final rule represent 0.18 percent of transfers by banks providing more than 100 transfers in either 2017 or 2018, and 2.31 percent of transfers by credit unions providing more than 100 transfers in either 2017 or 2018. Overall this is 0.32 percent of transfers in 2018 by insured institutions providing greater than 100 transfers in either 2017 or 2018. The corresponding numbers under this final rule are 0.83 percent for bank transfers and 6.3 percent for credit union transfers. As reported above, this is 1.2 percent of all 2018 transfers by insured institutions providing more than 100 transfers in either 2017 or

2018. Again, the other impacts as described above for a normal course of business safe harbor threshold of 500 transfers would follow for a 200-transfer threshold.

As discussed in greater detail in the section-by-section analysis of § 1005.30(f)(2), the 2019 Proposal solicited comment on basing the normal course of business safe harbor on the percentage of an entity's customers that send remittance transfers. A limitation on the ability of the Bureau to consider the impacts of potential alternatives is the lack of institutional-level data or representative averages for groups of institutions on, among other things, the percentage of customers that send remittance transfers, the average number of remittance transfers sent by customers who send remittance transfers, and the distribution of transfers across customers (*e.g.,* whether sending remittance transfers is concentrated among a small share of customers or dispersed). The numbers of consumers and covered persons affected by different per-customer thresholds would depend on this information. The qualitative effects on consumers and covered persons that would not be covered by the Rule at different normal course of business safe harbor thresholds would be as described above. In the 2019 Proposal, the Bureau requested data and other information that would be useful for quantifying the number of affected consumers and persons sending remittance transfers and the benefits and costs on the affected consumers and persons, but did not receive such information.

2. Permanent Exceptions To Estimate Exchange Rates and Covered Third-Party Fees

This section considers the benefits, costs, and impacts of the two permanent exceptions being adopted in this final rule that will allow remittance transfer providers that are insured institutions to estimate the exchange rate and covered third-party fees in certain circumstances. This analysis proceeds in two steps. First, it examines the information available to the Bureau to determine the likely impact of the expiration of the existing temporary exception. Second, the analysis then considers the likely benefits, costs, and impacts of the permanent exceptions. For reasons explained above, the analysis generally considers only the impacts of the expiration of the temporary exception and adoption of the new permanent exceptions on banks and credit unions that do not qualify for the normal course of business safe harbor threshold, as amended by this

final rule (*i.e.,* banks and credit unions that provide more than 500 remittance transfers annually).

According to their Call Reports, of 343 banks providing more than 500 transfers in 2017 or 2018, 48 (14 percent) reported using the temporary exception in 2018.[91] These 48 banks estimate they used the temporary exception for approximately 770,000 transfers in 2018, representing approximately 7.0 percent of all transfers by banks providing more than 500 transfers annually. The Bureau does not have comparable information on the use of the temporary exception for credit unions, and as such, assumes that credit union usage is similar to that of banks.[92] Specifically, assuming that the same proportion of credit unions providing more than 500 transfers annually use the temporary exception as banks and use the temporary exception for the same proportion of transfers as banks, around 21 credit unions would have used the temporary exception for 52,000 transfers. Thus, absent any mitigation to address the potential impact of the expiration of the temporary exception (other than the expansion of the normal course of business safe harbor threshold described above), it is reasonable to estimate that the approximately 70 insured institutions using the temporary exception for approximately 822,000 transfers would need to undertake certain adjustments.[93]

Bank Call Reports do not differentiate between the use of the temporary exception for exchange rates and covered third-party fees. From discussions with some large banks and a trade association representing a number of the largest banks, the Bureau understands that the temporary exception generally is not used by very large banks to estimate exchange rates because providing the exact exchange rate is not difficult for such banks. Over

---

[91] It is possible that there are more banks using the temporary exception than report it on their Call Reports. For example, smaller bank providers that rely on a larger service provider may not accurately report their usage.

[92] In the 2019 Proposal, the Bureau requested data and other information on the use of the temporary exception by credit unions, and in particular by credit unions providing more than 500 transfers annually. Commenters did not provide any such data or other information.

[93] According to their Call Reports, 34 banks providing between 101 and 500 remittance transfers annually relied on the temporary exception for 6,500 transfers. Assuming proportional use for credit unions providing between 101 and 500 remittance transfers annually, approximately 20 credit unions relied on the temporary exception for 3,500 transfers. For a baseline in which the normal course of business safe harbor threshold was not increased, the impacts on consumers and covered persons considered would also apply to these transfers and covered persons.

the years, banks, credit unions, and their trade associations suggested that there could still exist difficulties for certain large banks to provide exact exchange rates to specific countries. However, they did not provide examples or data on the number of large banks or transfers for which providing the exact exchange rate would be difficult. Accordingly, the analysis assumes that a substantial majority of the remittance transfers and institutions using the temporary exception are using it exclusively for covered third-party fees. In the 2019 Proposal, the Bureau requested data and other information on the share of remittance transfers that rely on the temporary exception to estimate exchange rates alone, covered third-party fees alone, and both exchange rates and covered third-party fees, but did not receive relevant information.

Permanent Exception for Estimation of the Exchange Rate by an Insured Institution

This final rule provides a permanent exception that allows insured institutions to estimate the exchange rate (and other disclosure information that depend on the exchange rate) under certain conditions when sending to a country. Principally, these conditions are that the designated recipient of the remittance transfer will receive funds in the country's local currency and (a) the insured institution made 1,000 or fewer transfers in the prior calendar year to that country where the designated recipients received funds in the country's local currency, and (b) the insured institution cannot determine the exact exchange rate for that particular transfer at the time it must provide the applicable disclosures.

The information available to the Bureau indicates that insured institutions primarily use the temporary exception to estimate covered third-party fees. However, as discussed below, the Bureau understands that certain insured institutions may incur additional costs in order to disclose exact exchange rates. Further, these costs, as well as the willingness to incur them, may differ across insured institutions. Thus, under the second baseline (*i.e.,* baseline in which the temporary exception expires and the Bureau raises the normal course of business safe harbor threshold to 500 transfers), it is possible that the requirement to disclose exact exchange rates may cause some insured institutions to cease providing transfers to certain countries to the extent that these institutions will not qualify for the normal course of business safe harbor

threshold, as amended, and do not qualify for the new permanent exception that allows insured institutions to estimate the exchange rate under certain conditions. The permanent exception for estimating the exchange rate would tend to mitigate the cost increases and reductions in the provision of remittance transfers at insured institutions that would otherwise occur.

Benefits and Costs to Insured Institutions

Under the second baseline, insured institutions that will continue to be covered by the Rule (because they send remittance transfers in excess of the 500-transfer threshold in the normal course of their business) and that have been using the temporary exception to estimate exchange rates will either need to provide exact exchange rate disclosures or stop sending those transfers. To provide exact exchange rate disclosures, these insured institutions will incur certain costs. An insured institution may need to establish and maintain currency-trading desk capabilities and risk management policies and practices related to the foreign currency and country at issue or to use service providers, correspondent institutions, or persons that act as the insured institution's agent. These additional costs may also differ across insured institutions, due to differences in existing arrangements with service providers or correspondent institutions, the ability to negotiate changes in those arrangements, the expertise of existing staff, and the likely volume of transfers. Insured institutions may also differ in the level of commitment to sending remittance transfers to particular countries, based on the needs of their customers, and thus their willingness to incur additional costs. Overall, the requirement to disclose exact exchange rates under the second baseline could cause some insured institutions to cease providing transfers to certain countries. These effects would likely differ across insured institutions.

The Bureau determines that adopting the permanent exception for estimating the exchange rate will tend to mitigate these costs and impacts. The Bureau asked for information in its 2019 Proposal about the percentage of transfers by recipient country that rely on the temporary exception for exchange rates and the portion of those transfers that could rely on the permanent exception being proposed. It did not receive this information. However, the Bureau understands that insured institutions predominantly use the temporary exception to estimate

covered third-party fees, rather than exchange rates. Thus, the Bureau concludes that the additional costs under the second baseline would be relatively modest overall, and adopting the permanent exception will mitigate most of the increase that would otherwise occur. Further, as noted in the 2019 Proposal, it is the Bureau's understanding from discussion with some large banks and a trade association representing a number of the largest banks that providing exact exchange rates is not generally difficult for very large banks. However, several trade association commenters asserted, in response to the 2019 Proposal, that large banks may have difficulties providing exact exchange rates in certain circumstances. Thus, to the extent that very large banks would have an advantage under the second baseline in providing transfers to particular countries, the permanent exception for the exchange rate will mitigate this advantage by allowing smaller institutions to continue to estimate exchange rates in disclosures for certain remittance transfers.

As discussed above, in the 2019 Proposal, the Bureau requested data and other information about the share of remittance transfers that relied on the temporary exception to estimate exchange rates alone, and both exchange rates and covered third-party fees. The Bureau did not receive such information.

Further, the Bureau recognizes that the magnitudes of the effects of the expiration of the temporary exception to estimate the exchange rate and the mitigating effects of the permanent exception for estimating the exchange rate are uncertain. Thus, the potential additional costs under the second baseline from the inability to estimate exchange rates by certain insured institutions may be larger than the Bureau has assumed. As a result, the permanent exception to estimate exchange rates may not mitigate all of the impact of the expiration of the temporary exception.

For reasons discussed in the section-by-section analysis of § 1005.32(b)(4), under this final rule, if an insured institution in the prior calendar year did not exceed the 1,000-transfer threshold to a particular country, but does exceed the 1,000-transfer threshold in the current calendar year, the insured institution will have a reasonable amount of time after exceeding the 1,000-transfer threshold to begin providing the exact exchange rate (assuming it cannot rely on another exception in § 1005.32 to estimate the exchange rate). This final rule provides

that the reasonable amount of time must not exceed the later of six months after exceeding the 1,000-transfer threshold in the current calendar year or January 1 of the next year.

The transition period may benefit insured institutions by giving them some additional time in which to provide remittance transfers while also establishing additional agreements with correspondent institutions or third-party service providers, or develop their own systems to provide exact exchange rates. The transition period also ensures that an insured institution that estimates exchange rates and inadvertently exceeds the 1,000-transfer threshold will not violate the Rule during the transition period. The Bureau does not have information on how frequently institutions are below 1,000 transfers to a particular country in one year and exceed the 1,000-transfer threshold in a subsequent year or how common it is for an insured institution to exceed the 1,000-transfer threshold by a large number of transfers. The Bureau understands that relatively few insured institutions provide most of the remittance transfers that insured institutions provide. In addition, while some insured institutions provide remittance transfers to many countries on their customers' behalf, some countries are the destination of far more remittance transfers than others.[94] Thus, the Bureau understands that the number of remittance transfers that most insured institutions provide to an individual country likely stays consistently above or below 1,000 transfers. It is not possible, however, to determine from these facts how many insured institutions will rely on the transition period.

Benefits and Costs to Consumers

Under the second baseline, in which the temporary exception expires and the Bureau raises the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually, the preferred insured institution for some consumers might not be able to provide an exact exchange rate disclosure for transfers to certain countries, for reasons discussed above. Some consumers, therefore, would need to seek out an alternate remittance transfer provider to send transfers to those countries. The Bureau understands that to the extent that a consumer's preferred insured institution cannot provide the exact exchange rate, there would likely be a less preferred insured institution that could provide

the exact exchange rate and send the transfer.[95]

Under this final rule, due to the adoption of the permanent exception for estimating the exchange rate, more consumers will be able to continue to use their preferred insured institution to send transfers. These consumers may also be able to do so at lower prices under the Rule if, without the Rule and under the second baseline, an insured institution would pass on the higher costs incurred to obtain exact exchange rate information.

The cost to these consumers is that they will receive estimated disclosures. Disclosures that include exact exchange rate information make it easier for a consumer to know whether a designated recipient is going to receive an intended sum of money, or the amount in U.S. dollars that the consumer must send to deliver a specific amount of foreign currency to a designated recipient. Requiring the disclosure of exact exchange rates may also make it easier for consumers to compare prices across providers. The permanent exception for estimating exchange rates may therefore impose a cost on certain consumers in the form of these foregone benefits. However, these costs may not be large to the extent that there is not a great difference between the estimated amounts and the actual amounts. In addition, the estimated amount may turn out to be the actual amount. If the estimated and actual amounts are frequently the same, the costs to consumers will be low.

Overall, however, the evidence available to the Bureau suggests that the costs to consumers of allowing insured institutions to use the permanent exception to estimate the exchange rate are not likely to be significant. Further, the Bureau believes the permanent exception for estimating the exchange rate will be used for only a small portion of all remittance transfers sent by insured institutions. As such, the potential negative impact on comparison shopping noted above may

be small. Lastly, as discussed in the Assessment Report and noted above, the Bureau reviewed evidence from its consumer complaints database and did not find evidence of significant consumer complaints regarding the use of estimates for exchange rates or for covered third-party fees.[96]

As discussed above, this final rule provides that if an insured institution in the prior calendar year did not exceed the 1,000-transfer threshold to a particular country but does exceed the 1,000 transfer threshold in the current calendar year, the insured institution has a reasonable amount of time after exceeding the 1,000-transfer threshold to begin providing exact exchange rates in disclosures (assuming that it cannot rely on another exception in § 1005.32 to estimate the exchange rate). While the Bureau does not have information on how many transfers might be affected, it expects the number of transfers to be relatively small and, as such, the costs to consumers of receiving estimates for additional transfers is likely to be limited. Further, by allowing providers additional flexibility, the transition period adopted in this final rule may help reduce costs. In turn, these cost savings may be passed on to consumers, and help to maintain consumer access to the extent that the extra flexibility the transition period will provide make it less likely that insured institutions would stop providing remittance transfers to stay below the 1,000-transfer threshold.

Permanent Exception for Estimation of Covered Third-Party Fees by an Insured Institution

As noted above, under the second baseline (*i.e.*, the baseline in which the temporary exception expires and the Bureau raises the normal course of business safe harbor threshold to 500 transfers), the Bureau estimates that approximately 70 insured institutions would need to stop providing estimated disclosures for approximately 822,000 transfers. Based on its analysis of available information, the Bureau expects that many of these insured institutions could form additional relationships or set up new systems to disclose exact covered third-party fees for a large portion of the transfers currently using the temporary exception

---

[94] *See* Assessment Report at 60, 77.

[95] These consumers may also consider using an MSB to send transfers if it is too difficult or expensive to find an insured institution that can send the transfer. MSBs are generally able to provide exact exchange rate information for the reasons discussed in part II above. Some MSBs compete with insured institutions for high-value transfers in some corridors. However, MSBs generally provide a somewhat different service than banks and credit unions to meet different consumer demands, as reflected in the differences in the average transfer amount for MSBs ($381) and banks and credit unions ($6,500) (Assessment Report at 68, 73). The Bureau therefore considers that there would be relatively few consumers, under the second baseline, who use an MSB because they find it too difficult or expensive to use an insured institution.

[96] Assessment Report at 113–16. The Assessment Report categorizes complaints into the type of complaint and estimates for exchange rates or for covered third-party fees were not an important source of complaint by themselves. However, 7 percent of complaints were for the "Wrong amount charged or received" and 0.5 percent for "Unexpected or other fees" which may contain complaints related to inaccurate estimates.

to estimate covered third-party fees. As described in detail in the 2019 Proposal, in formulating the proposed permanent exception for covered third-party fees, the Bureau held discussions with banks and a trade association representing a number of the largest banks, reviewed comments from the 2019 RFI, and analyzed Call Reports from banks that have reduced their reliance on the temporary exception. Based on the information received from these sources, the Bureau was preliminarily persuaded that banks would be willing to set up the relationships or establish other systems (such as international ACH) necessary to their ability to disclose exact covered third-party fees and reduce their reliance on estimates to around half of the number of transfers for which they used the temporary exception in 2018. The Bureau has no information that would suggest a different conclusion for credit unions. Based on the limited information available, the Bureau determines that insured institutions will implement these operational changes and provide exact disclosures for around half of the number of transfers for which they used the temporary exception in 2018, and their customers will gain the benefit of receiving exact disclosures. However, implementing these operational changes is likely to come at some cost to insured institutions, and some of these costs could be passed on to consumers. Note that these costs are not costs of this final rule; they are costs incurred under the baseline in which the temporary exception expires and the Bureau increases the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually.

There are a limited number of outcomes for the remaining half of transfers for which insured institutions used the temporary exception in 2018 and which could not be sent with estimated disclosures under the second baseline. Consumers requesting these transfers would need to find an alternative remittance transfer provider. The alternative remittance transfer provider would most likely be an insured institution that provides enough remittance transfers to the designated recipient's institution that the sending insured institution either has relationships or would form additional relationships or set up new systems to provide exact covered third-party fee disclosures. The alternative provider might also be an MSB. As discussed above, however, MSBs provide a somewhat different service than banks and credit unions to meet different consumer demands. This would tend to

reduce any substitution from insured institutions to MSBs. In either case, consumers would lose the convenience and other benefits of transferring with their preferred bank or credit union. Finally, it is also possible that no insured institution or MSB (or combination of MSBs), at any price, could send to certain designated recipient's institutions. This would occur if no insured institution is able to provide exact disclosures and no MSB (or combination of MSBs) is able to transfer high enough amounts to certain designated recipient's institutions.

The Bureau does not have the information necessary to quantify how many transfers would fall into each category. For purposes of the analysis below, the Bureau assumes that under the second baseline, customers of an insured institution that would no longer send remittance transfers to a designated recipient's institution would generally search for and find a different insured institution that would send the transfer. The Bureau considers it unlikely that no insured institution or MSB (or combination of MSBs), at any price, could send the desired amount of funds to a designated recipient's institution. In response to the 2019 Proposal, a group of trade association commenters representing large banks noted that the Bureau may be overly optimistic in this assumption that other remittance transfer providers would still be able to send transfers and that the costs of switching remittance transfer providers may be high for consumers. Note again that these are all costs incurred under the baseline in which the temporary exception expires without the new exception. If the costs under the baseline would be larger than the Bureau predicts, the mitigation of these costs by the new permanent exception for estimating covered third-party fees would also be larger.

Transfers that are actually provided under the second baseline will fall into three main categories relative to covered third-party fees: (1) Transfers that are below the threshold for covered third-party fees, and therefore disclose estimates, but under the second baseline would have been provided with exact disclosures at a higher price or by a remittance transfer provider other than the consumer's first choice; (2) transfers that are above the threshold for covered third-party fees, and so will be provided with exact disclosures for such fees under both this final rule and the second baseline; or (3) transfers that do not receive exact disclosures because a United States Federal statute or regulation prohibits the insured institution from being able to determine

the exact covered third-party fees and the insured institution cannot determine the exact covered third-party fees for that particular transfer at the time it must provide the applicable disclosures. Relative to the baseline, in which all bank or credit union transfers that take place would have to provide exact disclosures, only (1) and (3) represent a change considered for the costs or benefits of the permanent exception for estimating covered third-party fees because (2) represents no impacts relative to the second baseline.

The Bureau has no evidence that any United States Federal statute or regulation prohibits an insured institution from being able to determine exact covered third-party fees for any remittance transfer. Thus, to the best of the Bureau's knowledge, no transfers fall into category (3) above. To the extent there are transfers that fall under this provision, there are benefits to both insured institutions and consumers from the added flexibility. Insured institutions benefit by still being able to provide transfers that they could not otherwise provide. Consumers benefit by maintaining access to remittance transfers at their preferred institution that might not take place otherwise.

Benefits and Costs to Insured Institutions

As stated above, under the baseline in which the temporary exception expires and the Bureau raises the normal course of business safe harbor threshold to 500 transfers, the Bureau estimates that approximately 70 insured institutions would need to stop providing estimated disclosures for approximately 822,000 transfers. While the Bureau does not have market-wide information, the information provided by certain large banks suggests that there are few designated recipient's institutions to which these large banks individually send more than 500 transfers in a year and with which these large banks would not be able or willing to set up a relationship sufficient to provide exact disclosures of covered third-party fees. Based on this information, the Bureau expects that under both the second baseline and the permanent exception for estimating covered third-party fees, these 70 institutions will form roughly the same number of relationships and will provide exact disclosures for about half of these transfers. Forming these relationships comes at some cost to insured institutions, and some of these costs could be passed on to consumers. One trade association commenter representing banks questioned the Bureau's expressed expectation in the 2019 Proposal that insured institutions

would form new relationships or contract with service providers to provide exact disclosures. However, service providers for insured institutions are often insured institutions themselves making their correspondent network available to smaller and more regional institutions.

As explained above, under the second baseline, the other half of the remittance transfers for which estimated disclosures are currently provided would no longer be provided by the insured institutions that currently send them but would be sent by different insured institutions.[97] Based on the information available from certain large banks, under the permanent exception for estimating covered third-party fees, the Bureau expects that the insured institutions that currently send these transfers would continue to send them. In response to the 2019 Proposal, one large credit union commenter estimated that two-thirds of its current remittance transfers would be covered under the new permanent exception. Based on the information provided in its comment letter, it appears that the credit union had not yet sought to contract with a large bank, join the SWIFT network to be eligible to form RMAs, or otherwise form correspondent relationships, as would be necessary under the expiration of the temporary exception if it wished to continue to provide remittance transfer at its current levels.

For transfers under category (1) above, insured institutions can provide estimated disclosures under the permanent exception concerning coved third-party fees, so these insured institutions would not need to form additional relationships. These insured institutions would benefit from not turning away potential customers and by being able to continue providing a valuable service to their customers. These benefits might be significant, although they are difficult to quantify.

This final rule also provides a transition period for insured institutions that exceed the 500-transfer normal course of business safe harbor threshold under § 1005.32(b)(5) in the current calendar year, which will allow them to continue to provide estimates of covered third-party fees for a reasonable period of time (*i.e.,* the later of six months or January 1 of next year) while they come into compliance with the requirement to provide exact covered third-party fees (assuming that these institutions cannot rely on another exception in § 1005.32). The transition period may benefit insured institutions by giving them

some additional time in which to provide remittance transfers while relying on the permanent exception for covered third-party fees while also establishing additional agreements with other institutions or develop systems to provide exact covered third-party fees. The transition period also ensures that an insured institution that estimates covered third-party fees and inadvertently exceeds the 500-transfer threshold will not violate the Rule during the transition period. The Bureau does not have information on how frequently institutions move from below the threshold in one year to exceeding the 500-transfer threshold in a subsequent year. However, the Bureau expects that relatively few transfers will be affected because remittance transfers are generally concentrated in a few corridors and among relatively few large banks, which will always be above the 500-transfer threshold.

### Benefits and Costs to Consumers

Under category (1) above, certain senders of remittance transfers would have been provided with exact disclosures under the second baseline but at a higher price or by a remittance transfer provider other than the consumer's first choice. As discussed above, the Bureau expects that the permanent exception for estimating covered third-party fees if an insured institution makes 500 or fewer transfers to a designated recipient's institution in the prior calendar year will mitigate all or almost all of the costs to consumers from the loss of access to transfers to certain designated recipient's institutions under the second baseline. These remittance transfers represent the most important benefit of the permanent exception for estimating covered third-party fees for consumers. While the Bureau does not have the information to quantify the number of transfers in this category or the exact value to consumers, the benefit to consumers of continued access is potentially large.

Under category (1) above, consumers will receive disclosures containing estimates. As discussed above in considering the impact of the permanent exception for the exchange rate, the use of estimates for covered third-party fees may make it more difficult for consumers to engage in comparison shopping and impose a cost on consumers by making disclosures less accurate.

As discussed above, this final rule provides that if an insured institution in the prior calendar year did not exceed the 500-transfer threshold to a particular country but does exceed the 500-transfer threshold in the current calendar year,

the insured institution has a reasonable amount of time after exceeding the 500-transfer threshold to begin providing exact third-party fees in disclosures. While the Bureau does not have information on how many transfers might be affected, it expects the number of transfers to be relatively small and, as such, the costs to consumers of receiving estimates for additional transfers to be limited. Further, by allowing providers additional flexibility, the transition period may help reduce costs, which may be passed on to consumers, and maintain consumer access to the extent that the extra flexibility makes it less likely that insured institutions would stop providing transfers to stay below the threshold.

### Alternatives

For purposes of considering the effects of the permanent exceptions that allow insured institutions to estimate exchange rates and covered third-party fees under certain circumstances, the Bureau used the second baseline (*i.e.,* the baseline in which the temporary exception expires and the Bureau amended the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually). The Bureau instead considered the effects of these permanent exceptions relative to the first baseline, under which the temporary exception expires and the Bureau maintains the existing normal course of business safe harbor threshold at 100 transfers annually. In this case, the permanent exceptions that would allow institutions to estimate exchange rates and covered third-party fees would have effects on insured institutions that provide between 101 and 500 remittance transfers per year and the consumers on whose behalf these institutions send remittance transfers. These effects would be in addition to the effects on insured institutions that provide more than 500 remittance transfers per year and the consumers on whose behalf these insured institutions send remittance transfers.

As discussed above, 414 banks and 247 credit unions provided between 101 and 500 transfers in either 2017 or 2018, but not more than 500 in either year. In 2018, they respectively sent about 92,600 and 49,300 transfers. These banks and credit unions would remain covered by the Rule under the first baseline since the normal course of business safe harbor threshold remains at 100 transfers. However, all of these insured institutions would necessarily meet the respective 500-transfer and 1,000-transfer threshold requirements in the permanent exceptions. Thus, all of

---

[97] At least one commenter on the 2019 Proposal noted the large cost of this dislocation.

these insured institutions could continue to disclose estimates for exchange rates and covered third-party fees to the extent that they already do so. The ability to disclose estimates under the permanent exceptions would mitigate costs relative to the first baseline.

The insured institutions providing between 101 and 500 transfers currently provide error resolution rights and meet the other conditions of the Rule. These insured institutions would continue to do so under the first baseline and with the alternative rule considered here, *i.e.,* that provided only the permanent exceptions for estimating exchange rates and covered third-party fees.

### D. Potential Specific Impacts of the Final Rule

1. Depository Institutions and Credit Unions With $10 Billion or Less in Total Assets, as Described in Section 1026

As stated above, based on their Call Reports, 414 banks and 247 credit unions provided between 101 and 500 transfers in either 2017 or 2018, but not more than 500 in either year. Of these, 386 banks and all 247 credit unions had $10 billion or less in total assets in 2018. Some of these insured institutions currently provide exact disclosures (based on Call Report data) and all of them would have to provide exact disclosures under the first baseline (*i.e.,* the no-action baseline). None of these insured institutions would be covered by the Rule under the increase in the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually. It follows that a large majority of the banks and all of the credit unions affected by the change in the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually have $10 billion or less in assets. Thus, the impacts of the increase in the normal course of business safe harbor threshold, described above, will also generally be the specific impacts for depository institutions and credit unions with $10 billion or less in total assets.

In addition, 190 banks and 142 credit unions with $10 billion or less in assets in 2018 provided more than 500 transfers in 2017 or 2018. As discussed above, some of these banks and credit unions currently provide exact disclosures, and all of them will have to provide exact disclosures under the second baseline. These banks and credit unions will not be directly affected by the change in the normal course of business safe harbor threshold. They may be affected, compared to the second baseline, by the adoption of the permanent exceptions for estimating the exchange rate and covered third-party fees in this final rule. According to the bank Call Report data, only 18 of these banks reported using the temporary exception, and they did so for approximately 66,600 transfers. As discussed above, the Bureau understands that remittance transfer providers that are smaller depository institutions and credit unions obtain information about exchange rates and covered third-party fees from a limited number of service providers that are either very large insured institutions or large nonbank service providers. Given this reliance, the impacts of the permanent exceptions, described above, will also generally be the specific impacts for depository institutions and credit unions with $10 billion or less in total assets.

2. Impact on Consumers in Rural Areas

Consumers in rural areas may experience different impacts from this final rule than other consumers. The Bureau has discretion to define rural areas as appropriate for this impact analysis. For the impact analysis in this section, the Bureau used its 2018 rural counties list.[98] The Bureau compared the address each bank and credit union reported on its Call Report with this rural county list to determine if that bank or credit union was located in a rural county. This comparison is limited to the location listed in the Call Report, which is generally the headquarters of the bank or credit union. There are likely rural branches of insured institutions with headquarters located in non-rural areas, so this comparison captures only a portion of the impact of this final rule on consumers in rural areas.

According to the Call Reports, 83 banks provided between 101 and 500 remittance transfers in either 2017 or 2018, but not more than 500 in either year, and were headquartered in rural counties. These banks provided 17,000 transfers in 2018. Further, 15 credit unions provided between 101 and 500 remittance transfers in either 2017 or 2018, but not more than 500 in either year, and were headquartered in rural counties. These credit unions provided 2,200 transfers. Finally, three banks provided more than 500 transfers in either 2017 or 2018, were located in rural areas, and reported relying on the temporary exception. These banks reported that they relied on the temporary exception for 2,000 transfers total. Credit unions do not report reliance on the temporary exception, but assuming reliance on the temporary exception is similar for credit unions, the four credit unions that provided more than 500 transfers in either 2017 or 2018 and were located in rural areas would have used the temporary exception for approximately 900 transfers.

Consumers in rural areas may have access to fewer remittance transfers providers and therefore may benefit more than other consumers from a rule change that keeps more insured institutions in the market or helps reduce costs to the extent that cost reductions are passed on to consumers. However, these consumers will also disproportionately lose consumer protections relative to other consumers, under the second baseline, to the extent that the banks and credit unions that provide remittance transfers to these consumers will be disproportionately excluded from the Rule (due to the increase in the normal course of safe harbor threshold) or use the permanent exceptions adopted in this final rule to estimate covered third-party fees and the exchange rate. As stated above, the 414 banks and 247 credit unions that provided between 101 and 500 transfers in either 2017 or 2018, but not more than 500 in either year, represent 55 percent of the banks and 62 percent of the credit unions that provided more than 100 transfers in both years. In rural areas, the corresponding 83 banks and 15 credit unions represented 75 percent of the banks and 79 percent of the credit unions that provided more than 100 transfers in both years in rural areas. Thus, the increase in the normal course of business safe harbor threshold will have somewhat larger effects in rural areas in both preserving access to remittance transfer providers and possibly reducing the protections provided by the Rule, as described above.

### VII. Regulatory Flexibility Act Analysis

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires each agency to consider the potential impact of its regulations on small entities, including small businesses, small governmental units, and small not-for-profit organizations.[99] The RFA defines a "small business" as a business that meets the size standard developed by the Small Business Administration pursuant to the Small

---

[98] *See https://www.consumerfinance.gov/policy-compliance/guidance/rural-and-underserved-counties-list/.*

[99] 5 U.S.C. 601 *et seq.* The Bureau is not aware of any small governmental units or not-for-profit organizations to which this final rule would apply.

Business Act.[100] Potentially affected small entities include insured institutions that have $600 million or less in assets and that provide remittance transfers in the normal course of their business.[101]

The RFA generally requires an agency to conduct an initial regulatory flexibility analysis (IRFA) and a final regulatory flexibility analysis (FRFA) of any rule subject to notice-and-comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.[102] The Bureau also is subject to certain additional procedures under the RFA involving the convening of a panel to consult with small business representatives prior to proposing a rule for which an IRFA is required.[103]

At the proposed rule stage, the Bureau determined that an IRFA was not required because the proposal, if adopted, would not have a significant economic impact on a substantial number of small entities. The Bureau did not receive any comments on this analysis. For this final rule, the Bureau also determines that this determination is accurate. Under the no-action baseline, the temporary exception expires, and therefore no remittance transfer providers—including small entities—will be able to provide estimates using that exception. Under this final rule, certain small entities that would otherwise be covered by the Remittance Rule will not be covered by the Rule and certain other small entities will be able to provide estimates in certain circumstances. Thus, the Bureau concludes that this final rule will only reduce burden on small entities relative to the baseline.[104]

---

[100] 5 U.S.C. 601(3) (the Bureau may establish an alternative definition after consultation with the Small Business Administration and an opportunity for public comment).

[101] Small Bus. Admin., *Table of Small Business Size Standards Matched to North American Industry Classification System Codes, https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf.*

[102] 5 U.S.C. 603 through 605.

[103] 5 U.S.C. 609.

[104] In general, given the expiration of the temporary exception and this final rule, some small entities that currently provide estimates will be able to continue to provide estimates for some or all of their remittance transfers and some will need to begin providing exact disclosures. Using the bank Call Reports, however, the Bureau finds that only one small bank will need to begin providing exact disclosures. Specifically, the Bureau finds that there were 82 banks in 2018 with assets under $600 million covered by the Rule (because they provided greater than 100 transfers in 2017 or 2018). Of these banks, only 12 send an amount of transfers that exceeds this final rule's normal course of business safe harbor threshold of 500 transfers. Further, only one of these 12 banks currently reports relying on the temporary exception. Thus, only one small bank

will need to begin providing exact disclosures, even without the exceptions on use of estimates. Using the credit union Call Reports, the Bureau finds that there were 133 credit unions with assets under $600 million covered by the Rule in 2018 (because they provided more than 100 transfers in 2017 or 2018). Of these credit unions, only 30 send an amount of transfers that exceeds this final rule's normal course of business safe harbor threshold of 500 transfers. The credit union Call Reports do not report utilization of the temporary exception. However, since one of the 12 small banks that are covered by this final rule uses the temporary exception, the Bureau considers it reasonable to suppose that approximately two of the 30 small credit unions that are covered by this final rule use the temporary exception.

[105] 44 U.S.C. 3501 *et seq.*

Accordingly, the Director certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

## VIII. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA),[105] Federal agencies are generally required to seek approval from the Office of Management and Budget (OMB) for information collection requirements prior to implementation. Under the PRA, the Bureau may not conduct or sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.

This final rule amends 12 CFR part 1005 (Regulation E), which implements EFTA. The Bureau's OMB control number for Regulation E is 3170–0014.

Under Regulation E, the Bureau generally accounts for the paperwork burden for the following respondents pursuant to its administrative enforcement authority: Federally insured depository institutions with more than $10 billion in total assets, their depository institution affiliates, and certain non-depository institutions. The Bureau and the Federal Trade Commission (FTC) generally both have enforcement authority over non-depository institutions subject to Regulation E. Accordingly, the Bureau would generally allocate to itself half of this final rule's estimated reduction in burden on non-depository financial institutions subject to Regulation E, but estimates no reduction in burden on these institutions from this final rule. Other Federal agencies, including the FTC, are responsible for estimating and reporting to the Office of Management and Budget (OMB) the paperwork burden for the institutions for which they have enforcement and/or supervision authority. They may use the Bureau's burden estimation methodology, but need not do so.

The Bureau concludes that the overall impact of the increase in the normal course of business safe harbor threshold from 100 transfers annually to 500 transfers annually and allowing limited use of estimates for covered third-party fee and exchange rate disclosures is small. In addition, the Bureau concludes that this final rule will have no material change in burden on remittance transfer providers that are non-depository financial institutions. The Bureau recognizes, however, that it lacks data with which to determine the precise impact of this final rule. The Bureau requested comments or data concerning information that would assist the Bureau with making a determination on the impact of allowing limited use of estimates in certain disclosures on the Bureau's current collection of information pursuant to Regulation E, but received no comments on this aspect of the 2019 Proposal.

*Current Total Annual Burden Hours on Bureau Respondents, Regulation E:* 3,445,033.

*Current Total Annual Burden Hours on Bureau Respondents, Subpart B only:* 1,471,808.

*Estimated Total Annual Burden Hours on Bureau Respondents under the Rule, Subpart B only:* 1,448,938.

*Estimated Change in Total Annual Burden Hours on Bureau Respondents under the Rule:* −22,870.

The Bureau has determined that this final rule does not contain any new or substantively revised information collection requirements as defined by the PRA and that the burden estimate for the previously approved information collections should be revised as explained above. The Bureau will file a request with OMB to adjust the burden as discussed above. This request will be filed under OMB control number 3170–0014.

## IX. Congressional Review Act

Pursuant to the Congressional Review Act,[106] the Bureau will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to this final rule's published effective date. The Office of Information and Regulatory Affairs has designated this rule as not a ''major rule'' as defined by 5 U.S.C. 804(2).

## X. Signing Authority

The Director of the Bureau, having reviewed and approved this document is delegating the authority to electronically sign this document to

---

[106] 5 U.S.C. 801 *et seq.*

Laura Galban, a Bureau Federal Register Liaison, for purposes of publication in the **Federal Register**.

**List of Subjects in 12 CFR Part 1005**

Automated teller machines, Banking, Banks, Consumer protection, Credit unions, Electronic fund transfers, National banks, Remittance transfers, Reporting and recordkeeping requirements, Savings associations.

**Authority and Issuance**

For the reasons set forth above, the Bureau amends Regulation E, 12 CFR part 1005, as set forth below:

**PART 1005—ELECTRONIC FUND TRANSFERS (REGULATION E)**

■ 1. The authority citation for part 1005 continues to read as follows:

**Authority:** 12 U.S.C. 5512, 5581; 15 U.S.C. 1693b. Subpart B is also issued under 12 U.S.C. 5601 and 15 U.S.C. 1693o–1.

**Subpart B—Requirements for Remittance Transfers**

■ 2. Amend § 1005.30 by revising paragraphs (f)(2)(i)(A) and (B) and (f)(2)(ii), and adding paragraph (f)(2)(iii), to read as follows:

**§ 1005.30   Remittance transfer definitions.**

\* \* \* \* \*

(f) \* \* \*
(2) \* \* \*
(i) \* \* \*

(A) Provided 500 or fewer remittance transfers in the previous calendar year; and

(B) Provides 500 or fewer remittance transfers in the current calendar year.

(ii) *Transition period—coming into compliance.* Beginning on July 21, 2020, if a person that provided 500 or fewer remittance transfers in the previous calendar year provides more than 500 remittance transfers in the current calendar year, and if that person is then providing remittance transfers for a consumer in the normal course of its business pursuant to paragraph (f)(1) of this section, the person has a reasonable period of time, not to exceed six months, to begin complying with this subpart. Compliance with this subpart will not be required for any remittance transfers for which payment is made during that reasonable period of time.

(iii) *Transition period—qualifying for the safe harbor.* If a person who previously provided remittance transfers in the normal course of its business in excess of the safe harbor threshold set forth in this paragraph (f)(2) determines that, as of a particular date, it will qualify for the safe harbor, it may cease complying with this

requirements of this subpart with respect to any remittance transfers for which payment is made after that date. The requirements of the Act and this part, including those set forth in §§ 1005.33 and 1005.34, as well as the requirements set forth in § 1005.13, continue to apply to transfers for which payment is made prior to that date.

\* \* \* \* \*

■ 3. Amend § 1005.32 by:

■ A. Adding paragraphs (b)(4) and (5);

■ B. In paragraph (c), removing ''(a or (b)(1)'' and adding in its place ''(a or (b)(1), (4), or (5)'';

■ C. In paragraph (c)(4), italicizing the heading ''Amount of currency that will be received by the designated recipient''.

The additions read as follows:

**§ 1005.32   Estimates.**

\* \* \* \* \*

(b) \* \* \*
(4) *Permanent exception for estimation of the exchange rate by an insured institution.* (i) Except as provided in paragraph (b)(4)(ii) of this section, for disclosures described in §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2), estimates may be provided for a remittance transfer to a particular country in accordance with paragraph (c) of this section for the amounts required to be disclosed under § 1005.31(b)(1)(iv) through (vii), if the designated recipient of the remittance transfer will receive funds in the country's local currency and all of the following conditions are met:

(A) The remittance transfer provider is an insured institution as defined in paragraph (a)(3) of this section;

(B) At the time the insured institution must provide, as applicable, the disclosure required by § 1005.31(b)(1) through (3) or § 1005.36(a)(1) or (2), the insured institution cannot determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) for that remittance transfer;

(C) The insured institution made 1,000 or fewer remittance transfers in the prior calendar year to the particular country for which the designated recipients of those transfers received funds in the country's local currency; and

(D) The remittance transfer is sent from the sender's account with the insured institution; provided however, for the purposes of this paragraph, a sender's account does not include a prepaid account, unless the prepaid account is a payroll card account or a government benefit account.

(ii) The disclosures in § 1005.31(b)(1)(v) through (vii) may be

estimated under paragraph (b)(4)(i) of this section only if the exchange rate is permitted to be estimated under paragraph (b)(4)(i) of this section and the estimated exchange rate affects the amount of such disclosures.

(5) *Permanent exception for estimation of covered third-party fees by an insured institution.* (i) Except as provided in paragraph (b)(5)(ii) of this section, for disclosures described in §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2), estimates may be provided for a remittance transfer to a particular designated recipient's institution in accordance with paragraph (c) of this section for the amounts required to be disclosed under § 1005.31(b)(1)(vi) through (vii), if all of the following conditions are met:

(A) The remittance transfer provider is an insured institution as defined in paragraph (a)(3) of this section;

(B) At the time the insured institution must provide, as applicable, the disclosure required by § 1005.31(b)(1) through (3) or § 1005.36(a)(1) or (2), the insured institution cannot determine the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(vi) for that remittance transfer;

(C) The insured institution made 500 or fewer remittance transfers in the prior calendar year to that designated recipient's institution, or a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(vi) for that remittance transfer; and

(D) The remittance transfer is sent from the sender's account with the insured institution; provided however, for the purposes of this paragraph, a sender's account does not include a prepaid account, unless the prepaid account is a payroll card account or a government benefit account.

(ii) The disclosure in § 1005.31(b)(1)(vii) may be estimated under paragraph (b)(5)(i) of this section only if covered third-party fees are permitted to be estimated under paragraph (b)(5)(i) of this section and the estimated covered third-party fees affect the amount of such disclosure.

\* \* \* \* \*

**§ 1005.33   [Amended]**

■ 4. Amend § 1005.33(a)(1)(iii)(A) by removing ''(a), (b)(1) or (b)(2)'' and adding in its place ''(a) or (b)(1), (2), (4), or (5)''.

**§ 1005.36   [Amended]**

■ 5. Amend § 1005.36(b)(3) by removing ''(a) or (b)(1)'' and adding in its place ''(a) or (b)(1), (4), or (5)''.

■ 6. In supplement I to part 1005:
■ a. Under *Section 1005.30—Remittance Transfer Definitions,* revise *30(f) Remittance Transfer Provider.*
■ b. Under *Section 1005.31— Disclosures,* revise *31(b)(1)(viii) Statement When Additional Fees and Taxes May Apply.*
■ c. Under *Section 1005.32—Estimates:*
■ 1. Revise introductory paragraph 1 and *32(b)(1) Permanent Exceptions for Transfers to Certain Countries;*
■ 2. Add *32(b)(4) Permanent Exception for Estimation of the Exchange Rate by an Insured Institution,* and *32(b)(5) Permanent Exception for Estimation of Covered Third-Party Fees by an Insured Institution;* and
■ 3. Revise *32(c)(3) Covered Third-Party Fees,* and *32(d) Bases for Estimates for Transfers Scheduled Before the Date of Transfer.*
■ d. Under *Section 1005.36—Transfers Scheduled Before the Date of Transfer,* revise *36(b) Accuracy.*

The revisions and additions read as follows:

## Supplement I to Part 1005—Official Interpretations

*Section 1005.30—Remittance Transfer Definitions*

\*       \*       \*       \*       \*

30(f)   Remittance Transfer Provider

1. *Agents.* A person is not deemed to be acting as a remittance transfer provider when it performs activities as an agent on behalf of a remittance transfer provider.

2. *Normal course of business.* i. *General.* Whether a person provides remittance transfers in the normal course of business depends on the facts and circumstances, including the total number and frequency of remittance transfers sent by the provider. For example, if a financial institution generally does not make remittance transfers available to customers, but sends a couple of such transfers in a given year as an accommodation for a customer, the institution does not provide remittance transfers in the normal course of business. In contrast, if a financial institution makes remittance transfers generally available to customers (whether described in the institution's deposit account agreement, or in practice) and makes transfers more frequently than on an occasional basis, the institution provides remittance transfers in the normal course of business.

ii. *Safe harbor.* On July 21, 2020, the safe harbor threshold in § 1005.30(f)(2)(i) changed from 100 remittance transfers to 500 remittance transfers. Under § 1005.30(f)(2)(i), beginning on July 21, 2020, a person that provided 500 or fewer remittance transfers in the previous calendar year and provides 500 or fewer remittance transfers in the current calendar year is deemed not to be providing remittance transfers in the normal course of its business. Accordingly, a person that qualifies for the safe harbor in § 1005.30(f)(2)(i) is not a ''remittance transfer

provider'' and is not subject to the requirements of subpart B. For purposes of determining whether a person qualifies for the safe harbor under § 1005.30(f)(2)(i), the number of remittance transfers provided includes any transfers excluded from the definition of ''remittance transfer'' due simply to the safe harbor. In contrast, the number of remittance transfers provided does not include any transfers that are excluded from the definition of ''remittance transfer'' for reasons other than the safe harbor, such as small value transactions or securities and commodities transfers that are excluded from the definition of ''remittance transfer'' by § 1005.30(e)(2).

iii. *Transition period.* A person may cease to satisfy the requirements of the safe harbor described in § 1005.30(f)(2)(i) if, beginning on July 21, 2020, the person provides in excess of 500 remittance transfers in a calendar year. For example, if a person that provided 500 or fewer remittance transfers in the previous calendar year provides more than 500 remittance transfers in the current calendar year, the safe harbor applies to the first 500 remittance transfers that the person provides in the current calendar year. For any additional remittance transfers provided in the current calendar year and for any remittance transfers provided in the subsequent calendar year, whether the person provides remittance transfers for a consumer in the normal course of its business, as defined in § 1005.30(f)(1), and is thus a remittance transfer provider for those additional transfers, depends on the facts and circumstances. Section 1005.30(f)(2)(ii) provides a reasonable period of time, not to exceed six months, for such a person to begin complying with subpart B, if that person is then providing remittance transfers in the normal course of its business. At the end of that reasonable period of time, such person would be required to comply with subpart B unless, based on the facts and circumstances, the person is not a remittance transfer provider.

iv. *Examples.* A. *Example of safe harbor and transition period for 100-transfer safe harbor threshold effective prior to July 21, 2020.* Assume that a person provided 90 remittance transfers in 2012 and 90 such transfers in 2013. The safe harbor applied to the person's transfers in 2013, as well as the person's first 100 remittance transfers in 2014. However, if the person provided a 101st transfer on September 5, 2014, the facts and circumstances determine whether the person provided remittance transfers in the normal course of business and was thus a remittance transfer provider for the 101st and any subsequent remittance transfers that it provided in 2014. Furthermore, the person would not have qualified for the safe harbor described in § 1005.30(f)(2)(i) in 2015 because the person did not provide 100 or fewer remittance transfers in 2014. However, for the 101st remittance transfer provided in 2014, as well as additional remittance transfers provided thereafter in 2014 and 2015, if that person was then providing remittance transfers for a consumer in the normal course of business, the person had a reasonable period of time, not to exceed six months, to come into compliance with

subpart B. Assume that in this case, a reasonable period of time is six months. Thus, compliance with subpart B was not required for remittance transfers made on or before March 5, 2015 (*i.e.,* six months after September 5, 2014). After March 5, 2015, the person was required to comply with subpart B if, based on the facts and circumstances, the person provided remittance transfers in the normal course of business and was thus a remittance transfer provider.

B. *Example of safe harbor for a person that provided 500 or fewer transfers in 2019 and provides 500 or fewer transfers in 2020.* On July 21, 2020, the safe harbor threshold in § 1005.30(f)(2)(i) changed from 100 remittance transfers to 500 remittance transfers. Thus, beginning on July 21, 2020, pursuant to § 1005.30(f)(2)(i), a person is deemed not to be providing remittance transfers for a consumer in the normal course of its business if the person provided 500 or fewer remittance transfers in the previous calendar year and provides 500 or fewer remittance transfers in the current calendar year. If a person provided 500 or fewer transfers in 2019 and provides 500 or fewer remittance transfers in 2020, that person qualifies for the safe harbor threshold in 2020. For example, assume that a person provided 200 remittance transfers in 2019 and 400 remittance transfers in 2020. The safe harbor will apply to the person's transfers in 2020 beginning on July 21, 2020, as well as the person's first 500 transfers in 2021. *See* comment 30(f)-2.iv.C for an example regarding the transition period if the 500-transfer safe harbor is exceeded.

C. *Example of safe harbor and transition period for the 500-transfer safe harbor threshold beginning on July 21, 2020.* Assume that a person provided 490 remittance transfers in 2020 and 490 such transfers in 2021. The safe harbor will apply to the person's transfers in 2021, as well as the person's first 500 remittance transfers in 2022. However, if the person provides a 501st transfer on September 5, 2022, the facts and circumstances determine whether the person provides remittance transfers in the normal course of business and is thus a remittance transfer provider for the 501st and any subsequent remittance transfers that it provides in 2022. Furthermore, the person would not qualify for the safe harbor described in § 1005.30(f)(2)(i) in 2023 because the person did not provide 500 or fewer remittance transfers in 2022. However, for the 501st remittance transfer provided in 2022, as well as additional remittance transfers provided thereafter in 2022 and 2023, if that person is then providing remittance transfers for a consumer in the normal course of business, the person will have a reasonable period of time, not to exceed six months, to come into compliance with subpart B of Regulation E. Assume that in this case, a reasonable period of time is six months. Thus, compliance with subpart B is not required for remittance transfers made on or before March 5, 2023 (*i.e.,* six months after September 5, 2022). After March 5, 2023, the person is required to comply with subpart B if, based on the facts and circumstances, the person provides remittance transfers in the normal course of business and is thus a remittance transfer provider.

v. *Continued compliance for transfers for which payment was made before a person qualifies for the safe harbor.* Section 1005.30(f)(2)(iii) addresses situations where a person who previously was required to comply with subpart B of Regulation E newly qualifies for the safe harbor in § 1005.30(f)(2)(i). That section states that the requirements of EFTA and Regulation E, including those set forth in §§ 1005.33 and 1005.34 (which address procedures for resolving errors and procedures for cancellation and refund of remittance transfers, respectively), as well as the requirements set forth in § 1005.13 (which, in part, governs record retention), continue to apply to transfers for which payment is made prior to the date the person qualifies for the safe harbor in § 1005.30(f)(2)(i). Qualifying for the safe harbor in § 1005.30(f)(2)(i) likewise does not excuse compliance with any other applicable law or regulation. For example, if a remittance transfer is also an electronic fund transfer, any requirements in subpart A of Regulation E that apply to the transfer continue to apply, regardless of whether the person must comply with subpart B. Relevant requirements in subpart A may include, but are not limited to, those relating to initial disclosures, change-in-terms notices, liability of consumers for unauthorized transfers, and procedures for resolving errors.

3. *Multiple remittance transfer providers.* If the remittance transfer involves more than one remittance transfer provider, only one set of disclosures must be given, and the remittance transfer providers must agree among themselves which provider must take the actions necessary to comply with the requirements that subpart B imposes on any or all of them. Even though the providers must designate one provider to take the actions necessary to comply with the requirements that subpart B imposes on any or all of them, all remittance transfer providers involved in the remittance transfer remain responsible for compliance with the applicable provisions of the EFTA and Regulation E.

*Section 1005.31—Disclosures*

\*    \*    \*    \*    \*

31(b)    Disclosure Requirements

\*    \*    \*    \*    \*

31(b)(1)(viii)    Statement When Additional Fees and Taxes May Apply *Required disclaimer when non-covered third-party fees and taxes collected by a person other than the provider may apply.* If non-covered third-party fees or taxes collected by a person other than the provider apply to a particular remittance transfer or if a provider does not know if such fees or taxes may apply to a particular remittance transfer, § 1005.31(b)(1)(viii) requires the provider to include the disclaimer with respect to such fees and taxes. Required disclosures under § 1005.31(b)(1)(viii) may only be provided to the extent applicable. For example, if the designated recipient's institution is an agent of the provider and thus, non-covered third-party fees cannot apply to the transfer, the provider must disclose all fees imposed on the remittance transfer and may not provide the disclaimer regarding non-covered third-

party fees. In this scenario, the provider may only provide the disclaimer regarding taxes collected on the remittance transfer by a person other than the provider, as applicable. *See* Model Form A–30(c).

2. *Optional disclosure of non-covered third-party fees and taxes collected by a person other than the provider.* When a remittance transfer provider knows the non-covered third-party fees or taxes collected on the remittance transfer by a person other than the provider that will apply to a particular transaction, § 1005.31(b)(1)(viii) permits the provider to disclose the amount of such fees and taxes. Section 1005.32(b)(3) additionally permits a provider to disclose an estimate of such fees and taxes, provided any estimates are based on reasonable source of information. *See* comment 32(b)(3)–1. For example, a provider may know that the designated recipient's institution imposes an incoming wire fee for receiving a transfer. Alternatively, a provider may know that foreign taxes will be collected on the remittance transfer by a person other than the remittance transfer provider. In these examples, the provider may choose, at its option, to disclose the amounts of the relevant recipient institution fee and tax as part of the information disclosed pursuant to § 1005.31(b)(1)(viii). The provider must not include that fee or tax in the amount disclosed pursuant to § 1005.31(b)(1)(vi) or (b)(1)(vii). Fees and taxes disclosed under § 1005.31(b)(1)(viii) must be disclosed in the currency in which the funds will be received. *See* comment 31(b)(1)(vi)–1. Estimates of any non-covered third-party fees and any taxes collected on the remittance transfer by a person other than the provider must be disclosed in accordance with § 1005.32(b)(3).

\*    \*    \*    \*    \*

*Section 1005.32—Estimates*

1. *Disclosures where estimates can be used.* Sections 1005.32(a) and (b)(1), (b)(4), and (b)(5) permit estimates to be used in certain circumstances for disclosures described in §§ 1005.31(b)(1) through (3) and 1005.36(a)(1) and (2). To the extent permitted in § 1005.32(a) and (b)(1), (b)(4), and (b)(5), estimates may be used in the pre-payment disclosure described in § 1005.31(b)(1), the receipt disclosure described in § 1005.31(b)(2), the combined disclosure described in § 1005.31(b)(3), and the pre-payment disclosures and receipt disclosure for both first and subsequent preauthorized remittance transfers described in § 1005.36(a)(1) and (2). Section 1005.32(b)(2) permits estimates to be used for certain information if the remittance transfer is scheduled by a sender five or more business days before the date of the transfer, for disclosures described in § 1005.36(a)(1)(i) and (a)(2)(i).

\*    \*    \*    \*    \*

32(b)    Permanent Exceptions

32(b)(1)    Permanent Exceptions for Transfers to Certain Countries

1. *Laws of the recipient country.* The laws of the recipient country do not permit a remittance transfer provider to determine exact amounts required to be disclosed when

a law or regulation of the recipient country requires the person making funds directly available to the designated recipient to apply an exchange rate that is:

i. Set by the government of the recipient country after the remittance transfer provider sends the remittance transfer or

ii. Set when the designated recipient receives the funds.

2. *Example illustrating when exact amounts can and cannot be determined because of the laws of the recipient country.*

i. The laws of the recipient country do not permit a remittance transfer provider to determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) when, for example, the government of the recipient country, on a daily basis, sets the exchange rate that must, by law, apply to funds received and the funds are made available to the designated recipient in the local currency the day after the remittance transfer provider sends the remittance transfer.

ii. In contrast, the laws of the recipient country permit a remittance transfer provider to determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) when, for example, the government of the recipient country ties the value of its currency to the U.S. dollar.

3. *Method by which transactions are made in the recipient country.* The method by which transactions are made in the recipient country does not permit a remittance transfer provider to determine exact amounts required to be disclosed when transactions are sent via international ACH on terms negotiated between the United States government and the recipient country's government, under which the exchange rate is a rate set by the recipient country's central bank or other governmental authority after the provider sends the remittance transfer.

4. *Example illustrating when exact amounts can and cannot be determined because of the method by which transactions are made in the recipient country.*

i. The method by which transactions are made in the recipient country does not permit a remittance transfer provider to determine the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) when the provider sends a remittance transfer via international ACH on terms negotiated between the United States government and the recipient country's government, under which the exchange rate is a rate set by the recipient country's central bank on the business day after the provider has sent the remittance transfer.

ii. In contrast, a remittance transfer provider would not qualify for the § 1005.32(b)(1)(i)(B) methods exception if it sends a remittance transfer via international ACH on terms negotiated between the United States government and a private-sector entity or entities in the recipient country, under which the exchange rate is set by the institution acting as the entry point to the recipient country's payments system on the next business day. However, a remittance transfer provider sending a remittance transfer using such a method may qualify for the § 1005.32(a) temporary exception or the exception set forth in § 1005.32(b)(4).

iii. A remittance transfer provider would not qualify for the § 1005.32(b)(1)(i)(B)

methods exception if, for example, it sends a remittance transfer via international ACH on terms negotiated between the United States government and the recipient country's government, under which the exchange rate is set by the recipient country's central bank or other governmental authority before the sender requests a transfer.

5. *Safe harbor list.* If a country is included on a safe harbor list published by the Bureau under § 1005.32(b)(1)(ii), a remittance transfer provider may provide estimates of the amounts to be disclosed under § 1005.31(b)(1)(iv) through (vii). If a country does not appear on the Bureau's list, a remittance transfer provider may provide estimates under § 1005.32(b)(1)(i) if the provider determines that the recipient country does not legally permit or the method by which transactions are conducted in that country does not permit the provider to determine exact disclosure amounts.

6. *Reliance on Bureau list of countries.* A remittance transfer provider may rely on the list of countries published by the Bureau to determine whether the laws of a recipient country do not permit the remittance transfer provider to determine exact amounts required to be disclosed under § 1005.31(b)(1)(iv) through (vii). Thus, if a country is on the Bureau's list, the provider may give estimates under this section, unless a remittance transfer provider has information that a country on the Bureau's list legally permits the provider to determine exact disclosure amounts.

7. *Change in laws of recipient country.*
i. If the laws of a recipient country change such that a remittance transfer provider can determine exact amounts, the remittance transfer provider must begin providing exact amounts for the required disclosures as soon as reasonably practicable if the provider has information that the country legally permits the provider to determine exact disclosure amounts.

ii. If the laws of a recipient country change such that a remittance transfer provider cannot determine exact disclosure amounts, the remittance transfer provider may provide estimates under § 1005.32(b)(1)(i), even if that country does not appear on the list published by the Bureau.

\* \* \* \* \*

32(b)(4)   Permanent Exception for Estimation of the Exchange Rate by an Insured Institution

1. *Determining the exact exchange rate.* For purposes of § 1005.32(b)(4)(i)(B), an insured institution cannot determine, at the time it must provide the applicable disclosures, the exact exchange rate required to be disclosed under § 1005.31(b)(1)(iv) for a remittance transfer to a particular country where the designated recipient of the transfer will receive funds in the country's local currency if a person other than the insured institution sets the exchange rate for that transfer, except where that person has a correspondent relationship with the insured institution, that person is a service provider for the insured institution, or that person acts as an agent of the insured institution.

i. *Example where an insured institution cannot determine the exact exchange rate.*

The following example illustrates when an insured institution cannot determine an exact exchange rate under § 1005.32(b)(4)(i)(B) for a remittance transfer:

A. An insured institution or its service provider does not set the exchange rate required to be disclosed under § 1005.31(b)(1)(iv), and the rate is set when the funds are deposited into the recipient's account by the designated recipient's institution that does not have a correspondent relationship with, and does not act as an agent of, the insured institution.

ii. *Examples where an insured institution can determine the exact exchange rate.* The following examples illustrate when an insured institution can determine an exact exchange rate under § 1005.32(b)(4)(i)(B) for a remittance transfer, and thus the insured institution may not use the exception in § 1005.32(b)(4) to estimate the disclosures required under § 1005.31(b)(1)(iv) through (vii) for the remittance transfer:

A. An insured institution has a correspondent relationship with an intermediary financial institution (or the intermediary financial institution acts as an agent of the insured institution) and that intermediary financial institution sets the exchange rate required to be disclosed under § 1005.31(b)(1)(iv) for a remittance transfer.

B. An insured institution or its service provider converts the funds into the local currency to be received by the designated recipient for a remittance transfer using an exchange rate that the insured institution or its service provider sets. The insured institution can determine the exact exchange rate for purposes of § 1005.32(b)(4)(i)(B) for the remittance transfer even if the insured institution does not have a correspondent relationship with an intermediary financial institution in the transmittal route or the designated recipient's institution, and an intermediary financial institution in the transmittal route or the designed recipient's institution does not act as an agent of the insured institution.

2. *Threshold.* For purposes of determining whether an insured institution made 1,000 or fewer remittance transfers in the prior calendar year to a particular country pursuant to § 1005.32(b)(4)(i)(C):

i. The number of remittance transfers provided includes transfers in the prior calendar year to that country when the designated recipients of those transfers received funds in the country's local currency regardless of whether the exchange rate was estimated for those transfers. For example, an insured institution exceeds the 1,000-transfer threshold in the prior calendar year if the insured institution provided 700 remittance transfers to a country in the prior calendar year when the designated recipients of those transfers received funds in the country's local currency when the exchange rate was estimated for those transfers and also sends 400 remittance transfers to the same country in the prior calendar year when the designated recipients of those transfers received funds in the country's local currency and the exchange rate for those transfers was not estimated.

ii. The number of remittance transfers does not include remittance transfers to a country

in the prior calendar year when the designated recipients of those transfers did not receive the funds in the country's local currency. For example, an insured institution does not exceed the 1,000-transfer threshold in the prior calendar year if the insured institution provides 700 remittance transfers to a country in the prior calendar year when the designated recipients of those transfers received funds in the country's local currency and also sends 400 remittance transfers to the same country in the prior calendar year when the designated recipients of those transfers did not receive funds in the country's local currency.

3. *Transition period.* If an insured institution in the prior calendar year did not exceed the 1,000-transfer threshold to a particular country pursuant to § 1005.32(b)(4)(i)(C), but does exceed the 1,000-transfer threshold in the current calendar year, the insured institution has a reasonable amount of time after exceeding the 1,000-transfer threshold to begin providing exact exchange rates in disclosures (assuming it cannot rely on another exception in § 1005.32 to estimate the exchange rate). The reasonable amount of time must not exceed the later of six months after exceeding the 1,000-transfer threshold in the current calendar year or January 1 of the next year. For example, assume an insured institution did not exceed the 1,000-transfer threshold to a particular country pursuant to § 1005.32(b)(4)(i)(C) in 2020, but does exceed the 1,000-transfer threshold on December 1, 2021. The insured institution would have a reasonable amount of time after December 1, 2021 to begin providing exact exchange rates in disclosures (assuming it cannot rely on another exception in § 1005.32 to estimate the exchange rate). In this case, the reasonable amount of time must not exceed June 1, 2022 (which is six months after the insured institution exceeds the 1,000-transfer threshold in the previous year).

32(b)(5)   Permanent Exception for Estimation of Covered Third-Party Fees by an Insured Institution

1. *Insured institution cannot determine the exact covered third-party fees.* For purposes of § 1005.32(b)(5)(i)(B), an insured institution cannot determine, at the time it must provide the applicable disclosures, the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(vi) for a remittance transfer to a designated recipient's institution when all of the following conditions are met:

i. The insured institution does not have a correspondent relationship with the designated recipient's institution;

ii. The designated recipient's institution does not act as an agent of the insured institution;

iii. The insured institution does not have an agreement with the designated recipient's institution with respect to the imposition of covered third-party fees on the remittance transfer (*e.g.*, an agreement whereby the designated recipient's institution agrees to charge back any covered third-party fees to the insured institution rather than impose the fees on the remittance transfer); and

iv. The insured institution does not know at the time the disclosures are given that the

only intermediary financial institutions that will impose covered third-party fees on the transfer are those institutions that have a correspondent relationship with or act as an agent for the insured institution, or have otherwise agreed upon the covered third-party fees with the insured institution.

2. *Insured institution can determine the exact covered third-party fees.* For purposes of § 1005.32(b)(5)(i)(B), an insured institution can determine, at the time it must provide the applicable disclosures, exact covered third-party fees, and thus the insured institution may not use the exception in § 1005.32(b)(5) to estimate the disclosures required under § 1005.31(b)(1)(vi) or (vii) for the transfer, if any of the following conditions are met:

i. An insured institution has a correspondent relationship with the designated recipient's institution;

ii. The designated recipient's institution acts as an agent of the insured institution;

iii. An insured institution has an agreement with the designated recipient's institution with respect to the imposition of covered third-party fees on the remittance transfer; or

iv. An insured institution knows at the time the disclosures are given that the only intermediary financial institutions that will impose covered third-party fees on the transfer are those institutions that have a correspondent relationship with or act as an agent for the insured institution, or have otherwise agreed upon the covered third-party fees with the insured institution.

3. *Threshold.* For purposes of determining whether an insured institution made 500 or fewer remittance transfers in the prior calendar year to a particular designated recipient's institution pursuant to § 1005.32(b)(5)(i)(C):

i. The number of remittance transfers provided includes remittance transfers in the prior calendar year to that designated recipient's institution regardless of whether the covered third-party fees were estimated for those transfers. For example, an insured institution exceeds the 500-transfer threshold in the prior calendar year if an insured institution provides 300 remittance transfers to the designated recipient's institution in the prior calendar year when the covered third-party fees were estimated for those transfers and also sends 400 remittance transfers to the designated recipient's institution in the prior calendar year and the covered third-party fees for those transfers were not estimated.

ii. The number of remittance transfers includes remittance transfers provided to the designated recipient's institution in the prior calendar year regardless of whether the designated recipients received the funds in the country's local currency or in another currency. For example, an insured institution exceeds the 500-transfer threshold in the prior calendar year if the insured institution provides 300 remittance transfers to the designated recipient's institution in the prior calendar year when the designated recipients of those transfers received funds in the country's local currency and also sends 400 remittance transfers to the same designated recipient's institution in the prior calendar year when the designated recipients of those transfers did not receive funds in the country's local currency.

iii. The number of remittance transfers includes remittance transfers provided to the designated recipient's institution and any of its branches in the country to which the particular transfer described in § 1005.32(b)(5) is being sent. For example, if the particular remittance transfer described in § 1005.32(b)(5) is being sent to the designated recipient's institution Bank XYZ in Nigeria, the number of remittance transfers for purposes of the 500-transfer threshold would include remittances transfers in the previous calendar year that were sent to Bank XYZ, or to its branches, in Nigeria. The 500-transfer threshold would not include remittance transfers that were sent to branches of Bank XYZ that were located in any country other than Nigeria.

4. *United States Federal statute or regulation.* An insured institution can still use § 1005.32(b)(5) to provide estimates of covered third-party fees for a remittance transfer sent to a particular designated recipient's institution even if the insured institution sent more than 500 transfers to the designated recipient's institution in the prior calendar year if a United States Federal statute or regulation prohibits the insured institution from being able to determine the exact covered third-party fees required to be disclosed under § 1005.31(b)(1)(vi) for the remittance transfer and the insured institution meets the other conditions set forth in § 1005.32(b)(5). A United States Federal statute or regulation specifically prohibits the insured institution from being able to determine the exact covered third-party fees for the remittance transfer if the United States Federal statute or regulation:

i. Prohibits the insured institution from disclosing exact covered third-party fees in disclosures for transfers to a designated recipient's institution; or

ii. Makes it infeasible for the insured institution to form a relationship with the designated recipient's institution and that relationship is necessary for the insured institution to be able to determine, at the time it must provide the applicable disclosures, exact covered third-party fees.

5. *Transition period.* If an insured institution in the prior calendar year did not exceed the 500-transfer threshold to a particular designated recipient's institution pursuant to § 1005.32(b)(5)(i)(C), but does exceed the 500-transfer threshold in the current calendar year, the insured institution has a reasonable amount of time after exceeding the 500-transfer threshold to begin providing exact covered third-party fees in disclosures (assuming that a United States Federal statute or regulation does not prohibit the insured institution from being able to determine the exact covered third-party fees, or the insured institution cannot rely on another exception in § 1005.32 to estimate covered third-party fees). The reasonable amount of time must not exceed the later of six months after exceeding the 500-transfer threshold in the current calendar year or January 1 of the next year. For example, assume an insured institution did not exceed the 500-transfer threshold to a particular designated recipient's institution

pursuant to § 1005.32(b)(5)(i)(C) in 2020, but does exceed the 500-transfer threshold on December 1, 2021. The insured institution would have a reasonable amount of time after December 1, 2021 to begin providing exact covered third-party fees in disclosures (assuming that a United States Federal statute or regulation does not prohibit the insured institution from being able to determine the exact covered third-party fees, or the insured institution cannot rely on another exception in § 1005.32 to estimate covered third-party fees). In this case, the reasonable amount of time must not exceed June 1, 2022 (which is six months after the insured institution exceeds the 500-transfer threshold in the previous year).

\*   \*   \*   \*   \*

32(c)   Bases for Estimates

\*   \*   \*   \*   \*

32(c)(3)   Covered Third-Party Fees

1. *Potential transmittal routes.* A remittance transfer from the sender's account at an insured institution to the designated recipient's institution may take several routes, depending on the correspondent relationships each institution in the transmittal route has with other institutions. In providing an estimate of the fees required to be disclosed under § 1005.31(b)(1)(vi) pursuant to the § 1005.32(a) temporary exception or the exception under § 1005.32(b)(5), an insured institution may rely upon the representations of the designated recipient's institution and the institutions that act as intermediaries in any one of the potential transmittal routes that it reasonably believes a requested remittance transfer may travel.

32(d)   Bases for Estimates for Transfers Scheduled Before the Date of Transfer

1. *In general.* When providing an estimate pursuant to § 1005.32(b)(2), § 1005.32(d) requires that a remittance transfer provider's estimated exchange rate must be the exchange rate (or estimated exchange rate) that the remittance transfer provider would have used or did use that day in providing disclosures to a sender requesting such a remittance transfer to be made on the same day. If, for the same-day treatment transfer, the provider could utilize an exception permitting the provision of estimates in § 1005.32(a) or (b)(1), or (4), the provider may provide estimates based on a methodology permitted under § 1005.32(c). For example, if, on February 1, the sender schedules a remittance transfer to occur on February 10, the provider should disclose the exchange rate as if the sender was requesting the transfer be sent on February 1. However, if at the time payment is made for the requested transfer, the remittance transfer provider could not send any remittance transfer until the next day (for reasons such as the provider's deadline for the batching of transfers), the remittance transfer provider can use the rate (or estimated exchange rate) that the remittance transfer provider would have used or did use in providing disclosures that day with respect to a remittance transfer requested that day that could not be sent until the following day.

\*   \*   \*   \*   \*

*Section 1005.36—Transfers Scheduled Before the Date of Transfer*

\*　　\*　　\*　　\*　　\*

36(b)　Accuracy

1. *Use of estimates.* In providing the disclosures described in § 1005.36(a)(1)(i) or (a)(2)(i), remittance transfer providers may use estimates to the extent permitted by any of the exceptions in § 1005.32. When estimates are permitted, however, they must be disclosed in accordance with § 1005.31(d).

2. *Subsequent preauthorized remittance transfers.* For a subsequent transfer in a series of preauthorized remittance transfers, the receipt provided pursuant to § 1005.36(a)(1)(i), except for the temporal disclosures in that receipt required by § 1005.31(b)(2)(ii) (Date Available) and (b)(2)(vii) (Transfer Date), applies to each subsequent preauthorized remittance transfer unless and until it is superseded by a receipt provided pursuant to § 1005.36(a)(2)(i). For each subsequent preauthorized remittance transfer, only the most recent receipt provided pursuant to § 1005.36(a)(1)(i) or (a)(2)(i) must be accurate as of the date each subsequent transfer is made.

3. *Receipts.* A receipt required by § 1005.36(a)(1)(ii) or (a)(2)(ii) must accurately reflect the details of the transfer to which it pertains and may not contain estimates pursuant to § 1005.32(b)(2). However, the remittance transfer provider may continue to disclose estimates to the extent permitted by § 1005.32(a) or (b)(1), (4), or (5). In providing receipts pursuant to § 1005.36(a)(1)(ii) or (a)(2)(ii), § 1005.36(b)(2) and (3) do not allow a remittance transfer provider to change figures previously disclosed on a receipt provided pursuant to § 1005.36(a)(1)(i) or (a)(2)(i), unless a figure was an estimate or based on an estimate disclosed pursuant to § 1005.32. Thus, for example, if a provider disclosed its fee as $10 in a receipt provided pursuant to § 1005.36(a)(1)(i) and that receipt contained an estimate of the exchange rate pursuant to § 1005.32(b)(2), the second receipt provided pursuant to § 1005.36(a)(1)(ii) must also disclose the fee as $10.

\*　　\*　　\*　　\*　　\*

Dated: May 6, 2020.

**Laura Galban,**

*Federal Register Liaison, Bureau of Consumer Financial Protection.*

[FR Doc. 2020–10278 Filed 6–4–20; 8:45 am]

**BILLING CODE 4810–AM–P**