1  Marc M. Seltzer (54534)
   Steven G. Sklaver (237612)
2  Oleg Elkhunovich (269238)
   Meng Xi (280099)
3  SUSMAN GODFREY L.L.P.
   1900 Avenue of the Stars, Suite 1400
4  Los Angeles, CA  90067-6029
   Telephone: (310) 789-3100
5  Facsimile: (310) 789-3150
   mseltzer@susmangodfrey.com
6  ssklaver@susmangodfrey.com
   oelkhunovich@susmangodfrey.com
7  mxi@susmangodfrey.com

8  P.  Ryan Burningham (*pro hac vice*)
   SUSMAN GODFREY L.L.P.
9  1201 Third Avenue, Suite 3800
   Seattle, WA  98101
10 Telephone: (206) 516-3880
   Facsimile: (206) 516-3883
11 rburningham@susmangodfrey.com

12 James Q. Taylor-Copeland (284743)
   TAYLOR-COPELAND LAW
13 501 W. Broadway, Suite 800
   San Diego, CA 92101
14 james@taylorcopelandlaw.com
   Telephone: (619) 400-4944
15 Facsimile: (619) 566-4341

16 *Counsel for Lead Plaintiff Bradley Sostack*

17                **UNITED STATES DISTRICT COURT**

18               **NORTHERN DISTRICT OF CALIFORNIA**

19                      **OAKLAND DIVISION**

20

| | |
|---|---|
| In re RIPPLE LABS, INC. LITIGATION | Case No. 4:18-cv-06753-PJH |
| | <u>CLASS ACTION</u> |
| This Document Relates to:<br><br>All Actions | **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS FOUR, SIX, AND SEVEN OF THE CONSOLIDATED FIRST AMENDED COMPLAINT**<br><br>DATE:          August 26, 2020<br>TIME:          9:00 a.m.<br>PLACE:        Courtroom 3<br><br>Consolidated FAC Filed:  March 25, 2020 |

1

## **Table of Contents**

2

3      Introduction ................................................................................................................ 1

       Legal Standard ........................................................................................................... 1

4          A.      Motion to Dismiss Under Rule 12(b)(6) ................................................. 1

5          B.      Pleading Fraud Under Rule 9(b) .............................................................. 1

           C.      Actionable Statements of Opinion ........................................................... 2
6
           D.      The Reasonable-Consumer Test ............................................................... 3
7
       Argument ..................................................................................................................... 4
8          A.      False and Misleading Statements Concerning XRP's Utility .............. 4

           B.      Garlinghouse's False Statement That He Was "Very, Very, Very Long XRP" ............ 8
9
           C.      Garlinghouse's Misleading Tweet of a CNBC Article ......................... 9
10
           D.      Statements Conflating Ripple Enterprise Solutions and XRP ............ 11
11         E.      Differentiating Between Defendants ...................................................... 17

           F.      Leave to Amend ......................................................................................... 17
12
       Conclusion ................................................................................................................ 18

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Authorities

Page(s)

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................................1

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................................1

*Cheslow v. Ghirardelli Chocolate Co.,*
2020 WL 1701840 (N.D. Cal. Apr. 8, 2020) ..............................................................17

*Concha v. London,*
62 F.3d 1493 (9th Cir. 1995)...........................................................................................5

*Davis v. Monte,*
253 P. 352 (Cal. App. 1927) ............................................................................... *passim*

*Deutsch v. Flannery,*
823 F.2d 1361 (9th Cir. 1987).........................................................................................9

*Doan v. Singh,*
617 Fed. App'x 684 (9th Cir. 2015)............................................................................1, 9

*Furla v. Jon Douglas Co.,*
65 Cal. App. 4th 1069 (1998) ..........................................................................................3

*Jolley v. Chase Home Fin., LLC,*
213 Cal. App. 4th 872 (2013) ............................................................................. *passim*

*Leoni v. State Bar,*
39 Cal.3d 609 (1985) ......................................................................................................3

*Lokhova v. Halper,*
2020 WL 963032 (E.D. Va. Feb. 27, 2020).................................................................10

*Mirage Entm't, Inc. v. FEG Entretenimientos S.A.,*
326 F. Supp. 3d 26 (S.D.N.Y. 2018)............................................................................10

*Moore v. Kayport Package Exp., Inc.,*
885 F.2d 531 (9th Cir. 1989)...........................................................................................2

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
575 U.S. 175 (2015)........................................................................................................2

*In re Phila. Newspapers, LLC,*
690 F.3d 161 (3d Cir. 2012)..........................................................................................10

*Public Employees' Retirement Sys. v. Moody's Investors Serv., Inc.*,
   226 Cal. App. 4th 643 (2014) ..............................................................................2, 7

*Reid v. Johnson & Johnson*,
   780 F.3d 952 (9th Cir. 2015).......................................................................................3

*Rubenstein v. Neiman Marcus Group LLC*,
   687 Fed. App'x 564 (9th Cir. 2017)............................................................................2

*In re Tesla, Inc. Securities Litig.*,
   2020 WL 1873441 (N.D. Cal. Apr. 15, 2020) ..........................................................17

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003)...................................................................1, 4, 5, 17

*Williams v. Gerber Products Co.*,
   552 F.3d 934 (9th Cir. 2008).................................................................................3, 9

*Wolph v. Acer Am. Corp.*,
   2009 WL 2969467 (N.D. Cal. Sept. 14, 2009) ..........................................................2

*Zaragoza v. Apple, Inc.*,
   2019 WL 1171161 (N.D. Cal. Mar. 13, 2019) ...........................................................3

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......................................................................................11

Cal. Bus. & Prof. Code § 17500 ...........................................................................10, 11, 18

Cal. Corp. Code § 25401 .............................................................................................10, 18

**Other Authorities**

BAJI 12.32 ........................................................................................................................2, 7

Fed. R. Civ. P. 8(d)(3).........................................................................................................8

Fed. R. Civ. P. 9(b) ....................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 17

Restatement (Second) of Torts § 525, cmt. f ...................................................................2, 7

1

**INTRODUCTION**

2      In a scheme to raise hundreds of millions of dollars, Defendants illegally sold useless XRP

3  tokens to retail investors around the globe.  To maximize their profit from these sales, Defendants

4  consistently promoted XRP through false and misleading statements.  Lead Plaintiff Bradley

5  Sostack seeks to hold Defendants liable for defrauding investors in addition to selling

6  unregistered securities.  Although even one misleading statement is sufficient to support

7  Plaintiff's state-law fraud claims, the Consolidated First Amended Complaint (CFAC) identifies

8  more than a dozen such statements, particularly pleading who made them, when they were made,

9  and where.  Critically, the CFAC also alleges why each statement was false or misleading when

10  made.  Consequently, Plaintiff's pleadings satisfy the rules, and Defendants' motion should be

11  denied.

12

**LEGAL STANDARD**

13      **A.      Motion to Dismiss Under Rule 12(b)(6)**

14      When considering motions to dismiss under Rule 12(b)(6), courts first "accept as true all

15  factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving

16  party."  *Doan v. Singh*, 617 Fed. App'x 684, 685 (9th Cir. 2015).  Then they ask whether the

17  complaint contains sufficient factual matter to "state a claim for relief that is plausible on its

18  face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility

19  when the plaintiff pleads factual content that allows the court to draw the reasonable inference

20  that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

21  (2009).

22      **B.      Pleading Fraud Under Rule 9(b)**

23      Plaintiffs alleging fraud must particularly state the circumstances constituting fraud,

24  including the "who, what, when, where, and how of the misconduct charged."  *Vess v. Ciba-*

25  *Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation omitted); *see also* Fed. R. Civ.

26  P. 9(b).  In addition to these neutral facts, plaintiffs must also set forth "what is false or

27  misleading about a statement, and why it is false."  *Vess*, 317 F.3d at 1106.

28

The heightened pleading requirement of Rule 9(b) "must be read in harmony with the requirement to make out a 'short and plain' statement of the claim" and is "satisfied if the complaint 'identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.'"   *Wolph v. Acer Am. Corp.*, 2009 WL 2969467, at *5 (N.D. Cal. Sept. 14, 2009) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)).  Moreover, the requirement "may be relaxed as to matters within the opposing party's knowledge."  *Rubenstein v. Neiman Marcus Group LLC*, 687 Fed. App'x 564, 567 (9th Cir. 2017).  "Rule 9(b) only requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can reasonably be expected to have access."  *Id.* (quotation omitted).

### C.    Actionable Statements of Opinion

In California, "it is well settled that an opinion may be actionable when it is made by a party who possesses superior knowledge."  *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892 (2013) (quotation omitted).  For example, opinions concerning investment vehicles based on "superior knowledge, information and expertise concerning [their] composition, underlying structure and function" are actionable as "professional opinions" or "deliberate affirmations of fact" concerning the nature and quality of the investment vehicles.  *Public Employees' Retirement Sys. v. Moody's Investors Serv., Inc.*, 226 Cal. App. 4th 643, 664 (2014).

"Equally well recognized is that there may be liability for an opinion where it is expressed in a manner implying a factual basis which does not exist."  *Id.* (quotation omitted); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188, 190 N.8 (2015) ("[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."); Restatement (Second) of Torts § 525, cmt. f ("[A] statement that a second-hand car will run fifteen miles on a gallon of gasoline is an implied assertion that the condition of the car makes it capable of so doing, and is an actionable misrepresentation if the speaker knows that it has never run more than seven miles per gallon of gasoline."); BAJI 12.32 ("When a party states an opinion as a fact, in such a manner that

1    it is reasonable to rely and act upon it as a fact, it may be treated as a representation of fact.").

2    This rule "is often applied to statements about future events." *Jolley*, 213 Cal. App. 4th at 892.

3         "Where there is any doubt as to whether or not a representation was intended and

4    understood as a mere expression of opinion or a statement of fact, the question is one not of law

5    but of fact for the court or jury." *Davis v. Monte*, 253 P. 352, 354 (Cal. App. 1927); *see also*

6    *Furla v. Jon Douglas Co.*, 65 Cal. App. 4th 1069, 1081 (1998) ("Whether a statement is

7    nonactionable opinion or actionable misrepresentation of fact is a question of fact for the jury.").

8         **D.    The Reasonable-Consumer Test**

9         California's unfair-competition and false-advertising laws are governed by the

10    "reasonable-consumer" test. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

11    The test is satisfied when a plaintiff shows that members of the public are likely to be deceived.

12    *Id.* Accordingly, plaintiffs can sufficiently plead unfair competition and false advertising not only

13    by alleging false advertising, but also by alleging "advertising which, although true, is either

14    misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Id.*;

15    *see also Leoni v. State Bar*, 39 Cal.3d 609 (1985) (The court has a duty to interpret these statutes

16    "broadly to embrace not only advertising which is false, but also advertising which although true,

17    is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse

18    the public."). The Ninth Circuit has emphasized that the reasonable-consumer test "raises

19    questions of fact that are appropriate for resolution on a motion to dismiss only in rare situations."

20    *Reid v. Johnson & Johnson*, 780 F.3d 952 (9th Cir. 2015) (quotation and alteration omitted); *see*

21    *also Zaragoza v. Apple, Inc.*, 2019 WL 1171161 (N.D. Cal. Mar. 13, 2019) ("Whether a

22    reasonable consumer would be deceived is generally a question of fact not amenable to

23    determination on a motion to dismiss.") (quotation and alteration omitted).

24

25

26

27

28

1

**ARGUMENT**

2          Plaintiff's state-law fraud claims arise out of over a dozen false or misleading statements

3   made by Ripple and its CEO.  Defendants do not disagree that Plaintiff adequately alleges the

4   "who, what, when, where, and how of the misconduct charged."  *Vess*, 317 F.3d at 1106.  Instead,

5   they argue that he does not allege why the statements were false or misleading when made.  But

6   that is incorrect.  The CFAC does precisely that.  *See infra* §§ A–D.  Defendants also argue that

7   Plaintiff does not differentiate among them in his allegations of fraud.  This too is wrong.  The

8   CFAC identifies the speaker making each fraudulent statement, thereby alleging each defendant's

9   respective involvement.  *See infra* § E.

10         **A.      False and Misleading Statements Concerning XRP's Utility**

11         Ripple and its CEO repeatedly promoted XRP by misrepresenting its utility.  The CFAC

12  identifies five examples of misleading statements concerning XRP's utility.  First, in an interview

13  published by Forbes on October 23, 2017, Ripple CEO Bradley Garlinghouse claimed that banks

14  need XRP for "liquidity" and that XRP, as a "utility token," has a "real value proposition."

15  CFAC ¶ 41.  Second, in an interview with BNN (retweeted by Ripple on December 14, 2017),

16  Mr. Garlinghouse claimed that XRP is "required" to address "a multi-trillion dollar problem in

17  how cross-border payments flow."  *Id.*  Third, in a December 27, 2017 interview with CNBC, Mr.

18  Garlinghouse claimed that "we use XRP to settle liquidity between banks."[1]  *Id.*  Fourth, in a

19  February 14, 2015 submission to the Conference of State Bank Supervisors, Ripple Chief

20  Compliance Officer Karen Gifford claimed XRP is designed to be used by "banks and financial

21  services businesses," "payment networks," and "liquidity providers."  *Id.* ¶ 42.  Fifth, on

22  December 21, 2017, Ripple tweeted a link to an article from its own website claiming that XRP's

23  utility includes "its ability to help financial institutions source liquidity for payments into and out

24  of emerging markets."[2]  *Id.* ¶ 47.

25  ───────────────────

26  [1] Regarding the first three statements, the Court's order on Defendants' first motion to dismiss
    explained that Plaintiff had not specified "(1) who among defendants' employees made the
    statement, (2) when it was made, (3) where it was made, and (4) how it was communicated."
27  ECF No. 85 at 33.  The CFAC remedies each shortcoming identified by the Court, and
    Defendants do not argue otherwise.

28
    [2] Regarding the fifth statement, the Court's order explained that Plaintiff had not alleged "how or

4

1        Thus, Ripple touted XRP's purported utility, going so far as to say XRP was required to

2    solve a multi-trillion-dollar problem.  However, as Plaintiff alleges, XRP has no such utility.  *Id.*

3    ¶ 43 ("However, as discussed above, more than 60 percent of XRP is owned by Ripple and ***none***

4    ***of that XRP is used for anything at all***, other than to be sold in the future to investors.

5    Moreover, as for the XRP that was already sold or otherwise distributed by Defendants, ***the vast***

6    ***majority, if not all, of it is not used for bridging international transactions, but for investment***

7    ***purposes.***") (emphases added).   Ripple also claimed that XRP's utility stemmed from its ability

8    to help financial institutions source liquidity, but Plaintiff alleges that XRP was seldom, if ever,

9    used to source liquidity.  *Id.* ¶ 48 ("demand for XRP from financial institutions did not represent a

10    significant portion of the demand for XRP and little, if any XRP was used to 'help financial

11    institutions source liquidity'").  In short, the CFAC alleges both ***what*** is misleading (claims that

12    XRP has great utility) and ***why*** it is misleading (XRP has no such utility).  *See Vess*, 317 F.3d at

13    1106.  Consequently, Defendants have adequate notice of their misleading statements, and the

14    purpose of the rule is satisfied.  *See Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995)

15    (pleading with particularity ensures defendants have adequate notice and can prepare defense).

16        Defendants suggest that Plaintiff must go beyond his allegations and affirmatively prove

17    that XRP has no utility to satisfy Rule 9(b)'s particularity requirement.  *See* Mot. at 5.  And they

18    cite the Federal Register as evidence that XRP has utility.  *See id.* at 5–6 (quoting ECF No. 103-

19    2).  However, the rules do not require Plaintiff to prove his case in his pleadings.  The CFAC

20    need only allege facts that, taken as true, give rise to the reasonable inference that XRP has no

21    utility.  It does that.  And as explained in Plaintiff's Opposition to Defendants' Request for

22    Judicial Notice, the Court should not consider the factual assertions in the Notice of Final Rule

23    (or Defendants' interpretation thereof).  Whether XRP has utility is a hotly disputed question of

24    fact that cannot possibly be resolved at this stage in Defendants' favor.

25

26

27    (… cont'd)

    why" the statement is false.  ECF No. 85 at 33.  As explained here, the CFAC remedies that

28    shortcoming as well.

Even if the Court were to consider Defendants' interpretation of the Bureau's comments (which it should not), and even if the comments could properly be considered as statements of fact (which Plaintiff disputes), the comments still would not help Defendants.  They do not disprove Plaintiff's allegation that XRP has little or no utility.  The Bureau notes only that XRP "***can*** be used to effect settlement" of cross-border money transfers—not that it is actually being used for that purpose nor that it is being used for that purpose in any significant volume.  ECF No. 103-2 at 12 (emphasis added).  In fact, any utility would require "expanded adoption."  *Id.*  Indeed, the Bureau explains that, based on its experience, monitoring, and feedback, companies like Ripple "would need to enroll all or most of those [thousands of] financial institutions into their platforms to offer banks and credit unions up-front certainty when sending transfers."  *Id.*  However, it may be "costly, excessively time-consuming, or otherwise difficult to enroll all or even most of these institutions, especially the smaller ones."  *Id.*  Consequently, the Bureau amended its Remittance Rule to allow some institutions to provide estimates rather than exact figures relating to remittance transfers.  *See id.* at 2.  In other words, the Bureau amended its Remittance Rule precisely because it concluded that financial institutions could not rely on offerings like Ripple's to address uncertainty in remittance transfers.

Defendants also claim that Ripple and Mr. Garlinghouse's statements concern future events.  This is wrong.  None of the statements are forward-looking, and each is objectively verifiable.  Mr. Garlinghouse told Forbes in the present tense that banks need XRP for liquidity, CFAC ¶ 41, and whether banks have such a need that XRP satisfies is verifiable.  He told BNN, this time using the past tense, that he had seen that XRP is required to solve a real multi-trillion-dollar problem, *id.*, and whether XRP is used to solve that problem is verifiable.  He told CNBC, again in the present tense, that XRP is used to settle liquidity between banks, *id.*, which is likewise verifiable.  Ms. Gifford explained to the Conference of State Bank Supervisors XRP's present design and use case, *id.* ¶ 42, and how XRP is designed and used is objectively verifiable.  Similarly, Ripple's tweeted article claimed that XRP has utility in helping financial institutions source liquidity, *id.* ¶ 48, which is verifiable.  The article's use of the phrase "long-term value" does not insulate Ripple from liability for misrepresenting how XRP is currently used.

1        Defendants' vague suggestion that "several (if not all)" of these statements are

2   nonactionable opinions is also wrong.  Mr. Garlinghouse's single use of the phrase "I think" at

3   the end of an interview response (after claiming to "have seen" that XRP is "required") does not

4   convert his entire statement into an opinion.  Nor does it transform other statements he made on

5   different days or statements made by different people.

6        Even if these statements were opinions, they would still be actionable for two independent

7   reasons.  First, opinions by those with superior knowledge are actionable.  *See Jolley*, 213 Cal.

8   App. 4th at 892.  Because Ripple has special knowledge concerning XRP's true utility (including

9   whether financial institutions actually use XRP to source liquidity or to bridge international

10   transactions), Ripple's representations of opinion concerning XRP's utility are actionable.  *See*

11   *Public Employees' Retirement Sys.*, 226 Cal. App. 4th at 664 (holding that statements based on

12   superior knowledge of investment vehicles' "underlying structure and function" were "actionable

13   as 'professional opinions' or 'deliberate affirmations of fact.'").

14        Second, statements implying nonexistent factual bases are also actionable.  *See Jolley*, 213

15   Cal. App. 4th at 893; BAJI 12.32.  Ripple's claims concerning XRP's utility are stated as fact and

16   imply that XRP is actively serving a useful purpose as a bridge currency to solve a multi-trillion-

17   dollar problem in international transactions.  But, as the CFAC alleges, virtually no XRP serves

18   that purpose.  CFAC ¶¶ 43, 48.  Just as statements concerning a car's projected utility are

19   actionable if the speaker knows the car has not shown such utility, statements concerning XRP's

20   projected utility are actionable when the speakers know XRP has not shown such utility.  *See*

21   Restatement (Second) of Torts § 525, cmt. f.  To the extent there is room for debate concerning

22   whether the statements were opinions, that is a question of fact for the jury and should not be

23   decided at this stage.  *See Davis*, 253 P. at 354.

24        Defendants further contend that the amended complaint is contradictory concerning

25   XRP's utility.  But this is incorrect.  Plaintiff alleges that XRP has little or no utility.  Most sits in

26   escrow, doing nothing but propping up the value of XRP.  CFAC ¶¶ 90–100.  The rest "is not

27   used for bridging international transactions, but for investment" and therefore has no utility.  *Id.* ¶

28   43.  That Ripple has said its "long-term goal is . . . usage of XRP as a liquidity solution," *id.*

¶ 107, does not contradict Plaintiff's allegation.  Just because Ripple claims that it wants XRP to be useful does not make it so.  Nor does Ripple's selling XRP to financial institutions to raise funds, *id.* ¶ 42, contradict Plaintiff's allegation.  That XRP can be sold does not mean it has utility to "banks and financial services businesses," "payment networks," and "liquidity providers."[3]  *Id.*

More importantly, Defendants' argument that the CFAC is contradictory has no basis in law.  Defendants cite neither rule nor reasoned opinion supporting their argument.  This is because the federal rules expressly permit Plaintiff to plead "as many separate claims or defenses as [he] has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).  Thus, even if Defendants were correct, and the fraud claims were inconsistent with the securities claims, there still would be no grounds for dismissal.[4]

**B.    Garlinghouse's False Statement That He Was "Very, Very, Very Long XRP"**

Mr. Garlinghouse also promoted XRP by misrepresenting his personal investment in XRP.  In a December 14, 2017 interview with BNN, Mr. Garlinghouse claimed to be personally invested in XRP and said, "I'm long XRP, I'm very, very long XRP as a percentage of my personal balance sheet."  CFAC ¶ 52.  He emphasized the point, adding, "I remain very, very, very long XRP, there is an expression in the industry HODL, instead of hold, it's HODL . . . I'm on the HODL side."[5] *Id.*  This came just days after Ripple's XRP product manager retweeted: "Wow, XRP at all time high! Forget about bitcoin, we're all in on XRP!"  *Id.* ¶ 51.  However, Mr. Garlinghouse's claim to be long on XRP was false.  Rather than holding XRP for long-term gain, "he sold any XRP he received from Ripple within days of such receipt," selling "at least 67 million XRP in 2017."  *Id.* ¶ 53.

---

[3] Plaintiff does not oppose Defendants' request for judicial notice of Ripple's submission to the Conference of State Bank Supervisors.  However, Defendants' suggestion that the CFAC adopts the truth of every statement made therein merely by citing it is wrong.  In fact, Ripple's statement that it sells XRP it holds to financial institutions who then use XRP "as a bridge" to "maximize[] currency liquidity and geographic payments in an efficient way," is yet another false and misleading statement regarding XRP's utility.  *See* ECF No. 103-3 at 17.

[4] In fact, the sixth and seventh causes of action are brought as alternatives to the securities claims. *See* CFAC ¶¶ 215, 221.

[5] "HODL" is cryptocurrency-investor slang derived from a misspelling of "hold," meaning to hold for long-term gain.  CFAC ¶ 52.

Thus, the CFAC alleges both **what** was false (Mr. Garlinghouse's claim that he was "very, very, very long XRP" and holding XRP for long-term gain) and **why** it was false (Mr. Garlinghouse was actually selling any XRP he received within days of receipt, rather than holding XRP for long term gain).[6]  Despite this, Defendants claim that Plaintiff should have identified exactly how much XRP Mr. Garlinghouse held prior to his sales and should have alleged specifics concerning Mr. Garlinghouse's personal balance sheet.  Mot. at 8–9.  Neither is correct.

First, details concerning Mr. Garlinghouse's exact XRP holdings are unnecessary to sufficiently plead this claim.  He said he was long on XRP and therefore holding.  But in fact, he was selling "any XRP he received from Ripple within days of such receipt."  CFAC ¶ 53.  On a motion to dismiss, the Court must draw all reasonable inferences in Plaintiff's favor.  *Doan*, 617 Fed. App'x at 685.  Even if it is theoretically possible for an investor to sell while maintaining a long position, Plaintiff's allegation that Mr. Garlinghouse was selling his XRP within days of receipt leads to the reasonable inference that Mr. Garlinghouse was not actually long on or holding XRP and that his statement to the contrary was false.

Second, Defendants cite neither rule nor case law requiring Plaintiff to somehow gain access to Mr. Garlinghouse's personal balance sheet before filing a complaint.  This is because "Rule 9(b) does not require plaintiffs in a securities fraud case to set forth facts which, because no discovery has yet occurred, are in the exclusive possession of the defendants."  *Deutsch v. Flannery*, 823 F.2d 1361, 1366 (9th Cir. 1987).  Plaintiff will thus seek Mr. Garlinghouse's personal balance sheet in discovery and use it to support his claims.

Third, even if Mr. Garlinghouse's statements regarding his personal XRP investments were not false as Plaintiff alleges, they would still be actionable because they have "a capacity, likelihood or tendency to deceive or confuse the public."  *Williams*, 552 F.3d at 938.

### C.    Garlinghouse's Misleading Tweet of a CNBC Article

Mr. Garlinghouse further promoted XRP by tweeting a link to a CNBC article with an inaccurate and misleading headline.  On January 17, 2018, Mr. Garlinghouse tweeted a CNBC

---

[6] The Court's prior order explained with regard to this statement that Plaintiff had failed to "explain how or why the above statement is false."  ECF No. 85 at 34.  As shown here, the CFAC remedies that shortcoming.

article titled "*Ripple is sitting on close to $80 billion and could cash out hundreds of millions per month – but it isn't*" with the caption "A good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."  CFAC ¶ 56.  Although the article's title claimed Ripple was not cashing out hundreds of millions per month, in fact "it is likely that Ripple sold over one hundred million dollars' worth of XRP during the month" immediately prior to the article's publication. *Id.* ¶ 57.[7]

Thus, Plaintiff alleges *what* was misleading about Mr. Garlinghouse's tweet (that Ripple was not cashing out on hundreds of millions per month) and *why* it was misleading (in the month immediately prior, Ripple had likely cashed out over a hundred million dollars' worth of XRP).[8] Defendants claim they cannot be liable for retweeting a misleading article, but their argument ignores the California statutes at issue and instead invites the Court to import extra-jurisdictional determinations concerning republication in common-law defamation claims.  *See* Mot. at 9 (citing *Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26 (S.D.N.Y. 2018) (defamation under New York law); *In re Phila. Newspapers, LLC*, 690 F.3d 161 (3d Cir. 2012) (defamation under Pennsylvania law); *Lokhova v. Halper*, 2020 WL 963032 (E.D. Va. Feb. 27, 2020) (defamation under Virginia law)).  The Court should reject this invitation.  Plaintiff's fraud claims are not governed by New York, Pennsylvania, or Virginia defamation law.  They are governed by California Corporations Code § 25401 (making it illegal to "offer or sell a security . . . by means of *any written or oral communications which includes an untrue statement of material fact or omits to state a material fact*") (emphasis added), California Business and Professions Code § 17500 (making it illegal to "make or disseminate . . . in any newspaper or other publication . . . or in *any other manner or means whatever, including over the Internet, any statement concerning that real or personal property or those services* . . . or concerning any circumstance or matter of fact connected with the proposed performance or disposition . . . which

---

[7] Defendants' assertion that the CFAC contradicts this sum is wrong.  Plaintiff does not allege that Ripple likely sold over $100 million in XRP in December 2017.  He alleges that Ripple sold that amount in the month prior to January 17, 2018 (*i.e.* December 17, 2017 to January 17, 2018).

[8] The Court's prior order explained with regard to this statement that Plaintiff had failed to "explain how or why the above statement is false."  ECF No. 85 at 34.  The CFAC remedies that shortcoming.

is untrue or misleading) (emphasis added), and California Business and Professions Code § 17200 (prohibiting any "unlawful, unfair, or fraudulent business act or practices," including violations of § 17500).   The Corporations Code defines false and misleading statements to include "any" communications that "include" an untrue statement, and Mr. Garlinghouse's tweet was a communication that included an untrue statement.   Similarly, the Business and Professions Code requires only dissemination of a misleading statement by "any other manner or means whatever, including over the internet," which likewise encompasses Mr. Garlinghouse's tweet and hyperlink.

### D.    Statements Conflating Ripple Enterprise Solutions and XRP

Ripple also promoted XRP by persistently conflating adoption of Ripple's enterprise solutions with adoption and use of XRP.   The amended complaint identifies ten statements to that effect. All are misleading, and all are actionable.

1.   On March 20, 2017, Ripple retweeted a Bloomberg article regarding adoption of Ripple Enterprise Solutions, proclaiming, "Ripple is the only company in this space with real customers who are really in production." The price of XRP increased rapidly following this tweet. (¶¶ 64–65)

This tweet conflated adoption of Ripple enterprise solutions with adoption and use of XRP because it failed to disclose that the customers referenced were not XRP customers but rather enterprise solutions customers.   By referencing "customers" instead of "enterprise solutions customers," Ripple created the impression that XRP was being adopted by financial institutions when it was not.   *See* CFAC ¶ 76.   That this was misleading to reasonable investors is evident in the rapid XRP price increase that followed.   *See id.* ¶ 65.

2.   On March 24, 2017, Ripple tweeted: "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives." (¶ 65)

This tweet is not an independent basis for Plaintiff's fraud claims.   Instead, it provides additional context to the statement above.   By tweeting about a surge in XRP pricing prompted by Ripple's tweet from mere days before concerning "real customers who are really in production," Ripple reinforced investors' false association of XRP's value with adoption of Ripple's enterprise solutions.

3.   On April 26, 2017, Ripple tweeted a link to an article on its own site, proclaiming: "#Ripple welcomes 10 additional customers to our #blockchain #payments network." Neither this tweet nor the article it linked to informed readers that the blockchain payments network did not refer to the XRP Ledger, but rather Ripple's xCurrent enterprise solution.  (¶ 66)

This tweet conflated adoption of enterprise solutions with adoption of XRP because it did not specify that the additional customers referenced were xCurrent customers—not XRP customers.  Nor did the article specify that the additional customers were xCurrent customers rather than XRP customers.  *See* ECF No. 103-5.  Instead, it buried a single reference to "Ripple's enterprise blockchain solution" partway through the article.  *Id.* at 6.  This created the impression that customers using Ripple's blockchain payments network were using Ripple's XRP, which relies on blockchain technology.  But XRP was not being adopted by these financial institutions.  CFAC ¶ 76.  That this tweet and article were in fact misleading is clear from the first reply to Ripple's tweet, which assumed that Ripple taking in more enterprise customers would increase the demand for XRP: "That is great news!!!! It's good seeing the network growing so quickly! #XRP going to be happy 😊."  ECF No. 103-5 at 2.

4.   On May 3, 2017, with the price of XRP continuing to rise, Ripple tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last two months' via @Nasdaq."[9]  (¶ 67)

This tweet showed Ripple was aware of what the CFAC alleges: Ripple adoption sparked interest in XRP because investors wrongly associated adopting enterprise solutions with adopting XRP.  *See* CFAC ¶ 76.  However, rather than distinguish between enterprise solutions and XRP, Ripple perpetuated the false association, encouraging other investors to invest in XRP.  *See id.* Defendants dismiss the tweet as "opinion or puffery," *see* Mot. at 12, but whether adoption of Ripple by enterprise customers sparked interest in XRP is objectively verifiable.  Even if the statement were opinion, it would still be actionable because Ripple had superior knowledge regarding XRP and adoption of Ripple's enterprise solutions.  *See Jolley*, 213 Cal. App. 4th at

---

[9] Defendants make a straw man of this statement.  *See* Mot. at 11–12.  That XRP rallied is not the point.  The point is that the rally was a direct and intended result of Ripple's misleading statements.  By misleading investors into believing that XRP's use rose with each successive customer adopting Ripple's enterprise solution, Defendants inflated the price of XRP and then sold it off in enormous quantities, reaping hundreds of millions in profit.

892.  To the extent there is room for debate, that is a question of fact for the jury.  *See Davis*, 253 P. at 354.

5.  Ripple conflated the adoption of its Enterprise Solutions and XRP again on May 16, 2017, tweeting: "The appeal that Ripple has towards traditional financial institutions is a big advantage it has over Bitcoin."  (¶ 68)

This tweet claimed that Ripple's appeal toward traditional financial institutions (through its enterprise solutions) gave XRP a big advantage over Bitcoin, again conflating adoption of enterprise solutions with adoption of XRP.  By comparing Ripple to Bitcoin (a cryptocurrency), Ripple implied that its own cryptocurrency (XRP) was appealing to traditional financial institutions and therefore being adopted.  *See* CFAC ¶ 76.  But these institutions were not adopting XRP.  As above, Defendants dismiss the tweet as opinion, but they miss the point.  The misleading nature of the statement does not stem from XRP's alleged advantage over Bitcoin—it is that the statement itself conflates two distinct concepts (enterprise solutions and XRP).  And again, even Ripple's opinion on this issue would be actionable, considering Ripple's superior knowledge.  *See Jolley*, 213 Cal. App. 4th at 892.  In any event, if the point is debatable, it should not be resolved here.  *See Davis*, 253 P. at 354.

6.  On June 29, 2017, Ripple tweeted a clip of an interview its CEO Brad Garlinghouse gave on CNBC with the caption: "#XRP – up 4000% this year – has shown the market favors a real use case for #digitalassets . . ." In that interview, Garlinghouse proclaimed that "digital assets are in a position to be more valuable than gold," and described XRP as "solving a real-world use case, it's not just about speculators."  (¶ 69)

This tweet and interview suggested that XRP's price soared because it solved a real-world use case.  But, as the CFAC alleges, XRP has no such utility.  *See* CFAC ¶¶ 43, 48.  Only Ripple's enterprise solutions have any utility.  Consequently, by linking XRP's increasing value to solving a real-world problem, Ripple and its CEO again conflated adopting enterprise solutions with adopting XRP, even though enterprise customers were not adopting XRP.[10]  *See id.* ¶ 76.

---

[10]  Defendants challenge Ripple's tweet but do not challenge Mr. Garlinghouse's interview statements alleged in the same paragraph of the amended complaint.  *See* Mot. at 12.

7.   On September 11, 2017, Garlinghouse stated in an interview with CNBC: "People are looking at the success Ripple has been having as a company, and I think that's increased the value of XRP." (emphasis added). He continued by stating that Ripple wanted "to keep focusing on making XRP a valuable payments tool, and that value will increase accordingly," and he was "voting with [his] . . . pocketbook on the future increased value of cryptocurrencies." (¶ 70)

Like number 4 above, this tweet showed Mr. Garlinghouse was also aware of what Plaintiff alleges: Ripple adoption sparked interest in XRP because investors associated adopting enterprise solutions with adopting XRP.  However, rather than distinguish between enterprise solutions and XRP, Mr. Garlinghouse capitalized on the false association, using it to encourage other investors to invest in XRP, even though XRP was not being adopted by financial institutions.  *See* CFAC ¶ 76.  In addition, Mr. Garlinghouse misleadingly claimed that he was voting with his pocketbook on increased value of cryptocurrencies.  But the opposite was true. Throughout 2017, Mr. Garlinghouse "sold any XRP he received from Ripple within days of such receipt." *Id.* ¶ 53.

Here, Mr. Garlinghouse's statement concerning his pocketbook is objectively verifiable and is not an opinion.  However, Defendants are correct that his statement concerning the increased value of XRP was an expression of opinion.  Nevertheless, it is still actionable because Mr. Garlinghouse had superior knowledge concerning XRP, its utility, and its adoption (or lack thereof).  *See Jolley*, 213 Cal. App. 4th at 892.  And again, if there is a question as to whether the statement is actionable opinion, it is one for the jury.  *See Davis*, 253 P. at 354.

8.   On November 27, 2017, Garlinghouse tweeted "Ripple & $XRP are giving businesses 'what they want in a #blockchain,'" along with a link to a Motley Fool tweet. That Motley Fool tweet in turn stated that "AmEx and Banco Santander will use Ripple's blockchain network for instant intl. fund transfers. Could be a big deal for Ripple's XRP cryptocurrency. $AXP $SAN." (¶ 71)

This tweet treated Ripple (and its enterprise solutions) and XRP as a common unit, further conflating the important distinction between businesses adopting enterprise solutions and using XRP.  Moreover, it linked a Motley Fool tweet that directly connected use of Ripple's enterprise solutions with Ripple's XRP cryptocurrency, even though Ripple's enterprise customers were not adopting XRP. *See* CFAC ¶ 76.

14

1    Defendants disclaim liability for repeating Motley Fool's misleading tweet to hundreds of

2    thousands of followers.   However, as explained above, Defendants are not insulated from

3    liability, *see supra* § C, especially where they compounded the misleading statement with a

4    similar one of their own.

5    Defendants also claim the tweet was an expression of opinion, but again they miss the

6    point.  The key is not whether Ripple and XRP are giving businesses what they want—it is that

7    both Mr. Garlinghouse and the Motley Fool tweet he linked gave the false impression that

8    adopting Ripple's enterprise solutions meant adopting XRP, which would drive demand for XRP.

9    9.   On December 14, 2017 Ripple tweeted: "The Japan Bank Consortium launched a Ripple
         pilot with two large Korean banks – the first time money moves from Japan to Korea over
10       RippleNet." The tweet also linked to an article on Ripple's site. Buried inside that article is
         the fact that "RippleNet" refers to Ripple's xCurrent enterprise solution, which does not
11       require use of XRP. Nevertheless, earlier on that day, Ripple tweeted "@bgarlinghouse [its
         CEO's twitter handle] on why crypto prices will be driven by real utility, the multi-trillion $
12       problem @Ripple is solving and why $XRP will come out on top."  Ripple would later
         acknowledge that "neither the AMEX news nor the Korean bank initiative involved XRP."
13       (¶¶ 72–73)

14   10.  Nevertheless, the December 14, 2017 Ripple tweet linked to a BNN interview with Mr.
15       Garlinghouse, in which he said "the reason why XRP has performed so well this year, we're
         solving a real problem, it's a multi-trillion dollar problem around cross-border payments.
16       There is a lot of friction it's very slow it's expensive, we're working with the institutions to
         deal with that, so people have gotten excited. We now have over 100 customers we've
17       announced publicly." Although few, if any of those 100 customers were using XRP,
         Garlinghouse continued, "at the end of the day the value of digital assets will be driven by
18       their utility. If they are solving a real problem, and that problem has scale, and that problem,
         you know there is real value there, then there will be demand for the tokens and the price will
19       go up. For XRP we have seen because it's required, it's something that can really reduce the
         friction, and we're talking about a multi-trillion dollar problem in how cross-border
20       payments flow. And so, I think if you drive real utility, yes there's going to be demand for
         that." "XRP is up 100x this year, and I think it's because the problem we are solving people
21       realize is a real problem, it's a big problem."  (¶¶ 74–75)

22   The statements from December 14, 2017, should be read together, since that is how

23   investors read them.   Read in combination, they show how Ripple and its CEO framed an

24   important launch of Ripple's enterprise solution, xCurrent, in Japan and Korea so that it would

25   appear to involve XRP.  First, Ripple tweeted at Mr. Garlinghouse, linking a BNN interview and

26   claiming that XRP's price would be driven by real utility, that XRP would solve multi-trillion-

27   dollar problems, and that XRP would come out on top.  CFAC ¶ 72.  In turn, Mr. Garlinghouse

28   repeated the claim that XRP had performed well because it solved a real, multi-trillion-dollar

problem and, without distinguishing between XRP and Ripple's enterprise solutions, he immediately claimed that Ripple had over 100 publicly announced customers. Few, if any, of those 100 customers were using XRP, making Mr. Garlinghouse's statement highly misleading in context. *See id.* ¶¶ 75–76. But that was not all. Shortly after tweeting the BNN interview, Ripple then announced the Japan Bank Consortium pilot, where money (not XRP) would move from Japan to Korea over "RippleNet." *Id.* ¶ 72. Only buried inside a linked article did Ripple reveal that "RippleNet" referred to its enterprise solution xCurrent, which does not require use of XRP. *Id.*

In conjunction, these statements by Ripple and its CEO misleadingly conflated Ripple customers' adopting enterprise solutions with their using XRP—a fact Ripple tacitly admitted when it later felt compelled to announce that "neither the AMEX news nor the Korean bank initiative involved XRP." *Id.* ¶ 73.

Defendants again claim the statements were expressions of opinion, but the key statements (that XRP solved a real, multi-trillion-dollar problem, that Ripple had over 100 customers, and that money would move from Japan to Korea over RippleNet) were factual. Read in conjunction, they were misleading. To the extent the rest of the statements were Mr. Garlinghouse's opinions, they are nevertheless actionable because they were presented as facts and because Mr. Garlinghouse had superior knowledge. *See Jolley*, 213 Cal. App. 4th at 892. To the extent their actionability is in question, that is a question for the jury. *See Davis*, 253 P. at 354.

***

In sum, the CFAC alleges *what* was misleading about these statements (their suggestion that customers adopting Ripple's enterprise solutions were also adopting XRP) and *why* the statements were misleading (few, if any, of those customers were actually using XRP).[11,12]

---

[11] Defendants claim in passing that "the distinction between Ripple's enterprise software and XRP was already publicly disclosed." *See* Mot. at 14 n.8. For this proposition, they cite only to the CFAC. But the cited paragraphs to not allege that the distinction was publicly disclosed. *See* CFAC ¶¶ 60–62.

[12] The Court's prior order explained with regard to these statements that Plaintiff had failed to "explain how or why any of the misstatements alleged in the above paragraphs are false." ECF No. 85 at 35. As shown here, the CFAC remedies that shortcoming.

1

### E.   Differentiating Between Defendants

The Court's prior order instructed that Plaintiff must "identify the respective involvement of each defendant in the alleged fraud." Order at 36. The CFAC does that by specifically identifying the speaker responsible for each false or misleading statement alleged.

The CFAC describes Mr. Garlinghouse's involvement in paragraphs 41, 52–53, 56–57, 69–71, and 74–75. Because corporations are liable for fraud committed by their officers, the same paragraphs also describe Ripple's involvement. *See In re Tesla, Inc. Securities Litig.*, 2020 WL 1873441, at *18 (N.D. Cal. Apr. 15, 2020). The CFAC further describes Ripple's involvement in paragraphs 42, 47–48, 64–68, and 72–73. Where Ripple made false or misleading statements through employees known to Plaintiff, he identifies those employees. *See, e.g.*, CFAC ¶¶ 41, 42, 52–53, 56–57, 69–71, and 74–75. Where Ripple made false or misleading statements through its company Twitter handle (@Ripple), Plaintiff is unable, without the benefit of discovery, to identify the specific employee managing Ripple's Twitter account on the relevant dates. That information is in Ripple's possession, however, and there can be no argument that the relevant employee was acting outside the scope of their employment or that Ripple does not have sufficient notice of the allegations against it.

### F.   Leave to Amend

If the Court finds there is any merit to Defendants' arguments that the allegations in the complaint do not adequately state a claim, any dismissal should be without prejudice, and Plaintiff should be given leave to amend. *See Cheslow v. Ghirardelli Chocolate Co.*, 2020 WL 1701840, at *3 (N.D. Cal. Apr. 8, 2020) ("Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment."); *see also Vess*, 317 F.3d at 1108 ("As with Rule 12(b)(6) dismissals, dismissals for failure to comply with Rule 9(b) should ordinarily be without prejudice. Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect.") (quotation and alteration omitted). Defendants have not and cannot prove that it is impossible for Plaintiff to cure any defects found to exist in the CFAC.

17

1

**CONCLUSION**

2     The Court's prior order specifically identified certain shortcomings in Plaintiff's fraud

3 allegations.  The CFAC remedies each of those shortcomings.  *See supra* at fn. 1–2, 6, 8, and 12.

4 The CFAC pleads fraud with the requisite particularity, alleging why each fraudulent statement

5 was false or misleading when made.  Moreover, Plaintiff alleges over a dozen fraudulent

6 statements.  But even a single statement would suffice.  *See* Cal. Corp. Code § 25401 (requiring

7 only a single untrue statement); Cal. Bus. & Prof. Code § 17500 (same).  Consequently, his state-

8 law fraud claims should not be dismissed.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 18-cv-06753-PJH

1    Dated:  July 8, 2020                          SUSMAN GODFREY L.L.P.

2

3                                            By:  _____/s/ *P. Ryan Burningham*

4                                                 Marc M. Seltzer (54534)
                                                  Steven G. Sklaver (237612)
5                                                 Oleg Elkhunovich (269238)
                                                  Meng Xi (280099)
6                                                 SUSMAN GODFREY L.L.P.
                                                  1900 Avenue of the Stars, Suite 1400
7                                                 Los Angeles, CA  90067-6029
                                                  Telephone: (310) 789-3100
8                                                 Facsimile: (310) 789-3150
                                                  mseltzer@susmangodfrey.com
9                                                 ssklaver@susmangodfrey.com
                                                  oelkhunovich@susmangodfrey.com
10                                                mxi@susmangodfrey.com

11                                                P.  Ryan Burningham (*pro hac vice*)
                                                  SUSMAN GODFREY L.L.P.
12                                                1201 Third Avenue, Suite 3800
                                                  Seattle, WA  98101
13                                                Telephone: (206) 516-3880
                                                  Facsimile: (206) 516-3883
14                                                rburningham@susmangodfrey.com

15                                                James Q. Taylor-Copeland (284743)
                                                  TAYLOR-COPELAND LAW
16                                                501 W. Broadway, Suite 800
                                                  San Diego, CA 92101
17                                                james@taylorcopelandlaw.com
                                                  Telephone: (619) 400-4944
18                                                Facsimile: (619) 566-4341

19                                                *Counsel for Lead Plaintiff Bradley
                                                  Sostack*

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, I electronically filed the foregoing document with the clerk of the Court and served counsel of record via the CM/ECF system.

/s/ *P. Ryan Burningham*
P. Ryan Burningham

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
Case No. 18-cv-06753-PJH