1

Damien J. Marshall (Admitted *pro hac vice*)
dmarshall@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone:    (212) 556-2100

Andrew J. Ceresney (Admitted *pro hac vice*)
aceresney@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone:    (212) 909-6000
Facsimile:    (212) 909-6836

2

3

4

Maxwell V. Pritt (SBN 253155)
mpritt@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:    (415) 293-6800
Facsimile:    (415) 293-6899

5

6

7

8

Menno Goedman (SBN 301271)
mgoedman@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, DC  20005
Telephone:    (202) 237-2727
Facsimile:    (202) 237-6131

9

10

11

12

*Attorneys for Defendants Ripple Labs Inc.,*
*XRP II, LLC, and Bradley Garlinghouse*

13

14

15

UNITED STATES DISTRICT COURT

16

NORTHERN DISTRICT OF CALIFORNIA

17

OAKLAND DIVISION

18

In re RIPPLE LABS INC. LITIGATION,

Case No. 18-cv-06753-PJH

19

20

This Document Relates To:
All Actions

**REPLY IN SUPPORT OF MOTION TO DISMISS IN PART CONSOLIDATED FIRST AMENDED COMPLAINT**

21

22

Date:   August 26, 2020
Time:   9:00 am
Place:  Courtroom 3
Judge:  Hon. Phyllis J. Hamilton

23

24

25

Consolidated First Amended Complaint filed:
March 25, 2020

26

27

28

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    STANDARD OF REVIEW ................................................................................... 2

III.   THE FRAUD CLAIMS DO NOT MEET RULE 9(b)'S EXACTING REQUIREMENTS. ......... 3

      A.     Statements About XRP's Utility ........................................................... 3

      B.     Mr. Garlinghouse's Statements About Holding and Being "Long" XRP ......................... 6

      C.     CNBC Statement ..................................................................................... 7

      D.     Statements Allegedly Conflating Ripple Enterprise Solutions and XRP ......................... 9

IV.   PLAINTIFF'S FRAUD CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ................. 15

V.    CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Cansino v. Bank of Am.*,

    224 Cal. App. 4th 1462 (2014) ........................................................................... 6, 13

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,

    173 F.3d 725 (9th Cir. 1999) ................................................................................. 12

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,

    911 F.2d 242 (9th Cir. 1990) ................................................................................. 12

*Davidson v. Kimberly-Clark Corp.*,

    889 F.3d 956 (9th Cir. 2018) ................................................................................... 3

*Depot, Inc. v. Caring for Montanans, Inc.*,

    915 F.3d 643 (9th Cir. 2019) ............................................................................... 2, 3

*DSNR Media Group Ltd. v. Vdopia, Inc.*,

    2020 WL 2850284 (N.D. Cal. June 2, 2020) .......................................................... 2

*Henry v. Regents of the Univ. of Cal.*,

    37 F. Supp. 3d 1067 (N.D. Cal. 2014) .................................................................... 3

*In re Eventbrite, Inc. Sec. Litig.*,

    2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ................................................. 11, 12

*In re McKesson HBOC, Inc. Sec. Litig.*,

    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................ 13

*In re Worlds of Wonder Sec. Litig.*,

    694 F. Supp. 1427 (N.D. Cal. 1988) ....................................................................... 3

*Katiki v. Taser Intern., Inc.*,

    2013 WL 163668 (N.D. Cal. Jan. 15, 2013) ........................................................... 1

*Marolda v. Symantec Corp.*,

    672 F. Supp. 2d 992 (N.D. Cal. 2009) .................................................................... 9

*Martorello v. Sun Life Assur. Co. of Canada*,

    2009 WL 2160652 (N.D. Cal. July 20, 2009) ......................................................... 4

*Moore v. Kayport Package Express, Inc.*,

    885 F.2d 531 (9th Cir. 1989) ............................................................................................ 2

*Neubronner v. Milken*,

    6 F.3d 666 (9th Cir. 1993) .............................................................................................. 2

*Partington v. Bugliosi*,

    56 F.3d 1147 (9th Cir. 1995) .......................................................................................... 12

*Phleger v. Countrywide Home Loans, Inc.*,

    2008 WL 65771 (N.D. Cal. Jan. 4, 2008) ....................................................................... 6

*Troll Busters LLC v. Roche Diagnostics GmbH*,

    2011 WL 3859721 (S.D. Cal. Aug. 31, 2011) ................................................................. 2

*Wochos v. Tesla, Inc.*,

    2019 WL 1332395 (N.D. Cal. Mar. 25, 2019) ............................................................ 1, 7

**Rules**

Rule 9(b) ............................................................................................................................ passim

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH

# I.    INTRODUCTION

This Court previously rejected Plaintiff's Fraud Claims, in large part, for failing to plead *why* Ripple's purported misrepresentations are false.  Plaintiff's First Amended Complaint ("FAC") does not remedy this shortcoming.  Now, in a last-ditch effort, Plaintiff's Opposition asks the Court to find—based on unsupported leaps of logic and facts alleged nowhere in the FAC—falsity where there is none.  This deficiency infects each supposed category of purported misstatements:

- Statements about XRP's Utility:  Plaintiff alleges that *some* XRP may not have been used to settle cross-border transactions in 2017.  FAC ¶¶ 43, 48.  From these limited allegations, Plaintiff argues that "XRP has no such utility."  Opp. at 5.  But the latter does not follow from the former: a product's usefulness or utility does not depend on its widespread adoption in the moment.  Plaintiff has therefore not shown *why* statements about XRP's utility are false.  Thus, these purported misstatements cannot support Plaintiff's Fraud Claims.  *Infra* at pp. 3-6.

- Statements about Brad Garlinghouse's XRP Holdings:  Plaintiff alleges that Mr. Garlinghouse sold XRP in 2017 and that some of these sales occurred shortly after he received XRP.  FAC ¶ 53.  From these allegations, Plaintiff contends that "Mr. Garlinghouse was not actually long on or holding XRP" at the end of 2017.  Opp. at 9.  But a snapshot of Mr. Garlinghouse's alleged sales is not inconsistent with him continuing to hold XRP.  Thus, Plaintiff has not established *why* Mr. Garlinghouse's statements about his XRP holdings were false, and these purported misstatements cannot support Plaintiff's Fraud Claims.  *Infra* at pp. 6-7.

- Statements about Ripple's XRP Sales:  Plaintiff alleges that Ripple sold $91 million of XRP in the final *quarter* of 2017 and $167.7 million XRP in the first *quarter* of 2018.  FAC ¶¶ 36-37, 57.  From these allegations, Plaintiff claims that Ripple sold "over a hundred million dollars' worth of XRP" in the final *month* of 2017.  Opp. at 10.  But the former all but precludes the latter.  Because Plaintiff has not explained *why* statements about Ripple's XRP sales are false, these supposed misstatements cannot support Plaintiff's Fraud Claims.  *Infra* at pp. 7-9.

- XRP and Ripple's Enterprise Software Products:  Plaintiff alleges that Ripple "falsely conflate[d]" adoption of XRP with the company's enterprise business solutions, when, allegedly, "few, if any, of [Ripple's enterprise] customers were actually using XRP."  FAC ¶ 76.  But the statements Plaintiff cites are silent as to XRP's adoption and often do not even mention XRP at all.  Thus, Plaintiff has not established *how* these statements "conflate" XRP and Ripple's enterprise products, nor *why* the statements are false.  Therefore, these purported misstatements also cannot support Plaintiff's Fraud Claims.  *Infra* at pp. 9-14.

In short, Plaintiff fails to offer the factual allegations needed to show that Ripple's and Mr. Garlinghouse's statements were false when made.  Instead, Plaintiff invites the Court to ignore the requirements of Rule 9(b) and make unsupported leaps of logic based on facts that Plaintiff never alleged in the FAC.  The Court should refuse Plaintiff's invitation.  *See Katiki v. Taser Intern., Inc.*, 2013 WL 163668, at *2 (N.D. Cal. Jan. 15, 2013) (explaining that in the context of Rule 9(b)'s falsity requirement, "[a] court is not required to accept as true conclusory allegations, unreasonable inferences, or unwarranted deductions of fact"); *Wochos v. Tesla, Inc.*, 2019 WL 1332395, at *5-7 (N.D. Cal. Mar. 25, 2019)

(dismissing amended complaint with prejudice where plaintiff's securities fraud claims depended on "unreasonable inferences"); *Troll Busters LLC v. Roche Diagnostics GmbH*, 2011 WL 3859721, at *2 (S.D. Cal. Aug. 31, 2011) ("While the court assumes that the facts in a complaint are true, it is not required to indulge in unwarranted inferences in order to save a complaint from dismissal.") (citation omitted).

To satisfy Rule 9(b), Plaintiff must plead not only that a statement is false but also "*what* is false" about the statement and "*why* it is false." Because Plaintiff's allegations do not contradict or render false any alleged misrepresentation, Plaintiff has not carried his burden. The Court must reject Plaintiff's efforts to salvage his claims by muddling the familiar Rule 9(b) standard. *See* Opp. at 2-3. Plaintiff has had two bites at the apple and arguably takes a third in his Opposition. Yet he still fails to show *why* the statements on which his Fraud Claims depend are false, as required under Rule 9(b). Accordingly, the Court should dismiss Plaintiff's Fourth, Sixth, and Seventh Claims with prejudice.

## II.   STANDARD OF REVIEW

This Motion turns on Rule 9(b)'s demanding pleading standard. The Court previously held that Rule 9(b) applies to Plaintiff's Fraud Claims. Dkt. 85 at 32, 39. Rule 9(b)'s command is clear and inescapable: to plead a claim sounding in fraud, a plaintiff "must identify the who, what, when, where, and how of the misconduct charged, as well as *what* is false or misleading about the purportedly fraudulent statement, and *why* it is false." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (citations omitted) (emphasis added). In the Rule 9(b) context, as elsewhere, the Court is not required to accept as true "unwarranted deductions of fact, or unreasonable inferences." *DSNR Media Group Ltd. v. Vdopia, Inc.*, 2020 WL 2850284, at *3 (N.D. Cal. June 2, 2020) (citation omitted).

Plaintiff concedes that Rule 9(b) controls, Opp. at 1-2, but obfuscates the issue in several ways. First, Plaintiff overstates when Rule 9(b) is "relaxed" due to a defendant's exclusive and peculiar knowledge. Opp. at 2. Although Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge*," id.*, a plaintiff's allegations must still be "accompanied by a statement of the facts on which the belief is founded." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (citation omitted). Were it otherwise, the exception would swallow the rule, as defendants nearly *always* have superior knowledge of allegations that concern them. Critically, "this exception does not nullify Rule 9(b)[.]" *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993); *see also In re Worlds of Wonder*

*Sec. Litig.*, 694 F. Supp. 1427, 1433 (N.D. Cal. 1988) (holding Rule 9(b) "applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party"). <u>Second</u>, Plaintiff's discussion of the "reasonable consumer test," Opp. at 3, is immaterial to this Motion.  The Ninth Circuit has made clear that Rule 9(b) imposes a separate and independent pleading requirement that supplements the "reasonable consumer test." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (holding 9(b)'s falsity requirement applies to UCL and FAL claims).

The dispositive question raised by this Motion is whether Plaintiff has, for each allegedly fraudulent statement, pleaded "*what* is false or misleading about the purportedly fraudulent statement, and *why* it is false." *Depot*, 915 F.3d at 668.  Because he has failed to do so, the Motion should be granted.

## III.    THE FRAUD CLAIMS DO NOT MEET RULE 9(b)'S EXACTING REQUIREMENTS.

Plaintiff alleges four categories of statements that are purportedly false or misleading: (1) statements about XRP's utility; (2) Mr. Garlinghouse's statements that he is long XRP as a percentage of his personal balance sheet (i.e., that he held XRP at the end of 2017); (3) statements in a CNBC article about Ripple's monthly XRP sales at the time of publication; and (4) statements that supposedly conflate XRP and Ripple's Enterprise solutions.  For each statement, Plaintiff fails to plead *why* it is false.

### A.    Statements About XRP's Utility

Plaintiff purports to identify "five examples" of supposedly misleading statements regarding XRP's utility.  Opp. at 4 (citing FAC ¶¶ 41, 42, and 47).  To carry his burden, Plaintiff must allege with particularity why each of these five statements is false using allegations that were actually pleaded in the FAC; he cannot meet this burden with novel allegations raised for the first time in his opposition brief. *See Henry v. Regents of the Univ. of Cal.*, 37 F. Supp. 3d 1067, 1084 (N.D. Cal. 2014) (Hamilton, J.) (criticizing inclusion of "new allegations" raised for the first time in an opposition brief).

Plaintiff asserts a single theory of falsity as to these statements: the "five examples" are false because "XRP has no such utility."  Opp. at 5 (citing ¶¶ 43 and 48 of the FAC).[1]  However, Plaintiff never

---

[1]  Plaintiff's theory of liability is *not* that Defendants overstated the *extent* of XRP's adoption in the cross-border market.  This makes sense given that Plaintiff's "five examples" of purportedly false statements never speak to the *extent* of XRP's adoption.

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH

1   actually alleges—in his original Complaint or in the FAC—that "XRP has no such utility."[2]  And what

2   Plaintiff *has* alleged, in Paragraphs 43 and 48 of the FAC, falls far short.

3        Paragraphs 43 and 48 of the FAC merely allege that (a) Ripple holds XRP that is not used for

4   cross-border transactions, (b) the "vast majority, if not all" XRP on the market is not used for cross-border

5   transactions, (c) demand for XRP from financial institutions "did not represent a significant portion" of

6   total demand for XRP, and (d) "little, if any XRP was used to 'help financial institutions source liquidity.'"

7   FAC ¶¶ 43, 48.  These allegations are not equivalent to an allegation that "XRP has no such utility."

8   Simply put, the fact that some XRP is *not being used* does not mean XRP lacks *utility*.  For one, these

9   allegations suggest that at least some XRP *was* being used to facilitate cross-border payments (Plaintiff's

10   artful pleading—"60 percent," "vast majority," "significant portion"—studiously avoids absolutes).  More

11   to the point, a product can have a function at creation before it is widely adopted.  The first pair of

12   telephones had utility even if there was no one yet to call.  And the first printing press had utility before it

13   was used to mass print books.  In much the same way, XRP can be a fast, reliable, secure, and inexpensive

14   means of effectuating cross-border transactions, even if some portion of XRP is, for example, held in

15   escrow and not presently in use.

16        Plaintiff confuses this distinction when discussing the Bureau of Consumer Financial Protection's

17   recent statements about XRP.[3]  Opp. at 6.  As Plaintiff concedes, the Bureau's Notice of Final Rule

18   _____

19       [2]  Of course, even if the FAC included such an allegation, without more, it would need to be set
aside as conclusory.  *See Martorello v. Sun Life Assur. Co. of Canada*, 2009 WL 2160652, at *1 (N.D.

20   Cal. July 20, 2009) (Hamilton, J.) ("[T]he Supreme Court has been clear that conclusory allegations
unsupported by proper factual allegations do not meet the requisite threshold to defeat a motion to

21   dismiss.").  Plaintiff has never explained (because he cannot) why XRP lacks utility or why XRP cannot
be used to settle cross-border transactions.

22       [3]  Defendants have requested that the Court take judicial notice of four documents. Dkt. 103.  As
to three of the documents, Defendants' request is unopposed. Dkt. 104 at 1.  Plaintiff opposes taking

23   notice of the one remaining document: a Notice of Final Rule published in the Federal Register by the
Bureau of Consumer Financial Protection.  *Id.*  While Plaintiff does not dispute that the Court is statutorily

24   required to take judicial notice of the Final Rule, 44 U.S.C. § 1507, he attempts to draw a distinction
between the "Rule itself" and the contents thereof.  *See* Dkt. 104 at 3.  But this runs headlong into the text

25   of § 1507, which expressly states that "[t]he *contents* of the Federal Register *shall be judicially noticed*[.]"

26   (emphases added).  The statute provides no exception for "dispute[d]" facts and the Court should reject
Plaintiff's atextual attempt to read one in.  Nor is there any confusion as to the two statements which

27   Defendants request to be noticed: they are the statements quoted in Defendants' Motion, Mot. at 2, 5-6,
and published in the Federal Register at 34880, Dkt. 103-2.

28

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH

1  expressly states that XRP "*can* be used to effect settlement" of cross-border transactions.  *Id.* (quoting

2  Dkt. 103-2).  This undermines Plaintiff's argument in Opposition that XRP lacks utility and confirms the

3  veracity of Ripple's statements regarding the same.  Even if true, Plaintiff's protest that XRP is not

4  "actually being used" for this purpose, *id.*, is immaterial.

5      Grasping at straws, Plaintiff leans heavily on an alleged statement by Mr. Garlinghouse that XRP

6  is "required" to facilitate cross-border payments.  Opp. at 4-7, 15.  Of course, it is nonsensical to assert

7  that XRP is "required" for cross-border transactions.  Cross-border payments have existed for centuries,

8  long before virtual currencies came into existence.  They can be facilitated in a myriad of ways.  No one

9  believes otherwise, including Mr. Garlinghouse.

10     This is readily apparent when his statement is *viewed* in context (by watching the video interview

11  in which he made it, as the Court may do for purposes of resolving this motion).[4]  Plaintiff's repeated

12  reliance on the phrase "it's required", Opp. at 4-7, 15, reveals the weakness of his position.  Not only did

13  Mr. Garlinghouse use the phrase only once during a live, unscripted interview that ran nearly ten minutes,

14  he actually abandoned this line of thought in real time: ". . . because it is required, it's, it's something that

15  can really reduce the friction . . . and we are talking about a multi-trillion dollar problem."  Mr.

16  Garlinghouse's comments conveyed the uncontroversial view that, as a general matter, a product is more

17  valuable if it solves an important challenge facing businesses.  The idea that any reasonable viewer would

18  interpret Mr. Garlinghouse to mean that XRP is *required* for cross-border transactions is not credible.

19     The FAC further undermines Plaintiff's position because allegations in the FAC support, rather

20  than rebut, the notion that XRP has utility.  Dkt. 102 ("Mot.") at 6.  For example, to support his securities

21  claims, Plaintiff alleges that "[t]he development of the XRP Ledger and the success of XRP are dependent

22  on Defendants' technical, entrepreneurial, and managerial efforts."  FAC ¶ 104.  These efforts include

23  ensuring the "speed, uptime, and scalability" of the XRP Ledger so that "XRP is the most trusted

24  enterprise-grade digital asset."  *Id.* ¶ 106.  According to Plaintiff, these efforts also include expanding

25  xRapid, which furthers the "long-term goal" of increasing "usage of XRP as a liquidity solution for more

27  _____
    [4]  A link to the full video interview is being submitted herewith, Declaration of Maxwell V. Pritt
28  ("Pritt Decl.") ¶ 2 (relevant statement at 3:00 minute mark), and a copy of the full video will be lodged
    with the Court, Pritt Decl. Ex. A.

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH

1    and more corridors[.]" *Id.* ¶ 107.  But if XRP lacks even a *theoretical* use, as Plaintiff now contends, Opp.

2    at 4, then these efforts are all for naught, which, if true, would defeat Plaintiff's securities claims.

3           Plaintiff attempts to rescue his FAC from these contradictions by claiming that he may plead "as

4    many separate claims or defenses as [he] has, regardless of consistency" and that he pleads the Fraud

5    Claims in the alternative.  Opp. at 8.  This is true, but immaterial.  The issue is not that Plaintiff asserts

6    alternative legal theories, but that he alleges inconsistent facts, which is impermissible.  *Phleger v.*

7    *Countrywide Home Loans, Inc.*, 2008 WL 65771, at *4 (N.D. Cal. Jan. 4, 2008) ("The difficulty here is

8    not that [plaintiff] is asserting an alternative theory, but that within the alternative claim she is asserting

9    internally inconsistent facts.").

10          In sum, Plaintiff cannot predicate his Fraud Claims on the alleged misrepresentations concerning

11   XRP's utility, FAC ¶¶ 41-42, 47, because he has not shown these statements to be false.  Plaintiff now

12   argues for the first time that XRP has no utility at all, but he never alleged as much in the FAC.  What

13   Plaintiff actually alleged, *id.* ¶¶ 43, 48, suggests only that, in 2017, some XRP was not being used to settle

14   financial transactions.  But Plaintiff does not allege that Ripple or Mr. Garlinghouse ever said otherwise

15   (and Plaintiff surely scoured the internet for examples).[5]

16          **B.    Mr. Garlinghouse's Statements About Holding and Being "Long" XRP**

17          Plaintiff next takes issue with a December 2017 statement by Mr. Garlinghouse that he was "long

18   XRP as a percentage of [his] personal balance sheet" and that he was "on the HODL side."  FAC ¶ 52.

19   Plaintiff construes this statement to mean that Mr. Garlinghouse "was long on XRP and therefore holding."

20   Opp. at 9.  The statement is false, Plaintiff contends, because "Mr. Garlinghouse was not actually long on

21   or holding XRP."  *Id.*

22          [5]   Several of the alleged statements relied on by Plaintiff are also non-actionable statements of
23   opinion.  Specifically, Mr. Garlinghouse's statements to Forbes and BNN, Opp. at 4 (citing FAC ¶ 41),
     and Ripple's December 21, 2017 tweet, *id.* (citing FAC ¶ 47), set forth the opinion that XRP will have
24   more value if it can "solv[e] a real problem."  Contrary to Plaintiff's position, *id.* at 7, this prediction is
     not predicated on Ripple's "special knowledge" as to XRP's utility.  Even the casual observer would know
25   that a virtual currency that facilitates fast, reliable, and secure cross-border settlements would, in the long
     run, be more valuable than one that does not.  Nor do these statements of opinion "imply[] nonexistent
26   factual bases," Opp. at 7, as, again, these statements are conditional claims: "*if* [digital tokens] are solving
     a real problem . . . then there will be demand for the tokens and the price will go up," FAC ¶ 42 (quoting
27   statement to BNN).  *See Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469-70 (2014) (holding that
28   "a prediction about future market conditions" can never be actionable).

**REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT**
**CASE NO. 18-cv-06753-PJH**

1     The Court previously dismissed this claim because Plaintiff failed to explain how or why the

2     statement is false.  Dkt. 85 at 33-34.  To remedy this deficiency, Plaintiff relies on a single paragraph of

3     the FAC, which alleges that Mr. Garlinghouse sold 67 million XRP in 2017 and that some of these sales

4     purportedly occurred shortly after he obtained the XRP.  FAC ¶ 53.  But Mr. Garlinghouse's alleged sale

5     of 67 million XRP in 2017 does not establish the broader claim that he "was not actually long or holding

6     XRP" in December 2017.  Even assuming the allegation is true, Mr. Garlinghouse, Ripple's CEO, could

7     plausibly have sold 67 million XRP in 2017 while continuing to "hold" XRP.  The two statements are not

8     inconsistent, let alone contradictory (a fact Plaintiff concedes, Opp. at 9).  Because Plaintiff offers no other

9     theory of falsity, he cannot predicate his Fraud Claims on this alleged misrepresentation.

10    Plaintiff objects that he is being asked to plead "Mr. Garlinghouse's exact XRP holdings."  Opp.

11    at 9.  This misunderstands the point.  Plaintiff does not need to plead (or even know) Mr. Garlinghouse's

12    XRP holdings.  But he must explain *why* Mr. Garlinghouse's alleged XRP sales in 2017 render false or

13    misleading Mr. Garlinghouse's claim that he was holding XRP at the end of that year.  The alleged sales

14    themselves, without more, are inadequate.  If Plaintiff had a colorable reason to believe that, as a result of

15    the alleged sales, Mr. Garlinghouse no longer held XRP at the end of 2017, Plaintiff would have alleged

16    as much.  But he did not do so.  The Court should not infer what Plaintiff could not and did not credibly

17    plead.  *See Tesla*, 2019 WL 1332395, at *5-7 (dismissing amended complaint with prejudice where

18    plaintiff's securities fraud claims depended on "unreasonable inferences").

19    Finally, without explanation, Plaintiff asserts that Mr. Garlinghouse's statement, even if true, has

20    "a capacity, likelihood or tendency to deceive or confuse the public."  Opp. at 9.  But Plaintiff offers no

21    reason and pleads no facts regarding how Mr. Garlinghouse's statement could confuse the public if it is

22    true.  This conclusory argument should be rejected.

23    **C.     CNBC Statement**

24    Plaintiff's next supposed basis for his Fraud Claims—a January 17, 2018 tweet by Mr.

25    Garlinghouse that linked to a CNBC article and described the article as a "good read"—likewise fails.

26    Plaintiff concedes (as he must) that Mr. Garlinghouse's opinion of the CNBC article is not actionable.

27    Opp. at 9-10.  Nor does Plaintiff allege or argue that the article itself was false.  *Id.*  Instead, Plaintiff

28    focuses on the *title* of the CNBC article, entirely ignoring the contents of the article itself.  *Id.* at 10.  (The

7

1   irony should not be lost on the reader: Mr. Garlinghouse's tweet *encouraged* people to *read* the article,

2   which should have, if Plaintiff is to be believed, resolved any confusion.)

3         The Court previously rejected this purported misrepresentation because Plaintiff failed to allege

4   why it was false.  Dkt. 85 at 34.  Plaintiff now contends that the article's title (written by CNBC, not Mr.

5   Garlinghouse) "claimed Ripple was not cashing out hundreds of millions [of XRP] per month," when,

6   according to Plaintiff, "it is likely that Ripple sold over one hundred million dollars' worth of XRP during

7   the month' immediately prior to the article's publication."  Opp. at 10 (citing and quoting FAC ¶¶ 56-57).

8   But this claim is undermined by the article *and* surrounding allegations in the FAC.

9         To begin, the article details Ripple's sales of XRP throughout 2017 and into the start of 2018.

10   Specifically, the article states that "the company brought in over $90 million in the first three quarters of

11   2017," and that it likely "raised more than $75 million in the fourth quarter."  Dkt. 103-4 at 3.  The article

12   continues by noting that, if Ripple's sales continued apace, "it would have raised . . . another $150 million

13   just in the first half of January."  *Id.*  Thus, contrary to Plaintiff's argument, the article discusses (and

14   thereby *discloses*) the potential value of Ripple's XRP sales, even if the article then speculates that such

15   a high volume of sales is unlikely.  Because Mr. Garlinghouse's tweet *encouraged* his followers to read

16   the article (not just the headline), this cannot possibly serve as a predicate for Plaintiff's Fraud Claim.

17         The FAC further confirms the apparent veracity of the article and its title.  First, the FAC alleges

18   that in the fourth quarter of 2017, Ripple sold approximately $91 million of XRP.  FAC ¶ 37.  To state the

19   obvious, because $91 million is less than $100 million, this allegation precludes Plaintiff's argument that

20   the title of the article (which implied sales of less than $100 million per month) is false.  Second, the FAC

21   also alleges that in the first quarter of 2018, Ripple sold approximately $167 million of XRP over a three-

22   month period.  *Id.* ¶ 36.  But this volume of sales is entirely consistent with the title of the CNBC article

23   (which, again, simply suggested *monthly* sales of less than $100 million).  Nor does Plaintiff's belated act

24   of contortion, Opp. at 10, n.7 (defining "month" as the period from December 17, 2017 to January 17,

25   2018), rescue Plaintiff's claim.  As pleaded, the FAC alleges that Ripple's average monthly sales of XRP

26   from October 2017 through March 2018 was roughly $43 million, a sum that is entirely consistent with

27   the implication of the CNBC article and its title.  In short, Plaintiff's own allegations preclude his theory

28   of falsity as to the CNBC article.

1    Plaintiff's argument is also wrong on the law.  While Plaintiff refuses to accept case law holding

2    that a tweeted link to an article does not render one liable for the title thereof or content therein, Mot. at

3    9, he cites no California authority to the contrary, Opp. at 10.  In reciting language from the California

4    Codes, Plaintiff establishes only that statements made over the Internet may produce liability.  *Id.*  But the

5    issue here is not whether Mr. Garlinghouse's statement is actionable because it is a tweet; rather, it is

6    whether liability can result from linking to an article with a headline that Plaintiff alleges was misleading.

7    Plaintiff cites no authority to establish that Mr. Garlinghouse can be held liable for CNBC's statements

8    under California law, and persuasive authority cited by Defendants indicates he cannot be, Mot. at 9.

9    Finally, for many of the same reasons, Plaintiff's suggestion (made at Paragraph 57 of the FAC

10   and now seemingly abandoned in his Opposition brief) that Mr. Garlinghouse's tweet was misleading by

11   omission likewise fails.  *See Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D. Cal. 2009)

12   (stating a plaintiff "must describe the content of the omission and where the omitted information should

13   or could have been revealed.").  This theory fails because the information Plaintiff claims Mr.

14   Garlinghouse should have disclosed is contained in the article linked in his tweet.  Mot. at 10.

15       **D.    Statements Allegedly Conflating Ripple Enterprise Solutions and XRP**

16   Plaintiff's last-ditch effort to salvage his Fraud Claims depends on a smattering of statements that

17   Plaintiff asserts "conflate adoption of Ripple's enterprise solutions with adoption and use of XRP."  Opp.

18   at 11.  According to Plaintiff, "[t]hese statements create an impression that adoption of Ripple Enterprise

19   Solutions by financial institutions will drive demand for XRP and thereby allow investors to profit by

20   holding XRP."  FAC ¶ 76.  Plaintiff claims this is false or misleading because "few, if any, of those

21   customers were actually using XRP."  *Id.*

22   Plaintiff's theory of falsity fails.  Plaintiff once again confuses *present usage* with *future potential*.

23   Plaintiff never alleges that adoption of Ripple's enterprise products would not, in fact, make it more likely

24   that these enterprise customers would use XRP in the future.  And, as discussed in the context of the

25   statements regarding XRP's utility, *supra* at pp. 3-6, Plaintiff has never alleged that XRP lacks utility or

26   that financial institutions cannot use XRP for a variety of purposes.  Therefore, Plaintiff's allegation that

27   "few" enterprise customers were actually using XRP does not render Ripple's statements false.

28

1    The "ten statements" on which Plaintiff purports to rely, Opp. at 11, are also individually deficient

2  for a variety of reasons:

3        1.  An alleged March 20, 2017 tweet by Ripple that linked to a Bloomberg article and stated,
              "Ripple is the only company in this space with real customers who are really in production."
4              FAC ¶ 64.

5        2.  An alleged March 24, 2017 tweet by Ripple stating: "The price of #XRP continues to surge
              showing that people are looking for #bitcoin alternatives."  *Id.* ¶ 65.
6

7        Plaintiff claims that Ripple's tweet on March 20, 2017 conflates "Ripple enterprise solutions with

8  adoption of XRP because it failed to disclose that the customers referenced were not XRP customers but

9  rather enterprise solutions customers."  Opp. at 11.  But, by this logic, Ripple would be required to mention

10  XRP anytime it mentions its enterprise customers, and vice-versa.  That is nonsensical and is not the law.

11  Plaintiff has also failed to allege (because he cannot) that Ripple lacked "real customers" and that such

12  customers were "really in production."  Plaintiff has not established that anything about the March 20

13  tweet is false or misleading.

14        Plaintiff likewise fails to allege or explain why the subsequent March 24 tweet is false: nowhere

15  does he allege that the price of XRP was not surging on that date or that prospective customers were not

16  looking for alternatives to bitcoin.  Instead, Plaintiff attempts to *create* confusion where there is none by

17  drawing a link between two entirely separate tweets.  Opp. at 11 (claiming the March 24 tweet "provides

18  additional context" for the March 20 tweet).  There is simply no reason why these two tweets, posted days

19  apart with no discernable link between them, should be read together—and Plaintiff offers none.

20
        3.  An alleged April 26, 2017 tweet by Ripple stating "#Ripple welcomes 10 additional customers
21            to our #blockchain #payments network."  FAC ¶ 66.  The tweet linked to an article on Ripple's
              website confirming that the new customers would be using Ripple's "enterprise blockchain
22            solution."  *Id.*

23        Plaintiff once again asserts that this tweet is misleading because "it did not specify that the

24  additional customers referenced were xCurrent customers—not XRP customers."  Opp. at 12.  But, as

25  noted, this is nonsensical: nothing about the tweet references XRP and Ripple is not obligated to mention

26  or disavow XRP anytime it promotes its enterprise software solutions.  Moreover, even if that *were* the

27  standard, Plaintiff concedes the linked article resolves the confusion.  *Id.* (conceding that the article

28  references "Ripple's enterprise blockchain solution").  Plaintiff appears to take issue with the fact that

1   Ripple did not make this kind of disclosure repeatedly in a relatively short press release.  But Plaintiff

2   provides no authority that such cumbersome, redundant, and irrelevant disclosure is required.  As to the

3   actual content of the tweet, Plaintiff has not alleged that it is false: Plaintiff never alleges that Ripple did

4   not add new customers on this date or that those customers were not joining Ripple's payment network.

5       4.  An alleged May 3, 2017 tweet by Ripple stating, "#Ripple adoption is sparking interest in XRP

6           'which has had an impressive rally in the last two months' via @Nasdaq."  FAC ¶ 67.  The
        tweet links to a Nasdaq article, which posits that widespread adoption of the Ripple network

7           has "sparked interest" in XRP.

8       Plaintiff misreads this statement by inferring a causal relationship between "#Ripple adoption"

9   and XRP's "impressive rally in the last two months."  But the statement assumes no such relationship.

10  Instead, it merely states that "#Ripple adoption" is "sparking interest in XRP," and then, separately, quotes

11  the Nasdaq article to add that XRP has had an "impressive rally."  The statement does not offer a causal

12  explanation for XRP's "impressive rally," but makes only the uncontroversial claim that "#Ripple

13  adoption is *sparking interest*," which is a claim that is unverifiable (as "interest" could refer to any number

14  of things, including press coverage, new customers, or the attention of crypto enthusiasts).  *See In re*

15  *Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *9 (N.D. Cal. Apr. 28, 2020) ("An actionable statement

16  must also 'be capable of objective verification.'") (citation omitted).

17      Plaintiff also fails to establish falsity.  To begin, Plaintiff now concedes that the price of XRP was

18  increasing in May 2017.  Opp. at 12, n.9.  Instead, Plaintiff's theory of falsity appears, again, to be

19  premised on the tweet's causal attribution: that "#Ripple adoption" was creating demand for XRP "in the

20  last two months."  Opp. at 12.  But the Nasdaq article linked in the tweet explains that "the Ripple network

21  is experiencing adoption by a large number of financial institutions to process domestic and cross-border

22  payments."  Pritt. Decl., Ex. B.  Plaintiff's limited allegation that "few, if any, of those customers were

23  using XRP" falls far short of rendering Nasdaq's reporting false.  Finally, as discussed, *supra* at p. 9 and

24  Mot. at 9, Ripple cannot be liable for tweeting a link to an article it did not author.

25      5.  An alleged May 16, 2017 tweet by Ripple stating, "The appeal that Ripple has towards

26          traditional financial institutions is a big advantage it has over Bitcoin."  FAC ¶ 68.

27      Plaintiff alleges this tweet is false because it suggests that XRP "was appealing to traditional

28  financial institutions *and therefore [was] being adopted*."  Opp. at 13 (emphasis added).  But the tweet is

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH

1   silent as to XRP's adoption rate, so that cannot establish falsity.  Plaintiff's theory thus depends on whether

2   the comparative statement that XRP is more appealing to financial institutions than bitcoin is actionable

3   and false.  It is neither.  Comparative statements, like this one, are non-actionable statements of puffery.

4   Mot. at 12 (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.

5   1999)).  Nor has Plaintiff alleged this statement to be false.  As discussed, *supra* at pp. 3-6, Plaintiff has

6   not alleged that XRP lacks utility or that XRP and bitcoin are functionally identical such that a financial

7   institution would not (or could not) prefer the former over the latter.

8          Plaintiff argues this statement is actionable, despite the fact that it is a statement of opinion and

9   nonactionable puffery, because Ripple supposedly possesses "superior knowledge."  Opp. at 13.  But

10  Plaintiff has not alleged facts showing Ripple has superior knowledge regarding the relative advantages

11  of different cryptocurrencies, which is what this statement is commenting on.  *See Coastal Abstract*, 173

12  F.3d at 731 (holding that statement about a competitor's weaknesses "was exactly the kind of 'puffery'

13  that does not qualify as a statement of fact capable of being proved false."); *Cook, Perkiss & Liehe, Inc.*

14  *v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) ("Advertising which merely states in

15  general terms that one product is superior is not actionable.").

16              6.  An alleged June 29, 2017 tweet by Ripple stating, "#XRP—up 4000% this year—has shown
                    the market favors a real case for #digitalassets[.]"  FAC ¶ 69.  The tweet links to an interview
17                  with Mr. Garlinghouse on CNBC where he allegedly states that "digital assets are in a position
18                  to be more valuable than gold," and stated that XRP is "solving a real-world use case."  *Id.*

19         Here, Plaintiff's theory of falsity retreads a familiar (but still unsound) claim: "XRP has no such

20  utility."  Opp. at 13 (citing FAC ¶¶ 43, 48).  Thus, Plaintiff asserts, "by linking XRP's increasing value to

21  solving a real-world problem," Ripple has "conflated adopting enterprise solutions with adopting XRP."

22  *Id.* (citing FAC ¶ 76).  This syllogism fails because Plaintiff has never alleged that XRP lacks utility.

23  *Supra* at pp. 3-6.  Moreover, Plaintiff has not (and cannot) allege that, as of June 29, 2017, XRP was not

24  up "4000%" for the year, as the tweet states.  To the extent the tweet purports to attribute that increase to

25  a particular cause, it is a statement of unverifiable opinion that cannot serve as the predicate for Plaintiff's

26  Fraud Claims.  *See In re Eventbrite*, 2020 WL 2042078, at *9 ("An actionable statement must also 'be

27  capable of objective verification.'"); *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) ("[I]f it is

28  plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise,

---

12

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH

1   rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.").

2       7.  An alleged September 11, 2017 statement by Mr. Garlinghouse that "People are

3                looking at the success Ripple has been having as a company, and I think that's increased

4                the value of XRP" and that Ripple wanted "to keep focusing on making XRP a valuable
             payments tool, and that value will increase accordingly," and that Mr. Garlinghouse
             was "voting with [his] . . . pocketbook on the future increased value of

5                cryptocurrencies." FAC ¶ 70.

6           Plaintiff concedes that the first half of this statement—regarding Ripple's success and Mr.

7   Garlinghouse's personal belief as to the drivers of XRP's price increase—is opinion. Opp. at 14. The

8   same is true as to Ripple's desire to "keep focusing on making XRP a valuable payments tool," and the

9   company's subjective belief that "value will increase accordingly." *Id.* ("Defendants are correct that his

10   statement concerning the increased value of XRP was an expression of opinion."). Nevertheless, Plaintiff

11   contends this statement of opinion is actionable "because Mr. Garlinghouse had superior knowledge

12   concerning XRP, its utility, and its adoption (or lack thereof)." *Id.* While certain (but not all) statements

13   of opinion may be rendered actionable based on "superior knowledge," this rule does not absolve Plaintiff

14   from alleging why the opinion is false. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248,

15   1265-66 (N.D. Cal. 2000) (holding a plaintiff must plead with particularity *why* a statement of opinion

16   was false to plead an actionable opinion statement and satisfy Rule 9(b)). Plaintiff has not done so, and

17   thus Mr. Garlinghouse's statement of opinion—whether actionable or not—cannot serve as the predicate

18   for Plaintiff's Fraud Claims. Even if Plaintiff had, however, "[s]tatements or predictions regarding future

19   events are deemed to be mere opinions which are not actionable," and, in particular, "[a]ny future market

20   forecast must be regarded not as fact but as prediction or speculation." *Cansino v. Bank of Am.*, 224 Cal.

21   App. 4th 1462, 1469-70 (2014) (acknowledging defendant's "superior knowledge" but holding that "a

22   prediction about future market conditions" can *never* be actionable).

23           As to the remainder of the statement—which concerns Mr. Garlinghouse's personal investment in

24   cryptocurrencies—Plaintiff fails to identify factual allegations that render it false. Plaintiff relies entirely

25   on Paragraph 53 of the FAC, Opp. at 14 (citing only FAC ¶ 53), but that allegation is inadequate for the

26   reasons set forth earlier, *supra* pp. 6-7. Thus, this statement cannot support Plaintiff's Fraud Claims.

27       8.  An alleged November 27, 2017 tweet by Mr. Garlinghouse stating, "Ripple & $XRP are giving

28                businesses 'what they want in a #blockchain,'" and linking to a Motley Fool tweet. FAC ¶ 71.

1    The Court previously held that this statement could not support Plaintiff's Fraud Claims because
2    he failed to "explain how or why" it was false.  Dkt. 85 at 35.  In the FAC, Plaintiff adds only a single
3    new allegation, FAC ¶ 76, which alleges that this statement "falsely conflate[s] adoption of Ripple
4    Enterprise Solutions with adoption and use of XRP," despite the purported reality that "few, if any" of
5    Ripple's enterprise customers use XRP.  But the Motley Fool article (linked to in the tweet), expressly
6    states that "the partnership may open the door for Ripple's virtual currency, XRP, to play a role *down the*
7    *road*."   Thus, the tweet and the article do not speak to XRP's *current usage* in connection with the
8    Company's product suite, but instead offer an opinion as to how Ripple's enterprise products and XRP
9    may work in tandem in the future.

10       As to Mr. Garlinghouse's statement in his tweet that "Ripple & $XRP are giving businesses 'what
11   they want in a #blockchain,'" this statement does nothing more than state that Ripple and XRP are "giving
12   businesses what they want," which is non-actionable puffery.  *Elias v. Hewlett-Packard Co.*, 950 F. Supp.
13   2d 1123, 1132 (N.D. Cal. 2013) (statement that a product "delivers the power you need" is non-actionable
14   puffery).

15
16       9.  An alleged December 14, 2017 tweet by Ripple stating, "The Japan Bank Consortium launched
           a Ripple pilot with two large Korean banks—the first time money moves from Japan to Korea
17         over RippleNet."   FAC ¶ 72.   The tweet linked to an article on Ripple's website which
           explained that RippleNet refers to Ripple's xCurrent enterprise product.  *Id.*

18       10. An alleged December 14, 2017 tweet by Ripple linking to a BNN interview with Mr.
19          Garlinghouse in which he allegedly stated "the reason why XRP has performed so well this
           year, we're solving a real problem, it's a multi-trillion dollar problem around cross-border
20         payments.   There is a lot of friction it's very slow it's expensive, we're working with
           institutions to deal with that, so people got excited.  We now have over 100 customers we've
21         announced publicly." *Id.* ¶ 74.  Plaintiff further alleges that Mr. Garlinghouse stated in the
           same interview that "at the end of the day, the value of digital assets will be driven by their
22         utility.  If they are solving a real problem, and that problem has scale, and that problem, you
           know there is real value there, then there will be demand for the tokens and the price will go
23         up.  For XRP we have seen because it's required, it's something that we can really reduce the
           friction, and we're talking about a multi-trillion dollar problem in how cross-border payments
24         flow.  And so, I think if you drive real utility, yes there's going to be demand for that."  "XRP
           is up 100x this year, and I think it's because the problem we are solving people realize is a
           problem, it's a big problem." *Id.* ¶ 75.
25

26       Plaintiff (again) seeks to manufacture falsity by lumping together two unrelated statements
27   discussing different topics tweeted out twelve hours apart.  *Compare* FAC ¶ 72, n.51 (tweet with
28   timestamp 6:51 PM) *with* FAC ¶¶ 72, 74 nn.52, 54 (tweet with timestamp 8:59 AM).  These statements

1   thus cannot support Plaintiff's Fraud Claims.

2        Plaintiff has not alleged that the substance of either tweet is false. Ripple's first tweet—sent at

3   8:59 AM on December 14, 2017—linked to Mr. Garlinghouse's BNN interview. FAC ¶¶ 72, 74. Plaintiff

4   takes issue with Mr. Garlinghouse's statements regarding XRP's utility. But as discussed, *supra* pp. 3-6,

5   Plaintiff has not and cannot allege that XRP lacks utility. Ripple's second tweet—sent nearly twelve hours

6   later, at 6:51 PM on December 14, 2017—announced the launch of the Japan Bank Consortium, which

7   marked "the first time money move[d] from Japan to Korea over RippleNet." FAC ¶ 72. Plaintiff has

8   never alleged that the Consortium was fictitious or that money did not move from Japan to Korea across

9   RippleNet. Nor is there a plausible argument that this tweet was likely to confuse, as it never mentioned

10  XRP and linked to an article that disclosed the pilot involved xCurrent, an enterprise product. *Id.*

11       Confronted with this reality, Plaintiff claims—without authority or explanation—that these two

12  tweets "should be read together, since that is how investors read them." Opp. at 15. Because Plaintiff

13  does not even attempt to support his position, the Court should decline to adopt it. However, even if the

14  Court were to do so, Plaintiff's argument still fails. Plaintiff's theory of falsity depends on the allegation

15  that "[f]ew, if any of [Ripple's] 100 [enterprise] customers were using XRP." Opp. at 16 (citing FAC ¶¶

16  75-76). As a result, Plaintiff contends, "Mr. Garlinghouse's statement [was] highly misleading in

17  context." *Id.* But this (again) confuses *present usage* with *future potential*. *See supra* at pp. 3-6. Thus,

18  Plaintiff has not shown *why* Mr. Garlinghouse's claim is false.

19  **IV.    PLAINTIFF'S FRAUD CLAIMS SHOULD BE DISMISSED WITH PREJUDICE**

20       Despite having now had two opportunities to plead viable Fraud Claims, Plaintiff requests a

21  third. Opp. at 17. The Court should deny his request because granting it would be futile. *See Metzler*

22  *Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008) ("[T]he district court's

23  discretion to deny leave to amend is particularly broad where plaintiff has previously amended the

24  complaint.") (citation omitted).

25  **V.    CONCLUSION**

26       Plaintiff has not cured the defects that led the Court to dismiss his Fraud Claims from his original

27  Complaint, Dkt. 85 at 40, and he has not met the heightened pleading requirements of Rule 9(b). These

28  defects are incurable, and the Fraud Claims should be dismissed with prejudice.

Dated: July 29, 2020                    Respectfully submitted,

                                         By:   */s/ Maxwell V. Pritt*
                                               Maxwell V. Pritt (SBN 253155)
                                               BOIES SCHILLER FLEXNER LLP
                                               44 Montgomery Street, 41st Floor
                                               San Francisco, CA 94104
                                               Telephone: (415) 293-6800
                                               Facsimile:  (415) 293-6899
                                               Email: mpritt@bsfllp.com

                                               Damien J. Marshall (Admitted *pro hac vice*)
                                               KING & SPALDING LLP
                                               1185 Avenue of the Americas, 34th Floor
                                               New York, NY 10036
                                               Telephone: (212) 556-2100
                                               Email: dmarshall@kslaw.com

                                               Menno Goedman (SBN 301271)
                                               BOIES SCHILLER FLEXNER LLP
                                               1401 New York Avenue, N.W.
                                               Washington, DC  20005
                                               Telephone: (202) 237-2727
                                               Facsimile: (202) 237-6131
                                               Email: mgoedman@bsfllp.com

                                               *Attorneys for Defendants Ripple Labs Inc.,*
                                               *XRP II, LLC, and Bradley Garlinghouse*

REPLY ISO MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 18-cv-06753-PJH