1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7    VLADI ZAKINOV, et al.,
8                  Plaintiffs,                  Case No. 18-cv-06753-PJH
9         v.
                                                **ORDER GRANTING IN PART AND
10   RIPPLE LABS, INC., et al.,                 DENYING IN PART MOTION TO
                                                DISMISS CONSOLIDATED FIRST
11                 Defendants.                  AMENDED COMPLAINT**

                                                Re: Dkt. No. 102, 103, 109
12
13          Before the court is Defendant Ripple Labs, Inc.'s ("Ripple"), defendant XRP II,

14   LLC's ("XRP II"), and Ripple's Chief Executive Officer, Bradley Garlinghouse

15   ("Garlinghouse") (collectively, "defendants") motion to dismiss plaintiff Bradley Sostack's

16   ("plaintiff") consolidated first amended complaint. Dkt. 102. Having read the parties'

17   papers and carefully considered their argument and the relevant legal authority, and good

18   cause appearing, the court hereby **GRANTS** in part and **DENIES** in part defendants'

19   motion to dismiss.

20                              **BACKGROUND**

21          This order addresses defendants' second motion to dismiss in a consolidated

22   putative class action ("In re Ripple") that arises out of the creation, dispersal, circulation,

23   and sale of "XRP," which is a sort of "cryptocurrency." This action's procedural posture is

24   nuanced and, except as noted below, does not bear on the instant motion.

25          On February 26, 2020, the court granted in part and denied in part defendants' first

26   motion to dismiss plaintiff's consolidated class action complaint (the "prior order"). Dkt.

27   85. The court denied that motion with respect to plaintiff's claims for defendants' alleged

28   offer or sale of unregistered securities in violation of federal and California state law. Id.

at 40. However, the court granted that motion with respect to the following claims alleged in plaintiff's initial complaint:

- Violation of California Corporations Code § 25501 against Ripple and XRP II, as well as a parallel material assistance claim under § 25504.1 against Ripple and Garlinghouse, for misleading statements made in connection with the offer or sale of securities as prohibited by § 25401 (the "fourth cause of action").

- Violation of California Business & Professions Code § 17500 against defendants for misleading advertisements concerning XRP (the "sixth cause of action").

- Violation of California Business & Professions Code § 17200 against defendants for their unregistered offer or sale of securities in violation of federal and state law, false advertising practices, misleading statements, and offense to established public policy (the "seventh cause of action").

The court dismissed these three causes of action (collectively, the "fraud claims") because plaintiff failed to satisfy Rule 9(b)'s heightened pleading requirements as they pertain to the alleged misstatements underlying such claims. Dkt. 85 at 32-36. At core, the court reasoned that plaintiff failed to explain how and why the subject statements were false. Id. While the court generally dismissed the fraud claims without prejudice, it dismissed the sixth and seventh of causes of action (jointly, the "Business & Professions Code fraud claims") with prejudice to the extent they rested on the theory that XRP was a security. Id. at 37-40. The court based that determination on established state decisional law finding that claims brought under those sections may not extend to actions that relate to securities transactions. Id. Having drawn that distinction, the court nonetheless permitted plaintiff an opportunity to amend his pleadings to comply with Rule 9(b)'s requirements for claims brought under those sections, provided that he do so under the alternative theory that XRP is not a security. Id. at 40.

On March 25, 2020, plaintiff filed his consolidated first amended complaint. Dkt. 87 ("CFAC"). Aside from further detailing the purported misstatements underlying the fraud claims, the CFAC's factual allegations are materially similar to those alleged in

2

plaintiff's initial complaint.  Dkt. 87-1 (redline demarcating pleading changes).  In his

CFAC, plaintiff identifies 17 alleged misstatements to substantiate his fraud claims.

Those statements fall into one of the following four categories of purported fraud:

- Defendants misrepresented XRP's "utility."  CFAC ¶¶ 41-42, 47-48.
- Defendants conflated the adoption and use of their enterprise solutions software with that of XRP.  Id. ¶¶ 64-75.
- Ripple misstated its XRP sales activity during the December 2017 through January 2018 period.  Id. ¶¶ 56-57.
- Garlinghouse misrepresented the scope and character of his XRP holdings.  Id. ¶¶ 51-53.

The particular wording of all 17 alleged misstatements is critical to decide this

motion.  Rather than listing them here, the court will detail each statement in its analysis.

## DISCUSSION

**A.    Legal Standard**

### 1.    Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8

requires that a complaint include a "short and plain statement of the claim showing that

the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is

proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege

sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953,

959 (9th Cir. 2013).  While the court is to accept as true all the factual allegations in the

complaint, legally conclusory statements, not supported by actual factual allegations,

need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint

must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

As a general matter, the court should limit its Rule 12(b)(6) analysis to the

contents of the complaint, although it may consider documents "whose contents are

3

1   alleged in a complaint and whose authenticity no party questions, but which are not

2   physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th

3   Cir. 2005); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a

4   document on which the complaint relies if the document is central to the plaintiff's claim,

5   and no party questions the authenticity of the document"). The court may also consider

6   matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668,

7   688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v.

8   Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents

9   referenced extensively in the complaint and documents that form the basis of the

10  plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding

11  Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

12          Lastly, a district court "should grant [a] plaintiff leave to amend if the complaint can

13  possibly be cured by additional factual allegations," however, dismissal without leave "is

14  proper if it is clear that the complaint could not be saved by amendment." Somers, 729

15  F.3d at 960.  Relevant here, the Ninth Circuit has recognized that in circumstances

16  "where plaintiff has previously amended the complaint," the district court's discretion to

17  deny further leave "is particularly broad."  Metzler Inv. GMBH v. Corinthian Colleges, Inc.,

18  540 F.3d 1049, 1072 (9th Cir. 2008).

19          2.      Rule 9(b)

20          For actions alleging fraud, "a party must state with particularity the circumstances

21  constituting fraud or mistake."  Fed. R. Civ. Pro. 9(b).  To satisfy Rule 9(b), a plaintiff

22  must allege "the 'time, place, and specific content of the false representations as well as

23  the identities of the parties to the misrepresentations.'" Swartz v. KPMG LLP, 476 F.3d

24  756, 764 (9th Cir. 2007).  "Averments of fraud must be accompanied by 'the who, what,

25  when, where, and how' of the misconduct charged," and "a plaintiff must set forth *more*

26  than the neutral facts necessary to identify the transaction. The plaintiff must set forth

27  what is false or misleading about a statement, and why it is false." Vess v. Ciba-Geigy

28  Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis in the original).  Plaintiff's

United States District Court
Northern District of California

4

1    allegations of fraud "must be specific enough to give defendants notice of the particular

2    misconduct which is alleged to constitute the fraud charged so that they can defend

3    against the charge and not just deny that they have done anything wrong."  Swartz, 476

4    F.3d at 764.

5    **B.    Analysis**

6         In their motion, defendants move to dismiss only the fraud claims, which, as

7    previously noted, comprise the CFAC's fourth, sixth, and seventh causes of action.

8    Defendants principally argue that plaintiff again failed to show how or why each of the

9    alleged misstatements is false.  Dkt. 102 at 10-11.  The court analyzes each alleged

10   misstatement per category of fraud below.

11        **1.    Statements Concerning XRP's Utility**

12        To substantiate the first basis for his fraud claims, plaintiff relies on five statements

13   by defendants concerning XRP's utility.  Plaintiff's theory of falsity for all five statements

14   is the same.  It rests on only two allegations, paragraph 43 and paragraph 48.  In

15   paragraph 43, plaintiff alleges that the subject statements are false because, when made,

16   approximately 60 percent of XRP was owned by Ripple and the "vast majority, if not all"

17   of the remaining forty percent of XRP was "not used for bridging international

18   transactions but for investment purpose."  In paragraph 48, plaintiff adds that "demand for

19   XRP from financial institutions did not represent a significant portion of the demand for

20   XRP and little, if any, XRP was used to 'help financial institutions source liquidity for

21   payments into and out of emerging markets.'"

22        It is important to clarify that this theory does not assert that the subject statements

23   are false because XRP could not, theoretically, serve a useful purpose (e.g., as a

24   surrogate for traditional currency).  Instead, as alleged in paragraphs 43 and 48, plaintiff

25   asserts that the subject statements are false because they impart the misleading

26   impression that XRP was, in practice, being widely used for such purposes.   Plaintiff

27   doubles down on that theory in his opposition brief.  Dkt. 105 at 9 ("Thus, Ripple touted

28   XRP's purported utility . . .  However, as Plaintiff alleges, XRP has no such utility. . . .

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1  Ripple also claimed that XRP's utility stemmed from its ability to help financial institutions

2  source liquidity, but Plaintiff alleges that XRP was seldom, if ever, used to source

3  liquidity.")  To be clear, then, the issue here is whether plaintiff adequately alleged why

4  each of the subject statements by defendants concerning XRP's utility ***in practice*** was, in

5  fact, false.[1]  The court analyzes that theory as it concerns each statement below.

6         ***First*** – In an October 23, 2017 interview published by a third-party, Garlinghouse

7  was asked "[w]hy do banks need XRP?"  CFAC ¶ 41.  In response, he stated that "[i]t's

8  about liquidity.  If you have a utility token like XRP that has a real value proposition."  Id.

9         Plaintiff failed to explain why any part of this statement is false.  With respect to

10  the first part of this statement, plaintiff's theory does not contest that XRP could help

11  banks source liquidity.  It simply explains that, in fact, XRP was not then-presently

12  serving that function.  The second part of this statement is phrased in the conditional

13  tense.  It sets forth an if-then proposition, which, plainly, falls short of saying that XRP ***is***,

14  in practice, solving liquidity problems.

15         ***Second*** – In an interview with a third-party and subsequently retweeted by Ripple

16  on December 14, 2017, Garlinghouse stated that "[i]f they [digital tokens] are solving a

17  real problem, and that problem has scale, and that problem, you know there is real value

18  there, then there will be demand for the tokens and the price of the tokens will go up. For

19  XRP we have seen because it's required, it's something that can really reduce the

20  friction, and we're talking about a multi-trillion-dollar problem in how cross-border

21  payments flow. And so, I think if you drive real utility, yes there's going to be demand for

22  that." Id.

23

24  [1] The court **DENIES** defendants' request that it take judicial notice of the Bureau of
    Consumer Financial Protection's ("BCFP") June 5, 2020 rule titled "Remittance Transfers
25  Under Electronic Fund Transfer Act." Dkt. 103-2.  Defendants proffer that document for
    the fact that XRP "***can be used*** to effect settlement of [cross-border] transfers."  Dkt. 102
26  at 11-12 (emphasis added).  Given that plaintiff does not contest such theoretical use, the
    rule's purported fact is irrelevant to this motion.  While plaintiff does not oppose
27  defendants' remaining three requests, Dkt. 104 at 2, the court need not consider their
    documents (Dkts. 103-3, 103-4, 103-5) to reach its determination on this motion.  Thus,
28  the court **DENIES** defendants' request as it pertains to those documents as well.

1    Plaintiff failed to explain why this statement is false.  The first part of this statement

2    is phrased in the conditional tense and, again, plaintiff's theory of falsity does not

3    challenge the veracity of its if-then proposition.

4    Contrary to plaintiff's mischaracterization, the second part of this statement does

5    not assert that Garlinghouse stated that "he had seen that XRP is required to solve a real

6    multi-trillion-dollar problem." Dkt. 105 at 10.  Rather, this part asserts that defendants

7    "have seen" that XRP is "something that can really reduce the friction" for cross-border

8    payments.  CFAC ¶ 41.  By plaintiff's own allegation, that assertion is not false.  Id. ¶ 43

9    (implicitly acknowledging that some XRP has been "used for bridging international

10   transactions").  Regardless, any assertion that XRP is "required" (albeit for cross-border

11   payments or otherwise) is plainly puffery: the world (and global commerce) has operated

12   without XRP for centuries.[2]

13   The third part of this statement is also phrased in the conditional tense and, yet

14   again, plaintiff fails to challenge the veracity of the third part's proposition that the

15   demand for XRP will increase as a function of XRP's actual usefulness.  Moreover,

16   Garlinghouse's "I think" qualifier turns this part into an opinion, which, generally, is not

17   actionable.

18   To be sure, the court understands plaintiff's repeated fallback position that any

19   "opinions" by defendants are nonetheless actionable because they possess superior

20   knowledge concerning the content of the statements at hand.  To support that position,

21   plaintiff rests heavily on the California Court of Appeals for the First District's decision in

22   Public Employees' Retirement System v. Moody's Inv'rs Serv., Inc., 226 Cal. App. 4th 643

23   (2014).  In it, then-Justice Jenkins recognized the following under California law:

24      "Under certain circumstances, expressions of professional
         opinion are treated as representations of fact," such as "when
25      a party possesses or holds itself out as possessing superior
         knowledge or special information or expertise regarding the
26

27   ────────────────

28   [2] Since the court need not consider the full December 14, 2017 interview to reach this
     determination, it will not rule on plaintiff's objection to defendants' proffering that interview
     as part of their reply.  Dkt. 109.

United States District Court
Northern District of California

1

2

subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact." Id. at 662.

3      However, plaintiff's reliance on <u>Public Employees' Retirement System</u> is

4  misplaced.  In that case, the court applied the special knowledge exception to credit

5  ratings for certain special investment vehicles ("SIVs") implicated in the 2008 financial

6  collapse **only after** plaintiff proffered "several declarations" to "support its theory that

7  ratings are more akin to deliberate affirmations of fact based on special knowledge or

8  expertise than mere opinions or predications."  Id.  As thoroughly detailed in that court's

9  decision, those declarations revealed an exceptionally complex rating process in an

10  industry "shrouded in secrecy," id. at 662-63, thus justifying finding that the defendant

11  rating agencies "published ratings from a position of superior knowledge, information, and

12  expertise regarding the SIVs' composition, underlying structure, and function that was not

13  generally available in the market," id. at 664.

14      Plaintiff, on the other hand, proffers a "<u>see</u>" citation to this decision and, based on

15  it, asserts that the third part of this statement qualifies as an actionable opinion because

16  defendants "ha[ve] special knowledge concerning XRP's true utility." Dkt. 105 at 11.

17  Such a lackadaisical showing, repeated throughout the CFAC and opposition brief as it

18  pertains to various other alleged misstatements, is insufficient to invoke the superior

19  knowledge exception.  Moreover, even on the merits, it does not appear that the opinion

20  portion of this statement was based on non-public information or special expertise.  As

21  defendants point out, Dkt. 106 at 10 n.5, any intelligent observer could reason that a

22  fungible device capable of crossing borders quickly and securely as a medium of

23  exchange might serve a valuable function for those engaged in international transactions.

24      **Third** – In a December 27, 2017 interview with a third-party, Garlinghouse stated

25  that "we use XRP to settle liquidity between banks."  Id.

26      Again, plaintiff's own allegations undermine his argument that this statement is

27  false.  CFAC ¶ 48 ("demand for XRP from financial institutions did not represent a

28  significant portion of the demand for XRP **and little, if any,** XRP was used to 'help

8

financial institutions source liquidity for payments . . . '") (emphasis added).  Indeed, paragraph 48 substantiates Garlinghouse's assertion concerning XRP's use because it implicitly acknowledges that at least some XRP had then been used for liquidity.  If plaintiff meant to allege that no XRP has ever been used for liquidity, he could have done so.  He did not, and the court will not read that allegation into his pleadings.

 *Fourth* – In a February 14, 2015 submission to the Conference of State Bank Supervisors subsequently reposted on its website, Ripple's Chief Compliance Officer, Karen Gifford ("Gifford") stated in relevant part that XRP "is designed to be used directly by (1) banks and financial services business, (2) payment networks, and (3) liquidity providers."  Id. ¶ 42.

 As an initial matter, plaintiff distorts Gifford's statement when arguing its falsity.  Dkt. 105 at 10 ("Ms. Gifford explained to the Conference of State Bank Supervisors XRP's present design and use case . . . and how XRP is designed and used is objectively verifiable.").  Plainly, Gifford's statement does not address the status of XRP's use by third-parties.  Instead, this statement concerns the persons by whom XRP is *designed* to be used.  Thus, plaintiff's theory of falsity (i.e., XRP, in practice, was not being widely used) says nothing about the veracity of defendants' assertion that they developed XRP for use by banks and other financial services providers.

 *Fifth* – On December 21, 2017, Ripple tweeted a link to an article that stated in relevant part that "XRP's long-term value is determined by its utility—including its ability to help financial institutions source liquidity for payments into and out of emerging markets."  Id. ¶ 47.

 Again, plaintiff's theory of falsity does not explain why this statement is false.  In laymen's terms, this statement stands for the proposition that the long-term value of XRP depends on its use.  The allegations that XRP was not being used in practice does not establish that the subject proposition is false.  Plaintiff's attempt to distort this statement, Dkt. 105 at 10 ("Ripple's tweeted article claimed that XRP has utility in helping financial institutions source liquidity . . . which is verifiable"), does not salvage this shortcoming.

9

In short, the court concludes that plaintiff failed to adequately allege why any statement by defendants concerning XRP's utility is false.  Accordingly, these statements fail Rule 9(b)'s specificity requirements and may not serve as a basis for the fraud claims.

### 2. Statements Concerning Ripple's Enterprise Solutions Software and Its Relationship to XRP

To substantiate the second basis for his fraud claims, plaintiff relies on ten statements by defendants concerning the adoption and use of Ripple's enterprise solutions software and XRP.  Plaintiff asserts that the first and second statements as well as the ninth and tenth should, respectively, be read together.  Plaintiff argues that the remaining six statements each serve as an independent basis for the fraud claims.  While plaintiff proffers various specific arguments to show why each statement is false or misleading, his alleged theory of falsity for all ten statements is that they "conflate adoption of Ripple Enterprise Solutions with adoption and use of XRP" and, relatedly, "create an impression that adoption of Ripple Enterprise Solutions by financial institutions will drive demand for XRP and thereby allow investors to profit by holding XRP."  Id. ¶ 76.  The court details and analyzes each statement below.

*First* – On March 20, 2017, Ripple published a previously tweeted article written by a third-party concerning the adoption of Ripple's enterprise solutions software.  CFAC ¶ 64.  In its tweet, Ripple stated that it "is the only company in this space with real customers who are really in production."  Id.  Plaintiff argues that this tweet was misleading "because it failed to disclose that the customers referenced were not XRP customers but rather enterprise solutions customers."  Dkt. 105 at 15.

*Second* – On March 24, 2017, Ripple published a tweet stating that "[t]he price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."  Id. ¶ 65.  Plaintiff proffers this statement to show that "Ripple reinforced investors' false association of XRP's value with adoption of Ripple's enterprise solutions."  Dkt. 105 at 15.

Plaintiff failed to show how these statements conflate the software and XRP and why, in fact, they are false.  The first statement makes no explicit reference to XRP.  The

United States District Court
Northern District of California

1    court also does not see a basis to infer that its reference to "this space" implies the

2    cryptocurrency market or its use of the unqualified term "customers" necessarily means

3    XRP purchasers.  Both terms are vague and, when construed with the referenced article,

4    suggests the market for payment software (i.e., Ripple's enterprise solutions software).

5    Indeed, by plaintiff's own allegation, that article concerned the "adoption of Ripple

6    Enterprise Solutions."  CFAC ¶ 64.

7         The second statement does not remedy those shortcomings.  While it concerns

8    XRP, it says nothing about the software.  To the extent plaintiff invites the court to read

9    the first and second statements in combination, the court declines.  Plaintiff failed to

10   articulate any specific reason (or authority) to support such a construction and these

11   statements concern distinct topics published days apart.  Accordingly, these statements

12   may not serve as bases for the fraud claims.[3]

13        ***Third*** – On April 26, 2017, Ripple published a tweet linking to an article on its

14   website stating that "#Ripple welcomes 10 additional customers to our #blockchain

15   #payments network."  CFAC ¶ 66.  Plaintiff argues that this tweet was misleading

16   "because it did not specify that the additional customers referenced were xCurrent

17   customers—not XRP customers. Nor did the article specify that the additional customers

18   were xCurrent customers rather than XRP customers."  Dkt. 105 at 16.

19        The court disagrees with plaintiff's explanation for how this statement is

20   misleading.  Again, this statement does not make any explicit reference to XRP and its

21   use of the terms "#blockchain" and "#payments network" is vague.  In a vacuum, the

22   "#blockchain" reference might suggest that the statement implicitly referenced XRP.

23

24   ─────────────────────
     [3] Throughout their briefing, defendants repeatedly argue that plaintiff does not assert that
25   ***the content*** of the statements alleged in this category are, in fact, false.  See, e.g., Dkt.
     106 at 14 ("Plaintiff likewise fails to allege or explain why the subsequent March 24 tweet
26   is false: nowhere does he allege that the price of XRP was not surging on that date or
     that prospective customers were not looking for alternatives to bitcoin.").   Of course, as
27   shown at CFAC ¶ 76, plaintiff's theory of falsity is ***not*** that the content of the purported
     misstatement is itself inaccurate.  Instead, his theory is that defendants were engaged in
28   a sort of shell game when publicly referring to the software and XRP.  Accordingly, the
     court disregards this entire line of argument.

United States District Court
Northern District of California

1    However, the reasonableness of any such suggestion is belied by plaintiff's immediately

2    preceding allegation, which shows that defendants previously used "#XRP" in their tweets

3    when referring to the cryptocurrency.  CFAC ¶ 65 ("The price of XRP increased rapidly

4    following this tweet and on March 24, 2017, Ripple tweeted: 'The price of **#XRP**

5    continues to surge showing that people are looking for #bitcoin alternatives.'") (emphasis

6    added); see also id. ¶¶ 69, 91, 119-20 (post-April 26, 2017 "#XRP" references).

7         Moreover, as plaintiff himself cedes, the tweeted article refers to "Ripple's

8    **enterprise** blockchain solution" mid-way through the article.  Dkt. 105 at 16 (emphasis

9    added).  Such a reference, which a reasonable investor or consumer would identify when

10   reading the referenced article, further undermines plaintiff's assertion that this statement

11   is misleading.  Accordingly, it may not serve as a basis for the fraud claims.

12        **Fourth** – On May 3, 2017, as the price of XRP had continued to rise, Ripple

13   published a tweet stating that "#Ripple adoption is sparking interest in XRP 'which has

14   had an impressive rally in the last two months' via @Nasdaq."  Id. ¶ 67.  Plaintiff argues

15   that this tweet "perpetuated the false association" between Ripple's enterprise solutions

16   and XRP, Dkt. 105 at 16, because "[b]y misleading investors into believing that XRP's

17   use rose with each successive customer adopting Ripple's enterprise solution,

18   [d]efendants inflated the price of XRP . . ." id. at 16 n.9.

19        The court disagrees.  Again, the statement's reference to "interest" is vague and

20   does not necessarily mean the increased adoption or use of XRP.  As defendants note,

21   that term could refer to "any number of things, including press coverage, new customers,

22   or the attention of crypto enthusiasts."  Dkt. 106 at 15.  The fact that a third-party

23   (Nasdaq) reported on XRP as a result of the "Ripple Network's adoption by a large

24   number of financial institutions" (Dkt. 106-1 at 6) demonstrates that point.[4]  Accordingly,

25   _____

26   [4] The court **OVERRULES** plaintiff's objection to the court's consideration of the above-
     referenced Nasdaq article.  Dkt. 109.  Paragraph 67 discusses Ripple's May 3, 2017
27   tweet.  That paragraph's corresponding footnote details the link to the May 3, 2017 tweet.
     CFAC ¶ 67 n.46.  That tweet includes a link to the Nasdaq article immediately below the
28   tweet's heading.  Thus, the CFAC incorporates the subject article by reference.
     Additionally, defendants' arguments concerning this article in their reply is well-within the

1   this statement may not serve as a basis for the fraud claims.[5]

2          ***Fifth*** – On May 16, 2017, Ripple published a tweet stating that "[t]he appeal that

3   Ripple has towards traditional financial institutions is a big advantage it has over Bitcoin."

4   Id. ¶ 68.  Plaintiff explains that "[b]y comparing Ripple to Bitcoin (a cryptocurrency),

5   Ripple implied that its own cryptocurrency (XRP) was appealing to traditional financial

6   institutions and therefore being adopted."  Dkt. 105 at 17.

7          This explanation fails to establish the falsity of the subject statement.  As used

8   here, the reference to "Ripple" is vague and plaintiff does not show how it compels a

9   comparison between XRP and Bitcoin.  Separately, even if such a comparison were

10  necessarily implied, plaintiff fails to proffer any specific reason (or authority) to support

11  the position that the statement's reference to XRP's "appeal" amounts to its "adoption."

12  The reference to "appeal" is vague and could mean numerous things, including, for

13  example, a simple growing sense of curiosity about XRP by banks.  Accordingly, this

14  statement may not serve as a basis for the fraud claims.

15         ***Sixth*** – On June 29, 2017, Ripple published a tweet including a clip of an interview

16  that Garlinghouse had given to a third-party.  Id. ¶ 69.  In the tweet, Ripple stated that

17  "#XRP – up 4000% this year – has shown the market favors a real use case for

18  #digitalassets . . ."  Id.  In the interview clip, Garlinghouse stated that "digital assets are in

19  a position to be more valuable than gold" and described XRP as "solving a real-world use

20  case, it's not just about speculators."  Id.  Plaintiff explains that "[o]nly Ripple's enterprise

21  solutions have any utility," thus "by linking XRP's increasing value to solving a real-world

22  problem, Ripple and its CEO again conflated adopting enterprise solutions with adopting

23  XRP, even though enterprise customers were not adopting XRP."  Dkt. 105 at 17.

24         This explanation falls short.  Plainly, the above statements explicitly reference only

25  _____

26  scope of the issues raised in their opening brief.
    [5] Given that the court does not rest this conclusion on this statement's purported status

27  as an opinion, it need not consider plaintiff's catch-all rebuttal concerning defendants'
    supposedly superior knowledge.  Plaintiff raises this same argument for various other

28  statements in this category.  The court will address it only if relevant to the court's
    determination of the actionability of the subject statement.

1    XRP.  Plaintiff fails to explain how Garlinghouse's description of XRP as "solving a real-

2    world use case" invokes any reference to the software.  Whatever its merits, the assertion

3    that XRP has utility stands independent of the usefulness of the software.  Thus,

4    plaintiff's contention that this statement "conflated adopting enterprise solutions with

5    adopting XRP," Dkt. 105 at 18, is unfounded.  Accordingly, this statement may not serve

6    as a basis for the fraud claims.

7         **Seventh** – In a September 11, 2017 interview with a third-party, Garlinghouse

8    stated that "[p]eople are looking at the success Ripple has been having as a company,

9    and I think that's increased the value of XRP."  Id. ¶ 70.  Garlinghouse further stated that

10   Ripple wanted "to keep focusing on making XRP a valuable payments tool, and that

11   value will increase accordingly" and that he was "voting with [his] . . . pocketbook on the

12   future increased value of cryptocurrencies."  Id.  In relevant part, plaintiff argues that this

13   statement "falsely associated" the adoption of the enterprise solutions software with the

14   adoption of XRP.  Dkt. 105 at 18.

15        Plaintiff's argument lacks merit.  The subject statement does not refer to the

16   software.  Thus, plaintiff lacks any foundation to claim that Ripple falsely associated its

17   adoption with XRP's adoption.  To the contrary, Garlinghouse's citation to Ripple's

18   success "as a company" to justify his belief about XRP's then-increasing value implicitly

19   distinguishes between Ripple's corporate practices **generally** (which might include the

20   software) and XRP **specifically**.  That distinction undermines plaintiff's theory of falsity.

21   Accordingly, this statement may not serve as a basis for the fraud claims.[6]

22        **Eighth** – On November 27, 2017, Garlinghouse published a tweet including a link

23   to a tweet by a third-party, Motley Fool.  Id. ¶ 71.  In its tweet, Motley Fool stated that

24   "AmEx and Banco Santander will use Ripple's blockchain network for instant intl. fund

25   transfers. Could be a big deal for Ripple's XRP cryptocurrency. $AXP $SAN."  Id.  In his

26   tweet, Garlinghouse stated that "Ripple & $XRP are giving businesses 'what they want in

27

28   _____
     [6] The court will address statements akin to Garlinghouse's representation that he was
     "voting with his pocketbook" in Section B.4. below.

United States District Court
Northern District of California

1   a "#blockchain.'" Id.  Plaintiff argues that Ripple's tweet "treated Ripple (and its enterprise

2   solutions) and XRP as a common unit, further conflating the important distinction

3   between businesses adopting enterprise solutions and using XRP." Dkt. 105 at 19.

4   Plaintiff argues that the link to the Motley Fool tweet was also misleading because the

5   latter tweet "directly connected use of Ripple's enterprise solutions with Ripple's XRP

6   cryptocurrency, even though Ripple's enterprise customers were not adopting XRP." Id.

7       The court agrees that Garlinghouse's tweet implies that XRP is part of Ripple's

8   blockchain network.  However, plaintiff fails to explain why, in fact, such network excludes

9   XRP.  Absent that explanation, plaintiff cannot show why Garlinghouse's implicit

10  representation falsely conflated XRP with the software.

11      In any event, even if plaintiff had proffered such an explanation, the Motley Fool

12  tweet (linked to by Garlinghouse) states only that American Express's and Banco

13  Santander's use of such network "**could be** a big deal for Ripple's XRP cryptocurrency."

14  CFAC ¶ 71 (emphasis added).  That statement implies a distinction between Ripple's

15  blockchain and XRP because, if the two operated as a common unit, then the banks' use

16  of the network presumably **would be** a "big deal" for XRP.

17      To further clarify that distinction, the article linked to in the Motley Fool tweet

18  expressly states that "the partnership [between Ripple and the two banks] **may open the**

19  **door** for Ripple's virtual currency, XRP, to play a role **down the road**.  Ripple has been

20  testing methods to further speed up payments, **potentially allowing XRP to become** a

21  component of future banking partnerships." CFAC ¶ 71 n.50 (detailing hyperlink to Motley

22  Fool tweet dated November 26, 2017, 10:25 am) (emphases added).  Thus, even if

23  Garlinghouse's suggestion that XRP is part of Ripple's blockchain network were

24  technically inaccurate, the statements by Motley Fool in its tweets, which, according to

25  plaintiff, Garlinghouse adopted as his own,[7] cures that inaccuracy.  Accordingly, this

27  [7] Dkt. 105 at 15 (arguing that Garlinghouse's tweet of an article with a purportedly
inaccurate headline qualifies as an actionable statement by him, despite its original
28  publication by a third-party).

statement may not serve as a basis for the fraud claims.

*Ninth* – On December 14, 2017 at 8:59 am, Ripple published a tweet stating "@bgarlinghouse on why crypto prices will be driven by real utility, the multi-trillion $ problem @Ripple is solving and why $XRP will come out on top." CFAC ¶ 72. That tweet included a link to an interview that Garlinghouse had given to a third-party. Id. ¶¶ 74-75. In the interview, Garlinghouse stated the following in relevant part:

> "the reason why XRP has performed so well this year, we're solving a real problem, it's a multi-trillion-dollar problem around cross-border payments. There is a lot of friction it's very slow it's expensive, we're working with the institutions to deal with that, so people have gotten excited. We now have over 100 customers we've announced publicly." Id. ¶ 74.

*Tenth* – At 6:51 pm that same day, Ripple published a tweet stating that "[t]he Japan Bank Consortium launched a Ripple pilot with two large Korean banks – the first time money moves from Japan to Korea over RippleNet." Id. ¶ 72. That tweet also linked to an article on Ripple's website. Id. In that article, Ripple states that "RippleNet" refers to its enterprise solutions software, which does not require use of XRP. Id.

Plaintiff argues that these two statements "should be read together" and that, when taken together, they "show how Ripple and its CEO framed an important launch of Ripple's enterprise solution, xCurrent, in Japan and Korea so that it would appear to involve XRP." Dkt. 105 at 19-20. Critical to that scheme (plaintiff explains) is that, in the interview included in the initial tweet, "Garlinghouse repeated the claim that XRP had performed well because it solved a real, multi-trillion-dollar problem and, without distinguishing between XRP and Ripple's enterprise solutions, he immediately claimed that Ripple had over 100 publicly announced customers." Id. at 20. Despite that claim (plaintiff goes on), "[f]ew, if any of those 100 customers were using XRP," thereby making Garlinghouse's statement "highly misleading in context." Id. Plaintiff then adds that Ripple's announcement of the Japan Bank Consortium pilot contributed to the misleading nature of these statements because the transfer referenced in that statement did not involve XRP. Id.

United States District Court
Northern District of California

1    Again, this explanation fails to establish the falsity of the subject statements.  As

2    an initial matter, the court rejects plaintiff's predicate contention that it should construe

3    the two December 14, 2017 tweets together "since that is how investors read them."  Dkt.

4    105 at 19.  Plaintiff fails to provide any basis for that explanation and, aside from the ten-

5    hour lapse in time between the tweets, the court does not see one.

6    Regardless, even when those statements are read as one, plaintiff's explanation

7    does not establish how or why the referenced use of the software by the Japan Bank

8    Consortium implied the use of XRP.  The morning tweet concerned "crypto prices" and

9    "$XRP."  CFAC ¶ 72.  In the interview, Garlinghouse mentions only XRP.  Id. ¶¶ 74-75.

10   The evening tweet, on the other hand, concerned only "RippleNet," which, as clarified by

11   an article included via a cited link, refers to the enterprise solutions software.  Id. ¶ 72.

12   Plainly, the statements refer to distinct subjects.

13   Lastly, to the extent plaintiff asserts that Garlinghouse's reference to "100

14   customers . . . announced publicly" implies XRP customers (as opposed to software

15   customers), he fails to explain how such an implicit reference would lead an investor (or

16   consumer) to reasonably believe that the "important launch of Ripple's enterprise

17   solution, xCurrent, in Japan and Korea . . . involve[d] XRP."  Dkt. 105 at 19.  Given the

18   above, plaintiff's assertion that these statements "misleadingly conflated customers'

19   adopting enterprise solutions with their using XRP," Dkt. 105 at 20, is unfounded.

20   Accordingly, these statements may not serve as bases for the fraud claims.

21   **3.    Statement that Ripple Was Not Cashing out $100 Million Per Month**

22   To substantiate the third basis for his fraud claims, plaintiff alleges that

23   Garlinghouse published a tweet linking to a January 17, 2018 article by CNBC that had a

24   misleading headline.  CFAC ¶ 56.  The headline stated the following:

25       "*Ripple is sitting on close to $80 billion and could cash out
         hundreds of millions per month – but it isn't.*"  Id.
26

27   In his opposition, plaintiff clarifies that this allegation refers to the "December 17,

28   2017 to January 17, 2018" period.  Dkt. 105 at 14 n.7.  According to plaintiff, the subject

17

headline was false because "[b]ased on the volume of XRP traded and the market price

for XRP during this timeframe, it is likely that Ripple sold over one hundred million dollars'

worth of XRP during the month preceding January 17, 2018."  CFAC ¶ 57.

Plaintiff's explanation falls short.  First, his belated clarification of the relevant XRP

sales period does not alter the straightforward arithmetic calculation that controls whether

this statement is false.  Plaintiff alleges that Ripple sold approximately $91 million in XRP

during 2017 Q4, CFAC ¶ 37, and $167 million during 2018 Q1, id. ¶ 36.  Together, those

amounts total $258 million in XRP sales during the October 1, 2017 to March 31, 2018

period.  When that sum is divided by six, it shows that the average monthly XRP sales for

that period was approximately $43 million, which, plainly, is below $100 million.

Second, plaintiff's new allegation that it is "likely" that Ripple sold over $100

million in XRP during the relevant period does not salvage the apparent $57 million gap

in his theory of falsity.  Plaintiff proffers two bases for that allegation—namely (1) "the

volume of XRP traded" and (2) "the market price for XRP during this [] timeframe." Id. ¶

57.  Neither explains how or why XRP sales during the relevant period had a greater than

50 percent chance of materially deviating from $43 million to over $100 million.

Accordingly, this statement may not serve as a basis for the fraud claims.

### 4.    Garlinghouse's Statement that He Was "Long" XRP

To substantiate the fourth basis for his fraud claims, plaintiff alleges that

Garlinghouse misrepresented the status of his investment in XRP.  To support this

allegation, plaintiff chiefly relies on Garlinghouse's December 14, 2017 interview with a

third-party.  CFAC ¶ 52.  In that interview, Garlinghouse provided the following response

when asked if he personally invested in XRP:

> "I'm long XRP, I'm very, very long XRP as a percentage of my
> personal balance sheet. . . . . [I am] not long on some of the
> other [digital] assets, because it is not clear to me what's the
> real utility, what problem are they really solving . . . if you're
> solving a real problem, if it's a scaled problem, then I think you
> have a huge opportunity to continue to grow that. We have
> been really fortunate obviously, I remain very, very, very long
> XRP, there is an expression in the industry HODL, instead of
> hold, it's HODL . . . I'm on the HODL side." Id. (emphasis

United States District Court
Northern District of California

removed).[8]

According to plaintiff, this statement was false when made because "throughout 2017 Garlinghouse sold millions of XRP on various cryptocurrency exchanges." Id. ¶ 53. Plaintiff further explains that "[r]eview of the XRP ledger indicates that Garlinghouse sold at least 67 million XRP in 2017 and that he sold any XRP he received from Ripple within days of such receipt." Id.

In their opening brief, defendants argue that plaintiff's allegations do not permit a plausible inference that Garlinghouse was, in fact, not "long" XRP as a percentage of his balance sheet because plaintiff failed to include three allegations: (1) how much XRP Garlinghouse held prior to the alleged sales; (2) "what percentage of his personal balance sheet the alleged sales constitute"; and (3) "what percentage of his personal balance sheet remained invested in XRP after the alleged sales." Dkt. 102 at 14.

In his opposition, plaintiff advances three counterarguments.  Two are worth noting.  First, plaintiff argues that the above referenced details called for by defendants are "unnecessary" to allege his fraud claim based on this statement.  Dkt. 105 at 13.  He explains that "[e]ven if it is theoretically possible for an investor to sell while maintaining a long position, Plaintiff's allegation that Mr. Garlinghouse was selling his XRP within days of receipt leads to the reasonable inference that Mr. Garlinghouse was not actually long on or holding XRP and that his statement to the contrary was false." Id.  Second, citing Deutsch v. Flannery, 823 F.2d 1361, 1366 (9th Cir. 1987), plaintiff asserts that "Rule 9(b) does not require plaintiffs in a securities fraud case to set forth facts which, because no discovery has yet occurred, are in the exclusive possession of the defendants." Id.

In their reply, defendants respond that Garlinghouse's "alleged sale of 67 million XRP in 2017 does not establish the broader claim that he 'was not actually long or holding XRP' in December 2017," reasoning that "Garlinghouse . . .  could plausibly have sold 67 million XRP in 2017 while continuing to 'hold' XRP."  Dkt. 106 at 11.

---

[8] Plaintiff asserts that, in the cryptocurrency market, the acronym "HODL" means to hold a digital asset for long term gains.  CFAC ¶ 52.  Defendants do not contest that assertion.

19

1   The court agrees with plaintiff.  To be sure, the court understands defendants'

2   assertion that Garlinghouse's alleged sales activity does not necessarily contradict the

3   accuracy of the subject statement.  However, the volume of sales made by Garlinghouse

4   throughout 2017 and their quick turnaround timing support an inference that he did not

5   remain "long XRP" and, in actuality, he was not on the "HODL" side.

6   More importantly, though, defendants failed to contest that the information plaintiff

7   needs to sue on this statement is in Garlinghouse's exclusive possession.  They also

8   failed to address the viability of <u>Deutsch</u>'s limiting principle on Rule 9(b) in certain

9   securities cases.  Either way, it appears that principle is good law so long as plaintiff

10   provides "enough detail to give [defendant] notice of the particular misconduct which is

11   alleged to constitute the fraud charged so that [defendant] can defend against the charge

12   and not just deny that [defendant has] done anything wrong." <u>Ebeid ex rel. U.S. v.</u>

13   <u>Lungwitz</u>, 616 F.3d 993, 999 (9th Cir. 2010).  Plaintiff provides clear notice of the alleged

14   fraud: rather than holding XRP "for long term gains," Garlinghouse "was dumping XRP on

15   retail investors in exchange for dollars and other cryptocurrency." CFAC ¶ 53.

16   Despite the above, the court notes that there is a scenario in which Garlinghouse

17   both (1) sold 67 million XRP throughout 2017 (perhaps even making a profit on any short-

18   term sales) **and** (2) maintained a personal balance sheet comprising a substantial and

19   relatively consistent amount of XRP as a percentage of his personal portfolio.  Plaintiff

20   himself acknowledges this possibility.  Dkt. 105 at 13 ("Even if it is theoretically possible

21   for an investor to sell while maintaining a long position . . .").  Still, a motion for summary

22   judgment following the opportunity for appropriate discovery—not a motion to dismiss—is

23   the proper vehicle to determine whether such a non-actionable scenario is the case here.

24   Accordingly, except as noted below, plaintiff may proceed on the basis of this statement.[9]

25

26   ───────────────

[9] To the extent plaintiff asserts that Ripple's statement that "[f]orget about bitcoin, **_we're_**

27   **_all in on XRP!_**," CFAC ¶ 51 (emphasis in the original), serves as another misstatement
    by Garlinghouse concerning the scope of his XRP holdings, Dkt. 105 at 12, such

28   assertion is misplaced.  This statement was not made by Garlinghouse and its bolded
    portion is plainly puffery.  Thus, it may not serve as a basis for any fraud claim.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.   The Court Dismisses the Business & Professions Code Fraud Claims with Prejudice

In its prior order, the court explained that plaintiff's Business & Professions Code fraud claims may not proceed "on the theory that XRP is a security."  Dkt. 85 at 38.   As shown above, the only statement that plaintiff has alleged in compliance with Rule 9(b) depends on XRP's status as a security.  Deutsch, 823 F.2d at 1366 ("Rule 9(b) does not require plaintiffs in a ***securities fraud case*** to set forth facts which, because no discovery has yet occurred, are in the exclusive possession of the defendants.") (emphasis added).  Plaintiff failed to proffer any authority recognizing that Deutsch's limitation applies to claims for fraud that do not involve securities.  The Business & Professions Code fraud claims rest solely on the 17 alleged misstatements analyzed above.  CFAC ¶¶ 218, 225.  Plaintiff does not identify any alternative basis to support them.  Accordingly, the court dismisses plaintiff's Business & Professions Code fraud claims.

The remaining issue is whether the court should exercise its "particularly broad discretion" to dismiss these claims with prejudice.  Metzler Inv. GMBH, 540 F.3d at 1072. In its prior order, the court expressly identified the various Rule 9(b) deficiencies for each statement proffered by plaintiff in support of his fraud claims.  Dkt. 85 at 32-36.  Among such deficiencies were plaintiff's repeated failure to explain why or how the subject statements were false.  Id.  Those same defects endure in plaintiff's amended pleading.

The court concludes that further amendment would not salvage plaintiff's claims to the extent they rest on the subject statements.  The statements proffered in support of plaintiff's assertion that defendants misrepresented XRP's utility fail Rule 9(b)'s falsity requirement for reasons that appear beyond plaintiff's control.  Such reasons include the way the subject statement is phrased (e.g., in the conditional tense) and plaintiff's own recognition that, in fact, some persons had adopted XRP for functional purposes. Various statements proffered in support of plaintiff's contention that defendants conflated the adoption of the enterprise solutions software with XRP also fail, in large part, because

1   of the vague way those statements are phrased.  Again, such phrasing is something that

2   further amendment could not change and plaintiff failed to identify any reason to support

3   a contrary conclusion.  The sole statement supporting plaintiff's contention that Ripple

4   misstated its XRP sales in late 2017/early 2018 fell on the basis of a straightforward

5   calculation, which, again, is something plaintiff cannot change.

6                                                    **CONCLUSION**

7           For the foregoing reasons, the court grants in part and denies in part defendants'

8   motion to dismiss.  The motion to dismiss the sixth and seventh causes of action for

9   violations of California Business and Professions Code § 17200 and § 17500 is

10  **GRANTED** with prejudice as to all defendants.  The motion to dismiss the fourth cause of

11  action for the predicate violation of California Corporations Code § 25401 is **DENIED**.

12  That said, because plaintiff failed to allege any statement in support of his first through

13  third categories of purported fraud with the requisite Rule 9(b) specificity, he may proceed

14  on that cause of action solely on the basis of Garlinghouse's alleged misrepresentations

15  at paragraph 52 concerning the scope and character of his XRP holdings.  As previously

16  decided by the court in its prior order, plaintiff may, of course, also proceed on his

17  remaining first, second, third, and fifth causes of action against defendants for their

18  alleged sale or offer of unregistered securities in violation of federal and California state

19  law.

20          **IT IS SO ORDERED.**

21  Dated: October 2, 2020

22                                                    /s/ Phyllis J. Hamilton
                                                      _____
23                                                    PHYLLIS J. HAMILTON
                                                      United States District Judge

24

25

26

27

28

United States District Court
Northern District of California