1 | Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
2 | Steven G. Sklaver (237612)
ssklaver@susmangodfrey.com
3 | Oleg Elkhunovich (269238)
oelkhunovich@susmangodfrey.com
4 | Krysta Kauble Pachman (280951)
kpachman@susmangodfrey.com
5 | Nicholas N. Spear (304281)
nspear@susmangodfrey.com
6 | SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
7 | Los Angeles, CA  90067-6029
Telephone: (310) 789-3100
8 | Facsimile: (310) 789-3150

9 | James Q. Taylor-Copeland (284743)
james@taylorcopelandlaw.com
10 | TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
11 | San Diego, CA 92101
Telephone: (619) 400-4944
12 | Facsimile: (619) 566-4341

13 | *Counsel for Lead Plaintiff Bradley Sostack*

14 | **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
15 | **OAKLAND DIVISION**

16 |
17 | In re RIPPLE LABS, INC. LITIGATION

18 |

19 | This Document Relates to:

20 | All Actions

Case No. 4:18-cv-06753-PJH (RMI)
Formerly Consolidated/Related
Case No. 4:21-cv-06518 (Closed 9-27-21)

CLASS ACTION

**NOTICE OF MOTION AND MOTION
FOR CLASS CERTIFICATION;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT**

DATE:  April 26, 2023
TIME:  1:30 p.m.
PLACE: 1301 Clay St., Oakland, CA 94612
          Courtroom 3
JUDGE:  Hon. Phyllis J. Hamilton

Consolidated First Amended Complaint
Filed:  March 25, 2020

**FILED UNDER SEAL**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on April 26, 2023 at 1:30 p.m., in the courtroom of the Honorable Phyllis J. Hamilton, United States District Judge, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Courtroom 3, Lead Plaintiff Bradley Sostack will move the Court for certification of two classes pursuant to Rule 23 of the Federal Rules of Civil Procedure:

- Federal Securities Claims Class:  All persons or entities who purchased XRP from May 3, 2017 through the present and who have (a) retained the XRP, and/or (b) sold the XRP at a loss.

- California State Securities Claims Class:  All persons or entities who purchased XRP from Defendants and/or from any person or entity selling XRP on Defendants' behalf from May 3, 2017 through the present and who have (a) retained the XRP, and/or (b) sold the XRP at a loss.

Excluded from both Classes are: Defendant Bradley Garlinghouse; corporate officers, members of the boards of directors, and senior executives of Defendants Ripple Labs, Inc. and XRP II, LLC; members of Defendants' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

Lead Plaintiff also requests he be appointed by the Court as the class representative and that Susman Godfrey L.L.P. and Taylor-Copeland Law be appointed as Class Counsel.  The grounds for this motion are that this case meets all the requirements for class treatment as required under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

The Motion is based on this Notice of Motion and supporting Memorandum of Points and Authorities, the Declaration of Nicholas N. Spear and the exhibits attached thereto, the Declaration of Lead Plaintiff Bradley Sostack and the exhibit attached thereto, the reply briefing in further

1  support of this Motion, the arguments of counsel, and any such other matters as the Court may

2  consider.

3  Dated: November 18, 2022                    SUSMAN GODFREY L.L.P.

4                                              By */s/ Marc M. Seltzer*

5                                              Marc M. Seltzer (54534)
                                               Steven G. Sklaver (237612)
6                                              Oleg Elkhunovich (269238)
                                               Krysta Kauble Pachman (280951)
7                                              Nicholas N. Spear (304281)
                                               SUSMAN GODFREY L.L.P.
8                                              1900 Avenue of the Stars, Suite 1400
                                               Los Angeles, CA  90067-6029
9                                              Telephone: (310) 789-3100
                                               Facsimile: (310) 789-3150
10                                             mseltzer@susmangodfrey.com
                                               ssklaver@susmangodfrey.com
11                                             oelkhunovich@susmangodfrey.com
                                               kpachman@susmangodfrey.com
12                                             nspear@susmangodfrey.com

13                                             James Q. Taylor-Copeland (284743)
                                               TAYLOR-COPELAND LAW
14                                             501 W. Broadway, Suite 800
                                               San Diego, CA 92101
15                                             james@taylorcopelandlaw.com
                                               Telephone: (619) 400-4944
16                                             Facsimile: (619) 566-4341

17                                             *Counsel for Lead Plaintiff Bradley Sostack*

18

19

20

21

22

23

24

25

26

27

28

11104523v1/016433

1

## **TABLE OF CONTENTS**

2  I.    INTRODUCTION ................................................................................................. 1

3  II.   STATEMENT OF ISSSUES TO BE DECIDED .............................................. 4

   III.  BACKGROUND ................................................................................................. 4

4        A.   All Proposed Class Members Purchased the Fungible Digital Asset XRP ............. 4

5        B.   Ripple's ▮▮▮▮▮▮▮ Business Valuation are Tied to XRP ................................... 6

         C.   Defendants Promoted XRP to the Public as an Investment ...................................... 7

6        D.   Defendants Do Not Register XRP Despite Billions in Transaction Value ............. 8

7  IV.   LEGAL STANDARD ......................................................................................... 9

   V.    THE PROPOSED CLASSES SATISFY RULE 23(A) ................................... 10

8        A.   The Proposed Classes Are Sufficiently Numerous and Ascertainable ................. 10

9        B.   Common Issues of Fact and Law Exist .................................................................... 11

10       C.   Lead Plaintiff's Claims Are Typical of the Class ................................................... 12

         D.   Lead Plaintiff and His Counsel Will Adequately Represent the Class ................. 13

11 VI.   THE PROPOSED CLASSES SATISFY RULE 23(B)(3) ............................... 14

12       A.   Common Issues Predominate for the Federal Securities Class ............................. 14

13            1.   Common Questions of Law and Fact Predominate as to Whether
                   XRP is an Unregistered Security ................................................................... 15

14                 a.   *Investment of Money* ......................................................................... 16

15                 b.   *Common Enterprise* .......................................................................... 17

                   c.   *Expectation of Profits Produced by the Efforts of Others* ............. 19

16            2.   Common Questions of Law and Fact Predominate as to Whether
                   Defendants Offered XRP to the Proposed Class. .......................................... 21

17            3.   Damages Can Be Proven with a Common Methodology. ............................. 24

18            4.   Common Issues of Law and Fact Predominate as to Control Person
                   Liability for Defendants Ripple and Garlinghouse. ..................................... 25

19       B.   Common Issues of Law and Fact Predominate for State Securities Class ............ 26

20       C.   A Class Action is the Superior Method of Adjudicating the Claims .................... 29

   VII.  DEFENDANTS DO NOT PROVIDE ANY BASIS TO DENY CERTIFICATION ....... 30

21 VIII.  CONCLUSION ................................................................................................. 33

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. B. v. Hawaii State Dep't of Educ.*,
  30 F.4th 828 (9th Cir. 2022) .................................................. 12

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) .................................................. 9

*Addison v. Monarch & Assocs., Inc.*,
  2017 WL 10651455 (C.D. Cal. June 23, 2017) ....................... 10

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................ 14

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
  158 Cal. App. 4th 226, 253 (2007) ........................................ 28

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ......................... 20, 21, 22

*Balestra v. Cloud With Me Ltd.*,
  2020 WL 4370392 (W.D. Pa. July 2, 2020) ................... 2, 12, 29

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ............................................... 11

*Davidson v. Apple, Inc.*,
  2018 WL 2325426 (N.D. Cal. May 8, 2018) .......................... 32

*Davy v. Paragon Coin, Inc.*,
  2020 WL 4460446 (N.D. Cal. June 24, 2020) ................. *passim*

*Diamond Multimedia Sys., Inc. v. Superior Ct.*,
  19 Cal. 4th 1036 (1999) ......................................................... 27

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
  2013 WL 5789237 (C.D. Cal. Oct. 25, 2013) ........................ 25

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) ................................................. 13

*In re Lidoderm Antitrust Litig.*,
  2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .......................... 11

*In re Lyft Inc. Sec. Litig.*,
  2021 WL 3711470 (N.D. Cal. Aug. 20, 2021) ............. 10, 11, 29

ii

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
   318 F.R.D. 435 (D. Colo. 2015) ............................................................................ 25

*In re VeriSign, Inc. Sec. Litig.*,
   2005 WL 7877645 (N.D. Cal. Jan. 13, 2005), *as amended*, 2005 WL 226154
   (N.D. Cal. Jan. 31, 2005) ..................................................................................... 10

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ............................................................................... 12

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................................. 24

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) ............................................................................... 10

*Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*,
   2011 WL 13152893, at *5 (N.D. Cal. Oct. 27, 2011) ............................................ 28

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ................................................................................. 14

*Morrison v. National Australia Bank Ltd.*,
   561 U.S. 247 (2010) .............................................................................................. 30

*Owen v. Elastos Found.*,
   2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ................................................... 22, 24

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ................................................................................. 11

*People v. Black*,
   214 Cal. Rptr. 3d 402 (Ct. App. 2017) ............................................................ 26, 27

*Pinter v. Dahl*,
   486 U.S. 622 (1988) .............................................................................................. 21

*S.E.C. v. Goldman Sachs & Co.*,
   790 F. Supp. 2d 147 (S.D.N.Y. 2011) ................................................................... 31

*S.E.C. v. R.G. Reynolds Enterprises, Inc.*,
   952 F.2d 1125 (9th Cir. 1991) ......................................................................... *passim*

*S.E.C. v. Ripple Labs, Inc., et al.*,
   Case No. 1:20-cv-10832, Dkt. 4 (S.D.N.Y. Dec. 22, 2020) ..................................... 1

*S.E.C. v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................ *passim*

iii

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

*Sec. & Exch. Comm'n v. Blockvest, LLC*,
  2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ............................................................... 15, 17, 19

*Sec. & Exch. Comm'n v. LBRY, Inc.*,
  2022 WL 16744741 (D.N.H. Nov. 7, 2022) ................................................................. 19, 21

*Sec. & Exch. Comm'n v. NAC Found., LLC*,
  512 F. Supp. 3d 988 (N.D. Cal. 2021) ........................................................................ *passim*

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
  2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ................................................................. 31

*Sec. & Exch. Comm'n v. Telegram Grp. Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................................................... 18

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ...................................................................................................... 10

*U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) .......................................................................... 18

*Wade v. Indus. Funding Corp.*,
  1993 WL 594019 (N.D. Cal. Dec. 14, 1993) ............................................................... 10

*Warfield v. Alaniz*,
  569 F.3d 1015 (9th Cir. 2009) ...................................................................................... *passim*

*Wildes v. BitConnect Int'l PLC*,
  25 F.4th 1341 (11th Cir. 2022) ...................................................................................... 3, 14, 22

*Williams v. KuCoin*,
  2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021) ............................................................. *passim*

**Statutes**

15 U.S.C. § 77 ..................................................................................................................... 15, 21

15 U.S.C. § 77e ................................................................................................................... 1, 15

15 U.S.C. § 77*l*(a) ............................................................................................................. *passim*

15 U.S.C. § 77o ................................................................................................................... 15, 25

Cal. Corporations Code § 25110 ........................................................................................ 1, 26, 27

Cal. Corporations Code § 25503 ........................................................................................ 1, 3, 26, 29

Cal. Corporations Code § 25504 ........................................................................................ 26, 29

Securities Exchange Act of 1934 § 10(b) ................................................................. 30

**Rules**

Fed. R. Civ. P. 23 ..............................................................................................*passim*

Fed. R. Civ. P. 23(b)(3) ........................................................................................ 14

**Other Authorities**

Alexander Osipovich, TerraUSD Crash Led to Vanished Savings, Shattered
    Dreams (Wall St. Journal May 27, 2022), *available at*
    https://www.wsj.com/articles/terrausd-crash-led-to-vanished-savings-
    shattered-dreams-11653649201 (last accessed Nov. 18, 2022) ......................... 4, 5

Michael J. Kaufman, 26 Sec. Lit. Damages § 7:11 (2021) ......................................... 24

Michelle Zadikian, FTX crisis serves as warning to retail investors as major funds
    get burned (Yahoo! Finance Nov. 9, 2022), *available at*
    https://ca.finance.yahoo.com/news/ftx-crisis-serves-as-warning-to-retail-
    investors-as-major-funds-get-burned-184900788.html .................................... 4

William B. Rubenstein, 7 Newberg and Rubenstein on Class Actions §§ 22:63,
    22:66, 22.82 (6th ed. 2022) ................................................................................ 10

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

11104523v1/016433

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

This case meets the requirements for class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  Defendants Ripple Labs, Inc. ("Ripple"), its wholly-owned subsidiary XRP II, LLC ("XRP II"), and its Chief Executive Officer Bradley Garlinghouse ("Garlinghouse"), offered or sold unregistered securities to members of the proposed classes in violation of federal and state securities laws.  Each proposed class member purchased units or subunits of XRP, a fungible digital asset that is native to a blockchain called the XRP Ledger. Defendants solicited the XRP purchases through a multimedia public marketing campaign that promoted XRP as an investment that would appreciate due to Defendants' stewardship over XRP and related technology.  Defendants engaged in this marketing campaign for the simple reason that Ripple's company value was tied almost exclusively to the value of its XRP holdings. ███████

████████████████████████████████████████████████████████████████████████████

██.  Defendants, however, never registered any of these transactions with federal or state regulatory agencies, which violated Sections 5 and 12 of the Securities Act and Sections 25110 and 25503 of the California Corporations Code.  More than two years after this litigation was initiated, the United States Securities and Exchange Commission likewise filed an action against Defendants that similarly alleges that Defendants offered or sold unregistered securities.  *See S.E.C. v. Ripple Labs, Inc., et al.*, Case No. 1:20-cv-10832, Dkt. 4 (S.D.N.Y. Dec. 22, 2020).

Lead Plaintiff Bradley Sostack seeks certification of two classes under Federal Rule of Civil Procedure 23(b)(3): a Federal Securities Class for the Securities Act claims and a State Securities Class for the California law claims.  Courts routinely certify Rule 23(b)(3) classes bringing similar unregistered securities claims arising out of digital asset purchases.  *See, e.g.*, *Williams v. KuCoin*, 2021 WL 5316013, at *10–17 (S.D.N.Y. Oct. 21, 2021) (certifying a class of TOMO token

purchasers alleging federal and state unregistered securities claims), *report and recommendation adopted*, 2022 WL 392404 (S.D.N.Y. Feb. 9, 2022); *Balestra v. Cloud With Me Ltd.*, 2020 WL 4370392, at *2–4 (W.D. Pa. July 2, 2020) (certifying class of Cloud Token purchasers alleging federal unregistered securities claims), *report and recommendation adopted*, 2020 WL 4368153 (W.D. Pa. July 30, 2020); *Davy v. Paragon Coin, Inc.*, 2020 WL 4460446, at *5–7 (N.D. Cal. June 24, 2020) (certifying class of PRG token purchasers alleging federal unregistered securities claims).

Defendants engaged in a uniform course of conduct with respect to selling unregistered securities and liability will turn entirely on common evidence. The answer to the central question—whether XRP is an unregistered security—will be the same for all class members. Under the *Howey* test,[1] courts perform an "objective" inquiry into whether a "contract, transaction, or scheme" was "an investment of money in a common enterprise with an expectation of profits produced by the efforts of others." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (numerals omitted). Common evidence—including social media posts, Ripple-produced marketing materials, deposition testimony of senior Ripple executives, and internal Ripple documents—shows that Defendants specifically promoted XRP as an investment opportunity to speculators. Defendants did this by publicly linking their efforts to develop and invest in XRP and the XRP Ledger to increases in XRP's value. It was objectively reasonable to expect profits from Defendants' efforts, as Defendants had significant control over XRP (as the largest holder) and the XRP Ledger blockchain (as the primary developer). And Defendants publicly made clear that their efforts were mutually beneficial; a 2019 XRP Market Report, for example, stated that Ripple was "aligned with other XRP stakeholders and focused on supporting a healthy XRP community."[2] This common

---

[1] *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

[2] *See* Ex. 57 at 10. All exhibits are attached to the Declaration of Nicholas N. Spear, filed concurrently herewith.

evidence will establish that the XRP purchased by all class members was an unregistered security.

Whether Defendants solicited these purchases of unregistered securities is also a common question that turns on common proof.  This Court previously held that "any person who engaged in the steps necessary to the distribution of the unregistered security is liable."  Dkt. 85 (MTD Order) at 22 (internal quotation marks omitted).  Common evidence will establish that Defendants solicited all class members' XRP purchases by "systematically market[ing] XRP and financially benefit[ting] from such efforts." *Id.*  As discussed above, Defendants engaged in an extensive, public marketing campaign across multiple media to encourage the purchase of XRP.  *See Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022) ("Broadly disseminated communications . . . can convey a solicitation.").  This included detailed instructions on Ripple's website for how to purchase XRP.  And Defendants benefited from each and every purchase of XRP.  Transactions in XRP increase demand, liquidity, and trading volume, which allows Defendants to sell more XRP at a higher price.

Damages can also be calculated using a common methodology.  As described in the accompanying declaration of Dr. Steven P. Feinstein, a finance professor at Babson College and president of Crowninshield Financial Research, damages under Section 12(a) of the Securities Act and Section 25503 of the California Corporations Code can be represented as arithmetic formulas that can be used to mechanically calculate damages for each member of the proposed classes.[3]  And common evidence will establish that Defendants Ripple and Garlinghouse are jointly and severally liable as control persons for Ripple's (Garlinghouse) and XRP II's (Ripple and Garlinghouse) conduct.  XRP II is Ripple's wholly-owned subsidiary, and Garlinghouse is the CEO of both entities.

---

[3] *See* Ex. 62.

The securities laws are designed to protect ordinary investors by requiring registration and disclosures.  These concerns are particularly acute in the burgeoning crypto markets.  Indeed, retail crypto investors have lost billions in value this year alone.[4]  Defendants' marketing campaign for XRP specifically promoted XRP as an investment opportunity that would appreciate due to Defendants' efforts.  These were solicitations to buy a security.  Defendants' failure to register these transactions is a classwide violation of the federal and states securities laws.

For these reasons, as discussed in more detail below, the Court should certify the proposed classes under Rule 23(a) and Rule 23(b)(3).

## II.   STATEMENT OF ISSSUES TO BE DECIDED

A.  Whether the proposed Federal Securities Class should be certified under Federal Rule of Civil Procedure 23(b)(3) because the Rule 23(a) factors are satisfied, common issues predominate over individual issues, and a class action is the superior method of adjudication.

B.  Whether the proposed State Securities Class should be certified under Rule 23(b)(3) because the Rule 23(a) factors are satisfied, common issues predominate over individual issues, and a class action is the superior method of adjudication.

## III.   BACKGROUND

### A.   All Proposed Class Members Purchased the Fungible Digital Asset XRP

Lead Plaintiff, like every other member of the proposed class, purchased XRP.  *See* Declaration of Bradley Sostack ("Sostack Decl.") ¶ 3.  XRP is a digital asset ███████████.  Ex. 1 (████████████████████████) at RPLI_00623257, 69 (████████████████████

---

[4] *See, e.g.*, Michelle Zadikian, FTX crisis serves as warning to retail investors as major funds get burned (Yahoo! Finance Nov. 9, 2022), *available at* https://ca.finance.yahoo.com/news/ftx-crisis-serves-as-warning-to-retail-investors-as-major-funds-get-burned-184900788.html  (last accessed Nov. 18, 2022); Alexander Osipovich, TerraUSD Crash Led to Vanished Savings, Shattered Dreams (Wall St. Journal May 27, 2022), *available at* https://www.wsj.com/articles/terrausd-crash-led-to-vanished-savings-shattered-dreams-11653649201 (last accessed Nov. 18, 2022).

████████████████); Ex. 28 (Schwartz Depo.) at 22:22–24 (████████████████████).

Units of XRP are divisible into one million subunits, which are called "drops."  Ex. 28 (Schwartz

Depo.) at 25:22–26:7, 323:15–22.  Each unit and subunit of XRP is fungible with and has the same

value and currency conversation rates as all other units and subunits of XRP.  Ex. 40 (Def. RFAs)

at RPLI_03566726, 41–42 (Resps. 24–25); Ex. 59 (CoinMarketCap XRP Analytics).

> XRP is the native digital asset of the XRP Ledger.  Ex. 37 (Schwartz Inv. Tr.) at 13:22–24.

The XRP Ledger is an Internet protocol that ████████████████████████

████████████  Ex. 2 (█████████) at RPLI_00339374, 76; Ex. 28 (Schwartz Depo.) at

27:23–28:5.  The XPR Ledger is structured as a blockchain, with each block containing information

about transactions conducted on the XRP Ledger.  Ex. 28 (Schwartz Depo.) at 27:23–29:6.  The

blocks are linked together using cryptographically secure references.  *Id.* at 28:18–20.  XRP is

referred to as "native" to the XRP Ledger because every transaction on the ledger requires a small

amount of XRP.  Ex. 37 (Schwartz Inv. Tr.) at 18:12–19:24.[5]  The XRP Ledger was also ████

████.  *See* Ex. 1 (███████████████████████) at RPLI_00623257, 69

(██████████████████████).  ████████████

████████████████████████████████████████

████████  Ex. 28 (Schwartz Depo.) at 110:4–7 ████████████████████); Ex.

30 (Zagone Depo.) at 55:22–56:18 (██████████████████

████████████); Ex. 29 (Samarasinghe Depo.) at 84:10–13 (████████

████████).

> Ripple initially created 100 billion units of XRP.  Ex. 3 (12/19/13 Email Chain) at

RPLI_00339208.  Ripple retained 80 billion XRP.  Ex. 4 (███████████████████

---

[5] ████████████████████████████████████  *Id.*

██████) at RPLI_00294765, 80.  No more XRP have been, or likely will be, created.  Ex. 37

(Schwartz Inv. Tr.) at 15:8–14.  ████████████████████████████████████████

████████████████ Ex. 28 (Schwartz Depo.) at 23:10–13, 143:5–7.

      **B.**     **Ripple's** ████████ **Business Valuation are Tied to XRP**

Ripple is purportedly a software company, Ex. 31 (Birla Depo.) at 56:8–22, ████████

████████████████████████████████████████, *see, e.g.*, Ex. 32 (Will

Depo.) at 40:19–25, 42:2–5 (████████████████████████████████████████

████████████████████████████████████████

██████████████████████████); *accord* Ex. 27 (Garlinghouse Depo.) at 429:11–16 ██████

████████████████████████████████████████).

████████████████████████████████████████ *See, e.g.* Ex. 32 (Will

Depo.) at 14:19–20, 40:15–17 (████████████████████████████████████

██████████████████████); Ex. 8 at RPLI_01641423, 25 (██████████████████████

████████████████████████████████████████);

Ex. 9 (████████████████) at RPLI_01931261, 62 (████████████████████████

████████████████████████████████); Ex. 7 (████████████████████) at

RPLI_00160553 (████████████████████████████████).  Ripple's value

is driven almost entirely by its XRP holdings.  *See, e.g.*, Ex. 14 (████████████████) at

RPLI_00177952, 71 (████████████████████████████████████████

██████); Ex. 10 (████████████████) at RPLI_00276363 (████████████████

████████████████████████); Ex. 49 (6/26/17 Schwartz Reddit Post) ("For some time, Ripple

will be the largest holder of XRP and it will dominate over every other source of value Ripple

has.").

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

11104523v1/016433

Ripple primarily sold XRP in two different ways. *First*, Ripple—through its wholly-owned and controlled subsidiary XRP II, Ex. 11 (███████████████████) at RPLI_00000041, 43—███████████████████. Ex. 30 (Zagone Depo.) at 68:22–69:15 (███████████████████). Recently, Ripple—also through XRP II—███████████████████. Ex. 27 (Garlinghouse Depo.) at 336:1–11; Ex. 12 (███████████████████) at RPLI_01030511, 19 (███████████████████). *Second*, ███████████████████. Ex. 29 (Samarasinghe Depo.) at 44:22–45:9. ███████████████████ *Id.* at 45:11–20. A Ripple market maker acted as ███████████████████ which means that it was ███████████████████ Ex. 35 (Gil Depo.) at 180:4–9, 281:19–282:1; *accord* Ex. 33 (Madigan Depo.) at 213:13–15 (███████████████████).

## C.   Defendants Promoted XRP to the Public as an Investment

Although XRP had no real-world utility for retail consumers, *see, e.g.*, Ex. 56 (10/8/19 Economic Club Garlinghouse Interview) at 8 ("XRP, in my judgment, and really any crypto, I don't think the use case is a consumer use case today."), Defendants recognized that there was significant interest in XRP as a speculative investment, *see* Ex. 47 (10/29/19 Fintech Beat Garlinghouse Interview) at 23:02 ("You know, on XRP itself, and really I would say crypto broadly, I have publicly said before, you know, 99.9 percent of all crypto trading is speculation today. The amount of real utility you're talking about is very, very low and I – that's true within the XRP community, as well."). Defendants therefore targeted XRP speculators. *See, e.g.*, Ex. 18 (███████████████████) at RPLI_00327099 (███████████████████

███████████████████████).  As will be discussed in more detail below, Defendants engaged in a public multimedia marketing strategy to increase speculative interest in XRP.  *See* Section VI.A.1., *infra*.  Defendants specifically linked XRP's future increase in value to Defendants' efforts to develop and manage the XRP ecosystem.  *See id.*

Defendants also worked to make it easier for speculative investors to purchase XRP. Defendants expended extensive efforts to get XRP listed on cryptocurrency exchanges (*e.g.*, Coinbase) because that is where XRP speculation primarily occurred.  *See, e.g.*, Ex. 21 (████ ████████) at RPLI_035725334 (████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████); Ex. 38 (Vias Inv. Tr.) at 102:4–103:24, 110:20–113:21 (██████████████████████ ████████████████████████████████████████████████); Ex. 39 (Griffin Inv. Tr.) at 217:6–9 (██████████████████████████████████████████████████████ ██████).  Ripple's website—www.ripple.com—included instructions on how to purchase XRP from exchanges.  Ex. 20 (████████████) at RPLI_00753899.  Defendants also engaged in lobbying efforts with the White House, Congress, and the Securities and Exchange Commission█ ████████████████████.  *See, e.g.*, Ex. 27 (Garlinghouse Depo.) at 46:16–49:8; Ex. 30 (Zagone Depo.) at 51:3–52:8.

### D.   Defendants Did Not Register XRP Despite Billions in Transaction Value

Members of the proposed classes have spent billions of dollars on XRP transactions.  Lead Plaintiff, for example, spent over $300,000 on XRP in 2018.  Sostack Decl. ¶ 3.  There is also significant trading volume on cryptocurrency exchanges.  *See* Ex. 59 (CoinMarketCap XRP Analytics showing XRP's prior 24-hour trading volume on November 16, 2022 at 5:21pm was $1,304,813,202); Ex. 35 (Gil Depo.) at 122:15–20 (████████████████████████

8

1        ████████████████████████████████████████████).  This

2    has directly benefitted Defendants.  In █████████████████████████

3    ████   Ex. 13 (████████████████████████) at RPLI_01673352, 56

4    (████████████████████████████████████).[6]  ████████

5    ██████████████████████████████.  Ex. 27 (Garlinghouse Depo.) at

6    333:6–16.

7

8        Defendants, however, have never registered XRP with any securities regulator, including

9    the Securities and Exchange Commission or the California Commissioner of Corporations.  Dkt.

10    117 (Answer) ¶ 12.  ███████████████████████████████████

11    ██████████████████████   Ex. 27 (Garlinghouse Depo.) at 26:3–27:1.

12

13    **IV.**    <u>**LEGAL STANDARD**</u>

14        Class actions are governed by Federal Rule of Civil Procedure 23.  A plaintiff seeking class

15    certification must satisfy all the requirements in Federal Rule of Civil Procedure 23(a), and the

16    requirements of at least one of the subsections of Rule 23(b).  *See Abdullah v. U.S. Sec. Assocs.,*

17    *Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).  Rule 23(a) requires: "(1) the class is so numerous that

18    joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

19    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the

20    class; and (4) the representative parties will fairly and adequately protect the interests of the class."

21    Fed. R. Civ. P. 23(a).

22

23        Lead Plaintiff seeks certification of both classes under Rule 23(b)(3), which requires that

24    "questions of law or fact common to class members predominate over any questions affecting only

25    individual members, and that a class action is superior to other available methods for fairly and

26

27

28    [6] ████████████████████████████████.  *See id.*

efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks omitted).  A plaintiff "need not establish that there are no individual issues," *Addison v. Monarch & Assocs., Inc.*, 2017 WL 10651455, at *7 (C.D. Cal. June 23, 2017) (internal quotation marks omitted); all that needs be established is that the "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Tyson Foods*, 577 U.S. at 453; *accord Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (holding that the presence of individualized issues did not defeat predominance).

"Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants."  *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9 (N.D. Cal. Jan. 13, 2005), *as amended*, 2005 WL 226154 (N.D. Cal. Jan. 31, 2005); *accord Wade v. Indus. Funding Corp.*, 1993 WL 594019, at *2 (N.D. Cal. Dec. 14, 1993) ("[T]he Ninth Circuit and this District in particular have taken a liberal view of class certification motions brought in securities cases"); William B. Rubenstein, 7 Newberg and Rubenstein on Class Actions §§ 22:63, 22:66, 22.82 (6th ed. 2022) ("[S]ecurities cases are the paradigmatic class actions.").

## V.     THE PROPOSED CLASSES SATISFY RULE 23(A)

### A.     The Proposed Classes Are Sufficiently Numerous and Ascertainable

The proposed Classes meet the numerosity requirement.  "[C]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members."  *In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at *3 (N.D. Cal. Aug. 20, 2021).  Here there are thousands, if not millions, of XRP purchasers.  *See, e.g.*, Ex. 43 at POLO_SOSTACK_00000001 (███████████)

10

████████████████████████████████████████████████████████████

████████████████████████████ ).

The Class is also ascertainable. Ascertainability does not equate to a "freestanding administrative feasibility prerequisite[.]" *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017). Rather, a class definition must merely provide "objective criteria" sufficient to "allow potential class members to determine whether they are included in the proposed class." *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *3, *25 (N.D. Cal. Feb. 21, 2017) (certifying a class of "[a]ll persons or entities in the United States . . . who purchased [name] brand or generic Lidoderm" during the class period). Here, both proposed classes are defined by "objective criteria": the Federal Securities Class is "All persons or entities who purchased XRP from May 3, 2017 through the present and who have (a) retained the XRP, and/or (b) sold the XRP at a loss," and the State Securities Class is "All persons or entities who purchased XRP from Defendants and/or from any person or entity selling XRP on Defendants' behalf from May 3, 2017 through the present and who have (a) retained the XRP, and/or (b) sold the XRP at a loss." *See Briseno*, 844 F.3d at 1126 (affirming certification of a class where "the class was defined by an objective criterion: whether class members purchased Wesson oil during the class period").

## B. Common Issues of Fact and Law Exist

The proposed Classes also satisfy Rule 23(a)(2)'s commonality requirement. "A contention is sufficiently common where 'it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at *3 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011)). The commonality requirement is not an onerous one: "even a single common question" will do. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Dukes*, 564 U.S. at 359).

11

Common issues here include whether XRP is a security and whether Defendants offered or sold XRP to the proposed classes. Courts addressing similar unregistered securities class actions have found these issues sufficient to satisfy the commonality requirement. *See, e.g.*, *Williams*, 2021 WL 5316013, at *11 (holding that "questions common to members of the class" include "whether the TOMO Tokens are securities" and "whether KuCoin offered or sold the TOMO Tokens to members of the class"); *Cloud With Me*, 2020 WL 4370392, at *3 (common questions include whether "Defendants offered and sold unregistered securities in violation of the federal securities laws"); *Davy*, 2020 WL 4460446, at *6 ("whether the PRG Tokens qualify as 'securities'" is a common question).

## C. Lead Plaintiff's Claims Are Typical of the Class

Lead Plaintiff satisfies Rule 23(a)(3)'s typicality requirement. Under the "permissive" standard of Rule 23(a)(3), a court assesses whether the class representative's claims are "reasonably coextensive" with other proposed class members, which is measured by looking at "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). The commonality and typicality analyses "tend to merge." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022).

Lead Plaintiff purchased XRP from ███████████████████ in January 2018. *See* Sostack Decl. at ¶¶ 3–4 & Ex. A; Ex. 43 at POLO_SOSTACK_00000001; Ex. 64 (10/28/22 Declaration of Cristian Gil) at ¶¶ 2–3; Ex. 35 (Gil Depo.) at 142:6–24, 143:19–25, 145:20–146:2. Lead Plaintiff therefore alleges the same injury, based on the same course of conduct, as all other members of the proposed classes—the purchase of XRP, an unregistered security (Federal and State Securities Classes), from Ripple or any person or entity selling on Ripple's behalf (State Securities

12

Class).  This is sufficient to satisfy the typicality requirement.  *See Williams*, 2021 WL 5316013, at *12 ("Williams' claims are typical of the claims of the putative class of persons who purchased and sold TOMO Tokens during the relevant time period."); *Davy*, 2020 WL 4460446, at *6 (holding typicality satisfied because "Plaintiffs allege the same harm as absent class members – purchase of PRG Tokens").

### D.        Lead Plaintiff and His Counsel Will Adequately Represent the Class

Lead Plaintiff and his Counsel meet Rule 23(a)(4)'s adequacy requirement.  The adequacy inquiry looks at whether "the named plaintiffs and their counsel have any conflicts of interest with other class members" and whether "the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019).  Plaintiff's interests are aligned with the proposed classes—all purchased XRP (Federal and State Securities Classes) from Ripple or any person or entity selling on Defendants' behalf (State Securities Class).  *See* Section V.C. *supra*.  Lead Plaintiff understands his role as a fiduciary, has been actively involved in this litigation, including responding to discovery and reviewing briefing papers filed with the Court, and will continue to vigorously prosecute this litigation.  *See* Sostack Decl. ¶¶ 7–9.  As previously detailed in the briefing for the "Motion for Appointment as Lead Plaintiff," Plaintiff's counsel Susman Godfrey L.L.P. and Taylor-Copeland Law have the qualifications, experience, and ability to prosecute the securities claims.  *See* Dkt. 45 (Mtn. to Appoint Lead Pltf) at 5 (describing the qualifications of Taylor-Copeland Law); Dkt. 57 (Reply) at 3–5 (describing the qualifications of Susman Godfrey L.L.P.); Dkt. 60 (Order Approving Susman Godfrey L.L.P. and Taylor-Copeland Law as co-Lead Counsel).[7]  This has been demonstrated by

---

[7] *See also* Exs. 65–66 (current firm and attorney profiles for Susman Godfrey L.L.P. and Taylor-Copeland Law).

1   their vigorous and diligent litigation of this case to date.[8]

2   **VI.    THE PROPOSED CLASSES SATISFY RULE 23(B)(3)**

3        Lead Plaintiffs' proposed classes should be certified under Rule 23(b)(3) because common

4   issues of law and fact predominate, and a class action is the superior method of adjudication.  *See*

5   Fed. R. Civ. P. 23(b)(3).  Liability issues—including whether XRP is an unregistered security,

6   whether Defendants solicited class members' purchases, and control-person liability—will turn

7   entirely on Defendants' common course of conduct, and does not vary based on the conduct or state

8   of mind of any individual in either of the proposed classes.  Damages can be mechanically

9   calculated for each class member using a common methodology.

10

11       Indeed, unregistered securities cases are even more straightforward than the typical Section

12  10b-5 securities fraud case, in which predominance is "readily met."  *Amchem Prod., Inc. v.*

13  *Windsor*, 521 U.S. 591, 625 (1997).  The *Howey* test for unregistered securities is "objective,"

14  *Warfield*, 569 F.3d at 1021, solicitations do not need to "be personalized or individualized," *Wildes*,

15  25 F.4th at 1346, and there is no need to show reliance or scienter, *Miller v. Thane Int'l, Inc.*, 519

16  F.3d 879, 886 (9th Cir. 2008) (referring to the related 12(a)(2) claim as "a virtually absolute liability

17  provision").  And certification here is substantially more straightforward than the Rule 23(b)(3)

18  certifications approved in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, which

19  featured multiple products and individualized purchase negotiations.  31 F.4th 651, 676–82 (9th

20  Cir. 2022) (en banc).

21

22       **A.    Common Issues Predominate for the Federal Securities Class**

23       The proposed Federal Securities Class's Section 12(a)(1) claim alleges that Defendants

24

25

26  _____
    [8] Defendants contend that Lead Plaintiff is atypical and inadequate, but that is entirely premised on
    Defendants' contentions about the breadth of the classes.  *See* Ex. 42 (10/31/22 Def. Rog Resps.)
27  at Resp. 2.  As explained below, Defendants' overbreadth arguments are incorrect and not a barrier
    to class certification.  *See* Sections VI.A.2., VI.B., VI.D., *infra*.
28

"offer[ed] or s[old]" an unregistered security, XRP, to members of the proposed class in violation of Section 5.  15 U.S.C. §§ 77e (Section 5), 77l(a)(1) (Section 12).  The proposed Federal Securities Class's Section 15 claim alleges that Defendants Ripple and Garlinghouse controlled the conduct of Ripple (Garlinghouse) and XRP II (Ripple and Garlinghouse), and are therefore jointly and severally liable for Ripple's and XRP II's Section 12(a)(1) violations.  15 U.S.C. § 77o(a).  Common issues predominate for both claims.

1.  <u>Common Questions of Law and Fact Predominate as to Whether XRP is an Unregistered Security.</u>

The key issue underlying the Federal Securities Class's claims is whether XRP is an unregistered security.  It is undisputed that XRP is unregistered.  Dkt. 117 (Answer) ¶ 12.  Thus, whether XRP is an unregistered security turns on whether Defendants' offers and sales of XRP were offers and sales of an "investment contract."  *See* 15 U.S.C. § 77b(a)(1) (defining security to include "investment contract").  This analysis is "governed by the Supreme Court's guidance in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)."  *Warfield*, 569 F.3d at 1020.  "Under the *Howey* test, 'an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.'"  *Id.* (quoting *Howey*, 328 U.S. at 298–99).  The Ninth Circuit has "distilled" *Howey* into a "three-part test requiring '(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others.'"  *Id.* (internal quotation marks omitted).

The *Howey* test can be applied classwide because the analysis "is unquestionably an objective one."  *Sec. & Exch. Comm'n v. Blockvest, LLC*, 2019 WL 625163, at *5 (S.D. Cal. Feb. 14, 2019).  The court must "focus [its] inquiry on what the purchasers were offered or promised" by "conduct[ing] an objective inquiry into the character of the instrument or transaction offered

based on what the purchasers were led to expect." *Warfield*, 569 F.3d at 1021 (internal quotation

marks omitted); *see also Sec. & Exch. Comm'n v. NAC Found., LLC*, 512 F. Supp. 3d 988, 996

(N.D. Cal. 2021) ("[A] court's work must consist chiefly of an 'objective inquiry[.]'").  Courts

routinely find that common issues predominate for this analysis.  *See, e.g.*, *Williams*, 2021 WL

5316013, at *15 ("[W]hether the TOMO Tokens are securities under the *Howey* test" is a question

"susceptible to class-wide resolution"); *Davy*, 2020 WL 4460446, at *7 (common issues

predominate for "whether PRG Tokens are securities").

   Common evidence will be used to establish each element of the *Howey* analysis.

    *a.*  *Investment of Money*

   The first element—"investment of money"—"requires that the investor commit his assets

to the enterprise in such a manner as to subject himself to financial loss."  *Warfield*, 569 F.3d at

1021 (citations and internal quotation marks omitted).  As part of its objective inquiry, courts

examine a company's promotional materials to determine whether a "contract, transaction, or

scheme" was marketed as an investment.  *Id.* at 1021–23. Classwide evidence establishes that

Defendants publicly encouraged the use of XRP as an investment in a number of different ways,

including by: (1) providing public commentary about XRP to drive interest in XRP as an

investment, *see, e.g.*, Ex. 25 (███████████████████████) at RPLI_01022302

(██████████████████████████████████████); Ex. 28 (Schwartz

Depo.) at 359:5–12 (████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████); (2) producing quarterly market reports on XRP, beginning in 2017,

which trumpeted XRP's successes and Ripple's role in them, *see, e.g.*, Ex. 17 (███████████

16

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

1  ██████████████████████████) at RPLI_01017858 at 77 (████████████

2  ████████████████████████████████████████); Ex. 38 (Vias Inv. Tr.) at 178:18–

3  179:5 (████████████████████████████████████████████████████); (3)

4  hosting conferences and other meeting opportunities with speculative investors, *see, e.g.*, Ex. 15

5  (██████████████████) at RPLI_00978159, 61 (████████████████████

6  ████████████████████████████████████████████████

7  ██████████████████);  and (4) including a section on www.ripple.com called "How to Buy XRP,"

8  which allowed users to reach XRPcontact@ripple.com and directed users to the exchanges on

9  which they could purchase XRP, Ex. 20 (██████████████) at RPLI_00753899. *See Blockvest*,

10 2019 WL 625163, at *7 (the defendant's promotional materials for the BLV token, as well as a

11 "Buy Now" button on the defendant's website, satisfied the "'investment of money' prong").

12      Common evidence will establish that Ripple explicitly targeted these speculative investors.

13 *Warfield*, 569 F.3d at 1021–23 (noting that the alleged securities were marketed and sold to

14 investors); *see, e.g.*, Ex. 15 (████████████████) at RPLI_00978159, 61 (█████████

15 ██████████████ ████████████████████████████); Ex. 16 (████████

16 ██████████) at RPLI_01018075 (████████████████████████████

17 ████████████████████████████████████████████████

18 ██████████████); Ex. 19 (█████████████████████████████████)

19 at RPLI_00924526 (██████████████████████████████).  Purchasers

20 ultimately invested billions in XRP. *See* Section III.D., *supra*.

21                    b.     *Common Enterprise*

22      The second prong—a "common enterprise"—"exists where the investment scheme involves

23 either 'horizontal commonality' or 'strict vertical commonality.'" *NAC Found.*, 512 F. Supp. 3d at

24 996 (quoting *Hocking v. Dubois*, 885 F.2d 1449, 1459–60 (9th Cir. 1989) (en banc)). "Horizontal

17

11104523v1/016433

commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments." *Id.* "Strict vertical commonality" is a relationship in which "the fortunes of the investors are linked with those of the promoters." *Id.* (quoting *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991)).

Horizontal and strict vertical commonality can be established on a classwide basis.  Ripple is the largest XRP holder, has its valuation tied to these XRP holdings, and used XRP to ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Section III.A–B., *supra*.  As will be discussed in detail in the following section, Defendants explicitly linked XRP's value to their efforts to develop and manage the XRP ecosystem.  *See* Section VI.A.1.*c.*, *infra*. Because all units of XRP are fungible, an increase in XRP's price would be beneficial for all XRP purchasers, which Defendants also publicly touted.  *See* Sections III.A. & C., *supra*.  Indeed, Defendants made public efforts to connect their fortunes with those of XRP purchasers.  For example, in an October 2019 XRP Market Report posted on Ripple.com, Ripple stated: "As a stakeholder of XRP, Ripple is an interested party in its success. We are aligned with other XRP stakeholders and focused on supporting a healthy XRP community."  Ex. 57 at 10.  Garlinghouse similarly stated in a March 12, 2018 interview that "I am the most interested person, as CEO of Ripple, in making sure the XRP ecosystem is successful . . . I feel very comfortable about the opportunity to continue to grow the value of the XRP ecosystem, which is good for all of the participants in the XRP ecosystem."  Ex. 48 (3/12/18 Digital Ventures Interview) at 18:47.

Common evidence will therefore establish both horizontal and strict vertical commonality for all class members.  *See, e.g.*, *NAC Found.*, 512 F. Supp. 3d at 996 (similar evidence established vertical commonality); *Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369–70 (S.D.N.Y. 2020) (same for vertical and horizontal commonality); *U.S. Sec. & Exch. Comm'n v. Kik*

18

11104523v1/016433

*Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) (same for horizontal commonality).

> *c.*      *Expectation of Profits Produced by the Efforts of Others*

The third *Howey* element can be determined on a classwide basis because it considers whether purchases of XRP are "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Blockvest*, 2019 WL 625163, at *7 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)).

Common evidence will establish that Ripple publicly linked XRP's price to Ripple's efforts to develop the ecosystem. *See Sec. & Exch. Comm'n v. LBRY, Inc.*, 2022 WL 16744741, at *4 (D.N.H. Nov. 7, 2022) ("The SEC identifies multiple statements by LBRY that it claims led potential investors to reasonably expect that LBC would grow in value as the company continued to oversee the development of the LBRY Network."). Ripple and its executives routinely touted to the public the work and resources Ripple applied to XRP and the XRP Ledger. *See, e.g.*, Ex. 53 (2/27/18 Schwartz Reddit Ask Me Anything Post stating that one of the "three things [that] really set[s] XRP apart from any other digital asset" is the "amazing team of dedicated professionals that Ripple has managed to amass to develop an ecosystem around XRP"); Ex. 46 (12/14/17 Ripple Insights Garlinghouse Interview) at 07:50 (Garlinghouse stating that Ripple's "top three priorities for 2018" include "volume," "doing everything we can to make the XRP ecosystem successful around a liquidity basis," and "investing in other use cases for the XRP ledgers"); Declaration of Nicholas N. Spear ¶ 69 (12/14/17 BNN Bloomberg Garlinghouse Interview) at 07:49 (Garlinghouse stating that he is "very, very long XRP as a percentage of [his] personal balance sheet" because "if you're solving a real problem, if it's a scaled problem then you have a huge opportunity to continue to grow that"); Ex. 24 (Q2 2017 XRP Markets Report) at RPLI_00308325, 28 ("[W]e are accelerating the pace of our investment in the XRP Ledger to build on its speed, uptime, and scalability, to ensure XRP is the most trusted enterprise-grade digital asset."). Ripple

spokespeople explicitly tied this work to XRP's price. *See, e.g.*, Ex. 54 (8/11/17 XRP Chat with Ripple's Head of XRP Markets writing: "Our vision is literally world changing, and the last thing we are worried about is the price going up. That's a forgone conclusion if we continue to focus on the work, which is exactly what we're doing."); Ex. 49 (6/26/17 Schwartz Reddit Post stating: "I think most others do realize that the success of Ripple and the success of XRP are tightly tied.").

Common evidence will establish that Defendants—not class members—controlled the development of XRP and the XRP Ledger. *See, e.g.*, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356–57 (S.D.N.Y. 2019) (finding the expectations of profit prong met in part because "purchasers had no control over whether the new ATB Blockchain technology worked"). Ripple's CTO Schwartz— ██████████████████████████ *see* Ex. 36 (Garlinghouse Inv. Tr.) at 47:8–12—wrote in a public social media post that Ripple's significant ownership interest in XRP meant that XRP "is not decentralized." Ex. 51 (9/11/17 Schwartz Reddit Post stating: "Yes, Ripple holds more than half the XRP in existence. In that sense, XRP is not decentralized."). Ripple has always been the primary entity responsible for the development and maintenance of the XRP Ledger because a community of non-Ripple developers has not materialized. Ex. 6 (██████ ██████████) at RPLI_00555674, 83 (████████████████████████████ ████████████████████); Ex. 52 (11/14/17 Schwartz Reddit Post stating: "One thing we're definitely missing is a robust and inspired community of developers.").

Common evidence will also establish that Defendants touted their direct role in managing the XRP ecosystem. *See NAC Found.*, 512 F. Supp. 3d at 997 ("Nor, given the totality of circumstances, can defendants brush away the inference that an objectively reasonable ABTC purchaser likely viewed his or her prospective trading success as a function of the defendants' efforts: after all, the demand for ABTC or AML BitCoin, as reflected in those assets' pricing, would rely almost exclusively on market perception of defendants' work product."). Ripple publicly

20

positioned itself as the "steward" of XRP.  *See, e.g.*, Ex. 23 (████████████████████) at

RPLI_00380882, 84 (█████████████████████████████████████████

████).  Senior Ripple executives also made clear in public commentary that Ripple expected to

continue this role into the future.  *See, e.g.*, Ex. 45 (10/18/17 Garlinghouse Swell Interview) at

06:17 ("I'm not focused on the price of XRP over three days or three weeks or three months.  I'm

focused on the price of XRP over three years and five years.  I have no qualms saying definitively

if we continue to drive the success we're driving, we're going to drive a massive amount of demand

for XRP, because we're solving a multi-trillion dollar problem."); Ex. 49 (6/26/17 Schwartz Reddit

Post stating:  "It's that Ripple's future value and revenue is directly tied to the future value and

liquidity of XRP").

Thus, common evidence will establish a reasonable expectation of profits arising from

Ripple's development and managerial efforts over XRP and the XRP ledger.  *See, e.g.*, *LBRY*, 2022

WL 16744741, at *4 (sole issue was the third *Howey* prong, and similar evidence supported

summary judgment in the S.E.C.'s favor); *NAC Found.*, 512 F. Supp. 3d at 997 (similar allegations

were sufficient to establish the third prong); *ATBCOIN*, 380 F. Supp. 3d at 354–57 (same).

2.       Common Questions of Law and Fact Predominate as to Whether Defendants
         Offered XRP to the Proposed Class.

The Securities Act defines "offer" to include a "solicitation of an offer to buy" a security.

15 U.S.C. § 77*b*(a)(3).  Thus, Section 12(a)(1)'s inclusion of the word "offer" means that it

encompasses a person "who successfully solicits the purchase [of a security], motivated at least in

part by a desire to serve his own financial interests[.]"  *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).

As this Court previously held, the solicitation theory applies to all XRP purchases.  Dkt. 85 (MTD

Order) at 21 ("Because subsection (a)(1) provides a broader basis for assigning liability than its

subsection (a)(2) counterpart, the court further rejects defendants' position and concludes that it

may consider a § 77l(a)(1) claim premised upon a purchase outside the initial distribution context."); *id.* at 22 (under the solicitation theory, "any person who engaged in steps necessary to the distribution of the unregistered security is liable" (internal quotation marks omitted)); *see also Owen v. Elastos Found.*, 2021 WL 5868171, at *15–16 (S.D.N.Y. Dec. 9, 2021) (citing this court's MTD order and holding that the defendants could be liable for having "solicited" the plaintiff's "Secondary Market purchases of ELA Tokens for personal financial gain").

Common evidence will establish that Defendants solicited the proposed Federal Securities Class's purchases of XRP because Defendants "engaged in steps necessary to distribute XRP" by "systematically market[ing] XRP and financially benefit[ting] from such efforts." Dkt. 85 at 22. As described in detail in the previous section, *see* Section VI.A.1, *supra*, Defendants engaged in a large-scale, targeted marketing campaign to encourage the purchase of XRP, including by "publish[ing] various tweets, interviews, and articles pushing the adoption of XRP," "host[ing] conferences concerning XRP's use," "explain[ing] on its website how to purchase XRP and included a link to cryptocurrency exchanges for such purchases," and "lobby[ing] Congress and the SEC to adopt cryptocurrency friendly laws." Dkt. 85 ("Such alleged efforts by defendants, if proven, are more than sufficient to establish their status as sellers under a solicitation theory."); *see also Owen*, 2021 WL 5868171, at *15 (allegations about a "sustained and intensive marketing campaign" that included events, tweets, and interviews were sufficient for liability under a solicitation theory); *ATBCOIN LLC*, 380 F. Supp. 3d at 358 ("[P]romotional statements trumpeting the potential of the ATB Coin and the ongoing opportunity to invest in the ATB ICO . . . clearly reflect . . .efforts to solicit the sale of ATB Coins."). The common evidence here is akin to the evidence of solicitation in *Wildes*, where the Eleventh Circuit held that websites and social media publications promoting a digital asset were sufficient to establish that the defendant solicited purchases of the digital asset. 25 F.4th at 1343–46 ("Broadly disseminated communications also

22

11104523v1/016433

can convey a solicitation—indeed, they are consistent with the longstanding interpretation of the term.  [W]hen the promoters urged people to buy BitConnect coins in online videos, they still solicited the purchases that followed.").

Whether Defendants financially benefitted from purchases of XRP can also be determined classwide.  Dkt. 85 at 22 (solicitation requires that Defendants were "motivated at least in part by a desire to serve [their] own financial interests").  Common evidence will show that all XRP transactions—regardless of whether the XRP is purchased directly from Ripple or from a third-party—serve Defendants' financial interests:

- Increased Demand:  XRP speculation leads to an increase in demand for XRP, which in turn leads to an increase in XRP's price.  *See* Ex. 32 (Will Depo.) at 220:21–221:7; Ex. 38 (Vias Inv. Tr.) at 190:5–9.  An increase in the price of XRP is beneficial to both Ripple and other XRP holders, including Garlinghouse.  *See* Ex. 38 (Vias Inv. Tr.) at 353: 22–24 (███████████████████████████████████████████ ████████████████████████████).

- Increased Liquidity:  XRP speculation leads to more XRP liquidity.  *See id.* at 78:9–15.  Greater liquidity is correlated with higher and more stable XRP prices.  Ex. 55 (12/1/17 Schwartz XRP Chat Post stating: "A higher price tends to correlate with more liquidity. It's not really a direct cause and effect relationship, but they tend to move in tandem.").

  ███████████████████████████████████████████████████ ████████████████████████████████ Ex. 22 (████████████████) at RPLI_00157641, 42–43; Ex. 38 (Vias Inv. Tr.) at 42:8–10.

- Increased Volume:  Speculative trading creates greater trading volume.  Ex. 34 (Rapoport Depo.) at 106:20–107:2.  ████████████████████████████ ██████████████████ Ex. 38 (Vias Inv. Tr.) at 51:8–15.  ████████████

23

1

2                                                    ▮. Ex. 35 (Gil Depo.) at 74:7–76:25. ▮

3

4

5        *See also Owen*, 2021 WL 5868171, at *3, *16 (defendants stood to gain from soliciting

6    purchases of ELA Tokens due to increases in value of the tokens they held).

7

8                                          *See* Ex. 27 (Garlinghouse Depo.) at 308:12–20.

9                                          *See* Section III.D, *supra*.  This common evidence

10   further supports that Defendants solicited purchases for their financial gain.  *See* Dkt. 85 at 22

11   (Plaintiff sufficiently alleged financial benefit because "from early 2017 to 2018 alone, defendants

12   'have earned over $1.1 billion through the sale of XRP'").

13

14              3.      Damages Can Be Proven with a Common Methodology.

15        As explained in the Declaration of Dr. Steven P. Feinstein, damages can be calculated for

16   each member of the proposed class using a common methodology because Section 12(a) provides

17   statutory formulas for damages.  Ex. 62 (Feinstein Decl.) at ¶¶ 16–26; *see* Rubenstein, *supra*, 4

18   Newberg and Rubenstein on Class Actions § 12:4 (a plaintiff need only provide "a common

19   classwide method for calculating individual damages"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510,

20   513–14 (9th Cir. 2013) (district court abused its discretion in denying certification because there

21   was a common methodology for calculating individualized damages).

22

23        Under Section 12(a), damages are a return of the consideration paid with interest for the

24   security upon tender, or if the security has been sold, the consideration paid with interest less the

25   price received on resale.  *See* 15 U.S.C. § 77*l*(a); Michael J. Kaufman, 26 Sec. Lit. Damages § 7:11

26   (2021).  Dr. Feinstein shows that the damages methodology for Section 12(a) claims can be

27   represented in two arithmetic formulas—one for class members who have retained their XRP, and

28

24

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

one for class members who sold their XRP—and that these formulas can be uniformly and mechanically applied to all class members to calculate their individual damages. *See* Ex. 62 (Feinstein Decl.) ¶¶ 16–26. As will be discussed in more detail below, any individual information needed to calculate damages can be efficiently and manageably collected using a claim form process. *See* Section VI.C., *infra*.

For these reasons, courts routinely hold that damages can be proven using a common methodology in Section 12(a) claims. *See, e.g.*, *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 318 F.R.D. 435, 447 (D. Colo. 2015) (damages "common to the Class" because "Securities Act damages are calculated using a statutory formula[.]"); *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2013 WL 5789237, at *6 (C.D. Cal. Oct. 25, 2013) ("The only notable issue that is not common to the Class is damages. Each member of the Class will suffer different damages based on their shareholdings. However, '[t]he amount of damages is *invariably* an individual question and does not defeat class action treatment.' Further, the calculation of damages will be governed by statutory formulas.") (citations omitted).

        4.    <u>Common Issues of Law and Fact Predominate as to Control Person Liability for Defendants Ripple and Garlinghouse.</u>

Finally, control-person liability can also be determined classwide. Under Section 15 of the Securities Act, a person who "controls any person liable under [Section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 77*o*. Control means the "direct or indirect . . . power to direct or cause to the direct of the management and policies of a person[.]" Dkt. 85 (MTD Order) at 23 (quoting *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *12 (C.D. Cal. May 5, 2011)).

Common evidence will establish control-person liability for Defendants Ripple and Garlinghouse. *See* Dkt. 85 at 23–24. XRP II is a "wholly owned subsidiary" of Ripple and

██████████████████████████████████████████████████████████

Ex. 11 (████████████████████████) at RPLI_00000041, 43.  Garlinghouse is Ripple's

Chief Executive Officer, a position he has held since 2017.  Ex. 27 (Garlinghouse Depo.) at 25:16–

21.  As CEO, ████████████████████████████████████████████████████████

████████████████████████████████████  *Id.* at 26:3–27:1; Ex. 36 (Garlinghouse

Inv. Tr.) at 46:9–11.  ██████████████████████████████████████████

████  Ex. 27 (Garlinghouse Depo.) at 26:3–27:1.  Garlinghouse was previously Ripple's Chief

Operating Officer.  *Id.* at 25:22–26:2.  ████████████████████.  Ex. 26 (███████████████)

at RPLI_00000943, 45.

### B.    Common Issues of Law and Fact Predominate for State Securities Class

Plaintiff's proposed State Securities Class brings two claims under California law.  The first

claim alleges that Defendants unlawfully offered or sold unregistered securities in California.  *See*

Cal. Corp. Code §§ 25110, 25503.  The second alleges that Garlinghouse and Ripple controlled

Ripple (Garlinghouse) and XRP II (Garlinghouse and Ripple) and are therefore jointly and

severally liable for Ripple's and XRP II's primary violations.  *See id.* § 25504.  For similar reasons

as discussed above for the Federal Securities Class, common issues predominate.

*First*, the key question of whether XRP is a security is capable of classwide adjudication.

A transaction is a security under California law if it satisfies the *Howey* test or the "risk capital"

test.  *See People v. Black*, 214 Cal. Rptr. 3d 402, 411–12 (Ct. App. 2017).  As shown above,

common issues predominate for the *Howey* test.  *See* Section VI.A.1., *supra*.  The same is true for

the risk capital test, which describes "[1] an attempt by an issuer to raise funds for a business venture

or enterprise; [2] an indiscriminate offering to the public at large where the persons solicited are

selected at random; [3] a passive position on the part of the investor; and [4] the conduct of the

enterprise by the issuer with other people's money."  *Black*, 214 Cal. Rptr. 3d at 411 (quoting *Silver*

26

*Hills Country Club v. Sobieski*, 361 P.2d 906 (Cal. 1961).  Here, common evidence—including that

██████████████████████████████████████████████████████

████████████████████████████████████, which Ripple publicly proclaimed would

increase the value of XRP even further, benefitting all XRP holders; and XRP holders were not

required to do anything to realize the value of their XRP, *see* Sections III.B. & VI.A.1., *supra*—

establishes XRP is also a security under the risk capital test.

>    *Second*, whether Defendants offered or sold XRP in California is capable of classwide

adjudication.  A § 25110 claim requires that some XRP be offered or sold in California.  Dkt. 85

(MTD Order) at 28 (citing *Diamond Multimedia Sys., Inc. v. Superior Ct.*, 19 Cal. 4th 1036, 1053

(1999)); *id.* at 29 n.8 (holding that § 25110's "in this state" requirement does not require that the

plaintiff purchased in the state; an offer made to a third party in California is sufficient).[9]  An offer

or sale is made in California "[w]hen an offer to sell is made in this state," which includes an

advertisement that "invite[s] the performance of a specific act without further communication and

leave nothing for negotiation."  *Id.* at 28–29 (quoting Cal. Corp. Code § 25008(a) and *Donovan v.

RRL Corp.*, 26 Cal. 4th 261, 272 (2001), *as modified* (Sept. 12, 2001)).[10]

>    Common evidence establishes that Ripple, Garlinghouse, and XRP II are based in

California.  Ripple is a corporation headquartered in San Francisco, California.  Dkt. 117 (Answer)

at ¶ 14 (San Francisco is Ripple's "principal place of business"); Ex. 60 (Ripple's LinkedIn Page

stating that its "headquarters" are in San Francisco, California).  Ripple recently moved into a

---

[9] In *Diamond Multimedia Systems*, the California Supreme Court held that the state's securities laws "reach out-of-state purchasers and sellers of securities" and "are not limited to transactions made in California."  19 Cal. 4th at 1065.

[10] The *Davy* court denied certification of California state securities claims on choice-of-law grounds.  2020 WL 4460446, at *3–5.  *Davy* is factually and procedurally distinct, but to the extent the *Davy* court held that California securities claims cannot reach outside California, it is inconsistent with this Court's prior order and *Diamond Multimedia Systems*.

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

11104523v1/016433

130,000 sq. ft. building in San Francisco, which it will establish as its "San Francisco headquarters." Ex. 58 (5/3/22 TheRealDeal.com article titled: "Blockchain outfit takes 130K sf near Embarcadero."). XRP II is a limited liability company with its principal place of business in San Francisco, California. Dkt. 117 (Answer) at ¶ 15. Garlinghouse resides in San Mateo, California. Dkt. 117 (Answer) at ¶ 16. Common evidence also establishes that www.ripple.com—whose registrant, administrative contact, and technical contact is California-based Ripple, *see* Ex. 61 (screenshot of https://www.whois.com/whois/ripple.com)—has a section on how to buy XRP, which included links to exchanges selling XRP. *See* Section III.C.; VI.A.1., *supra*. Furthermore, the price for buying or selling XRP is nonnegotiable because it is set by the market and is the same for all units of XRP because all units and subunits of XRP are fungible. *See* Section III.A., *supra*; Dkt. 85 at 29 (stating that this evidence was sufficient to establish that Defendants offered or sold XRP in California).

*Third*, common evidence establishes privity with Defendants. Every member of the proposed State Securities Class purchased XRP either (1) from Defendants, or (2) from Defendants' market makers. No evidence beyond the purchase is needed to establish privity for those who purchased directly from Defendants. Dkt. 85 (MTD Order) at 26–27 (cause of action available to immediate purchasers). For those who purchased from market makers, common evidence will establish that the market makers were Defendants' agents and were operating on their behalf, *see* Section III.B., *supra*, which is sufficient to establish privity between proposed class members and Defendants for market maker sales, *see Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 2011 WL 13152893, at *5 (N.D. Cal. Oct. 27, 2011) ("California courts have held that privity lies with the ultimate seller and not with the placement agent." (citing *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 253 (2007))).

11104523v1/016433

1
2
3
4

*Finally*, common issues predominate for damages under § 25503 and control-person liability under § 25504 for the same reasons as their federal counterparts. *See* Sections VI.A.3.–4., *supra*.

### C.     A Class Action is the Superior Method of Adjudicating the Claims

"[S]ecurities class actions rarely fail the superiority test."  Rubenstein, *supra*, 7 Newberg and Rubenstein on Class Actions § 22:82 (securities cases are "well-suited" to class actions "in that they tend to encompass the claims of a large class of geographically dispersed, small stakeholders who, absent a class suit, would be without recompense").  A class action is clearly the superior method of adjudication here.  *See, e.g.*, *Williams*, 2021 WL 5316013, at *15–17 (finding a class action to be superior in a similar digital asset class action); *Cloud With Me*, 2020 WL 4370392, at *4 (same); *Davy*, 2020 WL 4460446, at *7 (same).  Few if any class members could afford on their own to bring an expensive securities case against a wealthy technology company with extensive resources to litigate, particularly in light of the small-dollar claims most XRP holders will have.  Rubenstein, *supra*, 7 Newberg and Rubenstein on Class Actions § 22:82.  Litigating these issues as a class action will allow XRP holders to vindicate their rights in a central forum where all Defendants reside.  As explained in the Declaration of Cameron Azari, a Senior Vice-President at EPIQ Class Action and Claims Solutions, Inc. and a national recognized expert in the field of legal notice and administration, the class can be efficiently administered through any class notice and claims administration processes using email, direct mail, a media plan and targeted claims forms.  *See* Ex. 63 (Azari Decl.) at ¶¶ 2–3, 22–43.  This is certainly more manageable than "the filing of possibly thousands of individual claims." *Cloud With Me*, 2020 WL 4370392, at *4.  Thus, a class action here is superior because it will "reduce litigation costs and promote greater efficiency." *In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at *7 (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d. 1227, 1234–35 (9th Cir. 1996)).

1

**VII.**   **DEFENDANTS DO NOT PROVIDE ANY BASIS TO DENY CERTIFICATION**

2

3          In response to an interrogatory requesting "all legal and factual bases" for the contention

4    that "the CLASS should not be certified," Defendants do not dispute that the Rule 23(a)(1)

5    numerosity and Rule 23(a)(2) commonality elements are satisfied.  *See* Ex. 42 (10/31/22 Def. Rog

6    Resps.) at Resp. 2.  They also do not dispute that the core issue underlying all claims—whether

7    XRP is a security—is capable of classwide adjudication.  *See id.* (including no reference to the

8    unregistered security inquiry or the *Howey* test).  Instead, Defendants contend that the proposed

9    classes should not be certified under Rules 23(a)(3)–(4) and (b)(3) because "foreign purchasers . . .

10   must be excluded under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 268 (2010)" and

11   "significant numbers of class members . . . lack standing because they were not injured."  *See id.*[11]

12   These arguments should be rejected.

13

14         *First*, any issues of extraterritoriality for the federal securities claims can be adjudicated on

15   a classwide basis.  Defendants cite to the Supreme Court's decision in *Morrison*, but that case

16   featured very different facts and claims.  In *Morrison*, the Supreme Court addressed whether

17   "§ 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs

18   suing foreign and American defendants for misconduct in connection with securities traded on

19   foreign exchanges."  561 U.S. at 250–51.  The Court held that § 10(b) only applies to "transactions

20   in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.* at

21

22   267.  Here, by contrast, the Plaintiff and the putative class are suing under Section 12(a)(1) of the

23

24

---

25   [11] Defendants' interrogatory response also incorrectly contends that certification fails under Rules
     Rules 23(a)(3)–(4) and (b)(3) because "purchasers who bought from sellers other than Ripple on
26   the secondary market that must be excluded" and "non-California residents and purchasers who
     bought outside of California pursuing California state law claims" must be excluded.  *See* Ex. 42
27   (10/31/22 Def. Rog Resps.) at Resp. 2.  These arguments were addressed in Sections VI.A.2. and
     VI.B., *supra*.

28

Securities Act for solicitations of offers to buy an unregistered security made by an American company in the United States.

In the S.E.C.'s parallel case against Defendants in the Southern District of New York, the Court addressed the domesticity of the solicitations here and held that the solicitations are domestic if "a person or entity . . . solicit[s,] in the United States, an offer to buy securities." *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 2022 WL 762966, at *12 (S.D.N.Y. Mar. 11, 2022) (quoting *S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011)) (cleaned up) (hereafter, "*SEC Action*").   Under this test—which applies to all proposed class members because Defendants solicitated all XRP purchases—the issue of domesticity "focus[es] . . . on the person or entity [offering] securities." *Id.* at *13 (internal quotation marks omitted).

Common evidence will establish that all Defendants' solicitations were domestic.  All three Defendants are based in California, and Garlinghouse admitted ████████████████████████ ████████████████████████████████████████████ *See* Section VI.B., *supra*; Ex. 41 (████████████████████) at RPLI_03564173, 79–81, 83 (██████); *SEC Action*, 2022 WL 762966, at *13 ("[I]t is the location of the offerors—here Larsen and Garlinghouse—that is relevant."); *Goldman Sachs & Co.*, 790 F. Supp. 2d at 165 ("Here, the SEC alleges Tourre, acting in and from New York City, offered ABACUS notes to IKB and solicited ABN's participation in an ABACUS CDS via direct and indirect communications.").  Defendants' U.S.-based conduct specifically targeted XRP speculators and included social media posts, live interviews and speeches, and XRP market reports.  *See* Section VI.A.1., *supra*; *Goldman Sachs & Co.*, 790 F. Supp. 2d at 165 (communications made in New York City, including phone calls and emails, supported domesticity of offers).  In addition, Defendants made extensive efforts to get XRP listed on crypto exchanges to increase speculative trading in XRP, including by including instructions for how to purchase XRP on Ripple's website. *See* Sections III.C. & VI.A.1., *supra*; *SEC Action*, 2022

31

WL 762966, at *13 (explaining that taking actions to distribute XRP while based in California supported that the offers were domestic).

*Second*, Defendants' speculation about hypothetical uninjured class members does not counsel against certification. As a threshold matter, all proposed class members have suffered an injury because every class member has retained XRP and/or sold XRP for a loss. Regardless, "it is sufficient for jurisdictional purposes that at least one named plaintiff must satisfy Article III standing." *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *9 (N.D. Cal. May 8, 2018) (citing *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 n.6 (9th Cir. 2016)) (internal quotation marks omitted). Here, Lead Plaintiff clearly has standing. *See* generally Sostack Decl.; Section V.A.3.– 4., *supra*. And even if there is a possibility that a portion the class is uninjured, that is not a barrier to certification under Rule 23. *See Olean*, 31 F.4th at 669 ("[W]e reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members. This position is inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages." (citations omitted)). Here, the monetary damages of every class member—even if $0—can be determined using the common methodology described by Dr. Feinstein. *See* Section VI.A.3., *supra*.

*Finally*, Defendants incorrectly contend that the remedy for their alleged concerns is to deny certification. Defendants' interrogatory response does not identify any liability issue that will require individualized law or evidence, nor contend that a common methodology does not exist for calculating damages. Rather, their challenges are to the scope of the class. Overbreadth is ameliorated by refining the class, not denying certification. *See Olean*, 31 F.4th at 669 n.14 ("[T]he problem of a potentially over-inclusive class can and often should be solved by refining the class

MEMORANDUM OF POINTS AND AUTHORITIES
4:18-cv-06753-PJH

definition rather than by flatly denying class certification on that basis." (citations and internal quotation marks omitted)).

## VIII.   **CONCLUSION**

The Court should certify the proposed classes, appoint Lead Plaintiff Bradley Sostack as the named plaintiff, and appoint Susman Godfrey L.L.P. and Taylor-Copeland Law as class counsel.

Dated: November 18, 2022                    SUSMAN GODFREY L.L.P.

By */s/ Marc M. Seltzer*

Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
Oleg Elkhunovich (269238)
Krysta Kauble Pachman (280951)
Nicholas N. Spear (304281)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
oelkhunovich@susmangodfrey.com
kpachman@susmangodfrey.com
nspear@susmangodfrey.com

James Q. Taylor-Copeland (284743)
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
james@taylorcopelandlaw.com
Telephone: (619) 400-4944
Facsimile: (619) 566-4341

*Counsel for Lead Plaintiff Bradley Sostack*