DAMIEN J. MARSHALL (admitted *pro hac vice*)
dmarshall@kslaw.com
ANDREW MICHAELSON (admitted *pro hac vice*)
amichaelson@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Tel: (212) 556-2100; Fax: (212) 556-2222

SUZANNE E. NERO (SBN 284894)
snero@kslaw.com
MEGHAN H. STRONG (SBN 324503)
mstrong@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Tel: (415) 318-1200; Fax: (415) 318-1300

ANDREW J. CERESNEY (admitted *pro hac vice*)
aceresney@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000; Fax: (212) 909-6836

*Attorneys for Defendants Ripple Labs Inc.,*
*XRP II, LLC, and Bradley Garlinghouse*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re RIPPLE LABS INC. LITIGATION | Case No. 4:18-cv-06753-PJH |
| _____ | **DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| This Document Relates to: | |
| ALL ACTIONS | Date:      April 26, 2023 |
| | Time:      1:30 p.m. |
| | Ctrm:      3 |
| | |
| | Consolidated FAC Filed: March 25, 2020 |
| | Trial Date: July 17, 2023 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................... 4

        A.     Defendants and the Creation of XRP and the XRP Ledger ............................... 4

        B.     The Many Uses of XRP and the XRP Ledger ..................................... 5

        C.     Plaintiff's Class Definitions ..................................................... 6

        D.     Plaintiff Is a Day-Trader from Florida ........................................... 7

        E.     Plaintiff Seeks Overlapping Relief to That Sought by the SEC ..................... 7

III.    LEGAL STANDARD ...................................................................... 7

ARGUMENT ............................................................................................ 8

IV.     PLAINTIFF CANNOT SATISFY RULE 23(a) BECAUSE HE IS AN
        INADEQUATE REPRESENTATIVE FOR HIS OVERBROAD
        CLASSES ...................................................................................... 8

        A.     Plaintiff Cannot Adequately Represent Class Members Who
               Disagree With the Premise and Aims of His Lawsuit ........................ 9

               1.      Plaintiff Is in Conflict With Class Members Harmed by His
                       Claims ...................................................................... 10

               2.      Plaintiff Is in Conflict With Class Members Who Could Be
                       Exposed to Legal Liability if Plaintiff's Claims Succeed .................... 11

               3.      This Class Conflict Is Rooted in XRP Purchasers' Differing
                       Expectations .............................................................. 12

        B.     Plaintiff Cannot Adequately Represent Direct Purchasers ............................. 14

V.      PLAINTIFF IS ATYPICAL DUE TO HIS LACK OF CREDIBILITY .................... 17

VI.     PLAINTIFF CANNOT MEET RULE 23(B)(3)'S PREDOMINANCE
        REQUIREMENT ............................................................................... 19

        A.     Individualized Issues of Standing Predominate Over Common
               Questions .................................................................... 19

               1.      Plaintiff Cannot Show Who Has Standing With
                       Predominantly Common Evidence ........................................ 20

2.   Plaintiff Cannot Define a Class to Avoid His Obligation to Show Standing With Predominantly Common Evidence ..................... 22

B.   Plaintiff Does Not Put Forward a Common Methodology for Proving Damages ............................................................................. 24

VII.   PLAINTIFF CANNOT MEET RULE 23(B)(3)'S SUPERIORITY REQUIREMENT .......................................................................................... 28

VIII.   PLAINTIFF'S CALIFORNIA CLASS FAILS ............................................................ 30

A.   Plaintiff's California Class Fails for the Above Reasons ................................ 30

B.   Plaintiff's California Securities Class Cannot Be Certified on a Nationwide or Worldwide Basis .................................................................. 31

C.   Plaintiff Has Not Defined a Class for His Fourth Cause of Action ................. 34

IX.   PLAINTIFF DEFINES AN IMPROPER CLASS PERIOD ......................................... 34

A.   Plaintiff's Start Date Is Too Early ................................................................ 34

B.   Plaintiff's End Date "To the Present" Is Impermissible .................................. 35

X.   CONCLUSION .............................................................................................. 35

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Amchem Prods., Inc. v. Windsor*
   521 U.S. 591 (1997) ............................................................................................ 8, 10

4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
   568 U.S. 455 (2013) .................................................................................................. 19

5

6

*Balestra v. Cloud With Me Ltd.*
   2020 WL 4370392 (W.D. Pa. July 2, 2020) ................................................... passim

7

8

*Blackie v. Barrack*
   524 F.2d 891 (9th Cir. 1975) ...................................................................................... 9

9

*Brazil v. Dell Inc.*
   585 F. Supp. 2d 1158 (N.D. Cal. 2008) .................................................................... 24

10

11

*Briseno v. ConAgra Foods, Inc.*
   844 F.3d 1121 (9th Cir. 2017) .................................................................................. 29

12

13

*Centeno v. Dep't of Soc. & Health Servs.*
   2015 WL 12670405 (W.D. Wash. June 9, 2015) ............................................... 10, 30

14

*Coffey v. Ripple Labs Inc.*
   Case No. CGC-18-566271 (San Francisco Sup. Ct. May 3, 2018) .................... 34, 35

15

16

*Comcast Corp. v. Behrend*
   569 U.S. 27 (2013) ......................................................................................... 7, 19, 24

17

18

*Cordoba v. DirectTV, LLC*
   942 F.3d 1259 (11th Cir. 2019) ................................................................................ 19

19

*Davy v. Paragon Coin, Inc.*
   2020 WL 4460446 (N.D. Cal. June 24, 2020) ................................................. passim

20

21

*de Fontbrune v. Wofsy*
   838 F.3d 992 (9th Cir. 2016) .................................................................................... 32

22

23

*Dean v. China Agritech*
   2012 WL 1835708 (C.D. Cal. May 3, 2012) ............................................................ 28

24

*Diamond Multimedia Sys., Inc. v. Superior Court*
   19 Cal. 4th 1036 (1999) ........................................................................................... 31

25

26

*Dixon v. Monterey Fin. Servs., Inc.*
   2016 WL 3456680 (N.D. Cal. June 24, 2016) ......................................................... 23

27

28

*Doyle v. Chrysler Grp., LLC*
   663 F. App'x 576 (9th Cir. 2016) ........................................................................ 24

*Drake v. Morgan Stanley & Co.*
   2010 WL 2175819 (C.D. Cal. Apr. 30, 2010) ....................................................... 19

*Eisen v. Carlisle & Jacquelin*
   417 U.S. 156 (1974) ............................................................................................ 29

*Ellis v. Costco Wholesale Corp.*
   657 F.3d 970 (9th Cir. 2011) ............................................................................... 17

*Finklestein v. Liberty Digital Inc.*
   2005 WL 1074364 (Del. Ch. Ct. April 25, 2005) ................................................. 28

*Ford v. TD Ameritrade Holding Corp.*
   995 F.3d 616 (8th Cir. 2021) ............................................................................... 22

*Gen. Tel. Co. of Sw. v. Falcon*
   457 U.S. 147 (1982) .............................................................................................. 8

*Greenwald v. Ripple Labs Inc.*
   Case No. 18-cv-3451 (San Mateo Sup. Ct. July 3, 2018) ..................................... 35

*Guido v. L'Oreal, USA, Inc.*
   2012 WL 2458118 (C.D. Cal. June 25, 2012) ..................................................... 18

*Hanon v. Dataproducts Corp.*
   976 F.2d 497 (9th Cir. 1992) ............................................................................... 17

*Hansberry v. Lee*
   311 U.S. 32 (1940) ................................................................................................ 9

*In re Apple Inc. Device Performance Litig.*
   386 F. Supp. 3d 1155 (N.D. Cal. 2019) ............................................................... 32

*In re iPhone 4S Consumer Litig*
   2013 WL 3829653 (N.D. Cal. July 23, 2013) ...................................................... 31

*In re Nexium Antitrust Litig.*
   777 F.3d 9 (1st Cir. 2015) ................................................................................... 23

*In re Tezos Sec. Litig.*
   No. 17-cv-6779 (N.D. Cal. May 1, 2020) ............................................................ 22

*Jimenez v. Allstate Ins. Co.*
   765 F.3d 1161 (9th Cir. 2014) ............................................................................. 24

*Kamar v. RadioShack Corp.*
   375 F. App'x 734 (9th Cir. 2010) ........................................................................ 23

*Knowles v. Arris Int'l PLC*
  2019 WL 3934781 (N.D. Cal. Aug. 20, 2019) ........................................................ 34

*Lee v. Pep Boys-Manny Moe & Jack of California*
  2015 WL 9480475 (N.D. Cal. Dec. 23, 2015) ........................................................ 10

*Leyva v. Medline Indus. Inc.*
  716 F.3d 510 (9th Cir. 2013) ........................................................ 27

*Liu v. SEC*
  140 S. Ct. 1936 (2020) ........................................................ 30

*Marsh v. First Bank of Delaware*
  2014 WL 2085199 (N.D. Cal. May 19, 2014) ........................................................ 34

*Matsushita Elec. Indus. Co. v. Epstein*
  516 U.S. 367 (1996) ........................................................ 8

*Mayfield v. Dalton*
  109 F.3d 1423 (9th Cir. 1997) ........................................................ 1, 9

*Mazza v. Am. Honda Motor Co.*
  666 F.3d 581 (9th Cir. 2012) ........................................................ 3, 31, 32

*Moore v. Apple Inc.*
  309 F.R.D. 532 (N.D. Cal. 2015) ........................................................ 23

*Morrison v. National Australia Bank Ltd.*
  561 U.S. 247 (2010) ........................................................ 15

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
  259 F.3d 154 (3d Cir. 2001) *as amended* (Oct. 16, 2001) ........................................................ 22

*Norwood v. Raytheon Co.*
  237 F.R.D. 581 (W.D. Tex. 2006) ........................................................ 32

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*
  2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................................ 27

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*
  31 F.4th 651 (9th Cir. 2022) ........................................................ passim

*Omnibus Fin. Corp. v. United States*
  566 F.2d 1097 (9th Cir. 1977) ........................................................ 35

*P. Stolz Family P'ship L.P. v. Daum*
  355 F.3d 92 (2d Cir. 2004) ........................................................ 33

*Pepka v. Kohl's Dep't Stores, Inc.*
  2016 WL 8919460 (C.D. Cal. Dec. 21, 2016) ........................................................ 23

*Peterson v. Okla. City Hous. Auth.*
   545 F.2d 1270 (10th Cir. 1976) ........................................................................ 10

*Pino v. Cardone Capital LLC*
   55 F.4th 1253 (9th Cir. 2022) .......................................................................... 16

*Pinter v. Dahl*
   486 U.S. 622 (1988)......................................................................................... 16

*Radcliffe v. Experian Info. Sols. Inc.*
   715 F.3d 1157 (9th Cir. 2013) ............................................................................ 8

*Rensel v. Centra Tech, Inc.*
   2021 WL 4134984 (S.D. Fla. Sept. 10, 2021) ................................................ 22

*Ruiz Torres v. Mercer Canyons Inc.*
   835 F.3d 1125 (9th Cir. 2016) ......................................................................... 23

*Schlaud v. Snyder*
   785 F.3d 1119 (6th Cir. 2015) ........................................................................... 9

*SEC v. Energy Grp. of Am., Inc.*
   459 F. Supp. 1234 (S.D.N.Y. 1978) ............................................................... 13

*SEC v. Fife*
   2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) ................................................. 12

*SEC v. Olins*
   2010 WL 900518 (N.D. Cal. Mar. 12, 2010).................................................. 12

*SEC v. Ripple Labs Inc. et al.*
   No. 1:20-cv-10832 (S.D.N.Y. Dec. 22, 2020) ........................................ passim

*SEC v. W.J. Howey*
   328 U.S. 293 (1946).......................................................................... passim

*Sicav v. James Jun Wang*
   2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) .................................................. 27

*Sidibe v. Sutter Health*
   333 F.R.D. 463 (N.D. Cal. 2019)....................................................................... 9

*Siino v. Foresters Life Ins. & Annuity Co.*
   340 F.R.D. 157 (N.D. Cal. 2022)..................................................................... 24

*Spokeo, Inc. v. Robins*
   578 U.S. 330 (2016)......................................................................................... 20

*State v. Lundberg*
   445 P.3d 1113 (Kan. 2019) .............................................................................. 33

*Stromberg v. Qualcomm Inc.*
  14 F.4th 1059 (9th Cir. 2021) ............................................................. 34

*Telco Grp., Inc. v. Ameritrade, Inc.*
  2007 WL 203949 (D. Neb. Jan. 23, 2007) ........................................... 22

*TransUnion LLC v. Ramirez*
  141 S. Ct. 2190 (2021) ......................................................................... 20

*Urena v. Earthgrains Distrib., LLC*
  2017 WL 4786106 (C.D. Cal. July 19, 2017) ................................... 3, 29

*Vasquez v. Leprino Foods Co.*
  2020 WL 1527922 (E.D. Cal. Mar. 31, 2020) ..................................... 35

*Walker v. Life Ins. Co. of Sw.*
  953 F.3d 624 (9th Cir. 2020) ................................................................. 8

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011) ........................................................................... 7, 8

*Warfield v. Alaniz*
  569 F.3d 1015 (9th Cir. 2009) ......................................................... 12, 13

*Weiss v. NNN Cap. Fund I, LLC*
  2015 WL 11990929 (S.D. Cal. Apr. 3, 2015) ...................................... 34

*White v. Hilton Hotels Ret. Plan*
  2022 WL 1050570 (D.D.C. Mar. 22, 2022) .......................................... 23

*Wilkins-Jones v. Cnty. of Alameda*
  2012 WL 3116025 (N.D. Cal. July 31, 2012) ....................................... 35

*Williams v. Block One*
  2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) .......................... 1, 14, 15, 17

*Williams v. KuCoin*
  2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021) ............................. 3, 14, 21

*Young v. Neurobrands, LLC*
  2020 WL 11762212 (N.D. Cal. Oct. 15, 2020) ..................................... 34

*Zinser v. Accufix Rsch. Inst., Inc.*
  253 F.3d 1180 (9th Cir. 2001) ............................................................. 32

**Statutes**

15 U.S.C. § 77*l*...................................................................................... 16, 26

Ariz. Rev. Stat. Ann. § 44-2004......................................................................... 33

Cal. Corp. Code § 25110 ................................................................................................ 33

Cal. Corp. Code § 25401 ................................................................................................ 34

Cal. Corp. Code § 25503 ................................................................................................ 25

Cal. Corp. Code § 25507 ................................................................................................ 33

Fla. Stat. Ann. § 95.11 ................................................................................................... 33

Kan. Stat. Ann. § 17-12a509 .......................................................................................... 33

Md. Code Ann., Corps. & Ass'ns § 11-703 .................................................................... 33

N.J. Stat. Ann. § 49:3-71 ................................................................................................ 33

Nev. Rev. Stat. Ann. § 90.670 ........................................................................................ 33

Ohio Rev. Code § 1707.43(B) ........................................................................................ 33

Utah Code Ann. § 61-1-22 .............................................................................................. 33

**Rules**

Fed. R. Civ. P. 15 ........................................................................................................... 35

Fed. R. Civ. P. 23(a) ............................................................................................. 1, 7, 8, 19

Fed. R. Civ. P. 23(a)(3) .............................................................................................. 2, 17

Fed. R. Civ. P. 23(a)(4) ..................................................................................................... 9

Fed. R. Civ. P. 23(b)(3) ........................................................................................... passim

Fed. R. Civ. P. 44.1 ........................................................................................................ 32

Local Rule 3-12 .............................................................................................................. 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   PRELIMINARY STATEMENT

Lead Plaintiff Bradley Sostack ("Plaintiff") is a day-trader from Florida who speculates in digital assets.  During a two-week period in January 2018, Plaintiff bought and sold XRP, at times selling the XRP he purchased just days—or even hours—later.  Plaintiff now claims that XRP is an unregistered security; specifically, that XRP is an "investment contract" with Defendants Ripple Labs Inc., XRP II, LLC, and Bradley Garlinghouse (collectively, "Ripple" or "Defendants") as defined by the Securities Act.  And he seeks to represent two classes of XRP purchasers—many of whom purchased XRP for different reasons, with different expectations, and under different circumstances.  The Court should deny Plaintiff's request for five reasons.

*First*, Plaintiff cannot meet Rule 23(a)'s adequacy requirement because the proposed classes are irreconcilably conflicted over the fundamental premise of Plaintiff's claims.  *See, e.g.*, *Mayfield v. Dalton*, 109 F.3d 1423, 1425, 1427 (9th Cir. 1997) (denying class certification where members of the putative class approved of a government program that two named plaintiffs sought to challenge on constitutional grounds).  Simply stated, vast swathes of the proposed classes disagree with Plaintiff's claim that XRP is a "security" under federal and state law—*tens of thousands* of putative class members, who (unlike Plaintiff) continue to hold XRP, oppose the relief that Plaintiff seeks.  If Plaintiff succeeds on his claim, that determination would also have harmful repercussions on how XRP can be traded and used in the United States.  Businesses that use XRP as a form of payment or to compensate employees would be harmed.  These undisputed conflicts preclude class certification.

Plaintiff is further an inadequate class representative as someone who purchased predominantly (if not entirely) on the secondary market from sellers other than Defendants.  In a recent case involving digital assets, the court denied a motion for class certification on adequacy grounds because the plaintiff (as a foreign purchaser) had weaker claims than those held by other class members (domestic purchasers) and therefore was not incentivized to maximize the other class members' recovery.  *See Williams v. Block One*, 2022 WL 5294189, at *8 (S.D.N.Y. Aug. 15, 2022).  Similar concerns exist here.  As an indirect purchaser who did not purchase XRP

from Ripple, Plaintiff's claims face more serious challenges than claims held by those who purchased XRP directly from, and are in privity with, Ripple.  Because he is not incentivized to maximize direct purchasers' recovery in either class (and particularly in the state class) he is inadequate to represent them.

*Second*, Plaintiff cannot meet Rule 23(a)(3)'s typicality requirement.  Plaintiff bears the burden of establishing that XRP is a security, which turns, in part, on whether purchasers acquired XRP with an expectation that they would earn profit based solely on the efforts of Ripple.  *See SEC v. W.J. Howey*, 328 U.S. 293, 299-300 (1946).  Plaintiff submitted a declaration in this case ██████████████████[1]) attesting that he purchased XRP with the expectation that it would increase in value based on Ripple's efforts.  But Plaintiff's testimony is belied by his own day-trading of XRP.  To state the obvious, it takes more than a few hours or weeks to increase adoption of XRP by financial institutions (the supposed basis of Plaintiff's expectation of profit).  This means that with regard to a central question of the case—whether XRP constitutes an "investment contract" with Defendants—Plaintiff has a credibility problem. Because his claims are subject to unique defenses, that renders him atypical.

*Third*, Plaintiff cannot meet Rule 23(b)(3)'s predominance requirement because highly individualized assessments are needed to determine whether XRP purchasers have standing.  In the Ninth Circuit, a plaintiff must be able to show that issues relating to standing will not predominate over common questions.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (en banc).  The opposite is true here.  While Plaintiff attempts to avoid his obligations by defining his class around it (to encompass only those who suffered "loss"), courts have rejected similar attempts to define a "fail-safe" class. Further, Plaintiff has not met his burden to demonstrate a "common methodology" to calculate damages, offering only the opinion of Dr. Steven Feinstein, whose reports have repeatedly been found deficient in other cases and whose report in this case rests on numerous flawed premises.

*Fourth*, Plaintiff cannot meet Rule 23(b)(3)'s superiority requirement because

---

[1] *SEC v. Ripple Labs Inc. et al.*, No. 1:20-cv-10832 (S.D.N.Y.) (the "SEC Action").

1    individualized issues associated with identifying class members, conflicts among the class, and

2    the existence of a parallel SEC Action combine to make a class action an inferior route to resolve

3    Plaintiff's claims.  *See Urena v. Earthgrains Distrib., LLC*, 2017 WL 4786106, at *10 (C.D. Cal.

4    July 19, 2017) (denying class certification on superiority grounds).

5            *Fifth*, and finally, Plaintiff's attempt, as a Florida resident, to certify a worldwide class of

6    purchasers to pursue California state law securities claims fails for the same reasons as the

7    federal class and because variances between California and foreign jurisdictions overwhelm

8    common issues and preclude predominance for a single worldwide class.  *See Mazza v. Am.*

9    *Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), *overruled on other grounds by Olean*

10   *Wholesale*, 31 F.4th at 682 n.32.

11           Each of these reasons independently precludes class certification.  The few class actions

12   involving digital assets that Plaintiff cites raised none of these issues and do not support

13   Plaintiff's request.  To begin with, in those cases the defendants had defaulted and the plaintiffs,

14   even though they faced no opposition, sought to certify classes far narrower than the classes

15   Plaintiff proposes here.  *See, e.g.*, *Williams v. KuCoin*, 2021 WL 5316013 (S.D.N.Y. Oct. 21,

16   2021) (certifying class of purchasers of TOMO token who *bought on a single exchange*), *report*

17   *and recommendation adopted*, 2022 WL 392404 (S.D.N.Y. Feb. 9, 2022); *Balestra v. Cloud*

18   *With Me Ltd.*, 2020 WL 4370392, at *1 (W.D. Pa. July 2, 2020) (certifying class of initial coin

19   offering ("ICO")[2] purchasers, not years of secondary market activity), *report and*

20   *recommendation adopted*, 2020 WL 4368153, at *1 (W.D. Pa. July 30, 2020); *Davy v. Paragon*

21   *Coin, Inc.*, 2020 WL 4460446, *1 (N.D. Cal. June 24, 2020) (certifying class of only *direct*

22   purchasers in an ICO).  More fundamentally, none of the cases cited by Plaintiff concerned a

23   digital asset, like XRP, that continues to trade with value, volume, and demonstrated utility.

24   XRP's inherent qualities are why *countless* businesses and XRP holders fundamentally disagree

25

26   _____

27   [2] An Initial Coin Offering ("ICO") is a pre-sale of digital assets in which the seller "tell[s]
     purchasers that the capital raised from the sales will be used to fund development of a digital
     platform." Ex. 61.  In contrast, the XRP Ledger was fully functional at all relevant times,

28   Defendants never pre-sold XRP, and there was no ICO for XRP.  Ex. 53, Schwartz Decl. ¶¶ 4-5.

1    with Plaintiff's lawsuit, rendering the class rife with conflicts that did not exist in any of the

2    cases upon which Plaintiff relies.  His motion should be denied.

3    **II.    FACTUAL BACKGROUND**

4        **A.  Defendants and the Creation of XRP and the XRP Ledger**

5        Defendant Ripple Labs Inc. is a privately held financial technology company employing

6    more than 700 people in 15 offices worldwide.  Ex. 54, Long Decl. ¶ 2.[3]  Defendant XRP II,

7    LLC is a wholly-owned subsidiary of Ripple Labs that was founded in 2013.  It merged into a

8    limited liability company in Delaware named Ripple Markets DE LLC on December 3, 2021.

9    Ex. 60.  Defendant Bradley Garlinghouse is Ripple's current Chief Executive Officer.  Ex. 54,

10   Long Decl. ¶ 2.  For the past decade, Ripple has worked with its customers—financial

11   institutions, payment providers, and corporations—to make cross-border payments (such as

12   remittances) faster, cheaper, and more transparent.  *Id.* ¶ 3; Ex. 1, Larsen Dep. 232:19-234:18.

13       The XRP Ledger, launched in 2012, is a distributed ledger enabled by open-source

14   software technology that can securely record transactions at lightning-fast speeds.  Ex. 53,

15   Schwartz Decl. ¶¶ 3-5.  The three individuals who developed the source code for the XRP

16   Ledger intended to create a blockchain that was better than Bitcoin by increasing the speed of

17   transactions, reducing their cost, and minimizing energy consumption.  *Id*. ¶ 3.

18       XRP is a virtual currency—the native currency of the XRP Ledger.  Ex. 64.  Upon its

19   launch in 2012, the XRP Ledger's code automatically generated a fixed supply of 100 billion

20   XRP.  Ex. 53, Schwartz Decl. ¶ 5  Ripple's founders, Chris Larsen, Arthur Britto, and Jed

21   McCaleb (none of whom are defendants in this case), gave 80% of that XRP to a newly formed

22   corporate entity, now called Ripple,[4] retaining 20 billion among themselves.  *Id*.  Over the years,

23   Ripple has sold some of the XRP it received.  *See* Ex. 54, Long Decl. ¶ 8.  It has also donated

24   more than 2 billion XRP to a charities and given away hundreds of millions of XRP to

25

26   [3] All exhibits are attached to the Declaration of Meghan H. Strong, filed concurrently herewith.

27   [4] The company was initially named NewCoin, Inc. and incorporated under California law in
     September 2012.  It was renamed OpenCoin, Inc. in October 2012.  The company was renamed
28   Ripple Labs Inc. in 2013 and incorporated under Delaware law in 2014.  Exs. 59, 62, 63.

1    developers of XRP-focused software through an initiative called Xpring, which is now known as

2    RippleX.  *Id.* ¶ 11-12.  Today, Ripple owns less than 50 billion XRP, compared to the more than

3    50 billion plus held by persons and institutions other than (and mostly unknown to) Ripple.  *Id.*

4    ¶ 13.

5           Ripple was founded in 2012, after the core code for the XRP Ledger was completed.  Ex.

6    53, Schwartz Decl. ¶¶ 5-7.  Ripple did not conduct an ICO for XRP; in fact, no XRP was sold

7    before the launch of the XRP Ledger.  *Id.*; *see also supra* n.2.  When XRP was first sold to the

8    public in 2013, the technology on which XRP was based was already operational.  *Id.* ¶ 4.

9        **B.  The Many Uses of XRP and the XRP Ledger**

10          Since its early days, Ripple's vision has been to create the "Internet of Value," allowing

11   money to move as easily as information does over the internet.  Ex. 1, Larsen Dep. 232:19-

12   234:18.  One area Ripple targets is cross-border payments, a roughly $20 trillion market that still

13   depends on mid-20th-century payment technologies.  Ex. 54, Long Decl. ¶ 3.  Ripple seeks to

14   modernize international payments by developing a global network for international currency

15   transfers.  Ex. 1, Larsen Dep. 232:19-234:18.  Some, but not all, of Ripple's products and

16   services rely on the XRP Ledger and XRP.

17          RippleNet is a software product developed by Ripple that allows enterprise customers to

18   clear and settle cross-border financial transactions on mutually agreed terms.  Ex. 54, Long Decl.

19   ¶ 3-4. RippleNet has been used by hundreds of financial institutions and payment providers

20   across more than 55 countries and six continents.  *Id.* ¶ 3.  RippleNet customers can settle cross-

21   border transactions using fiat currency or can opt to use a feature called On Demand Liquidity

22   ("ODL"), which uses XRP.  *Id.* ¶ 4.  ODL leverages the inherent properties of XRP—fast

23   settlement and low transaction costs—to allow cross-border transactions to settle in nearly real

24   time rather than in days, as traditional means require.  Ex. 2, Birla Dep. 43:10-17.  ODL also

25   enables transactions during times when traditional banks are closed.  Ex. 3, Samarasinghe Dep.

26   230:21-231:5.  To date, nearly $15 billion in ODL payments have been made—meaning nearly

27   $15 billion in XRP has been used as a bridge currency to facilitate cross-border transactions

28   using Ripple's products alone.  Ex. 54, Long Decl. ¶ 4.

1   Ripple's ODL product is just one application that uses the XRP Ledger.  Many other

2   developers with no connection to Ripple have built software products that use the XRP Ledger,

3   such as a range of payment-processing applications including micropayments.  Ex. 53, Schwartz

4   Decl. ¶ 8.  XRP is used in myriad ways globally, from facilitating cross-border payments to a

5   currency in exchange for goods and services.  The exact number of individuals and entities that

6   use or have used the XRP Ledger or XRP is unknown and unknowable to Ripple.  *Id.* ¶ 9.

7   XRP is also part of a robust, fully functioning currency market that allows trades between

8   XRP and various other currencies (both traditional fiat currencies and digital assets).  Ex. 54,

9   Long Decl. ¶ 5.  XRP has traded on more than 200 exchanges around the world.  *Id.*  These

10  trades happen in blind bid/ask transactions where neither side knows their counterparty.

11  Ripple's sales account for only a tiny proportion of XRP transactions on these exchanges.  *See,*

12  *e.g.*, Ex. 58.  Since May 2020, essentially all of Ripple's sales of XRP have been to ODL

13  customers that have sourced XRP directly from Ripple for cross-border transactions.  Ex. 54,

14  Long Decl. ¶ 8.  Currently, a robust secondary market is flourishing with trading volume

15  averaging between approximately $600 million and approaching $1 billion per day.  *Id.* ¶ 7.

16  **C.  Plaintiff's Class Definitions**

17  Plaintiff has defined two putative classes:

18  ● <u>Federal Securities Claims Class</u>:  All persons or entities who purchased XRP from
    May 3, 2017 to the present and who have (a) retained the XRP, and/or (b) sold the
19  XRP at a loss.

20  ● <u>California State Securities Claims Class</u>:  All persons or entities who purchased
    XRP from Defendants and/or from any person or entity selling XRP on
21  Defendants' behalf from May 3, 2017 through the present and who have
    (a) retained the XRP and/or (b) sold the XRP at a loss.
22

23  Although people and entities purchase XRP in a variety of different ways and for a

24  variety of purposes, neither Plaintiff's definitions nor his motion explain what constitutes a

25  "purchase" of XRP.  Plaintiff's experts also do not know what constitutes a purchase of XRP or

26  who qualifies as a purchaser.  Ex. 4, Azari Dep. 37:20-22 ("Q. And what are the different ways

27  in which a person or entity could purchase XRP? A. You know, I don't know."); *id.* 43:25-46:3;

28

1  Ex. 5, Feinstein Dep. 58:24-59:6.

2  **D.  Plaintiff Is a Day-Trader from Florida**

3  Plaintiff is a resident of Florida.  Ex. 6, Sostack Dep. 19:5–8.

8  **E.  Plaintiff Seeks Overlapping Relief to That Sought by the SEC**

9  On December 22, 2020, the SEC filed a suit bringing similar claims against Ripple, Brad

10  Garlinghouse, and Chris Larsen.  *See* SEC Action ECF No. 4.  The SEC contends that from 2013

11  through 2020, XRP was an investment contract and therefore a security under the Securities Act.

12  Summary judgment has been fully briefed in the SEC Action since November 2022.  Strong

13  Decl. ¶ 2.  The SEC is seeking an injunction, disgorgement, and a penalty, and if successful, that

14  money would be distributed to XRP purchasers through a fair fund.

15  The case has generated significant public attention and scrutiny.  A total of fourteen

16  amicus briefs filed by businesses and individuals raised concerns with the SEC's arguments.

17  Exs. 9-22.  These amicus briefs include one brief filed by six XRP purchasers, purporting to

18  represent more than 74,000 additional XRP purchasers, who fundamentally disagree that they

19  purchased a security when they bought XRP.  Ex. 17.

20  **III.   LEGAL STANDARD**

21  "The class action is an exception to the usual rule that litigation is conducted by and on

22  behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

23  (cleaned up).  "To come within the exception, a party seeking to maintain a class action 'must

24  affirmatively demonstrate his compliance' with Rule 23."  *Id.* (quoting *Wal-Mart Stores, Inc. v.*

25  *Dukes*, 564 U.S. 338, 350 (2011)).

26  Rule 23 has two parts.  Rule 23(a) requires that plaintiffs satisfy four threshold

27  requirements:  numerosity, commonality, typicality, and adequacy of representation.  Fed. R.

28  Civ. P. 23(a).  A plaintiff seeking money damages, like Plaintiff does here, must also establish

that the class satisfies Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  As part of the superiority consideration, courts consider factors including whether the class is manageable and whether class members can be identified and given adequate notice. *See also Walker v. Life Ins. Co. of Sw.*, 953 F.3d 624, 632 (9th Cir. 2020) ("the superiority prong might best lend itself to considering" issues of class member identification).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Plaintiffs "must actually *prove*—not simply plead—that their class satisfies each requirement of Rule 23," and they must do so by a preponderance of the evidence.  *Olean*, 31 F.4th at 664-65 (cleaned up).  "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'"  *Wal-Mart*, 564 U.S. at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

## ARGUMENT

## IV.   PLAINTIFF CANNOT SATISFY RULE 23(A) BECAUSE HE IS AN INADEQUATE REPRESENTATIVE FOR HIS OVERBROAD CLASSES

For class certification to be granted, Plaintiff must "prove that [he is] in fact" an adequate representative, *Wal-Mart*, 564 U.S. at 350, and the court must verify the putative class's "actual, not presumed, conformance with Rule 23(a)." *Falcon*, 457 U.S. at 160.  "Adequate representation depends upon an absence of antagonism [and] a sharing of interests between representatives and absentees." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (cleaned up).  Rule 23(a)'s adequacy requirement protects the due-process interests of unnamed class members who will be bound by a judgment litigated on their behalf by their representative.  *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 379 n.5 (1996).  The purpose of the adequacy requirement is thus to "uncover conflicts of interest between named parties and the classes they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Here, Plaintiff is not an adequate representative of the classes he proposes because both classes are rife with antagonism and irreconcilable conflicts.  In claiming that his "interests

are aligned with the proposed classes," Mot. at 13, Plaintiff fails to address these conflicts.

### A. Plaintiff Cannot Adequately Represent Class Members Who Disagree With the Premise and Aims of His Lawsuit

Conflicts that are "fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *Sidibe v. Sutter Health*, 333 F.R.D. 463, 488 (N.D. Cal. 2019) (cleaned up). "A conflict is fundamental when it goes to the specific issues in controversy." *Id.* (cleaned up); *see also Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) (courts will consider class conflicts when they are "apparent, imminent, and on an issue at the very heart of the suit").

This case presents an incontrovertible deep divide among putative class members as there are thousands of putative class members who do not agree with the fundamental premise of this case and the claims Plaintiff prosecutes, and who would be harmed by the relief Plaintiff seeks. The Ninth Circuit has affirmed the denial of class certification in similar circumstances. Specifically, in *Mayfield v. Dalton*, two members of the military objected to participating in a military program and challenged its legality on constitutional grounds, while seeking to represent a class of all military personnel. 109 F.3d at 1425, 1427. Not all military personnel, however, shared the named plaintiffs' objections to the program. The Ninth Circuit agreed with the district court that the two representatives "who objected to the [program], could not properly represent a class comprised of all service members who were compelled to participate in the program because there were undoubtedly people among the broad class proposed by them who did not oppose [it], and who, in fact, approved of it and wished the policies fully enforced." *Id.* at 1427. Numerous other cases have similarly held that a plaintiff cannot properly represent members of a class who oppose the relief that they seek.[5] And such concerns were absent in the few digital

---

[5] *See Hansberry v. Lee*, 311 U.S. 32, 44 (1940) (plaintiff who wanted to enforce an agreement was inadequate representative for those who wanted to resist enforcement); *Schlaud v. Snyder*, 785 F.3d 1119, 1128 (6th Cir. 2015) (per curiam) (affirming denial of class certification where named plaintiff's interests conflicted with the interests of part of the class that did not want to be part of the union); *Centeno v. Dep't of Soc. & Health Servs.*, 2015 WL 12670405, at *5 (W.D.

asset cases certifying class actions, two of which (*Balestra* and *Davy*) involved tokens that had yet to even be developed, and none of which involved a virtual currency like XRP with a diversity of use cases and robust global trading market.

### 1. Plaintiff Is in Conflict With Class Members Harmed by His Claims

Plaintiff cannot adequately represent putative class members who have made clear that a determination that XRP is a "security" would cause them harm.  Thousands of class members who currently hold XRP (unlike Plaintiff, who sold) would be harmed by the relief Plaintiff seeks due to its impact on their ability to access, sell, and/or use XRP.  *Cf. Amchem*, 521 U.S. at 626 (putative representative who suffered injury could not adequately represent a class who might suffer future injury because of conflict between goal for immediate payment for harmed members versus protection fund for the future for those who may be harmed).

Plaintiff's conflict with these putative class members is made clear by what has transpired in the parallel SEC Action, in which *more than 10,000* XRP holders who opposed the SEC's legal theory sought to intervene *as defendants* because "the entire theory being pursued by the SEC threatens their interests."  Ex. 23 at 22.  They explained that if the SEC succeeds in showing XRP is a security (like Plaintiff seeks to do here) their "ability to utilize, trade or transact in XRP could be impaired even though there is nothing about their conduct that could plausibly make XRP an investment contract."  *Id.*  "[T]housands of innocent holders' life savings and retirement accounts are frozen, unable to convert their XRP into Bitcoin, Ether or USD".  Ex. 17 at 29; *see also* Ex. 24 at 1.  Though the court denied these purchasers' motion to intervene, it permitted the group's counsel to later submit an amicus brief, on behalf of six XRP

---

Wash. June 9, 2015) (plaintiff who opposed paying dues not adequate representative for those who willingly consent to pay dues since this is a "disagreement going to the very subject matter of the litigation"); *Peterson v. Okla. City Hous. Auth.*, 545 F.2d 1270, 1273 (10th Cir. 1976) (affirming denial of class certification because named plaintiff seeking to invalidate the requirement of a security deposit with a lease could not adequately represent class of tenants, many of whom had paid the deposit and did not object to the requirements and thought it would help them by encouraging better upkeep of neighboring units); *Lee v. Pep Boys-Manny Moe & Jack of California*, 2015 WL 9480475, at *9 (N.D. Cal. Dec. 23, 2015) (representative could not adequately represent class members who wished the challenged practice to remain in place).

holders, which he did in opposition to the SEC's motion for summary judgment. In that amicus, counsel represented that the group of XRP purchasers who oppose the SEC's motion for summary judgment now "stands at 74,502 XRP holders." Ex. 17 at 10 n.3. These XRP holders expressed a range of harms that would result to them, including financial losses, potential legal liability and disruption of numerous innovative applications of XRP if XRP were deemed a "security," which is precisely the relief Plaintiff seeks here. *Id.* at 2-3, 29.

In addition, a determination that XRP is a security would also harm businesses that purchase XRP for various reasons. For example, Valhil Capital, LLC, is a private equity firm that compensates its executives in XRP and holds portfolio investments that maintain their excess cash in digital assets, including XRP. Valhil has explained that if sales of XRP are determined to be a security, it would "severely prejudice Valhil, materially and adversely impacting the value of Valhil and its portfolio of companies that seek to make use of XRP." Ex. 22 at 1, 10. TapJets, Inc.—a private jet charter service—has represented that it "will suffer significant financial damages" if XRP is determined to be a security since it has "invested a significant amount of its resources to build a proprietary platform to accept and process XRP." Ex. 11 at 10. TapJets has distinguished itself by permitting the instant booking and dispatch of private jet flights even after the close of banking hours, which has been an important tool for, among other uses, medical transport for organ transplants and donor transport. *Id.* at 2-4. "The acceptance XRP as payment for services "has become vital" to TapJets' business. *Id.* at 5.

## 2. Plaintiff Is in Conflict With Class Members Who Could Be Exposed to Legal Liability if Plaintiff's Claims Succeed

If Plaintiff prevails on his core allegation that XRP is a "security," then, in theory, members of the putative class who sold XRP could themselves be alleged to have engaged in the unregistered sale of a security. Class members would need to analyze whether their sales subject them to legal liability on the same type of securities law claim that Plaintiff now seeks to bring on their behalf. For many, the risk of liability would be real.

While there are exemptions in Section 4 of the Securities Act that provide safe harbors

1    for certain sellers of unregistered securities, these exemptions are not a panacea.[6]  XRP

2    purchasers would bear the burden of proving an exemption.  *See* Ex. 17 at 11.  And the

3    exemption is unavailable to "underwriters" and "dealers," creating risk to class members who

4    might be deemed as such.  *E.g.*, *SEC v. Olins*, 2010 WL 900518, at *2 (N.D. Cal. Mar. 12, 2010).

5    Notably, the SEC has taken an expansive view of what constitutes a "dealer," recently defining

6    the term to include a wide range of investments funds engaged in buying and selling securities.

7    *E.g.*, *SEC v. Fife*, 2021 WL 5998525, at *1 (N.D. Ill. Dec. 20, 2021) (observing without ruling

8    on the SEC's assertion that the definition of a "dealer as defined in the Exchange Act refer[s] to

9    persons or entities that buy and sell securities over 'more than a few isolated transactions' and

10   hold themselves out to the public as doing so").  Under the SEC's interpretation, numerous class

11   members that buy and sell XRP in volume may not qualify for an exemption from liability.  In

12   short, Plaintiff, if successful, could expose putative class members to legal risk.

13                     **3.  This Class Conflict Is Rooted in XRP Purchasers' Differing Expectations**

14           The term "security" is defined in the Securities Act to include an "investment contract,"

15   and the Supreme Court in *Howey* held that the term "investment contract" means "an investment

16   of money in a common enterprise with profits to come solely from the efforts of others."[7]  328

17   U.S. at 301; *see also Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009).  Thus, whether

18   XRP is a security—*i.e.*, an investment contract—turns in part on whether purchasers understood

19   themselves to be investing money in a common enterprise, expecting to make profits "solely

20

21

22   [6] At the very first hearing in the SEC Action, Judge Netburn immediately seized on the breadth
     of the SEC's similar claim, pressing the SEC to clarify whether it viewed every sale in the
23   secondary market as a violation of the Securities Act (as Plaintiff contends here).  Ex. 25 at 44:7-
24   9 ("Presumably under this theory then, every individual in the world who is selling XRP would
     be committing a Section 5 violation based on what you just said.").  The SEC was forced to
25   acknowledge that this was the logical conclusion of its theory of liability but sidestepped the
     issue by claiming that sellers on the secondary market might be protected by exemptions in
26   Section 4 of the Securities Act.  *See* Defendants' Memorandum of Law in Supp. of Mtn. for
     Summ. J., SEC Action, ECF No. 622 at 14 n.10; Ex. 25 at 44:7-24.
27
     [7] Defendants will argue at summary judgment that Plaintiff cannot meet any prong of the *Howey*
28   test, an issue that is not ripe for decision at the class certification stage.

from the efforts" of Ripple.[8]

The expectations of XRP purchasers, however, vary dramatically.  These purchasers range from sophisticated financial institutions that buy and use XRP to facilitate cross-border transactions, to speculators and day traders, to those who acquire digital assets as alternatives to government-backed currencies, to those who use it to buy tangible goods (like a cup of coffee), to employees who receive it in exchange for their labor, among many other scenarios.

Plaintiff himself claims that he bought XRP based on an expectation that it would increase in value due to Ripple's efforts, ECF No. 181-66 ¶¶ 5-6, but many purchasers did not share this expectation. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Similarly, several amicus briefs submitted by businesses in the SEC Action show an entirely different set of expectations than those of Plaintiff.  *E.g.*, Ex. 13 at 11 (purchased XRP not to make a profit but to create an application on the XRP Ledger in order to solve a problem related to Bitcoin transfers).

For these thousands of putative class members, the notion that *their* XRP—that they purchased and may still own—is a "security" comes as an unwanted surprise.  Yet, even though

---

[8] The "reasonable purchaser" standard is an objective one, but evidence of actual purchasers' beliefs can bear on what hypothetical "reasonable purchasers" believed, particularly where there is no reason to think the actual purchasers were unreasonable.  *See, e.g.*, *Warfield*, 569 F.3d at 1021 ("[T]he subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts"); *SEC v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1239 n.2 (S.D.N.Y. 1978) (finding it is "not without significance that, of the two customers of EGA called as witnesses by the SEC, one readily agreed on cross-examination that he considered entry into the lottery as 'a gamble, a bet'").

[9] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

XRP had been trading for *years* on the open market as a currency (not a security), Plaintiff and the SEC brought lawsuits seeking to establish that these members' XRP is a security, exposing them to harm and legal risk.  While this Court need not, and should not, decide the central issue of whether *Howey* is satisfied on class certification, the sheer number of putative class numbers with differing expectations help illuminate the reasons for the conflicts identified above.  Plaintiff, for his part, is ignorant to the conflict.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  While Plaintiff may not know about them, such class members not only exist, but number in the tens of thousands.  In this respect, Plaintiff's proposed class differs meaningfully from those classes certified in the digital asset cases upon which Plaintiff relies.  In *Davy*, for example, the digital asset in question had collapsed, so there was no issue of conflict with, or harm to, putative class members.  2020 WL 4460446, at *6 ("there is nothing in the record to suggest a conflict of interest exists").  Likewise, none of the other cases Plaintiff cites address conflicts like those presented here.  *KuCoin*, 2021 WL 5316013, at *13 (Plaintiff "has no apparent conflict with the class, let alone a fundamental conflict"); *Balestra*, 2020 WL 4370392, at *3 (no conflicts between plaintiff and putative class).[10]

## B.  Plaintiff Cannot Adequately Represent Direct Purchasers

An impermissible conflict also arises where a plaintiff seeks to represent a group of potential claimants whose claims are stronger than their own.  *See Block One*, 2022 WL 5294189, at *8.  In that situation, a plaintiff is inadequate to represent the class because he is not incentivized to maximize the recovery for a subgroup with stronger claims.  Here, such a conflict exists between Plaintiff—who bought all (or nearly all) of his XRP on the secondary market and is trying to recover from a party who is not his seller—and those putative class members who

---

[10] Opting out is not a viable option to solve this conflict, particularly given Plaintiff's inability to identify or provide notice to his putative class.  *See infra* Section VII.

1  bought directly from, and are therefore in privity with, one of Defendants.[11]

2     In *Block One*, the court denied class certification and rejected a proposed settlement due

3  to this precise form of conflict.  *Block One* concerned an ICO of digital assets that were traded

4  on both domestic and foreign exchanges.  *Id.* at *2-3.  The plaintiff sought to certify a settlement

5  class of all purchasers.  The problem was that the plaintiff's own claims suffered from a

6  weakness that other class members did not face—Plaintiff had purchased tokens on foreign

7  exchanges, meaning that in order to recover, he was forced to establish, on a transaction-by-

8  transaction basis, that his claims constituted "domestic" transactions under *Morrison v. National*

9  *Australia Bank Ltd.*, 561 U.S. 247 (2010).  Putative class members who had purchased on U.S.-

10 based exchanges, in contrast, did not face this hurdle.  The *Block One* court's concern was that

11 "class members have interests that are antagonistic to one another" because the "proportion of

12 [plaintiff's] investments made in domestic versus foreign transactions" may have given plaintiff

13 "the incentive to accept a lower settlement offer" than a plaintiff with predominantly domestic

14 transactions would have insisted upon.  2022 WL 5294189, at *8 (cleaned up).

15    Here, a similar antagonism exists because Plaintiff's claims on secondary market

16 purchases face substantial challenges that claims of class members who purchased solely or

17 predominantly from Defendants do not.[12]  To start, Plaintiff is inadequate to represent his

18 proposed state law class because that class is limited to those who bought directly from one of

19 Defendants, and Plaintiff's transactional records show that  he acquired at least 99.9% of his

20

21 _____

   [11] Plaintiff bought XRP on an exchange called Poloniex in January 2018, when XRP was trading

22 with a robust secondary market.  *See* Ex. 58; Ex. 8.  ████████████████████████████████████
   ████████████████████████████████████████████████████  Poloniex trading records

23 confirm that Plaintiff bought, at most, less than one tenth of one percent of his total XRP from

24 one of the market makers that had an engagement with Ripple.  Strong Decl. ¶ 3.  And it is not
   even clear this amount came *from Ripple* as ████████████████████████████████████████████

25 ████████████████████████████████████  Plaintiff is therefore predominantly, if not

   entirely, a secondary market purchaser who is not in privity with Ripple.

26 [12] This direct versus secondary market purchaser conflict did not exist in *Block One* because

27 plaintiff in that case pursued a Section 10(b)(5) claim which routinely encompasses claims
   related to both direct and secondary market purchasers.  Here, Plaintiff has not brought claims

28 pursuant to Section 10(b)(5).

1    XRP from sellers on the secondary market.  *See supra* n.11.  He therefore may not have standing

2    to represent the state class at all, let alone an incentive to maximize their claims.

3            Further, as a secondary market purchaser seeking to recover from upstream sellers,

4    Plaintiff's claims under *Howey* are simply weaker than those of direct purchasers for both

5    classes.  This is partly because the central question under *Howey* is whether an XRP holder has

6    (or had) an "investment contract" with Defendants, and there can be no "investment contract" if

7    there is no "contract" establishing the rights of the parties to begin with.  No privity, no contract.

8            On top of that, Plaintiff's claims are weaker because they are subject to a unique legal

9    defense: at summary judgment, Ripple will demonstrate that a plaintiff can recover on a

10   § 12(a)(1) claim only from his direct seller or a person who was acting on behalf of (or in concert

11   with) the direct seller to solicit the sale; he cannot recover from his seller's seller or other sellers

12   upstream.  The statutory text of § 12(a)(1) unambiguously cabins recovery to direct purchasers

13   by limiting the liability of any seller "to the person purchasing such security ***from him***," and

14   applying a recissionary measure of damages.[13]  15 U.S.C. § 77*l* (emphasis added); *see also*

15   *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988) ("a buyer cannot recover against his seller's

16   seller").  While courts have held that claims may proceed against defendants who are working in

17   concert with a seller and help to solicit that seller's direct sale, Plaintiff cites no appellate or

18   Supreme Court decision in which a buyer recovered from his seller's seller (or upstream sellers)

19   under Section 12(a)(1) of the Securities Act.[14]  While the Court need not resolve this issue until it

20

21   _____

     [13] While Plaintiff claims that this Court "held[] the solicitation theory applies to all XRP
22   purchases," (Mot. at 21) the issue was not squarely before the Court on Ripple's motion to
     dismiss and, while the Court referenced the "solicitation theory" in dicta in a footnote of its
23   order, it did not hold that any secondary market purchaser can pursue § 12(a)(1) claims against
     Ripple in this case.  ECF No. 85 at 22 & n.6.  As Ripple will argue at summary judgment, the
24   solicitation theory may permit a buyer to recover from his direct seller or someone soliciting a
     direct sale on behalf of the direct seller for financial gain, but as the Supreme Court succinctly
25   stated in *Pinter*, a buyer cannot recover from his seller's seller.

26   [14] While the Ninth Circuit in *Pino v. Cardone Capital LLC*, 55 F.4th 1253, 1260 (9th Cir. 2022)
27   recently opined on the scope of the solicitation theory, it did so only as it related to a direct
     purchaser from defendant.  It did not address (let alone endorse) that a purchaser can recover
28   from his seller's seller.

     _____
     DEFENDANTS' OPPOSITION TO LEAD          16          Case No. 4:18-cv-06753-PJH
     PLAINTIFF'S MOTION FOR CLASS
     CERTIFICATION

is fully briefed, at this stage it is clear that Plaintiff faces hurdles to recover on his claims that direct purchasers do not.  Plaintiff thus has interests antagonistic to members of the class and may not vigorously prosecute their claims relative to his own.  Just as in *Block One*, Plaintiff is not an adequate representative for the proposed class.

## V.    PLAINTIFF IS ATYPICAL DUE TO HIS LACK OF CREDIBILITY

Plaintiff also bears the burden, under Rule 23(a)(3), of establishing that his own claims and defenses are "typical of the claims or defenses of the class."  The test of typicality involves assessing, among other things, "whether the action is based on conduct which is not unique to the named plaintiffs . . . ."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (cleaned up).  Class certification "should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  Where a named plaintiff's "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class," the Ninth Circuit routinely finds typicality lacking.  *Id.* (quoting *Hanon*, 976 F.2d at 508).  Here, Defendants have a unique defense against Plaintiff's claims based on his lack of credibility to provide evidence on a key aspect of the *Howey* test.

To establish that XRP is a security, Plaintiff will need to prove that Ripple's sales of XRP constitute an "investment contract" as defined by the Securities Act, which turns in part on whether purchasers of XRP (a) invested money, (b) in a "common enterprise," and (c) were "led to expect profits solely from the efforts of" Defendants.  *Howey*, 328 U.S. at 299-300.  While *Howey* sets forth an objective test that turns on the reasonable expectation of purchasers, courts often consider evidence of actual purchasers' subjective experiences and real-world expectations.  *See supra*, n.8.  Thus, Plaintiff submitted fact declaration ████████████████ attesting that, as a matter of fact, *he* purchased XRP with an expectation that it would increase in value based on Ripple's efforts, including "its repeated representations that adoption of XRP by financial institutions would increase demand for XRP."  ECF No. 181-66 ¶ 6; *see also* Ex. 7.  He further expected that Ripple would "develop and improve the XRP Ledger," and

1   that Ripple would "secure additional exchanges through which XRP could be traded or sold."

2   *Id.*  Though Defendants dispute that such claims even credibly suggest that Plaintiff entered into

3   a common enterprise with Defendants, Plaintiff is clearly seeking to use his own, personal

4   experience with XRP to help meet his—and the putative class's—burden under *Howey*.

5         Plaintiff's credibility on the issue, however, is undermined by evidence that he acted as a

6   day-trader without any expectation of profit based on Ripple's efforts.  Plaintiff purchased XRP

7   for the first time on January 3, 2018.

8

9

10   [15]  In other words, Mr. Sostack day-

11   traded XRP, which is inconsistent with him having any expectation that XRP would increase in

12   value due to Ripple's efforts.  Developing uses that increase demand for a financial product takes

13   more than two weeks.

14         Plaintiff thus lacks credibility on an issue going to what he claims is the heart of his

15   case—whether Plaintiff can show that XRP meets the elements of *Howey*.  This renders his

16   claims atypical.  Courts have rejected representative plaintiffs where, as here, a lack of

17   credibility threatens to undermine their claims or subject them to unique defenses.  *See Guido v.

18   L'Oreal, USA, Inc.*, 2012 WL 2458118, at *4 (C.D. Cal. June 25, 2012) ("The discrepancies

19   between [plaintiff's] deposition testimony and the newly produced evidence threaten to

20   undermine her credibility, providing an alternative basis for the conclusion that her claims are

[15]

atypical."); *Drake v. Morgan Stanley & Co.*, 2010 WL 2175819, at *5 (C.D. Cal. Apr. 30, 2010) (unique defenses, including plaintiff's lack of credibility failed to meet typicality requirement).

## VI.   PLAINTIFF CANNOT MEET RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT

To obtain certification of a class under Rule 23(b)(3), Plaintiff must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (quotation marks omitted).  Rule 23(b)(3)'s predominance requirement "is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.  A plaintiff must prove that there are "questions of law or fact common to class members that can be determined in one stroke" that predominate over individualized ones.  *Olean*, 31 F.4th at 664 (quotation marks omitted).

Plaintiff cannot do so.  First, highly individualized issues regarding whether class members have standing predominate over common questions.  This must be addressed at the class certification stage.  Plaintiff cannot simply define a class around it, as he has impermissibly tried to do.  Second, Plaintiff has failed to put forward a common methodology to prove damages on a class-wide basis.

### A.  Individualized Issues of Standing Predominate Over Common Questions

The Ninth Circuit requires courts consider standing issues at the class certification stage. In an en banc decision, the Ninth Circuit explained that "[w]hen individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 668 (citing *Cordoba v. DirectTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019) ("[T]he district court must consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing.")).  Showing standing for the named Plaintiff alone is not enough; Plaintiff must show that individualized questions relating to the standing of class members will not predominate over common questions.  *Olean*, 31 F.4th at 668.

Plaintiff seeks to side-step the standing inquiry that *Olean* requires by defining his classes

to include only those purchasers who still hold XRP or who suffered a "loss" selling XRP.  This approach fails for two reasons.  First, Plaintiff cannot show who suffered a loss on the sale of XRP (and thus has standing) at all, much less with common evidence.  Second, the case law is clear that Plaintiff's proposed class definitions create impermissible fail-safe classes.

### 1. Plaintiff Cannot Show Who Has Standing With Predominantly Common Evidence

Plaintiff has a fundamental problem—he has no way to show who has standing with predominantly common evidence.  To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered concrete harm.  "No concrete harm, no standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).  Alleging a statutory violation alone (such as the sale of an unregistered security) is not enough.  *Id.* at 2207-13 (only those class members whose credit scores had been shared with third parties had standing to assert claim for violation of federal statute for failing to ensure accuracy of credit files; those whose files were kept inaccurately but not shared did not).  "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).  Therefore, to demonstrate standing, Plaintiff must show that XRP purchasers still hold XRP or sold at a loss, which cannot be done with common evidence.

In a typical securities class action, there is generally common evidence that bears on calculation of loss.  For example, the magnitude of loss might be established by the amount by which a fraud impacted a stock price, affecting all stockholders to the same degree.  But this is not a typical securities case.  Here, there is no way to show with predominantly common evidence which class members have standing and which do not.  Rather, establishing whether any XRP purchaser suffered a loss requires knowing specific, individualized information about the circumstances of each purchase and sale of XRP.[16]

---

[16] Plaintiff has not defined what constitutes a "loss" or how "loss" can be calculated for purposes of his class definition.  Plaintiff's claims administrator admitted he did not know the answer either.  Ex. 4, Azari Dep. 45:22-23 (Q. "Do you know what 'suffered a loss' means?" A. "I don't.").  And his damages expert acknowledged that his methodology could result in a gain or loss assessment that was inconsistent with a purchaser's *actual* gain or loss.  Ex. 5, Feinstein Dep. 72:21-73:18.

1    Setting aside that there are unanswered questions regarding a methodology for defining

2    and calculating loss (*e.g.*, whether it is calculated on a per unit basis, an individual buy/sale, or

3    across a portfolio), it is evident that the calculation will be highly specific to each purchaser,

4    involving at least the following elements: (1) quantity purchased, (2) price paid, (3) sale price,

5    (4) quantity sold, (5) form of consideration paid and received (*e.g.*, US dollars, Bitcoin,

6    Ethereum, Tether, etc.), and if not US dollars, an exchange rate to convert the purchase or sale

7    amounts into US dollars; (6) fees associated with any purchase and/or sale; (7) time/date of

8    transactions; and (8) the terms of any contract that bear on any gain or loss.  Ex. 52, Attari Rep.

9    ¶ 9; Ex. 5, Feinstein Dep. 52:6-9 (confirming that an evaluation of gain or loss requires

10   individualized information regarding price, quantity, form of consideration, and time of

11   transaction); *see also id.* 55:11-18; 64:13-16.  It cannot be assumed that any XRP purchaser

12   suffered a loss because a great many XRP purchasers surely sold for a gain.[17]  Rather, each of the

13   above-referenced factors must be assessed individually on a purchaser-by-purchaser basis.  This

14   issue was not presented in the factual scenarios in the digital asset cases cited by Plaintiff, which

15   predated or were based on a different standard than the standard now set forth in *Olean*.[18]

16   Common evidence cannot be used to conduct this assessment since there is no one

17   brokerage firm, or exchange, or clearinghouse that has all of this information.  Contrary to Mr.

18   Azari's unsupported assumption that this information is readily available, Pl. Ex. 63, Azari Decl.

19   ¶¶ 25-26, it is not.  Transactions on the XRP Ledger have no personally identifying information.

20

21   _____

22   [17] There can be no dispute that many, many XRP purchasers during the class period sold it for a gain.  The price of XRP today is trading higher than the price at the start of the class period.  Ex. 52, Attari Rep. ¶ 19, Figure 1.  And throughout the class period, price volatility provided ample opportunity for XRP purchasers to sell for a gain, regardless of whether they bought in the early, middle, or late part of the five-year class period.  *Id.*  Across the entire class period, considering all possible days in which a purchaser could buy and sell, 45-59% of the purchase-sale date combinations show gains in the price of XRP rather than losses.  *Id.* ¶ 44.

26   [18] Issues related to whether class members were harmed was not addressed at all in *Davy*, 2020 WL 4460446, and *Balestra*, 2020 WL 4370392, which is unsurprising given the assets floundered.  In *KuCoin*, standing was only addressed as to whether plaintiff could represent class members who bought a different digital asset.  *KuCoin*, 2021 WL 5316013, at *10.  In any event, all of these cases predate the clarification of the class certification requirements in *Olean*.

Schwartz Decl. ¶ 9.  And Ripple does not possess such information for the vast majority of the putative class because it was not a party or otherwise involved in those sales.  Even if Plaintiff could obtain information from the more than 200 exchanges that listed XRP around the world, this would leave unaddressed segments of the proposed class that purchased in other ways—for example, through bilateral transactions, on decentralized exchanges, or in exchange for a good or service, among numerous other methods.  Calculating gain or loss for each purchaser to determine standing is thus complicated and individualized and dwarfs any common questions.

In this way, this case is akin to "best execution" cases in which plaintiffs were unable to point to common evidence to establish loss, resulting in denials of class certification.  *Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 622 (8th Cir. 2021) (denying class certification where determining loss "entails individualized inquiry inconsistent with the predominance requirement of Rule 23."); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (affirming district court's finding of lack of predominance because "whether a class member suffered damages would have to be determined on a trade-by-trade basis because some class members would have suffered damages; while some would not" (quotation marks omitted)); *Telco Grp., Inc. v. Ameritrade, Inc.*, 2007 WL 203949, at *10 (D. Neb. Jan. 23, 2007) (denying class certification because economic loss could not be presumed and had to be instead assessed on an individualized basis), *aff'd on other grounds*, 552 F.3d 893 (8th Cir. 2009).  There, as here, there was no common evidence from which loss could be calculated.[19]  These issues will predominate and class certification should be denied.

### 2. Plaintiff Cannot Define a Class to Avoid His Obligation to Show Standing With Predominantly Common Evidence

Plaintiff has sought to avoid this problem by defining his class to include only those who

---

[19]  Common evidence could theoretically exist in an unregistered offering case where, for example, the "security" collapsed immediately following a single distribution that occurred over a limited period of time (like an ICO).  In those cases, common evidence would establish the price that investors paid in the offering, and a subsequent market price could do the lion's share of work establishing what each investor lost.  *Davy*, 2020 WL 4460446, at *7; *In re Tezos Sec. Litig.*, No. 17-cv-6779 (N.D. Cal. May 1, 2020); *Rensel v. Centra Tech, Inc.,* 2021 WL 4134984 (S.D. Fla. Sept. 10, 2021); *Balestra*, 2020 WL 4370392.  Those facts do not exist here.

1    sold for a loss (or held), but defining the class based on injury does not solve the problem.

2    Classes that are defined by whether a particular member can recover are known as "fail-safe"

3    classes and are prohibited.  *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010)

4    ("Fail-safe" classes are those "that determine[] the scope of the class only once it is decided that

5    a class member was actually wronged.").  Fail-safe classes are considered "palpably unfair" and

6    "unmanageable," *id.*, because they create a chicken-or-the-egg problem: whether a person is a

7    member of the class is an individualized inquiry dependent on whether or not they can recover

8    for the claim alleged.  *Pepka v. Kohl's Dep't Stores, Inc.*, 2016 WL 8919460, at *3 (C.D. Cal.

9    Dec. 21, 2016); *Moore v. Apple Inc.*, 309 F.R.D. 532, 542 (N.D. Cal. 2015) ("the inclusion of

10   class members whom, by definition, could not have been injured is not only problematic because

11   it demonstrates the overbreadth of the proposed class, it is also indicative of the individualized

12   inquiries that would be necessary to determine whether a class member has suffered any injury in

13   the first place").  Not only must the court address standing at class certification, *see Olean*, 31

14   F.4th at 668, but preventing the court from doing so by proposing a fail-safe class to dodge the

15   standing issue would generate endless practical problems: "[F]or example, to whom should the

16   class notice be sent?"  *Kamar*, 375 F. App'x at 736.

17        For this reason, courts here and across the country have found fail-safe classes based on

18   standing considerations to be improper.  *E.g.*, *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d

19   1125, 1138 n.7 (9th Cir. 2016) ("[D]efining the class to include only those individuals who were

20   'injured' by non-disclosure threatens to create a 'fail safe' class."); *see also White v. Hilton*

21   *Hotels Ret. Plan*, 2022 WL 1050570, at *5 & n.2 (D.D.C. Mar. 22, 2022) (collecting cases); *In re*

22   *Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015) ("Excluding all uninjured class members

23   at the certification stage is almost impossible in many cases given the inappropriateness of

24   certifying what is known as a 'fail-safe class'—a class defined in terms of the legal injury.");

25   *Dixon v. Monterey Fin. Servs., Inc.*, 2016 WL 3456680, at *4 (N.D. Cal. June 24, 2016) (striking

26   class action allegations from complaint because plaintiff's proposed class was fail-safe); *Brazil v.*

27   *Dell Inc.*, 585 F. Supp. 2d 1158, 1167 (N.D. Cal. July 7, 2008) (same).  Indeed, in *Olean*, the

28   Ninth Circuit explained that while a court could redefine an overbroad class "to include only

those members who can rely on the same body of common evidence to establish the common issue," it *cannot* "create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean*, 31 F.4th at 669 n.14.

Here, Plaintiff initially defined a class in his complaint as "all" XRP purchasers, ECF Nos. 63 ¶ 160 & 87 ¶ 166, but after learning in discovery that Defendants intended to argue that such a class could not be certified because too many class members lacked standing (based on their trading gains and lack of injury), Plaintiff shifted his class definitions to now include only those XRP purchasers who continue to hold or who sold for a loss.  Strong Decl. ¶¶ 4-5. Plaintiff cannot simply craft a class definition to circumvent his burden under *Olean* to demonstrate that individualized issues concerning standing can be shown with predominantly common evidence.  This Court should deny Plaintiff's motion on this basis alone.

### B.  Plaintiff Does Not Put Forward a Common Methodology for Proving Damages

To satisfy the Rule 23(b)(3) predominance requirement, damages must be "capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34.  In interpreting *Comcast*, the Ninth Circuit has made clear that, "a methodology for calculation of damages that [can] not produce a class-wide result [i]s not sufficient to support certification." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) (citing *Comcast*, 569 U.S. at 35-36).  While the need for individualized findings as to the *amount* of damages does not defeat certification, a plaintiff is required to put forward a common methodology for *calculating* damages across the class. *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016); *Siino v. Foresters Life Ins. & Annuity Co.*, 340 F.R.D. 157, 164 (N.D. Cal. 2022).

To meet his burden, Plaintiff proffers the expert report of Professor Steven Feinstein, who looks to Section 5 of the Securities Act to arrive at two damages calculations—one for individuals who purchased and later sold XRP, and another for individuals who purchased XRP but never sold it.  Pl. Ex. 62, Feinstein Rep. ¶¶ 19-20.  For putative class members that purchased and sold XRP, Dr. Feinstein's proposed "methodology" is to take the "$ amount paid," add interest income, and subtract the "$ amount received at time of sale." *Id.* ¶ 19.  For putative class members that never sold, Dr. Feinstein opines that damages are the amount paid at the time of

1  purchase, plus interest, minus the current monetary value of XRP. *Id.* ¶ 20. Dr. Feinstein's

2  calculation of damages under California Corporations Code § 25503 is the same as his

3  methodology for the federal class, other than the addition of attorneys' fees. *Id.* ¶ 24-25.

4      These "common methodologies" are too vague and undefined for this class to be

5  certified. XRP is bought and sold in a range of ways, including on centralized and decentralized

6  exchanges, in transactions recorded on the XRP Ledger, via negotiated, bilateral contracts, and in

7  exchange for goods and services, among other methods. It can be exchanged for other digital

8  assets (instead of US dollars) or other currencies, held long-term, or day-traded. Dr. Feinstein's

9  barebones model cannot be applied to the many ways in which XRP is exchanged. Here are just

10  four problems when trying to apply Dr. Feinstein's methodology:

11      First, Dr. Feinstein's model does not account for the billions of XRP that financial

12  institutions have purchased from Ripple to use in cross-border transactions using Ripple's ODL

13  product. These transactions have occurred pursuant to negotiated, bilateral agreements that

14  contain provisions bearing on gain or loss. Ex. 54, Long Decl. ¶ 4. Dr. Feinstein conceded

15  during testimony that it might be necessary to account for such contractual terms, Ex. 5,

16  Feinstein Dep. 113:1-22, but his model does not.

17      Second, Dr. Feinstein is silent on the fundamental question of whether "loss" is

18  calculated on a portfolio basis or based on individual trades. For example, assume that a person

19  buys 10 XRP and sells that 10 XRP on two different days, the first resulting in a $2 loss but the

20  second in a $3 gain, resulting in an overall gain of $1. Whether such a person would be a

21  putative class member is unclear from Dr. Feinstein's methodology.

22      Third is the problem presented by putative class members who bought and sold XRP in

23  "trading pairs" with other digital assets, for example, buying XRP with Bitcoin (or Ethereum),

24  just as Plaintiff did. If a purchaser buys and sells in Bitcoin, it makes sense to calculate gain and

25  loss in Bitcoin, not in US Dollars. Indeed, Section 12(a) itself specifically refers to calculating

26  loss by reference to the "consideration paid" for the security, (in this example, Bitcoin). *See* 15

27  U.S.C. § 77l. Dr. Feinstein's approach is to convert purchase and sale values into US dollars, but

28  this departs from economic reality and can produce absurd results. For example, under Dr.

Feinstein's methodology, a purchaser who buys XRP for 1 Bitcoin and thereafter sells it for 1.1 Bitcoin—thereby gaining 0.1 Bitcoin—could conceivably have a loss according to Dr. Feinstein if Bitcoin is converted to US dollars.

Further, Dr. Feinstein's model is silent on the question of how to convert the value of digital assets into US dollars. He testified that, at least for Bitcoin, he would use a Bloomberg exchange rate (for BTC/USD) as of 4 pm on the day of the trade. Ex. 5, Feinstein Dep. 108:15-109:12. However, this source and time is completely arbitrary. In the real world, the purchaser may have exchanged XRP for BTC at a time other than 4 pm, and evidence shows that the price of digital assets fluctuates (sometimes significantly) throughout the day. Ex. 52, Attari Rep. ¶¶ 21, 25. Exchange rates also differ from one another and a purchaser may have executed that conversion on an exchange where the exchange rate differed from that quoted by Bloomberg, or he may not have converted Bitcoin into US dollars at all. Dr. Feinstein conceded that exchange rates vary considerably across exchanges, and [redacted] Ex. 5, Feinstein Dep. 62:12-20; Ex. 6, Sostack Dep. 92:17-93:9. Dr. Feinstein's overly simplistic model captures none of that.

Fourth, Dr. Feinstein's methodology does not map to purchasers who acquired XRP in exchange for services or tangible goods.[20] This group would include, for example, those who bought XRP and exchanged it for groceries, a plane ticket or other goods. But Dr. Feinstein's model does not account for how to determine whether those purchasers suffered a "loss."

When pressed at his deposition, Dr. Feinstein retreated from his methodology, testifying

---

[20] Ex. 11 at 6 ("TapJets relies upon the acceptance of XRP to facilitate commercial transactions when fiat currency or credit card transactions are inadequate or impossible."); Ex. 23 at 16 ("XRP Holders include hundreds of developers, small businesses, artists and content providers who are paid in XRP."); Ex. 17 at 18 & Ex. U ("Time [Magazine] will accept all cryptocurrencies currently supported by Crypto.com Pay [including] bitcoin, ether, dogecoin, XRP and Litecoin."); Ex. 15 at 2 (market participants use tokens like XRP as "payment for goods and services, conveyance of intellectual property rights, inventory tracking and other 'back office' functions, or for a specific purpose in a given blockchain project.").

1  that even if his proposed methodology did not sufficiently calculate damages, he believed they

2  be by a "common methodology" albeit different from the one he proposed.  Ex. 5, Feinstein Dep.

3  65:13-66:10.  That, however, falls woefully short of meeting Plaintiff's burden that damages

4  "could feasibly and efficiently be calculated once the common liability questions are

5  adjudicated."  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

6      Dr. Feinstein's damages methodology is a vague, generalized, one-size-fits-all formula

7  (that does not actually "fit all").  Multiple courts presented with similarly deficient formulas

8  proffered by Dr. Feinstein have denied motions for class certification, finding his attempts to

9  articulate a "common methodology" to calculate damages on a class-wide basis insufficient.

10     For example, in *Ohio Public Employees Retirement System*, Dr. Feinstein opined that it

11  was possible to calculate damages using a common methodology with respect to alleged

12  misrepresentations relating to common stock for the Federal Home Loan Mortgage Corporation.

13  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *1 (N.D.

14  Ohio Aug. 14, 2018).  There, as here, Dr. Feinstein proposed a generic formula to conclude that a

15  common methodology could be applied to all class members but admitted that "the specifics of

16  exactly which model I would use, I have not yet determined."  *Id.* at *19.  Defendants explained

17  that this meant Dr. Feinstein has not developed a method that could calculate damages on a

18  class-wide basis.  *Id.*  The court agreed and denied class certification and granted defendant's

19  motion to strike Dr. Feinstein's expert testimony because his "proposed damages approach is

20  general and vague, and it fails to account for issues presented by [Plaintiff's] theories of

21  damages."  *Id.* at *19.  The court explained, "[w]hen a class plaintiff presents a damages model

22  that is vague, indefinite, and unspecific, or simply asserts (as did Dr. Feinstein) that there are

23  unspecified 'tools' available to measure damages, the model amounts to 'no damages model at

24  all,' and the class cannot be certified."  *Id.* (cleaned up).

25     Dr. Feinstein's analysis was also rejected in *Sicav v. James Jun Wang*, 2015 WL 268855,

26  at *2-3 (S.D.N.Y. Jan. 21, 2015).  There, the plaintiff offered Dr. Feinstein's expert report in

27  support of his motion for class certification in connection with a securities case.  2015 WL

28  268855, at *2-3.  The court denied class certification, holding that Dr. Feinstein's expert report

1   "does not undertake a close analysis, or indeed any analysis, of the trading activity at issue *in this*

2   *case* to determine if a credible claim can be made, based on actual evidence." *Id.* at *4.  The

3   court stated that Dr. Feinstein's report failed to "provide the Court with a concrete, non-

4   speculative basis on which to reach the conclusion that a determination of [the company's]

5   liability to [Plaintiff] would fairly resolve defendants' liability to the broadly-defined class." *Id*.

6   at *5.  These cases are not the only ones.  *See Dean v. China Agritech*, 2012 WL 1835708, at *7-

7   8 (C.D. Cal. May 3, 2012) (denying motion for class certification and questioning whether Dr.

8   Feinstein's expert opinion was "meaningful"); *Finklestein v. Liberty Digital Inc.*, 2005 WL

9   1074364 (Del. Ch. Ct. April 25, 2005) (ignoring Dr. Feinstein's expert opinion due to its failure

10  to consider the actual circumstances in the case).

11          Dr. Feinstein's damages methodology here is a similarly vague and deficient.  Given Dr.

12  Feinstein's admission that he has no real experience working with cryptocurrency-related assets,

13  this is perhaps unsurprising.  Ex. 5, Feinstein Dep. 21:16-22:13 (admitting he has no statements,

14  publications or writing relating to any cryptocurrency); *id*. at 22:21–25; *id.* at 23:1–13; *id.* at

15  25:2–19.  As it stands, his proposal is too ill-defined to know how it might apply in myriad real-

16  world situations involving XRP, and in many instances it produces results that depart from the

17  economic reality of the transactions at issue.  Accordingly, Plaintiff failed to meet his burden of

18  offering a "common methodology" to calculate damages on a class-wide basis.

19  **VII.   PLAINTIFF CANNOT MEET RULE 23(B)(3)'S SUPERIORITY REQUIREMENT**

20          To certify a Rule 23(b)(3) class, the Court must also find "that a class action is superior to

21  other available methods for fairly and efficiently adjudicating the controversy."  Courts evaluate:

22  "(A) the class members' interest in individually controlling the prosecution or defense of

23  separate actions; (B) the extent and nature of any litigation concerning the controversy already

24  begun by or against class members; (C) the desirability or undesirability of concentrating the

25  litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class

26  action."  Fed. R. Civ. P. 23(b)(3).  Issues regarding the ascertainability of the class are most

27  properly evaluated in this class certification requirement.  *See Briseno v. ConAgra Foods, Inc.*,

28  844 F.3d 1121, 1127-29 (9th Cir. 2017).  Here, Plaintiff cannot show a class action is superior.

First and foremost, putative class members who hold XRP have strong interests in individually controlling their own rights and interests.  *See* Fed. R. Civ. P. 23(b)(3)(A).  As discussed *supra*, thousands of businesses and XRP holders may be harmed by the relief Plaintiff seeks.  This large faction has a strong interest in *not* becoming part of Plaintiff's class.

Second, the desirability of concentrating the litigation of these claims in a class action is outweighed by the unmanageability of Plaintiff's broad putative class.  *See Urena*, 2017 WL 4786106, at *10.  Plaintiff defined two massive classes encompassing every purchaser of XRP anywhere in the world.  Plaintiff has not even shown how he could identify all such class members, let alone provide them with sufficient notice to satisfy due process.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974) ("Notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (cleaned up).[21]

While Plaintiff submitted the declaration of a claims administrator, Cameron Azari, who concluded that the "[c]lasses are readily identifiable," Pl. Ex. 63, Azari Decl. ¶ 25, Mr. Azari did not know who constitutes a "purchaser," believing that would be decided by the Court.  Ex. 4, Azari Dep. 43:25-44:5.  He did not know what percentage of XRP purchasers are located abroad, or the countries in which they are located.  *Id.* 32:18-21.  Despite claiming that he can give notice to 70-95% of the class, he did not know how many are in the class (nor whether it is closer to 10,000 or 50 million) and, when pressed, admitted it is just an assumption that he will be able to create a notice plan that reaches such a high percentage, though he has not yet designed one. *Id.* 33:9-34:12; 77:25-78:2.  He admitted that his conclusion that "data for the purpose of class notice can be readily obtained," Pl. Ex. 63, Azari Decl. ¶ 26, is actually just an assumption based on representations by Plaintiff's counsel; he has not seen such data.  Ex. 4, Azari Dep. 56:9-57:7.

As of now, Mr. Azari has no information and no plan for how to identify or provide

---

[21] Plaintiff's California Class poses additional challenges since only purchasers who bought from Defendants (or their agents) are members of the class; yet, most purchases on an exchange are blind bid/sell transactions in which the purchaser does not know from whom they are buying. ███████████████████████████████████████

notice to any class member and, thus, does nothing to help this Court make an assessment of whether the proposed classes are manageable.  They are not.[22]  This issue is of particular concern here given the large number of class members who oppose this action and may not even receive notice of it.  *See Centeno*, 2015 WL 12670405, at *5 ("Opt-out cannot be relied on to cure class conflict where the data suggest both significant numbers of likely dissenters and significant numbers of class members who are not easily located.").

Third, the parallel SEC Action addresses the question of whether Ripple's sales of XRP constitute "investment contracts."  In that case, the parties' summary judgment motions are fully briefed and pending, and any disgorgement relief obtained by the SEC would be distributed to XRP purchasers through its standard "fair fund" claims process.  Compl., SEC Action, ECF No. 4 at 70; *see Liu v. SEC*, 140 S. Ct. 1936, 1942, 1946-48 (2020) (when the SEC seeks disgorgement it must be "awarded for victims" and "[t]he equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit."). In light of these unique circumstances, this putative class action is inferior to the fully briefed SEC Action which will fairly and efficiently adjudicate the controversy at issue here.

## VIII.   PLAINTIFF'S CALIFORNIA CLASS FAILS

For his California claims, Plaintiff defines a separate class of "All persons or entities who purchased XRP from Defendants and/or from any person or entity selling XRP on Defendants' behalf from May 3, 2017 through the present and who have (a) retained the XRP and/or (b) sold the XRP at a loss" (the "California Class").  Mot. at 2.  This class also fails.

### A.  Plaintiff's California Class Fails for the Above Reasons

Plaintiff's California Class fails for all the reasons described above: Plaintiff is inadequate because the class is rife with conflicts; he is atypical because he lacks credibility presenting evidence concerning *Howey*; and he has failed to demonstrate predominance and superiority.  Most importantly, Plaintiff's status as a secondary-market purchaser (on at least

---

[22] Plaintiff's challenges in identifying class members are even more onerous for the California Class, which is limited to direct purchasers from Defendant.  Plaintiff has presented no evidence regarding how he will identify those individuals who purchased directly from Defendants.

1  99.9% of his purchases, if not all), *supra* n.11, means that he does not have standing to represent

2  the California Class nor any incentive to maximize their recovery.  His focus will be the federal

3  class, where his true claim lies.

4      **B.  Plaintiff's California Securities Class Cannot Be Certified on a Nationwide or**

5          **Worldwide Basis**

6       Plaintiff is a Florida resident moving to certify a *worldwide* class of XRP purchasers

7  under California law.  But it is not appropriate to certify a nationwide class, let alone a global

8  one, based on California claims where "variances in state law overwhelm common issues and

9  preclude predominance for a single nationwide class."  *Mazza*, 666 F.3d at 596.

10       Under *Mazza*, Plaintiff bears the "initial burden to show that California has significant

11  contact or significant aggregation of contacts to the claims of each class member."  *Mazza*, 66

12  F.3d at 589 (cleaned up).  Here, Plaintiff ignores that burden.  He does not cite *Mazza* or engage

13  with the choice-of-law analysis it requires.  Instead, he merely claims that California's securities

14  laws "reach 'out-of-state purchasers and sellers of securities'" and "are 'not limited to

15  transactions made in California.'"  Mot. at 27 & n.9 (quoting *Diamond Multimedia Sys., Inc. v.

16  Superior Court*, 19 Cal. 4th 1036, 1065 (1999)).  But *Diamond* (which predates *Mazza*) relates to

17  the extraterritorial application of California securities law, not the choice-of-law analysis.  *Cf. In*

18  *re iPhone 4S Consumer Litig*, 2013 WL 3829653, at *7-8 (N.D. Cal. July 23, 2013)

19  (distinguishing extraterritorial application for standing purposes from *Mazza*'s inquiry regarding

20  certification of a nationwide class).  Plaintiff thus failed to meet his preliminary burden of

21  demonstrating that California has significant contact with each class member.

22       Further, even if Plaintiff had met this burden, the next step of the *Mazza* analysis is to

23  determine whether California law or foreign law should apply under California's three-step

24  governmental interest test.  *Mazza*, 666 F.3d at 590.  This test considers: (1) whether there are

25  variances in the relevant laws of each potentially affected jurisdiction; (2) whether each

26  jurisdiction's interest in the application of its own law creates a true conflict; and (3) which

27  jurisdiction's interest "would be more impaired if its policy were subordinated to the policy of

28  [an]other state."  *Id.* (cleaned up).  In this case, the laws of other jurisdictions reveal material

1   differences with California's laws.

2          First, because Plaintiff seeks to certify a worldwide class, this implicates the laws of

3   foreign countries.[23]   *Norwood v. Raytheon Co.*, 237 F.R.D. 581, 600 & 606 (W.D. Tex. 2006)

4   (denying class certification of a worldwide class due to "variations in state and foreign laws"); *In*

5   *re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1169-70 (N.D. Cal. 2019)

6   (differences in California law and law of foreign countries raise "concerns that . . . are substantial

7   and potentially well-founded" (quotation marks omitted)).   Critically, in multiple countries—

8   including the United Kingdom, Japan, Singapore, Switzerland, and the United Arab Emirates—

9   XRP is *not* a security under local law.   *See* Ex. 55 at 5 (UK Treasury report classifying XRP,

10  Bitcoin and Ether, as an "exchange token" which is a subset of "unregulated tokens" that are not

11  securities); Ex. 56; Ex. 57.   Plaintiff's claim that XRP is a security under California law presents

12  a direct conflict with these countries' laws.   Every country "has an interest in having its law

13  applied to its resident claimants."   *Mazza*, 666 F.3d at 591-92 (quoting *Zinser v. Accufix Rsch.*

14  *Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001)); *see also Norwood*, 237 F.R.D. at 595 ("It might

15  be particularly important to apply foreign laws to claims of putative plaintiffs domiciled abroad

16  due to the interest in maintaining harmonious international relations.").   Other countries have

17  passed laws to ensure their "regulatory framework is equipped to harness the benefits of new

18  technologies . . . ."   Ex. 55 at 3.   These interests would be severely impaired if California law

19  were applied to claims of XRP purchasers in countries where XRP is not a security.

20         Second, variations among state securities laws also defeat a nationwide class.   One court

21  has already denied certification of a nationwide class in another digital asset case on the same

22  California claims at issue here based on concerns over differences in the laws of other

23

24  ---
[23] Pursuant to Federal Rule of Civil Procedure 44.1, Defendants hereby provide notice that they

25  intend to raise an issue of a foreign country's law, specifically the laws of the United Kingdom,
    Japan, Singapore, Switzerland, and the United Arab Emirates, as discussed herein.   "In

26  determining foreign law, the court may consider any relevant material or source, including
    testimony, whether or not submitted by a party or admissible under the Federal Rules of

27  Evidence."   Fed. R. Civ. P. 44.1; *see also de Fontbrune v. Wofsy*, 838 F.3d 992, 997 (9th Cir.

28  2016) (characterizing Rule 44.1's requirements as "flexible and informal").

---

jurisdictions.  *Davy*, 2020 WL 4460446, at \*3-5.  Here, Plaintiff contends he will be able to prove with common evidence that Ripple's sales of XRP satisfy California Corporate Code § 25110's requirement that an offer or sale of a security occur "in this state" because Ripple is headquartered in California.[24]  Mot. at 27-28.  The Kansas Supreme Court, however, has held that the corporate presence of a defendant in the state, on its own, is not sufficient to support a finding that an offer or sale occurred "in this state."  *State v. Lundberg*, 445 P.3d 1113, 1115 (Kan. 2019) (per curiam) (quoting Kan. Stat. Ann. § 17-12a610(a)).  In *Lundberg*, defendants had registered corporate entities in Kansas but retained intermediaries based in California to conduct all their sales; the court held that offers were not made in Kansas but rather "originated with the California intermediaries."  *Id.* at 1120.  Kansas' interpretation of the bounds of jurisdiction and place in which offers are made thus materially differs from California.  And here, where Ripple is headquartered in California but retained foreign market makers to sell XRP, that difference is material—it may provide Kansas residents a right to recover under California law where none exists in their own state.

Other differences exist between California and other states' securities laws, including defining different statutes of limitations[25] and statutes of repose.[26]  Because statutes of repose extinguish claims completely after a certain time, *see P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 103 (2d Cir. 2004), differences in their length and existence in particular have the potential to change the outcome of litigation by barring claims entirely.

Because Plaintiff has not shown that other states' interests should be subordinated,

---

[24] Defendants dispute the validity of this argument but assume its accuracy for purposes of illustrating the differences between California law (as asserted by Plaintiff) and other states' laws.

[25] *E.g.*, Ariz. Rev. Stat. Ann. § 44-2004 (1 year); Kan. Stat. Ann. § 17-12a509 (1 year); Md. Code Ann., Corps. & Ass'ns § 11-703 (1 year); Cal. Corp. Code § 25507 (2 years); Fla. Stat. Ann. § 95.11 (2 years); N.J. Stat. Ann. § 49:3-71 (2 years); Ohio Rev. Code § 1707.43(B) (2 years); Utah Code Ann. § 61-1-22 (2 years).

[26] *E.g.*, Fla. Stat. Ann. § 95.11 (5 years); Nev. Rev. Stat. Ann. § 90.670 (5 years); Ohio Rev. Code § 1707.43(B) (5 years); Utah Code Ann. § 61-1-22 (5 years); Cal. Corp. Code § 25507 (no statute of repose); Kan. Stat. Ann. § 17-12a509 (same); Md. Code Ann., Corps. & Ass'ns § 11-703 (same).

Plaintiff's California Class should not be certified.  *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021) (vacating class certification when "differences in relevant state laws swamp predominance"); *Marsh v. First Bank of Delaware*, 2014 WL 2085199, at *8 (N.D. Cal. May 19, 2014); *Young v. Neurobrands, LLC*, 2020 WL 11762212, at *10 (N.D. Cal. Oct. 15, 2020).

### C.  Plaintiff Has Not Defined a Class for His Fourth Cause of Action

The Court previously held that Plaintiff may proceed on his fourth cause of action, under Section 25401 of the California Corporations Code, "solely on the basis of" a statement Mr. Garlinghouse made on December 14, 2017 regarding his personal XRP holdings, as alleged at paragraph 52 of the First Amended Complaint.  ECF No. 115 at 22.  The class period Plaintiff proposes for the California Class, however, commences on May 3, 2017, months before Mr. Garlinghouse's statement, thereby incorporating individuals who purchased *before* the statement and who cannot recover thereon.  *See Weiss v. NNN Cap. Fund I, LLC*, 2015 WL 11990929, at *5 (S.D. Cal. Apr. 3, 2015).  Because Plaintiff did not propose a viable class for his fourth cause of action and made no mention of it in his motion, the Court should deem it abandoned.  *See Knowles v. Arris Int'l PLC*, 2019 WL 3934781, at *17 (N.D. Cal. Aug. 20, 2019).

## IX.   PLAINTIFF DEFINES AN IMPROPER CLASS PERIOD

### A.  Plaintiff's Start Date Is Too Early

Plaintiff proposes a class period for both of his classes that begins on May 3, 2017, presumably based on the filing of a separate, now-dismissed action, *Coffey v. Ripple Labs Inc.*, which was filed in San Francisco Superior Court as Case No. CGC-18-566271 on May 3, 2018, then removed to federal court as Case No. 4:18-cv-03286-PJH.  Coffey, however, voluntarily dismissed his complaint on August 22, 2018, and as a result, Plaintiff's complaint cannot relate back to *Coffey* or rely on it to broaden the class period.[27]  *See Omnibus Fin. Corp. v. United States*, 566 F.2d 1097, 1102 (9th Cir. 1977) (holding that the amended complaint could not relate

---

[27] Though the Court deemed *Coffey* "related" to this action under Local Rule 3-12, ECF No. 9, this was only for administrative purposes and was not a legal determination that the complaint in this case relates back to *Coffey* under Rule 15.  Coffey dismissed his complaint voluntarily more than two months *before* the cases were administratively related.

1    back to the original complaint that was voluntarily withdrawn).

2            The first complaint filed by Plaintiff was filed August 5, 2019.  ECF No. 63.  Plaintiff

3    does not argue in his motion that he is entitled to relate back to any earlier complaint for

4    purposes of his class period, and it is his burden to establish as much.  *Wilkins-Jones v. Cnty. of*

5    *Alameda*, 2012 WL 3116025, at *12 (N.D. Cal. July 31, 2012).  To the extent he belatedly

6    attempts to establish relation back, he certainly cannot relate back to a complaint any earlier than

7    *Greenwald v. Ripple Labs Inc.*, Case No. 18-civ-3461, which was originally filed in San Mateo

8    Superior Court on July 3, 2018, and was the first complaint to bring federal claims against Ripple

9    (aside from the voluntarily-dismissed *Coffey* complaint).  A class period beginning any earlier

10   than July 3, 2017, one year prior to the *Greenwald* complaint, would be overbroad and improper.

11           **B.  Plaintiff's End Date "To the Present" Is Impermissible**

12           "An end date of until resolution or until the present creates a moving target and presents

13   potential case management problems."  *Vasquez v. Leprino Foods Co.*, 2020 WL 1527922, at *9

14   (E.D. Cal. Mar. 31, 2020) (cleaned up).  "By contrast, a 'specified end date' promotes the

15   'interests of clarity and finality' and 'helps ensure that plaintiff-specific discovery will be

16   completed in a timely manner.'"  *Id.*  Here, the most appropriate end date is the filing date of

17   Plaintiff's complaint, August 5, 2019.  ECF No. 63.

18   **X.   CONCLUSION**

19           For the foregoing reasons, Defendants respectfully request the Court deny Plaintiff's

20   motion for class certification.

21

22

23

24

25

26

27

28

1    DATED: February 3, 2023           KING & SPALDING LLP

2
                                       By:    /s/ *Damien Marshall*
3                                             Damien Marshall

4                                             DAMIEN J. MARSHALL (admitted *pro hac vice*)
5                                             dmarshall@kslaw.com
                                              ANDREW MICHAELSON (admitted *pro hac vice*)
6                                             amichaelson@kslaw.com
                                              KING & SPALDING LLP
7                                             1185 Avenue of the Americas, 34th Floor
                                              New York, NY 10036
8                                             Tel: (212) 556-2100; Fax: (212) 556-2222

9                                             SUZANNE E. NERO (SBN 284894)
10                                            snero@kslaw.com
                                              MEGHAN H. STRONG (SBN 324503)
11                                            mstrong@kslaw.com
                                              KING & SPALDING LLP
12                                            50 California Street, Suite 3300
                                              San Francisco, CA 94111
13                                            Tel: (415) 318-1200; Fax: (415) 318-1300

14
                                              ANDREW J. CERESNEY (admitted *pro hac vice*)
15                                            aceresney@debevoise.com
                                              DEBEVOISE & PLIMPTON LLP
16                                            919 Third Avenue
                                              New York, NY 10022
17                                            Tel: (212) 909-6000; Fax: (212) 909-6836

18
                                              *Attorneys for Defendants Ripple Labs Inc.,*
19                                            *XRP II, LLC, and Bradley Garlinghouse*

20

21

22

23

24

25

26

27

28

---

DEFENDANTS' OPPOSITION TO LEAD              36              Case No. 4:18-cv-06753-PJH
PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION