# EXHIBIT 4

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4                          --oOo--
 5    IN RE RIPPLE LABS INC. LITIGATION
 6    _____
 7    THIS DOCUMENT RELATES TO:        Case No.
                                       4:18-cv-06753-PJH
 8    ALL ACTIONS
      _____/
 9
10
11
12
13
14       VIDEO-RECORDED DEPOSITION OF CAMERON AZARI
15                    VERITEXT VIRTUAL
16                FRIDAY, JANUARY 20, 2023
17
18
19
20
21
22
23    Reported by:
24    Anrae Wimberley, CSR No. 7778
25    Job No.  5655292
```

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3                  OAKLAND DIVISION
 4                      --oOo--
 5   IN RE RIPPLE LABS INC. LITIGATION
 6   _____
 7   THIS DOCUMENT RELATES TO:     Case No.
                4:18-cv-06753-PJH
 8   ALL ACTIONS
     _____/
 9
10
11
12
13       Transcript of video-recorded deposition
14   of CAMERON AZARI, taken via Zoom videoconference,
15   beginning at 10:03 a.m. PST and ending at 12:29 p.m.
16   PST on Friday, January 20, 2023, before Anrae
17   Wimberley, Certified Shorthand Reporter No. 7778.
```

Page 2

```
 1                    I N D E X
 2   EXAMINATION BY:                      PAGE
 3   Ms. Nero                              6
 4
 5                    --oOo--
 6
 7                  E X H I B I T S
 8   EXHIBIT       DESCRIPTION             PAGE
 9   Exhibit DX 25  Declaration of Cameron R.    19
                   Azari, Esq. Regarding
10                 Notice Plan; 66 pages
11   Exhibit DX 26  Declaration of Cameron R.    79
                   Azari, Esq. Regarding
12                 Notice Plan; 65 pages
13                    --oOo--
14   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15          Page 23, Line 16
16                    --oOo--
```

Page 4

```
 1   APPEARANCES:
 2   For Lead Plaintiff Bradley Sostack:
 3       SUSMAN GODFREY L.L.P.
 4       BY: OLEG ELKHUNOVICH, ESQ.
 5       1900 Avenue of the Stars, 14th Floor
 6       Los Angeles, California 90067
 7       (310) 789-3100
 8       oelkhunovich@susmangodfrey.com
 9
10   For Defendants Ripple Labs Inc.; XRP II, LLC, and
11   Bradley Garlinghouse:
12       KING & SPALDING LLP
13       BY: SUZANNE NERO, ESQ.
14           MEGHAN STRONG, ESQ.
15       50 California Street, Suite 3300
16       San Francisco, California 94111
17       (415) 318-1200
18       snero@kslaw.com
19       mstrong@kslaw.com
20
21   Also present:
22       JILL WARREN, CLVS, Videographer
23       VERITEXT LEGAL SOLUTIONS
24             --oOo--
25
```

Page 3

```
 1          FRIDAY, JANUARY 20, 2023;
 2            DEPOSITION VIA ZOOM;
 3                10:03 A.M. PST
 4                     - - -
 5       THE VIDEOGRAPHER: Good morning. We are on the   10:03:25
 6   record at 10:03 a.m. on Friday, January 20, 2023.
 7       Please note this deposition is being
 8   conducted virtually. Quality of recording depends
 9   on the participants' quality of equipment and
10   Internet connections.                               10:03:42
11       The deponent and what is heard on screen
12   will be recorded. Audio and video recording will
13   continue to take place until all parties agree to go
14   off the record.
15       This is the beginning of Media No. 1 of         10:03:55
16   the video-recorded deposition of Cameron Azari taken
17   by counsel for defendants in the matter of In Re:
18   Ripple Labs Inc. Litigation, et al., filed with the
19   United States District Court, Northern District of
20   California, Oakland Division, Case                  10:04:14
21   No. 4:18-cv-06753-PJH.
22       This deposition is being conducted
23   remotely using virtual technology. My name is Jill
24   Warren, and I am the videographer. The court
25   reporter is Anrae Wimberley, and we are representing 10:04:35
```

Page 5

```
 1  action; right?                              10:37:48
 2     A.  Yes, I understand that.
 3     Q.  And so your role is to provide them notice
 4  and give them an opportunity to opt out from that
 5  judgment if they want to?                    10:37:55
 6     A.  Yes.  When I'm retained, my role is to
 7  advise the parties and the Court on a notice plan
 8  that does accomplish that, that reaches an adequate
 9  percentage of the class and allows them to be aware
10  of their rights and the deadlines to act on them.  10:38:12
11     Q.  In your opinion, what is an adequate
12  percentage of the class for a notice to reach?
13     A.  That's a good question.
14         In my business, in my world that I'm in,
15  it's become customary for 70 percent reach to be the  10:38:28
16  floor of what is considered adequate notice.
17         I don't personally think that that should
18  rule in every situation, but that is the -- that's
19  the measurement that's become customary to say
20  that's the minimum required to have an adequate  10:38:50
21  notice plan.
22     Q.  You said that you don't personally think
23  that should rule in every situation.
24         Can you explain what you mean by that?
25     A.  Well, this is getting a little far afield.  10:39:07
                                              Page 30
```

```
 1  I think that sometimes people get too hung up on the  10:39:13
 2  reach instead of just being smart about giving good
 3  notice in the case.
 4         But that being said, we quantify every
 5  single plan where I'm doing a declaration in terms  10:39:24
 6  of reach.
 7         So that is the number that we would rely
 8  on, and frequently, we would --
 9         (Reporter seeks clarification.)
10     A.  Frequently, we may do better than          10:40:08
11  70 percent in terms of reach, but 70 percent is the
12  floor reach that I would provide a declaration to
13  the Court.
14     Q.  What is your understanding of who is in
15  the putative class in this case?                 10:40:27
16     A.  Well, all I can do is rely on the class
17  definition.  I can read them.
18         The federal securities claims class are
19  persons and entities who purchased XRP from May 3rd,
20  2'17 forward and either retained it or sold it at a  10:40:47
21  loss.
22         And then there's a California state claims
23  classes that is similar, but it reads [as read]:
24  All persons or entities who purchased XRP from
25  Defendants and/or from a person or entity selling  10:41:00
                                              Page 31
```

```
 1  XRP on Defendants' behalf from the same date,    10:41:01
 2  May 3rd, 2017, and either they retained it or sold
 3  it at a loss.
 4     Q.  And I see you're reading from your report.
 5         Are you reading from paragraph 24,        10:41:15
 6  subsections (a) and (b)?
 7     A.  Correct.
 8     Q.  Where are those class members located?
 9     A.  Physically?
10     Q.  Correct.                                  10:41:29
11     A.  I don't have that information, where they
12  are physically located.
13     Q.  I'm sorry, I didn't understand you.  Can
14  you say that again?
15     A.  Sure.  I don't have the information on the  10:41:36
16  precise location of where those class members are
17  located.
18     Q.  Is it your understanding that they're just
19  in the United States or around the world?
20     A.  I do understand that a portion of the     10:41:48
21  class is potentially outside the United States.
22     Q.  And how do you understand that?
23     A.  I believe that that's in some of the
24  documents I read, but also, from discussions with
25  class counsel.                                   10:42:02
                                              Page 32
```

```
 1     Q.  And what documents have you read that made  10:42:06
 2  you believe that some class members are outside of
 3  the United States?
 4     A.  Well, I think -- once again, I think I got
 5  it from -- it would have been the ones I read.  It  10:42:15
 6  would have been from the complaint or the class
 7  certification motion.  If those aren't in there,
 8  then it would have just come from class counsel.
 9     Q.  And how many people are in the putative
10  class?                                           10:42:43
11     A.  It's unknown.  I understand that it's at
12  least in the thousands, but I don't believe -- at
13  least I haven't been provided with information on a
14  precise number of class members.
15     Q.  Do you have an estimate?                  10:42:56
16     A.  I do not.
17     Q.  So you don't know if it's 10,000 or
18  50 million?
19     A.  I don't expect it to be 50 million, but I
20  don't know.  That's right, I do not know the size of  10:43:10
21  the class.
22     Q.  Why don't you expect it to be 50 million?
23     A.  It just seems like an implausible number.
24  But we've done -- I've done the class actions that
25  had more than 50 million class members.  So I guess  10:43:27
                                              Page 33
```

9 (Pages 30 - 33)

```
 1  it is plausible.                          10:43:27
 2     Q.  Tell me why you think it's an implausible
 3  number?
 4     A.  It was a throwaway comment.  It's a big
 5  number, that's why.                       10:43:36
 6         I don't really have any information on how
 7  many people might be in the class.
 8     Q.  Do you have any information on how many
 9  people purchased XRP?
10     A.  I don't.                           10:43:44
11     Q.  So it could be 50 million?
12     A.  I guess it could.
13     Q.  Did you rely on any information from
14  counsel on the size of the putative class in coming
15  to your opinions?                         10:44:03
16     A.  I did not.
17     Q.  On paragraph 25 of your report, you state
18  that the classes are readily identifiable.
19         Do you see that?
20     A.  I do.                              10:44:25
21     Q.  What did you base that opinion on?
22     A.  I base it on, frankly, primarily the fact
23  that the class definition is objective.  It's
24  objective criteria.  It's people who purchased
25  something defined in a defined time period.   10:44:41
                                                Page 34
```

```
 1         So that's -- that, to me, is the linchpin. 10:44:47
 2  I mean, I have candidly been brought in on cases
 3  where the class definition was not based on
 4  objective criteria and probably shouldn't have been
 5  certified, in my opinion.                 10:45:03
 6         This isn't one of those cases.  It's
 7  pretty clear they bought from this date, sold it at
 8  a loss or still had it.
 9     Q.  Aside from the definition of the class, is
10  there anything else that you relied on in coming to 10:45:19
11  the opinion that the classes are readily
12  identifiable?
13     A.  Really, just my experience.  Just my
14  experience in taking the first step of identifying
15  individual notice data, if it's available, and then 10:45:37
16  the second step of, if it's not all available or
17  none of it's available, then we would design some
18  sort of a media notice plan to target the class.
19     Q.  Did you rely on any information provided
20  by counsel as to the type of information that may be 10:45:58
21  available to give individual notice in reaching your
22  opinion that the classes are readily identifiable?
23     A.  No, I didn't.
24         The class would be -- even if no
25  individual notice -- look, it's better if we had   10:46:15
                                                Page 35
```

```
 1  individual notice, we always start there, but it    10:46:19
 2  doesn't make it so the class isn't readily
 3  identifiable.  It just means we have to take the
 4  next step and do an appropriate media plan in order
 5  to reach that class.                       10:46:33
 6     Q.  You mentioned that you understood that
 7  some of the putative class members could be outside
 8  of the United States.
 9         What percentage of the putative class do
10  you understand to be outside of the United States?  10:46:45
11     A.  I don't know.
12     Q.  What countries do you understand putative
13  class members may live in outside of the United
14  States?
15     A.  At this point, I don't know.        10:46:58
16     Q.  What information would you need in order
17  to determine that?
18     A.  Well, I would -- I would want -- in
19  designing a media plan, it would be helpful,
20  clearly, to have as much information as possible.   10:47:18
21         And so if there was information that
22  indicated that class members may be outside the
23  United States, we would use any that was available,
24  any particular countries or regions, in order to
25  target a media plan as best as we could.   10:47:38
                                                Page 36
```

```
 1         If we didn't have that information, then   10:47:40
 2  we would have to be much more broad.  But to the
 3  extent that information is available, we would
 4  definitely use it.
 5     Q.  Are you a member of the proposed class?   10:48:01
 6     A.  No.
 7     Q.  I want to take the class definition step
 8  by step and get your understanding of it.
 9         So the first part of the federal
10  securities claims class as listed in paragraph 24(a) 10:48:20
11  of your report is:  "All persons or entities who
12  have purchased XRP."
13         Do you see that?
14     A.  Yes.
15     Q.  And what does it mean to "purchase XRP"?  10:48:32
16     A.  I mean, I'm going from a layperson's
17  understanding of crypto, but I would assume that
18  means to exchange money or something of value for a
19  certain denomination or number or percentage of XRP.
20     Q.  And what are the different ways in which a 10:49:02
21  person or entity could purchase XRP?
22     A.  You know, I don't know.
23     Q.  So when you say that the class are readily
24  identifiable, you don't know how to identify who
25  purchased XRP?                            10:49:39
                                                Page 37
```

10 (Pages 34 - 37)

```
 1   that allowed you to make that opinion.          10:56:03
 2        So when you gave that opinion, I want to
 3   know who you were contemplating as XRP purchasers.
 4        A.   Well, what I was contemplating is people
 5   who fit the definition of the class.            10:56:18
 6        So when we would get down to actually
 7   designing the full notice program, I would be
 8   relying on the Court if it's still a judgment -- if
 9   it was a judgment or relying on the parties if it
10   were a settlement to help with some of the nuances  10:56:34
11   of who might be in the class.
12        It's not unusual for there to be gray on
13   their behalf.  So I would rely on that, and if that
14   was an audience that need to be targeted, what we
15   needed to do to target that audience.           10:56:50
16        Q.   Okay.  So when you're saying, "We will be
17   able to identify and provide reasonable notice to
18   the Class Members," you need to rely on someone else
19   to tell you who those class members are; is that
20   right?                                          10:57:04
21        A.   Well, I didn't quite say that, but --
22        MR. ELKHUNOVICH:  Objection, vague.  Objection,
23   misstates prior testimony, form.
24        Go ahead.
25        THE WITNESS:  Okay.  I didn't -- I might need  10:57:12
                                                   Page 42

 1   you to ask the question again.  Sorry.          10:57:14
 2        MS. NERO:  Sure.  Madam Reporter, could you
 3   repeat the question, please?
 4        (Record read by reporter as follows:
 5         "Question:  So when you're saying, 'We    10:57:20
 6         will be able to identify and provide
 7         reasonable notice to the Class Members,'
 8         you need to rely on someone else to tell
 9         you who those class members are; is that
10         right?")                                  10:57:20
11        THE WITNESS:  The answer is basically, yes.  I
12   don't determine who the class is.  That's not my
13   job.  My job is to take the objective class
14   definition as ordered by the Court and -- but it's
15   not unusual at all for there to be some gray on 10:58:04
16   that.
17        I mean, I don't have the data now, if
18   there is data available, and I'm always relying on
19   information to help us in putting together our
20   notice plan.                                    10:58:20
21        So if there was a gray area on what is a
22   purchaser or not, I would take all that information
23   and use it.
24        BY MS. NERO:
25        Q.   So would it be fair to say that, as you 10:58:29
                                                   Page 43

 1   sit here today, you don't -- you are not able to  10:58:31
 2   identify who would fit the definition of XRP
 3   purchaser as stated in the class definition?
 4        A.   Yeah, no, I don't think anybody in any
 5   case would be qualified to do that at this stage. 10:58:57
 6        Q.   All right.  The next part of the class
 7   definition is -- and I'm talking about the federal
 8   class definition in paragraph 24(a) of your
 9   report -- those people who still retain XRP.
10        Do you see that?                            10:59:22
11        A.   I do.
12        Q.   So they purchased and retained it.
13        And how are you able to identify which
14   class members still retain XRP?
15        A.   Well, we wouldn't at the notice stage.  10:59:31
16   The purpose of the notice stage would be to cast a
17   broad net and then it would be up to the individual
18   class member if they were wanting to file a claim,
19   depending on how this litigation ends up, to provide
20   whatever proof is necessary to show that they     10:59:49
21   retained it.
22        Q.   So does your plan contemplate that you
23   would send a notice to all XRP purchasers?
24        A.   I mean, it depends on the data, but that's
25   probably right.                                 11:00:07
                                                   Page 44

 1        If data was available to show us precisely 11:00:09
 2   who still retained XRP or sold it at a loss, then
 3   yes, I suppose we would cull the data down just to
 4   send it to those specific individuals.
 5        But that would be -- in any case, that's  11:00:25
 6   going to be unlikely.  There's almost always a proof
 7   element that people can prove that they're an actual
 8   class member that would be entitled to relief, if
 9   any relief existed.
10        (Reporter seeks clarification.)             11:00:46
11        Q.   So is that the same with regards to who
12   sold at a loss, your assumption would be you would
13   send it to all XRP class members through some sort
14   of a claim form and they would send it some proof
15   that they're entitled to be a part of the class?  11:01:01
16        A.   Yes.  I mean, you know, we do dozens and
17   dozens of securities settlements and that's a
18   typical requirement, that the class member has to
19   provide information that shows the purchase date and
20   sold date, and the claims process is doing the math  11:01:12
21   to confirm that they suffered a loss.
22        Q.   Do you know what "suffered a loss" means?
23        A.   I don't.
24        MS. NERO:  We've been going about an hour.  Why
25   don't we take a short break.                    11:01:34
                                                   Page 45
```

12 (Pages 42 - 45)

### Page 46

1   Do you want to take 5 or 10?          11:01:37
2       THE WITNESS: It's up to you. I'm fine. You
3   tell me what.
4       MS. NERO: Oleg, how are you doing?
5       MR. ELKHUNOVICH: I'm good.          11:01:48
6       MS. NERO: Okay. Maybe we'll take five then?
7       THE VIDEOGRAPHER: This is the end of Media
8   No. 1. Off the record at 11:02 a.m.
9       (Recess taken.)
10      THE VIDEOGRAPHER: We are back on the record at   11:12:34
11  11:12 a.m. This is the beginning of Media No. 2.
12  BY MS. NERO:
13  Q.  Mr. Azari, you understand you're still
14  under oath?
15  A.  Yes.                              11:12:45
16  Q.  Before the break, we were talking about
17  the portion of the class definition that talks about
18  XRP purchasers who sold at a loss.
19      Is it the claims administration's --
20  excuse me -- the claims administrator's   11:13:02
21  responsibility to determine who sold at a loss and
22  who did not?
23  A.  Typically, yes. If we're -- if that's a
24  material piece of whether or not someone is to
25  receive any compensation, then typically, it would   11:13:19

### Page 47

1   be the claims administrator's job to make that   11:13:24
2   evaluation, if that was a requirement of either a
3   judgment or a settlement.
4   Q.  Well, here, the class is defined as XRP
5   purchasers who sold at a loss, and so would it be   11:13:35
6   part of your job as the claims administrator to
7   determine who is in and who is out based upon
8   whether or not they earned a gain or suffered a
9   loss?
10  A.  Again, if that was -- I mean, sometimes   11:13:47
11  the -- you know, when it gets to a judgment or
12  settlement, things change in terms of how people are
13  compensated. But, yes, if that was a material
14  requirement of someone getting a payment, then yes,
15  that typically is the administrator's job to make   11:14:01
16  that evaluation.
17  Q.  Okay. And so what does it mean to have
18  sold XRP at a loss?
19  A.  We would rely on -- if there was something
20  strange, we would rely on that information from the   11:14:19
21  Court or the settling parties. But typically, that
22  means someone who purchased it and then later sold
23  it for a price that was higher than they purchased
24  it.
25  Q.  You said sold for a price that was higher   11:14:33

### Page 48

1   than they purchased it?                11:14:35
2   A.  I'm sorry, lower. I'm sorry, lower.
3   Q.  Okay. I thought that's what you meant.
4   A.  Yeah.
5   Q.  If someone buys 100 XRP and sells 99 XRP   11:14:47
6   for a gain and 1 XRP for a loss, have they suffered
7   a loss?
8   A.  I don't know the answer to that.
9   Q.  Have you evaluated here how you would
10  determine whether or not any purchaser of XRP   11:15:13
11  suffered a loss?
12  A.  No.
13  Q.  If someone buys XRP with Bitcoin and sells
14  it in dollars, do you know if you calculate a loss
15  based upon Bitcoin or dollars?        11:15:34
16  A.  I don't know.
17  Q.  If someone purchases XRP and uses it for a
18  consumptive purpose, such as to buy a plane ticket
19  or buy a cup of coffee, do you know whether or not
20  they have suffered a loss?            11:15:56
21  A.  I don't know.
22  Q.  At what point in the process do you come
23  up with a methodology to determine who suffers a
24  loss?
25  A.  Typically -- well, typically, we don't   11:16:27

### Page 49

1   come up with that. Typically, and we look candidly,   11:16:31
2   it is very rarely a judgment, but sometimes it is,
3   mostly a settlement.
4       That information comes to us in a plan of
5   disruption or an allocation plan or something along   11:16:47
6   those lines. And then we just apply whatever
7   criteria has been determined, you know, to judge
8   whether somebody has suffered a loss or whatever
9   other requirement exists for inclusion in the class.
10      So it's not -- in my experience, that   11:17:06
11  comes at the settlement or judgment stage when those
12  sort of decisions are made.
13  Q.  And you understand here that we're talking
14  about a class action in which you've offered an
15  opinion that notice can be given to the putative   11:17:25
16  class members in this case; you understand that?
17  A.  Yes.
18  Q.  And that part of the definition of the
19  class is that those who have suffered a loss.
20      If the class is certified here, will you   11:17:41
21  undertake an assessment as to who suffered a loss in
22  order to effectuate notice?
23  A.  No.
24  Q.  Will you obtain that information from
25  someone else?                         11:18:00

| | |
|---|---|
| 1  Q. So under your notice plan, you contemplate       11:25:37<br>2  giving notice to people who are not in the defined<br>3  classes; is that correct?<br>4     A. I mean, I think that in every notice plan,<br>5  there's going to be people who receive notice,        11:25:50<br>6  whether it's individual notice or media notice, that<br>7  aren't in the class.<br>8        We rely on various other communication<br>9  methods, the website, toll-free number, to help<br>10 potential class members self-identify whether        11:26:08<br>11 they're in or out.<br>12       But I guarantee you on every project I've<br>13 done, people who were not class members got notice.<br>14 We reject claims from people who aren't class<br>15 members, or people go to the website, no, I'm not a   11:26:23<br>16 class member and then that ends there.<br>17       So it would be unusual not to have some<br>18 non-class members get notice.<br>19    Q. So that's a "yes," under your notice plan,<br>20 you contemplate giving notice to people who are not  11:26:37<br>21 in the defined classes?<br>22    A. Yes.<br>23    Q. In paragraph 26, you say: "It is my<br>24 understanding that data for the purpose of class<br>25 notice can be readily obtained from Defendants and   11:26:54<br>Page 54 | 1  get any available information and then the example    11:28:45<br>2  from the named plaintiff of what that information<br>3  might be.<br>4     Q. Okay. So you relied on the fact that they<br>5  were serving subpoenas on third-party exchanges as   11:28:56<br>6  part of the basis for writing paragraph 26?<br>7     A. Well, that . . . yes, in terms of whether<br>8  data would be available, yes.<br>9     Q. You say here that information can be<br>10 readily obtained from defendants.                    11:29:22<br>11       Have you seen any data from defendants?<br>12    A. No, I have not.<br>13    Q. Do you know what type of data is<br>14 available?<br>15    A. I don't specifically.                           11:29:36<br>16    Q. Is that true for all three defendants,<br>17 Ripple, XRP II and Brad Garlinghouse?<br>18    A. It is.<br>19    Q. You say that data can be readily obtained<br>20 from defendants' agents' business records.           11:30:05<br>21       Who are defendants' agents?<br>22    A. I don't know specifically.<br>23    Q. How do you know that data is readily<br>24 available from them?<br>25    A. Based on my discussions with class counsel  11:30:21<br>Page 56 |
| 1  their agents' business records and business records   11:26:59<br>2  in the possession of exchanges that facilitate<br>3  trading of XRP."<br>4        Do you see that?<br>5     A. Yes.                                      11:27:08<br>6     Q. Okay. Tell me why you included that<br>7  paragraph in your report?<br>8     A. Based off of my discussions with class<br>9  counsel that they were going to or were already in<br>10 the process of issuing subpoenas to the exchanges    11:27:22<br>11 and then based off of my understanding of the named<br>12 plaintiff and his record -- again, I don't know<br>13 if -- I don't know the right terminology, if it's a<br>14 dashboard or a wallet or whatever it's called --<br>15 showing that, that that individual's information was 11:27:44<br>16 available.<br>17    Q. So the basis of your opinion in<br>18 paragraph 26 is your communications with counsel and<br>19 the single document you saw from Poloniex relating<br>20 to lead plaintiff's information?          11:28:11<br>21    A. Yes.<br>22    Q. And what information from counsel did you<br>23 rely on to write paragraph 26?<br>24    A. I believe what I just said, that the --<br>25 that they were issuing subpoenas to the exchanges to 11:28:42<br>Page 55 | 1  of where they were issuing the subpoenas, and it's   11:30:25<br>2  based off of representations of what may be<br>3  available.<br>4     Q. So you've made an assumption that data is<br>5  readily available from defendants' agents based upon 11:30:40<br>6  representations of counsel?<br>7     A. Yes.<br>8     Q. And the next section of paragraph 26, you<br>9  say that data will be readily obtained from<br>10 exchanges that facilitate trading of XRP.            11:31:25<br>11       What types of data do you believe are<br>12 readily available from the exchanges?<br>13    A. So first of all, I said "can" and not<br>14 "will."<br>15       And second of all, my understanding is the  11:31:41<br>16 data -- data such as e-mail notice, physical mail<br>17 notice or a name may be available.<br>18    Q. And what is that understanding based on?<br>19    A. Based off the example I saw from the main<br>20 plaintiff.                                         11:32:05<br>21    Q. From Poloniex?<br>22    A. Correct.<br>23    Q. Have you seen data from any of the other<br>24 exchanges?<br>25    A. No.                                        11:32:15<br>Page 57 |

15 (Pages 54 - 57)

**Page 74**

```
 1  just being hypothetical.  Maybe it's Facebook ads is          11:57:20
 2  the best that gets us right off the top the broadest
 3  reach and then we go in and layer on top of that
 4  additional pieces of media, online typically
 5  nowadays, but also could be print, and get ourselves          11:57:32
 6  up to whatever percentage that we need to be.
 7       And so it's really -- I don't want to
 8  call -- it's not a game but it's a trial and error
 9  going in and finding out which pieces of media get
10  added in, give us the best bang for the buck.                 11:57:49
11  Because some pieces of media are duplicative of each
12  other.  And so even the fourth best piece of media
13  you may not use because it may duplicate exactly
14  what the first three pieces of media are doing.
15  Maybe the sixth best hits a unique audience and that          11:58:04
16  one's better.
17       So it's really that sort of building that
18  my media team will do.
19   Q.  So are you looking to create a proxy
20  audience of XRP purchasers?                                   11:58:17
21   A.  Yeah, definitely.
22       But I want to interject -- you don't even
23  have to ask me a question -- this isn't the only
24  media we would typically buy.  When we're putting
25  together a good media plan, we want to be able to             11:58:33
```

**Page 75**

```
 1  tell the Court that we're reaching a specific                 11:58:37
 2  percentage, usually 70 percent.
 3       And so we build the media that will get us
 4  to that 70 percent.  But in addition to that, we
 5  also may use media that may not be measurable but we          11:58:47
 6  know is reasonable and intelligent to use depending
 7  on any other information we may have.
 8       So if we had information that the product
 9  was marketed on specifically pieces of media, even
10  if those were not ones that we could measure in               11:59:10
11  terms of our reach, we would want to use those as
12  part of the media plan.
13       So it would be a multi-faceted plan.  We
14  wouldn't just be -- I don't know what the right word
15  is -- we would just be tied to pieces that get us             11:59:24
16  our reach.
17   Q.  In order to create a proxy audience of XRP
18  purchasers, you have to understand who XRP
19  purchasers are; right?
20   A.  Generally, yes.                                          11:59:40
21   Q.  It's fair to say, as you sit here today,
22  you don't know all of the different types of XRP
23  purchasers?
24   A.  That's right, I don't know all the
25  specific purchasers or the specific ways it was               11:59:51
```

**Page 76**

```
 1  purchased.                                                    11:59:55
 2   Q.  How do you assign a percentage to the
 3  specific type of media that this proxy audience may
 4  view?
 5   A.  We don't assign the percentage.  It comes                12:00:15
 6  out of the research data and the tools that are used
 7  to measure the usage of the data for our proxy
 8  audience.  So we don't pick it.  It comes out.
 9       So if our proxy audience is people who
10  purchased -- I've got Crystal Geyser water on my              12:00:37
11  desk.  If it's people who purchased Crystal Geyser
12  water, then the research data will tell us, if we
13  buy a certain number of impressions on Facebook,
14  what percent of that audience it will reach.
15       And then as we layer in additional pieces                12:00:52
16  of media, whatever they may be, it's -- we don't
17  pick the numbers.  It comes out of the data that we
18  use.
19   Q.  You pick the factors that go into the
20  proxy audience?                                               12:01:07
21   A.  Yeah, we would choose the proxy audience.
22  That's right.
23   Q.  And if there's an error in the process of
24  defining the proxy audience, then it could affect
25  whether or not class members receive notice?                  12:01:21
```

**Page 77**

```
 1   A.  I mean, yes, to a certain extent.                        12:01:25
 2       I mean, we definitely want the proxy
 3  audience to be as close as possible.  Because that's
 4  what it is, it's as close as possible.  So we're
 5  very rarely -- we're never going to have a proxy              12:01:36
 6  audience -- we wouldn't call them the proxy audience
 7  if they were ever exactly who the class member was,
 8  yeah.
 9   Q.  As you sit here today, you haven't defined
10  a media plan for these putative classes; is that              12:01:55
11  correct?
12   A.  That's correct.
13   Q.  So you don't know what factors you would
14  use to identify a proxy audience?
15   A.  Generally, but no, we haven't built a                    12:02:08
16  specific plan.
17   Q.  You don't know what websites that you
18  would post on?
19   A.  Correct.
20   Q.  Or other forms of media that you would use               12:02:16
21  in order to try and reach this putative class?
22   A.  No.  I mean, again, generally.  But we
23  haven't gone through the process of actually
24  building a media plan.
25   Q.  So you're assuming that once your media                  12:02:31
```

20 (Pages 74 - 77)

Page 78

```
 1   plan is created, you'll be able to reach 70 to        12:02:34
 2   95 percent of these putative classes?
 3       A.   Correct.
 4       Q.   But as you sit here today, you can't tell
 5   us how you're going to effectuate that?              12:02:50
 6       A.   I don't have the specifics of the media
 7   plan, correct.
 8       MS. NERO:  I'd like to take a short break.  And
 9   I'd also like to see if we could get the scanned
10   copy of the report that you're looking at,           12:03:08
11   Mr. Azari, because I do want to make sure that we
12   got this as an exhibit.
13       THE WITNESS:  I should be able to scan it, now
14   provided the scanner works outside my -- in our
15   common area here.  You just need to tell me what      12:03:20
16   e-mail address to have it go to.
17       MR. ELKHUNOVICH:  Why don't we go off -- are we
18   at a break?  Should we go off the record?
19       MS. NERO:  Yeah, that's fine.  Let's go off the
20   record.                                               12:03:31
21       THE VIDEOGRAPHER:  This is the end of Media
22   No. 2.  Off the record at 12:03 p.m.
23       (Recess taken.)
24       THE VIDEOGRAPHER:  We are back on the record at
25   12:24 p.m.  This is the beginning of Media No. 3.     12:24:06
```

Page 79

```
 1       (Deposition Exhibit DX 26 was marked.)           12:24:11
 2   BY MS. NERO:
 3       Q.   Mr. Azari, if you open up your Exhibit
 4   Share, you'll see I introduced Defendants'
 5   Exhibit 26.                                          12:24:19
 6       Do you see that?
 7       A.   Just refreshing.
 8       Yes, I do.
 9       Q.   And my understanding is that this is the
10   report that you've had in hard copy in front of you  12:24:35
11   during today's testimony; is that right?
12       A.   Correct.
13       Q.   And you scanned that and then provided it
14   to us electronically?
15       A.   Correct.                                     12:24:52
16       Q.   Great.  Thank you.
17       On paragraph 35 of your report, you
18   discuss an informational release.
19       Can you explain what an informational
20   release is?                                          12:25:10
21       A.   Sure.  An informational release, also
22   called a "press release," in the context of a class
23   action, it's really a summary representation of the
24   notice that can be sent out, like it describes, to a
25   broad array of media sites, websites, online         12:25:30
```

Page 80

```
 1   databases, social networking sites, et cetera.       12:25:35
 2       Usually, it's a very generic description
 3   of the case.  If it's a settlement, it will say,
 4   yep, a settlement has been reached for this much, go
 5   here to file a claim.  People can opt out; here's    12:25:50
 6   the deadline.  People can object; here's the
 7   deadline, etc.  It's usually a very generic
 8   representation.
 9       And when it's sent out, it's sent out with
10   the hope of getting what we call "earned media,"     12:26:02
11   like stuff we didn't have to pay for.  Somebody
12   might run a story.
13       Q.   Is there anything about paragraph 35 that
14   is unique to this case or is this template language
15   that is similar in all of the cases in which you     12:26:19
16   administered?
17       A.   It's not unique to this case.  I mean,
18   this is the same language -- if we were using an
19   informational release in a case and proposing it,
20   this is the same language that would be used, that's 12:26:31
21   right.
22       Q.   You mentioned that one of the pieces of
23   information you reviewed was something related to
24   lead plaintiff on Poloniex.
25       A.   Correct.                                    12:26:45
```

Page 81

```
 1       Q.   Can you tell me what information was        12:26:45
 2   identified in the document that you reviewed?
 3       A.   To be honest, I didn't look at it really
 4   closely.  I just looked at it to see that the
 5   person's name was identified on there and that       12:27:00
 6   there -- it just has evidence that there was some
 7   transaction record that could be accessible.
 8       Q.   Did the document you reviewed have
 9   transactional data as well as identifying
10   information?                                         12:27:23
11       A.   You know, to be honest with you, I don't
12   recall.  I didn't look at that today in preparation,
13   and it's been a few weeks since I looked at it.
14       Q.   Do you recall whether or not the Poloniex
15   data has information on the date, time and price of 12:27:39
16   any sale of XRP?
17       A.   I don't.  In that specific example I
18   looked at, I don't recall if it had that on there.
19       Q.   Do you know whether it shows
20   counterparties to any transactions?                  12:27:55
21       A.   I don't know.
22       Q.   When someone purchases XRP on a site like
23   Poloniex, do you understand that they can then
24   transfer that XRP to another wallet on a different
25   exchange?                                            12:28:16
```

21 (Pages 78 - 81)

```
 1     A.  I didn't -- I don't specifically know    12:28:17
 2  that, and that sounds plausible, but I don't know
 3  that for a fact.
 4     Q.  And to be clear, you've only looked at one
 5  document from Poloniex?                          12:28:32
 6     A.  Correct.
 7     MS. NERO:  Mr. Azari, I don't have any more
 8  questions for you.  I thank you very much for your
 9  time today.
10     THE WITNESS:  Thank you.                      12:28:58
11     MR. ELKHUNOVICH:  No questions for me.
12     THE VIDEOGRAPHER:  This concludes today's
13  testimony given by Cameron Azari.
14        Three media were recorded and will be
15  retained by Veritext Legal Solutions.            12:29:10
16        We are off the record at 12:29 p.m.
17        (Whereupon, the proceedings were concluded
18        at 12:29 p.m. PST)
19               ---oOo---
```

Page 82

```
 1        I, the undersigned, a Certified Shorthand
 2  Reporter of the State of California, do hereby
 3  certify:
 4        That the foregoing proceedings were taken
 5  before me at the time and place herein set forth;
 6  that any witnesses in the foregoing proceedings,
 7  prior to testifying, were administered an oath; that
 8  a record of the proceedings was made by me using
 9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12        Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript ( ) was (X) was not requested.
16        I further certify that I am neither
17  financially interested in the action nor a relative
18  or employee of any attorney of any party to this
19  action.
20        IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated: January 22, 2023
23
24         [signature: Anrae Wimberley]
25        ANRAE WIMBERLEY, CSR No. 7778
```

Page 83

```
 1  SUZANNE NERO, ESQ.
 2  snero@kslaw.com
 3                 January 22, 2023
 4  IN RE RIPPLE LABS INC. LITIGATION
 5  JANUARY 20, 2023, CAMERON AZARI, JOB NO. 5655292
 6  The above-referenced transcript has been
 7  completed by Veritext Legal Solutions and
 8  review of the transcript is being handled as follows:
 9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10     to schedule a time to review the original transcript at
11     a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13     Transcript - The witness should review the transcript and
14     make any necessary corrections on the errata pages included
15     below, noting the page and line number of the corrections.
16     The witness should then sign and date the errata and penalty
17     of perjury pages and return the completed pages to all
18     appearing counsel within the period of time determined at
19     the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21     Counsel - Original transcript to be released for signature
22     as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24     time of the deposition.
```

Page 84

```
 1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
 2     Transcript - The witness should review the transcript and
 3     make any necessary corrections on the errata pages included
 4     below, noting the page and line number of the corrections.
 5     The witness should then sign and date the errata and penalty
 6     of perjury pages and return the completed pages to all
 7     appearing counsel within the period of time determined at
 8     the deposition or provided by the Federal Rules.
 9  _X_Federal R&S Not Requested - Reading & Signature was not
10     requested before the completion of the deposition.
```

Page 85