# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN.<br><br>        Defendants. | Case No. No. 20 Civ. 10832 (AT) |

**BRIEF OF *AMICUS CURIAE* I-REMIT, INC. IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

ARENTFOX SCHIFF LLP
Brian Farkas, Esq.
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
(212) 492-3297
brian.farkas@afslaw.com

Karen Ellis Carr, Esq.
(not admitted in S.D.N.Y.)
1717 K Street NW
Washington, DC 20006
(202) 715-8531
Karen.Carr@afslaw.com

*Attorneys for Amicus Curiae I-Remit, Inc.*

**TABLE OF CONTENTS**

Page

INTERESTS OF I-REMIT, INC. AS *AMICUS CURIAE* ............................................................. 1
BACKGROUND .............................................................................................................................. 2
ARGUMENT .................................................................................................................................... 3
I.    XRP is not an "investment contract" within the meaning of the Securities Act of 1933, and therefore falls outside of the SEC's purview. ...................................................................... 3
    A.    Applicable Standards ................................................................................................ 3
    B.    *Howey*'s Third Factor ............................................................................................... 4
        1.    No Expectation of Profit ............................................................................... 5
        2.    No Reliance on Ripple's "Efforts" ............................................................... 6
II.    The SEC dramatically minimizes and underestimates the importance of ODL. ................ 7
CONCLUSION ................................................................................................................................. 8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 756 F.2d 230 (2d Cir. 1985)..................................................................................................4

*In re J.P. Jeanneret Assocs., Inc.*,
 769 F. Supp. 2d 340 (S.D.N.Y. 2011)....................................................................................4

*Owen v. Elastos Found.*,
 No. 1:19 Civ. 5462, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021).........................................4

*S.E.C. v. Cavanagh*,
 1 F. Supp. 2d 337 (S.D.N.Y.), aff'd, 155 F.3d 129 (2d Cir. 1998).........................................4

*S.E.C. v. W.J. Howey Co.*,
 328 U.S. 293 (1946).......................................................................................................4, 5, 6

*United Horn. Found., Inc. v. Forman*,
 421 U.S. 837 (1975)............................................................................................................5, 6

*United States v. Leonard*,
 529 F.3d 83 (2d Cir. 2008)..................................................................................................4, 6

**Statutes**

Securities Act of 1933................................................................................................... *passim*

15 U.S.C. § 77b(a)(1)................................................................................................................4

15 U.S.C. § 77e(a)-(c)...............................................................................................................4

**Other Authorities**

I-Remit, available at https://iremitx.com/About (last visited September 24, 2022) .........................1

Binance Academy, available at https://xrpl.org/index.html (last visited
 September 24, 2022) .............................................................................................................3

Business World, available at:
 https://www.bworldonline.com/infographics/2022/07/12/460590/philippines-
 ranks-10th-in-crypto-adoption/ (last visited September 24, 2022) .........................................1

I-Remit, Inc., ("I-Remit") respectfully submits this *Amicus Curiae* Brief in support of the Motion for Summary Judgment filed by Defendants Ripple Labs Inc., Bradley Garlinghouse, and Christian A. Larsen (collectively, "Defendants").[1]

## INTERESTS OF I-REMIT, INC. AS *AMICUS CURIAE* [2]

Founded in 2001, I-Remit is a global payment remittance company that is headquartered in the Philippines. It functions as an intermediary that connects senders of money abroad to recipients of that money in the Philippines. I-Remit is the only remittance company that is publicly listed on the Philippine Stock Exchange. It serves individuals and businesses around the world, with offices in eight countries and partnerships with more than 100 financial institutions.[3]

One of the chief mechanisms that I-Remit employs to facilitate money transfers is the "RippleNet" software product. RippleNet, developed by Defendant Ripple Labs, Inc. ("Ripple"), allows customers to clear and settle cross-border financial transactions in a variety of ways. One of those ways is through software called On Demand Liquidity ("ODL"), which uses a virtual cryptocurrency called XRP. XRP, in turn, runs on the "XRP Ledger," an open-source technology (not owned by Ripple) that can securely record international transactions almost instantaneously.

Generally, the Philippines are a major global market for cryptocurrency usage. The Cryptocurrency Adoption Index's July 2022 survey ranks the Philippines as 10th among nations around the world in terms of the percentage of the population that owns or uses cryptocurrency.[4]

---

[1] I-Remit files this brief as a separate docket entry pursuant to the Court's October 11, 2022 Order granting I-Remit's motion for leave. (Dkt. 659). I-Remit believes this brief conforms with Section III.D of the Court's Individual Rules of Practice.

[2] This Brief was principally authored by I-Remit as *amicus curiae* along with its undersigned counsel. No party's counsel authored this Brief in whole or in part. Neither any party nor any party's counsel contributed money related to the preparation or submission of this Brief.

[3] *See generally*, "About," I-Remit, available at https://iremitx.com/About (last visited September 24, 2022).

[4] "Philippines ranks 10th in crypto adoption," BUSINESS WORLD, available at: https://www.bworldonline.com/infographics/2022/07/12/460590/philippines-ranks-10th-in-crypto-adoption/ (last visited September 24, 2022).

Accordingly, a Bangko Sentral ng Pilipinas (Philippine Central Bank)-licensed Remittance and Virtual Asset Service Provider company like I-Remit has a strong interest in cryptocurrency and cryptocurrency regulation, given that a significant portion of its remittance partners use, and indeed prefer, sending and receiving payments through digital currencies.

As a major ODL customer, I-Remit is interested in the outcome of this lawsuit because of its reliance on XRP and the XRL Ledger. I-Remit has deep knowledge of these technologies that will aid the Court's evaluation of the arguments advanced by the U.S. Securities and Exchange Commission ("SEC").

## BACKGROUND

The SEC claims that Ripple violated the Securities Act of 1933 because "XRP was an investment contract" and that "the principal reason for anyone to buy XRP was to speculate on it as an investment." (Amended Complaint, Dkt. 46, ¶¶ 230-232).

I-Remit believes that this is false. I-Remit—and countless similar companies that use XRP for cross-border fund transfer on a daily basis—are living proof. I-Remit does not use XRP "to speculate on it" nor does it consider XRP to be an "investment" whose inherent value is expected to increase over time. To be sure, sophisticated entities like I-Remit are broadly aware of cryptocurrency markets and their potential fluctuations. Those fluctuations might naturally affect the value of XRP on a given day, just as those same forces might affect the values of Bitcoin, Ethereum, and countless other currencies that have emerged in recent years. But these vacillations, whatever they might be, are not why I-Remit uses XRP—let alone the "principal reason."

Rather, as explained above, I-Remit uses Ripple's software product called ODL. Through ODL, a business can convert local fiat currency (i.e., a government-issued currency like U.S. dollars) into XRP, and then transfer the XRP to a particular jurisdiction and then convert back to local fiat currency. In the case of I-Remit, that recipient jurisdiction is the Philippines. I-Remit,

2

through its exchanges, automatically converts the transfer in local currency (i.e., the Philippine Peso) in real-time, therefore eliminating any "speculative" aspect of its use. ODL has many benefits for I-Remit and its remittance partners. For example, ODL settles cross-border transactions nearly instantaneously by recording those transactions on the XRP Ledger.[5] It can do so during times when traditional banks are closed (e.g., evenings, holidays, and weekends). ODL is also highly secure, providing assurance to entities like I-Remit and its users when sending currency across national borders. ODL also makes it very efficient to navigate between traditional fiat currencies and cryptocurrencies.

The SEC's contention that XRP is an "investment" subject to the Securities Act is not accurate in light of U.S. Supreme Court precedent that defines that term. The way in which entities like I-Remit use XRP on a daily basis undermines the SEC's theory of the case. For the following reasons, I-Remit respectfully urges the Court to grant Ripple's Motion for Summary Judgment and end the SEC's effort to expand its scope of regulatory authority.

## ARGUMENT

**I.     XRP is not an "investment contract" within the meaning of the Securities Act of 1933, and therefore falls outside of the SEC's purview.**

Defendants' Motion for Summary Judgment should be granted because, contrary to the SEC's position, XRP cannot constitute an "investment contract" within the meaning of the Securities Act of 1933 according to binding Supreme Court and Second Circuit precedent. This definitional problem, standing alone, should end this Court's inquiry.

   A.     *Applicable Standards*

Section 5 of the Securities Act prohibits the offer, sale, or delivery after sale of any security

---

[5] The XRP Ledger is open-source software that operates as a peer-to-peer database, spread across a network of computers, that records data respecting transactions, among other things. *See generally*, "What Is XRP Ledger (XRPL)?" BINANCE ACADEMY, available at https://xrpl.org/index.html (last visited September 24, 2022).

3

without an effective or filed registration statement. *See* 15 U.S.C. § 77e(a)-(c). To show a violation of Section 5, the SEC must establish, *inter alia*, that a defendant actually offered or sold a security. *S.E.C. v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), aff'd, 155 F.3d 129 (2d Cir. 1998); *see also*, *Owen v. Elastos Found.*, No. 1:19 Civ. 5462, 2021 WL 5868171, at *9 (S.D.N.Y. Dec. 9, 2021) (reciting standard). Under Section 2(a)(1) of the Securities Act, a security includes—as relevant to this litigation—an "investment contract."[6] 15 U.S.C. § 77b(a)(1); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 358 (S.D.N.Y. 2011) (providing definition).

In 1946, the U.S. Supreme Court defined an "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). Where courts have used the so-called *Howey* test to evaluate whether an investment contract exists, three factors are considered: whether there has been (1) an investment of money (2) in a common enterprise (3) with the expectation of profit from the essential efforts of another. *See, e.g.*, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985) (citing *Howey*, 328 U.S. at 298-99).

B.  *Howey's Third Factor*

The third prong of the *Howey* test is satisfied where investors have been "led to expect profits solely from the efforts of the promoter." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *W.J. Howey Co.*, 328 U.S. at 299).

Even assuming that the SEC could establish the first two *Howey* factors—that there has

---

[6] Although Section 2(a)(1) of the Securities Act includes numerous potential "securities" in its definitional ambit (e.g., notes, stocks, bonds, etc.), the SEC in this litigation alleges only that XRP constitutes an investment contract. (Amended Complaint, Dkt. 46, ¶¶ 3, 31).

4

been an investment of money into a common enterprise—it cannot establish the third.[7] As I-Remit's usage of XRP reveals, XRP (1) is not used with any expectation of profit and (2) is not used because of reliance upon Ripple's purported efforts to enhance XRP's value.

1. *No Expectation of Profit*

To meet *Howey*'s third factor, the investment must come with "a reasonable expectation of profits" that can take the form of "capital appreciation resulting from the development of the initial investment." *United Horn. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)).

I-Remit does not use XRP because of any expectation of profit. Rather, I-Remit is a customer of Ripple's ODL product (which uses XRP) because of ODL's substantively advantageous features to facilitate cross-border payments: speed, ease, and reliability.

*First*, ODL has the ability to transfer funds almost instantaneously. Traditional financial institutions (i.e., commercial banks) can take three to five days to settle international fund transfers and are often unavailable on evenings, weekends, and holidays. Even cryptocurrencies like Bitcoin or Ethereum can take ten or fifteen minutes to record a transaction. But XRP running on the XRP Ledger can support more than 1,500 transactions per *second* with confirmation speeds under five seconds.[8] Simply put, ODL is exponentially faster for customers.

*Second*, ODL is incredibly easy to use. While traditional financial institutions would require customers to worry about cumbersome currency exchanges—often charging fees with each conversion from one fiat currency to another—ODL permits I-Remit's partners to promptly transfer value across borders with ease by converting fiat currencies into XRP.

*Third*, and finally, ODL is secure and reliable, providing assurance to both senders and

---

[7] Defendants' Motion for Summary Judgment separately addresses why the SEC also cannot meet the first two *Howey* factors: namely, there is no investment and no common enterprise. (*See* Dkt. 643 at 51-64).

[8] *Supra*, note 2.

5

recipients of funds. As a remittance company, I-Remit relies on this security; indeed, the company's good will is largely based upon the trust of its users. Ripple's ODL product provides a high degree of customer confidence.

An expectation of profit is not among the reasons that I-Remit uses ODL and XRP. I-Remit is generally aware that XRP's value may fluctuate in a given day, week, or month. But its utility is purely as a means of value exchange for the reasons outlined above—not because of some expectation that its inherent worth will be higher at some future date.

The SEC's contention that XRP "purchasers [are] sophisticated individuals or entities hoping to profit from XRP price movement" is simply not an accurate reflection of why an entity like I-Remit and its end-users use ODL and XRP. (Dkt. 640 at 37).

2. *No Reliance on Ripple's "Efforts"*

Another requirement to meet *Howey*'s third factor is that the expectation of profit must be "derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. 837, 839 (1975). *Howey* contemplates that an investor is led to expect that he will earn a profit "solely through the efforts of the promoter or of someone other than themselves." *W.J. Howey Co.*, 328 U.S. at 298. The Second Circuit has clarified that "the word 'solely' should not be construed as a literal limitation; rather, we 'consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'" *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua–Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)).

I-Remit does not rely on Ripple's purported "efforts" to boost the value of XRP. The value of XRP is largely irrelevant to companies like I-Remit. As explained above, I-Remit is instead focused on ODL's speed, ease, and reliability. To the extent that I-Remit is conscious of the value

6

of XRP, it is only in the most general sense that XRP must maintain (rather than grow) its value in order to be a useful mechanism of exchange.

The SEC argues that "the fortunes of XRP purchasers were and are tied to one another and each depend on the success of Ripple's XRP Strategy." The price of XRP "rises and falls for XRP investors together and equally for all investors." (Amended Complaint, Dkt. 46, ¶¶ 291-292). While it is obviously true that holders of XRP would economically benefit if XRP's value rises, that would be true for *any* means of value exchange. The core function of a means of value exchange, however, is simply that it roughly maintains its value over time. That is what matters about XRP to entities like I-Remit.

As with many cryptocurrencies that have developed in recent years, XRP provides a digital currency with benefits not achievable through traditional governmental currencies. XRP is best understood as a means of value exchange, not an investment. It should not be regulated as an investment under the Securities Act.

## II.     The SEC dramatically minimizes and underestimates the importance of ODL.

The SEC's lawsuit paints ODL as essentially a distraction, and not a key aspect of the way in which XRP is used. In the SEC's telling, XRP is principally bought and sold as an investment vehicle. Customers of ODL do not seem to matter to the SEC.

To support its narrative, the SEC alleges that the use of XRP as a "universal digital asset" with the purpose of transferring money simply "never materialized." (Amended Complaint, Dkt. 46, ¶ 358). It further contends that "[s]ince its launch, ODL has gained very little traction" and that its use "was not organic or market-driven [but rather] subsidized by Ripple." (*Id*., ¶¶ 364-365). The SEC even goes as far as to say that Ripple essentially pays entities to use ODL: "To encourage adoption of ODL, Ripple paid XRP to both the money transmitting businesses and certain market makers that supported the product for their efforts." (*Id*., ¶ 131).

7

The SEC's insinuation is that ODL is irrelevant to the true nature of XRP as an investment. If anything, the SEC asserts that Ripple's ODL product is a red herring meant to distract regulators, even though it has little to no actual usage.

None of this is remotely accurate. As explained above, I-Remit is a significant customer of ODL within one of the world's largest national markets for cryptocurrency.[9] Not only did XRP's popularity as a universal digital currency "materialize," but it has done so spectacularly well. As Defendants point out in their Motion, ODL has seen tremendous growth since its launch in 2018, with more than $10 billion in ODL payments made to date. Put differently, that means over $10 billion in XRP has been exchanged across borders. (Dkt. 643 at 22).

I-Remit has been an active user of ODL since 2019. ODL is useful for I-Remit because XRP and the XRP Ledger lower the cost of real-time payments and allow greater customer access to currency markets with a high levels of speed and security. On an annual basis, I-Remit accommodates the utilization of XRP to process and payout remittance transactions equivalent to hundreds of millions of US dollars.

Contrary to the SEC's insinuation in its lawsuit (Dkt. 46 ¶¶ 364-365) and summary judgment motion (Dkt. 640 at 41), Ripple does *not* pay I-Remit to use ODL or XRP; I-Remit uses ODL and XRP voluntarily because they benefit I-Remit's remittance partners.

Simply put, the SEC's allegations misunderstand the extent and function of ODL's usage, thereby also misunderstanding the purpose of XRP.

## **CONCLUSION**

For the forgoing reasons, I-Remit respectfully urges the Court to grant Defendants' Motion for Summary Judgment.

---

[9] *Supra*, note 3.

Dated: September 30, 2022
       New York, New York

                ARENTFOX SCHIFF LLP

                */s/ Brian Farkas*
                Brian Farkas, Esq.
                1301 Avenue of the Americas, 42nd Floor
                New York, NY 10019
                (212) 492-3297
                brian.farkas@afslaw.com

                Karen Ellis Carr, Esq.
                (not admitted in S.D.N.Y.)
                1717 K Street NW
                Washington, DC 20006
                (202) 715-8531
                Karen.Carr@afslaw.com

                *Attorneys for Amicus Curiae I-Remit, Inc.*