# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,
           Plaintiff,
  v.

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,
           Defendants.

Case No. 20 Civ. 10832 (AT)

### BRIEF OF *AMICUS CURIAE* TAPJETS, INC. IN SUPPORT OF
### DEFENDANT RIPPLE LABS, INC. MOTION FOR SUMMARY JUDGMENT

**STRATFORD LAW FIRM, LLC**
Debra L. Feit, Esq.
401 East Las Olas Blvd.; Suite 1400
Fort Lauderdale, FL  33301
(954) 995-5400
debra@slglf.com

*Attorney for Amicus Curiae TapJets, Inc.*

# TABLE OF CONTENTS

| | | |
|---|---|---|
| **TABLE OF AUTHORITIES** | ............................................ | ii |
| **INTRODUCTION** | ............................................ | 1 |
| **INTEREST OF** *AMICI CURIAE* | ............................................ | 1 |
| **SUMMARY OF LEGAL ARGUMENT** | ............................................ | 6 |
| LEGAL ARGUMENT | ............................................ | 7 |
| *Introduction – The "Howey" Test* | ............................................ | 7 |
| *The "Character in Commerce" Test* | ............................................ | 8 |
| **CONCLUSION** | ............................................ | 9 |

# TABLE OF AUTHORITIES

**CASES**

*SEC V. W. J. HOWEY CO.*, 328 U.S. 293 (1946) …………….. **6, 7**

*TCHEREPNIN V. KNIGHT*, 389 U.S. 332 (1967) …………….. 7

*SEC V. C. M. JOINER LEASING CORP.*, 320 U.S. 344 (1943) …………….. 8

*UNITED HOUS. FOUND, INC. V. FORMAN*, 421 U.S. 837 (1975) …………….. 8

*MARINE BANK V. WEAVER*, 455 U.S. 551 (1982) …………….. 8

*GARY PLASTIC PACKAGING CORP. V. MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.*, 756 F.2D 230 (2ND CIR. 1985) …………….. 8

INTRODUCTION

TapJets, Inc. ("TapJets") respectfully submits this *Amicus Curiae* Brief in support of the Motion for Summary Judgment filed by the Defendants in the above referenced case. TapJets files this *Amicus Curiae* Brief pursuant to the Court's Order of October 11, 2022 [Dkt. 659]. In accordance with this Court's Individual Rules of Practice, Section III.D, TapJets is including the Affidavit of Eugene Kesselman, Founder and CEO of TapJets, Inc., as Exhibit "A" hereto (herein referenced as "Aff."), in support of the factual statements made in this Brief, with citations thereto to support the facts recited in this *Amicus Curiae* Brief. TapJets believes that this *Amicus Curiae* Brief complies with the Court's October 11, 2022 Order and the Court's Individual Rules of Practice, including Rule III.D.

**INTEREST OF *AMICI CURIAE***

TapJets, Inc ("TapJets") is a private jet charter service that distinguishes itself within the industry by developing and operating a digital platform that includes proprietary technology. Aff. at ¶ 1. TapJets is the only company in the world that allows for instant booking and dispatch of private jet flights in North America and Europe. Aff. at ¶ 2. TapJets is a for-profit Corporation duly organized under the laws of the state of Texas on December 8, 2015, whose principal address is 3707 Cypress Creek Parkway, Suite 103, Houston, Texas 77068. TapJets is also registered as a foreign for-profit corporation in the state of Florida. Aff. at ¶ 3.

Eugene Kesselman is the director of TapJets. Aff. at ¶ 1. Neither TapJets nor Kesselman has any connection, financial or otherwise, to any of the Defendants. Aff. at ¶ 26. No other person or entity other than TapJets or its counsel has funded any part of this *Amicus* Brief. TapJets' counsel has authored this brief in its entirety. TapJets' sole interest in this litigation is the

preservation of the use of XRP as a fiat currency substitute when the limitations inherent in the banking system under which fiat currency operates and fiat currency itself fails; if TapJets permanently loses its ability to accept XRP as a fiat currency substitute, TapJets will lose significant income, including but not limited to, the investment in technology that was developed to accept XRP as a form of payment, significant business growth opportunities, as well as valuable good will. Aff. at ¶ 6, 7, 10.

TapJets' mission is to change the way people book and utilize private jets for their personal and business needs. Aff. at ¶ 2. This mission is accomplished by returning the power of flight to the air traveler through the development of innovative technology, including the ability to instantly book a private jet anywhere in the world to anywhere in the world. Aff. at ¶ 2, 10. TapJets operates by connecting Travelers with the nearest suitable private jet aircraft that is operated by a FAR Part 135 certified air carrier. Aff. at ¶ 2.

Before TapJets innovated in this area, the process to book private jet travel required the travel facilitator (similar to a travel agent) to obtain quotes, negotiate and coordinate back and forth amongst brokers, operators, travelers, airports, handlers, and all others involved in the process. Aff. at ¶ 9, 10. With TapJets' proprietary technology, this process is now reduced to an instant on-line booking that is as easy as "calling an Uber". Aff. at ¶ 10. One of the most significant improvements in the process is that the traveler has the ability to book a flight and head to the private airport for their departure within minutes of booking. Aff. at ¶ 10.

However, TapJets' innovation in selling immediate air travel creates a business dilemma for TapJets and its travelers: by anyone's definition, TapJets sells an expensive service. Aff. at ¶ 2. A cross country flight on a private jet can cost upwards of $60,000 USD with transatlantic flights costs reaching in hundreds of thousands of dollars. The dilemma is how to pay for the flight

so that the funds are instantly available to TapJets when wire transfers can take hours are sometimes days and credit card transactions take time to clear and are subject to high fees and charge-backs. Aff. at ¶¶ 23.

It is standard practice in the industry that all parties involved in facilitating the flight, service, aircraft, fuel, and the like are paid *before* the flight takes off. Aff. at ¶ 11. And in turn, TapJets requires immediate payment and <u>clearing of the funds</u> before TapJets will confirm the booking of the travel to the customer. Aff. at ¶ 9. Generally, during bank hours, i.e. Monday through Friday from 9am to 5pm, a transfer of funds via wire transfer is possible and an acceptable form of payment; if travel is booked after or before normal banking hours or merely too late in the business day, traditional fiat currency may not be available to secure the booking. Aff. at ¶¶ 13, 14, 15. Many banks settle wire transfers once a day, generally, at the end of the day: Thus, a Traveler wishing to book a 3pm flight earlier on the same day to be paid by a wire transfer, most likely will not be able to complete the purchase because of the bank's delay in the completion of the wire transfer. Aff. at ¶¶ 13, 14, 15. Moreover, some banks require the individual account holder to complete the wire transfer in the bank in person. This means that the Traveler must first present themselves at a bank branch that offers wire transfers, provide acceptable identification, and complete the order for the wire before the bank will queue the wire transfer for completion at some time in the future. Aff. at ¶ 16. Given that TapJets will only book the Traveler's flight after payment is received, the banking policies regarding wire transfers is a major obstacle for TapJets. Aff. at ¶ 16 .

TapJets calls this the "Friday Night Problem" because the limitations in fiat currency and the banking system become most problematic when a Traveler wishes to book weekend travel, such as on Friday night. The inherent limitations in sending a wire transfer simply does not

3

accommodate the Friday night Traveler. Aff. at ¶ 15. Significantly, the Friday Night Problem has become more apparent in recent months now that the commercial airlines have become so grossly unreliable, with often delayed and cancelled flights. Aff. at ¶ 17. There are Travelers who have to be at their intended destination: When commercial airlines fail, many travelers turn to TapJets for alternative transportation. For many, the limit in the fiat currency system is a barrier to entry. Aff. at ¶¶ 8 - 16 .

Significantly, TapJets plays in medical transport. Aff. at ¶ 8. First, TapJets plays a role in transporting deceased persons from the location of the death to the location of the selected final resting place. Aff. at ¶ 8. For many reasons, commercial airlines may not be convenient for this, but the need is the most prevalent among those whose religious needs and beliefs require immediate burial. Aff. at ¶ 8. Second, TapJets immediacy in the booking and completing travel is vital when the Traveler is transporting organs, including blood, intended to be used in human organ transplants or donor transportation on short notice. Aff. at ¶ 8. Conversely, TapJets services are also vital when the individual is traveling for medical procedures. Aff. at ¶8 .

Cryptocurrency, including XRP, is/was the solution to the Friday Night Problem. Aff. at ¶ 7. XRP was a time-proven and trusted form of cryptocurrency that was preferred by TapJets' customer base (see below). Aff. at ¶¶ 18-20 . XRP offered travelers the ability to pay for the air travel instantly, solving the Friday Night Problem. Aff. at ¶¶ 22-23. When a Traveler tendered XRP for travel, TapJets treated these funds as it would fiat currency – TapJets then used these funds to pay its vendors for services rendered. Aff. at ¶ 21. The technology developed and employed by XRP was fast, safe, and secure to be used as an instant form of payment and was trusted to be stable enough to complete high dollar transactions. Aff. at ¶ 6, 7, 18, 19, 22.

4

In response to the Friday Night Problem and the cryptocurrency solution, on May 15, 2018, TapJets' director Eugene Kesselman asked TapJets' Twitter followers to choose the forms of cryptocurrency that TapJets would accept.[1] Aff. at ¶ 18-19. TapJets' Twitter Poll received a total of 57,054 votes while the poll was live, with an overwhelming majority, 43.9% of the votes, or 25,046 unique, recorded votes, in favor of XRP. Aff. at ¶ 19. XRP overwhelmingly received the most votes with the next form of cryptocurrency, which garnered significantly less votes than XRP. Aff. at ¶ 18-19. Moreover, since XRP offered streamlined cross-border payments, XRP simplified a major limitation inherent in the traditional banking systems, which serves to create a barrier to cross-border purchases, such as charter air travel. Aff. at ¶ 18-19. Since TapJets offers international flights, the ability to offer simplified cross-border payments is vital to TapJets' services and upheld its business mission. Aff. at ¶ 8, 18-19.

Thus, before being forced to suspend its acceptance of XRP, TapJets' acceptance of XRP was based solely upon its traveler's preferences as a fiat currency substitute solving a problem created by the limitations of the traditional banking system. Aff. at ¶ 18-19. TapJets' acceptance of XRP was based solely on XRP's simplification of services and transparency in payment as compared to other forms of currency, fiat or otherwise. Aff. at ¶ 22. The acceptance cryptocurrencies, including XRP, has become vital to TapJets ongoing business. Aff. at ¶¶ 1-28. The benefit in XRP was the immediacy of the payment, stability of the payment platform, and ease of use of XRP protocol for integration with TapJets', or other software, platforms. Aff. at ¶ 22.

---

[1] The Twitter poll and its results can be viewed here: https://twitter.com/tapjets/status/997512392115343360.

After accepting XRP as payment, TapJets then used exchanges to convert the XRP to FIAT currency (USD). Aff. at ¶ 5. After this instant litigation was filed by the SEC against the Defendants, the exchanges stopped accepting XRP. Aff. at ¶ 5. On or about March 3, 2021, TapJets reluctantly and without choice suspended the acceptance of XRP pending the outcome of the litigation. Aff. at ¶ 5. TapJets publicly made a statement on its site regarding this event. Aff. at ¶ 5. If exchanges are not able to reinstate XRP at the conclusion of this litigation, then all technology investments made to build the platforms designed specifically to accept XRP will be a total loss to TapJets and TapJets will sustain damages. Aff. at ¶ 5, 6.

In essence, TapJets disrupts the aviation industry by implementing advanced technology, which included XRP, as a fiat currency equivalent when the limitations imposed on fiat currency by a central banking system would otherwise prevent TapJets from engaging in commerce. Aff. at ¶¶ 1-28. For fiscal year 2021, 48% of TapJets' total bookings were paid by digital currency. Aff. at ¶ 23. TapJets projects that the revenue from digital currencies will continue to grow each year at a rate of 10% and is increasing over fiscal year 2022. Aff. at ¶ 24. However, TapJets believes that the loss of the ability to accept XRP is skewing these numbers and projections downward. Aff. at ¶¶ 3–28.

**SUMMARY OF LEGAL ARGUMENT**

TapJets relies upon the acceptance of XRP to facilitate commercial transactions when fiat currency or credit card transactions are inadequate or impossible. Aff. at ¶ 13. XRP was the fiat currency substitute of choice of those individuals consuming TapJets' services. Aff. at ¶ 18-19. XRP enabled low-cost, instantaneous transfer of funds from the traveler to TapJets or TapJets to its vendors. Aff. at ¶ 10, 17, 23. The choice to accept XRP was based solely on organic market demand – as evidenced by the Twitter Poll. Aff. at ¶ 18-19. Once TapJets was paid in XRP,

6

TapJets did not hold the XRP as in investment, but rather used the XRP as it would fiat currency as a form of payment in exchange for goods and services from other like-minded vendors or converted it to fiat currency on a qualified exchange. Aff. at ¶¶ 5, 21, 25, 26, 27. Accordingly, TapJets has no expectation of a profit in its acceptance of XRP. *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946).

**Legal Argument**

*Introduction – The "Howey" Test*

Under the test announced in *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), an "investment contract" exists when: "(i) an investment of money, (ii) in a common enterprise, (iii) with profits to be derived solely from the efforts of others." *Tcherepnin v. Knight,* 389 U.S. 332 (1967). TapJets writes this *amicus* brief because the third prong of the *Howey* Test is not satisfied given TapJets' use of XRP as a fiat currency substitute. TapJets used XRP in the same way it uses fiat currency Aff. at ¶¶ 5, 21, 25, 26, 27; (1) TapJets did not make an investment of money in XRP, instead it received XRP as a form of payment of its product and services. Aff. at ¶ 23; (2) TapJets is not in common enterprise with Ripple Laps or XRP, the use of protocol or technology was limited to being able to accept the payment in the form of XRP. Aff. at ¶¶ 25-26; (3) TapJets had no expectation of profit in XRP by its acceptance of XRP. Aff. at ¶¶ 21, 27. Specifically, the ease of use of XRP protocol and underlying technology reduced TapJets' cost revelated to accepting the payment. Aff. at ¶¶ 22, 23. The cost of processing XRP payment was approximately 0.3% of the transaction cost, where similar fees charged by banks and credit card processors are in 2.5% range. Aff. at ¶ 23. Accordingly, and as explained herein, TapJets accepted XRP as a fiat currency substitute and at no time relied upon XRP as an investment for which TapJets expects future returns. Aff. at ¶¶ 6 – 28.

7

*The "Character in Commerce" Test*

Rather, the dispositive argument lies in the test announced in *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943): "[T]he test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.* at 352-53. (articulating the "character in commerce test").

TapJets sells aviation travel. Aff. at ¶ 8. Travelers consume the air travel. Travelers who use XRP to pay for aircraft services are motivated by a desire to use or consume air travel. Aff. at ¶ 9. TapJets, in turn, used XRP to pay its vendors for goods or services and was motivated by a desire to use or consumer the item or service purchased. Aff. at ¶¶ 18-22. "When a purchaser is motivated by a desire to use or consume the item purchased… the securities laws do not apply." *United Hous. Found, Inc. v. Forman*, 421 U.S. 837 (1975). TapJets' Travelers are motivated by a desire to use or consume air travel: TapJets is motivated by a desire to sell its services and grow its company. Aff. at ¶¶ 18-22. Under the holding of *Forman*, the securities laws do not apply to the TapJets' transactions.

TapJets accepted XRP without consideration of risk of loss in XRP after acceptance. Aff. at ¶¶ 22-28. *Marine Bank v. Weaver*, 455 U.S. 551 (1982) (limiting the *Howey* test where the "investor" must assume a risk of loss for the asset to be a security). The case of *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2nd Cir. 1985) is instructive. In *Gary Plastic*, the issue before the court was whether an investment program in certificates of deposit ("CD Program") sold by Merrill Lynch was a security under the law. Gary Plastic appealed summary judgment in favor of Merrill Lynch. In the summary judgment, the court held that the CD Program was not a security. In reversing the summary judgment, the appellate court stated:

8

> investors such as Gary Plastic expect profits derived solely from the efforts of Merrill Lynch and the banks. Plaintiff's investment in the CD program was motivated by the expectation of a return of cash investment….

*Id.* at 240. The court held that the CD Program was a security under the *Howey* Test because the gravamen in the issue was **the expectation of Gary Plastics** (and others similarly situated) when investing in the CD Program and **not** the intent of Merrill Lynch in its selling of the CD Program: "The Plaintiff's decision to invest is obviously made in reliance upon the efforts, knowledge and skill of Merrill Lynch." *Id.* at 241.

Here, TapJets is not investing in XRP. Aff. at ¶¶ 22-28. TapJets was not holding XRP for long- or short-term capital gains. Aff. at ¶¶ 22-28. TapJets' acceptance of XRP as payment for its services was not "made in reliance upon the efforts, knowledge or skill" of any issuer of XRP. TapJets was not motivated by (or even "bank on") the expectation of a return of cash investment on their acceptance of XRP. TapJets' use of XRP did not satisfy the third prong of the *Howey* test. Indeed, the third prong of the *Howey* Test cannot be satisfied. Moreover, under the terms that TapJets accepted XRP, XRP's character in commerce is not akin to a security, under whatever definition of security is applied.

**CONCLUSION**

As explained above, TapJets accepts cryptocurrencies, including when it was able to accept XRP, because cryptocurrencies offer flexibility, convenience, security, and ease of use to Travelers that traditional forms of fiat currency inherently cannot offer. TapJets in turn used XRP in exchange for goods and services offered by its vendors or converted the XRP into fiat currency. Neither TapJets nor Eugene Kesselman holds or held XRP for investment purposes with the expectation that the value of XRP will or would increase over time based upon the actions or skill of any third party. TapJets was forced to suspend acceptance of XRP on or about March 3, 2021,

9

due to this instant litigation filed by the SEC, when the exchanges contemporaneously stopped accepting XRP; without the ability to convert XRP to fiat currency, XRP became worthless to TapJets. However, TapJets has invested a significant amount of its resources to build a proprietary platform to accept and process XRP and will suffer significant financial damages if the SEC prevails in this case, not only in lost sales but also in lost costs incurred in building the platform.

RESPECTFULLY SUBMITTED this 14th Day of October, 2022

/s/ Debra L. Feit
Debra L. Feit, Esq.
Florida Bar No.: 104452
*Counsel for Amicus Curiae TapJets, Inc.*
401 East Las Olas Blvd.; Suite 1400
Fort Lauderdale, FL 3301
T: 954-995-5400
debra@slgfl.com