# EXHIBIT 12

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiffs,<br><br>v.<br><br>RIPPLE LABS, INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,<br><br>          Defendants,<br><br>and<br><br>JORDON DEATON, JAMES LAMONTE, TYLER LAMONTE, MYA LAMONTE, MITCHELL MCKENNA, KRISTIANA WARNER, and ALL SIMILARLY SITUATED XRP HOLDERS,<br><br>          Proposed Intervenors | Civil Action No. 20 Civ. 10832 (AT) |

## BRIEF FOR AMICI CURIAE INVESTOR CHOICE ADVOCATES NETWORK AND PHILLIP GOLDSTEIN IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.  BACKGROUND ............................................................................................................3

II. THE SEC IS RELYING ON A VAGUE TERM TO REGULATE DIGITAL
    ASSETS ......................................................................................................................4

III. CONGRESS HAS PREVIOUSLY CONSIDERED AND IS STILL
     CONSIDERING VARIOUS OPTIONS AND FEDERAL AGENCIES TO
     REGULATE DIGITAL ASSETS..................................................................................7

IV. THE SEC'S ATTEMPT TO REGULATE DIGITAL ASSETS EXCEEDS ITS
    TRADITIONAL AUTHORITY PREVIOUSLY DELEGATED BY CONGRESS .......11

V.  CONCLUSION ..........................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Department of Transportation v. Association of American Railroads*,
    575 U.S. 43, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) .........................................................7

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................................................3, 7

*Glen-Arden Commodities, Inc. v. Costantino*,
    493 F.2d 1027 (2d Cir. 1974) ..............................................................................................6

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) .............................................................................................................3

*MCI Telecomm. Corp. v. American Tel. & Tel. Co.*,
    512 U.S. 218 (1994) .............................................................................................................3

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .............................................................................................................6

*SEC v. Wahi*
    (July 21, 2022) .............................................................................................................14, 15

*Utility Air Regulatory Grp. v. Env't Prot. Agency*,
    573 U.S. 302 (2014) .............................................................................................................2

*W. Virginia v. Env't Prot. Agency*,
    142 S. Ct. 2587 (2022) ................................................................................................*passim*

*Whitman v. American Trucking Assns., Inc.*,
    531 U.S. 457 (2001) .............................................................................................................5

**Statutes**

15 U.S.C. § 77(b)(a)(1) ................................................................................................................5

Clean Air Act ............................................................................................................................3, 4

Digital Commodities Consumer Protection Act of 2022 (S. 4760) .................................9, 11, 14

Lummis-Gillibrand Responsible Financial Innovation Act (S. 4356) ..........................................9

Securities Act of 1933 ......................................................................................................1, 4, 5, 6

Special Measures to Fight Modern Threats Act (S. 3876) .........................................................10

**Other Authorities**

H.R.

    923 ...........................................................................................................................8

    1602 .........................................................................................................................9

    1628 .........................................................................................................................8

    2144 .........................................................................................................................8

    2211 .......................................................................................................................10

    4741 .........................................................................................................................8

    6154 .........................................................................................................................9

    7614 .......................................................................................................................10

(https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122) ........................15

*MCI Telecomms. Corp* ................................................................................................3

*SEC's Peirce Calls for Crypto Legislation to Guide Regulation*, Bloomberg Law,
    (Oct. 12, 2022) ......................................................................................................11

## STATEMENT OF INTEREST

*Amici* are Phillip Goldstein and Investor Choice Advocates Network ("ICAN").
Mr. Goldstein is a sophisticated businessman and investor, who currently serves as a manager at
Bulldog Investors, focusing on investments in undervalued assets of all kinds that will deliver
risk-adjusted returns to clients. Mr. Goldstein believes the United States Securities and
Exchange Commission (the "SEC") has a tendency to expand its authority beyond its statutory
limits. ICAN is a nonprofit organization that advocates for expanding access to markets—
including markets for digital assets—for underrepresented investors and entrepreneurs who do
not share the same access and market power as those with more assets and resources.

*Amici* have a significant interest in limiting the scope of the SEC's regulatory power to
those functions authorized by statute and permissible under the United States Constitution. As
an active market participant and an organization speaking on behalf of underrepresented market
participants, *amici* also have a significant interest in ensuring the SEC's power to regulate
securities does not improperly hamper the ability of individuals and organizations seeking to
engage in the sort of digital asset transactions that Congress has not elected to regulate. The
Court's possible expansive interpretation and application of the Securities Act of 1933
("Securities Act") and other federal securities laws to digital assets will have far-reaching
consequences on the separation of powers and on digital asset and blockchain innovation across
the country.

## PRELIMINARY STATEMENT

*Amici* submit this brief urging the Court to grant Defendants' motion for summary
judgment. Defendants' motion focuses on the textual interpretation of the Securities Act—
specifically, on the meaning of the word "security"—and presents reasons for the Court to
interpret the statute as not encompassing the digital assets, including virtual currencies, at issue

in this case. *Amici* support their arguments and will not repeat them here. This brief instead aims to highlight why the SEC's efforts to assert regulatory control over digital assets is an impermissible and unauthorized exercise of regulatory power, and provides an analysis of the significant political and economic impact that broadening the SEC's authority will have on *amici*, other similarly situated parties, and every potential participant in burgeoning digital asset markets in the absence of proper statutory authorization.

The Supreme Court's recent decision in *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587 (2022) (hereinafter, "*West Virginia*"), which addressed an analogous question about an agency's authority, jurisdiction, and power to regulate, provides strong precedent for this Court to rule in Defendants' favor. Central to the Supreme Court's decision in *West Virginia* was the "major questions" doctrine, which provides that a court *will not* defer to an agency's interpretation of a statute when the issue presented is one of deep economic or political significance. The doctrine reflects the settled principle that Congress "speak[s] clearly" when it intends to confer sweeping regulatory power upon federal agencies and does not vaguely or implicitly delegate authority to settle major policy questions. *See Utility Air Regulatory Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014).

Over the past three years, members of Congress have introduced more than a dozen bills attempting to provide statutory authority for regulating digital assets and related topics. The remarkable level of activity in Congress (and even comments by the SEC and other parts of the Executive Branch) make clear what the SEC is not willing to concede: whether, by whom, and how to regulate the digital assets industry is an issue of deep economic and political significance. It is indisputably a "major question." Congress has explicitly authorized the SEC to regulate an enumerated list of financial instruments such as "stocks," "bonds," and "debentures." "Digital

assets" is notably absent from that enumerated list. The SEC is now seeking to regulate an entire industry by expanding one ambiguous term on that list, "investment contract," beyond any reasonable interpretation of that term. This is a bridge too far. Congress never authorized the SEC to regulate digital assets, and, therefore, the Court should not infer that Congress would allow the SEC to do so here in the absence of specific statutory authority.

## ARGUMENT

### I.    BACKGROUND

In specific instances, Congress has delegated regulatory authority to certain federal agencies. However, in what has become known as the "major questions doctrine," the Supreme Court has held that when an agency seeks to use its delegated authority to regulate an issue of major national significance, that agency's authority to do so must be supported by clear, and not vague or ambiguous, statutory authorization. *See*, *e.g.*, *MCI Telecomms. Corp.* v. AT&T Co., 512 U.S. 218 (1994) (rejecting Federal Communication Commission's waiver of tariff requirement); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (rejecting Food and Drug Administration's regulation of tobacco industry based on statutory authority over "drugs" and "devices"); *Gonzales v. Oregon*, 546 U.S. 243 (2006) (rejecting Attorney General's regulation of assisted suicide drugs under his statutory authority over controlled substances).

Most recently, in *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2620 (2022), the Supreme Court ruled that Section 111(d) of the Clean Air Act did not give the Environmental Protection Agency ("EPA") broad authority to regulate certain greenhouse gas emissions. In his concurring opinion, Justice Gorsuch observed that "when agencies seek to resolve major questions, they at least act with clear congressional authorization and do not 'exploit some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond' those the people's representatives actually conferred on them." *W. Virginia*, 142 S. Ct. at 2620

3

(2022) (Gorsuch, J., concurring) (*citing NFIB v. Osha*, 142 S. Ct. 661, 669 (2022)) (internal quotations and citations omitted).  The Court ultimately found that no such authorization existed under the Clean Air Act.

In determining that the EPA's decision constituted a "major question" in *West Virginia*, the Supreme Court observed that the EPA's decision would have "vast economic and political significance" involving "billions of dollars of impact" (*W. Virginia*, 142 S. Ct. at 2604) "representing a 'transformative expansion in [its] regulatory authority' . . . that Congress had conspicuously and repeatedly declined to enact itself."  *W. Virginia*, 142 S. Ct. at 2610.  In describing the EPA's regulatory decision, the Supreme Court could just as easily have been describing the SEC's attempt to expand its authority over digital assets despite the vast economic and political significance such a decision would have and in the absence of Congressional delegation to do so.

## II.    THE SEC IS RELYING ON A VAGUE TERM TO REGULATE DIGITAL ASSETS

The SEC treats the term "investment contract" as though it were infinitely flexible and applicable to all manner of investments.  But, the statutory source for the term "investment contract" gives no indication that Congress meant this term to be a catch-all phrase to capture financial transactions unrelated to "any interest or instrument commonly known as a 'security.'"  Indeed, "investment contract" is just one item on a very specific list of investment vehicles that Congress set forth in the Securities Act to delineate one limit of the federal securities laws:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, **investment contract**, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange

4

relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77(b)(a)(1) (emphasis added).

Nothing in the definition of "security" above provides sufficient support for the claim that digital assets are securities. The SEC, instead, relies primarily on the "flexibility" of the term "investment contract" to argue that its definition can be expanded to encompass digital assets, thus making them subject to regulation. *See* Dkt. 640 at 5. However, "investment contract" should be interpreted in the context of the laundry list of instruments in which it appears and would have to be much more than merely "flexible" to regulate an entirely new industry based on technology and ideas that did not exist in 1933 when Congress included the term in the Securities Act.

As noted by the Supreme Court, Congress rarely grants regulatory authority through "modest words," "vague terms," or "subtle device[s]." *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001). Nor does it "typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *West Virginia*, 142 S. Ct. at 2609 (*citing MCI Telecomm. Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994)).

In *West Virginia*, the EPA similarly relied upon a vague statutory term to establish authority for its actions. The Supreme Court rejected the agency's reliance, finding that the phrase "system of emission reduction" was an "empty vessel" that could encompass "almost anything[.]" *West Virginia*, 142 S. Ct. at 2614. The Court also held that, under its precedents, the issue presented was a major question because the EPA "'claim[ed] to discover in a long-extant statute an unheralded power' representing a transformative expansion in [its] regulatory

authority." *Id.* at 2610 (*citing Utility Air Regulatory Group v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014)).

Similarly, here, the term "investment contract" cannot be said to confer the type of authority the SEC wishes to yield. The Securities Act does not define the term "investment contract." Instead, the Supreme Court—not Congress—has laid out a four-part test (the "*Howey* test") for determining whether certain transactions or schemes qualify as investment contracts, which are in turn subject to regulation. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). To be sure, the *Howey* test is "flexible" and "capable of adaption to meet the countless and variable schemes derived by those who seek the use of money of others on the promise of profits." *Howey*, 328 U.S. at 299. But even the Supreme Court in 1946 surely was not suggesting that Congress intended the term "investment contract" to be a catch-all phrase designed to be applied to all instruments that, as discussed below, share isolated characteristics of currencies and commodities, among other things. The SEC nevertheless claims—as the EPA impermissibly did—to have discovered "an unheralded power" which would vastly transform and expand its regulatory authority.

Digital assets encompass a range of instruments—including centralized intermediaries that transact in digital assets and decentralized protocols that record digital asset transactions. The XRP token in question here does not have the "'character in commerce'" of a security. *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974) (*citing SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943))—in most transactions, no contractual relationship was formed, nor did holding XRP give the recipient equity or stock in any business. The phrase "investment contract" becomes so broad as to be meaningless if, as the SEC suggests,

it encompasses an instrument without a contract, without rights granted to the purchaser, and without obligations on the issuer.

The Court should not permit the SEC to transform a general and vague term into one that is so flexible it empowers the SEC to regulate an entire (and entirely new) industry. Such regulation involves a major question and exceeds the SEC's current statutory authority.

## III. CONGRESS HAS PREVIOUSLY CONSIDERED AND IS STILL CONSIDERING VARIOUS OPTIONS AND FEDERAL AGENCIES TO REGULATE DIGITAL ASSETS

The United States Congress has repeatedly considered regulation of digital assets through proposed legislation. Yet, almost every time legislation has been proposed, Congress has failed to enact it. In *West Virginia*, the Supreme Court acknowledged that "[a]gencies have only those powers given to them by Congress," and "enabling legislation" is generally not an "open book to which the agency [may] add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609. As Justice Gorsuch noted in his concurrence:

> Permitting Congress to divest its legislative power to the Executive Branch would "dash [this] whole scheme." *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 61, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (Alito, J., concurring). Legislation would risk becoming nothing more than the will of the current President, or, worse yet, the will of unelected officials barely responsive to him. See S. Breyer, Making Our Democracy Work: A Judge's View 110 (2010).

*Id.* at 2618 (Gorsuch, J., concurring). The Supreme Court has found it telling when Congress has "considered and rejected" bills authorizing something akin to the agency's proposed course of action. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000).

Congress has introduced several bills over the last four years that would have authorized federal agencies—including, critically, agencies other than the SEC—to regulate digital assets. Yet, Congress has failed to enact this legislation time after time. The following describes some, but not all, of those legislative efforts.

First, the Token Taxonomy Act (H.R. 2144) was introduced on April 9, 2019 and would specify that digital tokens, such as those used in virtual currencies, are ***not securities*** for regulatory purposes.  The bill also provided for the tax treatment of digital assets, including by excluding from gross income any gains from digital asset transactions up to $600, retroactive to January 1, 2017.  It was referred to the Committee on Financial Services and the Committee on Ways and Means, but did not leave either committee.  This bill has been reintroduced in the 117th Congress as H.R. 1628 on March 8, 2021.  It was referred to both committees again and has not yet left either committee.

Second, the Digital Asset Market Structure and Investor Protection Act (H.R. 4741) was introduced on July 28, 2021 and would have granted the Commodities Futures Trading Commission ("CFTC") authority over digital assets, which (1) are created electronically or digitally through software code; (2) are programmed with rules that govern the creation, supply, ownership, use, and transfer of the asset; (3) have a secure transaction history; and (4) are capable of being transferred through a decentralized method without an intermediate custodian. The bill would have also granted the Securities and Exchange Commission ("SEC") authority over the regulation of digital asset securities, digital assets that provide the holder with (1) equity or debt interest in the issuer, (2) rights to certain payments from the issuer, (3) voting rights in the major corporate actions of the issuer, or (4) liquidation rights in the event of the issuer's liquidation.  XRP does not meet this latter definition of a digital asset security.  The bill was referred to the Subcommittee on Commodity Exchanges, Energy, and Credit and has not left the committee.

Third, the U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019 (H.R. 923) was introduced on January 30, 2019 and would direct the CFTC to report on virtual

currency markets and U.S. competitiveness. The bill was referred to the Subcommittee on Commodity Exchanges, Energy, and Credit and has not left the committee.

Fourth, the Crypto-Currency Act of 2020 (H.R. 6154) was introduced on March 9, 2020 and would establish the CFTC as the primary regulator of cryptocommodities; FinCEN and the Office of the Comptroller of the Currency would be the primary regulators of cryptocurrencies and the SEC would be the primary regulator of cryptosecurities and synthetic stablecoins. The bill was referred to the Committee on Financial Services and has not left the committee.

Fifth, the Eliminate Barriers to Innovation Act of 2021 (H.R. 1602) was introduced on March 8, 2021 and would require the SEC and the CFTC to jointly establish a working group on digital assets. The bill was passed in the House and has been languishing in the Senate Committee on Banking, Housing, and Urban Affairs since April 2021.

Sixth, the Lummis-Gillibrand Responsible Financial Innovation Act (S. 4356) was introduced on June 7, 2022 and would make a distinction between digital assets that are either securities or commodities by looking at the purpose of the asset, and provide the CFTC with primary authority over most types of digital assets and digital asset activities. Digital asset securities would remain primarily regulated by the SEC. The bill would also permit digital asset trading platforms to register with the CFTC as Digital Asset Exchanges, and provide for safeguarding of customer assets in the event of Digital Asset Exchange insolvency. The bill would create disclosure requirements on digital asset service providers that will ensure that consumers understand the products they are purchasing, and create a structure for the taxation of digital assets. The bill has not left the Committee on Banking, Housing, and Urban Affairs.

Seventh, the Digital Commodities Consumer Protection Act of 2022 (S. 4760) was introduced on August 3, 2022 and would provide the CFTC authority to regulate digital

commodities. The bill has been referred to the Committee on Agriculture, Nutrition, and Forestry and has not left the committee.

Eighth, the Digital Commodity Exchange Act of 2022 (H.R. 7614) was introduced on April 28, 2022. The bill would authorize the CFTC to register and regulate trading venues offering spot or cash digital commodity markets as digital commodity exchanges. The bill would also provide the CFTC with exclusive jurisdiction over any agreement, contract, or transaction involving a contract of sale of a digital commodity in interstate commerce, and would provide that each futures commission merchant hold customer money, assets, and property in a manner to minimize the customer's risk of loss or unreasonable delay in the access to the money, assets, and property of the customer. The bill was referred to the Subcommittee on Commodity Exchanges, Energy, and Credit and has not left the subcommittee.

Ninth, the Central Bank Digital Currency Study Act of 2021 (H.R. 2211) was introduced on March 26, 2021 and would require the Board of Governors of the Federal Reserve System, (Fed) in consultation with the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), the Department of the Treasury (Treasury), the SEC, and CFTC, to study the impact of the introduction of a central bank digital currency. The bill was referred to the Committee on Financial Services and has not left the committee.

Tenth, the Special Measures to Fight Modern Threats Act, (H.R. 7128) and (S. 3876) was introduced on March 17, 2022 and would authorize the Secretary of the Treasury to place prohibitions or conditions on certain transmittals of funds. H.R. 7128 has been referred to the House Committee on Financial Services. S. 3876 has been referred to the Committee on Banking, Housing, and Urban Affairs. Neither bill has left its respective committee.

Eleventh, the Digital Commodities Consumer Protection Act of 2022 was introduced on August 3, 2022 and would provide the CFTC with the authority to regulate digital commodities.

The number of pending bills in committee—any of which can be presented to Congress—demonstrates that Congress is keenly interested in the area of digital assets. Until a consensus is reached, the SEC has no authority to fill what it apparently perceives as a vacuum.

## IV. THE SEC'S ATTEMPT TO REGULATE DIGITAL ASSETS EXCEEDS ITS TRADITIONAL AUTHORITY PREVIOUSLY DELEGATED BY CONGRESS

As recently as October 12, 2022, SEC Commissioner Hester Peirce commented on the lack of traditional SEC authority to regulate the new class of digital assets. At a Security Traders Association conference, Commissioner Peirce noted, "[c]rypto is something that's new and I think consequential enough that it would make sense for Congress to spend some time on." *SEC's Peirce Calls for Crypto Legislation to Guide Regulation*, Bloomberg Law, (Oct. 12, 2022).

Also, at a congressional hearing in May 2021, SEC Chair Gary Gensler voiced concerns regarding the lack of a regulatory framework for digital asset exchanges.[1] He stated that the lack of oversight represents a "gap in our system" that denies traders basic investor protection. Gensler emphasized the importance of bringing the same protections found in traditional securities markets to digital asset exchanges. He added that "none of the exchanges trading crypto tokens has registered yet as an exchange with the SEC. Altogether, this has led to substantially less investor protection than in our traditional securities markets, and to correspondingly greater opportunities for fraud and manipulation." There were a number of memorable exchanges in the May 2021 hearing:

---

[1] GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III, House Committee on Financial Services, May 6, 2021.

Mr. McHenry: Let's pivot to something that you spent some time out of government understanding. I think what we all have tried to seek is greater collaboration across agencies on the regulatory framework for digital assets, cryptocurrencies, notably. This includes more engagement from industry and appropriate regulators. In 2019, SEC staff produced the framework for investment contract analysis of digital assets.

Since then, the staff has sought feedback on a number of issues, most recently on the evolving standards and the best practices for custody. This is progress, but I believe more concrete steps are necessary to further the crypto market. As you look at this issue, what steps can you outline to bring regulatory clarity so that we can have a vibrant digital asset marketplace with legitimate money and the rule of law?

Mr. Gensler: Thank you for asking that. And I think that this market, which is close **to $2 trillion**, the crypto asset market, is one that could benefit from greater investor protection within the SEC's current authorities, our authorities around securities, and around asset managers and products that might invest in these cryptocurrencies. As you mentioned, we put out a comment, I think it was in October or November, asking for feedback on custody. I would hope that we would move forward and provide greater clarity around custody. **I do think that working with Congress, and I think it is only Congress that could really address it, it would be good to consider**, if you would ask my thoughts, to consider whether to bring greater investor protection to the crypto exchanges. And I think if that were the case, because right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission, that could instill greater confidence. (emphasis added).

Thus, while the SEC Chair has recognized the SEC's "current authorities" provide some guidance, "only Congress" (and not the SEC or the courts) can address the absence of a regulatory framework for either the SEC or the CFTC (or any another agency) to regulate aspects of the $2 trillion crypto asset market. Another member of the Committee, Warren Davidson observed, "Now with you at the helm of this agency, I think it is an opportune time for the SEC to work with Congress on creating this regulatory framework that is bipartisan and clear."

At another hearing before the House Committee on Financial Services, on October 5, 2021, Rep. McHenry, the Ranking Member of the Committee asked Mr. Gensler the following:

You have not been shy in the press, so I hope we can have a frank and transparent conversation here today. On digital assets, you have made, in my view, a number

of concerning and contradictory public statements regarding crypto assets and other innovative technology. When you were here in May, you stated that there was a need for additional legislation to appropriately regulate and define digital assets and digital asset exchanges.

Then, just a few weeks ago, when you testified before the Senate Banking Committee, you stated there was, 'a great deal' of clarity in the law. You implied that many digital asset exchanges are underregistered security exchanges and even threatened one digital asset exchange by name.

So, which is it? Does the SEC want more legislative authority, or is it about to unleash a regulatory tsunami under existing laws?

To be frank, I have strong concerns about how you will regulate in the digital asset space and whether the law is on your side. I believe it is time for Congress to step up and provide clear guidelines that will not allow an SEC Chair to change the law by interview or statement or a statement posted on the Commission's website.

Rep. Maloney asked Mr. Gensler a follow-up question in response to which the SEC Chair acknowledged (with some equivocation) the need for Congressional action:

Mrs. Maloney. Okay. Do you believe the SEC has all the authority that it needs to regulate this cryptocurrency if you should decide to do it or does Congress need to give you more authority to be able to regulate the cryptocurrency?

Mr. Gensler. Thank you, and it is a question that the ranking member asked in a little bit different way earlier, which is, I think our statutes are clear, and Congress painted with a broad brush what is a security, but I think working with Congress, there are some gaps and there are some places that we can work, whether it is our relationship with our sibling agencies in the market regulatory space but also as it relates to, for instance, what has come to be known as stable value coins and how to think through that with the bank regulatory regime as well.

Rather than unequivocally responding, "Yes, the SEC has all the authority it needs," the Chair demurred and instead discussed gaps in the framework.  When asked by Rep. Himes whether Congress should use existing regulations for exchanges, Mr. Gensler again noted the need for Congressional action:

It will be for Congress to decide, and some were quoting my testimony of prior years. Congress could decide, but we have two really great market regulators, the SEC and the CFTC, and I have been honored to Chair each of them, and we have different authorities, derivatives, commodities, and securities. I don't think that

we need another regulator. There are things that could be done to ensure the smoothness between the two agencies, and CFTC Chair Rostin Behnam and I have been talking about that, even if Congress doesn't act.

Mr. Gensler referenced Rostin Behnam, the Chairman of the CFTC; however, Mr. Behnam in his recent testimony to the Senate Committee on Agriculture, Nutrition, and Forestry stated that, "the unique characteristics of the growing digital asset industry necessitated a comprehensive federal regulatory regime."[2]  In recent testimony before the same committee, the CFTC Chief noted, "As I have publicly stated several times, including to this committee, and as has been recognized by federal courts, many digital assets constitute commodities.  As recognized by the [Digital Commodities Consumer Protection Act], the CFTC's expertise and experience make it the right regulator for the digital asset commodity market."

In the absence of clear statutory authority, the potential for disagreements between federal regulators has occasionally resulted in publicly aired friction between the SEC and CFTC.  In July of this year, following the SEC's filing of what it characterized as an insider trading case involving digital assets, *SEC v. Wahi*, CFTC Commissioner Caroline Pham issued a statement that read in part:

> The case *SEC v. Wahi* is a striking example of "regulation by enforcement."  The SEC complaint alleges that dozens of digital assets, including those that could be described as utility tokens and/or certain tokens relating to decentralized autonomous organizations (DAOs), are securities.
>
> The SEC's allegations could have broad implications beyond this single case, underscoring how critical and urgent it is that regulators work together. Major questions are best addressed through a transparent process that engages the public to develop appropriate policy with expert input—through notice-and-comment rulemaking pursuant to the Administrative Procedure Act.  Regulatory clarity comes from being out in the open, not in the dark.

---

[2] Rostin Behnam, Chairman, CFTC, Testimony of Chairman Rostin Behnam Regarding "Examining Digital Assets: Risks, Regulation, and Innovation" before the U.S. Senate Committee on Agriculture, Nutrition, and Forestry (Feb.9, 2022), Testimony of Chairman Rostin Behnam Regarding "Examining Digital Assets: Risks, Regulation, and Innovation" | CFTC.

Twelve years ago on this day, the Dodd-Frank Act became law. Since that time, the CFTC has faithfully carried out its expanded anti-fraud mission and has aggressively pursued wrongdoing in every one of our markets and all over the world. Given the overriding public interest and the open questions on the legal statuses of various digital assets, such as certain utility tokens and DAO-related tokens, the CFTC should use all means available to fulfill its statutory mandate to vigorously enforce the law and uphold the Commodity Exchange Act. This responsibility has been entrusted to us by the Congress and the American people.

Statement of Commissioner Caroline D. Pham on *SEC v. Wahi* (July 21, 2022)

(https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122)

Likewise, on September 15, 2022, Senator Toomey, the Ranking Member of the U.S.

Senate Committee on Banking, Housing, and Urban Affairs ("Committee"), noted:

Given the novel nature of these tokens, Congress ought to step in to provide clarity. In particular, we need to revisit the definition of "security" as part of a larger effort to tailor a regulatory framework that is calibrated to the unique risks and activities of the crypto market.

Opening Statement, Full Committee Hearing (Sept.15, 2022).

Similarly, Senator John Hickenlooper recently noted in a letter to the SEC Chair,

"Applying the old rules to the new market could inadvertently cause financial services to be

more expensive, less accessible" and "recognizing that some digital assets are securities, others

may be commodities, and others may subject to a completely different regulatory regime."[3]

Thus, even members of Congress recognize the traditional framework relied upon by the SEC is

inadequate for the regulation of cryptocurrencies.

## V.    CONCLUSION

For all the foregoing reasons, the Court should grant Defendants' motions for summary

judgment and deny the Plaintiff's cross-motion for summary judgment.

---

[3] https://www.hickenlooper.senate.gov/press_releases/hickenlooper-calls-on-sec-to-regulate-cryptocurrencies/.

Dated: October 18, 2022

Respectfully submitted,

/s/ Avi Weitzman
Avi Weitzman
Nicolas Morgan (*pro hac vice forthcoming*)
Anuva V. Ganapathi (*pro hac vice forthcoming*)

*Counsel for Amici Curiae*
PAUL HASTINGS
200 Park Avenue
New York, New York 10166
Tel.: (212) 318-6000