EXHIBIT 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                    *Plaintiff*,

           - against -

RIPPLE LABS INC., BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN,

                    *Defendants.*

20 Civ. 10832 (AT) (SN)

---

### *AMICUS CURIAE* BRIEF OF COINBASE, INC.
### IN SUPPORT OF THE DEFENDANTS' FAIR NOTICE DEFENSE

CAHILL GORDON & REINDEL LLP
Nola B. Heller
Samson A. Enzer

32 Old Slip
New York, New York 10005
(212) 701-3000
nheller@cahill.com
senzer@cahill.com

Attorneys for *Amicus Curiae* Coinbase, Inc.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 3

BACKGROUND ................................................................................................ 6

    A.    Digital Assets Are Now A Mainstream Part Of Financial Markets ............................. 6

    B.    The 1930s Securities Laws Were Not Drafted With Crypto In Mind ........................... 6

    C.    The SEC Has Failed To Provide Adequate Guidance For The Crypto Market.............. 8

    D.    This Enforcement Action Surprised And Harmed Crypto Market Participants .......... 11

ARGUMENT .................................................................................................... 13

    I.    Existing Due Process Precedents Prohibit Unforeseeable Enforcement Actions............. 14

    II.    SEC Rulemaking Is Essential To Account For New Technology In The Crypto Space .. 17

    III.   A Robust Fair Notice Defense Is Critical In The Absence Of Crypto Rulemaking ........ 21

CONCLUSION................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Christopher* v. *SmithKline Beecham Corp.*,
    567 U.S. 142 (2012).............................................................................................14

*FCC* v. *Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)........................................................................5, 14, 15, 21

*KPMG, LLC* v. *SEC*,
    289 F.3d 109 (D.C. Cir. 2002) ..........................................................................16

*NLRB* v. *Majestic Weaving Co.*,
    355 F.2d 854 (2d Cir. 1966)..............................................................................16

*SEC* v. *W.J. Howey Co.*,
    328 U.S. 293 (1946)...............................................................................7, 8, 11

*Trinity Broadcasting of Florida, Inc.* v. *FCC*,
    211 F.3d 618 (D.C. Cir. 2000) ....................................................................15, 16

*Upton* v. *SEC*,
    75 F.3d 92 (2d Cir. 1996) ...........................................................................15, 16

**Statutes**

15 U.S.C. § 77..............................................................................................................7

15 U.S.C. § 78..............................................................................................................7

**Other Authorities**

Australian Treasury, *Crypto Asset Secondary Service Providers: Licensing and
    Custody Requirements (Consultation Paper)* (Mar. 21, 2022) ................................18

C. Giancarlo and C. Bahlke, "Cryptocurrencies and US Securities Laws: Beyond
    Bitcoin and Ether," *Int'l Fin. L. Rev.* (June 17, 2020) ..........................................12

Chamber of Deputies, Projeto de Lei Nº 4401, De 2021 (Aug. 21, 2021) ....................18

Coinbase, *Digital Asset Proposal: Safeguarding America's Financial Leadership*
    (Oct. 24, 2021) *available at* https://www.coinbase.com/blog/digital-asset-
    policy-proposal-safeguarding-americas-financial-leadership.....................................2

Coinbase, *Petition for Rulemaking — Digital Asset Securities Regulation* (July
    21, 2022) *available at* https://www.sec.gov/rules/petitions/2022/petn4-789.pdf.................2, 9

Commissioner Hester M. Peirce, *How We Howey*, Securities Enforcement Forum (May 9, 2019) *available at* https://www.sec.gov/news/speech/peirce-how-we-howey-050919.................................................................................................................10

Commissioner Hester M. Peirce, *In The Matter of Poloniex, LLC* (Aug. 9, 2021) *available at* https://www.sec.gov/news/public-statement/pierce-statement-poloniex-080921 ...........................................................5

Commissioner Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"* (June 14, 2022) *available at* https://www.sec.gov/news/speech/peirce-remarks-regulatory-transparency-project-conference....................................................................20

Commissioner Hester M. Peirce, *Paper, Plastic, Peer-to-Peer* (Mar. 15, 2021) *available at* https://www.sec.gov/news/speech/peirce-paper-plastic-peer-to-peer-031521 ....................................................................................20

Commissioner Hester M. Peirce, *Response to Staff Accounting Bulletin No. 121* .........................9

Commissioner Hester M. Peirce, *Response to Staff Accounting Bulletin No. 121* (Mar. 31, 2022) *available at* https://www.sec.gov/news/statement/peirce-response-sab-121-033122; ..........................................................................5

Director William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) *available at* https://www.sec.gov/news/speech/speech-hinman-061418..............................................10, 11

Dubai Financial Services Authority, *Consultation Paper No. 143, Regulation of Crypto Tokens* (Mar. 8, 2022)............................................................................18

EU Council, *Digital Finance: Agreement Reached on European Crypto-assets Regulation (MiCA)* (June 31, 2022)........................................................................18

HM Treasury, *Government Sets Out Plan to Make UK a Global Cryptoasset Technology Hub* (Apr. 4, 2022) ..................................................................................18

Hong Kong Legislative Council, *Anti Money Laundering and Counter-Terrorist Financing (Amendment) Bill* (June 24, 2022).........................................................18

Letter Type A *available at* https://www.sec.gov/comments/4-789/4789-4789a.htm.....................9

President Barack Obama, *Circular A-4: Regulatory Analysis* (2003) *available at* https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/ ..........................................13

President Joseph R. Biden Jr., *Executive Order on Ensuring Responsible Development of Digital Assets* (Mar. 9, 2022) *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/..............................................................................................................6

R. Crea et al., "Metamorphosis: Digital Assets and the U.S. Securities Laws," *Harvard Law School Forum On Corporate Governance* (July 7, 2018) *available at* https://corpgov.law.harvard.edu/2018/07/07/metamorphosis-digital-assets-and-the-u-s-securities-laws/ .............................................................................11

S. Ho, "Industry Ratchets Up Pressure on SEC Asking For Crypto Regulation, But Gensler Says Clear Rules Already Exist," *Thomson Reuters* (Aug. 26, 2022) *available at* https://tax.thomsonreuters.com/news/industry-ratchets-up-pressure-on-sec-asking-for-crypto-regulation-but-gensler-says-clear-rules-already-exist/..............................................................................................................9

SEC, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ..................................................................................8

SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022) *available at* https://www.sec.gov/news/press-release/2022-78 ......................18

SEC, *Report of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of 1934: The DAO* (July 25, 2017) *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf ................................................8, 10

Senator J. Hickenlooper, Letter to Chair Gary Gensler (Oct. 13, 2022) *available at* https://www.hickenlooper.senate.gov/wp-content/uploads/2022/10/Sen.-Hickenlooper-Letter-to-Chair-Gensler-on-Digital-Asset-Regulation2.pdf ...........................10

Swiss Federation, *Federal Act on the Adaptation of Federal Law to Developments in Distributed Electronic Ledger Technology* (Sept. 15, 2014)..............................................18

U.S. Const. Amend. V ........................................................................................................14

## INTERESTS OF *AMICUS CURIAE*[1]

Coinbase, Inc. ("Coinbase") was founded in 2012 with the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin, the first cryptocurrency. Coinbase has since built a trusted online trading platform for buying, selling, and storing Bitcoin and many other digital assets through an intuitive user experience. Coinbase is the largest cryptocurrency trading platform in the United States by trading volume, and its parent company, Coinbase Global, Inc., is the only publicly traded U.S. company with a suite of businesses offering end-to-end financial infrastructure and technology for cryptocurrency transactions. As of last reporting, Coinbase's trading platform enables approximately nine million monthly transacting retail users, 14,500 institutions, and 245,000 ecosystem partners to participate in the rapidly evolving cryptoeconomy, with some $96 billion in assets on its platform and $217 billion in quarterly trading volume.

Coinbase strives to be the most trusted cryptocurrency trading platform in the world. To deliver on this objective, Coinbase seeks to foster common sense regulatory oversight and full compliance with the law. For example, Coinbase was among the first entities to obtain a BitLicense from the New York Department of Financial Services in 2017, it is registered with the Financial Crimes Enforcement Network, and it maintains some form of licensure in nearly every state in America. Because cryptocurrency is new to many regulators, Coinbase has also sought to play a supporting role in the development of pragmatic regulations for the cryptocurrency industry, including by publishing a proposed regulatory framework for digital assets, and petitioning the SEC to engage in notice-and-comment rulemaking for digital asset securities.[2]

---

[1] No person other than *amicus* or its counsel authored this brief in whole or in part, or made any monetary contribution intended to fund the preparation or submission of this brief.

[2] *See* Coinbase, *Digital Asset Proposal: Safeguarding America's Financial Leadership* (Oct. 24, 2021)

1

For the reasons explained in that petition, existing securities laws have failed to keep pace with the rapidly evolving digital asset ecosystem and the ways in which digital asset securities are offered, sold, traded, custodied, and cleared.[3] As a result, Coinbase and virtually all other U.S. cryptocurrency trading platforms do not facilitate trading in digital assets that qualify as "securities" under current law, but many would consider doing so once new rules are in place governing transactions in digital asset securities.[4] Rather than engage in rulemaking, the current SEC administration has sought to expand the SEC's jurisdiction over the cryptocurrency industry through ad hoc enforcement actions alleging on a retrospective basis that already-trading digital assets — previously understood by the market to be commodities regulated by the Commodity Futures Trading Commission ("CFTC") or other non-securities — are actually securities subject to SEC regulation. To manage the uncertainty created by this approach, Coinbase and many other U.S. market participants trying in good faith to comply with existing legal restrictions engage in a burdensome asset-by-asset analysis to determine whether each asset is sufficiently unlikely to be considered a security.

The due process issues raised in this SEC enforcement action — in which the SEC publicly alleged for the first time through litigation that digital "XRP" tokens sold by Ripple Labs and two Ripple officials (collectively, "Ripple") were offered as unregistered securities in violation of the 1933 Securities Act — should be rare but will only multiply in the absence of SEC rulemaking for

---

*available at* https://www.coinbase.com/blog/digital-asset-policy-proposal-safeguarding-americas-financial-leadership; Coinbase, *Petition for Rulemaking — Digital Asset Securities Regulation* (July 21, 2022) *available at* https://www.sec.gov/rules/petitions/2022/petn4-789.pdf. Whenever sources are quoted or cited throughout this submission, internal quotation marks, citations, and brackets are omitted unless otherwise noted.

[3] *See* Coinbase, *Petition for Rulemaking.*

[4] *See id.*

digital assets. The absence of formal rulemaking has led to unexpected enforcement actions like this one that create market uncertainty and profoundly disadvantage U.S. trading platforms like Coinbase as they compete with offshore platforms in jurisdictions where there is no risk of regulatory enforcement surprise.

The absence of notice-and-comment rulemaking by the SEC to address these issues underscores the constitutional need for a robust fair notice defense. The fair notice defense that Ripple has asserted in response to the SEC's charges in this case provides a safeguard against improper government enforcement actions in the digital asset space, as due process requires. Accordingly, Coinbase respectfully urges the Court to deny the SEC's motion asking the Court to summarily dismiss Ripple's fair notice defense before any trial.

## PRELIMINARY STATEMENT

One of the fundamental due process protections guaranteed by our Constitution is that government agencies cannot condemn conduct as a violation of law without providing fair notice that the conduct is illegal. By suing sellers of XRP tokens after making public statements signaling that those transactions were lawful, the SEC has lost sight of this bedrock principle.

For years after Bitcoin, Ether, and XRP were launched, the SEC watched as multi-billion-dollar trading markets for these cryptocurrencies developed without stating that it viewed any of these assets as "securities" subject to the onerous restrictions that come with that classification. In 2018, after XRP had become the world's third-largest cryptocurrency behind Bitcoin and Ether, William Hinman, the SEC's then-Director of Corporation Finance, signaled in a speech that fully functional, mature cryptocurrencies including Bitcoin and Ether were not securities. After Director Hinman's speech, and additional SEC guidance reaffirming its core message, multiple sophisticated market actors — including a former CFTC Chair — understood the SEC to be saying that the SEC would not treat many long-traded digital assets (including XRP) as securities.

3

Coinbase shared this market-wide understanding and listed XRP for nearly two years of trading activity from February 2019 through January 2021.

Without prior public warning, the SEC in December 2020 filed this action alleging for the first time that XRP was a "security" that Ripple had been selling for years in violation of the Securities Act. This allegation alone caused immediate collateral harms to market participants, including to platforms like Coinbase and their retail customers. For example, the SEC's allegation led multiple U.S. platforms to delist and halt trading in XRP shortly after this lawsuit was filed, resulting in a $15 billion decline in XRP's market value and significant losses to Coinbase's customers.

Enforcement actions should not be the primary means by which the SEC makes known what it considers to be illegal. This is particularly true when it comes to regulating emerging U.S. industries, like the cryptocurrency sector, which can be driven overseas by unexpected enforcement litigation, leaving customers without protection. Coinbase and other U.S. cryptocurrency companies that are committed to compliance are particularly vulnerable to these dynamics. That is one of the reasons why earlier this year Coinbase formally petitioned the SEC to engage in rulemaking for the U.S. digital asset industry. It is also why one of the SEC's own Commissioners, Hester Peirce, has criticized the SEC's refusal to engage in rulemaking for cryptocurrency "despite many pleas over many years, to provide regulatory guidance about how our rules apply to crypto-assets," and lamented that the SEC has instead chosen to come onto the scene "with our enforcement guns blazing" in a manner that risks chilling innovation and investment in American cryptocurrency ventures.[5]

---

[5] *See* Commissioner Hester M. Peirce, *Response to Staff Accounting Bulletin No. 121* (Mar. 31, 2022) *available at* https://www.sec.gov/news/statement/peirce-response-sab-121-033122; Commissioner Hester M. Peirce, *In The Matter of Poloniex, LLC* (Aug. 9, 2021) *available at* https://www.sec.gov/news/public-

The fair notice defense invoked by Ripple provides a constitutionally required check against such overreach of government enforcement powers. As the Supreme Court has stated, the fair notice doctrine is intended to ensure that regulated parties "know what is required of them so they may act accordingly," and furnish precision and guidance "so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

Given the absence of SEC rulemaking for the cryptocurrency industry, the question of whether the SEC has given fair notice before bringing an enforcement action against sales of one of the thousands of unique digital assets will often be highly fact-intensive, which makes it particularly ill-suited for adjudication on summary judgment. That is especially so here, as the widespread XRP trading in the United States prior to the SEC's enforcement action raises substantial questions of fact about whether the SEC gave fair notice of the position it first took in this litigation. Summarily dismissing those questions before trial would not only be unfair to Ripple, but would undermine the viability of the fair notice defense as a due process protection against government overreach. That protection is particularly important in cases like this one, where the government seeks to penalize conduct based on a statute that purports to impose strict liability without prior notice that the government views the conduct as illegal.

In order to ensure the existing due process precedents on which the fair notice defense rests continue to safeguard against improper regulatory enforcement when needed, the Court should deny the SEC's motion for summary judgment on this issue.

---

statement/pierce-statement-poloniex-080921.

5

## BACKGROUND

### A. Digital Assets Are Now A Mainstream Part Of Financial Markets

Bitcoin, Ether, stablecoins, and other cryptocurrencies are now a mainstream part of the financial market ecosystem in the United States and abroad. Hundreds of millions of people globally, including tens of millions in the United States alone, have purchased cryptocurrency assets, which reached a market capitalization of $3 trillion globally last November.[6] Digital assets and the blockchain technologies underlying them have accelerated the democratization of finance that began with mobile payments. For the billions of "unbanked" adults across the globe without access to bank accounts or services, the blockchain-powered evolution of peer-to-peer marketplaces has the potential to resolve deep inequities. Moreover, the demand for digital assets has inspired financial services innovations for Americans, including the development of trading platforms that give traders the ability to execute transactions 24 hours a day, seven days a week with faster transaction settlement times and fewer intermediaries and associated transaction costs.

### B. The 1930s Securities Laws Were Not Drafted With Crypto In Mind

Despite the well-recognized growth and rapidly evolving practices in the digital asset ecosystem in the 13 years since Bitcoin first launched in 2009, the SEC has yet to propose new rules governing the cryptocurrency market. In the absence of modern regulations tailored to digital assets, market participants must look to the 1930s-era securities laws that were passed generations before the invention of the computer, the internet, and cryptocurrency. Not surprisingly, many digital assets do not fit within any of the categories of financial instruments recognized as

---

[6] *See* President Joseph R. Biden Jr., *Executive Order on Ensuring Responsible Development of Digital Assets* (Mar. 9, 2022) *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/.

"securities" under the 1933 Securities Act, the 1934 Securities Exchange Act, or the securities regulations that the SEC has promulgated pursuant to those statutes.

In the Securities Act and Exchange Act, Congress explicitly authorized the SEC to regulate an enumerated list of assets that qualify as "securit[ies]" such as "stock[s]," "bond[s]," "debenture[s]," and other familiar investment vehicles. *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). Cryptocurrency, which did not exist when those laws were passed, is absent from the list. To assert enforcement jurisdiction over the cryptocurrency industry, the SEC has shoehorned offers and sales of cryptocurrency into a single ambiguous term on the list — namely, "investment contract" (*see id.*) — which the SEC has treated as though it were a catch-all for virtually any financial transactions that the SEC wishes to regulate.

Congress has passed no law and the SEC has adopted no regulation saying that digital assets are "investment contracts" and thus "securities" subject to SEC oversight. Under U.S. law as it currently stands, one has to look to a test handed down 76 years ago by the Supreme Court in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946) to determine whether a particular transaction constitutes an "investment contract" under federal securities law. The *Howey* Court interpreted "investment contract" to mean an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others" in holding that an offering of orange-grove interests and related contracts were "investment contracts, as so defined." *See id.* at 298-300.

Instead of proposing rules notifying the cryptocurrency industry as to which digital assets qualify as "securities" subject to SEC oversight, the SEC has obliquely said "that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending

on the particular facts and circumstances,"[7] and that "issuers and other persons and entities engaged in the marketing, offer, sale, resale or distribution of any digital asset will need to analyze the relevant transactions" under the "so-called *Howey* test" to "determine if the federal securities laws apply."[8]

This is not a realistic approach to regulating a technologically new industry and asset class. The fact-specific nature of any *Howey* analysis means that some digital asset transactions may reflect investment contracts, while others do not. In the absence of formal rulemaking from the SEC, determining whether a particular digital asset transaction qualifies as a security under *Howey* currently requires an expensive and labor-intensive analysis that cannot be systematically extrapolated to other digital assets or transactions. The end result is extraordinarily costly to U.S. innovation in this new industry. American innovators must undertake the substantial legal costs needed to proceed in good faith while still risking significant surprise enforcement actions years later.

## C.  The SEC Has Failed To Provide Adequate Guidance For The Crypto Market

As SEC Commissioner Peirce has stated, "the Commission has refused, despite many pleas over many years, to provide regulatory guidance about how our rules apply to crypto-assets, so some of the responsibility for the lack of legal and regulatory clarity lies at our doorstep."[9]

---

[7] *See* SEC, *Report of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of 1934: The DAO* (July 25, 2017) ("DAO Report") *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.

[8] *See* SEC, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) ("SEC Framework") *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[9] *See* Commissioner Hester M. Peirce, *Response to Staff Accounting Bulletin No. 121*.

Indeed, multiple stakeholders — from lawmakers to market participants — have requested that the SEC establish new rules to bring much-needed regulatory clarity to the digital assets markets. For example, Coinbase recently petitioned the SEC to propose and adopt rules to govern the regulation of securities that are offered and traded via digital means, including potential rules to identify which digital assets are securities.[10] Since then, more than 1,700 individuals signed and sent a form letter asking SEC Chair Gary Gensler to begin a notice-and-comment rulemaking process for digital asset securities.[11] The letter noted that without "smart crypto securities regulation," the United States will fall behind other markets because developers will be deterred from innovating, businesses and platforms will be uncertain about what they can launch without facing SEC litigation, consumers will be unsure whether products they invest in will be shut down, and many will go to offshore venues to transact in digital assets.[12] Moreover, Senator John Hickenlooper sent a letter to Chair Gensler this month "to urge the SEC to issue regulations for digital asset securities through a transparent notice-and-comment regulatory process" because "digital asset markets do not [currently] have a coordinated regulatory framework," which "creates uneven enforcement" and a host of other problems.[13]

---

[10] *See* Coinbase, *Petition for Rulemaking.*

[11] *See* S. Ho, "Industry Ratchets Up Pressure on SEC Asking For Crypto Regulation, But Gensler Says Clear Rules Already Exist," *Thomson Reuters* (Aug. 26, 2022) *available at* https://tax.thomsonreuters.com/news/industry-ratchets-up-pressure-on-sec-asking-for-crypto-regulation-but-gensler-says-clear-rules-already-exist/.

[12] *See* Letter Type A *available at* https://www.sec.gov/comments/4-789/4789-4789a.htm.

[13] *See* Senator J. Hickenlooper, Letter to Chair Gary Gensler (Oct. 13, 2022) *available at* https://www.hickenlooper.senate.gov/wp-content/uploads/2022/10/Sen.-Hickenlooper-Letter-to-Chair-Gensler-on-Digital-Asset-Regulation2.pdf.

To date, the SEC has not answered these calls. Although Bitcoin was launched in 2009, it was not until eight years later in 2017 that the SEC first offered any indication of how it thought the securities laws might apply to crypto assets. The SEC's sporadic, sometimes conflicting actions and statements since then have been described by SEC Commissioner Peirce as a "Jackson Pollock approach to splashing lots of factors on the canvas without a clear message" to the cryptocurrency market.[14]

Since 2017, virtually all of the SEC's enforcement actions and public reports concerning digital assets — including the SEC's July 2017 DAO Report, its August 2019 Digital Assets Framework, and various public statements by the SEC's then-Chair Jay Clayton in 2017 and 2018 — have focused on the legal theory that sales of digital tokens via initial coin offerings ("ICOs") to finance the development of *new* cryptocurrencies constitute securities offerings.[15]

Critically, at the same time that the SEC was warning about ICOs, it was also telling the public that well-established cryptocurrencies, including Bitcoin and Ether, were "no longer" securities (if they ever were) because they had become detached from any centralized enterprise, in contrast to ICOs used by entrepreneurs to raise capital for startup businesses.[16]

As Director Hinman explained in his 2018 speech, "[i]f the network on which the token or coin is to function is sufficiently decentralized — where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts — the assets

---

[14] *See* Commissioner Hester M. Peirce, *How We Howey*, Securities Enforcement Forum (May 9, 2019) *available at* https://www.sec.gov/news/speech/peirce-how-we-howey-050919.

[15] *See* DAO Report.

[16] *See* Director William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) *available at* https://www.sec.gov/news/speech/speech-hinman-061418.

may not represent an investment contract."[17] Using Bitcoin and Ether as examples, Director Hinman stated that even if these popular cryptocurrencies initially could have been viewed as securities, they are no longer securities because the blockchain networks on which they function had become sufficiently decoupled from the efforts of any central enterprise, such that they no longer satisfied *Howey*'s requirement of a "central third party whose efforts are a defining factor in the enterprise."[18] This concept that a cryptocurrency's *Howey* classification may shift over time has been colloquially referred to as Director Hinman's "morphing" theory.[19]

Of course, Director Hinman's speech is not official SEC guidance nor rulemaking, but it remains on the SEC's website today, and his "morphing" theory has been reaffirmed by the SEC. For example, the SEC's 2019 Digital Asset Framework identified "some of the factors to be considered in determining whether and when a digital asset may *no longer* be a security."[20] Until Director Hinman's remarks are superseded by rulemaking, his guidance will rightly continue to loom large for the cryptocurrency industry and public.

### D. This Enforcement Action Surprised And Harmed Crypto Market Participants

Because XRP was very similar to Bitcoin and Ether, and because XRP was the third-largest cryptocurrency behind Bitcoin and Ether by market capitalization, numerous stakeholders reasonably understood Director Hinman's speech to mean that the SEC viewed XRP to be outside of the SEC's regulatory purview. In 2020, for example, former CFTC Chair Christopher Giancarlo

---

[17] *Id.*

[18] *Id.*

[19] *See* R. Crea et al., "Metamorphosis: Digital Assets and the U.S. Securities Laws," *Harvard Law School Forum On Corporate Governance* (July 7, 2018) *available at* https://corpgov.law.harvard.edu/2018/07/07/metamorphosis-digital-assets-and-the-u-s-securities-laws/.

[20] *See* SEC Framework (emphasis added).

published an article relying on Director Hinman's analysis to conclude that XRP was not a security.[21] He explained that "XRP and the underlying XRP Ledger were designed in 2011 and 2012 specifically as a payment mechanism," and further stated:

> Consistent with statements from other SEC officials, director Hinman named bitcoin and ether as examples of cryptocurrencies that were, or had become, sufficiently decentralised networks such that regulating the tokens or coins that function on them as securities may not be required. If bitcoin and ether are sufficiently decentralised, the case for decentralisation of XRP is even stronger.[22]

In addition, the widespread market adoption of XRP speaks volumes about how the market understood the SEC's guidance. As this Court has noted, before the SEC filed this lawsuit in December 2020, "XRP was listed on over 200 exchanges, billions of dollars in XRP was bought and sold each month, numerous market-makers engaged in daily XRP transactions, Ripple's [On-Demand Liquidity] product was used by many customers, and XRP was used in third-party products, many of which were developed independently of Ripple." (Dkt. 440 at 4-5). It is implausible to think that all of these disparate actors would have done so if they believed, as the SEC now claims, that XRP sales were illegal.

When the SEC alleged for the first time that XRP was a security in its December 2020 complaint against Ripple, innumerable market participants worldwide were surprised and harmed. In the end, the constituents who suffered the most were retail customers, as evidenced by the fact that the SEC's announcement of this lawsuit triggered a $15 billion decline in XRP's market value.

This result could have been avoided if the SEC had engaged in the time-tested notice-and-comment rulemaking process under the Administrative Procedure Act to establish standards that

---

[21] *See* C. Giancarlo and C. Bahlke, "Cryptocurrencies and US Securities Laws: Beyond Bitcoin and Ether," *Int'l Fin. L. Rev.* (June 17, 2020).

[22] *Id.* (British spelling in original).

would have alerted the public that the SEC views XRP as a security. Indeed, the magnitude of the direct market impact of this action far exceeds the $1 billion threshold set by the Office of Management and Budget ("OMB") in its guidance to federal agencies on what constitutes a major rulemaking deserving of formal quantitative analysis of its benefits and costs.[23] The indirect market impact of creating this legal uncertainty is not fully quantifiable, but is likely far in excess of the $15 billion loss to retail customers. Yet, at the time this action was filed, the SEC failed to address the need for a regulatory framework for digital assets, nor has it done so since that time, instead choosing to regulate the industry through individual enforcement actions alone.

## ARGUMENT

The fair notice doctrine is one of the few constitutionally recognized protections against the harms caused by unpredictable government enforcement actions. That safeguard is particularly important for the cryptocurrency industry, which the SEC has so far chosen to regulate through *ex post* enforcement actions rather than *ex ante* rulemaking. Summarily dismissing the fair notice defense before trial in this case, where there is substantial evidence that the SEC led the market to believe that the very conduct it now seeks to punish was allowed, would endanger the viability of the defense as a constitutional guardrail in future cases. Notice-and-comment rulemaking on topics such as which digital assets are securities is critical to provide regulatory certainty and foster American leadership in the global cryptoeconomy.

In the absence of such rulemaking, the fair notice defense takes on added significance as a constitutional barricade against unforeseeable enforcement actions by regulators, especially in cases like this one where regulators seek to impose strict liability on conduct without providing

---

[23] *See* OMB, The White House of President Barack Obama, *Circular A-4*: *Regulatory Analysis* (2003) *available at* https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/.

prior guidance that they view the conduct as illegal. As a prudential matter, the Court should allow the fair notice defense in this case to proceed to the trial phase to ensure that the existing due process precedents underpinning this vital constitutional protection remain valid.

## I. Existing Due Process Precedents Prohibit Unforeseeable Enforcement Actions

Existing precedents furnish substantial support for Ripple's invocation of the fair notice defense. The Fifth Amendment to the Constitution prohibits federal government agencies such as the SEC from depriving anyone of "life, liberty, or property, without due process of law." U.S. Const. Amend. V. One of the fundamental principles of due process "in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox*, 567 U.S. at 253. "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment," and "requires the invalidation of laws that are impermissibly vague." *Id.* A statute or regulation violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

As the Supreme Court has stated, when "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012). Accordingly, the Supreme Court and Second Circuit have upheld fair notice defenses like Ripple's in circumstances, such as those presented here, where a regulator's change in enforcement policy created unfair surprise as to whether charged conduct violated the law.

For example, the Supreme Court in *FCC* v. *Fox Television Stations, Inc.* dismissed enforcement actions by the Federal Communications Commission ("FCC") alleging that Fox and ABC television stations violated a statute prohibiting the broadcasting of indecent material because the FCC failed to give Fox or ABC fair notice that fleeting obscenity could be found actionably

14

indecent. 567 U.S. at 254. Prior to bringing those lawsuits, the FCC had a long-standing policy that distinguished between the repetitive occurrence of obscenity, which warranted indecency enforcement actions, versus isolated or occasional obscenity, which did not. *Id.* at 245-47. After the Fox and ABC broadcasts at issue, which involved fleeting obscenity, the FCC changed its enforcement policy and sued Fox and ABC for violating the indecency statute. *Id.* at 254. The Supreme Court held that the FCC's "lack of notice to Fox and ABC that its interpretation had changed" such that their conduct violated the statute "as interpreted and enforced by the agency failed to provide a person of ordinary intelligence fair notice of what is prohibited." *Id.*

The Second Circuit reached a similar result in *Upton* v. *SEC*, 75 F.3d 92 (2d Cir. 1996). There, the SEC sanctioned the CFO of a broker-dealer for failing to prevent his firm from engaging in an industry-standard practice that the SEC determined, without adequate prior notice, violated the SEC's customer protection rule. Before the charged conduct, the SEC had ordered public administrative proceedings against another brokerage firm and two of its managers for engaging in the same practice, and the CFO's firm was informally warned by a New York Stock Exchange examiner that the SEC might consider this practice to be illegal. *Id.* at 94-95. However, the SEC had otherwise given little indication to the public that it viewed the practice as problematic. *Id.* at 94-98. The Second Circuit vacated the SEC's decision to sanction the CFO because he "was not on reasonable notice that [his company's] conduct might violate" the relevant SEC rule, and because the SEC "may not sanction [the CFO] pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public." *Id.* at 98.

These cases, and others like them, stand for the proposition that government agencies cannot enforce legal prohibitions against conduct that their prior enforcement policies allowed absent fair notice. *See, e.g.*, *KPMG, LLC* v. *SEC*, 289 F.3d 109, 115-16 (D.C. Cir. 2002) (KPMG

15

lacked fair notice of the SEC's novel interpretation of an accounting rule); *Trinity Broadcasting of Florida, Inc.* v. *FCC*, 211 F.3d 618, 629-30 (D.C. Cir. 2000) (Trinity lacked fair notice of the FCC's interpretation of a regulation in light of prior conflicting statements by the FCC, applications Trinity made that demonstrated its interpretation of the regulation, and the FCC's prior precedent of declining to enforce its regulation in this way); *accord NLRB* v. *Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966) (criticizing "when a financial penalty is assessed for action that might well have been avoided if the agency's changed disposition had been earlier made known, or might even have been taken in express reliance on the standard previously established").

Bearing these precedents in mind, the SEC is not entitled to a summary judgment ruling that finds, as a matter of law, that there is no set of facts under which Ripple's fair notice defense could prevail at trial. As Ripple has argued, the mere fact that so many market participants believed that XRP sales were allowed raises substantial, disputed questions of fact about whether a person of ordinary intelligence would have understood the SEC's guidance to allow the very XRP sales that it is now seeking to punish. Based on that fact alone, a reasonable jury could answer that question — which is central to the disposition of Ripple's fair notice defense — in Ripple's favor. As a result, that question cannot be resolved on summary judgment papers. It must be tried.

More broadly, because there is substantial legal and factual support for Ripple's invocation of the fair notice defense in this case, summarily dismissing the defense on this record would jeopardize the validity of the defense in future cases.

## II. SEC Rulemaking Is Essential To Account For New Technology In The Crypto Space

While the fair notice defense provides a vital constitutional backstop against unexpected SEC enforcement actions, it is not an adequate substitute for SEC rulemaking. Absent legislative reform, notice-and-comment rulemaking from the SEC that addresses the new technology

16

presented by digital assets is the only way to provide the regulatory clarity needed for the United States to play a leadership role in this industry.

The United States has the opportunity to spearhead the responsible development of digital assets and related innovations across the globe. In order for this to occur, as President Biden recently acknowledged, "an evolution and alignment of the United States Government approach to digital assets" is needed,[24] particularly as to the regulation of digital asset securities. The United States does not currently have a functioning market in digital asset securities due to the lack of a clear and workable regulatory regime. Coinbase and many other U.S. trading platforms have tried in good faith to steer clear of listing digital assets that the SEC may deem to be securities to ensure that they operate in full compliance with existing laws. But new rules facilitating the use of digital asset securities would allow for a more efficient and effective allocation of capital in American financial markets and create new opportunities for American entrepreneurs and investors.

Foreign governments are already drafting and adopting regulations that meet the specific needs of cryptocurrency markets. For example, the European Union ("EU") recently agreed on the Markets in Crypto Assets ("MiCA") regulation first proposed in 2020, and countries and markets such as the United Kingdom, Switzerland, Hong Kong, Australia, Brazil, and Dubai have all taken important steps towards establishing or have already established cryptocurrency regulations.[25]

---

[24] *See* President Biden, *Executive Order on Ensuring Responsible Development of Digital Assets*.

[25] *See* EU Council, *Digital Finance: Agreement Reached on European Crypto-assets Regulation (MiCA)* (June 31, 2022); HM Treasury, *Government Sets Out Plan to Make UK a Global Cryptoasset Technology Hub* (Apr. 4, 2022); Swiss Federation, *Federal Act on the Adaptation of Federal Law to Developments in Distributed Electronic Ledger Technology* (Sept. 15, 2014); Hong Kong Legislative Council, *Anti Money Laundering and Counter-Terrorist Financing (Amendment) Bill* (June 24, 2022); Australian Treasury, *Crypto Asset Secondary Service Providers: Licensing and Custody Requirements (Consultation Paper)* (Mar. 21, 2022); Chamber of Deputies, *Projeto de Lei Nº 4401, De 2021* (Aug. 21, 2021); Dubai Financial Services Authority, *Consultation Paper No. 143, Regulation of Crypto Tokens* (Mar. 8, 2022).

The SEC, however, has not taken any meaningful steps in this direction at all. Although there is now a multi-trillion dollar global market for trading in digital assets, the SEC has not yet opened a public dialogue, even informally, with digital asset market participants about the design of a practical regulatory framework, let alone proposed any new rules. Rather than initiate rulemaking, the SEC's current Chair, Gary Gensler, has made a variety of assertions through speeches and testimony that have introduced fear and uncertainty in cryptocurrency markets. But the ongoing informal suggestions that certain digital assets may be securities under some as-yet-undisclosed standard, coupled with erratic shifts in the SEC's enforcement priorities, has now created untenable uncertainty for the U.S. cryptocurrency industry and market participants.

Indeed, the SEC recently announced that its Enforcement Division's Crypto Assets and Cyber Unit would soon double in size.[26] Leading with enforcement actions before proposing rules results in arbitrary outcomes with limited value as guiding precedent. Ripple and others have been the subject of extensive enforcement scrutiny while others — with nearly identical products or services — have apparently been subject to none. This approach has led to both confusion and the uneven treatment of market participants. Regulators should not be picking winners and losers in the cryptocurrency industry. They should be setting the rules openly so all companies have a chance to follow them.

It is no answer to say that all digital assets should simply be registered with the SEC. Registration under current SEC rules is incompatible with the way that most digital assets function. For example, assets trading on securities exchanges must meet registration, disclosure, and listing requirements that are currently tailored to issuers of traditional debt and equity securities of public

---

[26] SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022) *available at* https://www.sec.gov/news/press-release/2022-78.

companies. But most digital assets trading on platforms like Coinbase do not represent ownership stakes in complicated public companies or pay returns to investors through dividends or interest. Traditional disclosures also do not cover features unique to digital assets that would be considered important to market participants, such as the supply and demand of cryptocurrency tokens, the risk of blockchain network attacks, what kind of governance rights are embedded in which tokens, who has the ability to change the code underlying the assets or network, and other features that do not exist with respect to stocks and other traditional securities. The disclosures that digital asset holders may need are materially different from those that public companies typically make. If current disclosure rules were applied, cryptocurrency market participants would be left with both incomplete and irrelevant information.

In addition, existing SEC registration requirements for national securities exchanges are currently unsuitable to the way digital asset platforms operate. A major innovation in digital asset markets has been to internalize the custodying, trade matching, execution, and settlement of digital assets within a single entity, thereby reducing the number of intermediaries and associated transaction costs imposed on customers — a meaningful and groundbreaking benefit. Existing SEC requirements, however, only allow broker-dealers to be members of registered securities exchanges, meaning that retail customers can only trade assets on exchanges indirectly by using the services of broker-dealers that charge transaction fees and add intermediation risks that could be avoided on digital asset trading platforms, again to the benefit of customers.

These hurdles risk driving investment and innovation in digital assets offshore, potentially to jurisdictions with fewer regulatory burdens and consumer safeguards. If this occurs, U.S.-based retail and institutional customers will continue to buy and sell digital assets, but will do so on unreliable overseas platforms, and no U.S. regulators will be able to protect them. Failure to

resolve these shortcomings leaves American investors vulnerable due to a lack of regulatory clarity, prevents U.S. market participants from leveraging the efficiencies new technologies can offer, and materially impairs the use of U.S. markets to raise capital for the development of such innovations. Such results are wholly inconsistent with the SEC's mission.

As SEC Commissioner Peirce has stated, "Neither complex [SEC] staff guidance nor enforcement actions are a satisfactory way to guide people who are eager to comply with the law, but unsure how to do so."[27] Rather, "the right way to build a regulatory framework" for cryptocurrency is to use the authority that Congress has conferred on the SEC to engage in "notice-and-comment rulemaking."[28] Coinbase and many other market participants have petitioned the SEC to do so.

## III.  A Robust Fair Notice Defense Is Critical In The Absence Of Crypto Rulemaking

Until the SEC engages in rulemaking for cryptocurrency, the fair notice defense is a constitutionally required brace against arbitrary, surprise cryptocurrency enforcement actions. As the Supreme Court has made clear, the fair notice defense is intended to address "at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253-54. Both concerns are implicated by the SEC's pattern of prioritizing enforcement over rulemaking when it comes to regulating cryptocurrency. Absent notice-and-comment rulemaking

---

[27] Commissioner Hester M. Peirce, *Paper, Plastic, Peer-to-Peer* (Mar. 15, 2021) *available at* https://www.sec.gov/news/speech/peirce-paper-plastic-peer-to-peer-031521.

[28] Commissioner Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"* (June 14, 2022) *available at* https://www.sec.gov/news/speech/peirce-remarks-regulatory-transparency-project-conference.

to address the collateral harms caused by unexpected enforcement actions, the fair notice defense is a critical deterrent against the SEC's current enforcement-centric approach to digital assets. Therefore, the lack of notice-and-comment rulemaking should be weighed heavily by courts considering a fair notice defense, especially in cases like this one where the SEC seeks to impose strict liability on conduct that it previously signaled was lawful.

Coinbase remains hopeful that the SEC will seize the opportunity to engage with public stakeholders to fashion pragmatic cryptocurrency regulations. But in the absence of such regulations, requiring the SEC to give fair notice of what conduct in the cryptocurrency industry it views as illegal before suing remains a fundamental due process check. Preventing Ripple's fair notice defense from even being heard at trial will not only undermine Ripple's ability to avail itself of a defense afforded by the basic tenets of due process, but will also give the SEC no incentive to engage in the rulemaking work the cryptocurrency industry and its customers need.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the SEC's motion for summary judgment dismissing Ripple's fair notice defense.

Dated: October 31, 2022           CAHILL GORDON & REINDEL LLP
      New York, New York

By:     /s/  Nola B. Heller
         Nola B. Heller
         Samson A. Enzer

         32 Old Slip
         New York, New York 10005
         (212) 701-3000
         nheller@cahill.com
         senzer@cahill.com

Attorneys for *Amicus Curiae* Coinbase, Inc.