# EXHIBIT 69

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4                        --oOo--
 5    IN RE RIPPLE LABS INC. LITIGATION
 6    _____
 7    THIS DOCUMENT RELATES TO:        Case No.
                                       4:18-cv-06753-PJH
 8    ALL ACTIONS
      _____/
 9
10
11
12
13
14       VIDEO-RECORDED DEPOSITION OF CAMERON AZARI
15                    VERITEXT VIRTUAL
16                FRIDAY, JANUARY 20, 2023
17
18
19
20
21
22
23    Reported by:
24    Anrae Wimberley, CSR No. 7778
25    Job No.  5655292

                                              Page 1
```

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4                       --oOo--
 5   IN RE RIPPLE LABS INC. LITIGATION
 6   _____
 7   THIS DOCUMENT RELATES TO:         Case No.
                                       4:18-cv-06753-PJH
 8   ALL ACTIONS
     _____/
 9
10
11
12
13           Transcript of video-recorded deposition
14   of CAMERON AZARI, taken via Zoom videoconference,
15   beginning at 10:03 a.m. PST and ending at 12:29 p.m.
16   PST on Friday, January 20, 2023, before Anrae
17   Wimberley, Certified Shorthand Reporter No. 7778.
18
19
20
21
22
23
24
25
                                                   Page 2
```

```
 1    APPEARANCES:
 2    For Lead Plaintiff Bradley Sostack:
 3           SUSMAN GODFREY L.L.P.
 4           BY:  OLEG ELKHUNOVICH, ESQ.
 5           1900 Avenue of the Stars, 14th Floor
 6           Los Angeles, California 90067
 7           (310) 789-3100
 8           oelkhunovich@susmangodfrey.com
 9
10    For Defendants Ripple Labs Inc.; XRP II, LLC, and
11    Bradley Garlinghouse:
12           KING & SPALDING LLP
13           BY:  SUZANNE NERO, ESQ.
14                MEGHAN STRONG, ESQ.
15           50 California Street, Suite 3300
16           San Francisco, California 94111
17           (415) 318-1200
18           snero@kslaw.com
19           mstrong@kslaw.com
20
21    Also present:
22           JILL WARREN, CLVS, Videographer
23           VERITEXT LEGAL SOLUTIONS
24                    --oOo--
25
```

Page 3

**Page 14**

1  5 percent. In terms of all the projects that I have  10:13:50
2  been retained to come in, that's probably a little
3  higher, maybe 10, 10 percent.
4  Q. So it's fair to say that the vast majority
5  of the time, you don't offer a declaration in  10:14:02
6  support of class certification?
7  A. Yeah, I think that's probably right. For
8  all the projects -- class action projects that we're
9  retained on, the majority of the time, I'm not --
10  that's right, I'm not retained to provide any sort  10:14:17
11  of opinion on class certification by either party.
12  Q. What did you do to prepare for today's
13  deposition?
14  A. I read over my declaration several times.
15  I read over a little bit of a couple of other  10:14:33
16  declarations on cryptocurrency/securities
17  settlements that Epiq has administered. I took a
18  look back at some of the documents that were filed
19  in the case, the complaint, the motion for class
20  cert.  10:14:54
21  Q. What declarations relating to Epiq's
22  security settlements did you review in preparation
23  for your deposition?
24  A. I don't have them in front of me, so I'm
25  going to get some of the names wrong, but the Audet  10:15:12

**Page 15**

1  matter I filed a declaration I believe -- I'm going  10:15:14
2  to get these mixed up -- I believe the class
3  certification stage there. I took a look at that
4  declaration.
5  And then Epiq, not me, filed the  10:15:26
6  declaration in the Tezos security settlements, one
7  of our project managers filed, and I took a look at
8  that.
9  Q. Okay. And why did you chose to look at
10  the Audet and the Tezos declarations in preparation?  10:15:37
11  A. Because that was the one that -- because
12  that's one of the matters that we -- it's a similar
13  matter in terms it's a
14  cryptocurrency/securities-related settlement, and I
15  filed the declaration on it. So I thought I'd  10:15:52
16  better take a look at it.
17  And Tezos is also a cryptocurrency
18  settlement, and I just thought it was good practice
19  to take a look at that.
20  Q. Do you think that cryptocurrency cases are  10:16:06
21  unique from the other types of cases in which you
22  typically provide notice?
23  A. Unique? I mean, all our cases are unique
24  in certain respects. I mean, there's some cases
25  that have a lot of similarities to one another, but  10:16:21

**Page 16**

1  I mean, we do consumer product cases, auto cases,  10:16:25
2  over-the-counter products, technology products. So
3  in that respect, I wanted to take a look at other
4  cryptocurrency settlements just to confirm that
5  there was nothing to be concerned about them.  10:16:41
6  Q. Does giving notice in a cryptocurrency
7  case pose different challenges for you than in a
8  consumer products case, for example?
9  A. I don't think so. I mean, like I said,
10  there's such a wide spectrum of different kinds of  10:17:21
11  projects. And even within similar -- what people
12  would think would be similar cases, there's a
13  spectrum of ways that we would give notice. It's a
14  unique plan every time, and as long as the class is
15  defined with objective criteria, it's no different.  10:17:36
16  I mean, we look for available data and
17  then we -- if we have to design a media plan, we
18  design a media plan. It's really the same overall
19  approach that we would apply to any other notice --
20  notice for any other project.  10:17:53
21  Q. Aside from the Audet declaration that you
22  offered and the declaration by one of your
23  colleagues in the Tezos case, did you review any
24  other declarations that either you or Epiq has
25  offered in preparation for your deposition?  10:18:13

**Page 17**

1  A. I did not.  10:18:16
2  Q. And you mentioned that you reviewed some
3  case documents. Can you just remind me which ones
4  you reviewed?
5  A. Yeah, I don't have them in front of me,  10:18:27
6  but I was provided the complaint and the motion for
7  class certification. So I read those.
8  And then I was also given an example of --
9  I'm going to pronounce this wrong, I wish somebody
10  would say it first -- is it Poloniex, the exchange?  10:18:44
11  I was given an example of the lead plaintiffs.
12  I'm not going to get the right term. I
13  was going to say their dashboard or whatever that
14  showed their information.
15  But that's all I reviewed.  10:19:03
16  Q. So the complaint, the motion for class
17  certification and some document from Poloniex
18  relating to the lead plaintiff?
19  A. Correct.
20  Q. Aside from the declarations and those  10:19:25
21  case-related documents, are there any other
22  documents or written materials that you reviewed in
23  preparation for your deposition?
24  A. I'm thinking. That's all I can recall
25  right now.  10:19:36

**Page 42**

```
 1  that allowed you to make that opinion.        10:56:03
 2       So when you gave that opinion, I want to
 3  know who you were contemplating as XRP purchasers.
 4    A.  Well, what I was contemplating is people
 5  who fit the definition of the class.           10:56:18
 6       So when we would get down to actually
 7  designing the full notice program, I would be
 8  relying on the Court if it's still a judgment -- if
 9  it was a judgment or relying on the parties if it
10  were a settlement to help with some of the nuances  10:56:34
11  of who might be in the class.
12       It's not unusual for there to be gray on
13  their behalf.  So I would rely on that, and if that
14  was an audience that need to be targeted, what we
15  needed to do to target that audience.          10:56:50
16    Q.  Okay.  So when you're saying, "We will be
17  able to identify and provide reasonable notice to
18  the Class Members," you need to rely on someone else
19  to tell you who those class members are; is that
20  right?                                         10:57:04
21    A.  Well, I didn't quite say that, but --
22    MR. ELKHUNOVICH:  Objection, vague.  Objection,
23  misstates prior testimony, form.
24       Go ahead.
25    THE WITNESS:  Okay.  I didn't -- I might need  10:57:12
```

**Page 43**

```
 1  you to ask the question again.  Sorry.         10:57:14
 2    MS. NERO:  Sure.  Madam Reporter, could you
 3  repeat the question, please?
 4       (Record read by reporter as follows:
 5       "Question:  So when you're saying, 'We    10:57:20
 6       will be able to identify and provide
 7       reasonable notice to the Class Members,'
 8       you need to rely on someone else to tell
 9       you who those class members are; is that
10       right?")                                  10:57:20
11    THE WITNESS:  The answer is basically, yes.  I
12  don't determine who the class is.  That's not my
13  job.  My job is to take the objective class
14  definition as ordered by the Court and -- but it's
15  not unusual at all for there to be some gray on  10:58:04
16  that.
17       I mean, I don't have the data now, if
18  there is data available, and I'm always relying on
19  information to help us in putting together our
20  notice plan.                                   10:58:20
21       So if there was a gray area on what is a
22  purchaser or not, I would take all that information
23  and use it.
24  BY MS. NERO:
25    Q.  So would it be fair to say that, as you  10:58:29
```

**Page 44**

```
 1  sit here today, you don't -- you are not able to  10:58:31
 2  identify who would fit the definition of XRP
 3  purchaser as stated in the class definition?
 4    A.  Yeah, no, I don't think anybody in any
 5  case would be qualified to do that at this stage.  10:58:57
 6    Q.  All right.  The next part of the class
 7  definition is -- and I'm talking about the federal
 8  class definition in paragraph 24(a) of your
 9  report -- those people who still retain XRP.
10       Do you see that?                          10:59:22
11    A.  I do.
12    Q.  So they purchased and retained it.
13       And how are you able to identify which
14  class members still retain XRP?
15    A.  Well, we wouldn't at the notice stage.   10:59:31
16  The purpose of the notice stage would be to cast a
17  broad net and then it would be up to the individual
18  class member if they were wanting to file a claim,
19  depending on how this litigation ends up, to provide
20  whatever proof is necessary to show that they  10:59:49
21  retained it.
22    Q.  So does your plan contemplate that you
23  would send a notice to all XRP purchasers?
24    A.  I mean, it depends on the data, but that's
25  probably right.                                11:00:07
```

**Page 45**

```
 1       If data was available to show us precisely  11:00:09
 2  who still retained XRP or sold it at a loss, then
 3  yes, I suppose we would cull the data down just to
 4  send it to those specific individuals.
 5       But that would be -- in any case, that's  11:00:25
 6  going to be unlikely.  There's almost always a proof
 7  element that people can prove that they're an actual
 8  class member that would be entitled to relief, if
 9  any relief existed.
10       (Reporter seeks clarification.)           11:00:46
11    Q.  So is that the same with regards to who
12  sold at a loss, your assumption would be you would
13  send it to all XRP class members through some sort
14  of a claim form and they would send it some proof
15  that they're entitled to be a part of the class?  11:01:01
16    A.  Yes.  I mean, you know, we do dozens and
17  dozens of securities settlements and that's a
18  typical requirement, that the class member has to
19  provide information that shows the purchase date and
20  sold date, and the claims process is doing the math  11:01:12
21  to confirm that they suffered a loss.
22    Q.  Do you know what "suffered a loss" means?
23    A.  I don't.
24    MS. NERO:  We've been going about an hour.  Why
25  don't we take a short break.                   11:01:34
```

12 (Pages 42 - 45)

**Page 50**

```
 1      A.  I mean, maybe, if that information is        11:18:04
 2  available.  But it's not -- it's not -- I mean, in
 3  securities class actions, regular -- but whatever,
 4  any class action, but also, in security class
 5  actions where oftentimes one of the criteria is      11:18:20
 6  whether someone suffered a loss, that's not --
 7  doesn't have anything to do with the notice piece.
 8          We're looking to ask a little bit of a
 9  broad -- a reasonably broad net to people who
10  purchased whatever the security or item or whatever  11:18:34
11  it was, and then it's part of a claims process to
12  determine the things like suffered a loss or
13  whatever other criteria might be included.
14      Q.  When you say that it is your opinion that
15  the classes are readily identifiable, does that      11:19:27
16  include differentiating the people who suffered a
17  loss from those who did not?
18      A.  No.
19      Q.  We've been speaking mainly about the
20  federal securities class as stated in                11:19:46
21  paragraph 24(a) of your report.
22          I want to speak briefly about the
23  California state securities claims class as listed
24  in paragraph 24(b) of your report.
25          Now, how does this class differ from the    11:20:01
```

**Page 51**

```
 1  federal securities claims class?                     11:20:04
 2      A.  In terms of the definition that I'm
 3  looking at in my declaration, it's really in the
 4  first sentence with the addition of "from Defendants
 5  and/or from any person or entity selling XRP on      11:20:18
 6  Defendants' behalf."
 7          And then the rest is the same in terms of
 8  the date and the retained and/or sold at a loss.
 9      Q.  Okay.  And how will you identify which
10  purchasers of XRP purchased from defendants?         11:20:37
11      A.  For notice, we wouldn't.  We wouldn't do
12  that.  We would be casting the same -- the notice
13  plan would be the same, honestly.  If the California
14  state securities claims class wasn't there, if it
15  was just the first class, at least my understanding, 11:20:58
16  at this point, the notice would be identical if that
17  was in there or not.
18          And if there was any particular remedy
19  that was available to the California state
20  securities claims class that was different or in     11:21:16
21  addition to the federal securities claims class,
22  then that would be something, if it was different,
23  if there was a different factor or behavior or
24  status, that would be something that would be dealt
25  with in a claims process.                            11:21:31
```

**Page 52**

```
 1      Q.  As you sit here today, do you know which     11:22:09
 2  of the defendants sold XRP?
 3      A.  No.
 4      Q.  Do you know where they sold it?
 5      A.  No, not really.                              11:22:18
 6      Q.  What do you mean, "not really"?
 7      A.  I know anecdotally and generally that at
 8  least some of it was sold through these exchanges,
 9  but I don't have any particular knowledge or
10  expertise on how much or what the exchanges are or   11:22:38
11  where else.
12      Q.  Do you know whether those exchanges are in
13  the United States or outside of the United States?
14      A.  I don't know.
15      Q.  What about persons or entities selling XRP   11:22:55
16  on defendants' behalf, do you know who that is?
17      A.  I don't.
18      Q.  Do you know how many persons or entities
19  did this?
20      A.  I don't.                                     11:23:06
21      Q.  Do you know where they sold XRP on
22  defendants' behalf?
23      A.  I don't know.
24      Q.  Do you know who they sold to?
25      A.  I don't know that.                           11:23:21
```

**Page 53**

```
 1      Q.  How will you determine who bought from       11:23:39
 2  defendants during the claims process?
 3      A.  Again, it's going to depend on whether
 4  that's even a factor in the claims process.
 5          If it is a factor, we would rely on the      11:23:52
 6  Court, or if the parties settled, on defining for us
 7  who the defendants are.  And then on a claim form,
 8  just for example, a claimant could either provide
 9  documentation if that was required, screen shots,
10  you know, whatever, some documentation of purchase,  11:24:22
11  or they could sign an affidavit saying I bought from
12  defendant X.
13          Those are just options.  But, again, we
14  would rely on the Court or settling parties to
15  define for us what requirements would be necessary.  11:24:37
16      Q.  You haven't thought about how you would do
17  that as part of this report that you've offered in
18  support of class certification?
19      A.  In terms of how specifically this specific
20  claims process would look, no.  Just generally.      11:25:05
21      Q.  And is that the same for how you would
22  determine whether or not someone sold XRP at a loss?
23      A.  Yes, the --
24          (Reporter seeks clarification.)
25      A.  Yes, the same.                               11:25:32
```

**Page 62**

1  that's something that we do.    11:39:24
2     Q.  And what sort of data would you need in
3  order to do that?
4     A.  Usually, it would be information provided
5  by the claimants evidencing their purchase and their    11:39:35
6  purchase date and their -- and their sale and their
7  sale date or dates.
8     Q.  Will you use a first-in/first-out
9  methodology?
10    A.  I can't answer that.    11:39:57
11    Q.  How will you account for the different
12 prices in purchase and sales of XRP through
13 different currency?
14    A.  Again, that would be we would apply
15 whatever methodology that either the Court ordered    11:40:14
16 or the parties agreed to.  And then just if we had
17 to do it, then we would do the math that was
18 necessary.
19    Q.  I guess what I'm trying to figure out is
20 are you coming up with a methodology here or you're    11:40:28
21 waiting for someone else to tell you what the
22 methodology is and you apply it?
23    A.  We typically wait for someone else to tell
24 us what the methodology is.
25        Now, we might be consulted on if this is    11:40:44

**Page 63**

1  the methodology, how practical is it for you to do    11:40:44
2  that?  If this is the methodology, how much is it
3  going to cost you to apply it?
4        And it would not be uncommon for whoever
5  it was, the Court or the settling parties, to say,    11:40:54
6  Oh, no, that's too expensive, we want to make this
7  easier, and then apply a more lax methodology.
8        But we're not the ultimate decision maker
9  for this.  It would it be the Court or the parties.
10    Q.  I get it.  So whether or not someone falls    11:41:11
11 within the definition of "suffered a loss" is going
12 to be decided either by the Court or by the parties,
13 they will provide that information to you and then
14 you effectuate that?
15    A.  Yeah, we get the criteria and then we    11:41:24
16 apply it, that's right.
17    Q.  Understood.  Thank you.
18        And as of right now, you don't know how
19 many people are in the putative classes; is that
20 right?    11:41:45
21    A.  Correct.
22    Q.  On paragraph 46 of your report, I think
23 it's the last two sentences of paragraph 46, you say
24 [as read]:  It is reasonable to reach between 70 and
25 95 percent.  If the Court certifies the Classes    11:42:12

**Page 64**

1  here, the process described above will be used to    11:42:17
2  achieve a reach within that range.
3        What is the basis for saying that you can
4  reach 70 to 95 percent of a class that you don't
5  know the size of?    11:42:37
6     A.  Yeah, that's a good question, and it comes
7  up in probably the majority of the settlement notice
8  plans that we put together.
9        There are some notice plans, some
10 situations where we have a very clear understanding    11:42:50
11 of the denominator, right, the actual number of
12 class members.  But in many cases, consumer product
13 cases, we don't have a clear idea.
14       To the extent that information is
15 available either from the defendant or publicly    11:43:09
16 available resources, we may come up with a rough
17 estimate of the denominator, the actual size of the
18 class.
19       If we did that, then we would take the
20 individual notice data that was available and that    11:43:27
21 would be the numerator, and we assume that we can
22 reach approximately 30 percent with the individual
23 notice.
24       Then we would build a media plan to a
25 proxy target audience that reflects likely    11:43:41

**Page 65**

1  purchasers of the product, likely class members, and    11:43:45
2  we would build a media plan that got us up to
3  70 percent or higher.
4        If we can't come up with a reasonable
5  denominator, if it could be wildly different, then    11:43:59
6  we often will rely on the media plan on its own to
7  reach at least 70 percent of the target audience.
8        And so that I don't know because we
9  don't -- we haven't done the process of getting
10 whatever data is available what exactly this would    11:44:18
11 end up being, but that's how we get there.
12       At the very least, we would rely on the
13 media plan to say that we've reached X percentage
14 of -- once again, it's a proxy audience.  It could
15 be cryptocurrency purchasers.  We narrowed it as    11:44:36
16 best we can.  And that's what the Courts typically
17 rely upon even, though it's imperfect.
18    Q.  Are you offering an opinion in this report
19 that you can provide notice to 70 to 95 percent of
20 the putative class members?    11:44:58
21    A.  In terms of doing a media plan that
22 reaches a reasonable proxy target audience, yes, I
23 am.
24    Q.  Even though you don't know whether there's
25 10,000 or 50 million class members?    11:45:23

**Page 66**

    1   A.  Correct.  It's a percentage.  It's a         11:45:27
    2   percentage, not a raw number of people that are
    3   reached.
    4   Q.  And you don't know where the class members
    5   are located?                                      11:45:35
    6   A.  At this point, I don't know specifically
    7   where the class members are located.
    8       Now, we may make some determinations based
    9   off any available data that will lead us to
    10  different areas.  I mean, we've done many plans that   11:45:49
    11  are geo targeted or geared, so we add weight to a
    12  particular geographic area if that's what needs to
    13  be done here.  If we have to go broad in scope, we'd
    14  have to go broad in scope.
    15  Q.  Right.  But as you sit here right now         11:46:09
    16  offering an opinion that you can provide notice to
    17  70 to 95 percent of the class members, you don't
    18  know where those class members are?
    19  A.  Correct.
    20  Q.  You don't know how many countries they        11:46:18
    21  live in?
    22  A.  Exact number, no.
    23  Q.  You don't know how people purchased XRP,
    24  all of the ways in which they purchased XRP?
    25  A.  I don't know all of the ways that people      11:46:29

**Page 67**

    1   purchased XRP; correct.                           11:46:31
    2   Q.  Have you ever defined a retention because
    3   you did not think you could give adequate notice?
    4   A.  Yes.
    5   Q.  Tell me about that.                           11:46:51
    6   A.  There have been situations where -- and
    7   it's both plaintiff and -- it's been both plaintiff
    8   and/or defendants -- where the parties didn't want
    9   to do individual notice and asked me to come in and
    10  say that a particular media plan was good enough. 11:47:10
    11      And I've declined because the rule very
    12  clearly says individual notice to all class members
    13  should be identified with reasonable effort.
    14      And so where I've been asked to say it's
    15  too expensive or it would be too hard, but it really   11:47:26
    16  wasn't too hard, I declined.
    17  Q.  Why is there a preference for -- please,
    18  go ahead.
    19  A.  And, of course, I've been conflicted out.
    20  I mean, that was one example, but I have declined 11:47:42
    21  because of conflicts in the past, too, of course.
    22  Q.  Sure.
    23      Why is individual notice preferred to a
    24  media plan?
    25  A.  Well, I mean, technically, it's in the        11:47:54

**Page 68**

    1   rule.  So, you know, that's -- my job is to come  11:47:56
    2   forward and tell the Court that we're in compliance
    3   with Rule 23, and I would be lying if I came in and
    4   made up some reasons why we couldn't do it.
    5       I mean, there's very clear opinions going    11:48:15
    6   back to the Eisen decision back in the '70's that
    7   cost isn't an issue and it shouldn't be an issue.
    8       So that's the primary reason, I don't want
    9   be overturned on -- you know, if somebody objects or
    10  there's an appeal.                                11:48:30
    11      But, look, I'm going to be honest,
    12  individual notice to the extent we can get the data
    13  is typically better in terms of getting a response.
    14  But, again, I've done dozens and dozens of cases
    15  that relied either substantially or exclusively on    11:48:49
    16  media notice.
    17  Q.  Is notice more or less important in cases
    18  with potentially high numbers of opt outs?
    19  A.  To me, it's all the same.
    20  Q.  Is it the same for the class member who       11:49:23
    21  might want to opt out?
    22  A.  I can't speak for an individual class
    23  member.  I just know for me, my job is to satisfy
    24  Rule 23 in due process and then it's up to the class
    25  members to decide whether they want to opt out or 11:49:37

**Page 69**

    1   not or file a claim or whatever.                  11:49:40
    2   Q.  And they can only do that if they obtain
    3   the proper notice; is that right?
    4   A.  Yes.  I guess if they weren't aware of it,
    5   that's right, that's the only way they would know 11:49:52
    6   they have a right to opt out.
    7   Q.  Over the course of your career, what's the
    8   highest percentage of opt outs of a putative class
    9   that you've seen?
    10  A.  I don't have that specific number.            11:50:06
    11  Q.  More or less than 20 percent?
    12  A.  Twenty percent would be really unusual in
    13  terms of an opt-out percentage.
    14      I honestly can't sit here and say I
    15  haven't worked on a project where it was that high.   11:50:32
    16  It's possible that we've had an individual project
    17  that had that high of opt out.  It's typically way,
    18  way less than . . .
    19  Q.  Sorry, say that again?  "It's typically"
    20  what?                                             11:50:47
    21  A.  No.  It's typically much less than even a
    22  tenth of a percent.
    23  Q.  When you're offering the opinion that
    24  notice here is going to reach 70 to 95 percent of
    25  the putative classes, how can you offer a percentage 11:51:07

## Page 70

1  without knowing the denominator?  11:51:12
2      A.   So, again, it's based off of us -- if we
3  don't know the denominator, it's based off of us
4  having a media proxy audience.
5           So when -- as a notice expert, I rely on  11:51:27
6  the same data that every other notice expert in my
7  industry relies upon.  And it's the same data used
8  by advertising agencies to target audiences.  And
9  they also quantify in terms of group.
10          And so what we do is -- it's based off of  11:51:45
11 survey data.  We get as close to a proxy audience as
12 we can in terms of a definition.  Here, we could
13 find -- if the survey data includes people who
14 bought this specific XRP product, we'd use that.  It
15 doesn't get that specific, but we can target all the  11:52:08
16 way down to people who purchased cryptocurrency.
17          We build a media plan that we can say
18 reaches whatever percent we want to get to -- again,
19 typically, at least 70 -- hitting that proxy
20 audience, and then that is a proxy for the class.  11:52:22
21          It's best practicable.  That's what we've
22 done and that's what's been accepted in terms of
23 media plans.
24      Q.   What's a proxy audience?
25      A.   Well, again, the media survey data isn't  11:52:41

## Page 71

1  going to be -- even if it's a well-known consumer  11:52:45
2  product, it's not going to have the exact class
3  period.  It may not have the exact details in a
4  class definition.
5           So we're coming up with an audience of  11:52:57
6  people that is as close as we can to the classes as
7  they're defined.
8      Q.   And how would you define your media proxy
9  audience?
10     A.   In general or here?  11:53:14
11     Q.   Here.
12     A.   Here, once again, we haven't built a media
13 plan yet, so I don't have a specific plan, but we
14 would most likely target at least cryptocurrency --
15 people who have purchased or expressed an interest  11:53:29
16 in cryptocurrency.
17          But, again, the survey data comes out
18 every six months.  I'd rely on my team if we could
19 do better or closer or something that's -- the
20 parties all agree is a better representation, we  11:53:42
21 would do it.  But something along those lines.
22     Q.   What survey data are you referring to?
23     A.   It's -- I always call it "MRI" because
24 that's the old term.  It's GfK Mediamark research
25 data.  That's our typical first source.  But we  11:54:02

## Page 72

1  use -- if we're going to do TV, which I don't think  11:54:06
2  we would do here, but I don't know, we would look,
3  we could use Nielsen data.  Also, Comscore is
4  another company that we use for online data.
5      Q.   And what type of data does GfK Mediamark  11:54:20
6  put out every six months?
7      A.   They compile a wide array of demographic
8  and what's called "psychographic" data on the
9  consumer buying preferences.
10          And so it's, frankly, a little bit -- it's  11:54:39
11 almost alarming how much data is there.  It's based
12 off of survey data.  We go in and we can come up
13 with the demographics of a target audience, race,
14 geography, income level, home ownership, anything
15 that you could think would be in a census report in  11:55:01
16 terms of demographic data.
17          And then psychographic data is the media
18 usage habits of the target audience that's being
19 queried.  So it could be -- it used to be which
20 magazines they bought, right?  That's still there,  11:55:18
21 but not quite as common.  But magazine readership,
22 newspaper readership, Internet access, which
23 websites are visited, how much TV people watch,
24 which programs.  It's a wide array.  And so we use
25 that to build media plans for notice.  11:55:34

## Page 73

1      Q.   And where does GfK get their data?  11:55:42
2      A.   It's based off of survey data that they
3  administer.
4      Q.   And how many people are surveyed?
5      A.   I don't have that information right now.  11:55:54
6      Q.   Do you know who is surveyed?
7      A.   Specifically?  I don't know who is
8  surveyed, no.
9      Q.   Is that data limited to the United States?
10     A.   Yes, it is.  11:56:13
11     Q.   And what specific factors from the GfK
12 data would you look for in order to create a media
13 plan here?
14     A.   Like I said, we would look -- we would
15 look into the available data in terms of how narrow  11:56:40
16 we could get -- you know, base our proxy audience
17 on.  And then once we do that, all the data is
18 available to us.
19          And so my media team would then look --
20 our job is to design an effective notice program in  11:56:58
21 terms of reach, but also, to do it as efficiently as
22 possible.  We're not going to buy media that we
23 don't need and be overly duplicative.
24          And so it's a balancing act.  We go in and
25 find the pieces of media that seem the best.  I'm  11:57:17

19 (Pages 70 - 73)

**Page 74**

```
 1   just being hypothetical.  Maybe it's Facebook ads is        11:57:20
 2   the best that gets us right off the top the broadest
 3   reach and then we go in and layer on top of that
 4   additional pieces of media, online typically
 5   nowadays, but also could be print, and get ourselves        11:57:32
 6   up to whatever percentage that we need to be.
 7        And so it's really -- I don't want to
 8   call -- it's not a game but it's a trial and error
 9   going in and finding out which pieces of media get
10   added in, give us the best bang for the buck.              11:57:49
11   Because some pieces of media are duplicative of each
12   other.  And so even the fourth best piece of media
13   you may not use because it may duplicate exactly
14   what the first three pieces of media are doing.
15   Maybe the sixth best hits a unique audience and that       11:58:04
16   one's better.
17        So it's really that sort of building that
18   my media team will do.
19   Q.   So are you looking to create a proxy
20   audience of XRP purchasers?                                11:58:17
21   A.   Yeah, definitely.
22        But I want to interject -- you don't even
23   have to ask me a question -- this isn't the only
24   media we would typically buy.  When we're putting
25   together a good media plan, we want to be able to          11:58:33
```

**Page 75**

```
 1   tell the Court that we're reaching a specific              11:58:37
 2   percentage, usually 70 percent.
 3        And so we build the media that will get us
 4   to that 70 percent.  But in addition to that, we
 5   also may use media that may not be measurable but we       11:58:47
 6   know is reasonable and intelligent to use depending
 7   on any other information we may have.
 8        So if we had information that the product
 9   was marketed on specifically pieces of media, even
10   if those were not ones that we could measure in            11:59:10
11   terms of our reach, we would want to use those as
12   part of the media plan.
13        So it would be a multi-faceted plan.  We
14   wouldn't just be -- I don't know what the right word
15   is -- we would just be tied to pieces that get us          11:59:24
16   our reach.
17   Q.   In order to create a proxy audience of XRP
18   purchasers, you have to understand who XRP
19   purchasers are; right?
20   A.   Generally, yes.                                       11:59:40
21   Q.   It's fair to say, as you sit here today,
22   you don't know all of the different types of XRP
23   purchasers?
24   A.   That's right, I don't know all the
25   specific purchasers or the specific ways it was            11:59:51
```

**Page 76**

```
 1   purchased.                                                 11:59:55
 2   Q.   How do you assign a percentage to the
 3   specific type of media that this proxy audience may
 4   view?
 5   A.   We don't assign the percentage.  It comes             12:00:15
 6   out of the research data and the tools that are used
 7   to measure the usage of the data for our proxy
 8   audience.  So we don't pick it.  It comes out.
 9        So if our proxy audience is people who
10   purchased -- I've got Crystal Geyser water on my           12:00:37
11   desk.  If it's people who purchased Crystal Geyser
12   water, then the research data will tell us, if we
13   buy a certain number of impressions on Facebook,
14   what percent of that audience it will reach.
15        And then as we layer in additional pieces             12:00:52
16   of media, whatever they may be, it's -- we don't
17   pick the numbers.  It comes out of the data that we
18   use.
19   Q.   You pick the factors that go into the
20   proxy audience?                                            12:01:07
21   A.   Yeah, we would choose the proxy audience.
22   That's right.
23   Q.   And if there's an error in the process of
24   defining the proxy audience, then it could affect
25   whether or not class members receive notice?               12:01:21
```

**Page 77**

```
 1   A.   I mean, yes, to a certain extent.                     12:01:25
 2        I mean, we definitely want the proxy
 3   audience to be as close as possible.  Because that's
 4   what it is, it's as close as possible.  So we're
 5   very rarely -- we're never going to have a proxy           12:01:36
 6   audience -- we wouldn't call them the proxy audience
 7   if they were ever exactly who the class member was,
 8   yeah.
 9   Q.   As you sit here today, you haven't defined
10   a media plan for these putative classes; is that           12:01:55
11   correct?
12   A.   That's correct.
13   Q.   So you don't know what factors you would
14   use to identify a proxy audience?
15   A.   Generally, but no, we haven't built a                 12:02:08
16   specific plan.
17   Q.   You don't know what websites that you
18   would post on?
19   A.   Correct.
20   Q.   Or other forms of media that you would use            12:02:16
21   in order to try and reach this putative class?
22   A.   No.  I mean, again, generally.  But we
23   haven't gone through the process of actually
24   building a media plan.
25   Q.   So you're assuming that once your media               12:02:31
```

20 (Pages 74 - 77)

1          I, the undersigned, a Certified Shorthand
2     Reporter of the State of California, do hereby
3     certify:
4          That the foregoing proceedings were taken
5     before me at the time and place herein set forth;
6     that any witnesses in the foregoing proceedings,
7     prior to testifying, were administered an oath; that
8     a record of the proceedings was made by me using
9     machine shorthand which was thereafter transcribed
10    under my direction; that the foregoing transcript is
11    a true record of the testimony given.
12         Further, that if the foregoing pertains to
13    the original transcript of a deposition in a Federal
14    Case, before completion of the proceedings, review
15    of the transcript ( ) was (X) was not requested.
16         I further certify that I am neither
17    financially interested in the action nor a relative
18    or employee of any attorney of any party to this
19    action.
20         IN WITNESS WHEREOF, I have this date
21    subscribed my name.
22    Dated: January 22, 2023
23
24
                                        *Anrae Wimberley* (signature)
25                    ANRAE WIMBERLEY, CSR No. 7778

Page 83