# EXHIBIT 71

**In the Matter Of:**

*IN RE MATTER OF RIPPLE LABS*

*MUKARRAM ATTARI, PH.D.*

*March 08, 2023*



Confidential          Mukarram Attari, PH.D. - March 08, 2023

```
                                                                    1
 1                     UNITED STATES DISTRICT COURT

 2                    NORTHERN DISTRICT OF CALIFORNIA

 3                           OAKLAND DIVISION

 4

 5

 6   IN RE MATTER OF:                )
                                     )
 7   RIPPLE LABS INC. LITIGATION     )
                                     ) CASE NO. 4:18-cv-06753-PJH
 8   _____)

 9

10

11                        *** CONFIDENTIAL ***

12

13      VIDEOTAPED DEPOSITION OF MUKARRAM ATTARI, Ph.D.

14                   REMOTE VIA VIDEOCONFERENCE

15                     Wednesday, March 8, 2023

16

17

18

19

20   Stenographically Reported by:

21   HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
     Realtime Systems Administrator
22   California CSR License #11600
     Oregon CSR License #21-0005
23   Washington License #21009491
     Nevada CCR License #980
24   Texas CSR License #10725

25   Job No.:  2023-884741
```

Confidential          Mukarram Attari, PH.D. - March 08, 2023

```
                                                                  2
1          VIDEOTAPED DEPOSITION of MUKARRAM ATTARI,
2    Ph.D., taken before Heather J. Bautista, CSR No. 11600,
3    a Certified Shorthand Reporter for the state of
4    California, with principal office in the county of Santa
5    Clara, commencing on Wednesday, March 8, 2023,
6    10:21 a.m., remotely via videoconference.
7
8    APPEARANCES OF COUNSEL:
9         For Lead Plaintiff BRADLEY SOSTACK:
10              Susman Godfrey LLP
                BY:  NICHOLAS N. SPEAR, ESQ.
11              1900 Avenue of the Stars
                14th Floor
12              Los Angeles, California 90067
                Phone:  (310) 789-3100 / Fax:  (310) 789-3150
13              nspear@susmangodfrey.com
14        For Defendants RIPPLE LABS INC.; XRP II, LLC; and
          BRADLEY GARLINGHOUSE:
15
                King & Spalding LLP
16              BY:  ANDREW MICHAELSON, ESQ.
                1185 Avenue of the Americas
17              34th Floor
                New York, New York 10036
18              Phone:  (212) 556-2100 / Fax:  (212) 556-2222
                amichaelson@kslaw.com
19
                King & Spalding LLP
20              BY:  LUKE RONIGER, ESQ.
                500 W. 2nd Street
21              Suite 1800
                Austin, Texas 78701
22              Phone:  (512) 547-2044
                lroniger@kslaw.com
23
24   ALSO PRESENT:   Drayton Everson, Videographer
                    Deborah McCrimmon, ESQ., (Ripple in-house
25                  counsel)
```

**Page 77**

1  opinions about what consumptive uses XRP has?
2      A.  No, I'm not.
3      Q.  Are you offering any opinions about what
4  consumer use cases XRP has?
5      A.  No, I'm not.
6      Q.  Are you offering any opinions about what
7  commercial use cases XRP has?
8      A.  No, I'm not.
9      Q.  So let's go down to Section IX titled Summary
10 of Opinions -- or Paragraph 9, which is in the Summary
11 of Opinions section.  Do you see that?
12     A.  Yes.
13     Q.  So can you please read out loud Paragraph 9(a)
14 to me.
15     A.  All of it?
16     Q.  Yes, please.
17     A.  "Purchaser-specific transaction-by-transaction
18 information is needed to determine whether a purchaser
19 of XRP earned a gain or suffered a loss because of their
20 purchase and sale of XRP during the analysis period.
21 Given the daily and intraday fluctuations in XRP prices
22 during the analysis period and further differences in
23 XRP prices across exchanges and currency pairs, it is
24 important that any gain or loss analysis accounts for
25 the actual transaction data for each individual

**Page 78**

1  purchaser of XRP.  To determine the gain or loss for an
2  XRP purchaser, one must know, (i), the quantities of XRP
3  purchased and sold; (ii), the purchase price and the
4  currency used for purchase; (iii), the sale price and
5  the currency received by a sale; and, (iv), the currency
6  exchange rate" --
7          (Stenographer clarification.)
8          THE WITNESS:  -- "applicable to the purchase
9  and sale currencies.  In the absence of detailed records
10 that are not available, it is not possible to determine
11 the gain or loss experienced by an XRP purchaser."
12     Q.  (By Mr. Spear)  I'd like to focus on the
13 sentence beginning "To determine."  That sentence
14 states, "To determine the gain or loss for an XRP
15 purchaser, one must know," and then lists four things;
16 correct?
17     A.  Yes.
18     Q.  How did you determine that these are the four
19 things you must know?
20     A.  I determined it by trying to figure out what
21 would be needed to calculate a gain or loss.
22     Q.  If you knew these four things for an XRP
23 purchaser, you'd be able to calculate that purchaser's
24 gain or loss; correct?
25          MR. MICHAELSON:  Objection.  Form.

**Page 79**

1          THE WITNESS:  You would be able to calculate
2  several different gains or losses for that purchaser.
3      Q.  (By Mr. Spear)  You would be able to calculate,
4  though, a gain or loss for that purchaser; correct?
5      A.  Multiple gains or losses.
6      Q.  Would you be able to calculate gains or losses
7  in U.S. dollars?
8      A.  Yes, you could.  If you had the exchange rate
9  from dollars to the purchase currency and dollars to the
10 sale currency, you'd be able to calculate the gain or
11 loss in the U.S. dollar.  But it may not be relevant to
12 the purchase.
13     Q.  So if I wanted to calculate the gain or loss
14 for a purchaser, and I had these four pieces of
15 information, including the exchange rates in
16 U.S. dollars, I'd be able to calculate the gain or loss
17 for an XRP purchaser in U.S. dollars; correct?
18     A.  You'd be able to calculate a gain or loss for
19 the XRP purchaser in U.S. dollars, but, again, it might
20 not be relevant to the purchaser.
21     Q.  How would you calculate the gain or loss for an
22 XRP purchaser in U.S. dollars with this information?
23     A.  You'd take the purchase quantity.  You'd take
24 the purchase price.  You'd take the currency that the
25 purchase price was denominated in.  You'd take the

**Page 80**

1  exchange rate applicable at the time of the purchase on
2  the exchange that the transaction happened that allowed
3  you to convert the purchase price into U.S. dollars.
4  You'd take the sale price.  You'd go through the same
5  process of converting it into U.S. dollars, and then you
6  could calculate a gain or loss in U.S. dollars.
7          However, you could also calculate other gains
8  or losses and -- expressed in U.S. dollars, that would
9  be different from the gain or loss that I just
10 described; and to do that, you'd take the purchase price
11 and the purchase currency, the sale price and the sale
12 currency, convert them -- if they were the same, say
13 Bitcoin, figure out the difference in Bitcoin, and you'd
14 have the gain or loss in Bitcoin that you could convert
15 to U.S. dollars; and then you get a second U.S. dollar
16 gain or loss.
17     Q.  Either of those methodologies could be applied
18 to any XRP purchaser who sold their XRP; correct?
19     A.  Those two --
20          (Stenographer clarification.)
21          THE WITNESS:  Those two and others could be
22 applied to XRP purchasers to calculate gains or losses
23 in U.S. dollars, and you'd have multiple numbers, then,
24 to choose from.
25     Q.  (By Mr. Spear)  But just to be clear, if you

Page 81

1  had those four pieces of information you list, you could
2  calculate gains or losses in U.S. dollars under either
3  of those two approaches for any XRP purchaser who later
4  sold their XRP.
5      MR. MICHAELSON: Objection. Form.
6      THE WITNESS: If you had the four pieces of
7  information and the currency exchange rates that we're
8  now talking about are different, because you need
9  multiple currency exchange rates, but -- and so thinking
10 of currency exchange rates as one piece of information,
11 those four pieces of information would -- would give you
12 multiple answers -- answers as to gain or loss in
13 U.S. dollars.
14     Q.  (By Mr. Spear)  But the approach would be the
15 same -- or the approaches would be the same for any XRP
16 purchaser; correct?
17     MR. MICHAELSON: Objection. Form.
18     THE WITNESS: When you say "approaches would be
19 the same," what do you mean?
20     Q.  (By Mr. Spear)  Sure.
21     You described, I think, two methodologies for
22 calculating gains or losses in U.S. dollars; correct?
23     A.  I described two approaches, but then I --  I
24 mentioned that there would be other approaches that
25 would also give you gains or losses in U.S. dollars.

Page 82

1      Q.  So focusing on the two approaches you
2  mentioned, those two approaches would -- could be
3  applied to any XRP purchaser who later sold their XRP;
4  correct?
5      MR. MICHAELSON: Objection. Form.
6      THE WITNESS: Provided information was
7  available.
8      Q.  (By Mr. Spear)  Okay.
9      And that's those four pieces of information
10 that you list in Section 9(a); correct?
11     A.  Yes.  So the exchange rates might not be -- all
12 be available, because, as I note in my report, you could
13 trade XRP for more than 200 different currencies, and I
14 don't know if there's simultaneous information on
15 exchange rates to the U.S. dollar available across all
16 of those 200.
17     Q.  What do you mean you don't know?
18     A.  I haven't checked.
19     Q.  So you state at the end of that -- at the end
20 of Paragraph 9(a), "In the absence of detailed records
21 that are not available, it is not possible to determine
22 the gain or loss experienced by an XRP purchaser."
23     Do you see that?
24     A.  Yes.
25     Q.  And then if you go to Paragraph 23 of your

Page 83

1  report, which is on Page 12 --
2      A.  Yes.
3      Q.  -- that same sentence is included at the end of
4  Paragraph 23; correct?
5      A.  Yes.
6      Q.  What is your basis for stating that detailed
7  records are not available?
8      A.  It's my understanding that they're not
9  available.
10     Q.  What is that understanding based on?
11     A.  They are not publicly available, and they were
12 not provided to me.
13     Q.  What detailed records are not publicly
14 available?
15     A.  Every purchaser's purchase and sale information
16 of the type that I describe in Paragraph 9.
17     Q.  What investigation did you do to determine they
18 were not available?
19     A.  I looked at -- I had my team look at public
20 data sources, and they were not available publicly.
21     And we asked counsel -- I asked counsel whether
22 it was available.
23     Q.  And what were you told?
24     A.  That it was not available.
25     Q.  And this is -- this is data about aggregate

Page 84

1  volume and sale, or is this about individual user
2  transactions?
3      A.  It says "purchaser-specific transactions," so
4  that's what --
5      Q.  Did you ever check whether these exchanges
6  maintain the user-specific transaction data?
7      A.  I did not.
8      Q.  Did you ever investigate whether an individual
9  would be able to log into their account on one of these
10 exchanges and access that data?
11     A.  I did not.
12     Q.  Do you have any idea whether an individual XRP
13 purchaser would have access to the four pieces of data
14 you list in Paragraph 9(a)?
15     A.  I would assume they do.
16     Q.  You would assume they do have access to that?
17     A.  Individuals have access to their own data for
18 some --
19     (Stenographer clarification.)
20     THE WITNESS: -- some history of their trading
21 data.
22     Q.  (By Mr. Spear)  And if those individuals were
23 able to provide that data to a claims administrator or
24 an expert, that person could then use that to calculate
25 gains or losses for that individual XRP purchaser;

141

1  overall losses than gains; correct?
2       MR. SPEAR: Objection. Form. Scope.
3  Misstates Table 1.
4       THE WITNESS: I don't think there would be more
5  overall losses. There'd be more -- there'd be more
6  volume that was purchased and sold at a loss than there
7  would be volume purchase and sold at a gain, but that
8  wouldn't tell you anything about -- you know, you could
9  have one person accounting for all of that volume.
10     Q.  (By Mr. Spear) Let me ask it this way. You
11 see paragraph -- Title Header B on Page 17 says
12 "Purchasers of XRP would have earned a gain for a large
13 portion of purchase/sale date" -- "purchase date/sale
14 date combinations during the analysis period."
15     Do you see that?
16     A.  Yes.
17     Q.  You're not testifying about which purchase/sale
18 date combinations had the highest trading volume;
19 correct?
20     A.  No. That's not in my analysis.
21     Q.  And so what your analysis is showing is the
22 amount of dates that had, in your opinion, purchase
23 date/sale date combinations that would have resulted in
24 a gain; correct?
25     MR. MICHAELSON: Objection. Form.

142

1       THE WITNESS: In a loss. Table 1 is -- is
2  expressed in terms of a loss.
3       Q.  (By Mr. Spear) But you aren't testifying
4  whether those purchase date combinations are the
5  purchase date combinations on which any specific amount
6  of XRP was actually traded; correct?
7       MR. MICHAELSON: Objection. Form.
8       THE WITNESS: Yes. My analysis doesn't take
9  into account trading volume, but that requires
10 information that is not available, because you need to
11 match trades, purchases to sales.
12     Q.  (By Mr. Spear) Let's look at Paragraph 8 of
13 your report again.
14     A.  Yes.
15     Q.  So looking, sort of, at the -- there's a
16 sentence on the middle of the paragraph that sort of
17 bleeds on to Page 6 that says, "For example, XRP." Do
18 you see that?
19     A.  "For example, XRP" starts on Page 8 -- Page 6.
20     Q.  Yes. I'm talking about that sentence; correct?
21     A.  Yes.
22     Q.  You see it?
23     A.  Yes.
24     Q.  One of the things that you say XRP could be is
25 used in negotiated bilateral contractual arrangements

143

1  between private parties. Do you see that?
2       A.  Yes.
3       Q.  What negotiated bilateral contractual
4  arrangements between private parties are you referring
5  to here?
6       A.  You know, where one party is providing XRP to
7  another for -- under -- under a contract.
8       Q.  Are you aware of any specific situations where
9  that happened?
10     A.  No.
11     Q.  Did -- did you ever ask Defendants whether
12 there were any specific situations where that happened?
13     MR. MICHAELSON: Objection. I mean,
14 privileged.
15     You can answer to the extent that wouldn't --
16     Q.  (By Mr. Spear) Let me ask the question this
17 way. Did you ever look into whether there were any
18 negotiated bilateral contractual arrangements between
19 private parties for XRP?
20     A.  That wouldn't be public.
21     Q.  I understand.
22     But did you ever look into whether that
23 happened?
24     MR. MICHAELSON: Again, without revealing any
25 communications with counsel.

144

1       THE WITNESS: Not publicly.
2       Q.  (By Mr. Spear) Are you offering any opinions
3  about negotiated bilateral contractual arrangements
4  between private parties?
5       A.  No.
6       Q.  Look back at Paragraph 9(a).
7       A.  Okay.
8       Q.  You are not offering an opinion, just to be
9  clear -- well, strike that.
10     Let's actually look at Paragraph 7. And this
11 paragraph identifies your assignment; correct?
12     A.  Yes.
13     Q.  You were not asked to determine the appropriate
14 methodology or methodologies for calculating gains and
15 losses; correct?
16     MR. MICHAELSON: Objection. Form.
17     THE WITNESS: No, I was not asked to
18 determine -- I -- I was not asked to determine whether
19 there was a specific approach as to evaluate gain or
20 losses, but that was part of, kind of, whether it could
21 be done.
22     Q.  (By Mr. Spear) Gotcha.
23     And then if you go to 9(a), just to be clear,
24 you don't offer any opinions about the appropriate
25 approach for calculating gains or losses; correct?

1    I, HEATHER J. BAUTISTA, CSR No. 11600, Certified
2    Shorthand Reporter, certify:
3        That the foregoing proceedings were taken before
4    me at the time and place therein set forth, at which
5    time the witness declared under penalty of perjury; that
6    the testimony of the witness and all objections made at
7    the time of the examination were recorded
8    stenographically by me and were thereafter transcribed
9    under my direction and supervision;
10       That the foregoing is a full, true, and correct
11   transcript of my shorthand notes so taken and of the
12   testimony so given;
13       (  ) Reading and signing was requested/offered.
14       (XX) Reading and signing was not requested/offered.
15       (  ) Reading and signing was waived.
16       I further certify that I am not financially
17   interested in the action, and I am not a relative or
18   employee of any attorney of the parties, nor of any of
19   the parties.
20       I declare under penalty of perjury under the laws
21   of California that the foregoing is true and correct.
22
23       Dated:   March 14, 2023
24
25                  *Heather Bautisa*
                 HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR