# EXHIBIT 3

```
 1                              VOLUME: I
                                PAGES:  1 to 148
 2                              EXHIBITS:  9 to 10
 3
                  UNITED STATES DISTRICT COURT
 4               NORTHERN DISTRICT OF CALIFORNIA
                        OAKLAND DIVISION
 5
 6        Civil Action No. 4:18-cv-06753-PJH
 7                                         )
          In Re:                           )
 8        RIPPLE LABS, INC.                )
          LITIGATION                       )
 9                                         )
          _____  )
10                                         )
                                           )
11        This Document Relates To:        )
                                           )
12        ALL ACTIONS                      )
                                           )
13
14             VIDEOTAPED DEPOSITION OF STEVEN P.
15        FEINSTEIN, called as a witness on behalf of
16        the Defendants, pursuant to the applicable
17        provisions of the Federal Rules of Civil
18        Procedure, before Jeanette N. Maracas,
19        Registered Professional Reporter and Notary
20        Public in and for the Commonwealth of
21        Massachusetts, at the Offices of Morgan,
22        Lewis & Bockius, One Federal Street, Boston,
23        Massachusetts, on Friday, January 20, 2023,
24        commencing at 9:41 a.m.
25
```

Page 1

| | |
|---|---|
| 1  APPEARANCES: | 1       P R O C E E D I N G S    09:40:39 |

1    APPEARANCES:
2
3        SUSMAN GODFREY, LLP
         By: Nicholas N. Spear, Esq.
4        1900 Avenue of the Stars
         Los Angeles, CA 90067
5        For the Lead Plaintiff.
         Nspear@susmangodfrey.com
6
7        KING & SPALDING, LLP
         By: Andrew Michaelson, Esq.
8        By: Luke N. Roniger, Esq. (Texas)
         By: Jared Lax, Esq. (via Zoom)
9        1185 Avenue of the Americas
         New York, NY 10036
10       For the Defendants.
         Amichaelson@kslaw.com
11       Lroniger@kslaw.com
12       Shawn Budd, Videographer.
13
     ALSO PRESENT VIA ZOOM:
14
         Ana Guardado, Esq., Ripple Labs, Inc.
15
16
17
18
19
20
21
22
23
24
25
                                              Page 2

1          P R O C E E D I N G S          09:40:39
2          VIDEOGRAPHER:  We are on the record.  09:40:39
3    This is the videographer speaking, Shawn      09:41:46
4    Budd with Veritext Legal Solutions.  Today's  09:41:48
5    date is January 20, 2023, and the time is     09:41:51
6    9:41 a.m.  We are here at the offices of      09:41:55
7    Morgan Lewis, Boston, Massachusetts to take   09:41:59
8    the video deposition of Dr. Steven Feinstein  09:42:02
9    in the matter of Ripple Labs, Inc.            09:42:06
10   litigation.                                   09:42:09
11         Will counsel please introduce           09:42:10
12   themselves for the record.                    09:42:11
13         MR. SPEAR:  Nick Spear, Susman           09:42:13
14   Godfrey for lead plaintiff, Bradley Sostack.  09:42:16
15         MR. MICHAELSON:  Andrew Michaelson       09:42:20
16   from King & Spalding representing defendants,  09:42:21
17   and joined by my colleague, Luke Roniger,     09:42:25
18   also from King & Spalding in person.  My      09:42:29
19   colleague, Jared Lax, also from King &        09:42:30
20   Spalding, is attending remotely and Ana       09:42:35
21   Guardado, in-house counsel at Ripple, is      09:42:40
22   also joining remotely.                        09:42:42
23         VIDEOGRAPHER:  The court reporter        09:42:43
24   today is Jeanette Maracas.  Will you please   09:42:44
25   swear in the witness.                         09:42:47
                                              Page 4

1          I N D E X
2    Testimony of:          Direct   Cross
3    Steven P. Feinstein
4    (by Mr. Michaelson)        5
5
6          E X H I B I T S
7    No.      Description        Page
8
     Exhibit 9    Deposition notice.     19
9
     Exhibit 10   Exhibit 62, Expert
10           Report of Steven P.
             Feinstein, 11/18/22.   24
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 3

1          STEVEN P. FEINSTEIN
2          A witness called for examination
3    by counsel for the Defendants, having been
4    first duly sworn, was examined and testified
5    as follows:
6          DIRECT EXAMINATION
7    BY MR. MICHAELSON:                        09:43:06
8    Q. Good morning, Dr. Feinstein.  My name is  09:43:08
9    Andrew Michaelson from King & Spalding      09:43:18
10   representing defendants.  How are you today?  09:43:22
11   A. Fine, thank you.                         09:43:24
12   Q. Let me go over a few groundrules that should  09:43:25
13   help make today go more smoothly.  You may   09:43:27
14   be familiar with them, but I'll go through   09:43:28
15   them nonetheless.                           09:43:29
16         First, do you understand you're       09:43:31
17   under oath just as you would be in a        09:43:32
18   courtroom at trial, is that correct?        09:43:34
19   A. Yes.                                      09:43:37
20   Q. And you understand that we have a court   09:43:37
21   reporter who is taking down every word that  09:43:39
22   you and I say?                              09:43:41
23   A. Yes.                                      09:43:42
24   Q. Is there any reason why you can't give    09:43:42
25   complete truthful testimony today?          09:43:47
                                              Page 5

2 (Pages 2 - 5)

1    A. No.                                    09:43:48
2    Q. Okay. I'll ask that you let me finish    09:43:49
3      my question before you answer so that we    09:43:52
4      don't talk over each other so that the court    09:43:55
5      reporter can be sure to take down every    09:43:58
6      word. Is that okay?                     09:44:00
7    A. Yes.                                   09:44:02
8    Q. If you need to take a break, let me know.    09:44:02
9      I'll likely ask that you completely answer    09:44:08
10     any question that's pending before we break,    09:44:10
11     but aside from that, we can generally    09:44:13
12     accommodate.                           09:44:15
13   A. Okay.                                  09:44:16
14   Q. So I'm going to ask you a few questions    09:44:17
15     about what you did to prepare, and I'm not    09:44:22
16     asking you for the substance of any    09:44:24
17     communications you had with counsel in the    09:44:26
18     matter. So setting aside the substance    09:44:28
19     of any of communications you've had with    09:44:31
20     counsel, can you describe what you did to    09:44:33
21     prepare for today's deposition.          09:44:35
22        MR. SPEAR: I'll just, consistent    09:44:37
23     with what he just said, please don't disclose    09:44:39
24     any communications that we had. Go ahead.    09:44:42
25   A. Well, I read my report. I read or reviewed    09:44:44

1      the documents that are listed in my report.    09:44:48
2      I also read a few other documents, some    09:44:52
3      of which were not listed in the documents    09:44:55
4      considered exhibit in my report, including    09:44:59
5      the mediation statements produced in this    09:45:03
6      case. Essentially that's it as far as    09:45:08
7      documents.                            09:45:13
8        I looked at the interrogatory    09:45:16
9      responses and questions that have been    09:45:18
10     produced and prepared. I met yesterday with    09:45:22
11     plaintiff's counsel and we had a virtual    09:45:28
12     meeting over Zoom, I believe, about a week    09:45:33
13     ago.                                   09:45:37
14   Q. Okay. I'm going to break that down a little    09:45:40
15     bit. The documents that you reviewed in    09:45:44
16     preparation for today, you indicated that    09:45:45
17     you reviewed documents including the    09:45:50
18     mediation statements. Were there any other    09:45:53
19     documents aside from mediation statements    09:45:55
20     that you reviewed in preparation for today?    09:45:57
21   A. Yes. The motion to dismiss order. I believe    09:46:00
22     it was a motion to dismiss order. I think    09:46:07
23     that is listed in my docs reviewed and relied    09:46:10
24     upon list. I can't think of any others as I    09:46:14
25     sit here now. So about half a dozen    09:46:18

1      documents, my report and these others.    09:46:20
2    Q. Okay. So aside from what's listed in your    09:46:22
3      report and what you've mentioned already    09:46:26
4      specifically this morning, you can't think    09:46:28
5      of any other document you reviewed in    09:46:31
6      preparation for today?                  09:46:32
7    A. Correct.                              09:46:33
8    Q. Okay. And the meetings with counsel, there    09:46:34
9      was one yesterday in person and there was a    09:46:40
10     remote meeting about a week prior?       09:46:42
11   A. That's correct.                       09:46:44
12   Q. Did you talk with anyone other than your    09:46:45
13     counsel in preparation for today?        09:46:48
14   A. Yes.                                  09:46:51
15   Q. Who did you speak with?                09:46:51
16   A. Members of my staff at Crowninshield    09:46:53
17     Research.                             09:46:59
18   Q. What are their names?                 09:46:59
19   A. Dan Bettencourt, Alex Xuang and Mark McKew.    09:47:00
20     Those are the folks I spoke with about this    09:47:08
21     case.                                 09:47:10
22   Q. Did they help prepare your report?     09:47:11
23   A. Yes.                                  09:47:15
24   Q. Did they draft it?                    09:47:15
25   A. No.                                   09:47:19

1        MR. SPEAR: Objection to the extent    09:47:19
2      I don't think we discussed any drafts.    09:47:22
3        MR. MICHAELSON: I'm not asking for    09:47:24
4      the substance of anything. I'm just asking    09:47:25
5      if his staff drafted the report.        09:47:27
6        MR. SPEAR: Go ahead.               09:47:29
7    A. Well, they assisted me, but it's my words,    09:47:30
8      my writing, my opinions.              09:47:33
9    Q. Aside from communications with counsel and    09:47:35
10     your staff, did you speak with anyone else    09:47:38
11     in preparation for today?             09:47:40
12   A. There's one other person. Rawley Heimer    09:47:42
13     I've spoken to about this case. He's also on    09:47:47
14     my staff now and he's a finance professor.    09:47:50
15   Q. Where is he a professor?              09:47:52
16   A. He just recently moved from Boston College    09:47:56
17     to Arizona State. He works with our firm    09:47:59
18     routinely.                           09:48:06
19   Q. So, again, aside from counsel and staff, did    09:48:07
20     you speak with anyone else in preparation    09:48:09
21     for today?                           09:48:11
22   A. No.                                   09:48:11
23   Q. Did you check out any social media in    09:48:11
24     preparation for today?                09:48:21
25   A. No, no.                              09:48:26

3 (Pages 6 - 9)

1  Q.  Did you read any news articles in preparation  09:48:28
2      for today other than those listed in your  09:48:34
3      report?  09:48:36
4  A.  Well, I keep abreast of the financial news  09:48:37
5      in general, not for purposes of preparing  09:48:41
6      for this case, and in the news there have  09:48:44
7      been articles about Ripple and XRP over the  09:48:48
8      course of the last year which I read, but  09:48:53
9      just in the general course of my business  09:48:56
10     both as a consultant and as a professor,  09:48:59
11     not specifically to prepare for this case.  09:49:02
12 Q.  In what publications did you see these  09:49:04
13     articles about Ripple and XRP?  09:49:08
14 A.  Law 360 primarily, but as you know, Ripple  09:49:09
15     has been in the news, in the Wall Street  09:49:14
16     Journal.  That's what I know for sure.  09:49:19
17     There may have been other places I've seen  09:49:21
18     articles covering similar content and events.  09:49:23
19 Q.  So you recall seeing articles about Ripple  09:49:26
20     and XRP in Law 360 and the Wall Street  09:49:30
21     Journal.  Any other publications?  09:49:35
22 A.  That's what -- I don't recall specifically  09:49:36
23     other places, but those two I do recall  09:49:37
24     specifically.  09:49:40
25 Q.  What articles do you recall seeing about  09:49:41

Page 10

1      Ripple or XRP in Law 360?  09:49:44
2  A.  Coverage of the SEC action.  09:49:48
3  Q.  And what do you remember about those  09:49:50
4      articles?  09:49:52
5  A.  As I sit here now, it's hard to tell.  I  09:49:54
6      mean, not much.  That there's this action,  09:49:59
7      what areas are the most contentious being  09:50:04
8      adjudicated in those actions, what the SEC's  09:50:09
9      position is and what Ripple's position is  09:50:13
10     on these questions.  09:50:15
11 Q.  What areas do you recall them describing as  09:50:16
12     the most contentious?  09:50:20
13 A.  Whether or not XRP tokens are a security.  09:50:22
14 Q.  So you understand that's an issue, that's a  09:50:29
15     contentious issue in the SEC action?  09:50:33
16 A.  I do understand that.  09:50:35
17 Q.  Is that also an issue in this case?  09:50:36
18 A.  I believe it is, although it's not one that  09:50:39
19     I've expressed an opinion about.  09:50:44
20 Q.  Did you read and review anything else in  09:50:46
21     preparation for today's deposition aside  09:50:58
22     from what you've already discussed?  09:51:00
23 A.  Again, it's hard to separate what I read  09:51:01
24     and reviewed for general knowledge purposes  09:51:06
25     versus what I read or reviewed for purposes  09:51:09

Page 11

1      of the case, but I did look to see who are  09:51:10
2      the experts who filed reports in the SEC  09:51:13
3      action.  I may have skimmed some reports.  09:51:17
4      I didn't read any of those reports carefully.  09:51:21
5  Q.  Who do you recall being the experts in the  09:51:24
6      SEC case?  09:51:33
7  A.  I recall that Daniel Fischel was involved  09:51:35
8      and Alan Farrell.  I don't recall the other  09:51:39
9      names, but I do recall there were about  09:51:48
10     five reports that were linked to articles  09:51:51
11     that I had seen in the press.  09:51:55
12 Q.  Did you read the Fischel report?  09:51:58
13 A.  I believe I opened it, but I don't recall  09:52:01
14     anything of the content.  I may have just  09:52:05
15     looked to see what side he was on.  I opened  09:52:08
16     the report.  I don't recall reading it.  09:52:11
17 Q.  Which side was he on?  09:52:14
18 A.  I don't even remember.  09:52:16
19 Q.  How about Alan Farrell, did you read his  09:52:17
20     report?  09:52:19
21 A.  Same thing, I kind of just wanted to see,  09:52:19
22     and I recall for sure that he was on the  09:52:22
23     defense side.  I don't remember what his  09:52:24
24     opinions were.  09:52:26
25 Q.  And did you open -- I'm trying to get a  09:52:27

Page 12

1      sense of the other reports.  Did you open  09:52:32
2      them, skim them?  09:52:34
3  A.  No, I don't recall that I did, just like  09:52:36
4      the listing, the links.  09:52:40
5  Q.  Any other documents that you reviewed in  09:52:45
6      preparation for today?  09:52:49
7  A.  No.  09:52:50
8  Q.  Did you -- and anyone, again, aside from  09:52:52
9      counsel, aside from your staff who you spoke  09:52:59
10     with in preparation for today?  09:53:00
11 A.  No.  09:53:03
12 Q.  Did you speak with any purchasers of XRP in  09:53:04
13     preparation for today?  09:53:10
14 A.  No.  09:53:10
15 Q.  Have you ever purchased XRP?  09:53:11
16 A.  No.  09:53:13
17 Q.  Again, circling back to social media, did  09:53:14
18     you read any posts on social media in  09:53:22
19     preparation for today?  09:53:27
20 A.  No.  09:53:28
21 Q.  Did you check out Ripple's website in  09:53:29
22     preparation for today?  09:53:35
23 A.  Not in preparation for this deposition,  09:53:36
24     but at one point between the filing of my  09:53:40
25     report and when I began to prepare for  09:53:43

Page 13

4 (Pages 10 - 13)

| | | |
|---|---|---|
| 1 | the deposition. | 09:53:46 |
| 2 | Q. You went to Ripple's website? | 09:53:48 |
| 3 | A. Correct. | 09:53:50 |
| 4 | Q. About how long did you spend there? | 09:53:51 |
| 5 | A. Minutes. | 09:53:53 |
| 6 | Q. Fewer than ten? | 09:53:56 |
| 7 | A. Yes. | 09:53:59 |
| 8 | Q. Fewer than five? | 09:53:59 |
| 9 | A. I'm not sure. Maybe between five and ten. | 09:54:01 |
| 10 | Q. What do you recall seeing on Ripple's | 09:54:06 |
| 11 | website? | 09:54:10 |
| 12 | A. Well, really what I was looking to see is | 09:54:10 |
| 13 | if their website was still up and running, | 09:54:12 |
| 14 | and I confirmed that it was at the time I | 09:54:14 |
| 15 | looked at it, which was sometime between | 09:54:20 |
| 16 | the time filing of the report and earlier | 09:54:22 |
| 17 | than two weeks ago. | 09:54:25 |
| 18 | Q. Why did you check out Ripple's website to | 09:54:26 |
| 19 | see if it was up and running? | 09:54:29 |
| 20 | A. Curiosity. If it wasn't, I think that would | 09:54:31 |
| 21 | have been relevant to how this case plays | 09:54:34 |
| 22 | out, and I wanted to know that. | 09:54:39 |
| 23 | Q. Did you have some reason to believe that | 09:54:40 |
| 24 | Ripple had gone out of business? | 09:54:43 |
| 25 | A. I had no reason to believe that. I do recall | 09:54:45 |

Page 14

| | | |
|---|---|---|
| 1 | from the complaint, the complaint side or | 09:54:48 |
| 2 | even the complaint or some documentation | 09:54:53 |
| 3 | prepared by plaintiff's counsel that the | 09:54:55 |
| 4 | website had changed, so I just wanted to see | 09:55:00 |
| 5 | what was there and if it was still there. | 09:55:04 |
| 6 | MR. SPEAR: I don't know what | 09:55:06 |
| 7 | document you're referring to, but just make | 09:55:07 |
| 8 | sure when -- you shouldn't be discussing | 09:55:10 |
| 9 | any -- if there's personal communications we | 09:55:11 |
| 10 | had about this, you shouldn't be discussing | 09:55:13 |
| 11 | those, but if you're referring to like a | 09:55:13 |
| 12 | motion we filed or a brief, then that's fine. | 09:55:13 |
| 13 | THE WITNESS: It was a motion, brief | 09:55:19 |
| 14 | or maybe a mediation statement. I don't | 09:55:21 |
| 15 | recall which. | 09:55:23 |
| 16 | Q. And just to make sure I'm clear on the timing | 09:55:23 |
| 17 | of this, you visited the website, this was | 09:55:25 |
| 18 | after you submitted your report in this case, | 09:55:28 |
| 19 | but prior to today's deposition? | 09:55:31 |
| 20 | A. Even prior to two weeks ago. | 09:55:32 |
| 21 | Q. And prior to two weeks ago? | 09:55:34 |
| 22 | A. That's right. | 09:55:35 |
| 23 | Q. So between the time when you submitted your | 09:55:35 |
| 24 | report in this case and two weeks ago? | 09:55:37 |
| 25 | A. That's right. | 09:55:41 |

Page 15

| | | |
|---|---|---|
| 1 | Q. Did you review or did you visit Ripple's | 09:55:42 |
| 2 | website prior to submitting your report in | 09:55:48 |
| 3 | this case? | 09:55:50 |
| 4 | A. No. | 09:55:50 |
| 5 | Q. How about websites associated with crypto | 09:55:50 |
| 6 | exchanges? Did you visit any of those | 09:55:54 |
| 7 | websites, let's say, prior to submitting | 09:55:56 |
| 8 | your report in this case? | 09:56:01 |
| 9 | A. Yes, but not for purposes of preparing | 09:56:02 |
| 10 | the report. | 09:56:05 |
| 11 | Q. I see. Which exchanges, websites do you | 09:56:06 |
| 12 | recall visiting prior to submitting your | 09:56:11 |
| 13 | report? | 09:56:13 |
| 14 | A. Coinbase. | 09:56:16 |
| 15 | Q. Any others? | 09:56:16 |
| 16 | A. No. | 09:56:19 |
| 17 | Q. Approximately when did you visit the Coinbase | 09:56:20 |
| 18 | website? | 09:56:23 |
| 19 | A. I think going back, at least a year ago and | 09:56:24 |
| 20 | a number of times since then. | 09:56:35 |
| 21 | Q. A number of times since then? | 09:56:38 |
| 22 | A. That's right. | 09:56:41 |
| 23 | Q. And why did you first visit the Coinbase | 09:56:41 |
| 24 | website? | 09:56:45 |
| 25 | A. Well, keeping abreast of developments in the | 09:56:45 |

Page 16

| | | |
|---|---|---|
| 1 | financial markets is part of what I do | 09:56:50 |
| 2 | as a professor, and this is a burgeoning | 09:56:52 |
| 3 | field. I was reading a lot about | 09:56:56 |
| 4 | cryptocurrency in both the popular press, | 09:56:58 |
| 5 | the financial press and academic | 09:57:02 |
| 6 | publications. I just wanted to see for | 09:57:04 |
| 7 | myself what was there and what the experience | 09:57:07 |
| 8 | would be for investors and consumers. | 09:57:10 |
| 9 | Q. So did you visit -- the first time you | 09:57:15 |
| 10 | visited the Coinbase website, was it in | 09:57:19 |
| 11 | connection with this litigation? | 09:57:22 |
| 12 | A. No, not at all. | 09:57:23 |
| 13 | Q. Okay. You said you visited a number of | 09:57:24 |
| 14 | times since then. Did you ever visit it | 09:57:27 |
| 15 | in connection with this litigation | 09:57:31 |
| 16 | specifically? | 09:57:33 |
| 17 | A. No. | 09:57:33 |
| 18 | Q. Do you have an account with Coinbase? | 09:57:34 |
| 19 | A. Yes, yes. | 09:57:37 |
| 20 | Q. Have you traded digital assets there? | 09:57:37 |
| 21 | A. I did purchase one small amount, again, | 09:57:40 |
| 22 | to experiment with what the experience is | 09:57:44 |
| 23 | like for an investor, and I did that as a | 09:57:47 |
| 24 | finance professor to keep abreast of | 09:57:49 |
| 25 | developments. | 09:57:54 |

Page 17

5 (Pages 14 - 17)

1 Q. I see. Have you visited the website of    09:57:54
2   any other crypto exchange aside from    09:57:58
3   Coinbase?    09:58:00
4 A. I may have. I don't recall specifically,    09:58:02
5   but I may have. Not that I recall    09:58:04
6   specifically as I sit here now.    09:58:08
7 Q. So you may have, but you don't recall today?    09:58:10
8 A. Correct.    09:58:12
9 Q. Okay.    09:58:12
10 A. Names that appear -- for example, what I'm    09:58:17
11   referring to here is if I read an article    09:58:20
12   and they cite Gemini, for example, I may have    09:58:22
13   Googled quickly Gemini and seen what comes    09:58:25
14   up, but I did that again not in connection    09:58:30
15   with this case.    09:58:31
16 Q. And I'm not prying into financial details    09:58:32
17   here, but I do just want to ask what your    09:58:38
18   experience is in trading digital assets, and    09:58:41
19   you said that you bought some small amount    09:58:44
20   of digital assets on Coinbase. Do you still    09:58:47
21   own digital assets today?    09:58:51
22 A. No.    09:58:53
23 Q. Approximately how many trades in digital    09:58:54
24   assets have you made?    09:59:00
25 A. Two, a purchase and a sale of Ethereum.    09:59:01

Page 18

1 Q. So a purchase and a sale of Ethereum.    09:59:06
2   Okay. Have you visited the XRP Ledger in    09:59:10
3   preparation for today's deposition?    09:59:29
4 A. No.    09:59:32
5 Q. Did you visit or interact at all with the    09:59:32
6   XRP Ledger in preparation for submitting    09:59:38
7   your report in this case?    09:59:41
8 A. No.    09:59:42
9   MR. MICHAELSON: I'd like to mark    09:59:47
10   as Exhibit 9...    09:59:48
11   (Exhibit 9 marked for    10:00:13
12   identification.)    10:00:15
13 Q. I handed you a document marked Defense    10:00:21
14   Exhibit 9 which is titled on the first page    10:00:31
15   Defendants' Notice of Deposition of Steven P.    10:00:33
16   Feinstein with a Request For Documents.    10:00:36
17   It's a four-page exhibit. Are you familiar    10:00:40
18   with this document?    10:00:45
19 A. Yes.    10:00:47
20 Q. You've seen it before?    10:00:47
21 A. Yes.    10:00:49
22 Q. Do you understand that you're appearing here    10:00:50
23   today pursuant to this notice of deposition?    10:00:56
24 A. I'll take your word for it. I was asked to    10:01:00
25   appear here and that's why I'm here. It's    10:01:04

Page 19

1   not really pursuant to.    10:01:07
2 Q. Fair enough. I'd like to direct your    10:01:08
3   attention to Page 3 of the document which is    10:01:10
4   the request for production of documents.    10:01:12
5 A. Okay.    10:01:15
6 Q. And have you seen these requests before?    10:01:16
7 A. Did you say these requests?    10:01:23
8 Q. Have you seen this set of document requests    10:01:24
9   before?    10:01:27
10 A. This exhibit, yes, I've seen this document.    10:01:27
11 Q. Did you undertake to collect documents in    10:01:30
12   response to this request?    10:01:33
13 A. I did.    10:01:35
14 Q. Was there any document that you're aware    10:01:35
15   of that are responsive to these requests    10:01:43
16   that you didn't provide to your counsel for    10:01:44
17   production in this case?    10:01:46
18   MR. SPEAR: Objection. I'll just    10:01:48
19   note that we objected to certain documents or    10:01:49
20   certain parts of these as not being things    10:01:53
21   that we were going to produce. Are you    10:01:55
22   asking -- I'm not sure what you're asking.    10:01:57
23   MR. MICHAELSON: I was asking if    10:02:00
24   he's aware of something that's responsive to    10:02:01
25   these that he didn't share with counsel, but    10:02:03

Page 20

1   I understand the nature of your objection.    10:02:09
2   To be honest, we just got the production    10:02:12
3   less than, I think, 48 hours ago and we've    10:02:15
4   transferred to our vendor 24 hours ago and    10:02:17
5   some of it we haven't been able to access    10:02:21
6   yet, so we're sitting here today not entirely    10:02:24
7   sure what it fully contains, the production,    10:02:28
8   because it was made so close in time to    10:02:30
9   the deposition. I guess I'll focus on No. 6.    10:02:32
10   Is there an objection to No. 6?    10:02:38
11   MR. SPEAR: I don't believe so,    10:02:40
12   other than just I don't think we found    10:02:42
13   anything. Go ahead.    10:02:43
14 Q. I'll direct your attention to Request No. 6.    10:02:45
15 A. Yes.    10:02:53
16 Q. No. 6 is a request for all of your public    10:02:53
17   statements, publications, writings, notes    10:02:56
18   slides or presentations relating to XRP,    10:02:58
19   Ripple, cryptocurrency or any other    10:03:02
20   blockchain technology. Do you see that?    10:03:05
21 A. I do.    10:03:06
22 Q. Do you have any documents responsive to    10:03:06
23   this request?    10:03:08
24 A. Depends on how one interprets "relating." I    10:03:09
25   interpreted "relating" to mean that it    10:03:13

Page 21

6 (Pages 18 - 21)

Page 22

```
 1   specifically mentions these words, "XRP,       10:03:16
 2   Ripple, cryptocurrency or any other            10:03:24
 3   blockchain technology," and I believe I have   10:03:27
 4   no such statements, publications, writings      10:03:31
 5   that specifically mention these words or        10:03:37
 6   topics, although, of course, these topics       10:03:39
 7   are subsumed within the -- are covered within   10:03:42
 8   the field of financial economics in general.   10:03:46
 9   I didn't provide every statement that relates   10:03:50
10   to finance, but I believe that nothing was      10:03:53
11   provided here because I have no statements      10:03:58
12   and documentation that specifically cites       10:04:01
13   XRP or Ripple and so on.                        10:04:04
14   Q. I see. So I understand you to be saying that  10:04:06
15   you have made public statements, publications   10:04:10
16   concerning finance, correct?                    10:04:13
17   A. That's right, and finance applies to -- the  10:04:14
18   analysis and study of finance applies to XRP    10:04:19
19   and Ripple, but I didn't believe that's what    10:04:22
20   you meant by this Statement 6 request.          10:04:24
21   Q. Okay. The publications, focusing on          10:04:26
22   publications for a moment. The publications     10:04:30
23   that you've authored concerning finance don't   10:04:33
24   mention XRP or Ripple, correct?                 10:04:36
25   A. That's correct.                              10:04:39
```

Page 23

```
 1   Q. They don't mention cryptocurrency?           10:04:40
 2   A. Correct.                                     10:04:42
 3   Q. And they don't mention any other blockchain  10:04:43
 4   technology?                                     10:04:47
 5   A. Again correct.                               10:04:47
 6   Q. Do they mention digital assets?              10:04:48
 7   A. No.                                          10:04:50
 8   Q. Virtual currencies?                          10:04:50
 9   A. To the best of my recollection, no.          10:04:52
10   Q. How about Bitcoin?                           10:04:55
11   A. No.                                          10:04:56
12   Q. Ethereum?                                    10:04:56
13   A. No.                                          10:05:00
14   Q. I'd like to direct your attention to Request 10:05:00
15   No. 4, all opinions, reports, testimony         10:05:33
16   and/or declarations you submitted that          10:05:39
17   pertain to damages in cases involving or        10:05:41
18   related to state or federal securities          10:05:45
19   actions over the past ten years. Do you         10:05:48
20   see that request?                               10:05:50
21   A. I do.                                         10:05:50
22   Q. Did you provide all documents responsive      10:05:51
23   to this request to your counsel?                10:05:58
24      MR. SPEAR: Objection. Subject to             10:06:00
25   our objections, but go ahead.                   10:06:01
```

Page 24

```
 1   A. Again, it depends on -- I'm not a lawyer      10:06:03
 2   so it depends on how one is defining             10:06:06
 3   "responsive to," and that was a decision         10:06:09
 4   and determination made by counsel. Let me       10:06:12
 5   elaborate, because I did not turn over to        10:06:17
 6   counsel reports or testimony that's covered      10:06:19
 7   by protective orders that preclude my            10:06:23
 8   making them public.                              10:06:26
 9   Q. Okay.                                         10:06:27
10   A. But everything else I endeavored to collect   10:06:32
11   and provided to plaintiff's counsel.             10:06:36
12   Plaintiff's counsel made a determination as      10:06:43
13   to what to give to you, is my understanding.     10:06:44
14   Q. Okay.                                         10:06:46
15      MR. SPEAR: Just for the record,              10:06:51
16   whatever information -- just so we don't         10:06:53
17   beat around the bush, whatever they gave us      10:06:56
18   in response to No. 4 we just produced. We        10:06:56
19   didn't share it beyond what they gave us.        10:06:59
20      MR. MICHAELSON: Okay.                        10:07:03
21      MR. SPEAR: It's the same for No. 5.          10:07:18
22      MR. MICHAELSON: Mark this No. 10.            10:07:26
23      (Exhibit 10 marked for                       10:07:28
24   identification.)                                 10:07:29
25   Q. Before moving on to Exhibit 10, just a last   10:07:40
```

Page 25

```
 1   question on Exhibit 9, request, document         10:08:10
 2   Request No. 6. I just want to make sure          10:08:15
 3   that you do not have any notes, class notes      10:08:26
 4   that mention XRP, Ripple, cryptocurrency         10:08:35
 5   or any other blockchain technology?              10:08:39
 6   A. Correct, not class notes. Again,              10:08:45
 7   specifically class notes, notes I use for        10:08:52
 8   teaching, no. I believe I do not have any        10:08:55
 9   that specifically mention XRP, Ripple or         10:09:01
10   cryptocurrency.                                  10:09:05
11   Q. Or any other blockchain technology?           10:09:07
12   A. Correct.                                       10:09:09
13   Q. Slides, lecture outlines, do you have any     10:09:10
14   slides or lecture outlines that mention XRP,     10:09:14
15   Ripple, cryptocurrency or any other             10:09:17
16   blockchain technology?                           10:09:21
17   A. Correct.                                       10:09:22
18   Q. Correct, you don't have any?                  10:09:23
19   A. I do not have those.                          10:09:25
20   Q. And the notes that -- you paused for a moment 10:09:27
21   on notes. Do you have some kind of notes         10:09:29
22   other than class notes that mention XRP,         10:09:31
23   Ripple, cryptocurrency or other blockchain       10:09:34
24   technology?                                       10:09:37
25   A. I'll tell you what I'm thinking. My           10:09:38
```

7 (Pages 22 - 25)

1   hesitation was I believe in an exam, a          10:09:42
2   midterm exam or a final exam I may have          10:09:45
3   used Bitcoin as an example, and then I'm          10:09:49
4   thinking if I provide the answer key to          10:09:57
5   the exam to the students, is that considered          10:10:00
6   class notes or not, I'm not sure. But I          10:10:02
7   think there may be an answer -- I didn't          10:10:04
8   interpret it this way when I responded to          10:10:07
9   the exhibit, but I certainly will if you          10:10:09
10  think that's how it should be interpreted,          10:10:13
11  provide that, but I think there was an exam          10:10:15
12  question that mentioned Bitcoin and then          10:10:17
13  there would be a key that also mentions          10:10:21
14  Bitcoin, but that's not, those aren't          10:10:23
15  teaching notes.          10:10:25
16  Q.  I understand.  Do you remember what the          10:10:26
17  nature of the exam question was?          10:10:30
18  A.  Sure.  It was derivatives of -- I think it          10:10:33
19  was -- I think I had taken an old test          10:10:37
20  question about buying a future contract or          10:10:39
21  forward contract tied to some other          10:10:42
22  commodity, and then for the students I had          10:10:44
23  last year just changed whatever commodity          10:10:47
24  that was to Bitcoin.  It was a question about          10:10:49
25  how to price futures or forwards.          10:10:54
Page 26

1   Q.  So moving to Exhibit 10 --          10:10:56
2   A.  Actually, I just want to be complete.          10:11:08
3   I'm thinking now and, again, my thinking          10:11:10
4   now is a little bit different from what          10:11:12
5   my thinking was at the time, but I believe          10:11:15
6   in the syllabus for these classes that I          10:11:17
7   taught over the last couple of years, I          10:11:20
8   do assign that the students can or must          10:11:21
9   write a term paper, there's a term project,          10:11:23
10  and in the syllabus there's a list of          10:11:26
11  suggested term paper topics or permissible          10:11:31
12  term paper topics just to spur their          10:11:36
13  creativity, and there I might have said          10:11:40
14  something about you may wish to investigate          10:11:41
15  futures, forwards and options that are          10:11:46
16  tied to cryptocurrency, so the word          10:11:47
17  "cryptocurrency" may be in my syllabus for          10:11:49
18  that reason.  But, again, at the time          10:11:53
19  responding to this production, I didn't          10:11:55
20  think that that fit the definition of          10:11:56
21  statements, publications, writing notes,          10:11:59
22  slides or presentations.          10:12:01
23  Q.  Thank you.  So you should have in front          10:12:03
24  of you Exhibit 10, which is a copy of -- I'll          10:12:10
25  give you a moment to look at it.  The first          10:12:15
Page 27

1   page says Exhibit 62 and the next page          10:12:17
2   identifies it as the expert report of          10:12:21
3   Professor Steven P. Feinstein dated          10:12:24
4   November 18, 2022 in this case.  Do you          10:12:27
5   recognize this document?          10:12:30
6   A.  I do.          10:12:31
7   Q.  Is this the report that you've --          10:12:31
8   A.  It is.          10:12:34
9   Q.  I'll represent it's the report that you          10:12:34
10  submitted in this case.  So you mention          10:12:37
11  in your teaching of your classes, you're a          10:12:42
12  professor?          10:12:45
13  A.  That's right.          10:12:46
14  Q.  Where do you teach?          10:12:46
15  A.  Babson College.          10:12:47
16  Q.  How long have you been a professor there?          10:12:48
17  A.  Since 1996.          10:12:50
18  Q.  Do you teach anywhere outside of Babson          10:12:51
19  College?          10:12:57
20  A.  No, not presently.          10:12:57
21  Q.  And how would you describe sort of the          10:12:58
22  focus of your teaching?          10:13:02
23  A.  I'm a finance professor so I teach in the          10:13:04
24  finance division, I teach finance courses.          10:13:08
25  Within finance, my areas of concentration --          10:13:11
Page 28

1   finance is broadly divided into investments          10:13:15
2   and corporate investments, industry and          10:13:18
3   field versus corporate finance and corporate          10:13:21
4   managerial decisions.  I tend to specialize          10:13:24
5   in the investment side, and in the investment          10:13:27
6   side my areas of research and teaching are          10:13:30
7   securities, stocks, bonds and derivatives.          10:13:35
8   Q.  Do you publish in the field of finance?          10:13:45
9   A.  Yes.          10:13:53
10  Q.  So turning to your report on the second          10:13:54
11  page, Paragraph 10, you write that you          10:13:59
12  published in the field of finance and you          10:14:06
13  list some articles.  Are any of these          10:14:08
14  articles about cryptocurrency?          10:14:11
15  A.  Not specifically.          10:14:15
16      MR. SPEAR:  I'll just object.  It          10:14:17
17  doesn't list articles.  It lists places where          10:14:19
18  articles appeared.  Go ahead.          10:14:24
19  A.  The answer is not specifically, although          10:14:24
20  cryptocurrency is an area of analysis and          10:14:27
21  research and study that falls within finance,          10:14:30
22  and my articles apply generally to finance.          10:14:33
23  Q.  So you're saying your articles are sort of          10:14:37
24  generally about finance and so principles          10:14:39
25  articulated in those articles could apply to          10:14:42
Page 29

8 (Pages 26 - 29)

Page 30

1  cryptocurrency?                        10:14:45
2  A. Well said, yes. That's what I meant to say.   10:14:46
3  Q. But they don't mention cryptocurrency?    10:14:48
4  A. Correct.                            10:14:52
5  Q. Okay. Is cryptocurrency, in your view,    10:14:53
6    just like other assets that are invested in?   10:14:57
7         MR. SPEAR: Objection, scope.       10:15:05
8  A. I wouldn't say "just like." I mean, there   10:15:07
9    are similarities and there are differences.   10:15:10
10  Q. You'd agree that there's some differences   10:15:11
11    between cryptocurrencies and other assets   10:15:14
12    that investors choose to invest in?     10:15:18
13         MR. SPEAR: Same objection.       10:15:20
14  A. Sure, just as there's differences between  10:15:22
15    stocks and bonds or bonds and derivatives.  10:15:25
16  Q. Is a model to calculate profit or loss on  10:15:27
17    an investment of stock the same as a model  10:15:43
18    to calculate profit or loss on an investment  10:15:45
19    in bonds?                          10:15:49
20         MR. SPEAR: Objection, scope.     10:15:50
21  A. It really depends on the context and the   10:15:52
22    specifics. It can be or it might not be.   10:15:56
23  Q. Would the same be true for a model to    10:15:58
24    calculate profit or loss on an investment   10:16:05
25    of cryptocurrency, which is to say it could  10:16:08

Page 31

1  be the same or different as models to      10:16:11
2  calculate profit or loss on investments     10:16:14
3  in stocks or bonds, depends on the         10:16:16
4  circumstances?                         10:16:17
5         MR. SPEAR: Same objection.       10:16:18
6  A. My answer is yes.                    10:16:21
7  Q. You mentioned that you had a CFA designation.  10:16:22
8    What is a CFA designation?             10:16:41
9  A. CFA stands for Chartered Financial Analyst.  10:16:43
10    It's the premier practitioner credential   10:16:48
11    among practicing financial professionals.   10:16:52
12    It's awarded by the CFA Institute and     10:16:58
13    that's what it is. It's awarded after the   10:17:03
14    candidate passes a series of three        10:17:08
15    progressively more and more difficult exams,  10:17:13
16    shows proficiency in mastering generally   10:17:15
17    accepted principles in finance and has    10:17:19
18    sort of a requisite amount of time spent   10:17:22
19    working as a professional financial analyst.  10:17:25
20  Q. When did you obtain your CFA designation,  10:17:28
21    approximately?                        10:17:33
22  A. It's in the exhibit on Page 10. 1998.    10:17:34
23  Q. Has the CFA Institute issued any papers   10:17:42
24    or publications on the subject of        10:17:48
25    cryptocurrency?                       10:17:50

Page 32

1  A. I don't know.                        10:17:52
2  Q. Do you recall ever reviewing any?        10:17:52
3  A. No.                                 10:17:56
4  Q. Did you review any in preparation for     10:17:57
5    today?                              10:17:59
6  A. No.                                 10:17:59
7  Q. Did you review any in preparation for     10:18:00
8    preparing your report in this case?      10:18:02
9  A. No.                                 10:18:06
10  Q. I'd like to direct your attention to Page  10:18:06
11    10 of Exhibit 10.                     10:18:40
12  A. The page numbers at the bottom or the top  10:18:41
13    of the page?                         10:18:43
14  Q. The page numbers -- good question. The    10:18:44
15    page numbers at the bottom.            10:18:47
16  A. Okay.                              10:18:47
17  Q. It's Exhibit 2. It lists your business    10:18:50
18    experience and then professional         10:18:55
19    designations.                         10:18:57
20  A. I'm there.                          10:18:57
21  Q. Okay. So business experience, it lists    10:18:59
22    from 2008 to present, Crowninshield Financial  10:19:03
23    Research. What is that?               10:19:06
24  A. That's a consulting firm that I founded   10:19:07
25    located in Brookline, Massachusetts. It's   10:19:13

Page 33

1  a staff of analysts and experts and we      10:19:19
2  conduct financial research and analysis on   10:19:24
3  a contract basis with a focus primarily,    10:19:27
4  although not exclusively, in the area of    10:19:31
5  forensic finance.                       10:19:34
6  Q. Does this organization provide expert     10:19:35
7    testimony and expert reports in support of  10:19:49
8    litigation?                           10:19:51
9  A. Yes.                                10:19:51
10  Q. Would you say that that's the primary, its  10:19:52
11    primary business?                     10:19:55
12  A. Yes.                                10:19:56
13  Q. Is it its sole business?               10:19:56
14  A. No.                                 10:19:58
15  Q. What percentage of its business would you  10:19:59
16    say is providing expert testimony and     10:20:01
17    reports?                             10:20:03
18  A. Well, I guess I would need some clarification  10:20:04
19    on your question. Sometimes we are asked   10:20:18
20    to prepare a plan of allocation in a case and  10:20:20
21    that wouldn't be testimony or report.     10:20:23
22  Q. Fair enough. What percentage of its business  10:20:26
23    would you say is in support of litigation?   10:20:28
24  A. It varies from year to year. It's always  10:20:33
25    more than 90 percent. It has recently all   10:20:39

9 (Pages 30 - 33)

| | Page 34 |
|---|---|
| 1 | been much more, somewhere between 90 and 10:20:41 |
| 2 | 99 percent. 10:20:44 |
| 3 | Q. And has it done any work at any time -- you 10:20:45 |
| 4 | said it performs work on a contract basis, 10:20:51 |
| 5 | correct? 10:20:54 |
| 6 | A. Yes. 10:20:54 |
| 7 | Q. Has it performed any work for any 10:20:54 |
| 8 | cryptocurrency exchange? 10:20:57 |
| 9 | A. No. 10:20:59 |
| 10 | Q. Has it performed any work for any entity 10:20:59 |
| 11 | in the crypto business? 10:21:08 |
| 12 | A. No. 10:21:11 |
| 13 | Q. Then moving down to on this page, Papers 10:21:13 |
| 14 | and Publications, can you describe the list 10:21:19 |
| 15 | here that follows under the heading Pages 10:21:26 |
| 16 | and Publications?  What is this list? 10:21:29 |
| 17 | A. These are my publications.  On Page 10, 10:21:32 |
| 18 | these are publications since September 2013. 10:21:36 |
| 19 | Q. And the list continues on the next page? 10:21:39 |
| 20 | A. Right. 10:21:43 |
| 21 | Q. How far back does it go?  To the 10:21:43 |
| 22 | beginning of time? 10:21:46 |
| 23 | A. I think so.  1987, yes. 10:21:47 |
| 24 | Q. Okay.  Focusing on the more recent ones, am 10:21:51 |
| 25 | I correct that there are three papers and 10:21:58 |

Page 34

| | Page 35 |
|---|---|
| 1 | publications listed here since 2014? 10:22:01 |
| 2 | A. Yes. 10:22:07 |
| 3 | Q. I've already asked whether your papers and 10:22:07 |
| 4 | publications mention cryptocurrency, you 10:22:15 |
| 5 | said no, but you testified that they apply 10:22:19 |
| 6 | generally to finance, and I'm wondering if 10:22:23 |
| 7 | you could explain whether any of these three 10:22:26 |
| 8 | publications that you've authored since 2014, 10:22:28 |
| 9 | how many of them would apply to the crypto 10:22:33 |
| 10 | space? 10:22:35 |
| 11 | A. What do you mean by "apply"? 10:22:36 |
| 12 | MR. SPEAR:  Objection to form and 10:22:37 |
| 13 | scope. 10:22:38 |
| 14 | Q. How would they -- let's take the first one. 10:22:38 |
| 15 | So the first one is called Securities 10:22:42 |
| 16 | Litigation Event Studies in the COVID 10:22:42 |
| 17 | Volatility Regime.  Do you see that? 10:22:47 |
| 18 | A. Yes. 10:22:48 |
| 19 | Q. Does that have an application to 10:22:48 |
| 20 | cryptocurrency? 10:22:51 |
| 21 | A. It could. 10:22:52 |
| 22 | Q. Can you explain that? 10:22:53 |
| 23 | MR. SPEAR:  Objection, scope. 10:22:55 |
| 24 | A. Well, that article explains how one would 10:22:56 |
| 25 | run an event study, which is essentially a 10:23:01 |

Page 35

| | Page 36 |
|---|---|
| 1 | regression analysis, to determine whether 10:23:07 |
| 2 | information has affected the valuation of 10:23:11 |
| 3 | the security.  This article addresses the 10:23:11 |
| 4 | problem with running an event study when 10:23:14 |
| 5 | the period of interest has a change in 10:23:17 |
| 6 | volatility, and the example given in the 10:23:19 |
| 7 | paper is change of volatility caused by the 10:23:22 |
| 8 | COVID pandemic.  And it solves the problem 10:23:25 |
| 9 | and explains how one would nonetheless be 10:23:25 |
| 10 | able to determine what were the events or 10:23:31 |
| 11 | announcements that impacted the security 10:23:35 |
| 12 | price and one could apply this methodology 10:23:38 |
| 13 | to a stock, a bond or digital assets. 10:23:41 |
| 14 | Q. Does the paper explore in any way anything 10:23:45 |
| 15 | that might be unique to the cryptocurrency 10:23:52 |
| 16 | space if one were trying to perform an event 10:23:54 |
| 17 | study on cryptocurrency? 10:23:58 |
| 18 | A. No, it doesn't focus on the specific 10:23:59 |
| 19 | idiosyncracies of cryptocurrency or digital 10:24:04 |
| 20 | assets. 10:24:08 |
| 21 | Q. Let's move on to the second paper there. 10:24:08 |
| 22 | It's entitled Stock Price Reactivity to 10:24:10 |
| 23 | Earnings Announcements: The Role of the 10:24:14 |
| 24 | Cammer/Krogman Factors.  Does that have any 10:24:19 |
| 25 | application to crypto space? 10:24:33 |

Page 36

| | Page 37 |
|---|---|
| 1 | MR. SPEAR:  Objection, scope. 10:24:35 |
| 2 | A. It certainly could.  The paper runs tests 10:24:36 |
| 3 | to see if characteristics and indicators 10:24:41 |
| 4 | describing companies or stocks are related 10:24:47 |
| 5 | to the propensity or frequency of the 10:24:51 |
| 6 | security moving significantly on certain 10:24:56 |
| 7 | announcement dates.  It's more geared towards 10:25:01 |
| 8 | equities, but some of the concepts and 10:25:05 |
| 9 | principles and tools described would apply 10:25:08 |
| 10 | to any traded asset. 10:25:11 |
| 11 | Q. The subject is how an asset price would 10:25:17 |
| 12 | change in response to a public announcement? 10:25:21 |
| 13 | A. Correct. 10:25:24 |
| 14 | Q. When you say it provides general tools, that 10:25:25 |
| 15 | might help and analyze that? 10:25:32 |
| 16 | A. Well, it takes a list of tools that are 10:25:36 |
| 17 | commonly used and assesses whether they are 10:25:38 |
| 18 | informative. 10:25:42 |
| 19 | Q. I see.  And, again, there's no, nothing in 10:25:44 |
| 20 | that article that is applying those tools to 10:25:48 |
| 21 | movement in the price of a cryptocurrency, 10:25:54 |
| 22 | correct? 10:25:56 |
| 23 | A. Specifically, the answer would be no. 10:25:58 |
| 24 | Q. And we'll just do one more and then move on. 10:26:00 |
| 25 | The next article is called What a Solar 10:26:05 |

Page 37

10 (Pages 34 - 37)

| | Page 38 |
|---|---|
| 1 | Eclipse has to do with Market Efficiency?        10:26:07 |
| 2 | A. I just want to correct that.  The way I        10:26:10 |
| 3 | wanted to phrase that last answer was if you        10:26:13 |
| 4 | mean specifically, then the answer is no.        10:26:14 |
| 5 | Q. Okay.  Again, how would your, the writing        10:26:17 |
| 6 | there, how might that apply to        10:26:24 |
| 7 | cryptocurrency?        10:26:32 |
| 8 | A. It's the same thing.  It doesn't specifically        10:26:32 |
| 9 | address cryptocurrency.        10:26:33 |
| 10 | MR. SPEAR:  I'll object to scope.        10:26:33 |
| 11 | Go ahead.        10:26:35 |
| 12 | A. The article about the solar eclipse and        10:26:36 |
| 13 | market efficiency does not mention digital        10:26:38 |
| 14 | assets and it doesn't apply specifically        10:26:41 |
| 15 | to digital assets, but it talks about, it        10:26:43 |
| 16 | addresses tests of whether or not a market        10:26:47 |
| 17 | is efficient, meaning that the trading price        10:26:50 |
| 18 | is absorbed and reflect information, and        10:26:54 |
| 19 | those concepts do apply to digital assets        10:26:56 |
| 20 | just like they apply to any other financial        10:26:59 |
| 21 | asset.        10:27:02 |
| 22 | Q. Okay.  And, again, same question as before,        10:27:03 |
| 23 | these are general tools that one might apply        10:27:19 |
| 24 | to the cryptocurrency space, but this        10:27:21 |
| 25 | publication does not undertake to apply those        10:27:23 |

| | Page 39 |
|---|---|
| 1 | tools to a specific cryptocurrency?        10:27:26 |
| 2 | A. That is correct.        10:27:28 |
| 3 | MR. SPEAR:  I'll just note for        10:27:33 |
| 4 | the record, my understanding is that these        10:27:35 |
| 5 | four papers and the next three from 2010        10:27:36 |
| 6 | were produced in that batch we gave you guys        10:27:40 |
| 7 | the other day.        10:27:47 |
| 8 | MR. MICHAELSON:  Thank you.        10:27:48 |
| 9 | Q. Does Babson offer a course to students        10:27:53 |
| 10 | focused on cryptocurrency?        10:28:07 |
| 11 | A. Not presently.        10:28:11 |
| 12 | Q. So aside from your work as a professor and        10:28:23 |
| 13 | your work at Crowninshield, have you done any        10:28:35 |
| 14 | paid work, a job relating to cryptocurrency?        10:28:40 |
| 15 | A. No.        10:28:46 |
| 16 | Q. And focusing on your expert work, have you        10:28:46 |
| 17 | been an expert witness in another case        10:28:52 |
| 18 | focused on cryptocurrency?        10:28:55 |
| 19 | A. No.        10:28:57 |
| 20 | Q. Do you own -- personally you mentioned that        10:28:57 |
| 21 | you had a Coinbase account, you bought and        10:29:09 |
| 22 | sold Ethereum on one occasion.  You never        10:29:13 |
| 23 | had any accounts on other crypto exchanges,        10:29:16 |
| 24 | correct?        10:29:19 |
| 25 | A. That's correct.        10:29:20 |

| | Page 40 |
|---|---|
| 1 | Q. Do you own or control any wallets on any        10:29:20 |
| 2 | blockchain?        10:29:26 |
| 3 | A. No.        10:29:26 |
| 4 | Q. How about a cold wallet, do you own or        10:29:27 |
| 5 | control any cold wallet?        10:29:38 |
| 6 | A. No.        10:29:40 |
| 7 | Q. All right.  Would you say that you have        10:29:40 |
| 8 | any scientific knowledge regarding        10:29:56 |
| 9 | cryptocurrency?        10:29:58 |
| 10 | MR. SPEAR:  Objection, form.        10:30:00 |
| 11 | A. It depends what you mean by "scientific        10:30:01 |
| 12 | knowledge."        10:30:04 |
| 13 | Q. I'm trying to understand the basis for        10:30:04 |
| 14 | reaching an expert opinion in a case about        10:30:43 |
| 15 | calculating profit and loss in a trade in        10:30:46 |
| 16 | crypto.        10:30:50 |
| 17 | MR. SPEAR:  Objection to form.        10:30:51 |
| 18 | Q. Do you have experience calculating damages        10:30:53 |
| 19 | in securities cases where the assets are        10:31:00 |
| 20 | stocks or bonds?        10:31:04 |
| 21 | A. Yes.        10:31:05 |
| 22 | Q. Do you have a lot of experience in that or        10:31:05 |
| 23 | a little experience in that?        10:31:09 |
| 24 | A. A great deal.        10:31:10 |
| 25 | Q. You have a lot of experience in that.  Is it        10:31:11 |

| | Page 41 |
|---|---|
| 1 | fair to say that you don't have experience,        10:31:14 |
| 2 | apart from this case, calculating profit or        10:31:16 |
| 3 | loss on trading in any cryptocurrency?        10:31:19 |
| 4 | MR. SPEAR:  Objection to form.        10:31:23 |
| 5 | A. It depends how one's interpreting your        10:31:24 |
| 6 | question.  I certainly have a great deal        10:31:31 |
| 7 | of experience and expertise and training        10:31:39 |
| 8 | for valuing damages, profits and loss and        10:31:44 |
| 9 | damages of financial assets, and digital        10:31:49 |
| 10 | assets are financial assets.  Therefore, I        10:31:52 |
| 11 | do have a great deal of experience and        10:31:55 |
| 12 | training and education and knowledge that        10:31:57 |
| 13 | gives me confidence and the ability to value        10:32:04 |
| 14 | profits and losses and damages in digital        10:32:10 |
| 15 | assets.        10:32:13 |
| 16 | The knowledge I have is that the        10:32:15 |
| 17 | similarities between digital assets and more        10:32:18 |
| 18 | traditional assets are such that the        10:32:21 |
| 19 | expertise I have already demonstrated applies        10:32:25 |
| 20 | here in this case with digital assets.        10:32:28 |
| 21 | Q. So it's your testimony that you can take        10:32:33 |
| 22 | these general tools that you have used to        10:32:37 |
| 23 | value assets in other spaces like stocks or        10:32:39 |
| 24 | bonds and apply those tools to digital        10:32:44 |
| 25 | assets?        10:32:50 |

11 (Pages 38 - 41)

**Page 42**

1  A.  Yes.  I believe that given what I know        10:32:50
2     about valuing assets, financial assets,        10:32:54
3     traditional or digital and computing           10:32:58
4     damages for financial assets, coupled with     10:33:05
5     a little bit more knowledge that I have         10:33:11
6     obtained about the idiosyncracies of digital   10:33:13
7     assets, allows me to calculate and gives       10:33:22
8     me the specific expertise that one would       10:33:22
9     need to calculate profits, losses and damages  10:33:24
10    for digital assets.                            10:33:27
11 Q.  Do you agree that it's important to take      10:33:30
12    into account the idiosyncracies of digital     10:33:33
13    assets in calculating profit or loss on        10:33:36
14    trading digital assets?                         10:33:39
15 A.  Yes, I agree.  And I just want to say for     10:33:40
16    the record that I have done that in this       10:33:45
17    report and in the example that was provided    10:33:46
18    in interrogatory response.                      10:33:53
19 Q.  So you mentioned having a little bit of       10:33:54
20    experience regarding the idiosyncracies?       10:33:56
21    What is --                                      10:33:56
22 A.  I didn't say a little bit of experience.  I   10:34:01
23    said the background in valuation and damage    10:34:05
24    computation coupled with a little bit more     10:34:08
25    knowledge about those idiosyncracies is what   10:34:11

**Page 43**

1     one would need to expertly and effectively     10:34:16
2     undertake this task.                            10:34:19
3  Q.  And it's your testimony that you have         10:34:21
4     that little bit more knowledge of the          10:34:23
5     idiosyncracies of digital assets?              10:34:26
6  A.  I think I have more than the minimum little   10:34:30
7     bit necessary, but I have definitely at        10:34:33
8     least that minimum necessary.                   10:34:36
9  Q.  Okay.  I'm trying to understand where you    10:34:36
10    got that from because it's not really in       10:34:38
11    your teachings or your publications.  So       10:34:42
12    where did you get that knowledge of the        10:34:44
13    idiosyncracies of digital assets?              10:34:46
14        MR. SPEAR:  Objection to form.             10:34:50
15 A.  I think we did cover that this morning.  I    10:34:51
16    keep abreast of the financial literature       10:34:53
17    and this is a topic that appears in academic   10:34:57
18    articles and even unpublished papers and       10:35:06
19    seminars that I participated in and read.      10:35:11
20        MR. SPEAR:  We've been going about          10:35:22
21    an hour, so if you want to take a little       10:35:24
22    break, let me know.                            10:35:26
23        MR. MICHAELSON:  We can take a              10:35:28
24    break.                                          10:35:29
25        VIDEOGRAPHER:  The time is                  10:35:29

**Page 44**

1     10:35 a.m.  We're off the record.              10:35:30
2        (Break taken)                               10:35:34
3        VIDEOGRAPHER:  We are back on the            10:50:54
4     record.  The time is 10:51 a.m.                10:51:12
5  BY MR. MICHAELSON:                                10:51:16
6  Q.  I wanted to circle back to the expert reports 10:51:16
7     in the SEC action that you reviewed.  You      10:51:28
8     mentioned having opened and at least skimmed   10:51:35
9     the Fischel report.  Do you recall that?       10:51:38
10 A.  Right.                                         10:51:39
11 Q.  Why did you look at the Fischel report?       10:51:40
12 A.  I was just curious who the players were in    10:51:46
13    that case and who was on what side.            10:51:49
14 Q.  So when you opened the Fischel report, what   10:51:52
15    were you looking for?                          10:51:55
16 A.  Some indication as to whether he was on the   10:51:58
17    defense or the plaintiff's side or the SEC     10:51:59
18    side.                                           10:52:04
19 Q.  Were you interested as well in what his       10:52:04
20    opinion was, the subject matter of his         10:52:14
21    opinion?                                        10:52:17
22 A.  I was interested.  I actually, as I sit       10:52:19
23    here now, I don't recall what it was, but      10:52:22
24    I was interested.                              10:52:24
25 Q.  So did you read the introduction?            10:52:27

**Page 45**

1  A.  Probably.                                     10:52:30
2  Q.  Did you read the full report?                10:52:31
3  A.  I don't think so.                            10:52:34
4  Q.  Did you print it out?                        10:52:34
5  A.  No.                                           10:52:37
6  Q.  You just reviewed it online?                10:52:37
7  A.  Correct.                                      10:52:40
8  Q.  Did you save it or download it?             10:52:40
9  A.  I don't recall.  I don't think so.           10:52:43
10 Q.  Without getting into substance, did you --   10:52:44
11 A.  Wait, wait.  It is downloaded.              10:52:50
12 Q.  It is downloaded?                             10:52:52
13 A.  It is downloaded, yeah.                      10:52:52
14 Q.  Without getting into the substance of        10:52:53
15    communications with your staff, did you       10:52:55
16    discuss it with your staff?                   10:52:58
17 A.  Just the names and sides.                    10:53:01
18 Q.  Like here are the names of experts in the    10:53:05
19    SEC action and which side they're on?         10:53:10
20 A.  Exactly.                                      10:53:12
21 Q.  But any discussion of the substance of their 10:53:13
22    opinions?                                       10:53:16
23 A.  No.  I think we had a discussion as to       10:53:17
24    whether it would be helpful for this          10:53:22
25    particular engagement and decided that it     10:53:24

| | | |
|---|---|---|
| 1 | would not be. | 10:53:26 |
| 2 | Q. As to whether what would be helpful for | 10:53:26 |
| 3 | this engagement? | 10:53:29 |
| 4 | A. Reading, studying, understanding the SEC | 10:53:31 |
| 5 | reports. | 10:53:35 |
| 6 | Q. Okay. So it's your testimony that you | 10:53:35 |
| 7 | didn't read the reports for purposes of | 10:53:42 |
| 8 | forming your opinion in this case? | 10:53:47 |
| 9 | A. That's correct. | 10:53:49 |
| 10 | Q. Did the Fischel report in any way influence | 10:53:49 |
| 11 | the report you issued here in this case? | 10:54:00 |
| 12 | A. No, not at all. | 10:54:03 |
| 13 | Q. Did the Farrell report influence in any way | 10:54:04 |
| 14 | the opinion you expressed in this case? | 10:54:07 |
| 15 | A. No. | 10:54:10 |
| 16 | Q. With respect to the Farrell report, do you | 10:54:10 |
| 17 | recall reading the intro or preliminary | 10:54:24 |
| 18 | statement? | 10:54:26 |
| 19 | A. I recall that that's probably what I did | 10:54:27 |
| 20 | by opening the report. I couldn't tell you | 10:54:32 |
| 21 | what it said, though, as I sit here now. | 10:54:35 |
| 22 | Q. As you sit here now, do you know what | 10:54:38 |
| 23 | Farrell's opinion at a high level was? | 10:54:41 |
| 24 | A. No. I mean, I can guess, I can speculate. | 10:54:44 |
| 25 | I'm pretty sure it was not about how to | 10:54:49 |

Page 46

| | | |
|---|---|---|
| 1 | calculate damages and whether damages | 10:54:53 |
| 2 | can be calculated on a classwide basis. | 10:54:56 |
| 3 | Essentially, that's what I would have | 10:55:02 |
| 4 | been looking for, and I'm pretty sure | 10:55:04 |
| 5 | there was nothing in there about that. | 10:55:07 |
| 6 | Q. And how about Fischel, sitting here today, | 10:55:08 |
| 7 | can you describe his opinion at a high | 10:55:11 |
| 8 | level? | 10:55:13 |
| 9 | A. I think, and, again, you're asking me to | 10:55:14 |
| 10 | speculate so I'm going to tell you that's | 10:55:18 |
| 11 | what I'm doing. I shouldn't. I think | 10:55:21 |
| 12 | they were focused on the question of whether | 10:55:27 |
| 13 | or not a digital asset is a security. I | 10:55:33 |
| 14 | think that's the case. I might be wrong | 10:55:36 |
| 15 | about that, but I do know that what they | 10:55:38 |
| 16 | wrote about was not relevant to what the | 10:55:40 |
| 17 | scope of my engagement was. | 10:55:42 |
| 18 | Q. What is XRP? | 10:55:44 |
| 19 |     MR. SPEAR: Objection, scope. | 10:55:53 |
| 20 | A. It's a digital asset. | 10:55:54 |
| 21 | Q. And what is Ripple? | 10:55:55 |
| 22 | A. Ripple is the company that sold or solicited | 10:56:00 |
| 23 | this for sale, this digital asset. And I | 10:56:12 |
| 24 | understand these are some of the questions -- | 10:56:16 |
| 25 | it's a company, it's a company involved in, | 10:56:18 |

Page 47

| | | |
|---|---|---|
| 1 | among other things, the sale and solicitation | 10:56:23 |
| 2 | of XRP tokens. | 10:56:25 |
| 3 | Q. Do you have an understanding as to how XRP | 10:56:28 |
| 4 | was created? | 10:56:32 |
| 5 | A. Yes. | 10:56:33 |
| 6 | Q. What's your understanding? | 10:56:33 |
| 7 | A. Well, I came to that understanding through | 10:56:34 |
| 8 | reading the documents we already spoke about, | 10:56:36 |
| 9 | but my understanding is that it was invented | 10:56:38 |
| 10 | by a trio of programmers who -- I guess | 10:56:44 |
| 11 | it's a legal question that I'm not here to | 10:56:52 |
| 12 | opine about, whether they represented Ripple | 10:56:55 |
| 13 | or whether they were internal or external | 10:56:58 |
| 14 | to Ripple I understand is a question that | 10:57:00 |
| 15 | needs to be determined, but it has no bearing | 10:57:03 |
| 16 | on my opinion. I understand the defendants | 10:57:05 |
| 17 | have said that these inventors then gifted a | 10:57:12 |
| 18 | large quantity of XRP tokens to the company, | 10:57:17 |
| 19 | Ripple, who then sold and solicited them | 10:57:20 |
| 20 | for sale. I understand the plaintiffs say | 10:57:24 |
| 21 | these inventors essentially represented | 10:57:27 |
| 22 | Ripple or that Ripple comprised these | 10:57:29 |
| 23 | inventors, in which case Ripple invented it | 10:57:32 |
| 24 | and then kept a portion for the company and | 10:57:35 |
| 25 | for themselves and sold the rest and made | 10:57:41 |

Page 48

| | | |
|---|---|---|
| 1 | available for sale the rest. | 10:57:45 |
| 2 | Q. What is your understanding of the XRP Ledger? | 10:57:48 |
| 3 |     MR. SPEAR: Objection to scope. | 10:57:53 |
| 4 | A. There's a lot to say about that, but it's | 10:57:54 |
| 5 | essentially blockchain technology that | 10:57:58 |
| 6 | records ownership in transactions and also | 10:58:01 |
| 7 | facilitates transactions. | 10:58:05 |
| 8 | Q. How does the ledger facilitate transactions? | 10:58:12 |
| 9 |     MR. SPEAR: Objection, scope. | 10:58:15 |
| 10 | A. My understanding is that there is software | 10:58:17 |
| 11 | that lets traders or investors interact with | 10:58:21 |
| 12 | the ledger to consummate trades directly on | 10:58:26 |
| 13 | the ledger. | 10:58:35 |
| 14 | Q. Do you have an understanding as to whether | 10:58:36 |
| 15 | XRP has features that are different than | 10:58:42 |
| 16 | other digital assets, like, for example, | 10:58:48 |
| 17 | Bitcoin or Ethereum? | 10:58:51 |
| 18 |     MR. SPEAR: Objection to scope. | 10:58:53 |
| 19 | A. Every asset, every stock, Apple stock versus | 10:58:54 |
| 20 | Google stock, every asset has specific | 10:58:59 |
| 21 | idiosyncracies and distinctive features. So | 10:59:02 |
| 22 | would XRP. | 10:59:06 |
| 23 | Q. Do you know what any of those idiosyncracies | 10:59:07 |
| 24 | or distinguishing features of XRP are? | 10:59:10 |
| 25 | A. How one answers that question is the matter | 10:59:13 |

Page 49

13 (Pages 46 - 49)

| | |
|---|---|
| 1  of some debate that has, in my opinion,   10:59:19 | 1  methodology?   11:02:24 |
| 2  no bearing on my opinions. It's not   10:59:21 | 2  A. Yes.   11:02:25 |
| 3  something I wrote about in my report or   10:59:23 | 3  Q. Does that methodology need to take into   11:02:25 |
| 4  expressed as an opinion. There are   10:59:26 | 4  account the contractual terms that are   11:02:28 |
| 5  representations and allegations from both   10:59:34 | 5  expressed in the bilateral contract?   11:02:31 |
| 6  sides in this case about what XRP was   10:59:37 | 6  A. Just the prices and the quantities and the   11:02:33 |
| 7  used for and how it would be used and why   10:59:41 | 7  times. Prices, quantities, the form of   11:02:35 |
| 8  it had value, whether the ledger was   10:59:45 | 8  the consideration, the time the transaction   11:02:39 |
| 9  centralized or decentralized, for example,   10:59:47 | 9  took place is all that you would need.   11:02:41 |
| 10  but none of that had any bearing on my   10:59:51 | 10  Q. So you need information contained in the   11:02:43 |
| 11  opinions.   10:59:53 | 11  contract to perform that calculation,   11:02:52 |
| 12  Q. So whether XRP has utility or not have any   10:59:54 | 12  correct?   11:02:55 |
| 13  bearing on your opinion?   11:00:05 | 13      MR. SPEAR: Objection.   11:02:55 |
| 14      MR. SPEAR: Objection, scope.   11:00:06 | 14  A. No, just the standard facts and details   11:02:57 |
| 15  A. Well, my opinion as spelled out in this   11:00:07 | 15  that describe any transaction, the same   11:02:59 |
| 16  report is that there's a common method for   11:00:10 | 16  common information that would commonly be   11:03:01 |
| 17  computing damages for all class members.   11:00:14 | 17  supplied by any class member for purposes   11:03:04 |
| 18  The common method is consistent with   11:00:19 | 18  of calculating that class member's damages.   11:03:07 |
| 19  plaintiff's theory of liability, and I lay   11:00:22 | 19  Q. Could the contract, though, supply, for   11:03:10 |
| 20  out what that method is. That is really   11:00:27 | 20  example, the price?   11:03:12 |
| 21  what I wrote about in this report, and so   11:00:33 | 21  A. Like I said, price would need to be known.   11:03:15 |
| 22  specific idiosyncracies of XRP versus   11:00:37 | 22  In any damage calculation in any class action   11:03:18 |
| 23  other crypto digital assets did not matter.   11:00:41 | 23  litigation, you need to know prices.   11:03:21 |
| 24  As I sit here now, that's my thinking.   11:00:46 | 24  Sometimes you -- my understanding is that   11:03:26 |
| 25  Q. Sitting here today, do you have an   11:00:49 | 25  prices, price data for a claimant's   11:03:31 |
| Page 50 | Page 52 |

| | |
|---|---|
| 1  understanding as to whether a use of XRP   11:00:58 | 1  transactions is supplied by the claimant   11:03:36 |
| 2  could impact calculation of profit or   11:01:06 | 2  to the claims administrator, and whether   11:03:38 |
| 3  loss made by someone who owns it?   11:01:11 | 3  that price is documented in an exchange or   11:03:42 |
| 4  A. Well, it could certainly impact the profit   11:01:16 | 4  brokerage confirmation versus some other   11:03:48 |
| 5  or loss that was realized, but it would   11:01:18 | 5  form doesn't matter for purposes of applying   11:03:52 |
| 6  not impact the formula used for calculating   11:01:20 | 6  the formula.   11:03:57 |
| 7  the profit or loss and the damages.   11:01:23 | 7  Q. So it sounds like you have in mind a claims   11:03:58 |
| 8  Q. Sitting here today, do you know whether   11:01:26 | 8  process where the claimant would come forward   11:04:11 |
| 9  XRP is traded pursuant to any bilateral   11:01:32 | 9  with the inputs needed to, certain to your   11:04:14 |
| 10  contracts?   11:01:40 | 10  methodology, to your formula to determine   11:04:19 |
| 11      MR. SPEAR: Objection to form.   11:01:41 | 11  profit or loss, is that correct?   11:04:23 |
| 12  A. What do you mean by "bilateral contracts"?   11:01:42 | 12  A. That's typically how damages are ultimately   11:04:26 |
| 13  Q. A contract between two parties to buy or   11:01:47 | 13  calculated in a class action securities case.   11:04:28 |
| 14  sell an asset.   11:01:49 | 14  Q. So turning to Exhibit 10 here, your report,   11:04:38 |
| 15  A. Some trading took place that way, is my   11:01:50 | 15  I'd refer you to Page 4, you express your   11:04:50 |
| 16  understanding.   11:01:54 | 16  conclusion which is I think what you're   11:04:54 |
| 17  Q. So you are aware that some XRP exchanged   11:01:54 | 17  referring to, you opine here on Paragraph 16,   11:04:58 |
| 18  hands pursuant to bilateral contracts?   11:01:59 | 18  Page 4, the damages can be computed using   11:05:03 |
| 19  A. Well, we usually call that in finance an   11:02:03 | 19  a common methodology for all class members   11:05:11 |
| 20  over-the-counter transaction, and my   11:02:05 | 20  and the common classwide methodology for   11:05:16 |
| 21  understanding is there were some   11:02:07 | 21  determining damages for all XRP purchasers   11:05:21 |
| 22  over-the-counter transactions.   11:02:09 | 22  involves the straightforward application of   11:05:26 |
| 23  Q. Where XRP is exchanged pursuant to an   11:02:12 | 23  statutory arithmetic formulas?   11:05:30 |
| 24  over-the-counter transaction, can profit or   11:02:19 | 24  A. Yes.   11:05:34 |
| 25  loss be calculated pursuant to a common   11:02:20 | 25  Q. Sir, are you opining -- you're opining that   11:05:35 |
| Page 51 | Page 53 |

14 (Pages 50 - 53)

1     damages can be computed using a common          11:05:47
2     methodology, correct?                           11:05:51
3  A. Yes.                                            11:05:51
4  Q. Are you opining that they can be computed       11:05:52
5     using common evidence?                          11:05:56
6  A. I think "evidence" has a specific legal         11:05:58
7     meaning, and I'm not a lawyer.  So if you       11:06:00
8     mean data, that the same data, the same         11:06:05
9     type of data is needed from each claimant,      11:06:11
10    that's true, the same type of data, and I       11:06:13
11    mentioned already what that data would be.      11:06:17
12    "Evidence" is a legal term, that I can answer   11:06:20
13    the question if you explain it better.          11:06:22
14 Q. Got it.  Well, I guess what I'm hearing you     11:06:24
15    say is that the claimant would need to come     11:06:28
16    forth with the information concerning their     11:06:30
17    purchase or sale in order for the calculation   11:06:32
18    to be run?                                      11:06:36
19 A. That's one way to do it.  There are other       11:06:37
20    ways to calculate damages, but to apply the     11:06:39
21    common formula that's in my report, one would   11:06:42
22    need price and quantity data for purchases      11:06:45
23    and sales, if there was a sale for anybody      11:06:50
24    whose damages are going to be calculated,       11:06:56
25    so it's common data and it's common formulas    11:06:59
                                              Page 54

1     that are used.                                  11:07:03
2  Q. So you need the price data and you need         11:07:03
3     the quantity data?                              11:07:10
4  A. Right, how much did the person pay and          11:07:11
5     when did they pay it and how much XRP did       11:07:15
6     they receive, and the same thing on the         11:07:21
7     sale, if there was a sale, or we would need     11:07:24
8     to know that there was no sale.                 11:07:32
9  Q. Is any other data needed aside from the         11:07:34
10    price data and quantity data?                   11:07:38
11 A. I said price data, price, quantity, both at     11:07:40
12    the time of sale and the time, time of          11:07:45
13    purchase and time of sale information as to     11:07:47
14    whether or not there was a sale because         11:07:50
15    there may not have been, the form of the        11:07:53
16    consideration paid.  That's it.  Wait.          11:07:57
17    Right, that's it.  That's what's in the         11:08:09
18    formula.                                        11:08:11
19       Again, if there was -- the example           11:08:13
20    I gave in the interrogatory did not apply       11:08:18
21    interest that could have been earned, the       11:08:25
22    opportunity interest on the consideration,      11:08:27
23    but if one were to include the interest, you    11:08:31
24    would also need guidance from the court or      11:08:34
25    agreement among the parties as to what          11:08:40
                                              Page 55

1     interest rate should be applied.                11:08:42
2  Q. Anything else?                                  11:08:44
3  A. The formula is on Page 5.  Those are the        11:08:50
4     arguments of the formula that we just           11:08:50
5     covered, so no.                                 11:08:56
6  Q. You mentioned that you need information as      11:08:56
7     to whether there had been a sale.  What did     11:08:59
8     you mean by that?                               11:09:02
9  A. Well, you would need to know.  I mean, the      11:09:02
10    class members are people who purchased and      11:09:04
11    then sold XRP and sustained a loss.  These      11:09:08
12    are the proposed class members, or those        11:09:12
13    who still own XRP, they purchased it and        11:09:16
14    still own it.  So notice that Paragraph 19      11:09:19
15    has a formula for one and 20 has got the        11:09:23
16    adaptation of that same formula for the         11:09:28
17    other, so you need to know whether they         11:09:30
18    still own XRP or not.                           11:09:32
19 Q. I see.  So the information as to whether        11:09:33
20    there has been a sale is important to know      11:09:40
21    which, whether they're in Paragraphs 19 or      11:09:43
22    20?                                             11:09:45
23 A. Right.                                          11:09:48
24 Q. Okay.  And then you said you would need to      11:09:48
25    know the form of consideration paid.  What      11:09:50
                                              Page 56

1     did you mean by that?                           11:09:52
2  A. Was Bitcoin tendered for the XRP or was         11:09:53
3     it Tether or U.S. dollars, and you need to      11:10:01
4     know that so that you can translate the         11:10:03
5     consideration, you can value the                11:10:04
6     consideration at the time of the                11:10:06
7     transactions.                                   11:10:07
8  Q. If someone paid Bitcoin, used Bitcoin to        11:10:08
9     purchase XRP, wouldn't the value of the         11:10:17
10    consideration paid be the amount of Bitcoin     11:10:22
11    they paid for the XRP?                          11:10:25
12 A. It would be the value of the Bitcoin paid.      11:10:27
13 Q. Why not just the -- so the value of the         11:10:29
14    Bitcoin?                                        11:10:32
15 A. The formula, the statute says consideration    11:10:34
16    with interest thereon.  The word                11:10:37
17    "consideration" I guess can either mean         11:10:42
18    the form of the consideration or the value      11:10:45
19    of the consideration, and I think from the      11:10:46
20    context it's pretty clear that it's the         11:10:47
21    value of the consideration, so that would       11:10:50
22    be dollars, how many dollars were those         11:10:52
23    Bitcoin worth at the time the XRP was           11:10:54
24    purchased.                                      11:10:57
25 Q. Okay.  So let's, we'll break this down a        11:10:58
                                              Page 57

Page 58

```
 1   little bit.  It was helpful to hear your      11:11:04
 2   explanation.                     11:11:06
 3         Going back to Paragraph 16, you      11:11:07
 4   express that your opinion here relates to a   11:11:12
 5   common classwide methodology for determining  11:11:16
 6   damages for all XRP purchasers.  What does    11:11:18
 7   it mean to purchase XRP?                11:11:26
 8         MR. SPEAR:  Objection to form.      11:11:28
 9   A.  It's almost a philosophical question.  To  11:11:32
10   pay a counterparty and receive XRP, quid pro  11:11:37
11   quo in exchange for that payment.          11:11:44
12   Q.  So if you receive XRP as a gift, are you a  11:11:51
13   purchaser of XRP?                    11:11:59
14         MR. SPEAR:  Objection, calls for a   11:12:00
15   legal conclusion.                   11:12:01
16   A.  I would have to say I don't know.  That's a  11:12:03
17   legal determination.                 11:12:06
18   Q.  Can your methodology apply to individuals  11:12:07
19   who obtained XRP via gift?             11:12:11
20   A.  I'm not sure.  That's something I would have  11:12:22
21   to think about.                    11:12:25
22   Q.  Do you have any understanding as to whether  11:12:26
23   Ripple has employees?                11:12:28
24   A.  I'm sure they do have employees.        11:12:32
25   Q.  To the extent a Ripple employee receives  11:12:34
```

Page 59

```
 1   XRP as a form of their compensation, are   11:12:37
 2   they a purchaser of XRP?               11:12:43
 3         MR. SPEAR:  Objection, calls for   11:12:45
 4   a legal conclusion.                 11:12:46
 5   A.  Again, that does sound like -- the answer   11:12:47
 6   to that question must be covered somewhere   11:12:50
 7   in the law, and I'm not a lawyer.  I can    11:12:53
 8   answer economic questions.  I don't think   11:12:57
 9   that is an economic question, so I think   11:13:00
10   I should just say I don't know for sure.     11:13:03
11   I don't want to say, give an answer that's  11:13:04
12   contrary to established law, case law or    11:13:06
13   statute.  I think the case law and statute   11:13:10
14   should speak for itself and legal experts   11:13:12
15   can decide that.                   11:13:14
16   Q.  Can the common methodology that you propose  11:13:15
17   in your opinion be applied to those who    11:13:20
18   acquire XRP as compensation for their work?  11:13:24
19   A.  I think it can.                  11:13:28
20   Q.  Do you have an understanding as to whether  11:13:31
21   someone could sell a tangible good like a   11:13:46
22   cup of coffee in exchange for XRP?        11:13:51
23   A.  I think that's possible.             11:13:56
24   Q.  Can your common methodology be used to    11:14:06
25   calculate the gain or loss experienced by   11:14:09
```

Page 60

```
 1   a person who obtained XRP in exchange for   11:14:14
 2   a tangible good?                   11:14:19
 3   A.  Yes.                        11:14:20
 4   Q.  Just to be clear on the scope of your    11:14:20
 5   opinion, it sounds like it is not part of   11:14:35
 6   the scope of your opinion who is or who    11:14:41
 7   is not a purchaser of XRP?             11:14:43
 8   A.  That's correct.                  11:14:48
 9   Q.  So you're not opining on who is or is not   11:14:48
10   a purchaser of XRP, correct?            11:14:54
11   A.  Correct.                      11:14:56
12   Q.  Does your opinion encompass the         11:14:56
13   identification of people who are purchasers  11:15:01
14   of XRP?                        11:15:05
15   A.  How is that different from the previous   11:15:06
16   question?                       11:15:09
17   Q.  The first question is more of a conceptual  11:15:10
18   question of like categorically speaking,     11:15:15
19   who would count or not in the determination  11:15:18
20   of who is a purchaser of XRP.  The second   11:15:20
21   is actually like identifying the class     11:15:21
22   members.                        11:15:23
23   A.  No.  I haven't been asked to identify class  11:15:24
24   members and nothing about that is expressed  11:15:26
25   in my report.                    11:15:28
```

Page 61

```
 1   Q.  Okay.  Does your opinion encompass price   11:15:29
 2   correlation between XRP and any other     11:15:35
 3   digital asset?                    11:15:37
 4   A.  What do you mean by "correlation"?       11:15:39
 5   Q.  Whether the price or value of XRP is     11:15:41
 6   correlated with movements in prices of     11:15:44
 7   other digital assets.                11:15:46
 8   A.  I have expressed that to apply the formula,  11:15:48
 9   one should convert whatever the form of     11:15:53
10   the consideration was to the value of the   11:15:57
11   consideration.  So exchange rates and      11:15:59
12   valuations are relevant to apply the common  11:16:04
13   methodology commonly for all class members,  11:16:09
14   but correlation usually means movement     11:16:12
15   over time, and that I haven't expressed     11:16:15
16   anything about movement over time.         11:16:18
17   Q.  Okay.  Yes, that's what I was asking about,  11:16:20
18   whether the price of XRP correlates over    11:16:24
19   time with the price of digital assets, not  11:16:27
20   something that's the subject of your opinion,  11:16:31
21   correct?                        11:16:32
22   A.  Say that again, please?             11:16:33
23   Q.  It's fair to say that your opinion does not  11:16:35
24   encompass whether the price of XRP correlates  11:16:40
25   with the price of any other digital asset   11:16:44
```

16 (Pages 58 - 61)

1  over time?                          11:16:46
2  A. Right, I express no opinion about that   11:16:47
3  specifically.                        11:16:50
4  Q. Does your opinion encompass whether the   11:16:51
5  price or value of XRP might vary across   11:17:01
6  exchanges at any given point in time?   11:17:08
7  A. I considered that. I believe given that,   11:17:13
8  though that may be the case, these formulas,   11:17:19
9  data exists such that these formulas can   11:17:23
10  still be applied commonly for all class   11:17:27
11  members.                            11:17:29
12  Q. So you agree it may be the case, that the   11:17:30
13  price of XRP varies at a given point in   11:17:35
14  time across exchanges?               11:17:38
15  A. That may be the case, yes.         11:17:41
16  Q. And do you also agree that the price of,   11:17:42
17  say, Bitcoin at a given point in time might   11:17:46
18  vary across exchanges?               11:17:49
19  A. There seems to be evidence of that in the   11:17:52
20  literature in the market, yes. It does   11:17:56
21  not preclude calculation of damages commonly   11:17:58
22  for all class members.               11:18:04
23  Q. You referred to evidence in the literature   11:18:05
24  about price variation of Bitcoin across   11:18:09
25  exchanges. What were you referring to?   11:18:12

1  A. I can't cite an article specifically, but   11:18:15
2  this is an observation that's been made.   11:18:18
3  Q. Sitting here today, do you have a sense   11:18:21
4  of how large or small that variation might   11:18:23
5  be?                                 11:18:29
6  A. No, but I did check Bloomberg and the   11:18:29
7  documentation in Bloomberg that they've   11:18:36
8  arrived at analytics and a methodology for   11:18:38
9  producing data that according to Bloomberg   11:18:42
10  represents the value of digital assets at   11:18:47
11  various points in time, notwithstanding   11:18:49
12  that the trading price might be different on   11:18:52
13  one exchange versus another.          11:18:55
14  Q. Is this Bloomberg data to which you're   11:18:59
15  referring something that you would use in   11:19:07
16  the computation of gain or loss pursuant   11:19:10
17  to your methodology?                 11:19:12
18  A. You can.                         11:19:14
19  Q. You referenced you needed to translate the   11:19:18
20  consideration paid into U.S. dollars. So,   11:19:23
21  for example, if someone bought XRP with   11:19:25
22  Bitcoin, you need to translate, under your   11:19:29
23  methodology, the value of that Bitcoin into   11:19:33
24  U.S. dollars, correct?               11:19:36
25  A. Well, first of all, I just want to point   11:19:38

1  out that if there's a determination that   11:19:45
2  one doesn't need to translate the form   11:19:47
3  of the consideration to the value of that   11:19:50
4  consideration in dollars, then that   11:19:51
5  methodology would also be common to all   11:19:53
6  class members. I just want to point out   11:19:55
7  that regardless of whether one does the   11:19:58
8  translation or chooses not to do the   11:20:00
9  translation, the methodology that's arrived   11:20:02
10  at from making that determination will be   11:20:04
11  common for all class remembers. I think   11:20:07
12  that's paramount and primary.         11:20:09
13      However, if the methodology is to   11:20:12
14  translate forms of consideration to value   11:20:17
15  consideration in dollars, then you need   11:20:21
16  exchange rates and Bloomberg provides them.   11:20:23
17  Q. To be clear, the methodology that you are   11:20:31
18  putting forth in your opinion involves the   11:20:37
19  conversion of consideration paid into U.S.   11:20:40
20  dollars?                            11:20:44
21  A. My conclusion in Paragraph 16 is that the   11:20:45
22  methodology is common, and that conclusion   11:20:48
23  holds firm whether we choose to translate   11:20:54
24  the consideration into dollar value or   11:20:57
25  choose not to translate the form of the   11:21:01

1  consideration to dollar value. So it's   11:21:04
2  still, the conclusion that I represent   11:21:06
3  in Paragraph 16 holds regardless. The   11:21:12
4  examples I gave in Paragraphs 19 and 20,   11:21:16
5  these examples do translate consideration   11:21:16
6  form into consideration value, and for that   11:21:19
7  you need exchange rates, and I verified   11:21:21
8  that exchange rates are available.    11:21:26
9  Q. This is helpful. In Paragraphs 19 and 20   11:21:28
10  of your report, you put forward formulas for   11:21:37
11  calculating damages, correct?         11:21:40
12  A. Yes.                             11:21:44
13  Q. But what I hear you saying is these are   11:21:44
14  just examples of formulas that might be used,   11:21:49
15  but there are other competing formulas that   11:21:52
16  might also be used to calculate damages. Is   11:21:54
17  that a fair summary of your testimony?   11:21:57
18      MR. SPEAR: Objection.             11:21:58
19  A. I'm saying I believe these are the formulas   11:21:59
20  that should be used. I do understand that   11:22:03
21  it's possible that an alternative formula   11:22:04
22  that's very similar, there may be a   11:22:09
23  determination that that other similar formula   11:22:12
24  is more appropriate, and I'm pointing out   11:22:15
25  that even if it were not these formulas but   11:22:19

17 (Pages 62 - 65)

1    the very similar alternative formula, it      11:22:22
2    would still be a common damage methodology      11:22:25
3    for all class members.      11:22:28
4        I do believe these are the correct      11:22:29
5    formulas and these are the formulas that      11:22:31
6    ought to be used, but I just want to point      11:22:33
7    out that my opinion in Paragraph 16 is      11:22:35
8    maintained even if one were to modify this      11:22:37
9    formula slightly in the way we've been      11:22:40
10   describing.      11:22:43
11  Q. You say a common methodology can be used      11:22:44
12   to calculate damages, but what that      11:22:46
13   methodology is could take different forms?      11:22:48
14  A. Well, two that I can think of that we've      11:22:51
15   talked about, they're very similar, I believe      11:22:54
16   of those two, the formulas in Paragraphs 19      11:22:59
17   and 20 are the correct ones.      11:23:02
18  Q. Okay. When you say we've talked about two,      11:23:04
19   you're referring to one formula that would      11:23:07
20   involve translating consideration paid into      11:23:09
21   U.S. dollars, that's one method. A different      11:23:14
22   method would be leaving the consideration      11:23:19
23   paid in whatever form it was paid, whether      11:23:21
24   that be Bitcoin, Tether or Ethereum?      11:23:25
25  A. Correct.      11:23:29

Page 66

1  Q. In then in your model, the one that you're      11:23:29
2    proposing in Paragraphs 19 and 20, there's      11:23:34
3    this conversion into U.S. dollars, correct?      11:23:36
4  A. Well, in order to calculate consideration,      11:23:39
5    one would convert the form of the      11:23:43
6    consideration to that dollar value of the      11:23:45
7    consideration.      11:23:47
8  Q. What is your proposal for what exchange      11:23:48
9    rates would be used to translate, for      11:23:53
10   example, Bitcoin or Ethereum into U.S.      11:23:56
11   dollars?      11:23:58
12  A. What I check is that we have Bloomberg,      11:23:59
13   Bloomberg is a good source, it's      11:24:03
14   reputable, but at this point I don't think      11:24:04
15   I have to -- I just want to reserve the      11:24:08
16   option to consider it further. That's not      11:24:16
17   part of my opinion right now, which is the      11:24:18
18   best data source to use. If I were to do      11:24:20
19   damages, I might at a later date decide that      11:24:23
20   there was a better data source. I know      11:24:26
21   that for sure there's at least Bloomberg,      11:24:28
22   but my opinion at this point does not      11:24:31
23   encompass a determination that Bloomberg is      11:24:33
24   the only or best data source to use.      11:24:35
25  Q. So you think that the preferred model, the      11:24:38

Page 67

1    better model does involve converting the      11:24:43
2    consideration into U.S. dollars, but you      11:24:49
3    have not yet opined on how that conversion      11:24:51
4    would be performed?      11:24:56
5  A. No, that's not true at all. It's the same      11:24:56
6    model, how much you paid for XRP versus      11:25:03
7    how much you got back when you sold your      11:25:06
8    XRP. If you got back less than you paid,      11:25:08
9    that's a loss, and how it's translated into      11:25:11
10   dollars, there's a slight tweak, there's      11:25:16
11   different ways of doing that.      11:25:19
12       I think the best way to do it is      11:25:20
13   to do the translation at the time of the      11:25:22
14   transactions. I believe that's consistent      11:25:24
15   with the statute, the language in the      11:25:26
16   statute, and I verified that there are      11:25:29
17   databases that allow one to do that. In      11:25:33
18   fact, I provided defendants with an example      11:25:35
19   of that calculation done. But at this point,      11:25:40
20   I'm saying that I haven't yet calculated      11:25:42
21   damages for the entire class or for members      11:25:45
22   of the class beyond Mr. Sostack, and it's      11:25:51
23   altogether possible that exactly which      11:25:54
24   exchange rates to use, that's what I want to      11:25:59
25   focus on, exactly which database for the      11:26:02

Page 68

1    exchange rates is not something that I      11:26:05
2    was asked to opine about or need to opine      11:26:11
3    about in order to proffer the opinion that      11:26:14
4    it's a common damage methodology for all      11:26:17
5    class members.      11:26:19
6  Q. So I have a bunch of questions about these      11:26:20
7    exchange rates. Does the scope of your      11:26:29
8    opinion include what exchange rate would be      11:26:34
9    used to translate consideration paid into      11:26:39
10   U.S. dollars?      11:26:43
11  A. No, it doesn't need to. We know that      11:26:45
12   exchange rates exist. The choice of the      11:26:48
13   best, most appropriate, most reliable      11:26:53
14   exchange rate data doesn't impact or      11:26:56
15   doesn't affect the opinion that it's a      11:27:03
16   common damage methodology for all class      11:27:06
17   members which is the opinion I'm offering      11:27:08
18   today and in this report.      11:27:10
19  Q. You could imagine two different purchasers      11:27:11
20   of XRP, one who had just before buying XRP      11:27:14
21   converted U.S. dollars to Bitcoin and then      11:27:20
22   used that Bitcoin to buy XRP. You can      11:27:24
23   imagine another purchaser of XRP who had      11:27:26
24   just Bitcoin holdings in their Coinbase      11:27:29
25   account, for example, had been holding the      11:27:32

Page 69

18 (Pages 66 - 69)

| | | |
|---|---|---|
| 1 | Bitcoin for some period of time and they | 11:27:34 |
| 2 | used that Bitcoin to purchase XRP.  What | 11:27:36 |
| 3 | exchange rate would you propose is the | 11:27:47 |
| 4 | best exchange rate in each of those two | 11:27:49 |
| 5 | scenarios? | 11:27:51 |
| 6 | MR. SPEAR:  Objection, scope. | 11:27:52 |
| 7 | A.  As an economist, I think the best exchange | 11:27:53 |
| 8 | rate is the exchange rate at the time of | 11:27:58 |
| 9 | the transactions, although if there's a | 11:28:00 |
| 10 | legal opinion that says no, it should be, | 11:28:02 |
| 11 | consideration should be left in the form | 11:28:07 |
| 12 | until settlement or jury verdict, then you | 11:28:09 |
| 13 | would use the exchange rates of the later | 11:28:13 |
| 14 | date. | 11:28:15 |
| 15 | So as an economist, I have an | 11:28:16 |
| 16 | opinion which is the best, which represents | 11:28:17 |
| 17 | damages and I actually think that's most | 11:28:21 |
| 18 | consistent with the statute, language in the | 11:28:23 |
| 19 | statute, but it doesn't change my opinion | 11:28:26 |
| 20 | about there being a common damage methodology | 11:28:28 |
| 21 | if the law or the court or the parties agree | 11:28:31 |
| 22 | on a different time to do the translation. | 11:28:34 |
| 23 | Q.  For the first of the two hypothetical | 11:28:39 |
| 24 | purchasers that I mentioned who had | 11:28:42 |
| 25 | transferred U.S. dollars into Bitcoin just | 11:28:46 |

Page 70

| | | |
|---|---|---|
| 1 | before the transaction and then used the | 11:28:49 |
| 2 | Bitcoin immediately to buy XRP, would | 11:28:52 |
| 3 | the actual exchange rate that that person | 11:28:58 |
| 4 | obtained transferring U.S. dollars into | 11:29:00 |
| 5 | Bitcoin be the right to use or more of like | 11:29:05 |
| 6 | a general Bloomberg rate? | 11:29:07 |
| 7 | MR. SPEAR:  Objection, scope.  Go | 11:29:10 |
| 8 | ahead. | 11:29:14 |
| 9 | A.  It's a hypothetical you're asking about. | 11:29:14 |
| 10 | I'm sure there are details of this | 11:29:17 |
| 11 | hypothetical that are not explicated in | 11:29:19 |
| 12 | your offering of the hypothetical.  I would | 11:29:24 |
| 13 | want to look at all the facts.  Whatever | 11:29:27 |
| 14 | the answer is, you're still left with a | 11:29:31 |
| 15 | common methodology for all class members. | 11:29:35 |
| 16 | I kind of want to reserve the opportunity | 11:29:38 |
| 17 | to think about that some more if it turns | 11:29:40 |
| 18 | out that that hypothetical is realistic.  I | 11:29:44 |
| 19 | think I'll leave it at that. | 11:29:48 |
| 20 | Q.  What I hear you saying is it could be that | 11:29:49 |
| 21 | different exchange rates could be used | 11:29:55 |
| 22 | for different types of purchasers of XRP | 11:29:56 |
| 23 | depending on the circumstances of their | 11:29:59 |
| 24 | purchase? | 11:30:02 |
| 25 | MR. SPEAR:  Objection, misstates | 11:30:02 |

Page 71

| | | |
|---|---|---|
| 1 | witness' testimony. | 11:30:03 |
| 2 | A.  I'm saying that that's within the realm | 11:30:04 |
| 3 | of possibility.  It would still be a common | 11:30:07 |
| 4 | methodology.  Personally, I think the best | 11:30:09 |
| 5 | methodology would be to use the value of | 11:30:12 |
| 6 | the Bitcoin at the time of the transaction | 11:30:15 |
| 7 | according to a reputable database.  But | 11:30:19 |
| 8 | if there's some legal determination that | 11:30:22 |
| 9 | overrides the economic analysis, what one | 11:30:24 |
| 10 | is left with still is a common methodology | 11:30:29 |
| 11 | for all class members. | 11:30:31 |
| 12 | Q.  So what you personally think would be the | 11:30:33 |
| 13 | best methodology is the value of Bitcoin | 11:30:35 |
| 14 | at the time of the transaction as determined | 11:30:39 |
| 15 | by a reputable database, and you have | 11:30:42 |
| 16 | Bloomberg in mind for that? | 11:30:47 |
| 17 | A.  Bloomberg is a reputable database.  I haven't | 11:30:48 |
| 18 | yet determined whether it's the only or the | 11:30:53 |
| 19 | best, but it's certainly available for this | 11:30:54 |
| 20 | purpose. | 11:30:56 |
| 21 | Q.  Would you agree that if that were the | 11:30:56 |
| 22 | methodology that were used, that the | 11:30:58 |
| 23 | calculation of an individual purchaser's | 11:31:00 |
| 24 | gain or loss might differ from their sort | 11:31:01 |
| 25 | of real-world experience because, for | 11:31:04 |

Page 72

| | | |
|---|---|---|
| 1 | example, they just acquired that Bitcoin | 11:31:06 |
| 2 | with dollars that cost them a little more or | 11:31:09 |
| 3 | less than what Bloomberg might say was the | 11:31:11 |
| 4 | exchange rate at the time? | 11:31:15 |
| 5 | MR. SPEAR:  Objection to form. | 11:31:15 |
| 6 | Objection to scope. | 11:31:16 |
| 7 | A.  If you've got different alternatives, the | 11:31:18 |
| 8 | outcome of the different alternatives might | 11:31:26 |
| 9 | be different.  In the hypothetical you | 11:31:29 |
| 10 | gave, it's hard to believe that it would be | 11:31:32 |
| 11 | materially different.  Bloomberg being a | 11:31:34 |
| 12 | reputable database seeks to assess what the | 11:31:36 |
| 13 | value of these different digital assets | 11:31:41 |
| 14 | actually are at a point in time, so that | 11:31:45 |
| 15 | would give you an assessment of the value | 11:31:48 |
| 16 | of the consideration paid even if there | 11:31:52 |
| 17 | had been a different transaction external to | 11:31:54 |
| 18 | the XRP purchase at a different price. | 11:31:59 |
| 19 | Q.  Do crypto exchanges, to your knowledge, | 11:32:11 |
| 20 | typically charge transaction fees? | 11:32:18 |
| 21 | A.  I'm not sure.  I know there's a bid-ask | 11:32:25 |
| 22 | spread.  I just don't recall whether | 11:32:29 |
| 23 | there's -- some might charge a commission | 11:32:33 |
| 24 | on top of a bid-ask spread, some might not. | 11:32:36 |
| 25 | I know there generally is a bid-ask spread | 11:32:47 |

Page 73

19 (Pages 70 - 73)

1  and a bid-ask spread is a transaction fee.    11:32:49
2  Q.  Do you know if crypto exchanges like    11:32:52
3  Coinbase, for example, charge fees separate    11:32:55
4  from any bid-ask spread?    11:32:59
5  A.  Whether they do or don't doesn't make this    11:33:07
6  calculation any different from calculation    11:33:10
7  of damages in a stock or a bond case.  In    11:33:14
8  stocks and bonds there's bid-ask spreads    11:33:19
9  and there are are commissions charged.    11:33:22
10  How one deals with transaction fees in    11:33:26
11  calculating damages is well-trod ground in    11:33:28
12  the calculation of damages and doesn't,    11:33:36
13  wouldn't cause there to be anything but a    11:33:39
14  common damage methodology that could be    11:33:42
15  applied.    11:33:44
16      To answer your question, I don't    11:33:46
17  know as I sit here now.  I mean, there's    11:33:48
18  160 exchanges.  Some might, some might not.    11:33:50
19  Q.  In this common methodology that you're    11:33:56
20  proposing in your report, do transaction    11:34:03
21  fees factor into the calculation of gain or    11:34:06
22  loss?    11:34:09
23  A.  Well, if the transaction fee is in the    11:34:11
24  form of a bid-ask spread, then one would be    11:34:13
25  purchasing at the ask and selling at the    11:34:19
Page 74

1  bid and so the transaction fee would be    11:34:20
2  factored in.  My understanding is that when    11:34:25
3  there's a separate commission paid, there    11:34:28
4  would have to be a determination as to    11:34:32
5  whether that should be included as a cost    11:34:34
6  for the purchase or not, and if it's    11:34:37
7  determined that it should be included, then    11:34:41
8  it would be included for all class members,    11:34:44
9  and if it's determined that it should be    11:34:45
10  excluded, it would be excluded for all class    11:34:48
11  members.    11:34:50
12  Q.  Does your report express a view on that?    11:34:51
13  A.  No, but I do want to point out the exact    11:34:56
14  same considerations and factors apply to    11:35:10
15  damages in every other class action security    11:35:14
16  case that I've ever been involved in.    11:35:19
17  Q.  So referring to Paragraph 17 of your report,    11:35:22
18  you copy-and-paste here the methodology for    11:35:41
19  calculating damages under Section 12(a) of    11:35:41
20  the Securities Act.  Do you see that?    11:35:46
21  A.  Yeah, 12(a)(1), but yes.    11:35:47
22  Q.  And the damages, the methodology -- strike    11:35:50
23  that.  I'll start over.    11:36:04
24      The statute provides that "any    11:36:08
25  person who purchases an unregistered security    11:36:12
Page 75

1  in violation of Section 5 may sue to recover    11:36:15
2  the consideration paid for such security    11:36:19
3  with interest thereon, less the amount of    11:36:24
4  any income received thereon upon the tender    11:36:27
5  of such security or for damages if he no    11:36:33
6  longer owns the security."  I'm going to    11:36:40
7  break down some of the words.    11:36:44
8      The consideration paid for such    11:36:46
9  security, you've expressed the view that it    11:36:47
10  could be the consideration paid, for example,    11:36:50
11  Bitcoin, or the value of that consideration    11:36:53
12  paid, for example, translating that Bitcoin    11:36:55
13  amount into U.S. dollars at the time of    11:36:58
14  purchase, correct?    11:37:00
15  A.  Well, I understand that there might be a    11:37:02
16  legal determination that needs to be made    11:37:06
17  as to whether the word "consideration" here    11:37:08
18  means the form of the consideration or the    11:37:11
19  value of the consideration.  I believe it    11:37:13
20  means the value of the consideration because    11:37:16
21  that's how you would then be able to    11:37:20
22  calculate interest thereon, but I'm not here    11:37:22
23  to make legal determinations.  I'm here to    11:37:30
24  offer economic opinions based on economics,    11:37:34
25  and my economics opinion is that whichever    11:37:39
Page 76

1  legal determination is made, it would be    11:37:42
2  a common methodology for all class members    11:37:44
3  either way, although I think one is better    11:37:47
4  than the other.    11:37:49
5  Q.  The formulas that you proceed to propose    11:37:50
6  in Paragraphs 19 and 20 proceed from the    11:37:53
7  notion that the consideration paid is the    11:38:00
8  value of the consideration paid, is that    11:38:02
9  correct?    11:38:04
10  A.  Yes.  That's how you would then be able    11:38:04
11  to calculate interest thereon.    11:38:09
12  Q.  Could you not calculate interest thereon    11:38:13
13  if the consideration was, for example,    11:38:15
14  Bitcoin?    11:38:18
15      MR. SPEAR:  Objection, scope.    11:38:20
16  A.  You may or may not be able to depending on    11:38:21
17  if you interpreted this to mean any form of    11:38:26
18  consideration left in that original form.    11:38:29
19  Q.  Can you explain what you mean by that?    11:38:35
20  A.  If the consideration is a box of candy,    11:38:39
21  how are you going to calculate interest    11:38:41
22  thereon?  I think it's got to be translated    11:38:43
23  to dollars in order to calculate interest    11:38:48
24  thereon.  Dollars have an interest rate.  I    11:38:51
25  think that's what the statute contemplates.    11:38:55
Page 77

20 (Pages 74 - 77)

1  Q. I see.  So in the scenario where, for      11:38:58
2    example, someone exchanges a cup of coffee      11:39:02
3    for XRP, a tangible good like a cup of      11:39:05
4    coffee for XRP, it would be hard to calculate   11:39:10
5    the interest that one would have obtained      11:39:12
6    on a cup of coffee?                      11:39:15
7  A. It would be very easy if you translated it   11:39:16
8    into value first.  That's why I think that's   11:39:21
9    what the statute contemplates.            11:39:22
10 Q. Okay.  It says here in the statute that you  11:39:25
11   then subtract from the amount recovered, the  11:39:28
12   amount of any income received thereon?       11:39:34
13 A. Right.                              11:39:37
14 Q. Is it possible to receive income on XRP     11:39:37
15   during the period of time when you're holding 11:39:46
16   it?                                11:39:48
17 A. Well, Ripple did not pay interest or        11:39:48
18   dividends on its XRP tokens.  There are other  11:39:50
19   applications or transactions that people     11:39:58
20   might have gone to to try to earn income     11:39:59
21   being in possession of XRP, but that's --    11:40:04
22   what this here means is dividends or interest 11:40:07
23   paid by the issuer, and XRP did not pay      11:40:10
24   dividends on its XRP tokens.              11:40:15
25 Q. What are the other types of applications or  11:40:16

Page 78

1    transactions that people might have gone     11:40:19
2    on to try to earn income on their XRP while   11:40:20
3    holding it?                          11:40:25
4  A. I'll give you two.  Take your XRP and maybe  11:40:25
5    use it as collateral to engage in a real     11:40:30
6    estate investment and then it turns out to   11:40:37
7    be a good real estate investment.  That's    11:40:40
8    clearly not what the statute contemplates.   11:40:42
9    That's not interest thereon.  That's not     11:40:45
10   interest that the security pays.           11:40:47
11       I do know that there were digital        11:40:48
12   asset market participants that would pay     11:40:53
13   short sell lending fees or if you would      11:40:56
14   lend your assets to them, they would pay you  11:41:01
15   interest on it, but that's a separate        11:41:03
16   transaction outside of the transaction with  11:41:05
17   Ripple, outside of the interest that Ripple   11:41:08
18   would pay on its XRP tokens.  And clearly,    11:41:13
19   from what I know about other cases I've been  11:41:19
20   involved in, things like short sale lending   11:41:21
21   fees are not what the statute meant when it   11:41:25
22   said income received thereon.  What's been    11:41:31
23   interpreted in other cases is that it's      11:41:35
24   income paid by the issuer.               11:41:38
25 Q. So if a person were holding XRP and lent it  11:41:42

Page 79

1    out to a third party for that third party    11:41:48
2    to use in exchange for interest payments --  11:41:52
3  A. Right.                              11:41:54
4  Q. -- does that -- and received those interest  11:41:55
5    payments --                          11:41:58
6  A. Right.                              11:41:58
7  Q. -- and at the end of a period of time       11:41:58
8    received their XRP back --               11:42:00
9  A. Right.                              11:42:02
10 Q. -- and then sold it, let's say, does the     11:42:03
11   interest that that XRP holder earned while    11:42:08
12   having lent out the XRP factor into your     11:42:11
13   calculation of gain or loss?              11:42:16
14 A. It's excluded.  That doesn't count.  That's  11:42:17
15   not interest thereon.  That's interest or     11:42:21
16   payment for bearing counterparty risk for a   11:42:24
17   separate transaction.  That's not at issue   11:42:26
18   in this case.  What's at issue in this case  11:42:31
19   is if Ripple paid dividends or interest on    11:42:37
20   XRP tokens, and they did not.  So it was     11:42:46
21   considered in my opinion.  It was considered  11:42:47
22   in the formulas.  It's represented          11:42:48
23   appropriately in my opinion and the formulas 11:42:51
24   by being excluded.                     11:42:54
25 Q. Understood.                          11:42:55

Page 80

1  A. Can we take a break?                    11:43:00
2  Q. I was about to propose the same thing.       11:43:02
3       MR. MICHAELSON:  We can go off the       11:43:04
4    record.                             11:43:07
5       VIDEOGRAPHER:  The time is 11:43.       11:43:07
6    We're off the record.                   11:43:09
7       (Break taken)                       11:43:10
8       VIDEOGRAPHER:  We are back on the       11:59:11
9    record.  The time is 11:59.              11:59:15
10      BY MR. MICHAELSON:                     11:59:18
11 Q. Dr. Feinstein, I'd like to direct your       11:59:21
12   attention to Page 5 of Exhibit 10, your      11:59:24
13   report, specifically Paragraph 20 which I    11:59:30
14   understand is the paragraph that sets forth  11:59:36
15   the methodology for calculating damages      11:59:38
16   for an XRP purchaser who has not sold,       11:59:40
17   correct?                            11:59:46
18 A. Yes.                                11:59:46
19 Q. So referring to the formula here, it says,   11:59:46
20   "the damages for class members who purchased  11:59:52
21   but never sold XRP equals," then you start   11:59:55
22   with a dollar amount paid at the time of     11:59:59
23   purchase.  Do you see that?               12:00:01
24 A. Yes.                                12:00:02
25 Q. We covered this a little bit already, but    12:00:02

Page 81

21 (Pages 78 - 81)

Page 82

```
 1   the dollar amount paid, what are you      12:00:05
 2   referring to there?                       12:00:09
 3   A. The dollar value of the consideration paid.   12:00:10
 4   Q. So, again, if the purchaser used Bitcoin      12:00:18
 5   or ETHE or Tether, you're proposing here        12:00:22
 6   to convert that into dollars based on the        12:00:28
 7   exchange rate --                          12:00:32
 8   A. Yes.                                   12:00:35
 9   Q. -- as of the time of the purchase?     12:00:35
10   A. Yes.                                   12:00:37
11   Q. And if that purchaser had in the real world   12:00:38
12   just converted dollars to Bitcoin and then       12:00:48
13   used that Bitcoin to make this purchase,         12:00:53
14   would you use that purchaser's real-world        12:00:55
15   exchange rate or the general market exchange     12:00:58
16   rate for Bitcoin to dollar as of the time        12:01:06
17   of the purchase of XRP?                    12:01:09
18        MR. SPEAR: Objection to form.        12:01:13
19   Objection, scope and asked and answered. Go      12:01:14
20   ahead.                                    12:01:16
21   A. My understanding is that the data sources     12:01:16
22   like Bloomberg take into account actual          12:01:18
23   transactions, so I think the person's actual     12:01:21
24   transaction would be reflected in the data       12:01:25
25   that's available, so they're not really          12:01:28
```

Page 83

```
 1   mutually exclusive.                       12:01:33
 2   Q. But they're not going to be identical,        12:01:34
 3   right?                                    12:01:37
 4        MR. SPEAR: Objection, scope.          12:01:38
 5   Objection, form.                          12:01:39
 6   A. They might not be. How they did in their      12:01:40
 7   own individual transaction is not necessarily    12:01:45
 8   better than calculating the value of the         12:01:51
 9   consideration paid using a market valuation,     12:01:56
10   a market metric, a market exchange rate          12:02:00
11   metric.                                   12:02:04
12   Q. Do you think, though, that it's important     12:02:05
13   for your model to capture the purchaser's        12:02:11
14   actual gain or loss in the real world?          12:02:17
15        MR. SPEAR: Objection, form.           12:02:21
16   A. Yeah, I believe it does. I just want to       12:02:24
17   also say it's not my model. I'm presenting       12:02:34
18   that this model exists and is used and in        12:02:37
19   the statute. I'm just explaining what's in       12:02:40
20   the statute.                              12:02:45
21   Q. The statute is -- you quote the statute in    12:02:45
22   Paragraph 17, right?                       12:02:48
23   A. Yes.                                   12:02:49
24   Q. But Paragraph 20 is -- the formula is not     12:02:49
25   in the statute?                           12:02:53
```

Page 84

```
 1   A. It's the arithmetic form of what's in         12:02:54
 2   the statute. It's the arithmetic formula         12:03:03
 3   form of the statute.                       12:03:08
 4   Q. There are certain leaps between the statutory  12:03:10
 5   language and the formula expressed in            12:03:13
 6   Paragraph 20, right?                       12:03:17
 7        MR. SPEAR: Objection to form.         12:03:18
 8   A. If there's some interpretation here, what     12:03:19
 9   I want to say about that is I think the          12:03:22
10   interpretation is correct. The             12:03:23
11   interpretation is consistent with other          12:03:25
12   cases I've done that have been validated         12:03:27
13   by the parties or by the courts. And if          12:03:29
14   in this particular case a slightly different     12:03:33
15   interpretation of one or more of the             12:03:36
16   words applies, it would still be a common        12:03:38
17   damage methodology given the alternative         12:03:41
18   interpretation. I believe this is the            12:03:44
19   correct way to present the statute as a          12:03:46
20   mathematical formula, but if there has to        12:03:52
21   be some adjustment to it of the kind you're      12:03:56
22   describing, we would still have a common         12:03:59
23   formula for all class members.             12:04:01
24   Q. Do you know if the proposed class here        12:04:03
25   includes foreign purchasers? By that I mean      12:04:05
```

Page 85

```
 1   a purchaser -- well, for purposes of       12:04:10
 2   my question here, I'm referring to, for          12:04:14
 3   example, a foreigner living in a different       12:04:17
 4   country and trading XRP from a foreign           12:04:21
 5   country on a foreign exchange.             12:04:25
 6        MR. SPEAR: Objection to form.         12:04:27
 7   Go ahead.                                 12:04:29
 8   A. My understanding is that plaintiff's counsel  12:04:29
 9   wishes to include all investors into whom        12:04:31
10   XRP was solicited regardless of where they       12:04:34
11   bought it. But, again, if I'm wrong about        12:04:38
12   that, the record speaks for itself.            12:04:41
13   Q. So the putative class, then, would include,   12:04:43
14   for example, a Swiss person who converts         12:04:53
15   Swiss francs into Bitcoin and then uses that     12:04:55
16   Bitcoin to purchase XRP, correct?          12:04:59
17        MR. SPEAR: Objection, calls for       12:05:04
18   speculation.                              12:05:06
19   A. Perhaps. That's a hypothetical. It's not      12:05:06
20   entirely unrealistic, but it's not entirely      12:05:10
21   complete.                                 12:05:14
22   Q. If you're applying the methodology expressed  12:05:14
23   in Paragraph 20 to that purchaser, how would     12:05:17
24   you calculate the dollar amount paid at the      12:05:21
25   time of purchase?                         12:05:22
```

22 (Pages 82 - 85)

**Page 86**

1  A.  The dollar value of the consideration paid.   12:05:24
2     If the transaction was Bitcoin for XRP, it   12:05:27
3     would be the dollar value of the XRP that   12:05:32
4     was conveyed in exchange for the XRP.   12:05:36
5  Q.  Irrespective of whether the purchaser was   12:05:39
6     located in a foreign country?   12:05:54
7  A.  Correct.   12:05:57
8  Q.  And irrespective of whether that purchaser   12:05:58
9     had acquired the Bitcoin using a foreign   12:06:01
10    currency?   12:06:04
11  A.  Correct.  This is an American federal statute   12:06:05
12    and a California statute.  Damages, I believe   12:06:14
13    it would be expected the damages would be   12:06:19
14    calculated in terms of dollars.   12:06:21
15  Q.  Okay.  I just want to be clear.  If that   12:06:22
16    purchaser was using an exchange that charged   12:06:26
17    some sort of transaction fee, not a fee baked   12:06:29
18    into the bid-ask spread, but a transaction   12:06:34
19    fee, would that fee be factored into the   12:06:39
20    damages?   12:06:43
21       MR. SPEAR:  Objection, asked and   12:06:43
22    answered.   12:06:45
23  A.  I think ultimately that's a legal question.   12:06:45
24    I mean, I don't -- in the cases I've been   12:06:49
25    involved in, if we're talking about a bid-ask   12:06:51

**Page 87**

1     spread, to the extent that a bid-ask   12:06:55
2     spread represents a transaction fee, it   12:07:00
3     is included in the damage computation.  I   12:07:03
4     don't know all the case law and statutory   12:07:08
5     law about transaction -- about commissions,   12:07:10
6     about explicit commissions.  I would just   12:07:14
7     defer to the legal experts on that.   12:07:17
8  Q.  Under your model, is it conceivable that   12:07:18
9     someone could take one Bitcoin, use it to   12:07:21
10    buy XRP, hold that XRP for a period of time,   12:07:28
11    sell the XRP for one Bitcoin and suffer a   12:07:31
12    loss?   12:07:35
13  A.  That's possible, sure.   12:07:37
14  Q.  How could that happen?   12:07:39
15  A.  Well, the form of the consideration might   12:07:40
16    be the same, but the value paid and the   12:07:44
17    value received could be different if XRP   12:07:49
18    fell in value over that point in time, over   12:07:54
19    that interval in time.   12:07:58
20  Q.  So could it even be the case, then, that   12:08:01
21    someone could take one Bitcoin, buy XRP,   12:08:06
22    hold the XRP for a period of time, sell the   12:08:09
23    XRP for more than one Bitcoin, 1.1 Bitcoin,   12:08:13
24    let's say, but under your model that   12:08:17
25    purchaser could have a loss?   12:08:19

**Page 88**

1  A.  You're gratuitous to my model.  If there's   12:08:21
2     a determination by the court that the   12:08:26
3     translations from form of consideration   12:08:27
4     to value of consideration take place at the   12:08:31
5     time of the transaction, then in your   12:08:35
6     hypothetical they could, that would calculate   12:08:37
7     as being an actual loss, it could   12:08:40
8     hypothetically, depending on the numbers   12:08:43
9     involved, be a loss.  And that would make   12:08:44
10    some sense because over that point in time,   12:08:47
11    not only did the Bitcoin -- not only was   12:08:49
12    the Bitcoin received not really the same   12:08:52
13    as the Bitcoin paid because the Bitcoin   12:08:55
14    would have depreciated over that time and   12:08:58
15    this particular investor would be receiving   12:09:01
16    depreciated Bitcoin whereas they paid a   12:09:03
17    higher value of Bitcoin initially, but   12:09:06
18    over that point in time XRP would have   12:09:09
19    necessarily had to have fallen in value,   12:09:11
20    too, in terms of dollars.   12:09:13
21       So what I want to say here is this   12:09:14
22    interpretation in your hypothetical would   12:09:16
23    be a realistic and reasonable measure of   12:09:27
24    damages, but what I want to say is that the   12:09:30
25    legal experts or the court or whoever is   12:09:32

**Page 89**

1     adjudicating exactly that question about   12:09:36
2     when the translation should take place   12:09:36
3     should decide alternatively that the   12:09:39
4     translation should take place at the time   12:09:40
5     of the settlement or of a jury verdict rather   12:09:42
6     than at the time of the transaction.  That   12:09:47
7     methodology would now be -- that   12:09:48
8     methodology would now still be common for   12:09:53
9     all class members.  It would be a little bit   12:09:56
10    different from the formulas in my report.   12:09:59
11    It would be easy to modify the formulas to   12:10:01
12    represent that alternative interpretation,   12:10:01
13    and it would still be a common methodology   12:10:06
14    for all class members encompassing a legal   12:10:08
15    determination that the translation takes   12:10:10
16    place at a later date.   12:10:14
17  Q.  So you're a professor of finance, right?   12:10:15
18  A.  Yes.   12:10:19
19  Q.  And you teach courses on investment?   12:10:19
20  A.  Yes.   12:10:22
21  Q.  And you testified earlier that investment   12:10:22
22    is an area of your teaching and research,   12:10:25
23    correct?   12:10:29
24  A.  Yes.   12:10:29
25  Q.  So as a professor of finance that focuses   12:10:30

23 (Pages 86 - 89)

Page 90

```
 1   on investment, do you think that -- what        12:10:37
 2   is your opinion on what best captures a          12:10:43
 3   person's gain or loss in a sale of XRP           12:10:46
 4   if -- strike that. Start over.                   12:10:52
 5        Were you instructed to interpret            12:11:01
 6   the term "consideration" in the statute as       12:11:03
 7   the value of consideration paid?                 12:11:07
 8   A. Instructed by counsel?                        12:11:11
 9   Q. Instructed by counsel, yes. Was that a        12:11:12
10   choice?                                          12:11:15
11        MR. SPEAR: I'm a little bit --              12:11:16
12   communications with counsel --                   12:11:18
13        MR. MICHAELSON: Usually if counsel          12:11:20
14   instructs an expert to follow certain            12:11:22
15   formulas, it's usually not privileged. It's      12:11:24
16   usually identified in the report.                12:11:27
17        MR. SPEAR: It is identified, but            12:11:29
18   go ahead.                                         12:11:30
19   A. No.                                            12:11:32
20   Q. Okay. So it's your choice to use the value    12:11:32
21   of the consideration paid in these formulas      12:11:41
22   presented in Paragraphs 19 and 20, right?        12:11:44
23   A. Yes, but I do want to emphasize that my       12:11:47
24   opinion about there being a common               12:11:51
25   methodology would accommodate a different        12:11:53
```

Page 91

```
 1   interpretation as to what consideration          12:11:55
 2   meant.                                            12:11:57
 3   Q. Okay. But I want to explore whether that      12:11:57
 4   varies depending on the type of investor,        12:12:00
 5   okay? So if you've got -- and I'm asking,        12:12:03
 6   you're a professor of finance and investment.    12:12:08
 7   So if you have an investor who has converted     12:12:11
 8   all their savings into Bitcoin and they've       12:12:14
 9   been in Bitcoin since 2014 and they use one      12:12:18
10   Bitcoin to buy XRP and they hold it and they     12:12:21
11   sell that XRP for 1.1 Bitcoin.                   12:12:24
12   A. Okay.                                          12:12:29
13   Q. Isn't it fair to say that that purchaser of   12:12:29
14   XRP experienced a gain?                          12:12:38
15   A. Not necessarily. If the Bitcoin they         12:12:47
16   received is worth less than the Bitcoin they    12:12:50
17   paid, they suffered a loss.                      12:12:52
18   Q. So even in the case of an investor who has    12:12:57
19   chosen to put all their savings into Bitcoin    12:13:01
20   and uses a piece of that Bitcoin to buy XRP      12:13:06
21   and then sells the XRP for more Bitcoin they     12:13:12
22   paid for, in your view, that person could        12:13:16
23   still have a loss?                               12:13:17
24   A. If you're asking a legal question, I'm not    12:13:18
25   qualified to answer it from a legal             12:13:21
```

Page 92

```
 1   perspective. But from the economic               12:13:22
 2   perspective, if their economic position is       12:13:24
 3   worse than it previously was because they        12:13:27
 4   were paid in, they received back depreciated     12:13:33
 5   Bitcoin whereas they are worth less than         12:13:36
 6   the Bitcoins they originally paid, it sounds     12:13:39
 7   to me like a loss.                               12:13:42
 8        It's also important to emphasize            12:13:53
 9   that in that hypothetical, in order for that     12:13:55
10   to happen, the XRP that would have been held     12:13:58
11   over that holding period also would have         12:14:02
12   had to have fallen in dollar value. So in        12:14:05
13   order for the 1.1 Bitcoins received back to      12:14:09
14   be worth less than the one Bitcoin originally    12:14:13
15   paid, over that holding period the XRP must      12:14:16
16   also have fallen in value in dollar terms        12:14:20
17   over that holding period.                        12:14:22
18   Q. What is the basis for your decision to        12:14:24
19   translate all of this into U.S. dollars?         12:14:30
20   A. Well, every case I've -- I don't recall       12:14:33
21   the case that I previously had been involved     12:14:39
22   in where the translation was done at a           12:14:41
23   different point in time, but more than that,     12:14:43
24   the statute itself says with interest            12:14:45
25   thereon. In order to calculate interest         12:14:52
```

Page 93

```
 1   thereon, the most straightforward way to         12:14:56
 2   do that would be an interpretation that          12:14:59
 3   it's the value of the consideration that         12:15:02
 4   must be evaluated at the time of the             12:15:05
 5   purchase.                                         12:15:09
 6        But, again, I feel a little              12:15:09
 7   uncomfortable. It feels like we're               12:15:12
 8   straddling right up to the line of economics     12:15:12
 9   versus law, and I'm not a legal expert. If       12:15:17
10   there's a legal determination that this          12:15:17
11   statute, that the excerpt in Paragraph 17        12:15:20
12   has to be interpreted differently, I'm fine      12:15:24
13   with modifying the formula, presenting very      12:15:29
14   slightly different mathematical formulas         12:15:29
15   in 19 and 20, and my opinion, my conclusion      12:15:34
16   in Paragraph 16 will remain absolutely           12:15:36
17   unchanged because even with that                 12:15:38
18   modification, it would still be a common         12:15:41
19   damage methodology for all class members.        12:15:42
20   Q. I'm asking for the economic opinion, not a   12:15:45
21   legal opinion. I'm asking for the economic      12:15:49
22   rationale for translating everything into        12:15:53
23   dollars even for purchasers of XRP who           12:15:57
24   have converted their, all their savings and      12:16:02
25   investments into virtual currencies.             12:16:07
```

24 (Pages 90 - 93)

| | | |
|---|---|---|
| 1 | MR. SPEAR:  Objection, asked and | 12:16:10 |
| 2 | answered.  Was there a question there? | 12:16:11 |
| 3 | I'm sorry. | 12:16:13 |
| 4 | A.  The rationale, if the question is what's | 12:16:15 |
| 5 | the rationale, the rationale is if the job | 12:16:17 |
| 6 | is to calculate damages in terms of | 12:16:19 |
| 7 | dollars, it makes most sense to calculate | 12:16:24 |
| 8 | consideration paid in terms of dollars, | 12:16:24 |
| 9 | consideration received in terms of dollars | 12:16:26 |
| 10 | and the interest earned thereon also in | 12:16:29 |
| 11 | terms of dollars.  I mean, a common numerare, | 12:16:33 |
| 12 | that's what they teach in economics school | 12:16:38 |
| 13 | and graduate school.  That's the purpose of | 12:16:40 |
| 14 | there being numerares, so they can do those | 12:16:45 |
| 15 | calculations. | 12:16:47 |
| 16 | Q.  I'm just wondering why -- I'm not familiar | 12:16:47 |
| 17 | with the term "numerare."  What is that term? | 12:16:53 |
| 18 | A.  Common currency.  Currency has a lot of | 12:16:55 |
| 19 | different meanings at this table, so | 12:16:58 |
| 20 | numerare, it's synonymous.  Numerare is | 12:17:02 |
| 21 | another unit of a count for measuring value. | 12:17:03 |
| 22 | You need a common unit of a count for | 12:17:05 |
| 23 | measuring value in order to calculate | 12:17:05 |
| 24 | damages.  It's an American court.  I think | 12:17:10 |
| 25 | dollars is the appropriate numerare. | 12:17:12 |

Page 94

| | | |
|---|---|---|
| 1 | Q.  Look, obviously what I'm questioning is | 12:17:14 |
| 2 | whether dollars is the appropriate numerare | 12:17:22 |
| 3 | for someone who has converted their dollars | 12:17:23 |
| 4 | into Bitcoin or other digital currencies | 12:17:31 |
| 5 | and is buying and selling from those | 12:17:35 |
| 6 | currencies.  I'm looking at your report, | 12:17:36 |
| 7 | Paragraph 17.  It has the excerpt from the | 12:17:43 |
| 8 | statute and the statute doesn't say U.S. | 12:17:46 |
| 9 | dollars anywhere, so I'm trying to understand | 12:17:49 |
| 10 | your basis for importing the U.S. dollars | 12:17:53 |
| 11 | into 17.  That's what I'm trying to explore, | 12:17:57 |
| 12 | even where we've got purchasers who are | 12:18:08 |
| 13 | Swiss and using Swiss francs and not dollars. | 12:18:12 |
| 14 | So as an economist -- setting aside | 12:18:16 |
| 15 | the legal determination, as an economist, | 12:18:31 |
| 16 | why is dollar the right baseline for a Swiss | 12:18:34 |
| 17 | person or someone who's converted all their | 12:18:39 |
| 18 | assets into Bitcoin? | 12:18:42 |
| 19 | MR. SPEAR:  Objection, scope. | 12:18:43 |
| 20 | Objection, form.  And objection, asked and | 12:18:45 |
| 21 | answered.  Go ahead. | 12:18:48 |
| 22 | A.  I really think that's more of a legal | 12:18:56 |
| 23 | question than an economics question.  I | 12:18:58 |
| 24 | would point to a quote in 17.  If you look | 12:19:00 |
| 25 | at the cite, the first two words of the | 12:19:04 |

Page 95

| | | |
|---|---|---|
| 1 | cite are "United States."  This is United | 12:19:07 |
| 2 | States law, it's United States courts. | 12:19:09 |
| 3 | My understanding is that I was asked to | 12:19:11 |
| 4 | calculate dollar damages.  If there's a | 12:19:13 |
| 5 | determination that all damages should be | 12:19:18 |
| 6 | calculated in some other currency or some | 12:19:20 |
| 7 | other units, I can do it, I would take | 12:19:26 |
| 8 | that instruction and complete the task.  It | 12:19:31 |
| 9 | would still be a common damage methodology | 12:19:36 |
| 10 | for all investors.  It would be a different | 12:19:39 |
| 11 | numerare. | 12:19:45 |
| 12 | If there's a legal determination | 12:19:46 |
| 13 | that an alternative -- the basis for my, | 12:19:49 |
| 14 | essentially, assumption that the task was | 12:19:51 |
| 15 | to propose a formula for calculating dollar | 12:19:54 |
| 16 | damages is the fact that it's United States | 12:19:57 |
| 17 | statute, United States courts and United | 12:19:59 |
| 18 | States company, but I realize that might be | 12:20:03 |
| 19 | straddling over the line into law rather | 12:20:08 |
| 20 | than economics.  And if I'm instructed by | 12:20:12 |
| 21 | the legal experts or the court to do it a | 12:20:14 |
| 22 | different way, I certainly could and it would | 12:20:17 |
| 23 | be common using that other methodology, too. | 12:20:21 |
| 24 | Q.  Well, let's explore that other methodology | 12:20:23 |
| 25 | for a moment.  Another methodology might | 12:20:28 |

Page 96

| | | |
|---|---|---|
| 1 | say if you're going into and out of XRP | 12:20:35 |
| 2 | with Swiss francs, then what matters is | 12:20:41 |
| 3 | whether you gained or lost in Swiss francs. | 12:20:45 |
| 4 | If you go into or out of XRP with Bitcoin, | 12:20:47 |
| 5 | then what matters is whether you gained | 12:20:51 |
| 6 | or lost Bitcoin.  Is it your testimony that | 12:20:53 |
| 7 | that would be an application of a common | 12:20:55 |
| 8 | methodology? | 12:20:59 |
| 9 | A.  Well, now you're specifically asking me | 12:21:05 |
| 10 | if what you described is a common | 12:21:08 |
| 11 | methodology, and that's a legal question. | 12:21:10 |
| 12 | That's a legal determination.  As an | 12:21:13 |
| 13 | economist, I believe I would go so far as | 12:21:16 |
| 14 | to say if you were dead set on proposing a | 12:21:18 |
| 15 | model that wasn't common, you probably could | 12:21:21 |
| 16 | come up with a model that's not common. | 12:21:24 |
| 17 | My opinion is that you certainly | 12:21:27 |
| 18 | can come up with a better model that is | 12:21:29 |
| 19 | common.  I'd really have to think more | 12:21:32 |
| 20 | about -- well, I don't need to -- I don't | 12:21:34 |
| 21 | think I should be opining as to whether | 12:21:37 |
| 22 | the model you described is common or not. | 12:21:40 |
| 23 | That's really a legal determination, but | 12:21:42 |
| 24 | it's also not the model that I think is | 12:21:45 |
| 25 | the appropriate one given the statute. | 12:21:47 |

Page 97

25 (Pages 94 - 97)

1  Q. Do you think that how purchasers of XRP      12:21:52
2     calculated their taxes on a gain or loss of   12:22:11
3     a sale should factor into the determination   12:22:16
4     into whether they had a gain or loss?         12:22:19
5  A. Are you saying that like net of taxes        12:22:26
6     whether there was a gain or loss or just      12:22:28
7     whether they submitted tax forms that were    12:22:30
8     denominated in anything besides dollars?      12:22:33
9  Q. Take the person who bought the XRP for one    12:22:36
10    Bitcoin and sold it for 1.1 Bitcoin.  If      12:22:41
11    they view that as a gain, would that affect   12:22:48
12    your view of whether that person experienced  12:22:52
13    a gain or loss?                               12:22:55
14 A. I'm not a tax accountant.  I don't know       12:22:57
15    what the appropriate tax accounting would     12:22:59
16    be for that.                                  12:23:01
17 Q. Look, I'm not asking you to opine on the      12:23:01
18    law.  I'm not asking you to opine on taxes.   12:23:05
19    I'm asking for -- you're a professor of       12:23:13
20    finance who focuses on investment.  I assume  12:23:18
21    that you're putting yourself and asking your  12:23:18
22    students to put themselves in the shoes of    12:23:20
23    investors making investment decisions all     12:23:20
24    the time.                                     12:23:20
25 A. Sure.                                         12:23:20

Page 98

1  Q. And you're proposing here a model where      12:23:26
2     the gain or loss that you calculate might     12:23:29
3     differ from what the investor might think     12:23:36
4     about.                                        12:23:39
5  A. That's your opinion.  That's not necessarily  12:23:43
6     the one I share.                              12:23:45
7  Q. So my question for you, though, is if that    12:23:46
8     investor who spends one Bitcoin to buy XRP    12:23:49
9     and then sells that XRP for 1.1 Bitcoin,      12:23:54
10    if they as an investor believe that they      12:23:59
11    experienced a gain, does that factor into     12:24:01
12    your assessment as to whether they            12:24:04
13    experienced a gain or loss?                   12:24:07
14 A. I can't speak to any person's personal        12:24:09
15    beliefs.  I think whether they've suffered    12:24:15
16    a gain or loss depends on the dollar value    12:24:18
17    of what they paid and the dollar value        12:24:22
18    of what they received.  That's how I would    12:24:24
19    think about it personally.  If I bought       12:24:27
20    XRP and paid something worth $100 and when    12:24:28
21    I sold the XRP I got something worth $90,      12:24:32
22    I would think that I suffered a loss          12:24:35
23    over that holding period, and in that         12:24:39
24    hypothetical, XRP would have had to have      12:24:41
25    fallen in value.                              12:24:44

Page 99

1  Q. Do you agree that crypto enthusiasts who      12:24:45
2     are all in on virtual currencies might        12:24:51
3     not see it that way?                          12:24:54
4  A. I can't speak to how they see it.             12:24:54
5  Q. Turning to Paragraph 21, you say, "the        12:24:57
6     amounts paid when the XRP units were          12:25:03
7     purchased can be determined from trading      12:25:08
8     records or publicly available XRP price       12:25:11
9     records."  Do you see that?                   12:25:14
10 A. Yes.                                          12:25:15
11 Q. What do you mean by "trading records"?        12:25:16
12 A. Well, documentation of what they paid, the    12:25:18
13    form of what they paid and -- documentation   12:25:27
14    of what they paid.                            12:25:42
15 Q. So for someone buying on an exchange, what    12:25:49
16    form would that documentation take?           12:25:53
17 A. It could take the form of a confirmation,     12:25:55
18    an exchange confirmation, a broker            12:25:59
19    confirmation, a trading confirmation.         12:26:01
20 Q. That might show, for example, how much        12:26:03
21    Bitcoin they paid for their XRP, right?       12:26:05
22 A. Right.                                        12:26:09
23 Q. Would it show the value of that Bitcoin in    12:26:09
24    U.S. dollars at the time of the purchase?     12:26:17
25 A. It could.                                     12:26:19

Page 100

1  Q. It also could not?                            12:26:20
2  A. If it didn't, then you can go to publicly     12:26:24
3     available XRP price records to see what       12:26:30
4     the dollar value of the XRP was at the        12:26:33
5     time of purchase.                             12:26:35
6  Q. If that exchange -- if it's possible to       12:26:36
7     trade U.S. dollars for Bitcoin on that        12:26:36
8     exchange, would that exchange's U.S. dollar   12:26:46
9     to Bitcoin exchange rate matter?              12:26:49
10 A. It would be in the data.  It would be in      12:27:00
11    the very data you'd be looking at, how many   12:27:02
12    dollars they paid and what XRP they received.  12:27:05
13 Q. I think what would be in the data is what,    12:27:09
14    for example, if it's Bitcoin, what Bitcoin    12:27:11
15    they paid, but the Bitcoin to U.S. dollar     12:27:14
16    exchange rate offered on that exchange        12:27:19
17    wouldn't necessarily be on the trading        12:27:23
18    record, right?                                12:27:26
19    MR. SPEAR:  Are you talking about             12:27:26
20    a specific trading record right now or is     12:27:27
21    this a hypothetical?                          12:27:30
22    MR. MICHAELSON:  I'm trying to                12:27:31
23    understand, Paragraph 21 purports to lay out  12:27:32
24    the documents that he would use to do this    12:27:35
25    calculation, but I'm wondering where he's     12:27:37

Page 101

26 (Pages 98 - 101)

```
 1   getting the exchange rate for assets used    12:27:40
 2   to buy or sell XRP, those assets in U.S.     12:27:43
 3   dollars.                                     12:27:49
 4       MR. SPEAR: Objection, asked and          12:27:50
 5   answered. Go ahead.                          12:27:51
 6  A. If I were doing the damage calculation or  12:27:52
 7   if I was advising someone else who is doing  12:27:56
 8   it, I would advise that they seek the most   12:27:58
 9   reputable exchange rate database available.  12:28:02
10  Q. Okay.                                      12:28:08
11  A. But, again, for the implementation, I just 12:28:11
12   don't know if those details need to be       12:28:16
13   decided. Those details weren't decided as    12:28:19
14   of the time that I was writing this report   12:28:22
15   and I don't think they need to be. They're   12:28:24
16   not -- whatever fork in the road one were    12:28:26
17   to take on working out those specific        12:28:31
18   implementation details, choosing one fork    12:28:36
19   over the -- one side of the fork over the    12:28:36
20   other would still produce a common damage    12:28:40
21   methodology for all class members. So        12:28:42
22   maybe I really should have just answered I   12:28:45
23   don't know for sure which one I would do,    12:28:47
24   which exchange rate database I would use.    12:28:50
25  Q. When you refer to publicly available XRP   12:28:53
                                        Page 102
```

```
 1   price records, what are you referring to     12:28:57
 2   there?                                        12:28:59
 3  A. There are. Bloomberg has it, among other   12:28:59
 4   places. There are other databases, but       12:29:02
 5   Bloomberg is a good one.                      12:29:07
 6  Q. Are you familiar ODL?                       12:29:08
 7  A. ODL? No. Maybe I will be if you tell me     12:29:12
 8   more about it.                                12:29:20
 9  Q. Ripple ODL, does that ring a bell?          12:29:21
10  A. What does ODL stand for?                    12:29:25
11  Q. It's okay.                                  12:29:29
12       MR. MICHAELSON: I suggest we break        12:29:31
13   for lunch.                                    12:29:32
14       MR. SPEAR: Okay.                          12:29:33
15       VIDEOGRAPHER: The time is 12:29.          12:29:35
16   We're off the record.                         12:29:44
17       (Break taken)                             12:29:46
18
19
20
21
22
23
24
25
                                        Page 103
```

```
 1       AFTERNOON SESSION                        12:29:59
 2       VIDEOGRAPHER: We are back on the         01:11:51
 3   record. The time is 1:12 p.m.                01:11:56
 4   BY MR. MICHAELSON:                           01:12:05
 5  Q. Thank you. Referring back to your review   01:12:06
 6   of expert reports in the SEC action, do you  01:12:10
 7   know Dan Fischel personally?                 01:12:20
 8  A. No.                                        01:12:21
 9  Q. Do you have a view on the quality of his   01:12:21
10   work?                                        01:12:26
11  A. Several views on the quality of his work.  01:12:29
12   I think it varies from case to case.         01:12:36
13  Q. Did you form a view as to the opinion that 01:12:40
14   he wrote, issued in the SEC action?          01:12:45
15  A. No, I have not, because I don't recall what 01:12:48
16   that opinion is.                             01:12:51
17  Q. And Alan Farrell, do you know him personally? 01:12:53
18  A. More professionally than personally.       01:12:56
19  Q. You know him professionally?               01:12:59
20  A. Right. I've been in cases where he's been  01:13:01
21   involved as well.                            01:13:03
22  Q. I see. Have you formed an overall view of  01:13:03
23   the quality of his work?                     01:13:06
24  A. No, just that it varies from case to case. 01:13:08
25  Q. Have you formed a view as to the quality of 01:13:11
                                        Page 104
```

```
 1   the report he issued in connection with      01:13:16
 2   the SEC action?                              01:13:17
 3  A. I have not.                                01:13:19
 4  Q. Okay. You've mentioned having a calculation 01:13:20
 5   of the lead plaintiff, Bradley Sostack's,    01:13:25
 6   gain or loss in this case. Have you          01:13:30
 7   performed such a calculation?                01:13:35
 8  A. Yes.                                       01:13:36
 9  Q. Do you know what exchange he traded XRP on? 01:13:36
10  A. Yes.                                       01:13:43
11  Q. What exchange was that?                    01:13:43
12  A. Poloniex.                                  01:13:45
13  Q. Are you familiar with the transaction fees 01:13:47
14   that Poloniex charges its users?             01:13:50
15  A. No, not specific, no.                      01:13:55
16  Q. Do you have any understanding as to whether 01:13:59
17   Poloniex's fee structure varies based on     01:14:02
18   the volume of transactions of the user?      01:14:07
19  A. I do not.                                  01:14:09
20  Q. Do you recall how you treated transaction  01:14:10
21   fees in connection with your calculation of  01:14:14
22   Mr. Sostack's damages?                       01:14:16
23  A. I do.                                      01:14:19
24  Q. And how did you treat them?                01:14:19
25  A. We used the actual transaction prices, so  01:14:22
                                        Page 105
```

27 (Pages 102 - 105)

| | | |
|---|---|---|
| 1 | if they included a bid-ask spread, the | 01:14:25 |
| 2 | bid-ask spread transaction cost was included | 01:14:28 |
| 3 | and incorporated, but I did not include | 01:14:33 |
| 4 | commissions as a cost. | 01:14:35 |
| 5 | Q. When you say if a fee was included in the | 01:14:39 |
| 6 | bid-ask spread, you mean that fee is | 01:14:42 |
| 7 | baked into the transaction price that he | 01:14:45 |
| 8 | experiences, correct? | 01:14:48 |
| 9 | A. Correct. | 01:14:49 |
| 10 | Q. Okay. Did you perform any analysis as to | 01:14:50 |
| 11 | whether, had you calculated -- let me scratch | 01:14:54 |
| 12 | that. | 01:15:02 |
| 13 | Where a trader like Mr. Sostack | 01:15:09 |
| 14 | buys, multiple buys and multiple sales, how | 01:15:14 |
| 15 | do you calculate gain or loss? Do you use a | 01:15:18 |
| 16 | FIFO analysis, LIFO? How do you -- | 01:15:22 |
| 17 | A. In the case of Mr. Sostack, I did it both | 01:15:25 |
| 18 | ways and it did not make any difference. | 01:15:28 |
| 19 | Q. Would you agree that there are instances | 01:15:31 |
| 20 | where it can make a difference whether you | 01:15:34 |
| 21 | use FIFO or LIFO? | 01:15:37 |
| 22 | A. Yes. | 01:15:39 |
| 23 | Q. Would you agree that that could impact, | 01:15:40 |
| 24 | depending on what methodology is picked, | 01:15:51 |
| 25 | FIFO or LIFO, that some class members here | 01:15:54 |

Page 106

| | | |
|---|---|---|
| 1 | thinks the LIFO or FIFO method is the | 01:17:02 |
| 2 | better method, I think that's outside the | 01:17:06 |
| 3 | scope of his opinions, but that's the | 01:17:08 |
| 4 | objection. I'm not instructing him not to | 01:17:09 |
| 5 | answer. I'm objecting on scope grounds. | 01:17:15 |
| 6 | Q. Okay. When calculating Mr. Sostack's | 01:17:20 |
| 7 | damages, do you recall whether he, whether | 01:17:29 |
| 8 | certain of his purchases involved Bitcoin? | 01:17:35 |
| 9 | A. I'm sorry? | 01:17:38 |
| 10 | Q. Did certain of his purchases involve Bitcoin? | 01:17:38 |
| 11 | A. Yes. | 01:17:44 |
| 12 | Q. And certain of his transactions involved | 01:17:44 |
| 13 | Tether? | 01:17:47 |
| 14 | A. That's correct. | 01:17:48 |
| 15 | Q. And what did you use to calculate the | 01:17:49 |
| 16 | amount paid at time of purchase in those | 01:17:56 |
| 17 | instances where Mr. Sostack used Bitcoin | 01:18:00 |
| 18 | to purchase XRP? | 01:18:02 |
| 19 | A. His transaction records indicated how | 01:18:04 |
| 20 | much Bitcoin he paid and Bloomberg data | 01:18:09 |
| 21 | was used to translate quantity of Bitcoin | 01:18:15 |
| 22 | to dollars, dollar value. | 01:18:19 |
| 23 | Q. Precisely what Bloomberg data? | 01:18:22 |
| 24 | A. Bloomberg provides exchange rates between | 01:18:29 |
| 25 | Bitcoin in dollars, and I used that data | 01:18:33 |

Page 108

| | | |
|---|---|---|
| 1 | could be impacted favorably and others | 01:15:57 |
| 2 | unfavorably? | 01:16:02 |
| 3 | A. It's possible. | 01:16:02 |
| 4 | Q. Have you determined what methodology would | 01:16:03 |
| 5 | be the appropriate methodology to use here, | 01:16:06 |
| 6 | FIFO or LIFO? | 01:16:09 |
| 7 | MR. SPEAR: Objection, scope. | 01:16:11 |
| 8 | A. No, but I have determined that whichever | 01:16:12 |
| 9 | methodology is dictated would produce a | 01:16:18 |
| 10 | methodology for calculating damages that's | 01:16:23 |
| 11 | common for all class members. Usually | 01:16:25 |
| 12 | it's a legal determination or an agreement | 01:16:28 |
| 13 | among the parties as to whether LIFO or | 01:16:31 |
| 14 | FIFO should be used. | 01:16:33 |
| 15 | MR. MICHAELSON: Mr. Spear, could | 01:16:38 |
| 16 | you explain the scope objection there? You | 01:16:39 |
| 17 | objected to that question based on scope, | 01:16:42 |
| 18 | and I'm trying to understand what the basis | 01:16:43 |
| 19 | of that objection is. | 01:16:45 |
| 20 | MR. SPEAR: I think he's testified | 01:16:46 |
| 21 | a few times today like the mechanics of | 01:16:48 |
| 22 | his methodology. If you're asking whether | 01:16:50 |
| 23 | LIFO or FIFO would not be a classwide | 01:16:54 |
| 24 | application, it goes to the scope of the | 01:16:57 |
| 25 | opinions. If you're asking him whether he | 01:17:01 |

Page 107

| | | |
|---|---|---|
| 1 | precisely I specified as of 4:00 p.m., so | 01:18:37 |
| 2 | end of trading day in New York. | 01:18:41 |
| 3 | Q. Did you know at the same time that Mr. | 01:18:45 |
| 4 | Sostack's transaction happened? | 01:18:49 |
| 5 | A. No. | 01:18:51 |
| 6 | Q. Do you know if on the Bloomberg data, does | 01:18:52 |
| 7 | it have data for every minute of the day | 01:18:58 |
| 8 | or only 4:00 p.m.? | 01:19:03 |
| 9 | A. I believe you can specify other times during | 01:19:05 |
| 10 | the day. | 01:19:09 |
| 11 | Q. And you specified four o'clock? | 01:19:10 |
| 12 | A. Yes. | 01:19:11 |
| 13 | Q. Do you know if Mr. Sostack's trading records | 01:19:12 |
| 14 | reflected the time of his transaction | 01:19:16 |
| 15 | involving Bitcoin? | 01:19:21 |
| 16 | A. My recollection is that they did not, and | 01:19:22 |
| 17 | it's fairly standard methodology applied in | 01:19:27 |
| 18 | other class action cases to use end-of-day | 01:19:31 |
| 19 | data for these sort of purposes. | 01:19:35 |
| 20 | Q. And in those other cases, does the asset | 01:19:37 |
| 21 | trade 24 hours a day? | 01:19:41 |
| 22 | A. Sometimes, yes. Bonds do, currencies do. | 01:19:44 |
| 23 | Q. And would you agree that if you used the | 01:19:48 |
| 24 | Bitcoin-to-dollar exchange rate at the time | 01:19:51 |
| 25 | of transaction rather than at end of day 4:00 | 01:19:53 |

Page 109

28 (Pages 106 - 109)

```
 1    p.m., that could affect some class members      01:19:59
 2    favorably and some class members unfavorably?   01:20:01
 3         MR. SPEAR:  Objection, calls for          01:20:04
 4    speculation.                                     01:20:05
 5 A. I don't know for sure, but it's possible.       01:20:05
 6 Q. Referring to your damages models at             01:20:15
 7    Paragraphs 19 and 20 of your report, the        01:20:37
 8    first input is the dollar amount paid at        01:20:41
 9    time of purchase.  How would you apply          01:20:44
10    this methodology to someone who acquired        01:20:51
11    XRP as payment for their work, for example,     01:20:57
12    from their employer?                            01:21:01
13 A. First of all, I don't know if I would.          01:21:04
14    That seems to be a legal determination          01:21:06
15    whether that hypothetical person would be       01:21:08
16    a member of the class, but it's certainly       01:21:13
17    theoretically possible to value the work        01:21:23
18    that is being paid for or just use the          01:21:25
19    quantity of XRP that's being delivered and      01:21:33
20    a market price of the XRP at that time.         01:21:35
21 Q. Even in the case of -- even if the              01:21:39
22    compensation, the amount of XRP that the        01:21:59
23    employee would receive was set months in        01:22:03
24    advance of when the employee received it,       01:22:08
25    are you proposing that you would use the        01:22:11
                                           Page 110
```

```
 1 A. I hadn't thought about it before you were       01:23:31
 2    asking about it today, and I'm not sure         01:23:33
 3    from a legal perspective whether someone        01:23:38
 4    who's paid in XRP is considered a purchaser     01:23:41
 5    of XRP.  As I sit here now, it's my first       01:23:44
 6    impression, which may change as I consider      01:23:50
 7    it further, but my first impression is that     01:23:52
 8    it certainly could.  It would measure the       01:23:55
 9    value of the XRP that was delivered with an     01:23:57
10    understanding that that's what the person       01:24:00
11    was getting paid.                               01:24:02
12 Q. How would this methodology apply to someone     01:24:04
13    who acquired XRP in exchange for a tangible     01:24:06
14    good, like a cup of coffee?                     01:24:09
15 A. You could do the same thing, look at the        01:24:20
16    quantity of XRP and the value in terms of       01:24:21
17    dollars of the XRP at the time of that          01:24:24
18    transaction.                                    01:24:25
19 Q. How would it apply to someone who acquired      01:24:37
20    XRP pursuant to a bilateral contract            01:24:49
21    providing for the exchange of XRP?              01:24:55
22 A. As I sit here now, I think you could do the     01:25:04
23    same thing.  You can calculate the dollar       01:25:07
24    value of the XRP that was conveyed as of the    01:25:09
25    time of the conveyance.                         01:25:15
                                           Page 112
```

```
 1    value of the XRP at the time it was             01:22:13
 2    received, not when the compensation             01:22:14
 3    amount was set?                                 01:22:17
 4 A. I don't know if a person who receives a         01:22:17
 5    bonus or pay compensation in terms of XRP       01:22:22
 6    is a member of the class.  It's something       01:22:29
 7    I'd have to think about.  Let me hear your      01:22:33
 8    question again, please.                         01:22:35
 9 Q. Well, I had asked how you would calculate       01:22:36
10    the amount, dollar amount paid at the time      01:22:42
11    of purchase, how you would apply that to        01:22:44
12    someone who received XRP in exchange for        01:22:48
13    their work, and you had said that you'd         01:22:51
14    look to the value in U.S. dollars of XRP        01:22:55
15    as of the time of the receipt of that           01:22:59
16    compensation?                                   01:23:02
17 A. That's certainly a methodology that could       01:23:03
18    be done.  I'd have to think whether that's      01:23:05
19    the only methodology and the best              01:23:08
20    methodology.  I haven't made a determination    01:23:09
21    yet.  I'm not even sure I would ever need       01:23:12
22    to do that calculation.                         01:23:15
23 Q. But it's your testimony that this methodology   01:23:16
24    expressed here in Paragraphs 19 and 20 could    01:23:26
25    apply to that situation?                        01:23:30
                                           Page 111
```

```
 1 Q. And if the contract were to have a             01:25:17
 2    clause that would, for example, make the       01:25:25
 3    counterparty whole if they were to sell        01:25:30
 4    XRP at a loss, would that be factored into     01:25:32
 5    your analysis of whether that person with      01:25:36
 6    XRP suffered a gain or loss?                   01:25:38
 7 A. I don't know.  I really, once you talk about   01:25:41
 8    a particular contract, I just don't know.      01:25:44
 9    It's a hypothetical and it seems incomplete.   01:25:50
10    I don't know the details of this contract to   01:25:54
11    be able to answer that question.               01:25:56
12 Q. Is it fair to say you would need to know       01:25:59
13    what the contract says in order to assess      01:26:01
14    whether that purchaser of XRP suffered,        01:26:04
15    sustained a gain or loss?                      01:26:07
16         MR. SPEAR:  Objection, calls for          01:26:08
17    speculation.                                   01:26:09
18 A. I just really don't know one way or the        01:26:10
19    other.  I might not need to know the details   01:26:14
20    of the contract.  I might need to know the     01:26:19
21    details of the contract.  As I sit here, I     01:26:23
22    don't know.                                    01:26:28
23 Q. Is it fair to say that if a contract had       01:26:28
24    a clause that would affect whether a           01:26:32
25    purchaser would gain or lose on their sale     01:26:34
                                           Page 113
```

29 (Pages 110 - 113)

| | |
|---|---|
| 1 of XRP, that you would need to see the          01:26:38 | 1 to that situation.                          01:29:16 |
| 2 contract in order to calculate that          01:26:43 | 2 A. You calculate how much was paid for the   01:29:19 |
| 3 purchaser's gain or loss?                  01:26:46 | 3 XRP, not how much was paid for the option   01:29:21 |
| 4     MR. SPEAR: Objection, incomplete     01:26:48 | 4 on the XRP.                                01:29:26 |
| 5 hypothetical. Objection, calls for        01:26:49 | 5 Q. And why is that?                          01:29:27 |
| 6 speculation.                             01:26:51 | 6 A. Because this person is buying two different  01:29:28 |
| 7 A. I really think my answer has to be I don't   01:26:52 | 7 things, XRP tokens as well as an option     01:29:31 |
| 8 know. It can. It might not. I can imagine   01:26:59 | 8 in XRP tokens. If I want to find out how    01:29:35 |
| 9 hypotheticals where it matters, the details  01:27:03 | 9 much they're paying for the XRP tokens      01:29:39 |
| 10 of the contract, and I can imagine         01:27:04 | 10 themselves, I've got to exclude how much    01:29:42 |
| 11 hypotheticals where it doesn't or I wouldn't.  01:27:07 | 11 they're paying for the options.             01:29:45 |
| 12 If the contract -- certainly it's always    01:27:15 | 12 Q. So if that purchaser were then to sell    01:29:47 |
| 13 possible using publicly available data to    01:27:23 | 13 XRP at a loss and receives some money from   01:29:50 |
| 14 calculate the value of the XRP that's being  01:27:27 | 14 the contractual counterparty thereafter,    01:29:53 |
| 15 conveyed at a particular point in time.     01:27:30 | 15 you wouldn't offset that purchaser's loss    01:29:56 |
| 16 Whether there's a contract that includes    01:27:36 | 16 based on the payment they received from the  01:30:01 |
| 17 other transactions simultaneously, like some  01:27:37 | 17 counterparty following their sale?          01:30:03 |
| 18 sort of put option, might make a difference  01:27:41 | 18     MR. SPEAR: Objection, incomplete     01:30:03 |
| 19 or might not in terms of measuring          01:27:45 | 19 hypothetical. Objection, calls for        01:30:04 |
| 20 consideration paid and value received.      01:27:47 | 20 speculation.                             01:30:06 |
| 21 Q. So referring to your formula in Paragraph 19,  01:27:51 | 21 A. These seem to be unusual aberrant        01:30:07 |
| 22 you start with a dollar amount paid at time  01:27:58 | 22 hypotheticals that might take some analysis,  01:30:11 |
| 23 of purchase, you add interest income earned  01:28:01 | 23 but it's not a different methodology. We're  01:30:17 |
| 24 at an appropriate interest rate and then you  01:28:06 | 24 still calculating how much was paid and how  01:30:20 |
| 25 subtract dollar amount received at time of   01:28:08 | 25 much was received and the difference is the  01:30:22 |
| Page 114 | Page 116 |
| 1 sale, correct?                            01:28:11 | 1 loss. If there's some unusual details of    01:30:24 |
| 2 A. Right.                                 01:28:12 | 2 the transactions that might require some    01:30:30 |
| 3 Q. What if the contract called for that seller  01:28:13 | 3 additional analysis from an economist or    01:30:34 |
| 4 to receive some additional dollar amount    01:28:15 | 4 from the claims administrator, but if the   01:30:38 |
| 5 later in time --                          01:28:20 | 5 sale is the result of the exercise of a     01:30:43 |
| 6     MR. SPEAR: Objection.              01:28:21 | 6 put option, as I sit here now, it seems to  01:30:46 |
| 7 Q. -- would that factor into --would it be   01:28:21 | 7 me that the sale price would be the strike   01:30:49 |
| 8 appropriate to factor in that subsequent    01:28:24 | 8 price of that put option and we would know   01:30:52 |
| 9 payment into that person's gain or loss?    01:28:26 | 9 how much this person received when selling   01:30:57 |
| 10     MR. SPEAR: Objection, incomplete    01:28:30 | 10 his or her XRP.                            01:31:02 |
| 11 hypothetical. Objection, calls for        01:28:31 | 11 Q. Your formula here in Paragraph 19 purports  01:31:06 |
| 12 speculation.                             01:28:33 | 12 to calculate damages for class members who  01:31:15 |
| 13 A. I'm trying to mentally picture this contract  01:28:33 | 13 purchased and later sold XRP?              01:31:18 |
| 14 you're describing. Can you say it again?    01:28:36 | 14 A. Right.                                 01:31:19 |
| 15 Q. Yes. Assume there's a contract pursuant   01:28:42 | 15 Q. It sets out three inputs, the dollar amount  01:31:20 |
| 16 where someone buys XRP, but the contract    01:28:46 | 16 paid at time of purchase, interest thereon  01:31:23 |
| 17 provides that if they sell for a loss or a  01:28:50 | 17 and the amount received at time of sale?    01:31:27 |
| 18 loss of certain magnitude, they'll be made  01:28:53 | 18 A. Right.                                 01:31:29 |
| 19 whole to some degree.                     01:28:55 | 19 Q. What I'm suggesting, I'm wondering how this  01:31:29 |
| 20 A. So this person is buying XRP and they're   01:28:58 | 20 would apply to a situation where a contract  01:31:34 |
| 21 also buying a put option on the XRP. That's  01:29:02 | 21 provided for some payment to the seller     01:31:36 |
| 22 how you would analyze that from a financial  01:29:07 | 22 after the time of sale. That is not        01:31:39 |
| 23 perspective. And you're asking how would I  01:29:09 | 23 encompassed by this methodology, correct?   01:31:41 |
| 24 calculate how much was paid for the XRP?    01:29:12 | 24     MR. SPEAR: Objection, calls for      01:31:44 |
| 25 Q. I'm asking how this methodology would apply  01:29:14 | 25 speculation. Objection, incomplete        01:31:46 |
| Page 115 | Page 117 |

30 (Pages 114 - 117)

| | | |
|---|---|---|
| 1 | hypothetical. Go ahead. | 01:31:48 |
| 2 | A. So you're saying there's a contract that | 01:31:49 |
| 3 | says the person sells it and then at a later | 01:31:51 |
| 4 | date is given additional money pursuant to | 01:31:55 |
| 5 | a put option? Is that what you're saying? | 01:31:59 |
| 6 | Q. You're the one describing it as a put option. | 01:32:01 |
| 7 | I have not described it as a put option. | 01:32:03 |
| 8 | A. Well, locking in that you can't sell for | 01:32:06 |
| 9 | less than what you paid for it is modeled | 01:32:09 |
| 10 | as a put option, so I think the proceeds | 01:32:12 |
| 11 | from the market sale, plus the -- I would | 01:32:18 |
| 12 | have to think about that. I'm not sure | 01:32:25 |
| 13 | whether you include the amount they receive | 01:32:27 |
| 14 | in the put option or not as part of the | 01:32:28 |
| 15 | sales proceeds. I'd have to think about | 01:32:32 |
| 16 | that, but we're still trying to calculate how | 01:32:33 |
| 17 | much was received from the sale. | 01:32:37 |
| 18 | Q. Is it fair to say, though, that in order to | 01:32:37 |
| 19 | apply this methodology that you put forth | 01:32:40 |
| 20 | in Paragraph 19, we need to look at the | 01:32:43 |
| 21 | contract? | 01:32:45 |
| 22 | MR. SPEAR: Objection, incomplete | 01:32:47 |
| 23 | hypothetical, calls for speculation. | 01:32:48 |
| 24 | A. I think the trading records would suffice | 01:32:50 |
| 25 | just as they would for any other investor. | 01:32:52 |

Page 118

| | | |
|---|---|---|
| 1 | The trading records say how much he or | 01:32:56 |
| 2 | she received when they sold the XRP and | 01:33:00 |
| 3 | then how much they received pursuant to | 01:33:03 |
| 4 | the put option. I think that would be in | 01:33:05 |
| 5 | the trading records, or that could certainly | 01:33:07 |
| 6 | be a claims administrator question, did you | 01:33:09 |
| 7 | receive additional compensation subsequent | 01:33:12 |
| 8 | pursuant to that sale. That's the kind of | 01:33:16 |
| 9 | thing claims administrators handle all the | 01:33:19 |
| 10 | time. | 01:33:22 |
| 11 | Q. Isn't what your opinion here expressing | 01:33:23 |
| 12 | is that the claims administrator would | 01:33:23 |
| 13 | follow this formula? | 01:33:29 |
| 14 | A. Right. And to measure the amount received | 01:33:29 |
| 15 | for the sale, I would think for the vast | 01:33:32 |
| 16 | majority of class members would be a | 01:33:37 |
| 17 | straightforward reading of the confirmation | 01:33:38 |
| 18 | ticket or the trading records for the small | 01:33:42 |
| 19 | minority or one-offs that might have received | 01:33:47 |
| 20 | compensation in a different way. That could | 01:33:51 |
| 21 | be a question that the claims administrator | 01:33:54 |
| 22 | asked, did you receive additional | 01:33:54 |
| 23 | compensation for the sale. It could be a | 01:33:54 |
| 24 | straightforward question asked by the claims | 01:33:54 |
| 25 | administrator in a questionnaire attached | 01:34:02 |

Page 119

| | | |
|---|---|---|
| 1 | to the claim form, is this all the | 01:34:05 |
| 2 | compensation you received for selling this | 01:34:07 |
| 3 | asset or did you receive additional | 01:34:09 |
| 4 | compensation somewhere else in some other | 01:34:11 |
| 5 | way. I think this is the job the claims | 01:34:15 |
| 6 | administrators are comfortable performing | 01:34:18 |
| 7 | and typically do. | 01:34:21 |
| 8 | Q. If a claims addministrator did that, would | 01:34:21 |
| 9 | that claims administrator be deviating from | 01:34:25 |
| 10 | the formula laid out in Paragraph 19? | 01:34:27 |
| 11 | A. Not at all. Well, only to the extent that | 01:34:31 |
| 12 | it says at time of sale. So what I wrote | 01:34:33 |
| 13 | here is what applies to the -- what you're | 01:34:38 |
| 14 | doing is an exercise to try to look for | 01:34:44 |
| 15 | hypotheticals that possibly don't even exist | 01:34:48 |
| 16 | that would add complexity to the formula. | 01:34:53 |
| 17 | And if these hypotheticals do exist, it's | 01:34:56 |
| 18 | easy to modify this formula so it's all | 01:34:59 |
| 19 | common for all class members, but takes into | 01:35:02 |
| 20 | account very peculiar complexities such as | 01:35:05 |
| 21 | you received your payment two different, | 01:35:08 |
| 22 | on two different dates or multiple dates. | 01:35:10 |
| 23 | Q. What is your basis for expressing that | 01:35:13 |
| 24 | this hypothetical that I'm describing is | 01:35:18 |
| 25 | aberrant or so unusual? | 01:35:20 |

Page 120

| | | |
|---|---|---|
| 1 | A. Because the whole idea of exchange trading | 01:35:23 |
| 2 | or trading even on the ledger is that | 01:35:28 |
| 3 | you're trading in a fungible manner, that | 01:35:32 |
| 4 | your trades are just like other people's | 01:35:35 |
| 5 | trades and they're standardized, the terms | 01:35:38 |
| 6 | are standardized. It's only, you know -- | 01:35:43 |
| 7 | even over-the-counter trades are usually | 01:35:47 |
| 8 | standardized, but over-the-counter it's | 01:35:49 |
| 9 | possible to have customized features, but | 01:35:52 |
| 10 | because they're customized, over-the-counter | 01:35:58 |
| 11 | trading in a security tends to be much, | 01:36:00 |
| 12 | much lower in volume, if it exists at all, | 01:36:05 |
| 13 | but in a customized way. Standardization | 01:36:09 |
| 14 | allows for marketplaces to handle volume, | 01:36:13 |
| 15 | so the volume will predominantly be from | 01:36:17 |
| 16 | standardized trades. | 01:36:20 |
| 17 | Q. Do you have any basis to form a view as | 01:36:22 |
| 18 | to whether a use of a digital asset might | 01:36:27 |
| 19 | impact the frequency with which these types | 01:36:33 |
| 20 | of bilateral agreements might exist? | 01:36:37 |
| 21 | MR. SPEAR: Objection, form. | 01:36:41 |
| 22 | A. I didn't entirely understand your question. | 01:36:44 |
| 23 | Q. You've expressed a view that -- I was | 01:36:47 |
| 24 | describing a contract before that had what | 01:36:52 |
| 25 | you characterized as put option and you | 01:36:55 |

Page 121

31 (Pages 118 - 121)

```
 1   expressed the view that that sounds          01:36:58
 2   aberrant or unusual to you.  So my question   01:37:00
 3   to you is whether you have a basis to         01:37:03
 4   understand whether it would actually not      01:37:06
 5   be so aberrant with respect to transactions   01:37:07
 6   involving a digital asset that has use.       01:37:11
 7           MR. SPEAR:  Objection, form.          01:37:15
 8      Objection, calls for speculation.          01:37:17
 9   A.  You're saying that if the asset has some  01:37:22
10      sort of use, then customized peculiar      01:37:25
11      features of the trans -- there may be more 01:37:31
12      frequent customized peculiar features to   01:37:34
13      the transaction, is that the question?  And 01:37:37
14      you're asking whether I agree with that or 01:37:39
15      not?                                       01:37:41
16   Q.  Yes.                                      01:37:42
17           MR. SPEAR:  Objection, scope.         01:37:43
18      Objection, calls for speculation.          01:37:53
19   A.  What I do know is that exchange trading is 01:37:57
20      facilitated by standardization and exchange 01:38:03
21      trading is where volume tends to be most.  01:38:07
22      So most trading would be standardized.  It's 01:38:15
23      certainly possible in an over-the-counter  01:38:21
24      transaction for there to be some odd       01:38:24
25      customized features.                       01:38:27
```
Page 122

```
 1           Getting specifically to your          01:38:29
 2   question, would there be more odd customized  01:38:30
 3   features when the digital asset has other     01:38:33
 4   uses?  It's something I would have to study   01:38:36
 5   further.  I just don't know as I sit here     01:38:40
 6   now.                                          01:38:43
 7   Q.  Sitting here today, do you know what      01:38:43
 8      percentage of XRP transactions occur on    01:39:15
 9      exchanges as compared to the ledger or     01:39:21
10      other sources?                             01:39:24
11   A.  Well, I don't want to say I have no idea.  01:39:27
12      I do want to point out whether it's ledger 01:39:35
13      trading or exchange trading, it's still    01:39:37
14      going to be standardized.  If it's ledger  01:39:40
15      plus exchange versus over-the-counter, based 01:39:43
16      on economic principles, I would surmise    01:39:51
17      that exchange and ledger is far greater than 01:39:55
18      over-the-counter in terms of the number    01:40:01
19      of trades.  Beyond that, it's something I  01:40:03
20      can research.  I don't have the answer to it, 01:40:08
21      more precise answer sitting here now.      01:40:12
22   Q.  If you turn to Page 8, bottom of the page, 01:40:15
23      Page 8 of your report which is Exhibit 1,  01:40:46
24      documents and other information considered. 01:40:51
25   A.  Okay.                                     01:40:53
```
Page 123

```
 1   Q.  What does this exhibit reflect?           01:40:53
 2   A.  Documents that I assembled and considered 01:40:57
 3      in the course of arriving at the opinions  01:41:03
 4      expressed in this report and writing this  01:41:06
 5      report.                                     01:41:08
 6   Q.  Is there anything that you considered in  01:41:09
 7      the course of arriving at the opinions     01:41:15
 8      expressed in your report that's not reflected 01:41:19
 9      here in Exhibit 1?                          01:41:21
10   A.  I don't think so.                          01:41:22
11   Q.  There are two bullets here towards the bottom 01:41:23
12      that describe daily XRP price and volume   01:41:31
13      data.  Can you explain what those are?     01:41:41
14   A.  These are databases of XRP price and volume 01:41:46
15      data for the periods 2013 through 2018 from 01:41:47
16      two different sources, CoinMarketCap and   01:41:50
17      CoinGecko.                                  01:41:57
18   Q.  And you obtained that data online from those 01:41:58
19      websites?                                   01:42:02
20   A.  I obtained that data from counsel.         01:42:03
21   Q.  Did you look at -- not on this list or    01:42:05
22      any trading records, did you look at any   01:42:10
23      trading records in considering the opinion 01:42:13
24      expressed in your report?                  01:42:17
25   A.  I did look at trading records for Mr. Sostack 01:42:22
```
Page 124

```
 1      subsequent to writing this report.  I      01:42:25
 2      think there was some reference to trading  01:42:29
 3      records in the complaint itself, but beyond 01:42:31
 4      that, no.                                   01:42:33
 5   Q.  Okay.  How about documents or other       01:42:33
 6      information concerning exchange rates between 01:42:41
 7      digital assets and U.S. dollar, did you look 01:42:46
 8      at any such document or other information  01:42:51
 9      in considering the opinions expressed in this 01:42:53
10      report?                                     01:42:56
11   A.  You mean between like Bitcoin and dollars  01:43:00
12      and Tether and dollars?                    01:43:04
13   Q.  Correct.                                   01:43:06
14   A.  I remember I was confident the data exists. 01:43:07
15      That may have been in the CoinMarket and   01:43:19
16      CoinGecko data just to satisfy my interest 01:43:22
17      in knowing whether that kind of data exists. 01:43:27
18   Q.  You previously testified that Bloomberg has 01:43:29
19      such data?                                  01:43:36
20   A.  Right, but I looked at Bloomberg after     01:43:37
21      writing the report, confirming what I      01:43:40
22      believed to be the case when I was writing 01:43:43
23      the report.                                 01:43:45
24   Q.  I see.  So at the time you wrote the report, 01:43:45
25      you at minimum had a belief that that type 01:43:48
```
Page 125

32 (Pages 122 - 125)

| | | |
|---|---|---|
| 1 | of data would be available? | 01:43:51 |
| 2 | A. Yes. | 01:43:52 |
| 3 | Q. And you're unsure -- I don't want to put | 01:43:53 |
| 4 | words in your mouth, but you're unsure as | 01:43:53 |
| 5 | to whether you'd actually checked | 01:43:58 |
| 6 | CoinMarketCap.com or CoinGecko.com for such | 01:44:00 |
| 7 | information prior to -- | 01:44:06 |
| 8 | A. I remember I was confident that I was | 01:44:06 |
| 9 | right, and I was right. I don't remember | 01:44:10 |
| 10 | where I got that confidence from, whether | 01:44:11 |
| 11 | it was from CoinMarketCap, CoinGecko or | 01:44:14 |
| 12 | any of the articles here, or just things I | 01:44:18 |
| 13 | had seen previously and not specifically | 01:44:21 |
| 14 | attached to this case but in the course of | 01:44:24 |
| 15 | keeping abreast of the markets. | 01:44:26 |
| 16 | Q. Any other documents or information that | 01:44:28 |
| 17 | you considered in arriving at the report | 01:44:40 |
| 18 | beyond what's listed here in Exhibit 1 and | 01:44:42 |
| 19 | what we've just discussed? | 01:44:44 |
| 20 | A. I don't believe so. | 01:44:46 |
| 21 | Q. So you've been retained by the plaintiff | 01:44:47 |
| 22 | in this case to serve as an expert, right? | 01:44:53 |
| 23 | A. Yes, to provide analysis and arrive at | 01:44:59 |
| 24 | conclusions based on that analysis, explain | 01:45:02 |
| 25 | those conclusions to the court and you. | 01:45:04 |

Page 126

| | | |
|---|---|---|
| 1 | That's the engagement. | 01:45:08 |
| 2 | Q. And you state in your report that you | 01:45:10 |
| 3 | provided expert analysis in more than | 01:45:12 |
| 4 | 150 cases, is that right? | 01:45:15 |
| 5 | A. That's right. | 01:45:16 |
| 6 | Q. You're being paid by the hour for the work | 01:45:16 |
| 7 | that you're performing in this case? | 01:45:19 |
| 8 | A. Yes. | 01:45:21 |
| 9 | Q. At a rate of $950 an hour, is that right? | 01:45:21 |
| 10 | A. Correct. | 01:45:26 |
| 11 | Q. Does that rate change depending on the type | 01:45:26 |
| 12 | of work that you're doing? | 01:45:28 |
| 13 | A. No. | 01:45:29 |
| 14 | Q. Is there a different rate for appearance at | 01:45:29 |
| 15 | a trial or deposition? | 01:45:34 |
| 16 | A. No. I do want to point out just for | 01:45:35 |
| 17 | completeness of the record that I also | 01:45:38 |
| 18 | receive compensation for the people that | 01:45:39 |
| 19 | work under me as the firm is paid, and | 01:45:42 |
| 20 | then I receive money from the firm. So | 01:45:46 |
| 21 | it's not just my hours. It's also the | 01:45:50 |
| 22 | hours of the people that work for me on | 01:45:52 |
| 23 | this case. | 01:45:53 |
| 24 | Q. I see. The plaintiff is paying an hourly | 01:45:53 |
| 25 | rate for your time and on top of that an | 01:45:56 |

Page 127

| | | |
|---|---|---|
| 1 | hourly rate for the time of your staff? | 01:45:59 |
| 2 | A. That's right. | 01:46:01 |
| 3 | Q. How many hours would you estimate that | 01:46:01 |
| 4 | you've worked on this case so far? | 01:46:03 |
| 5 | MR. SPEAR: Objection, scope. | 01:46:07 |
| 6 | You're asking in relation to this report | 01:46:13 |
| 7 | or for -- I mean, we also have an expert | 01:46:15 |
| 8 | period coming up for -- | 01:46:17 |
| 9 | MR. MICHAELSON: So far, so far in | 01:46:18 |
| 10 | this case. | 01:46:20 |
| 11 | MR. SPEAR: Okay. Go ahead. | 01:46:20 |
| 12 | A. I don't know. I just don't recall. There | 01:46:22 |
| 13 | are records for this and I can venture a | 01:46:27 |
| 14 | guess. | 01:46:30 |
| 15 | Q. Can you ballpark it? | 01:46:30 |
| 16 | A. Prior to preparation for the deposition? | 01:46:32 |
| 17 | Q. Up to today. | 01:46:36 |
| 18 | A. I would guess 50 hours, in the neighborhood | 01:46:38 |
| 19 | of 50 hours, but I just don't recall. And | 01:46:43 |
| 20 | I just want to caveat that answer with it | 01:46:45 |
| 21 | may not be precise. It's an estimate. It | 01:46:48 |
| 22 | may not even be close, but it's a reasonable | 01:46:57 |
| 23 | ballpark. | 01:47:01 |
| 24 | Q. Broadly speaking, you receive income from | 01:47:01 |
| 25 | your job as a professor? | 01:47:04 |

Page 128

| | | |
|---|---|---|
| 1 | A. That's right. | 01:47:05 |
| 2 | Q. You also receive income from your work as | 01:47:06 |
| 3 | an expert witness? | 01:47:09 |
| 4 | A. Yes. | 01:47:10 |
| 5 | Q. More broadly, that latter category, you | 01:47:11 |
| 6 | receive income through your work at | 01:47:16 |
| 7 | Crowninshield, right? | 01:47:18 |
| 8 | A. That's right. I own the company. | 01:47:19 |
| 9 | Q. Right. | 01:47:20 |
| 10 | A. Okay. | 01:47:20 |
| 11 | Q. Give me a ballpark on a percentage basis | 01:47:23 |
| 12 | over the last five years, what percentage of | 01:47:24 |
| 13 | your income would you say has come from | 01:47:27 |
| 14 | Crowninshield as compared to your teaching? | 01:47:29 |
| 15 | A. It varies from year to year, but averaging | 01:47:38 |
| 16 | over the last five years, approximately | 01:47:41 |
| 17 | 80 percent from consulting work, could be | 01:47:44 |
| 18 | as high as 90 in some years, but between 80 | 01:47:49 |
| 19 | and 90. | 01:47:53 |
| 20 | Q. Okay. So in the course of this expert work, | 01:47:54 |
| 21 | you've issued reports, correct? Is that for | 01:47:58 |
| 22 | testimony, correct? | 01:48:02 |
| 23 | A. Conduct analysis, conduct research, supervise | 01:48:04 |
| 24 | the staff, help manage the firm, right, | 01:48:06 |
| 25 | write reports, offer opinions based on the | 01:48:13 |

Page 129

33 (Pages 126 - 129)

1  analysis.                          01:48:15
2  Q. Has any of the cases in which you've served   01:48:16
3     as an expert witness, has the opposing   01:48:18
4     counsel moved to disqualify you under   01:48:21
5     Daubert?                        01:48:26
6  A. Yes.                            01:48:26
7  Q. How many times?                 01:48:26
8  A. It seems to be a run-of-the-mill tactic to   01:48:30
9     at least try, so it's very frequently.   01:48:32
10 Q. Okay.  And have opposing counsel ever   01:48:36
11    succeeded in disqualifying you as an expert   01:48:47
12    under Daubert?                   01:48:48
13 A. Yes, once.  In over 150, maybe 200 cases it   01:48:48
14    has happened exactly once.        01:48:55
15 Q. And what year was that?          01:48:56
16 A. Apparently, it was longer ago than four   01:49:26
17    years ago.  I don't know how much longer   01:49:29
18    ago than four years ago it was.  I say that   01:49:31
19    because I'm looking at my Exhibit 3 and   01:49:34
20    the name of the case is not there.  That   01:49:38
21    can't be.  Wait a minute.  I guess it was   01:49:44
22    longer ago than four years ago.   01:50:02
23 Q. I see you're referring to Exhibit 3 of your   01:50:05
24    report?                         01:50:09
25 A. Yes.                            01:50:09
                                    Page 130

1  Q. Page 18 of the report?           01:50:10
2  A. Yes.                            01:50:11
3  Q. And this is titled Testimony Provided in   01:50:11
4     the Last Four Years?             01:50:14
5  A. Right.                          01:50:15
6  Q. Did you prepare this Exhibit 3?   01:50:15
7          MR. SPEAR:  Objection to form.   01:50:22
8  A. Yes and no.  We keep a running updated   01:50:23
9     version of this on the computers at the   01:50:28
10    office, so I added to it and other people   01:50:31
11    have added to it.                01:50:35
12 Q. Were you involved in a decision as to why   01:50:38
13    the testimony would be, go back only four   01:50:42
14    years?                          01:50:47
15         MR. SPEAR:  Objection to form.   01:50:47
16 A. I thought that was the rules of the federal   01:50:48
17    -- I've been told in the past that the rules   01:50:52
18    for federal, expert reports in federal cases   01:50:54
19    is that testimony over the last four years   01:50:59
20    is what's required, and that's what I always   01:51:01
21    provide in reports in federal cases.   01:51:04
22 Q. Is it your testimony that in understanding   01:51:08
23    that that's what the federal rules require   01:51:18
24    is why this testimony cutoff is the four-year   01:51:21
25    mark?                           01:51:27
                                    Page 131

1  A. That's why I provided four years and not   01:51:27
2     five.  Ten years of reports were provided   01:51:31
3     because you asked for them.       01:51:33
4  Q. In what case was the Daubert successful?   01:51:35
5  A. It was a FreddieMac securities litigation.   01:51:39
6          MR. MICHAELSON:  Why don't we take   01:52:14
7     a quick break and go off the record.   01:52:16
8          VIDEOGRAPHER:  The time is 1:52.   01:52:18
9     We're off the record.            01:52:20
10         (Break taken)               01:52:21
11         VIDEOGRAPHER:  We are back on the   02:02:57
12    record.  The time is 2:03.        02:03:39
13 BY MR. MICHAELSON:                  02:03:44
14 Q. So, Dr. Feinstein, I want to refer you to   02:03:44
15    Page 4 of your report which has the   02:03:47
16    conclusion of your opinion at the very top.   02:03:49
17    Do you see that?                 02:03:52
18 A. Okay.  Yes.                      02:03:52
19 Q. And your opinion expresses the view that   02:03:52
20    damages here can be computed using a common   02:03:58
21    methodology for all class members, right?   02:04:01
22 A. Yes.                            02:04:02
23 Q. And that class is comprised of purchasers   02:04:03
24    of XRP, correct?                 02:04:05
25 A. The class, the proposed class is detailed   02:04:09
                                    Page 132

1     in the complaint, not here.       02:04:12
2  Q. What's your understanding of who the class   02:04:13
3     members are?                    02:04:16
4  A. Purchasers and individuals who still -- no.   02:04:17
5     Can I see the complaint?  I think it says   02:04:27
6     purchasers who have suffered a loss and   02:04:29
7     purchasers who still hold XRP is what it   02:04:33
8     says.                           02:04:36
9  Q. Okay.  So it's comprised of purchasers?   02:04:36
10 A. Right, right.                    02:04:38
11 Q. Maybe not all purchasers, to be purchased   02:04:40
12    for gain you might be excluded, but --   02:04:42
13 A. Correct.                        02:04:44
14 Q. But everybody who is in the putative class   02:04:45
15    is a purchaser?                  02:04:49
16 A. I'll take your word for it.        02:04:50
17 Q. You're not expressing a view in your opinion   02:04:52
18    on what constitutes a purchaser of XRP,   02:04:55
19    correct?                        02:04:58
20 A. Correct.                        02:04:58
21 Q. So that could include someone who received   02:04:59
22    XRP as a gift, but maybe not, is that --   02:05:04
23 A. I can't answer that.             02:05:07
24 Q. You can't answer that.  Could it include   02:05:08
25    someone who received XRP as a form of   02:05:12
                                    Page 133

34 (Pages 130 - 133)

1  compensation for work?                02:05:15
2  A.  We just established that I'm not the one    02:05:17
3      who would be determining who the purchasers  02:05:19
4      are.  That's really someone else's           02:05:21
5      determination.                                02:05:30
6  Q.  In preparing for this report, did you give   02:05:30
7      thought to the range of different types of   02:05:33
8      people who might be purchasers --            02:05:35
9  A.  Yes.                                          02:05:36
10 Q.  -- in this class?                             02:05:36
11 A.  Yes.                                          02:05:37
12 Q.  And is it your view that your opinion as     02:05:37
13     to the damages methodology could be applied  02:05:40
14     to any of them?                               02:05:42
15 A.  Yes.                                          02:05:43
16 Q.  Including those who received it as a gift?   02:05:43
17 A.  Yes.  Well, yeah, I think so.  I mean, I     02:05:47
18     don't think I considered when I was writing  02:05:54
19     the report if someone who received it as a   02:05:55
20     gift -- first, I definitely did not spend    02:05:56
21     time thinking about whether someone who      02:06:03
22     received XRP as a gift would be considered a  02:06:05
23     purchaser.  I did not think about that when  02:06:09
24     I was writing the report, period.            02:06:16
25 Q.  I'm trying to understand.  Is it your        02:06:19
                                          Page 134

1      testimony that your report contains a         02:06:24
2      methodology that can be applied to all        02:06:28
3      purchasers, but it's not within the scope     02:06:30
4      of your report to opine on who purchasers     02:06:35
5      are or not?                                    02:06:39
6  A.  I think that's fair to say.  It's not my     02:06:43
7      professional expert opinion what the law     02:06:45
8      says about who would be considered a         02:06:48
9      purchaser, but it is my expert opinion that  02:06:51
10     whatever the law does decide, a common        02:06:55
11     methodology can be applied to calculate the  02:06:59
12     damages for everyone in the class.            02:07:03
13 Q.  Is it fair to say that in preparing for the  02:07:10
14     report, you didn't think through how the     02:07:14
15     methodology might apply to all variations of  02:07:17
16     purchasers?                                    02:07:20
17         MR. SPEAR:  Objection, misstates         02:07:21
18     his testimony.                                 02:07:22
19 A.  No, I think I did.  I think I considered     02:07:29
20     anybody who received it, received XRP in     02:07:34
21     exchange for some consideration and either   02:07:36
22     held that XRP or ultimately sold it in       02:07:40
23     exchange for some sort of consideration, that  02:07:44
24     it's possible to calculate their damages in  02:07:48
25     a straightforward arithmetic way that's      02:07:49
                                          Page 135

1      common for all such people.                  02:07:52
2  Q.  So now it's your testimony that you did      02:07:54
3      consider in preparing this methodology       02:08:00
4      everybody who received it in exchange for    02:08:03
5      some consideration?                           02:08:06
6          MR. SPEAR:  Objection, misstates         02:08:08
7      his testimony.                                 02:08:09
8  A.  I didn't spell out a taxonomy of all the    02:08:10
9      different kinds of ways there are to acquire  02:08:14
10     it, but I did consider that if you received  02:08:17
11     it in exchange for consideration and sold    02:08:19
12     it in exchange for consideration, that       02:08:22
13     there's a straightforward common way to      02:08:24
14     calculate your damages if you suffered a     02:08:26
15     loss.                                         02:08:28
16 Q.  But with respect to, for example, someone   02:08:28
17     who acquires it for a cup of coffee, how     02:08:32
18     would your methodology apply?                 02:08:39
19         MR. SPEAR:  Objection, asked and         02:08:41
20     answered.                                     02:08:42
21 A.  I did explain that before.  You would value  02:08:44
22     what the XRP was at the time they conveyed   02:08:47
23     it, gave it up -- rather, received it, and   02:08:53
24     what was the value of the XRP at the time    02:08:59
25     that you disposed of it, or currently if you  02:09:02
                                          Page 136

1      still have it.                               02:09:05
2  Q.  Using what exchange rate?                     02:09:06
3          MR. SPEAR:  Objection, asked and         02:09:09
4      answered.                                     02:09:10
5  Q.  This is an XRP exchange rate, not a Bitcoin  02:09:11
6      exchange rate.                                02:09:16
7  A.  Right.  You can use -- Bloomberg has a       02:09:16
8      reputable, well-regarded database of exchange  02:09:18
9      rates, daily exchange rates, even exchange   02:09:26
10     rates intraday.                               02:09:30
11 Q.  Would you use the rate at 4:00 p.m. or the   02:09:33
12     rate at the time of the acquisition of XRP?  02:09:38
13         MR. SPEAR:  Objection, asked and         02:09:40
14     answered.  Objection, scope.  Go ahead.      02:09:42
15 A.  For my example I used 4:00 p.m. rates, but   02:09:43
16     there's a determination that one would need  02:09:46
17     to use an intraday rate, then you could do   02:09:48
18     that, you could commonly for all class       02:09:51
19     members.                                      02:09:54
20 Q.  Did you consider before submitting this     02:09:58
21     report how this methodology expressed in     02:10:01
22     Paragraphs 19 and 20 would apply to          02:10:05
23     individuals who obtained XRP in exchange     02:10:07
24     for their work?                               02:10:10
25         MR. SPEAR:  Objection, asked and         02:10:12
                                          Page 137

35 (Pages 134 - 137)

Page 138

```
 1    answered.                       02:10:13
 2 A. Not specifically, but generally I would   02:10:15
 3    say yes, because I did consider -- that is   02:10:20
 4    a transaction and I did consider potential   02:10:25
 5    class members that would be receiving --   02:10:29
 6    well, receiving XRP and then providing XRP   02:10:33
 7    in the course of some economic transaction.   02:10:39
 8 Q. Okay.  So in 19 and 20, both of them, both   02:10:43
 9    formulas you start with a dollar amount paid   02:10:49
10    at time of purchase, and you're saying that   02:10:52
11    applies to -- I'll just strike that.  So is   02:10:58
12    it fair to say that in Paragraphs 19 --   02:11:04
13    strike that.                    02:11:11
14        In Paragraph 17 you've got the   02:11:13
15    statutory formula for damages which uses   02:11:14
16    the term "consideration."  You covered   02:11:18
17    consideration paid for such security with   02:11:22
18    interest thereon.  Do you see that?   02:11:24
19 A. Paragraph 17?                   02:11:27
20 Q. Yes, of your report.            02:11:27
21 A. Yes.                          02:11:30
22 Q. Do you see where it says that?   02:11:30
23 A. Yes.                          02:11:35
24 Q. We discussed this, you're interpreting the   02:11:36
25    term "consideration" to mean the value paid   02:11:40
```

Page 139

```
 1    for such security, correct?  Not the form?   02:11:43
 2 A. Well, I am expressing today, here -- it's   02:11:48
 3    not in the report -- actually, it is in   02:11:53
 4    the report.  I am expressing that I believe   02:11:55
 5    the best way to interpret the word   02:11:57
 6    "consideration" and the way that's most   02:11:59
 7    consistent with the statute is that it means   02:12:01
 8    the value of the consideration, not the   02:12:03
 9    form of the consideration, and I explain   02:12:05
10    that part of that comes from the fact that   02:12:07
11    the very next clause is "with interest   02:12:09
12    thereon," which means that we should be   02:12:12
13    translating the form to a value.  But I   02:12:15
14    also express -- and this is very important,   02:12:19
15    I said it was important earlier today and   02:12:21
16    it's important now, that if there's some   02:12:23
17    legal determination that the word   02:12:25
18    "consideration" should be the form of the   02:12:28
19    consideration and not the value of the   02:12:30
20    consideration, then that, too, would be,   02:12:31
21    there would be one common methodology that   02:12:37
22    can be applied for all class members given   02:12:40
23    that interpretation, given that alternative   02:12:44
24    interpretation.                 02:12:46
25 Q. Okay.                         02:12:46
```

Page 140

```
 1 A. Meaning that for whichever way you interpret   02:12:48
 2    the word "consideration," the conclusion   02:12:51
 3    in Paragraph 16 won't change.  The formulas   02:12:53
 4    in 19 and 20 might in a very straightforward   02:12:58
 5    way, but the conclusion in Paragraph 16 would   02:13:01
 6    not change.                     02:13:05
 7 Q. Okay.  And with respect to how you propose   02:13:05
 8    to calculate the value of the consideration   02:13:11
 9    paid, it's your opinion that if someone   02:13:14
10    used Bitcoin, that that should be converted   02:13:22
11    to U.S. dollars using the Bloomberg rate as   02:13:24
12    of 4:00 p.m. on the date of the transaction?   02:13:28
13        MR. SPEAR:  Objection, misstates   02:13:29
14    prior testimony.                02:13:30
15 A. I explained that you could do that and   02:13:31
16    that would be a reasonable approach, but I   02:13:36
17    haven't determined yet whether that's the   02:13:37
18    only approach or best approach.  That would   02:13:40
19    certainly be a reasonable way to proceed.   02:13:42
20 Q. What if Ethereum was used to purchase XRP?   02:13:44
21    What would you use to translate Ethereum   02:13:49
22    into U.S. dolalrs?              02:13:49
23 A. That database exists, too, database of   02:13:53
24    Ethereum exchange rates.        02:13:58
25 Q. On Bloomberg?                   02:13:58
```

Page 141

```
 1 A. I believe so.                   02:14:00
 2 Q. What if Tether was used?         02:14:00
 3 A. I know that the Tether exchange rates do   02:14:08
 4    exist on Bloomberg.  I looked them up.   02:14:12
 5 Q. And what if someone used, for example, a   02:14:14
 6    foreign currency like a Swiss franc and   02:14:16
 7    went directly into XRP, then what would   02:14:21
 8    you use?                        02:14:23
 9 A. Using exchange rates to convert the form   02:14:24
10    of the consideration to the value of the   02:14:27
11    consideration in dollars is a straightforward   02:14:29
12    arithmetic exercise that would be common   02:14:33
13    for all class members.          02:14:35
14 Q. Do you have an understanding sitting here   02:14:36
15    today of how many different types of assets   02:14:37
16    can be transferred for XRP?     02:14:40
17 A. Yes.                          02:14:44
18 Q. How many?                      02:14:45
19 A. It's many.  That's the nature of digital   02:14:46
20    assets, that that's also why there are   02:14:50
21    databases that provide matrices of exchange   02:14:54
22    rates.                          02:15:01
23 Q. Do you know if, for example, Bloomberg   02:15:01
24    provides an exchange rate for each of the   02:15:05
25    assets that can be used to purchase or sell   02:15:07
```

36 (Pages 138 - 141)

Page 142

```
1    XRP?                              02:15:13
2  A. I don't know for sure.  I know that the    02:15:14
3    important ones, the common ones it does.    02:15:16
4    I know sometimes there's an announcement    02:15:21
5    that Bloomberg has taken on a new currency   02:15:23
6    so that would tell me at points in time     02:15:27
7    it might be omitting a particular currency,  02:15:28
8    but I know that in this industry the exchange 02:15:32
9    rate data exists.  Bloomberg is a good       02:15:35
10    source, but if something is missing from    02:15:40
11    Bloomberg, there are other sources that can 02:15:41
12    be used.                          02:15:44
13 Q. Do you agree that where XRP is purchased    02:15:44
14    or sold pursuant to a bilateral contract,   02:15:50
15    that it may be necessary to see the contract 02:15:55
16    to apply the damages formula you set forth  02:15:57
17    in Paragraphs 19 and 20?          02:16:00
18       MR. SPEAR:  Objection, asked and        02:16:02
19    answered.  Objection, calls for speculation. 02:16:02
20    Objection, incomplete hypothetical.  Go     02:16:05
21    ahead.                           02:16:08
22 A. I'm really not sure.  I know that this is   02:16:11
23    the kind of detail that claims administrators 02:16:14
24    are proficient at handling.  They know what  02:16:16
25    questions to ask and how to facilitate the   02:16:20
```

Page 143

```
1    administration of claims.  That's their    02:16:24
2    job.  I wasn't asked for that level of     02:16:28
3    detail.  What I was asked to -- what I     02:16:33
4    presented in my report is a common damage  02:16:37
5    methodology.  Some of the implementation   02:16:41
6    might require the expertise of a claims    02:16:49
7    administrator, but it would be following   02:16:52
8    the model that's presented in my report.   02:16:54
9  Q. When you refer to the model in your report, 02:16:55
10    you're referring to Paragraphs 19 and 20?  02:16:58
11 A. Well, 17 and -- 19 and 20 as they are or   02:17:00
12    perhaps 19 and 20 as modified based on legal 02:17:05
13    determinations.                  02:17:09
14 Q. Okay.  I have no further questions.        02:17:09
15       MR. SPEAR:  I got nothing.           02:17:22
16       VIDEOGRAPHER:  The time is 2:17.       02:17:25
17    We're off the record.              02:17:27
18       (Whereupon the deposition was         02:17:29
19    concluded at 2:17 p.m.)
20
21
22
23
24
25
```

Page 144

```
1       I declare under penalty of perjury that the
2   foregoing is true and correct.  Subscribed at
3   _____, _____, this_____day of
4   _____, 20____.
5
6
7
8
9       _____
10       WITNESS NAME
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 145

```
1   COMMONWEALTH OF MASSACHUSETTS)
2   SUFFOLK, SS. )
3
4
5       I, Jeanette Maracas, Registered
    Professional Reporter and Notary Public in
    and for the Commonwealth of Massachusetts,
6   do hereby certify that there came before me
    on the 20th day of January, 2023, at 9:41
7   a.m., the person hereinbefore named, who
    was by me duly sworn to testify to the truth
8   and nothing but the truth of his knowledge
    touching and concerning the matters in
9   controversy in this cause; that he was
    thereupon examined upon his oath, and his
10   examination reduced to typewriting under my
    direction; and that the deposition is a true
11   record of the testimony given by the witness.
12
    I further certify that I am neither
13   attorney or counsel for, nor related to or
    employed by, any attorney or counsel employed
14   by the parties hereto or financially
    interested in the action.
15
16       In witness whereof, I have hereunto
    set my hand this 25th day of January, 2023.
17
18
19
20       _____
         Notary Public
         My commission expires 7/29/27
21
22
23
24
25
```

1 ANDREW MICHAELSON, ESQ.
2 AMICHAELSON@KSLAW.COM
3                JANUARY 25, 2023
4 RE: RIPPLE LABS, INC. LITIGATION
5 JANUARY 20, 2023, STEVEN P. FEINSTEIN, JOB NO. 5655291
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, notating the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25
                                              Page 146

1 __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, notating the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9 _X_ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 147

1 RE: RIPPLE LABS, INC. LITIGATION
2 JANUARY 20, 2023, STEVEN P. FEINSTEIN, JOB NO. 5655291
3      E R R A T A  S H E E T
4 PAGE____ LINE____ CHANGE_____
5 _____
6 REASON_____
7 PAGE____ LINE____ CHANGE_____
8 _____
9 REASON_____
10 PAGE____ LINE____ CHANGE_____
11 _____
12 REASON_____
13 PAGE____ LINE____ CHANGE_____
14 _____
15 REASON_____
16 PAGE____ LINE____ CHANGE_____
17 _____
18 REASON_____
19 PAGE____ LINE____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 WITNESS               Date
25
                                              Page 148

**[& - 90067]**

| & |
|---|
| **&**  1:22 2:6 4:16 4:18,19 5:9 146:23 147:9 |

| 0 |
|---|
| **06753**  1:6 |

| 1 |
|---|
| **1**  1:1 75:21 123:23 124:9 126:18 147:1 |
| **1.1**  87:23 91:11 92:13 98:10 99:9 |
| **10**  1:2 3:9 24:22,23,25 27:1,24 29:11 31:22 32:11,11 34:17 53:14 81:12 |
| **100**  99:20 |
| **10036**  2:9 |
| **10:35**  44:1 |
| **10:51**  44:4 |
| **11/18/22**  3:10 |
| **1185**  2:8 |
| **11:43**  81:5 |
| **11:59**  81:9 |
| **12**  75:19,21 |
| **12:29**  103:15 |
| **148**  1:1 |
| **150**  127:4 130:13 |
| **16**  53:17 58:3 64:21 65:3 |

66:7 93:16 140:3,5
**160**  74:18
**17**  75:17 83:22 93:11 95:7,11 95:24 138:14 138:19 143:11
**18**  28:4 131:1
**19**  3:8 56:14,21 65:4,9 66:16 67:2 77:6 90:22 93:15 110:7 111:24 114:21 117:11 118:20 120:10 137:22 138:8 138:12 140:4 142:17 143:10 143:11,12
**1900**  2:3
**1987**  34:23
**1996**  28:17
**1998**  31:22
**1:12**  104:3
**1:52**  132:8

| 2 |
|---|
| **2**  32:17 |
| **20**  1:23 4:5 56:15,22 65:4,9 66:17 67:2 77:6 81:13 83:24 84:6 85:23 90:22 93:15 110:7 111:24 137:22 |

138:8 140:4 142:17 143:10 143:11,12 144:4 146:5 148:2
**200**  130:13
**2008**  32:22
**2010**  39:5
**2013**  34:18 124:15
**2014**  35:1,8 91:9
**2018**  124:15
**2022**  28:4
**2023**  1:23 4:5 145:6,16 146:3 146:5 148:2
**2025.520**  146:9 146:12
**20th**  145:6
**21**  100:5 101:23
**21498**  145:19
**24**  3:10 21:4 109:21
**25**  146:3
**25th**  145:16
**2:03**  132:12
**2:17**  143:16,19

| 3 |
|---|
| **3**  20:3 130:19 130:23 131:6 |
| **30**  147:1 |
| **360**  10:14,20 11:1 |

| 4 |
|---|
| **4**  23:15 24:18 53:15,18 132:15 |
| **48**  21:3 |
| **4:00**  109:1,8,25 137:11,15 140:12 |
| **4:18**  1:6 |

| 5 |
|---|
| **5**  3:4 24:21 56:3 76:1 81:12 |
| **50**  128:18,19 |
| **5655291**  146:5 148:2 |

| 6 |
|---|
| **6**  21:9,10,14,16 22:20 25:2 |
| **62**  3:9 28:1 |

| 7 |
|---|
| **7/29/27**  145:20 |

| 8 |
|---|
| **8**  123:22,23 |
| **80**  129:17,18 |

| 9 |
|---|
| **9**  1:2 3:8 19:10 19:11,14 25:1 |
| **90**  33:25 34:1 99:21 129:18 129:19 |
| **90067**  2:4 |

Page 1

**[950 - alternatively]**

**950**   127:9
**99**   34:2

**a**

**a.m.**   1:24 4:6
44:1,4 145:7
**aberrant**
116:21 120:25
122:2,5
**ability**   41:13
**able**   21:5 36:10
76:21 77:10,16
113:11
**above**   146:6
**abreast**   10:4
16:25 17:24
43:16 126:15
**absolutely**
93:16
**absorbed**   38:18
**academic**   17:5
43:17
**accepted**   31:17
**access**   21:5
**accommodate**
6:12 90:25
**account**   17:18
39:21 42:12
52:4 69:25
82:22 120:20
**accountant**
98:14
**accounting**
98:15
**accounts**   39:23

**acquire**   59:18
136:9
**acquired**   73:1
86:9 110:10
112:13,19
**acquires**
136:17
**acquisition**
137:12
**act**   75:20
**action**   1:6 11:2
11:6,15 12:3
44:7 45:19
52:22 53:13
75:15 104:6,14
105:2 109:18
145:14
**actions**   1:12
11:8 23:19
**actual**   71:3
82:22,23 83:14
88:7 105:25
**actually**   27:2
44:22 60:21
70:17 73:14
122:4 126:5
139:3
**adaptation**
56:16
**add**   114:23
120:16
**added**   131:10
131:11
**additional**
115:4 117:3

118:4 119:7,22
120:3
**addministrator**
120:8
**address**   38:9
**addresses**   36:3
38:16
**adjudicated**
11:8
**adjudicating**
89:1
**adjustment**
84:21
**administration**
143:1
**administrator**
53:2 117:4
119:6,12,21,25
120:9 143:7
**administrators**
119:9 120:6
142:23
**advance**   110:24
**advise**   102:8
**advising**   102:7
**affect**   69:15
98:11 110:1
113:24
**affected**   36:2
**afternoon**
104:1
**ago**   7:13 14:17
15:20,21,24
16:19 21:3,4
130:16,17,18

130:18,22,22
**agree**   30:10
42:11,15 62:12
62:16 70:21
72:21 100:1
106:19,23
109:23 122:14
142:13
**agreement**
55:25 107:12
**agreements**
121:20
**ahead**   6:24 9:6
21:13 23:25
29:18 38:11
71:8 82:20
85:7 90:18
95:21 102:5
118:1 128:11
137:14 142:21
**alan**   12:8,19
104:17
**alex**   8:19
**allegations**   50:5
**allocation**
33:20
**allow**   68:17
**allows**   42:7
121:14
**alternative**
65:21 66:1
84:17 89:12
96:13 139:23
**alternatively**
89:3

Veritext Legal Solutions
866 299-5127

**[alternatives - article]**

| | | | |
|---|---|---|---|
| **alternatives** | **analyze** 37:15 | **appearance** | 112:19 115:25 |
| 73:7,8 | 115:22 | 127:14 | 117:20 118:19 |
| **altogether** | **andrew** 2:7 | **appearances** | 135:15 136:18 |
| 68:23 | 4:15 5:9 146:1 | 2:1 | 137:22 142:16 |
| **american** 86:11 | **angeles** 2:4 | **appeared** 29:18 | **applying** 37:20 |
| 94:24 | **announcement** | **appearing** | 53:5 85:22 |
| **americas** 2:8 | 37:7,12 142:4 | 19:22 146:18 | **approach** |
| **amichaelson** | **announcements** | 147:7 | 140:16,18,18 |
| 2:10 146:2 | 36:11,23 | **appears** 43:17 | **appropriate** |
| **amount** 17:21 | **answer** 6:3,9 | **apple** 49:19 | 65:24 69:13 |
| 18:19 31:18 | 26:4,7 29:19 | **applicable** 1:16 | 94:25 95:2 |
| 57:10 76:3,13 | 31:6 37:23 | **application** | 97:25 98:15 |
| 78:11,12 81:22 | 38:3,4 54:12 | 35:19 36:25 | 107:5 114:24 |
| 82:1 85:24 | 59:5,8,11 71:14 | 53:22 97:7 | 115:8 |
| 108:16 110:8 | 74:16 91:25 | 107:24 | **appropriately** |
| 110:22 111:3 | 108:5 113:11 | **applications** | 80:23 |
| 111:10,10 | 114:7 123:20 | 78:19,25 | **approximately** |
| 114:22,25 | 123:21 128:20 | **applied** 56:1 | 16:17 18:23 |
| 115:4 117:15 | 133:23,24 | 59:17 62:10 | 31:21 129:16 |
| 117:17 118:13 | **answered** | 74:15 109:17 | **area** 29:20 33:4 |
| 119:14 138:9 | 82:19 86:22 | 134:13 135:2 | 89:22 |
| **amounts** 100:6 | 94:2 95:21 | 135:11 139:22 | **areas** 11:7,11 |
| **ana** 2:14 4:20 | 102:5,22 | **applies** 22:17 | 28:25 29:6 |
| **analysis** 22:18 | 136:20 137:4 | 22:18 41:19 | **arguments** 56:4 |
| 29:20 33:2 | 137:14 138:1 | 84:16 120:13 | **arithmetic** |
| 36:1 72:9 | 142:19 | 138:11 | 53:23 84:1,2 |
| 106:10,16 | **answers** 49:25 | **apply** 29:22,25 | 135:25 141:12 |
| 113:5 116:22 | **anybody** 54:23 | 35:5,9,11 36:12 | **arizona** 9:17 |
| 117:3 126:23 | 135:20 | 37:9 38:6,14,19 | **arrive** 126:23 |
| 126:24 127:3 | **apart** 41:2 | 38:20,23,25 | **arrived** 63:8 |
| 129:23 130:1 | **apparently** | 41:24 54:20 | 64:9 |
| **analyst** 31:9,19 | 130:16 | 55:20 58:18 | **arriving** 124:3 |
| **analysts** 33:1 | **appear** 18:10 | 61:8,12 75:14 | 124:7 126:17 |
| **analytics** 63:8 | 19:25 | 110:9 111:11 | **article** 18:11 |
| | | 111:25 112:12 | 35:24 36:3 |

**[article - believe]**

37:20,25 38:12
63:1
**articles** 10:1,7
10:13,18,19,25
11:4 12:10
29:13,14,17,18
29:22,23,25
43:18 126:12
**articulated**
29:25
**aside** 6:11,18
7:19 8:2 9:9,19
11:21 13:8,9
18:2 39:12
55:9 95:14
**asked** 19:24
33:19 35:3
60:23 69:2
82:19 86:21
94:1 95:20
96:3 102:4
111:9 119:22
119:24 132:3
136:19 137:3
137:13,25
142:18 143:2,3
**asking** 6:16 9:3
9:4 20:22,22,23
47:9 61:17
71:9 91:5,24
93:20,21 97:9
98:17,18,19,21
107:22,25
112:2 115:23
115:25 122:14

128:6
**assembled**
124:2
**assess** 73:12
113:13
**assesses** 37:17
**assessment**
73:15 99:12
**asset** 37:10,11
38:21 47:13,20
47:23 49:19,20
51:14 61:3,25
79:12 109:20
120:3 121:18
122:6,9 123:3
**assets** 17:20
18:18,20,21,24
23:6 30:6,11
36:13,20 38:14
38:15,19 40:19
41:9,10,10,15
41:17,18,20,23
41:25 42:2,2,4
42:7,10,13,14
43:5,13 49:16
50:23 61:7,19
63:10 73:13
79:14 95:18
102:1,2 125:7
141:15,20,25
**assign** 27:8
**assisted** 9:7
**associated** 16:5
**assume** 98:20
115:15

**assumption**
96:14
**attached**
119:25 126:14
**attending** 4:20
**attention** 20:3
21:14 23:14
32:10 81:12
**attorney**
145:13,13
**authored** 22:23
35:8
**available** 49:1
65:8 72:19
82:25 100:8
101:3 102:9,25
114:13 126:1
**avenue** 2:3,8
**averaging**
129:15
**awarded** 31:12
31:13
**aware** 20:14,24
51:17

**b**

**b** 3:5 147:1
**babson** 28:15
28:18 39:9
**back** 13:17
16:19 34:21
44:3,6 58:3
68:7,8 80:8
81:8 92:4,13
104:2,5 131:13
132:11

**background**
42:23
**baked** 86:17
106:7
**ballpark**
128:15,23
129:11
**based** 76:24
82:6 105:17
107:17 116:16
123:15 126:24
129:25 143:12
**baseline** 95:16
**basis** 33:3 34:4
40:13 47:2
92:18 95:10
96:13 107:18
120:23 121:17
122:3 129:11
**batch** 39:6
**bearing** 48:15
50:2,10,13
80:16
**beat** 24:17
**began** 13:25
**beginning**
34:22
**behalf** 1:15
**belief** 125:25
**beliefs** 99:15
**believe** 7:12,21
11:18 12:13
14:23,25 21:11
22:3,10,19 25:8
26:1 27:5 42:1

**[believe - buying]**

62:7 65:19
66:4,15 68:14
73:10 76:19
83:16 84:18
86:12 97:13
99:10 109:9
126:20 139:4
141:1
**believed** 125:22
**bell** 103:9
**best** 23:9 67:18
67:24 68:12
69:13 70:4,7,16
72:4,13,19 90:2
111:19 139:5
140:18
**bettencourt**
8:19
**better** 54:13
67:20 68:1
77:3 83:8
97:18 108:2
**beyond** 24:19
68:22 123:19
125:3 126:18
**bid** 73:21,24,25
74:1,4,8,24
75:1 86:18,25
87:1 106:1,2,6
**bilateral** 51:9
51:12,18 52:5
112:20 121:20
142:14
**bit** 7:15 27:4
42:5,19,22,24

43:4,7 58:1
81:25 89:9
90:11
**bitcoin** 23:10
26:3,12,14,24
49:17 57:2,8,8
57:10,12,14,23
62:17,24 63:22
63:23 66:24
67:10 69:21,22
69:24 70:1,2,25
71:2,5 72:6,13
73:1 76:11,12
77:14 82:4,12
82:13,16 85:15
85:16 86:2,9
87:9,11,21,23
87:23 88:11,12
88:13,13,16,17
91:8,9,10,11,15
91:16,19,20,21
92:5,14 95:4,18
97:4,6 98:10,10
99:8,9 100:21
100:23 101:7,9
101:14,14,15
108:8,10,17,20
108:21,25
109:15,24
125:11 137:5
140:10
**bitcoins** 92:6
92:13
**blockchain**
21:20 22:3

23:3 25:5,11,16
25:23 40:2
49:5
**bloomberg**
63:6,7,9,14
64:16 67:12,13
67:21,23 71:6
72:16,17 73:3
73:11 82:22
103:3,5 108:20
108:23,24
109:6 125:18
125:20 137:7
140:11,25
141:4,23 142:5
142:9,11
**bockius** 1:22
**bond** 36:13
74:7
**bonds** 29:7
30:15,15,19
31:3 40:20
41:24 74:8
109:22
**bonus** 111:5
**boston** 1:22 4:7
9:16
**bottom** 32:12
32:15 123:22
124:11
**bought** 18:19
39:21 63:21
85:11 98:9
99:19

**box** 77:20
**bradley** 4:14
105:5
**break** 6:8,10
7:14 43:22,24
44:2 57:25
76:7 81:1,7
103:12,17
132:7,10
**brief** 15:12,13
**broadly** 29:1
128:24 129:5
**broker** 100:18
**brokerage** 53:4
**brookline**
32:25
**budd** 2:12 4:4
**bullets** 124:11
**bunch** 69:6
**burgeoning**
17:2
**bush** 24:17
**business** 10:9
14:24 32:17,21
33:11,13,15,22
34:11
**buy** 51:13
69:22 71:2
87:10,21 91:10
91:20 99:8
102:2
**buying** 26:20
69:20 95:5
100:15 115:20
115:21 116:6

[buys - charge]

| | | | |
|---|---|---|---|
| **buys** 106:14,14 | 96:15 107:10 | 14:21 15:18,24 | **caused** 36:7 |
| 115:16 | 108:6 116:24 | 16:3,8 18:15 | **caveat** 128:20 |

**c**

**c** 4:1
**ca** 2:4 146:9,12
146:20
**calculate** 30:16
30:18,24 31:2
42:7,9 47:1
54:20 59:25
65:16 66:12
67:4 76:22
77:11,12,21,23
78:4 85:24
88:6 92:25
94:6,7,23 96:4
99:2 106:15
108:15 111:9
112:23 114:2
114:14 115:24
116:2 117:12
118:16 135:11
135:24 136:14
140:8
**calculated** 47:2
51:25 53:13
54:24 68:20
86:14 96:6
98:2 106:11
**calculating**
40:15,18 41:2
42:13 51:6
52:18 65:11
74:11 75:19
81:15 83:8

**calculation**
51:2 52:11,22
54:17 62:21
68:19 72:23
74:6,6,12,21
80:13 101:25
102:6 105:4,7
105:21 111:22
**calculations**
94:15
**california** 1:4
86:12
**call** 51:19
**called** 1:15 5:2
35:15 37:25
115:3
**calls** 58:14 59:3
85:17 110:3
113:16 114:5
115:11 116:19
117:24 118:23
122:8,18
142:19
**cammer** 36:24
**candidate**
31:14
**candy** 77:20
**capture** 83:13
**captures** 90:2
**carefully** 12:4
**case** 7:6 8:21
9:13 10:6,11
11:17 12:1,6

19:7 20:17
28:4,10 32:8
33:20 39:17
40:14 41:2,20
44:13 46:8,11
46:14 47:14
48:23 50:6
53:13 59:12,13
62:8,12,15 74:7
75:16 80:18,18
84:14 87:4,20
91:18 92:20,21
104:12,12,24
104:24 105:6
106:17 110:21
125:22 126:14
126:22 127:7
127:23 128:4
128:10 130:20
132:4
**cases** 23:17
40:19 79:19,23
84:12 86:24
104:20 109:18
109:20 127:4
130:2,13
131:18,21
**categorically**
60:18
**category** 129:5
**cause** 74:13
145:9

**ccp** 146:9,12
**centralized**
50:9
**certain** 20:19
20:20 37:6
53:9 84:4
90:14 108:8,10
108:12 115:18
**certainly** 26:9
37:2 41:6 51:4
72:19 96:22
97:17 110:16
111:17 112:8
114:12 119:5
122:23 140:19
**certify** 145:6,12
**cfa** 31:7,8,9,12
31:20,23
**change** 36:5,7
37:12 70:19
112:6 127:11
140:3,6 148:4,7
148:10,13,16
148:19
**changed** 15:4
26:23
**characteristics**
37:3
**characterized**
121:25
**charge** 73:20
73:23 74:3

**[charged - common]**

| | | | |
|---|---|---|---|
| **charged**  74:9 | **clarification** | **clear**  15:16 | **come**  53:8 |
| 86:16 | 33:18 | 57:20 60:4 | 54:15 97:16,18 |
| **charges**  105:14 | **class**  25:3,6,7 | 64:17 86:15 | 129:13 |
| **chartered**  31:9 | 25:22 26:6 | **clearly**  79:8,18 | **comes**  18:13 |
| **check**  9:23 | 50:17 52:17,18 | **close**  21:8 | 139:10 |
| 13:21 14:18 | 52:22 53:13,19 | 128:22 | **comfortable** |
| 63:6 67:12 | 56:10,12 60:21 | **code**  146:9,12 | 120:6 |
| **checked**  126:5 | 60:23 61:13 | 146:19,20 | **coming**  128:8 |
| **choice**  69:12 | 62:10,22 64:6 | **coffee**  59:22 | **commencing** |
| 90:10,20 | 64:11 66:3 | 78:2,4,6 112:14 | 1:24 |
| **choose**  30:12 | 68:21,22 69:5 | 136:17 | **commission** |
| 64:23,25 | 69:16 71:15 | **coinbase**  16:14 | 73:23 75:3 |
| **chooses**  64:8 | 72:11 75:8,10 | 16:17,23 17:10 | 145:20 |
| **choosing** | 75:15 77:2 | 17:18 18:3,20 | **commissions** |
| 102:18 | 81:20 84:23,24 | 39:21 69:24 | 74:9 87:5,6 |
| **chosen**  91:19 | 85:13 89:9,14 | 74:3 | 106:4 |
| **circle**  44:6 | 93:19 102:21 | **coingecko** | **commodity** |
| **circling**  13:17 | 106:25 107:11 | 124:17 125:16 | 26:22,23 |
| **circumstances** | 109:18 110:1,2 | 126:11 | **common**  50:16 |
| 31:4 71:23 | 110:16 111:6 | **coingecko.com** | 50:18 51:25 |
| **cite**  18:12 63:1 | 117:12 119:16 | 126:6 | 52:16 53:19,20 |
| 95:25 96:1 | 120:19 132:21 | **coinmarket** | 54:1,5,21,25,25 |
| **cites**  22:12 | 132:23,25,25 | 125:15 | 58:5 59:16,24 |
| **civil**  1:6,17 | 133:2,14 | **coinmarketcap** | 61:12 64:5,11 |
| 146:19,20 | 134:10 135:12 | 124:16 126:11 | 64:22 66:2,11 |
| **claim**  120:1 | 137:18 138:5 | **coinmarketca...** | 69:4,16 70:20 |
| **claimant**  53:1,8 | 139:22 141:13 | 126:6 | 71:15 72:3,10 |
| 54:9,15 | **classes**  27:6 | **cold**  40:4,5 | 74:14,19 77:2 |
| **claimant's** | 28:11 | **collateral**  79:5 | 84:16,22 89:8 |
| 52:25 | **classwide**  47:2 | **colleague**  4:17 | 89:13 90:24 |
| **claims**  53:2,7 | 53:20 58:5 | 4:19 | 93:18 94:11,18 |
| 117:4 119:6,9 | 107:23 | **collect**  20:11 | 94:22 96:9,23 |
| 119:12,21,24 | **clause**  113:2,24 | 24:10 | 97:7,10,15,16 |
| 120:5,8,9 | 139:11 | **college**  9:16 | 97:19,22 |
| 142:23 143:1,6 | | 28:15,19 | 102:20 107:11 |

**[common - consistent]**

120:19 132:20
135:10 136:1
136:13 139:21
141:12 142:3
143:4
**commonly**
37:17 52:16
61:13 62:10,21
137:18
**commonwealth**
1:20 145:1,5
**communicati...**
6:17,19,24 9:9
15:9 45:15
90:12
**companies**  37:4
**company**  47:22
47:25,25 48:18
48:24 96:18
129:8
**compared**
123:9 129:14
**compensation**
59:1,18 110:22
111:2,5,16
119:7,20,23
120:2,4 127:18
134:1
**competing**
65:15
**complaint**  15:1
15:1,2 125:3
133:1,5
**complete**  5:25
27:2 85:21

96:8
**completed**
146:7,17 147:6
**completely**  6:9
**completeness**
127:17
**completion**
147:10
**complexities**
120:20
**complexity**
120:16
**comprised**
48:22 132:23
133:9
**computation**
42:24 63:16
87:3
**computed**
53:18 54:1,4
132:20
**computers**
131:9
**computing**  42:3
50:17
**conceivable**
87:8
**concentration**
28:25
**concepts**  37:8
38:19
**conceptual**
60:17
**concerning**
22:16,23 54:16

125:6 145:8
**concluded**
143:19
**conclusion**
53:16 58:15
59:4 64:21,22
65:2 93:15
132:16 140:2,5
**conclusions**
126:24,25
**conduct**  33:2
129:23,23
**confidence**
41:13 126:10
**confident**
125:14 126:8
**confirmation**
53:4 100:17,18
100:19,19
119:17
**confirmed**
14:14
**confirming**
125:21
**connection**
17:11,15 18:14
105:1,21
**consider**  67:16
112:6 136:3,10
137:20 138:3,4
**consideration**
52:8 55:16,22
56:25 57:5,6,10
57:15,17,18,19
57:21 61:10,11

63:20 64:3,4,14
64:15,19,24
65:1,5,6 66:20
66:22 67:4,6,7
68:2 69:9
70:11 73:16
76:2,8,10,11,17
76:18,19,20
77:7,8,13,18,20
82:3 83:9 86:1
87:15 88:3,4
90:6,7,21 91:1
93:3 94:8,9
114:20 135:21
135:23 136:5
136:11,12
138:16,17,25
139:6,8,9,18,19
139:20 140:2,8
141:10,11
**considerations**
75:14
**considered**  7:4
26:5 62:7
80:21,21 112:4
123:24 124:2,6
126:17 134:18
134:22 135:8
135:19
**considering**
124:23 125:9
**consistent**  6:22
50:18 68:14
70:18 84:11
139:7

Veritext Legal Solutions
866 299-5127

**[constitutes - courtroom]**

| | | | |
|---|---|---|---|
| **constitutes** 133:18 | 142:14,15 | 30:4 34:5,25 | 85:8 90:8,9,12 |
| **consultant** 10:10 | **contracts** 51:10 51:12,18 | 37:13,22 38:2 39:2,24,25 45:7 | 90:13 124:20 130:4,10 |
| **consulting** 32:24 129:17 | **contractual** 52:4 116:14 | 46:9 52:12 53:11 54:2 | 145:13,13 146:18,21 |
| **consumers** 17:8 | **contrary** 59:12 | 60:8,10,11 | 147:7 |
| **consummate** 49:12 | **control** 40:1,5 | 61:21 63:24 | **count** 60:19 |
| **contact** 146:9 | **controversy** 145:9 | 65:11 66:4,17 66:25 67:3 | 80:14 94:21,22 |
| **contained** 52:10 | **conversion** 64:19 67:3 | 76:14 77:9 81:17 84:10,19 | **counter** 51:20 51:22,24 121:7 |
| **contains** 21:7 135:1 | 68:3 | 85:16 86:7,11 89:23 106:8,9 | 121:8,10 122:23 123:15 |
| **contemplates** 77:25 78:9 | **convert** 61:9 67:5 82:6 | 108:14 115:1 117:23 125:13 | 123:18 |
| 79:8 | 141:9 | 127:10 129:21 | **counterparty** 58:10 80:16 |
| **content** 10:18 12:14 | **converted** 69:21 82:12 | 129:22 132:24 133:13,19,20 | 113:3 116:14 116:17 |
| **contentious** 11:7,12,15 | 91:7 93:24 95:3,17 140:10 | 139:1 144:2 | **country** 85:4,5 86:6 |
| **context** 30:21 57:20 | **converting** 68:1 **converts** 85:14 | **corrections** 146:14,15 147:3,4 | **couple** 27:7 **coupled** 42:4 |
| **continues** 34:19 | **conveyance** 112:25 | **correlated** 61:6 | 42:24 |
| **contract** 26:20 26:21 33:3 | **conveyed** 86:4 112:24 114:15 | **correlates** 61:18,24 | **course** 10:8,9 22:6 39:9 |
| 34:4 51:13 52:5,11,19 | 136:22 | **correlation** 61:2,4,14 | 124:3,7 126:14 129:20 138:7 |
| 112:20 113:1,8 113:10,13,20 | **copy** 27:24 75:18 | **cost** 73:2 75:5 106:2,4 | **courses** 28:24 89:19 |
| 113:21,23 114:2,10,12,16 | **corporate** 29:2 29:3,3 | **counsel** 4:11,21 5:3 6:17,20 | **court** 1:3 4:23 5:20 6:4 55:24 |
| 115:3,13,15,16 117:20 118:2 | **correct** 5:18 8:7,11 14:3 | 7:11 8:8,13 9:9 9:19 13:9 15:3 | 70:21 88:2,25 94:24 96:21 |
| 118:21 121:24 | 18:8 22:16,24 22:25 23:2,5 | 20:16,25 23:23 24:4,6,11,12 | 126:25 |
| | 25:6,12,17,18 | | **courtroom** 5:18 |

Veritext Legal Solutions
866 299-5127

[courts - decide]

| | | | |
|---|---|---|---|
| **courts** 84:13 96:2,17 | 37:21 38:7,9,24 39:1,10,14,18 40:9 41:3 | 42:4,9 47:1,1 50:17 51:7 52:18 53:12,18 | 125:19 126:1 142:9 |
| **cover** 43:15 | **cup** 59:22 78:2 | 53:21 54:1,20 | **database** 68:25 |
| **coverage** 11:2 | 78:3,6 112:14 | 54:24 58:6 | 72:7,15,17 |
| **covered** 22:7 24:6 56:5 59:6 81:25 138:16 | 136:17 | 62:21 65:11,16 66:12 67:19 | 73:12 102:9,24 137:8 140:23 |
| | **curiosity** 14:20 | 68:21 70:17 | 140:23 |
| | **curious** 44:12 | 74:7,11,12 | **databases** |
| **covering** 10:18 | **currencies** 23:8 | 75:15,19,22 | 68:17 103:4 |
| **covid** 35:16 36:8 | 93:25 95:4,6 100:2 109:22 | 76:5 81:15,20 86:12,13,20 | 124:14 141:21 |
| **created** 48:4 | **currency** 86:10 | 88:24 94:6,24 | **date** 4:5 67:19 70:14 89:16 |
| **creativity** 27:13 | 94:18,18 96:6 | 96:4,5,16 | 118:4 140:12 |
| **credential** 31:10 | 141:6 142:5,7 | 105:22 107:10 108:7 110:6 | 146:16 147:5 148:24 |
| **cross** 3:2 | **currently** 136:25 | 117:12 132:20 | **dated** 28:3 |
| **crowninshield** 8:16 32:22 | **customized** 121:9,10,13 | 134:13 135:12 135:24 136:14 | **dates** 37:7 120:22,22 |
| 39:13 129:7,14 | 122:10,12,25 | 138:15 142:16 | **daubert** 130:5 |
| **crypto** 16:5 18:2 34:11 | 123:2 | **dan** 8:19 104:7 | 130:12 132:4 |
| 35:9 36:25 | **cutoff** 131:24 | **daniel** 12:7 | **day** 39:7 109:2 |
| 39:23 40:16 | **cv** 1:6 | **data** 52:25 54:8 | 109:7,10,18,21 |
| 50:23 73:19 | **d** | 54:8,9,10,11,22 | 109:25 144:3 |
| 74:2 100:1 | | 54:25 55:2,3,9 | 145:6,16 |
| **cryptocurren...** | **d** 3:1 4:1 | 55:10,10,11 | **dead** 97:14 |
| 30:11 | **daily** 124:12 | 62:9 63:9,14 | **deal** 40:24 41:6 |
| **cryptocurrency** | 137:9 | 67:18,20,24 | 41:11 |
| 17:4 21:19 | **damage** 42:23 | 69:14 82:21,24 | **deals** 74:10 |
| 22:2 23:1 25:4 | 52:22 66:2 | 101:10,11,13 | **debate** 50:1 |
| 25:10,15,23 | 69:4,16 70:20 | 108:20,23,25 | **decentralized** |
| 27:16,17 29:14 | 74:14 84:17 | 109:6,7,19 | 50:9 |
| 29:20 30:1,3,5 | 87:3 93:19 | 114:13 124:13 | **decide** 59:15 |
| 30:25 31:25 | 96:9 102:6,20 | 124:15,18,20 | 67:19 89:3 |
| 34:8 35:4,20 | 143:4 | 125:14,16,17 | 135:10 |
| 36:15,17,19 | **damages** 23:17 40:18 41:8,9,14 | | |

**[decided - digital]**

decided  45:25
102:13,13
decision  24:3
92:18 131:12
decisions  29:4
98:23
declarations
23:16
declare  144:1
defendants
1:16 2:9 4:16
5:3,10 19:15
48:16 68:18
defense  12:23
19:13 44:17
defer  87:7
defining  24:2
definitely  43:7
134:20
definition
27:20
degree  115:19
delivered
110:19 112:9
demonstrated
41:19
denominated
98:8
depending
71:23 77:16
88:8 91:4
106:24 127:11
depends  21:24
24:1,2 30:21
31:3 40:11

41:5 99:16
deposition  1:14
3:8 4:8 6:21
11:21 13:23
14:1 15:19
19:3,15,23 21:9
127:15 128:16
143:18 145:10
146:19,22,24
147:8,10
depreciated
88:14,16 92:4
derivatives
26:18 29:7
30:15
describe  6:20
28:21 34:14
47:7 52:15
124:12
described  37:9
97:10,22 118:7
describing
11:11 37:4
66:10 84:22
115:14 118:6
120:24 121:24
description  3:7
designation
31:7,8,20
designations
32:19
detail  142:23
143:3
detailed  132:25

details  18:16
52:14 71:10
102:12,13,18
113:10,19,21
114:9 117:1
determination
24:4,12 58:17
60:19 64:1,10
65:23 67:23
72:8 75:4
76:16 77:1
88:2 89:15
93:10 95:15
96:5,12 97:12
97:23 98:3
107:12 110:14
111:20 134:5
137:16 139:17
determinations
76:23 143:13
determine  36:1
36:10 53:10
determined
48:15 72:14,18
75:7,9 100:7
107:4,8 140:17
146:18,22
147:7
determining
53:21 58:5
134:3
developments
16:25 17:25
deviating  120:9

dictated  107:9
differ  72:24
99:3
difference
106:18,20
114:18 116:25
differences
30:9,10,14
different  27:4
31:1 49:15
60:15 63:12
66:13,21 68:11
69:19 70:22
71:21,22 73:7,8
73:9,11,13,17
73:18 74:6
84:14 85:3
87:17 89:10
90:25 92:23
93:14 94:19
96:10,22 116:6
116:23 119:20
120:21,22
124:16 127:14
134:7 136:9
141:15
differently
93:12
difficult  31:15
digital  17:20
18:18,20,21,23
23:6 36:13,19
38:13,15,19
41:9,14,17,20
41:24 42:3,6,10

**[digital - education]**

| | | | |
|---|---|---|---|
| 42:12,14 43:5 | **distinguishing** | **dollar**  64:24 | **dozen**  7:25 |
| 43:13 47:13,20 | 49:24 | 65:1 67:6 | **dr**  4:8 5:8 |
| 47:23 49:16 | **district**  1:3,4 | 81:22 82:1,3,16 | 81:11 132:14 |
| 50:23 61:3,7,19 | **divided**  29:1 | 85:24 86:1,3 | **draft**  8:24 |
| 61:25 63:10 | **dividends** | 92:12,16 95:16 | **drafted**  9:5 |
| 73:13 79:11 | 78:18,22,24 | 96:4,15 99:16 | **drafts**  9:2 |
| 95:4 121:18 | 80:19 | 99:17 101:4,8 | **duly**  5:4 145:7 |
| 122:6 123:3 | **division**  1:4 | 101:15 108:22 | **e** |
| 125:7 141:19 | 28:24 | 109:24 110:8 | **e**  3:1,5 4:1,1 |
| **direct**  3:2 5:6 | **docs**  7:23 | 111:10 112:23 | 146:9,12 147:1 |
| 20:2 21:14 | **document**  1:11 | 114:22,25 | 148:3,3,3 |
| 23:14 32:10 | 8:5 15:7 19:13 | 115:4 117:15 | **earlier**  14:16 |
| 81:11 | 19:18 20:3,8,10 | 125:7 138:9 | 89:21 139:15 |
| **direction** | 20:14 25:1 | **dollars**  57:3,22 | **earn**  78:20 79:2 |
| 145:10 | 28:5 125:8 | 57:22 63:20,24 | **earned**  55:21 |
| **directly**  49:12 | **documentation** | 64:4,15,20 | 80:11 94:10 |
| 141:7 | 15:2 22:12 | 66:21 67:3,11 | 114:23 |
| **disclose**  6:23 | 63:7 100:12,13 | 68:2,10 69:10 | **earnings**  36:23 |
| **discuss**  45:16 | 100:16 | 69:21 70:25 | **easy**  78:7 89:11 |
| **discussed**  9:2 | **documented** | 71:4 73:2 | 120:18 |
| 11:22 126:19 | 53:3 | 76:13 77:23,24 | **eclipse**  38:1,12 |
| 138:24 | **documents**  7:1 | 82:6,12 86:14 | **economic**  59:8 |
| **discussing**  15:8 | 7:2,3,7,15,17 | 88:20 92:19 | 59:9 72:9 |
| 15:10 | 7:19 8:1 13:5 | 93:23 94:7,8,9 | 76:24 92:1,2 |
| **discussion** | 19:16 20:4,11 | 94:11,25 95:2,3 | 93:20,21 |
| 45:21,23 | 20:19 21:22 | 95:9,10,13 98:8 | 123:16 138:7 |
| **dismiss**  7:21,22 | 23:22 48:8 | 100:24 101:7 | **economics**  22:8 |
| **disposed** | 101:24 123:24 | 101:12 102:3 | 76:24,25 93:8 |
| 136:25 | 124:2 125:5 | 108:22,25 | 94:12 95:23 |
| **disqualify** | 126:16 | 111:14 112:17 | 96:20 |
| 130:4 | **doing**  47:11 | 125:11,12 | **economist**  70:7 |
| **disqualifying** | 68:11 102:6,7 | 140:11 141:11 | 70:15 95:14,15 |
| 130:11 | 120:14 127:12 | **download**  45:8 | 97:13 117:3 |
| **distinctive** | **dolalrs**  140:22 | **downloaded** | **education** |
| 49:21 | | 45:11,12,13 | 41:12 |

Page 12

[effectively - excluded]

| | | | |
|---|---|---|---|
| **effectively** 43:1 | **entirely** 21:6 | **exact** 75:13 | 68:24 69:1,7,8 |
| **efficiency** 38:1 | 85:20,20 | **exactly** 45:20 | 69:12,14 70:3,4 |
| 38:13 | 121:22 | 68:23,25 89:1 | 70:7,8,13 71:3 |
| **efficient** 38:17 | **entitled** 36:22 | 130:14 | 71:21 73:4 |
| **either** 57:17 | **entity** 34:10 | **exam** 26:1,2,2,5 | 80:2 82:7,15,15 |
| 77:3 135:21 | **equals** 81:21 | 26:11,17 | 83:10 85:5 |
| **elaborate** 24:5 | **equities** 37:8 | **examination** | 86:4,16 100:15 |
| **else's** 134:4 | **errata** 146:14 | 5:2,6 145:10 | 100:18 101:6,8 |
| **emphasize** | 146:16 147:3,5 | **examined** 5:4 | 101:9,16,16 |
| 90:23 92:8 | **esq** 2:3,7,7,8,14 | 145:9 | 102:1,9,24 |
| **employed** | 146:1 | **example** 18:10 | 105:9,11 |
| 145:13,13 | **essentially** 7:6 | 18:12 26:3 | 108:24 109:24 |
| **employee** 58:25 | 35:25 47:3 | 36:6 42:17 | 111:12 112:13 |
| 110:23,24 | 48:21 49:5 | 49:16 50:9 | 112:21 121:1 |
| **employees** | 96:14 | 52:20 55:19 | 122:19,20 |
| 58:23,24 | **established** | 63:21 67:10 | 123:13,15,17 |
| **employer** | 59:12 134:2 | 68:18 69:25 | 125:6 135:21 |
| 110:12 | **estate** 79:6,7 | 73:1 74:3 | 135:23 136:4 |
| **encompass** | **estimate** 128:3 | 76:10,12 77:13 | 136:11,12 |
| 60:12 61:1,24 | 128:21 | 78:2 85:3,14 | 137:2,5,6,8,9,9 |
| 62:4 67:23 | **ethe** 82:5 | 100:20 101:14 | 137:23 140:24 |
| **encompassed** | **ethereum** 18:25 | 110:11 113:2 | 141:3,9,21,24 |
| 117:23 | 19:1 23:12 | 136:16 137:15 | 142:8 |
| **encompassing** | 39:22 49:17 | 141:5,23 | **exchange's** |
| 89:14 | 66:24 67:10 | **examples** 65:4 | 101:8 |
| **endeavored** | 140:20,21,24 | 65:5,14 | **exchanged** |
| 24:10 | **evaluated** 93:4 | **exams** 31:15 | 51:17,23 |
| **engage** 79:5 | **event** 35:16,25 | **excerpt** 93:11 | **exchanges** 16:6 |
| **engagement** | 36:4,16 | 95:7 | 16:11 39:23 |
| 45:25 46:3 | **events** 10:18 | **exchange** 18:2 | 62:6,14,18,25 |
| 47:17 127:1 | 36:10 | 34:8 53:3 | 73:19 74:2,18 |
| **enthusiasts** | **everybody** | 58:11 59:22 | 78:2 123:9 |
| 100:1 | 133:14 136:4 | 60:1 61:11 | **exclude** 116:10 |
| **entire** 68:21 | **evidence** 54:5,6 | 63:13 64:16 | **excluded** 75:10 |
| | 54:12 62:19,23 | 65:7,8 67:8 | 75:10 80:14,24 |

Veritext Legal Solutions
866 299-5127

**[excluded - features]**

133:12
**exclusive** 83:1
**exclusively**
33:4
**exercise** 117:5
120:14 141:12
**exhibit** 3:8,9,9
7:4 19:10,11,14
19:17 20:10
24:23,25 25:1
26:9 27:1,24
28:1 31:22
32:11,17 53:14
81:12 123:23
124:1,9 126:18
130:19,23
131:6
**exhibits** 1:2
**exist** 69:12
120:15,17
121:20 141:4
**exists** 62:9
83:18 121:12
125:14,17
140:23 142:9
**expected** 86:13
**experience** 17:7
17:22 18:18
32:18,21 40:18
40:22,23,25
41:1,7,11 42:20
42:22 72:25
**experienced**
59:25 91:14
98:12 99:11,13

**experiences**
106:8
**experiment**
17:22
**expert** 3:9 28:2
33:6,7,16 39:16
39:17 40:14
44:6 90:14
93:9 104:6
126:22 127:3
128:7 129:3,20
130:3,11
131:18 135:7,9
**expertise** 41:7
41:19 42:8
143:6
**expertly** 43:1
**experts** 12:2,5
33:1 45:18
59:14 87:7
88:25 96:21
**expires** 145:20
**explain** 35:7,22
54:13 77:19
107:16 124:13
126:24 136:21
139:9
**explained**
140:15
**explaining**
83:19
**explains** 35:24
36:9
**explanation**
58:2

**explicated**
71:11
**explicit** 87:6
**explore** 36:14
91:3 95:11
96:24
**express** 53:15
58:4 62:2
75:12 139:14
**expressed**
11:19 46:14
50:4 52:5
60:24 61:8,15
76:9 84:5
85:22 111:24
121:23 122:1
124:4,8,24
125:9 137:21
**expresses**
132:19
**expressing**
119:11 120:23
133:17 139:2,4
**extent** 9:1
58:25 87:1
120:11
**external** 48:13
73:17

**f**

**facilitate** 49:8
142:25
**facilitated**
122:20
**facilitates** 49:7

**fact** 68:18
96:16 139:10
**factor** 74:21
80:12 98:3
99:11 115:7,8
**factored** 75:2
86:19 113:4
**factors** 36:24
75:14
**facts** 52:14
71:13
**fair** 20:2 33:22
41:1 61:23
65:17 91:13
113:12,23
118:18 135:6
135:13 138:12
**fairly** 109:17
**fallen** 88:19
92:12,16 99:25
**falls** 29:21
**familiar** 5:14
19:17 94:16
103:6 105:13
**far** 7:6 34:21
97:13 123:17
128:4,9,9
**farrell** 12:8,19
46:13,16
104:17
**farrell's** 46:23
**favorably**
107:1 110:2
**features** 49:15
49:21,24 121:9

Veritext Legal Solutions
866 299-5127

**[features - formula]**

122:11,12,25
123:3
**federal** 1:17,22
23:18 86:11
131:16,18,18
131:21,23
147:1,8,9
**fee** 74:1,23 75:1
86:17,17,19,19
87:2 105:17
106:5,6
**feel** 93:6
**feels** 93:7
**fees** 73:20 74:3
74:10,21 79:13
79:21 105:13
105:21
**feinstein** 1:15
3:3,10 4:8 5:1
5:8 19:16 28:3
81:11 132:14
146:5 148:2
**fell** 87:18
**fewer** 14:6,8
**field** 17:3 22:8
29:3,8,12
**fifo** 106:16,21
106:25 107:6
107:14,23
108:1
**filed** 12:2 15:12
**filing** 13:24
14:16
**final** 26:2

**finance** 9:14
17:24 22:10,16
22:17,18,23
28:23,24,24,25
29:1,3,8,12,21
29:22,24 31:17
33:5 35:6
51:19 89:17,25
91:6 98:20
**financial** 10:4
17:1,5 18:16
22:8 31:9,11,19
32:22 33:2
38:20 41:9,10
42:2,4 43:16
115:22
**financially**
145:14
**find** 116:8
**fine** 5:11 15:12
93:12
**finish** 6:2
**firm** 9:17 32:24
64:23 127:19
127:20 129:24
**first** 5:4,16
16:23 17:9
19:14 27:25
35:14,15 60:17
63:25 70:23
78:8 95:25
110:8,13 112:5
112:7 134:20
**fischel** 12:7,12
44:9,11,14

46:10 47:6
104:7
**fit** 27:20
**five** 12:10 14:8
14:9 129:12,16
132:2
**focus** 21:9
28:22 33:3
36:18 68:25
**focused** 39:10
39:18 47:12
**focuses** 89:25
98:20
**focusing** 22:21
34:24 39:16
**folks** 8:20
**follow** 90:14
119:13
**following**
116:17 143:7
**follows** 5:5
34:15 146:8
**foregoing** 144:2
**foreign** 84:25
85:4,5 86:6,9
141:6
**foreigner** 85:3
**forensic** 33:5
**fork** 102:16,18
102:19
**form** 35:12
40:10,17 41:4
43:14 51:11
52:7 53:5
55:15 56:25

57:18 58:8
59:1 61:9 64:2
64:25 65:6
66:23 67:5
70:11 73:5
74:24 76:18
77:17,18 82:18
83:5,15 84:1,3
84:7 85:6
87:15 88:3
95:20 100:13
100:16,17
104:13 120:1
121:17,21
122:7 131:7,15
133:25 139:1,9
139:13,18
141:9
**formed** 104:22
104:25
**forming** 46:8
**forms** 64:14
66:13 98:7
**formula** 51:6
53:6,10 54:21
55:18 56:3,4,15
56:16 57:15
61:8 65:21,23
66:1,9,19 81:19
83:24 84:2,5,20
84:23 93:13
96:15 114:21
117:11 119:13
120:10,16,18
138:15 142:16

[formulas - guys]

**formulas** 53:23 54:25 62:8,9 65:10,14,15,19 65:25 66:5,5,16 77:5 80:22,23 89:10,11 90:15 90:21 93:14 138:9 140:3
**forth** 54:16 64:18 81:14 118:19 142:16
**forward** 26:21 53:8 65:10
**forwards** 26:25 27:15
**found** 21:12
**founded** 32:24
**four** 19:17 39:5 109:11 130:16 130:18,22 131:4,13,19,24 132:1
**franc** 141:6
**francs** 85:15 95:13 97:2,3
**frcp** 147:1
**freddiemac** 132:5
**frequency** 37:5 121:19
**frequent** 122:12
**frequently** 130:9

**friday** 1:23
**front** 27:23
**full** 45:2
**fully** 21:7
**fungible** 121:3
**further** 67:16 112:7 123:5 143:14 145:12
**future** 26:20
**futures** 26:25 27:15

**g**

**g** 4:1
**gain** 59:25 63:16 72:24 74:21 80:13 83:14 90:3 91:14 98:2,4,6 98:11,13 99:2 99:11,13,16 105:6 106:15 113:6,15,25 114:3 115:9 133:12
**gained** 97:3,5
**geared** 37:7
**gemini** 18:12 18:13
**general** 10:5,9 11:24 22:8 37:14 38:23 41:22 71:6 82:15
**generally** 6:11 29:22,24 31:16

35:6 73:25 138:2
**getting** 45:10 45:14 102:1 112:11 123:1
**gift** 58:12,19 133:22 134:16 134:20,22
**gifted** 48:17
**give** 5:24 24:13 27:25 59:11 73:15 79:4 129:11 134:6
**given** 36:6 42:1 62:6,7,13,17 84:17 97:25 118:4 139:22 139:23 145:11
**gives** 41:13 42:7
**go** 5:12,13,14 6:24 9:6 21:13 23:25 29:18 34:21 38:11 71:7 81:3 82:19 85:7 90:18 95:21 97:4,13 101:2 102:5 118:1 128:11 131:13 132:7 137:14 142:20
**godfrey** 2:2 4:14

**goes** 107:24
**going** 6:14 7:14 16:19 20:21 43:20 47:10 54:24 58:3 76:6 77:21 83:2 97:1 123:14
**good** 5:8 32:14 59:21 60:2 67:13 78:3 79:7 103:5 112:14 142:9
**google** 49:20
**googled** 18:13
**graduate** 94:13
**gratuitous** 88:1
**great** 40:24 41:6,11
**greater** 123:17
**ground** 74:11
**groundrules** 5:12
**grounds** 108:5
**guardado** 2:14 4:21
**guess** 21:9 33:18 46:24 48:10 54:14 57:17 128:14 128:18 130:21
**guidance** 55:24
**guys** 39:6

Veritext Legal Solutions
866 299-5127

**[h - indicated]**

| h | | | |
|---|---|---|---|
| **h**  3:5 148:3 | **high**  46:23 47:7 | **hypotheticals** | **important** |
| **half**  7:25 | 129:18 | 114:9,11 | 42:11 56:20 |
| **hand**  145:16 | **higher**  88:17 | 116:22 120:15 | 83:12 92:8 |
| **handed**  19:13 | **hold**  87:10,22 | 120:17 | 139:14,15,16 |
| **handle**  119:9 | 91:10 133:7 | | 142:3 |
| 121:14 | **holder**  80:11 | **i** | **importing** |
| **handled**  146:8 | **holding**  69:25 | **idea**  121:1 | 95:10 |
| **handling** | 78:15 79:3,25 | 123:11 | **impression** |
| 142:24 | 92:11,15,17 | **identical**  83:2 | 112:6,7 |
| **hands**  51:18 | 99:23 | **identification** | **include**  55:23 |
| **happen**  87:14 | **holdings**  69:24 | 19:12 24:24 | 69:8 85:9,13 |
| 92:10 | **holds**  64:23 | 60:13 | 106:3 118:13 |
| **happened** | 65:3 | **identified**  90:16 | 133:21,24 |
| 109:4 130:14 | **honest**  21:2 | 90:17 | **included**  75:5,7 |
| **hard**  11:5,23 | **hour**  43:21 | **identifies**  28:2 | 75:8 87:3 |
| 73:10 78:4 | 127:6,9 | **identify**  60:23 | 106:1,2,5 |
| **heading**  34:15 | **hourly**  127:24 | **identifying** | 146:14 147:3 |
| **hear**  58:1 65:13 | 128:1 | 60:21 | **includes**  84:25 |
| 71:20 111:7 | **hours**  21:3,4 | **idiosyncracies** | 114:16 |
| **hearing**  54:14 | 109:21 127:21 | 36:19 42:6,12 | **including**  7:4 |
| **heimer**  9:12 | 127:22 128:3 | 42:20,25 43:5 | 7:17 134:16 |
| **held**  92:10 | 128:18,19 | 43:13 49:21,23 | **income**  76:4 |
| 135:22 | **house**  4:21 | 50:22 | 78:12,14,20 |
| **help**  5:13 8:22 | **hypothetical** | **imagine**  69:19 | 79:2,22,24 |
| 37:15 129:24 | 70:23 71:9,11 | 69:23 114:8,10 | 114:23 128:24 |
| **helpful**  45:24 | 71:12,18 73:9 | **immediately** | 129:2,6,13 |
| 46:2 58:1 65:9 | 85:19 88:6,22 | 71:2 | **incomplete** |
| **hereinbefore** | 92:9 99:24 | **impact**  51:2,4,6 | 113:9 114:4 |
| 145:7 | 101:21 110:15 | 69:14 106:23 | 115:10 116:18 |
| **hereto**  145:14 | 113:9 114:5 | 121:19 | 117:25 118:22 |
| **hereunto** | 115:11 116:19 | **impacted**  36:11 | 142:20 |
| 145:16 | 118:1,23 | 107:1 | **incorporated** |
| **hesitation**  26:1 | 120:24 142:20 | **implementati...** | 106:3 |
| | **hypothetically** | 102:11,18 | **indicated**  7:16 |
| | 88:8 | 143:5 | 108:19 |

[indication - joined]

indication
44:16
indicators 37:3
individual
72:23 83:7
individuals
58:18 133:4
137:23
industry 29:2
142:8
influence 46:10
46:13
information
24:16 36:2
38:18 52:10,16
54:16 55:13
56:6,19 123:24
125:6,8 126:7
126:16
informative
37:18
initially 88:17
input 110:8
inputs 53:9
117:15
instances
106:19 108:17
institute 31:12
31:23
instructed 90:5
90:8,9 96:20
instructing
108:4
instruction
96:8

instructs 90:14
interact 19:5
49:11
interest 36:5
55:21,22,23
56:1 57:16
76:3,22 77:11
77:12,21,23,24
78:5,17,22 79:9
79:10,15,17
80:2,4,11,15,15
80:19 92:24,25
94:10 114:23
114:24 117:16
125:16 138:18
139:11
interested
44:19,22,24
145:14
internal 48:13
interpret 26:8
90:5 139:5
140:1
interpretation
84:8,10,11,15
84:18 88:22
89:12 91:1
93:2 139:23,24
interpreted
21:25 26:10
77:17 79:23
93:12
interpreting
41:5 138:24

interprets
21:24
interrogatory
7:8 42:18
55:20
interval 87:19
intraday
137:10,17
intro 46:17
introduce 4:11
introduction
44:25
invented 48:9
48:23
inventors 48:17
48:21,23
invest 30:12
invested 30:6
investigate
27:14
investment
29:5,5 30:17,18
30:24 79:6,7
89:19,21 90:1
91:6 98:20,23
investments
29:1,2 31:2
93:25
investor 17:23
88:15 91:4,7,18
99:3,8,10
118:25
investors 17:8
30:12 49:11
85:9 96:10

98:23
involve 66:20
68:1 108:10
involved 12:7
47:25 75:16
79:20 86:25
88:9 92:21
104:21 108:8
108:12 131:12
involves 53:22
64:18
involving 23:17
109:15 122:6
irrespective
86:5,8
issue 11:14,15
11:17 80:17,18
issued 31:23
46:11 104:14
105:1 129:21
issuer 78:23
79:24

j

january 1:23
4:5 145:6,16
146:3,5 148:2
jared 2:8 4:19
jeanette 1:18
4:24 145:4
job 39:14 94:5
120:5 128:25
143:2 146:5
148:2
joined 4:17

Page 18

**[joining - litigation]**

**joining**   4:22
**journal**   10:16
  10:21
**jury**   70:12 89:5

**k**

**keep**   10:4 17:24
  43:16 131:8
**keeping**   16:25
  126:15
**kept**   48:24
**key**   26:4,13
**kind**   12:21
  25:21 71:16
  84:21 119:8
  125:17 142:23
**kinds**   136:9
**king**   2:6 4:16
  4:18,19 5:9
**know**   6:8 10:14
  10:16 14:22
  15:6 32:1 42:1
  43:22 46:22
  47:15 49:23
  51:8 52:23
  55:8 56:9,17,20
  56:25 57:4
  58:16 59:10
  67:20 69:11
  73:21,25 74:2
  74:17 79:11,19
  84:24 87:4
  98:14 102:12
  102:23 104:7
  104:17,19
  105:9 109:3,6

109:13 110:5
110:13 111:4
113:7,8,10,12
113:18,19,20
113:22 114:8
117:8 121:6
122:19 123:5,7
128:12 130:17
141:3,23 142:2
142:2,4,8,22,24
**knowing**
  125:17
**knowledge**
  11:24 40:8,12
  41:12,16 42:5
  42:25 43:4,12
  73:19 145:8
**known**   52:21
**krogman**   36:24
**kslaw.com**   2:10
  2:10 146:2

**l**

**labs**   1:8 2:14
  4:9 146:4
  148:1
**laid**   120:10
**language**   68:15
  70:18 84:5
**large**   48:18
  63:4
**law**   10:14,20
  11:1 59:7,12,12
  59:13 70:21
  87:4,5 93:9
  96:2,19 98:18

135:7,10
**lawyer**   24:1
  54:7 59:7
**lax**   2:8 4:19
**lay**   50:19
  101:23
**lead**   2:4 4:14
  105:5
**leaps**   84:4
**leave**   71:19
**leaving**   66:22
**lecture**   25:13
  25:14
**ledger**   19:2,6
  49:2,8,12,13
  50:8 121:2
  123:9,12,14,17
**left**   70:11 71:14
  72:10 77:18
**legal**   4:4 48:11
  54:6,12 58:15
  58:17 59:4,14
  70:10 72:8
  76:16,23 77:1
  86:23 87:7
  88:25 89:14
  91:24,25 93:9
  93:10,21 95:15
  95:22 96:12,21
  97:11,12,23
  107:12 110:14
  112:3 139:17
  143:12 146:7
**lend**   79:14

**lending**   79:13
  79:20
**lent**   79:25
  80:12
**level**   46:23 47:8
  143:2
**lewis**   1:22 4:7
**liability**   50:19
**lifo**   106:16,21
  106:25 107:6
  107:13,23
  108:1
**likely**   6:9
**line**   93:8 96:19
  146:15 147:4
  148:4,7,10,13
  148:16,19
**linked**   12:10
**links**   13:4
**list**   7:24 27:10
  29:13,17 34:14
  34:16,19 37:16
  124:21
**listed**   7:1,3,23
  8:2 10:2 35:1
  126:18
**listing**   13:4
**lists**   29:17
  32:17,21
**literature**   43:16
  62:20,23
**litigation**   1:8
  4:10 17:11,15
  33:8,23 35:16
  52:23 132:5

**[litigation - meaning]**

146:4 148:1
**little** 7:14 27:4
40:23 42:5,19
42:22,24 43:4,6
43:21 58:1
73:2 81:25
89:9 90:11
93:6
**living** 85:3
**llp** 2:2,6
**located** 32:25
86:6
**locked** 146:12
147:1
**locking** 118:8
**long** 14:4 28:16
**longer** 76:6
130:16,17,22
**look** 12:1 27:25
44:11 71:13
95:1,24 98:17
111:14 112:15
118:20 120:14
124:21,22,25
125:7
**looked** 7:8
12:15 14:15
125:20 141:4
**looking** 14:12
44:15 47:4
95:6 101:11
130:19
**los** 2:4
**lose** 113:25

**loss** 30:16,18
30:24 31:2
40:15 41:3,8
42:13 51:3,5,7
51:25 53:11
56:11 59:25
63:16 68:9
72:24 74:22
80:13 83:14
87:12,25 88:7,9
90:3 91:17,23
92:7 98:2,4,6
98:13 99:2,13
99:16,22 105:6
106:15 113:4,6
113:15 114:3
115:9,17,18
116:13,15
117:1 133:6
136:15
**losses** 41:14
42:9
**lost** 97:3,6
**lot** 17:3 40:22
40:25 49:4
94:18
**lower** 121:12
**lroniger** 2:10
**luke** 2:7 4:17
**lunch** 103:13

**m**

**made** 18:24
21:8 22:15
24:4,12 48:25
51:3 63:2

76:16 77:1
111:20 115:18
**magnitude**
115:18
**maintained**
66:8
**majority**
119:16
**make** 5:13 15:7
15:16 25:2
74:5 76:23
82:13 88:9
106:18,20
113:2 114:18
146:14 147:3
**makes** 94:7
**making** 24:8
64:10 98:23
**manage** 129:24
**managerial**
29:4
**manner** 121:3
**maracas** 1:18
4:24 145:4
**mark** 8:19 19:9
24:22 131:25
**marked** 19:11
19:13 24:23
**market** 38:1,13
38:16 62:20
79:12 82:15
83:9,10,10
110:20 118:11
**marketplaces**
121:14

**markets** 17:1
126:15
**massachusetts**
1:21,23 4:7
32:25 145:1,5
**mastering**
31:16
**materially**
73:11
**mathematical**
84:20 93:14
**matrices**
141:21
**matter** 4:9 6:18
44:20 49:25
50:23 53:5
101:9
**matters** 97:2,5
114:9 145:8
**mckew** 8:19
**mean** 11:6
21:25 30:8
35:11 38:4
40:11 46:24
51:12 54:8
56:8,9 57:1,17
58:7 61:4
74:17 77:17,19
84:25 86:24
94:11 100:11
106:6 125:11
128:7 134:17
138:25
**meaning** 38:17
54:7 140:1

[meanings - moment]

| | | | |
|---|---|---|---|
| **meanings** 94:19 | 93:19 102:21 | 71:15 72:4,5,10 | **mind** 53:7 |
| **means** 61:14 | 106:25 107:11 | 72:13,22 74:14 | 72:16 |
| 76:18,20 78:22 | 110:1,2 117:12 | 74:19 75:18,22 | **minimum** 43:6 |
| 139:7,12 | 119:16 120:19 | 77:2 81:15 | 43:8 125:25 |
| **meant** 22:20 | 132:21 133:3 | 84:17 85:22 | **minority** |
| 30:2 79:21 | 137:19 138:5 | 89:7,8,13 90:25 | 119:19 |
| 91:2 | 139:22 141:13 | 93:19 96:9,23 | **minute** 109:7 |
| **measure** 88:23 | **mentally** | 96:24,25 97:8 | 130:21 |
| 112:8 119:14 | 115:13 | 97:11 102:21 | **minutes** 14:5 |
| **measuring** | **mention** 22:5 | 106:24 107:4,5 | **missing** 142:10 |
| 94:21,23 | 22:24 23:1,3,6 | 107:9,10,22 | **misstates** 71:25 |
| 114:19 | 25:4,9,14,22 | 109:17 110:10 | 135:17 136:6 |
| **mechanics** | 28:10 30:3 | 111:17,19,20 | 140:13 |
| 107:21 | 35:4 38:13 | 111:23 112:12 | **model** 30:16,17 |
| **media** 9:23 | **mentioned** 8:3 | 115:25 116:23 | 30:23 67:1,25 |
| 13:17,18 | 26:12 31:7 | 117:23 118:19 | 68:1,6 83:13,17 |
| **mediation** 7:5 | 39:20 42:19 | 132:21 134:13 | 83:18 87:8,24 |
| 7:18,19 15:14 | 44:8 54:11 | 135:2,11,15 | 88:1 97:15,16 |
| **meeting** 7:12 | 56:6 70:24 | 136:3,18 | 97:18,22,24 |
| 8:10 | 105:4 | 137:21 139:21 | 99:1 143:8,9 |
| **meetings** 8:8 | **mentions** 22:1 | 143:5 | **modeled** 118:9 |
| **member** 52:17 | 26:13 | **metric** 83:10,11 | **models** 31:1 |
| 110:16 111:6 | **met** 7:10 | **michaelson** 2:7 | 110:6 |
| **member's** | **method** 50:16 | 3:4 4:15,15 5:7 | **modification** |
| 52:18 | 50:18,20 66:21 | 5:9 9:3 19:9 | 93:18 |
| **members** 8:16 | 66:22 108:1,2 | 20:23 24:20,22 | **modified** |
| 50:17 53:19 | **methodology** | 39:8 43:23 | 143:12 |
| 56:10,12 60:22 | 36:12 52:1,3 | 44:5 81:3,10 | **modify** 66:8 |
| 60:24 61:13 | 53:10,19,20 | 90:13 101:22 | 89:11 120:18 |
| 62:11,22 64:6 | 54:2 58:5,18 | 103:12 104:4 | **modifying** |
| 66:3 68:21 | 59:16,24 61:13 | 107:15 128:9 | 93:13 |
| 69:5,17 71:15 | 63:8,17,23 64:5 | 132:6,13 146:1 | **moment** 22:22 |
| 72:11 75:8,11 | 64:9,13,17,22 | **midterm** 26:2 | 25:20 27:25 |
| 77:2 81:20 | 66:2,11,13 69:4 | **mill** 130:8 | 96:25 |
| 84:23 89:9,14 | 69:16 70:20 | | |

Veritext Legal Solutions
866 299-5127

**[money - objection]**

| | | | |
|---|---|---|---|
| **money** 116:13 | **necessarily** | **news** 10:1,4,6 | **o** |
| 118:4 127:20 | 83:7 88:19 | 10:15 | |
| **months** 110:23 | 91:15 99:5 | **nicholas** 2:3 | **o** 4:1 |
| **morgan** 1:21 | 101:17 | **nick** 4:13 | **o'clock** 109:11 |
| 4:7 | **necessary** 43:7 | **northern** 1:4 | **oakland** 1:4 |
| **morning** 5:8 | 43:8 142:15 | **notary** 1:19 | **oath** 5:17 145:9 |
| 8:4 43:15 | 146:14 147:3 | 145:5,20 | **object** 29:16 |
| **motion** 7:21,22 | **need** 6:8 33:18 | **notating** 146:15 | 38:10 |
| 15:12,13 | 42:9 43:1 52:3 | 147:4 | **objected** 20:19 |
| **mouth** 126:4 | 52:9,10,21,23 | **note** 20:19 39:3 | 107:17 |
| **move** 36:21 | 54:15,22 55:2,2 | **notes** 21:17 | **objecting** 108:5 |
| 37:24 | 55:7,24 56:6,9 | 25:3,3,6,7,7,20 | **objection** 9:1 |
| **moved** 9:16 | 56:17,24 57:3 | 25:21,21,22 | 20:18 21:1,10 |
| 130:4 | 63:22 64:2,15 | 26:6,15 27:21 | 23:24 30:7,13 |
| **movement** | 65:7 69:2,11 | **notice** 3:8 | 30:20 31:5 |
| 37:21 61:14,16 | 94:22 97:20 | 19:15,23 56:14 | 35:12,23 37:1 |
| **movements** | 102:12,15 | **notion** 77:7 | 40:10,17 41:4 |
| 61:6 | 111:21 113:12 | **notwithstandi...** | 43:14 47:19 |
| **moving** 24:25 | 113:19,20 | 63:11 | 49:3,9,18 50:14 |
| 27:1 34:13 | 114:1 118:20 | **november** 28:4 | 51:11 52:13 |
| 37:6 | 137:16 | **nspear** 2:5 | 58:8,14 59:3 |
| **multiple** 106:14 | **needed** 53:9 | **number** 16:20 | 65:18 70:6 |
| 106:14 120:22 | 54:9 55:9 | 16:21 17:13 | 71:7,25 73:5,6 |
| **mutually** 83:1 | 63:19 | 123:18 146:15 | 77:15 82:18,19 |
| **n** | **needs** 48:15 | 147:4 | 83:4,5,15 84:7 |
| | 76:16 | **numbers** 32:12 | 85:6,17 86:21 |
| **n** 1:18 2:3,7 3:1 | **neighborhood** | 32:14,15 88:8 | 94:1 95:19,20 |
| 4:1 | 128:18 | **numerare** | 95:20 102:4 |
| **name** 5:8 | **neither** 145:12 | 94:11,17,20,20 | 107:7,16,19 |
| 130:20 144:10 | **net** 98:5 | 94:25 95:2 | 108:4 110:3 |
| **named** 145:7 | **never** 39:22 | 96:11 | 113:16 114:4,5 |
| **names** 8:18 | 81:21 | **numerares** | 115:6,10,11 |
| 12:9 18:10 | **new** 2:9 109:2 | 94:14 | 116:18,19 |
| 45:17,18 | 142:5 | **ny** 2:9 | 117:24,25 |
| **nature** 21:1 | | | 118:22 121:21 |
| 26:17 141:19 | | | 122:7,8,17,18 |

**[objection - own]**

| | | | |
|---|---|---|---|
| 128:5 131:7,15 | 17:13 18:9 | **opine** 48:12 | **opposing** 130:3 |
| 135:17 136:6 | 19:2 20:5 | 53:17 69:2,2 | 130:10 |
| 136:19 137:3 | 22:21 24:9,14 | 98:17,18 135:4 | **option** 67:16 |
| 137:13,14,25 | 24:20 30:5 | **opined** 68:3 | 114:18 115:21 |
| 140:13 142:18 | 32:16,21 34:24 | **opining** 53:25 | 116:3,7 117:6,8 |
| 142:19,20 | 38:5,22 43:9 | 53:25 54:4 | 118:5,6,7,10,14 |
| **objections** | 46:6 56:24 | 60:9 97:21 | 119:4 121:25 |
| 23:25 | 57:25 61:1,17 | **opinion** 11:19 | **options** 27:15 |
| **observation** | 66:18 78:10 | 40:14 44:20,21 | 116:11 |
| 63:2 | 86:15 90:20 | 46:8,14,23 47:7 | **order** 7:21,22 |
| **obtain** 31:20 | 91:3,5,12 | 48:16 50:1,4,13 | 54:17 67:4 |
| **obtained** 42:6 | 102:10 103:11 | 50:15 58:4 | 69:3 77:23 |
| 58:19 60:1 | 103:14 105:4 | 59:17 60:5,6,12 | 92:9,13,25 |
| 71:4 78:5 | 106:10 108:6 | 61:1,20,23 62:2 | 94:23 113:13 |
| 124:18,20 | 123:25 125:5 | 62:4 64:18 | 114:2 118:18 |
| 137:23 | 128:11 129:10 | 66:7 67:17,22 | **orders** 24:7 |
| **obviously** 95:1 | 129:20 130:10 | 69:3,8,15,17 | **organization** |
| **occasion** 39:22 | 132:18 133:9 | 70:10,16,19 | 33:6 |
| **occur** 123:8 | 138:8 139:25 | 76:25 80:21,23 | **original** 77:18 |
| **odd** 122:24 | 140:7 143:14 | 90:2,24 93:15 | 146:10,21 |
| 123:2 | **old** 26:19 | 93:20,21 97:17 | **originally** 92:6 |
| **odl** 103:6,7,9 | **omitting** 142:7 | 99:5 104:13,16 | 92:14 |
| 103:10 | **once** 113:7 | 119:11 124:23 | **ought** 66:6 |
| **offer** 39:9 | 130:13,14 | 132:16,19 | **outcome** 73:8 |
| 76:24 129:25 | **one's** 41:5 | 133:17 134:12 | **outlines** 25:13 |
| **offered** 101:16 | **ones** 34:24 | 135:7,9 140:9 | 25:14 |
| **offering** 69:17 | 66:17 142:3,3 | **opinions** 9:8 | **outside** 28:18 |
| 71:12 | **online** 45:6 | 12:24 23:15 | 79:16,17 108:2 |
| **office** 131:10 | 124:18 | 45:22 50:2,11 | **overall** 104:22 |
| 146:11 | **open** 12:25 | 76:24 107:25 | **overrides** 72:9 |
| **offices** 1:21 4:6 | 13:1 | 108:3 124:3,7 | **own** 18:21 |
| **offs** 119:19 | **opened** 12:13 | 125:9 129:25 | 39:20 40:1,4 |
| **offset** 116:15 | 12:15 44:8,14 | **opportunity** | 56:13,14,18 |
| **okay** 6:2,6,13 | **opening** 46:20 | 55:22 71:16 | 83:7 129:8 |
| 7:14 8:2,8 | | | |

**[ownership - perform]**

**ownership**  49:6
**owns**  51:3 76:6

**p**

**p**  1:14 3:3,10
  4:1 5:1 19:15
  28:3 146:5
  148:2
**p.m.**  104:3
  109:1,8 110:1
  137:11,15
  140:12 143:19
**page**  3:7 19:14
  19:17 20:3
  28:1,1 29:11
  31:22 32:10,12
  32:13,14,15
  34:13,17,19
  53:15,18 56:3
  81:12 123:22
  123:22,23
  131:1 132:15
  146:15 147:4
  148:4,7,10,13
  148:16,19
**pages**  1:1 34:15
  146:14,17,17
  147:3,6,6
**paid**  39:14
  55:16 56:25
  57:8,10,11,12
  63:20 64:19
  66:20,23,23
  68:6,8 69:9
  73:16 75:3
  76:2,8,10,12

77:7,8 78:23
79:24 80:19
81:22 82:1,3
83:9 85:24
86:1 87:16
88:13,16 90:7
90:21 91:17,22
92:4,6,15 94:8
99:17,20 100:6
100:12,13,14
100:21 101:12
101:15 108:16
108:20 110:8
110:18 111:10
112:4,11
114:20,22
115:24 116:2,3
116:24 117:16
118:9 127:6,19
138:9,17,25
140:9
**pandemic**  36:8
**paper**  27:9,11
  27:12 36:7,14
  36:21 37:2
**papers**  31:23
  34:13,25 35:3
  39:5 43:18
**paragraph**
  29:11 53:17
  56:14 58:3
  64:21 65:3
  66:7 75:17
  81:13,14 83:22
  83:24 84:6

85:23 93:11,16
95:7 100:5
101:23 114:21
117:11 118:20
120:10 138:14
138:19 140:3,5
**paragraphs**
  56:21 65:4,9
  66:16 67:2
  77:6 90:22
  110:7 111:24
  137:22 138:12
  142:17 143:10
**paramount**
  64:12
**part**  17:1 60:5
  67:17 118:14
  139:10
**participants**
  79:12
**participated**
  43:19
**particular**
  45:25 84:14
  88:15 113:8
  114:15 142:7
**parties**  51:13
  55:25 70:21
  84:13 107:13
  145:14
**parts**  20:20
**party**  80:1,1
**passes**  31:14
**past**  23:19
  131:17

**paste**  75:18
**paused**  25:20
**pay**  55:4,5
  58:10 78:17,23
  79:12,14,18
  111:5
**paying**  116:9
  116:11 127:24
**payment**  58:11
  80:16 110:11
  115:9 116:16
  117:21 120:21
**payments**  80:2
  80:5
**pays**  79:10
**pdf**  146:12
  147:1
**peculiar**  120:20
  122:10,12
**penalty**  144:1
  146:16 147:5
**pending**  6:10
**people**  56:10
  60:13 78:19
  79:1 127:18,22
  131:10 134:8
  136:1
**people's**  121:4
**percent**  33:25
  34:2 129:17
**percentage**
  33:15,22 123:8
  129:11,12
**perform**  36:16
  52:11 106:10

Veritext Legal Solutions
866 299-5127

**[performed - present]**

performed 34:7
    34:10 68:4
    105:7
performing
    120:6 127:7
performs 34:4
period 36:5
    70:1 78:15
    80:7 87:10,22
    92:11,15,17
    99:23 128:8
    134:24 146:18
    147:7
periods 124:15
perjury 144:1
    146:17 147:6
permissible
    27:11
person 4:18 8:9
    9:12 55:4 60:1
    71:3 75:25
    79:25 85:14
    91:22 95:17
    98:9,12 110:15
    111:4 112:10
    113:5 115:20
    116:6 117:9
    118:3 145:7
person's 82:23
    90:3 99:14
    115:9
personal 15:9
    99:14
personally
    39:20 72:4,12

99:19 104:7,17
    104:18
perspective
    92:1,2 112:3
    115:23
pertain 23:17
philosophical
    58:9
phrase 38:3
picked 106:24
picture 115:13
piece 91:20
pjh 1:6
place 51:15
    52:9 88:4 89:2
    89:4,16
places 10:17,23
    29:17 103:4
plaintiff 2:4
    4:14 105:5
    126:21 127:24
plaintiff's 7:11
    15:3 24:11,12
    44:17 50:19
    85:8
plaintiffs 48:20
plan 33:20
players 44:12
plays 14:21
please 4:11,24
    6:23 61:22
    111:8
plus 118:11
    123:15

point 13:24
    62:6,13,17
    63:25 64:6
    66:6 67:14,22
    68:19 73:14
    75:13 87:18
    88:10,18 92:23
    95:24 114:15
    123:12 127:16
pointing 65:24
points 63:11
    142:6
poloniex
    105:12,14
poloniex's
    105:17
popular 17:4
portion 48:24
position 11:9,9
    92:2
possession
    78:21
possibility 72:3
possible 59:23
    65:21 68:23
    78:14 87:13
    101:6 107:3
    110:5,17
    114:13 121:9
    122:23 135:24
possibly 120:15
posts 13:18
potential 138:4
practicing
    31:11

practitioner
    31:10
precise 123:21
    128:21
precisely
    108:23 109:1
preclude 24:7
    62:21
predominantly
    121:15
preferred
    67:25
preliminary
    46:17
premier 31:10
preparation
    7:16,20 8:6,13
    9:11,20,24 10:1
    11:21 13:6,10
    13:13,19,22,23
    19:3,6 32:4,7
    128:16
prepare 6:15
    6:21 8:22
    10:11 13:25
    33:20 131:6
prepared 7:10
    15:3
preparing 10:5
    16:9 32:8
    134:6 135:13
    136:3
present 2:13
    32:22 84:19

**[presentations - publications]**

**presentations**
21:18 27:22
**presented**
90:22 143:4,8
**presenting**
83:17 93:13
**presently** 28:20
39:11
**press** 12:11
17:4,5
**pretty** 46:25
47:4 57:20
**previous** 60:15
**previously** 92:3
92:21 125:18
126:13
**price** 26:25
36:12,22 37:11
37:21 38:17
52:20,21,25
53:3 54:22
55:2,10,11,11
61:1,5,18,19,24
61:25 62:5,13
62:16,24 63:12
73:18 100:8
101:3 103:1
106:7 110:20
117:7,8 124:12
124:14
**prices** 52:6,7
52:23,25 61:6
105:25
**primarily**
10:14 33:3

**primary** 33:10
33:11 64:12
**principles**
29:24 31:17
37:9 123:16
**print** 45:4
**prior** 8:10
15:19,20,21
16:2,7,12 126:7
128:16 140:14
**privileged**
90:15
**pro** 58:10
**probably** 45:1
46:19 97:15
**problem** 36:4,8
**procedure** 1:18
146:19,20
**proceed** 77:5,6
140:19
**proceeds**
118:10,15
**process** 53:8
**produce** 20:21
102:20 107:9
**produced** 7:5
7:10 24:18
39:6
**producing** 63:9
**production**
20:4,17 21:2,7
27:19
**professional**
1:19 31:19
32:18 135:7

145:5
**professionally**
104:18,19
**professionals**
31:11
**professor** 9:14
9:15 10:10
17:2,24 28:3,12
28:16,23 39:12
89:17,25 91:6
98:19 128:25
**proffer** 69:3
**proficiency**
31:16
**proficient**
142:24
**profit** 30:16,18
30:24 31:2
40:15 41:2
42:13 51:2,4,7
51:24 53:11
**profits** 41:8,14
42:9
**programmers**
48:10
**progressively**
31:15
**project** 27:9
**propensity** 37:5
**proposal** 67:8
**propose** 59:16
70:3 77:5 81:2
96:15 140:7
**proposed** 56:12
84:24 132:25

**proposing** 67:2
74:20 82:5
97:14 99:1
110:25
**protective** 24:7
**provide** 20:16
22:9 23:22
26:4,11 33:6
126:23 131:21
141:21
**provided** 22:11
24:11 42:17
68:18 117:21
127:3 131:3
132:1,2 146:19
147:8
**provides** 37:14
64:16 75:24
108:24 115:17
141:24
**providing**
33:16 112:21
138:6
**provisions** 1:17
**prying** 18:16
**public** 1:20
21:16 22:15
24:8 37:12
145:5,20
**publication**
38:25
**publications**
10:12,21 17:6
21:17 22:4,15
22:21,22,22

Page 26

**[publications - rate]**

27:21 31:24
34:14,16,17,18
35:1,4,8 43:11
**publicly** 100:8
101:2 102:25
114:13
**publish** 29:8
**published**
29:12
**purchase** 17:21
18:25 19:1
54:17 55:13
57:9 58:7 70:2
71:24 73:18
75:6 76:14
81:23 82:9,13
82:17 85:16,25
93:5 100:24
101:5 108:16
108:18 110:9
111:11 114:23
117:16 138:10
140:20 141:25
**purchased**
13:15 56:10,13
57:24 81:20
100:7 117:13
133:11 142:13
**purchaser**
58:13 59:2
60:7,10,20
69:23 81:16
82:4,11 85:1,23
86:5,8,16 87:25
91:13 112:4

113:14,25
116:12 133:15
133:18 134:23
135:9
**purchaser's**
72:23 82:14
83:13 114:3
116:15
**purchasers**
13:12 53:21
58:6 60:13
69:19 70:24
71:22 84:25
93:23 95:12
98:1 132:23
133:4,6,7,9,11
134:3,8 135:3,4
135:16
**purchases**
54:22 75:25
108:8,10
**purchasing**
74:25
**purports**
101:23 117:11
**purpose** 72:20
94:13
**purposes** 10:5
11:24,25 16:9
46:7 52:17
53:5 85:1
109:19
**pursuant** 1:16
19:23 20:1
51:9,18,23,25

63:16 112:20
115:15 118:4
119:3,8 142:14
**put** 65:10 91:19
98:22 114:18
115:21 117:6,8
118:5,6,7,10,14
118:19 119:4
121:25 126:3
**putative** 85:13
133:14
**putting** 64:18
98:21

**q**

**qualified** 91:25
**quality** 104:9
104:11,23,25
**quantities** 52:6
52:7
**quantity** 48:18
54:22 55:3,10
55:11 108:21
110:19 112:16
**question** 6:3,10
25:1 26:12,17
26:20,24 32:14
33:19 38:22
41:6 47:12
48:11,14 49:25
54:13 58:9
59:6,9 60:16,17
60:18 74:16
85:2 86:23
89:1 91:24
94:2,4 95:23,23

97:11 99:7
107:17 111:8
113:11 119:6
119:21,24
121:22 122:2
122:13 123:2
**questioning**
95:1
**questionnaire**
119:25
**questions** 6:14
7:9 11:10
47:24 59:8
69:6 142:25
143:14
**quick** 132:7
**quickly** 18:13
**quid** 58:10
**quo** 58:11
**quote** 83:21
95:24

**r**

**r** 4:1 148:3,3
**r&s** 147:1,9
**range** 134:7
**rate** 56:1 69:8
69:14 70:3,4,8
70:8 71:3,6
73:4 77:24
82:7,15,16
83:10 101:9,16
102:1,9,24
109:24 114:24
127:9,11,14,25
128:1 137:2,5,6

**[rate - referring]**

137:11,12,17
140:11 141:24
142:9
**rates** 61:11
64:16 65:7,8
67:9 68:24
69:1,7,12 70:13
71:21 108:24
125:6 137:9,9
137:10,15
140:24 141:3,9
141:22
**rather** 89:5
96:19 109:25
136:23
**rationale** 93:22
94:4,5,5
**rawley** 9:12
**reaching** 40:14
**reactivity** 36:22
**read** 6:25,25
7:2 10:1,8
11:20,23,25
12:4,12,19
13:18 18:11
43:19 44:25
45:2 46:7
**reading** 12:16
17:3 46:4,17
48:8 119:17
146:23 147:9
**real** 72:25 79:5
79:7 82:11,14
83:14

**realistic** 71:18
88:23
**realize** 96:18
**realized** 51:5
**really** 14:12
20:1 30:21
43:10 50:20
82:25 88:12
95:22 97:19,23
102:22 113:7
113:18 114:7
134:4 142:22
**realm** 72:2
**reason** 5:24
14:23,25 27:18
148:6,9,12,15
148:18,21
**reasonable**
88:23 128:22
140:16,19
**recall** 10:19,22
10:23,25 11:11
12:5,7,8,9,13
12:16,22 13:3
14:10,25 15:15
16:12 18:4,5,7
32:2 44:9,23
45:9 46:17,19
73:22 92:20
104:15 105:20
108:7 128:12
128:19
**receipt** 111:15
**receive** 55:6
58:10,12 78:14

110:23 115:4
118:13 119:7
119:22 120:3
127:18,20
128:24 129:2,6
**received** 76:4
78:12 79:22
80:4,8 87:17
88:12 91:16
92:4,13 94:9
99:18 101:12
110:24 111:2
111:12 114:20
114:25 116:16
116:25 117:9
117:17 118:17
119:2,3,14,19
120:2,21
133:21,25
134:16,19,22
135:20,20
136:4,10,23
**receives** 58:25
111:4 116:13
**receiving** 88:15
138:5,6
**recent** 34:24
**recently** 9:16
33:25
**recognize** 28:5
**recollection**
23:9 109:16
**record** 4:2,12
24:15 39:4
42:16 44:1,4

81:4,6,9 85:12
101:18,20
103:16 104:3
127:17 132:7,9
132:12 143:17
145:11
**records** 49:6
100:8,9,11
101:3 103:1
108:19 109:13
118:24 119:1,5
119:18 124:22
124:23,25
125:3 128:13
**recover** 76:1
**recovered**
78:11
**reduced** 145:10
**refer** 53:15
102:25 132:14
143:9
**reference** 125:2
**referenced**
63:19 146:6
**referred** 62:23
**referring** 15:7
15:11 18:11
53:17 62:25
63:15 66:19
75:17 81:19
82:2 85:2
103:1 104:5
110:6 114:21
130:23 143:10

Veritext Legal Solutions
866 299-5127

[reflect - reviewed]

| | | | |
|---|---|---|---|
| **reflect** 38:18 | **report** 3:10 | **reports** 12:2,3 | **required** |
| 124:1 | 6:25 7:1,4 8:1 | 12:4,10 13:1 | 131:20 |
| **reflected** 82:24 | 8:3,22 9:5 10:3 | 23:15 24:6 | **requisite** 31:18 |
| 109:14 124:8 | 12:12,16,20 | 33:7,17 44:6 | **research** 8:17 |
| **regarded** 137:8 | 13:25 14:16 | 46:5,7 104:6 | 29:6,21 32:23 |
| **regarding** 40:8 | 15:18,24 16:2,8 | 129:21,25 | 33:2 89:22 |
| 42:20 | 16:10,13 19:7 | 131:18,21 | 123:20 129:23 |
| **regardless** 64:7 | 28:2,7,9 29:10 | 132:2 | **reserve** 67:15 |
| 65:3 85:10 | 32:8 33:21 | **represent** 28:9 | 71:16 |
| **regime** 35:17 | 42:17 44:9,11 | 65:2 89:12 | **respect** 46:16 |
| **registered** 1:19 | 44:14 45:2 | **representations** | 122:5 136:16 |
| 145:4 | 46:10,11,13,16 | 50:5 | 140:7 |
| **regression** 36:1 | 46:20 50:3,16 | **represented** | **responded** 26:8 |
| **related** 23:18 | 50:21 53:14 | 48:12,21 80:22 | **responding** |
| 37:4 145:13 | 54:21 60:25 | **representing** | 27:19 |
| **relates** 1:11 | 65:10 69:18 | 4:16 5:10 | **response** 20:12 |
| 22:9 58:4 | 74:20 75:12,17 | **represents** | 24:18 37:12 |
| **relating** 21:18 | 81:13 89:10 | 63:10 70:16 | 42:18 |
| 21:24,25 39:14 | 90:16 95:6 | 87:2 | **responses** 7:9 |
| **relation** 128:6 | 102:14 105:1 | **reputable** | **responsive** |
| **released** 146:21 | 110:7 123:23 | 67:14 72:7,15 | 20:15,24 21:22 |
| **relevant** 14:21 | 124:4,5,8,24 | 72:17 73:12 | 23:22 24:3 |
| 47:16 61:12 | 125:1,10,21,23 | 102:9 137:8 | **rest** 48:25 49:1 |
| **reliable** 69:13 | 125:24 126:17 | **request** 19:16 | **result** 117:5 |
| **relied** 7:23 | 127:2 128:6 | 20:4,12 21:14 | **retained** 126:21 |
| **remain** 93:16 | 130:24 131:1 | 21:16,23 22:20 | **return** 146:17 |
| **remember** 11:3 | 132:15 134:6 | 23:14,20,23 | 147:6 |
| 12:18,23 26:16 | 134:19,24 | 25:1,2 | **review** 11:20 |
| 125:14 126:8,9 | 135:1,4,14 | **requested** | 16:1 32:4,7 |
| **remembers** | 137:21 138:20 | 147:1,9,10 | 104:5 146:8,10 |
| 64:11 | 139:3,4 143:4,8 | **requests** 20:6,7 | 146:13 147:2 |
| **remote** 8:10 | 143:9 | 20:8,15 | **reviewed** 6:25 |
| **remotely** 4:20 | **reporter** 1:19 | **require** 117:2 | 7:15,17,20,23 |
| 4:22 | 4:23 5:21 6:5 | 131:23 143:6 | 8:5 11:24,25 |
| | 145:5 | | 13:5 44:7 45:6 |

Veritext Legal Solutions
866 299-5127

[reviewing - see]

reviewing  32:2
right  15:22,25
  16:22 22:17
  28:13 34:20
  40:7 44:10
  55:4,17 56:23
  62:2 67:17
  71:5 78:13
  80:3,6,9 83:3
  83:22 84:6
  89:17 90:22
  93:8 95:16
  100:21,22
  101:18,20
  104:20 115:2
  117:14,18
  119:14 125:20
  126:9,9,22
  127:4,5,9 128:2
  129:1,7,8,9,24
  131:5 132:21
  133:10,10
  137:7
ring  103:9
ripple  1:8 2:14
  4:9,21 10:7,13
  10:14,19 11:1
  14:24 21:19
  22:2,13,19,24
  25:4,9,15,23
  47:21,22 48:12
  48:14,19,22,22
  48:23 58:23,25
  78:17 79:17,17
  80:19 103:9

  146:4 148:1
ripple's  11:9
  13:21 14:2,10
  14:18 16:1
risk  80:16
road  102:16
role  36:23
roniger  2:7
  4:17
routinely  9:18
rules  1:17
  131:16,17,23
  147:8
run  35:25
  54:18 130:8
running  14:13
  14:19 36:4
  131:8
runs  37:2

s

s  3:5 4:1 148:3
sale  18:25 19:1
  47:23 48:1,20
  49:1 54:17,23
  55:7,7,8,12,13
  55:14 56:7,20
  79:20 90:3
  98:3 113:25
  115:1 116:17
  117:5,7,17,22
  118:11,17
  119:8,15,23
  120:12
sales  54:23
  106:14 118:15

satisfy  125:16
save  45:8
savings  91:8,19
  93:24
saying  22:14
  29:23 65:13,19
  68:20 71:20
  72:2 98:5
  118:2,5 122:9
  138:10
says  28:1 57:15
  70:10 78:10
  81:19 92:24
  113:13 118:3
  120:12 133:5,8
  135:8 138:22
scenario  78:1
scenarios  70:5
schedule
  146:10
school  94:12,13
scientific  40:8
  40:11
scope  30:7,20
  35:13,23 37:1
  38:10 47:17,19
  49:3,9,18 50:14
  60:4,6 69:7
  70:6 71:7 73:6
  77:15 82:19
  83:4 95:19
  107:7,16,17,24
  108:3,5 122:17
  128:5 135:3
  137:14

scratch  106:11
sec  11:2,15
  12:2,6 44:7,17
  45:19 46:4
  104:6,14 105:2
sec's  11:8
second  29:10
  36:21 60:20
section  75:19
  76:1
securities  23:18
  29:7 35:15
  40:19 53:13
  75:20 132:5
security  11:13
  36:3,11 37:6
  47:13 75:15,25
  76:2,5,6,9
  79:10 121:11
  138:17 139:1
see  10:12 12:1
  12:15,21 14:12
  14:19 15:4
  16:11 17:6
  18:1 21:20
  22:14 23:20
  35:17 37:3,19
  56:19 75:20
  78:1 81:23
  100:3,4,9 101:3
  104:22 114:1
  125:24 127:24
  130:23 132:17
  133:5 138:18
  138:22 142:15

Veritext Legal Solutions
866 299-5127

**[seeing - sostack's]**

| | | | |
|---|---|---|---|
| seeing 10:19,25 14:10 | serve 126:22 | similar 10:18 65:22,23 66:1 66:15 | social 9:23 13:17,18 |
| seek 102:8 | served 130:2 | | software 49:10 |
| seeks 73:12 | session 104:1 | similarities 30:9 41:17 | solar 37:25 38:12 |
| seem 116:21 | set 20:8 97:14 110:23 111:3 142:16 145:16 | simultaneously 114:17 | sold 39:22 47:22 48:19,25 56:11 68:7 80:10 81:16,21 98:10 99:21 117:13 119:2 135:22 136:11 142:14 |
| seems 62:19 110:14 113:9 117:6 130:8 | | | |
| | sets 81:14 117:15 | sir 53:25 | |
| seen 10:17 12:11 18:13 19:20 20:6,8,10 126:13 | | sit 7:25 11:5 18:6 44:22 46:21,22 50:24 74:17 112:5,22 113:21 117:6 123:5 | |
| | setting 6:18 95:14 | | |
| | settlement 70:12 89:5 | | |
| sell 51:14 59:21 79:13 87:11,22 91:11 102:2 113:3 115:17 116:12 118:8 141:25 | several 104:11 | | sole 33:13 |
| | share 20:25 24:19 99:6 | sitting 21:6 47:6 50:25 51:8 63:3 123:7,21 141:14 | solicitation 48:1 |
| | | | solicited 47:22 48:19 85:10 |
| | shawn 2:12 4:3 | | solutions 4:4 146:7 |
| | shoes 98:22 | situation 111:25 116:1 117:20 | solves 36:8 |
| seller 115:3 117:21 | short 79:13,20 | | sorry 94:3 108:9 |
| | show 100:20,23 | | |
| | shows 31:16 | skim 13:2 | sort 28:21 29:23 31:18 72:24 86:17 109:19 114:18 122:10 135:23 |
| selling 74:25 95:5 117:9 120:2 | side 12:15,17 12:23 15:1 29:5,6 44:13,17 44:18 45:19 102:19 | skimmed 12:3 44:8 | |
| | | slides 21:18 25:13,14 27:22 | |
| sells 91:21 99:9 118:3 | | slight 68:10 | |
| | sides 45:17 50:6 | slightly 66:9 84:14 93:14 | sostack 4:14 68:22 106:13 106:17 108:17 124:25 |
| seminars 43:19 | | | |
| sense 13:1 63:3 88:10 94:7 | sign 146:16 147:5 | small 17:21 18:19 63:4 119:18 | |
| separate 11:23 74:3 75:3 79:15 80:17 | signature 145:19 146:21 146:23,23 147:9 | | sostack's 105:5 105:22 108:6 109:4,13 |
| | | smoothly 5:13 | |
| september 34:18 | significantly 37:6 | | |
| series 31:14 | | | |

Veritext Legal Solutions
866 299-5127

[sound - statute]

| | | | |
|---|---|---|---|
| **sound** 59:5 | 65:18 70:6 | 138:2 | **stand** 103:10 |
| **sounds** 53:7 | 71:7,25 73:5 | **specifics** 30:22 | **standard** 52:14 |
| 60:5 92:6 | 77:15 82:18 | **specified** 109:1 | 109:17 |
| 122:1 | 83:4,15 84:7 | 109:11 | **standardization** |
| **source** 67:13,18 | 85:6,17 86:21 | **specify** 109:9 | 121:13 122:20 |
| 67:20,24 | 90:11,17 94:1 | **speculate** 46:24 | **standardized** |
| 142:10 | 95:19 101:19 | 47:10 | 121:5,6,8,16 |
| **sources** 82:21 | 102:4 103:14 | **speculation** | 122:22 123:14 |
| 123:10 124:16 | 107:7,15,20 | 85:18 110:4 | **stands** 31:9 |
| 142:11 | 110:3 113:16 | 113:17 114:6 | **stars** 2:3 |
| **space** 35:10 | 114:4 115:6,10 | 115:12 116:20 | **start** 75:23 |
| 36:16,25 38:24 | 116:18 117:24 | 117:25 118:23 | 81:21 90:4 |
| **spaces** 41:23 | 118:22 121:21 | 122:8,18 | 114:22 138:9 |
| **spalding** 2:6 | 122:7,17 128:5 | 142:19 | **state** 9:17 23:18 |
| 4:16,18,20 5:9 | 128:11 131:7 | **spell** 136:8 | 127:2 146:9,12 |
| **speak** 8:15 9:10 | 131:15 135:17 | **spelled** 50:15 | **statement** |
| 9:20 13:12 | 136:6,19 137:3 | **spend** 14:4 | 15:14 22:9,20 |
| 59:14 99:14 | 137:13,25 | 134:20 | 46:18 |
| 100:4 | 140:13 142:18 | **spends** 99:8 | **statements** 7:5 |
| **speaking** 4:3 | 143:15 | **spent** 31:18 | 7:18,19 21:17 |
| 60:18 128:24 | **specialize** 29:4 | **spoke** 8:20 13:9 | 22:4,11,15 |
| **speaks** 85:12 | **specific** 36:18 | 48:8 | 27:21 |
| **spear** 2:3 4:13 | 39:1 42:8 | **spoken** 9:13 | **states** 1:3 96:1 |
| 4:13 6:22 9:1,6 | 49:20 50:22 | **spread** 73:22 | 96:2,2,16,17,18 |
| 15:6 20:18 | 54:6 101:20 | 73:24,25 74:1,4 | **statute** 57:15 |
| 21:11 23:24 | 102:17 105:15 | 74:24 86:18 | 59:13,13 68:15 |
| 24:15,21 29:16 | **specifically** 8:4 | 87:1,2 106:1,2 | 68:16 70:18,19 |
| 30:7,13,20 31:5 | 10:11,22,24 | 106:6 | 75:24 77:25 |
| 35:12,23 37:1 | 17:16 18:4,6 | **spreads** 74:8 | 78:9,10 79:8,21 |
| 38:10 39:3 | 22:1,5,12 25:7 | **spur** 27:12 | 83:19,20,21,21 |
| 40:10,17 41:4 | 25:9 29:15,19 | **ss** 145:2 | 83:25 84:2,3,19 |
| 43:14,20 47:19 | 37:23 38:4,8,14 | **staff** 8:16 9:5 | 86:11,12 90:6 |
| 49:3,9,18 50:14 | 62:3 63:1 | 9:10,14,19 13:9 | 92:24 93:11 |
| 51:11 52:13 | 81:13 97:9 | 33:1 45:15,16 | 95:8,8 96:17 |
| 58:8,14 59:3 | 123:1 126:13 | 128:1 129:24 | 97:25 139:7 |

Veritext Legal Solutions
866 299-5127

**[statutory - talked]**

| | | | |
|---|---|---|---|
| **statutory** 53:23 | **study** 22:18 | **suffice** 118:24 | **swear** 4:25 |
| 84:4 87:4 | 29:21 35:25 | **suffolk** 145:2 | **swiss** 85:14,15 |
| 138:15 | 36:4,17 123:4 | **suggest** 103:12 | 95:13,13,16 |
| **steven** 1:14 3:3 | **studying** 46:4 | **suggested** | 97:2,3 141:6 |
| 3:10 4:8 5:1 | **subject** 23:24 | 27:11 | **sworn** 5:4 |
| 19:15 28:3 | 31:24 37:11 | **suggesting** | 145:7 |
| 146:5 148:2 | 44:20 61:20 | 117:19 | **syllabus** 27:6 |
| **stipulation** | **submitted** | **summary** 65:17 | 27:10,17 |
| 146:20 | 15:18,23 23:16 | **supervise** | **synonymous** |
| **stock** 30:17 | 28:10 98:7 | 129:23 | 94:20 |
| 36:13,22 49:19 | **submitting** | **supplied** 52:17 | **t** |
| 49:19,20 74:7 | 16:2,7,12 19:6 | 53:1 | **t** 3:5 148:3,3 |
| **stocks** 29:7 | 137:20 | **supply** 52:19 | **table** 94:19 |
| 30:15 31:3 | **subscribed** | **support** 33:7 | **tactic** 130:8 |
| 37:4 40:20 | 144:2 | 33:23 | **take** 4:7 6:5,8 |
| 41:23 74:8 | **subsequent** | **sure** 6:5 10:16 | 19:24 35:14 |
| **straddling** 93:8 | 115:8 119:7 | 12:22 14:9 | 41:21 42:11 |
| 96:19 | 125:1 | 15:8,16 20:22 | 43:21,23 52:3 |
| **straightforward** | **substance** 6:16 | 21:7 25:2 26:6 | 66:13 79:4 |
| 53:22 93:1 | 6:18 9:4 45:10 | 26:18 30:14 | 81:1 82:22 |
| 119:17,24 | 45:14,21 | 46:25 47:4 | 87:9,21 88:4 |
| 135:25 136:13 | **subsumed** 22:7 | 58:20,24 59:10 | 89:2,4 96:7 |
| 140:4 141:11 | **subtract** 78:11 | 67:21 71:10 | 98:9 100:16,17 |
| **street** 1:22 | 114:25 | 73:21 87:13 | 102:17 116:22 |
| 10:15,20 | **succeeded** | 98:25 102:23 | 132:6 133:16 |
| **strike** 75:22 | 130:11 | 110:5 111:21 | **taken** 26:19 |
| 90:4 117:7 | **successful** | 112:2 118:12 | 44:2 81:7 |
| 138:11,13 | 132:4 | 142:2,22 | 103:17 132:10 |
| **structure** | **sue** 76:1 | **surmise** 123:16 | 142:5 |
| 105:17 | **suffer** 87:11 | **susman** 2:2 | **takes** 37:16 |
| **students** 26:5 | **suffered** 91:17 | 4:13 | 89:15 120:19 |
| 26:22 27:8 | 99:15,22 113:6 | **susmangodfr...** | **talk** 6:4 8:12 |
| 39:9 98:22 | 113:14 133:6 | 2:5 | 113:7 |
| **studies** 35:16 | 136:14 | **sustained** 56:11 | **talked** 66:15,18 |
| | | 113:15 | |

Veritext Legal Solutions
866 299-5127

**[talking - time]**

| | | | |
|---|---|---|---|
| **talking** 86:25 | **term** 27:9,9,11 | **theoretically** | 84:9 86:23 |
| 101:19 | 27:12 54:12 | 110:17 | 90:1 94:24 |
| **talks** 38:15 | 90:6 94:17,17 | **theory** 50:19 | 95:22 97:19,21 |
| **tangible** 59:21 | 138:16,25 | **thereon** 57:16 | 97:24 98:1 |
| 60:2 78:3 | **terms** 52:4 | 76:3,4,22 77:11 | 99:3,15,19,22 |
| 112:13 | 86:14 88:20 | 77:12,22,24 | 101:13 102:15 |
| **task** 43:2 96:8 | 92:16 94:6,8,9 | 78:12 79:9,22 | 104:12 107:20 |
| 96:14 | 94:11 111:5 | 80:15 92:25 | 108:2 111:7,18 |
| **taught** 27:7 | 112:16 114:19 | 93:1 94:10 | 112:22 114:7 |
| **tax** 98:7,14,15 | 121:5 123:18 | 117:16 138:18 | 118:10,12,15 |
| **taxes** 98:2,5,18 | **test** 26:19 | 139:12 | 118:24 119:4 |
| **taxonomy** | **testified** 5:4 | **thing** 12:21 | 119:15 120:5 |
| 136:8 | 35:5 89:21 | 38:8 55:6 81:2 | 124:10 125:2 |
| **teach** 28:14,18 | 107:20 125:18 | 112:15,23 | 133:5 134:17 |
| 28:23,24 89:19 | **testify** 145:7 | 119:9 | 134:18,23 |
| 94:12 | **testimony** 3:2 | **things** 20:20 | 135:6,14,19,19 |
| **teaching** 25:8 | 5:25 23:15 | 48:1 79:20 | **thinking** 25:25 |
| 26:15 28:11,22 | 24:6 33:7,16,21 | 116:7 126:12 | 26:4 27:3,3,5 |
| 29:6 89:22 | 41:21 43:3 | **think** 7:22,24 | 50:24 134:21 |
| 129:14 | 46:6 65:17 | 8:4 9:2 14:20 | **thinks** 108:1 |
| **teachings** 43:11 | 72:1 97:6 | 16:19 21:3,12 | **third** 80:1,1 |
| **technology** | 111:23 129:22 | 26:7,10,11,18 | **thought** 112:1 |
| 21:20 22:3 | 131:3,13,19,22 | 26:19 27:20 | 131:16 134:7 |
| 23:4 25:5,11,16 | 131:24 135:1 | 34:23 43:6,15 | **three** 31:14 |
| 25:24 49:5 | 135:18 136:2,7 | 45:3,9,23 47:9 | 34:25 35:7 |
| **tell** 11:5 25:25 | 140:14 145:11 | 47:11,14 53:16 | 39:5 117:15 |
| 46:20 47:10 | **tests** 37:2 38:16 | 54:6 57:19 | **ticket** 119:18 |
| 103:7 142:6 | **tether** 57:3 | 58:21 59:8,9,13 | **tied** 26:21 |
| **ten** 14:6,9 | 66:24 82:5 | 59:19,23 64:11 | 27:16 |
| 23:19 132:2 | 108:13 125:12 | 66:14 67:14,25 | **time** 4:5 14:14 |
| **tend** 29:4 | 141:2,3 | 68:12 70:7,17 | 14:16 15:23 |
| **tender** 76:4 | **texas** 2:7 | 71:17,19 72:4 | 17:9 21:8 27:5 |
| **tendered** 57:2 | **thank** 5:11 | 72:12 77:3,22 | 27:18 31:18 |
| **tends** 121:11 | 27:23 39:8 | 77:25 78:8 | 34:3,22 43:25 |
| 122:21 | 104:5 | 82:23 83:12 | 44:4 52:8 |

Page 34

**[time - translate]**

| | | | |
|---|---|---|---|
| 55:12,12,12,13 | 130:7 | **touching** 145:8 | 72:6,14 73:17 |
| 57:6,23 61:15 | **timing** 15:16 | **towards** 37:7 | 73:20 74:1,10 |
| 61:16,19 62:1,6 | **titled** 19:14 | 124:11 | 74:20,23 75:1 |
| 62:14,17 63:11 | 131:3 | **trade** 40:15 | 79:16,16 80:17 |
| 68:13 70:1,8,22 | **today** 4:24 5:10 | 101:7 109:21 | 82:24 83:7 |
| 72:6,14 73:4,14 | 5:13,25 7:16,20 | **traded** 17:20 | 86:2,17,18 87:2 |
| 76:13 78:15 | 8:6,13 9:11,21 | 37:10 51:9 | 87:5 88:5 89:6 |
| 80:7 81:5,9,22 | 9:24 10:2 13:6 | 105:9 | 105:13,20,25 |
| 82:9,16 85:25 | 13:10,13,19,22 | **trader** 106:13 | 106:2,7 108:19 |
| 87:10,18,19,22 | 18:7,21 19:23 | **traders** 49:11 | 109:4,14,25 |
| 88:5,10,14,18 | 21:6 32:5 47:6 | **trades** 18:23 | 112:18 122:13 |
| 89:4,6 92:23 | 50:25 51:8 | 49:12 121:4,5,7 | 122:24 138:4,7 |
| 93:4 98:24 | 63:3 69:18 | 121:16 123:19 | 140:12 |
| 100:24 101:5 | 107:21 112:2 | **trading** 18:18 | **transactions** |
| 102:14 103:15 | 123:7 128:17 | 38:17 41:3 | 49:6,7,8 51:22 |
| 104:3 108:16 | 139:2,15 | 42:14 51:15 | 53:1 57:7 |
| 109:3,3,14,24 | 141:15 | 63:12 85:4 | 68:14 70:9 |
| 110:9,20 111:1 | **today's** 4:4 | 100:7,11,19 | 78:19 79:1 |
| 111:10,15 | 6:21 11:21 | 101:17,20 | 82:23 105:18 |
| 112:17,25 | 15:19 19:3 | 109:2,13 | 108:12 114:17 |
| 114:15,22,25 | **tokens** 11:13 | 118:24 119:1,5 | 117:2 122:5 |
| 115:5 117:16 | 48:2,18 78:18 | 119:18 121:1,2 | 123:8 |
| 117:17,22 | 78:24 79:18 | 121:3,11 | **transcript** |
| 119:10 120:12 | 80:20 116:7,8,9 | 122:19,21,22 | 146:6,8,10,13 |
| 125:24 127:25 | **told** 131:17 | 123:13,13 | 146:13,21 |
| 128:1 132:8,12 | **took** 51:15 52:9 | 124:22,23,25 | 147:2,2 |
| 134:21 136:22 | **tools** 37:9,14,16 | 125:2 | **transferred** |
| 136:24 137:12 | 37:20 38:23 | **traditional** | 21:4 70:25 |
| 138:10 142:6 | 39:1 41:22,24 | 41:18 42:3 | 141:16 |
| 143:16 146:10 | **top** 32:12 73:24 | **training** 41:7 | **transferring** |
| 146:18,24 | 127:25 132:16 | 41:12 | 71:4 |
| 147:7 | **topic** 43:17 | **trans** 122:11 | **translate** 57:4 |
| **times** 16:20,21 | **topics** 22:6,6 | **transaction** | 63:19,22 64:2 |
| 17:14 52:7 | 27:11,12 | 51:20,24 52:8 | 64:14,23,25 |
| 107:21 109:9 | | 52:15 71:1 | 65:5 67:9 69:9 |

Page 35

**[translate - use]**

92:19 108:21
140:21
**translated**  68:9
77:22 78:7
**translating**
66:20 76:12
93:22 139:13
**translation**
64:8,9 68:13
70:22 89:2,4,15
92:22
**translations**
88:3
**treat**  105:24
**treated**  105:20
**trial**  5:18
127:15
**trio**  48:10
**trod**  74:11
**true**  30:23
54:10 68:5
144:2 145:10
**truth**  145:7,8
**truthful**  5:25
**try**  78:20 79:2
120:14 130:9
**trying**  12:25
36:16 40:13
43:9 95:9,11
101:22 107:18
115:13 118:16
134:25
**turn**  24:5
123:22

**turning**  29:10
53:14 100:5
**turns**  71:17
79:6
**tweak**  68:10
**two**  10:23
14:17 15:20,21
15:24 18:25
51:13 66:14,16
66:18 69:19
70:4,23 79:4
95:25 116:6
120:21,22
124:11,16
**type**  54:9,10
91:4 125:25
127:11
**types**  71:22
78:25 121:19
134:7 141:15
**typewriting**
145:10
**typically**  53:12
73:20 120:7

**u**

**u.s.**  57:3 63:20
63:24 64:19
66:21 67:3,10
68:2 69:10,21
70:25 71:4
76:13 92:19
95:8,10 100:24
101:7,8,15
102:2 111:14
125:7 140:11

140:22
**ultimately**
53:12 86:23
135:22
**unchanged**
93:17
**uncomfortable**
93:7
**under**  5:17
34:15 63:22
75:19 87:8,24
127:19 130:4
130:12 144:1
145:10
**understand**
5:16,20 11:14
11:16 19:22
21:1 22:14
26:16 40:13
43:9 47:24
48:14,16,20
65:20 76:15
81:14 95:9
101:23 107:18
121:22 122:4
134:25
**understanding**
24:13 39:4
46:4 48:3,6,7,9
49:2,10,14 51:1
51:16,21 52:24
58:22 59:20
75:2 82:21
85:8 96:3
105:16 112:10

131:22 133:2
141:14
**understood**
80:25
**undertake**
20:11 38:25
43:2
**unfavorably**
107:2 110:2
**unique**  36:15
**unit**  94:21,22
**united**  1:3 96:1
96:1,2,16,17,17
**units**  96:7
100:6
**unpublished**
43:18
**unrealistic**
85:20
**unregistered**
75:25
**unsure**  126:3,4
**unusual**  116:21
117:1 120:25
122:2
**updated**  131:8
**use**  25:7 51:1
63:15 67:18,24
68:24 70:13
71:5 72:5 79:5
80:2 82:14
87:9 90:20
91:9 101:24
102:24 106:15
106:21 107:5

Veritext Legal Solutions
866 299-5127

**[use - wallet]**

108:15 109:18
110:18,25
121:18 122:6
122:10 137:7
137:11,17
140:21 141:8
**used**  26:3 37:17
41:22 50:7,7
51:6 55:1 57:8
59:24 65:14,16
65:20 66:6,11
67:9 69:9,22
70:2 71:1,21
72:22 82:4,13
83:18 102:1
105:25 107:14
108:17,21,25
109:23 137:15
140:10,20
141:2,5,25
142:12
**user**  105:18
**users**  105:14
**uses**  85:15
91:20 123:4
138:15
**using**  53:18
54:1,5 83:9
86:9,16 95:13
96:23 114:13
132:20 137:2
140:11 141:9
**usually**  51:19
61:14 90:13,15
90:16 107:11

121:7
**utility**  50:12

**v**

**validated**  84:12
**valuation**  36:2
42:23 83:9
**valuations**
61:12
**value**  41:13,23
50:8 57:5,9,12
57:13,18,21
61:5,10 62:5
63:10,23 64:3
64:14,24 65:1,6
67:6 72:5,13
73:13,15 76:11
76:19,20 77:8
78:8 82:3 83:8
86:1,3 87:16,17
87:18 88:4,17
88:19 90:7,20
92:12,16 93:3
94:21,23 99:16
99:17,25
100:23 101:4
108:22 110:17
111:1,14 112:9
112:16,24
114:14,20
136:21,24
138:25 139:8
139:13,19
140:8 141:10
**valuing**  41:8
42:2

**variation**  62:24
63:4
**variations**
135:15
**varies**  33:24
62:13 91:4
104:12,24
105:17 129:15
**various**  63:11
**vary**  62:5,18
**vast**  119:15
**vendor**  21:4
**venture**  128:13
**verdict**  70:12
89:5
**verified**  65:7
68:16
**veritext**  4:4
146:7,9,11
**version**  131:9
**versus**  11:25
29:3 49:19
50:22 53:4
63:13 68:6
93:9 123:15
**video**  4:8
**videographer**
2:12 4:2,3,23
43:25 44:3
81:5,8 103:15
104:2 132:8,11
143:16
**videotaped**
1:14

**view**  30:5 75:12
76:9 91:22
98:11,12 104:9
104:13,22,25
121:17,23
122:1 132:19
133:17 134:12
**views**  104:11
**violation**  76:1
**virtual**  7:11
23:8 93:25
100:2
**visit**  16:1,6,17
16:23 17:9,14
19:5
**visited**  15:17
17:10,13 18:1
19:2
**visiting**  16:12
**volatility**  35:17
36:6,7
**volume**  1:1
105:18 121:12
121:14,15
122:21 124:12
124:14

**w**

**wait**  45:11,11
55:16 130:21
**waived**  146:23
146:23
**waiving**  146:20
**wall**  10:15,20
**wallet**  40:4,5

**[wallets - xrp]**

**wallets**  40:1
**want**  18:17
  25:2 27:2 38:2
  42:15 43:21
  59:11 63:25
  64:6 66:6
  67:15 68:24
  71:13,16 75:13
  83:16 84:9
  86:15 88:21,24
  90:23 91:3
  116:8 123:11
  123:12 126:3
  127:16 128:20
  132:14
**wanted**  12:21
  14:22 15:4
  17:6 38:3 44:6
**way**  26:8 36:14
  38:2 46:10,13
  51:15 54:19
  66:9 68:12
  77:3 84:19
  93:1 96:22
  100:3 113:18
  119:20 120:5
  121:13 135:25
  136:13 139:5,6
  140:1,5,19
**ways**  54:20
  68:11 106:18
  136:9
**we've**  21:3
  43:20 66:9,14
  66:18 95:12

126:19
**website**  13:21
  14:2,11,13,18
  15:4,17 16:2,18
  16:24 17:10
  18:1
**websites**  16:5,7
  16:11 124:19
**week**  7:12 8:10
**weeks**  14:17
  15:20,21,24
**went**  14:2
  141:7
**whereof**  145:16
**whichever**
  76:25 107:8
  140:1
**wish**  27:14
**wishes**  85:9
**witness**  1:15
  4:25 5:2 15:13
  39:17 72:1
  129:3 130:3
  144:10 145:11
  145:16 146:13
  146:16 147:2,5
  148:24
**wondering**
  35:6 94:16
  101:25 117:19
**word**  5:21 6:6
  19:24 27:16
  57:16 76:17
  133:16 139:5
  139:17 140:2

**words**  9:7 22:1
  22:5 76:7
  84:16 95:25
  126:4
**work**  34:3,4,7
  34:10 39:12,13
  39:14,16 59:18
  104:10,11,23
  110:11,17
  111:13 127:6
  127:12,19,22
  129:2,6,17,20
  134:1 137:24
**worked**  128:4
**working**  31:19
  102:17
**works**  9:17
**world**  72:25
  82:11,14 83:14
**worse**  92:3
**worth**  57:23
  91:16 92:5,14
  99:20,21
**write**  27:9
  29:11 129:25
**writing**  9:8
  27:21 38:5
  102:14 124:4
  125:1,21,22
  134:18,24
**writings**  21:17
  22:4
**wrong**  47:14
  85:11

**wrote**  47:16
  50:3,21 104:14
  120:12 125:24

**x**

**x**  3:1,5 147:9
**xrp**  10:7,13,20
  11:1,13 13:12
  13:15 19:2,6
  21:18 22:1,13
  22:18,24 25:4,9
  25:14,22 47:18
  48:2,3,18 49:2
  49:15,22,24
  50:6,12,22 51:1
  51:9,17,23
  53:21 55:5
  56:11,13,18
  57:2,9,11,23
  58:6,7,10,12,13
  58:19 59:1,2,18
  59:22 60:1,7,10
  60:14,20 61:2,5
  61:18,24 62:5
  62:13 63:21
  68:6,8 69:20,20
  69:22,23 70:2
  71:2,22 73:18
  78:3,4,14,18,21
  78:23,24 79:2,4
  79:18,25 80:8
  80:11,12,20
  81:16,21 82:17
  85:4,10,16 86:2
  86:3,4 87:10,10
  87:11,17,21,22

Veritext Legal Solutions
866 299-5127

**[xrp - zoom]**

| | |
|---|---|
| 87:23 88:18 | **y** |
| 90:3 91:10,11 | **yeah** 45:13 |
| 91:14,20,21 | 75:21 83:16 |
| 92:10,15 93:23 | 134:17 |
| 97:1,4 98:1,9 | **year** 10:8 16:19 |
| 99:8,9,20,21,24 | 26:23 33:24,24 |
| 100:6,8,21 | 129:15,15 |
| 101:3,4,12 | 130:15 131:24 |
| 102:2,25 105:9 | **years** 23:19 |
| 108:18 110:11 | 27:7 129:12,16 |
| 110:19,20,22 | 129:18 130:17 |
| 111:1,5,12,14 | 130:18,22 |
| 112:4,5,9,13,16 | 131:4,14,19 |
| 112:17,20,21 | 132:1,2 |
| 112:24 113:4,6 | **yesterday** 7:10 |
| 113:14 114:1 | 8:9 |
| 114:14 115:16 | **york** 2:9 109:2 |
| 115:20,21,24 | **z** |
| 116:3,4,7,8,9 | |
| 116:13 117:10 | **zoom** 2:8,13 |
| 117:13 119:2 | 7:12 |
| 123:8 124:12 | |
| 124:14 132:24 | |
| 133:7,18,22,25 | |
| 134:22 135:20 | |
| 135:22 136:22 | |
| 136:24 137:5 | |
| 137:12,23 | |
| 138:6,6 140:20 | |
| 141:7,16 142:1 | |
| 142:13 | |
| **xuang** 8:19 | |

Page 39

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.