# EXHIBIT 4

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
 5
 6   IN RE MATTER OF:        )
                             )
 7   RIPPLE LABS INC. LITIGATION )
                             ) CASE NO. 4:18-cv-06753-PJH
 8   _____  )
 9
10
11              *** CONFIDENTIAL ***
12
13      VIDEOTAPED DEPOSITION OF MUKARRAM ATTARI, Ph.D.
14            REMOTE VIA VIDEOCONFERENCE
15              Wednesday, March 8, 2023
16
17
18
19
20   Stenographically Reported by:
21   HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
     Realtime Systems Administrator
22   California CSR License #11600
     Oregon CSR License #21-0005
23   Washington License #21009491
     Nevada CCR License #980
24   Texas CSR License #10725
25   Job No.: 2023-884741
```

**Page 2**

```
 1         VIDEOTAPED DEPOSITION of MUKARRAM ATTARI,
 2   Ph.D., taken before Heather J. Bautista, CSR No. 11600,
 3   a Certified Shorthand Reporter for the state of
 4   California, with principal office in the county of Santa
 5   Clara, commencing on Wednesday, March 8, 2023,
 6   10:21 a.m., remotely via videoconference.
 7
 8   APPEARANCES OF COUNSEL:
 9     For Lead Plaintiff BRADLEY SOSTACK:
10         Susman Godfrey LLP
           BY:  NICHOLAS N. SPEAR, ESQ.
11         1900 Avenue of the Stars
           14th Floor
12         Los Angeles, California 90067
           Phone: (310) 789-3100 / Fax: (310) 789-3150
13         nspear@susmangodfrey.com
14     For Defendants RIPPLE LABS INC.; XRP II, LLC; and
       BRADLEY GARLINGHOUSE:
15
           King & Spalding LLP
16         BY:  ANDREW MICHAELSON, ESQ.
           1185 Avenue of the Americas
17         34th Floor
           New York, New York 10036
18         Phone: (212) 556-2100 / Fax: (212) 556-2222
           amichaelson@kslaw.com
19
           King & Spalding LLP
20         BY:  LUKE RONIGER, ESQ.
           500 W. 2nd Street
21         Suite 1800
           Austin, Texas 78701
22         Phone: (512) 547-2044
           lroniger@kslaw.com
23
24   ALSO PRESENT: Drayton Everson, Videographer
             Deborah McCrimmon, ESQ., (Ripple in-house
25           counsel)
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2                                              PAGE
 3   MUKARRAM ATTARI, Ph.D.
 4     EXAMINATION BY MR. SPEAR                  6
 5
 6
 7
 8              --oOo--
 9
10
11
12         Instructed Not to Answer
13             Page Line
14              49  20
15              107 12
```

**Page 4**

```
 1              INDEX OF EXHIBITS
 2   Exhibit No. Description                   Page
 3   Exhibit 66  2/3/2023 Expert Report of       7
                 Dr. Mukarram Attari
 4
     Exhibit 67  Defendants' Responses to Lead   30
 5               Plaintiff's Deposition of
                 Dr. Mukarram Attari with Request for
 6               Documents
 7   Exhibit 68  CRA profile page for            34
                 Dr. Mukarram Attari
 8
     Exhibit 69  15 USCA Section 77(l)           47
 9
10          ::: PREVIOUSLY MARKED EXHIBITS :::
11   Exhibit No. Description                   Page
12   Exhibit 2   Trading records for Lead Plaintiff  109
                 Bradley Sostack
13
     Exhibit 10  Expert report of                53
14               Dr. Steven Feinstein
```

**Page 5**

            Wednesday, March 8, 2023
            10:21 a.m.
            --oOo--
    THE VIDEOGRAPHER: We are now on the record on March 8th, 2023, at approximately 10:21 a.m. Pacific Time for the remote video deposition of Dr. Mukarram Attari in the matter of In Re: Ripple Labs, Inc., litigation.
    My name is Drayton Everson, and I'm the videographer on behalf of Lexitas.
    Will counsel please introduce themselves for the record and who they represent, beginning with the party noticing this proceeding.
    MR. SPEAR: Good morning. Nick Spear, Susman Godfrey, for Lead Plaintiff Bradley Sostack.
    MR. MICHAELSON: Andrew Michaelson from King & Spalding. I'm representing Defendants in this action, and I'm joined by my co-counsel, Luke Roniger, also King & Spalding, and Deborah McCrimmon from Ripple.
    THE VIDEOGRAPHER: Thank you, Counsel.
    Will our court reporter please swear in the witness.
    THE STENOGRAPHER: Good morning.
    My name is Heather Bautista, and I'm a certified stenographer licensed by the State of

**Page 6**

California. My license number is 11600.
    This deposition and any transcript produced therefrom will be handled pursuant to Federal Rule of Civil Procedure Section 30.
    As the deposition officer, I will be retaining my duties and responsibilities under the Code.
    Please raise your right hand so I can swear you in.
            MUKARRAM ATTARI, Ph.D.,
having been first duly sworn, was examined and testified as follows:
    THE WITNESS: I do.
    THE STENOGRAPHER: Thank you.
    Please state your full name for the record.
    THE WITNESS: Mukarram, M-u-k-a-r-r-a-m, Attari; that's A, -t, as in "Texas," -t, as in "Texas," -a-r-i.
    THE STENOGRAPHER: Thank you.
    Counsel, you can begin.
            DIRECT EXAMINATION
BY MR. SPEAR:
    Q. Good morning, Dr. Attari.
    What city and state do you currently live in?
    A. Oakland, California.
    MR. SPEAR: So I'm going to mark Exhibit 66.

**Page 7**

    (Exhibit 66 was marked for identification.)
    Q. (By Mr. Spear) This, Dr. Attari, is your expert report. Exhibit 66 was filed as Exhibit 52 to Defendants' Motion for Opposition to Class Certification.
    Is that the version you are looking at?
    A. Yes.
    Q. Okay.
    So if you look on Page 2 of that document, it says "Expert Report of Dr. Mukarram Attari, February 3rd, 2023." Is this your expert report in this matter?
    A. Yes.
    Q. You have been retained by counsel for the defendants as an expert in this case; correct?
    A. Yes.
    Q. Did anyone assist you in writing this report?
    A. I drafted the --
    (Stenographer clarification.)
    THE WITNESS: I drafted the initial version, and a team at CRA, that's C-R-A, assisted me with the analysis and the -- and refining the drafts.
    Q. (By Mr. Spear) For the benefit of the court reporter and the record, CRA stands for Charles Rivers Associate; correct -- Associates; correct?
    A. Yes.

**Page 8**

    Q. So going forward, when I say "CRA" or you say "CRA" today, we'll all understand that to be Charles Rivers Associates; fair enough?
    A. Fair enough.
    Q. Who helped you draft or edit or write this report or do the analysis?
    MR. MICHAELSON: Objection. Form.
    THE WITNESS: It was a number of people. The two of them that come to mind as I'm sitting here is Sam Lynch -- S-a-m, L-y-n-c-h -- and Swati Kanoria. That's S-w-a-t, as in "Texas," -i, K-a-n-o-r-i-a.
    Q. (By Mr. Spear) What is your billing rate for this matter, Dr. Attari?
    A. Stated in the report, it's $1,275.
    Q. And for the two people you mentioned that you recall working on the report with you, what is their billing rates?
    A. I do not know.
    Q. About how long did you spend putting together this report?
    A. I believe we started work sometime in December and were done by February 3rd.
    Q. Do you know how many hours you spent, roughly, working on this report?
    A. Not sitting here.

**125**

1 losses, Andrew. I'm talking purely about gains and
2 losses, which is literally the subject of Dr. Attari's
3 opinion.
4         Again, if you guys -- if you guys want -- if
5 you guys want to say right now that Dr. Attari is not
6 offering an opinion that there is -- or, you know, is
7 not offering an opinion about whether there's a common
8 methodology to calculate gains or losses, we can move
9 on. But I'm -- I don't think it's unfair to say, "Can
10 you calculate gains or losses using the same formula for
11 each person, even if the inputs are different?" It's a
12 simple question.
13         So you -- you tell me. If you guys -- if you
14 want to say on the record that he's not offering an
15 opinion at all about the formula used to calculate gains
16 or losses or whether it's common or not common, we can
17 move on. But if you can't offer me that, then I got to
18 keep asking my questions.
19         MR. MICHAELSON: Look. A calculation of gain
20 or loss is a part of his -- of his opinion. Where
21 you're going beyond that is this concept of applying one
22 methodology across a class, and I think it's because
23 you've covered this terrain multiple times, spent a lot
24 of time on it, and what you've -- what you've -- you
25 know, what you get are questions like there are multiple

**126**

1 ways to calculate it; you get different answers; it may
2 not make sense, depending on the purchaser. You've --
3 you've already covered this. And that's -- and it's not
4 his opinion -- he's not expressing an opinion on -- on
5 whether one -- one approach would make sense for all
6 purchasers. It's not -- that's outside the scope.
7         I think, you know, if you want to keep asking
8 about this, keep asking, and I'll keep saying "asked and
9 answered," and we'll see, you know, where it goes.
10         You're coming back to this. You've spent a lot
11 of time on it already.
12         MR. SPEAR: I mean, that's my -- that's my
13 choice. I've not been inefficient today. I'm allowed
14 to ask my questions. We can just keep going.
15    Q.  (By Mr. Spear) Dr. Attari, are you ready?
16    A.  Yes.
17    Q.  Are you offering an opinion, Dr. Attari, about
18 the appropriate method for calculating gains or losses
19 for class members?
20         MR. MICHAELSON: Objection.
21         THE WITNESS: I'm saying that there are
22 multiple approaches to calculating gains or losses, and
23 those approaches would give you different answers.
24    Q.  (By Mr. Spear) Not my question, Dr. Attari.
25         Are you offering an opinion about the

**127**

1 appropriate method for calculating gains or losses for
2 class members?
3         MR. MICHAELSON: Objection. Form.
4         THE WITNESS: Am I saying there is one correct
5 method? No.
6    Q.  (By Mr. Spear) Are you saying that you would
7 need to use different methods depending on the class
8 member? Is that an opinion you're offering?
9    A.  I'm saying that there are different methods --
10 approaches to calculating gains and losses that give you
11 different answers.
12    Q.  Are you offering an opinion, Dr. Attari, that
13 it is appropriate to use different methods for
14 calculating gains and losses depending on the XRP
15 purchaser?
16         MR. MICHAELSON: Objection. Form.
17         THE WITNESS: Can you say that again, please.
18    Q.  (By Mr. Spear) Sure.
19         Are you offering an opinion that you would need
20 to apply different approaches to determining gains and
21 losses for different XRP purchasers?
22         MR. MICHAELSON: Objection. Form.
23         THE WITNESS: I'm saying that there are
24 different approaches to calculating gains and losses
25 that will give you different answers.

**128**

1    Q.  (By Mr. Spear) I understand that.
2         Are you saying that you would need to apply
3 different approaches to determining gains and losses to
4 different class members?
5         MR. MICHAELSON: Objection. Form. Scope.
6 Asked and answered.
7         THE WITNESS: I don't understand the question.
8    Q.  (By Mr. Spear) Are you testifying that to
9 determine the gains and losses for an individual class
10 member, you might need to apply a different approach to
11 different class members?
12         MR. MICHAELSON: Same objections.
13         THE WITNESS: You -- if the approach to -- the
14 approach to computing gains or losses will depend on the
15 currencies the purchaser used or purchase and sale, and
16 it will be more complicated for people who purchase and
17 sold in different currencies, and the gain or losses
18 will be -- should be computed in -- in whatever
19 currencies they used to purchase and sell.
20         So, yes, I mean, you know, across all possible
21 purchasers of XRP, you cannot use the same method. You
22 will not be able to use the same method.
23    Q.  (By Mr. Spear) So it's your testimony that for
24 some purchasers, you have to calculate gains or losses
25 in, say, Bitcoin and others in U.S. dollars; that's

**129**

1  your -- that's your testimony?
2       MR. MICHAELSON:  Same objections.
3       THE WITNESS:  That is one dimension of the
4  difference, yes.
5       Q.  (By Mr. Spear) And what is your basis for
6  saying that you would calculate some gains or losses for
7  some class members in U.S. dollars and some gains or
8  losses in Bitcoin for other class members?
9       MR. MICHAELSON:  Same objections.  Form.
10  Scope.
11      THE WITNESS:  Well, it will depend on the
12  currencies that they purchased and sold in.  So if there
13  are people sitting in Korea, for example, buying and
14  selling in Korean won, then computing gains or losses
15  for them in U.S. dollars is meaningless economically.
16      Q.  (By Mr. Spear) Even if we're in a U.S. court?
17      MR. MICHAELSON:  Objection.
18      THE WITNESS:  So I think there you're asking me
19  a legal question, and you asked me that earlier, too,
20  and I -- I don't know the answer to that.
21      Q.  (By Mr. Spear) So are you offering an opinion
22  about whether you should not calculate gains or
23  losses -- strike that.
24      Let's -- is it ever possible to calculate gains
25  or losses on an aggregate basis?

**130**

1       MR. MICHAELSON:  Objection.  Form.
2       THE WITNESS:  I don't understand the question.
3       Q.  (By Mr. Spear) You said it is not possible, in
4  Paragraph 41, to evaluate gain or loss on an aggregate
5  basis.  Do you see that?
6       A.  It says, "These substantial variations show
7  that the assessment of gain or loss should account for
8  purchase-by-purchase inputs on an individualized basis
9  and, accordingly, that it's not possible to evaluate
10  gain or loss on an aggregate basis."
11      Q.  In securities litigation, is it ever possible
12  to calculate gain or loss on an aggregate basis?
13      MR. MICHAELSON:  Objection.  Form.
14      THE WITNESS:  In securities cases, you're
15  typically not calculating gains or losses.  You're
16  calculating damages, which is something different, which
17  has to do with inflation and all those other inputs --
18      Q.  (By Mr. Spear) You say here --
19      A.  -- specific to the --
20      Q.  Go ahead.
21      A.  -- the case facts.
22      Q.  You say here, "It is not possible to evaluate
23  gains or losses on an aggregate basis."  I'm just asking
24  the simple question of:  Can you think of a scenario
25  where it would ever be possible to evaluate gains or

**131**

1  losses on an aggregate basis?
2       MR. MICHAELSON:  Objection.  Form.
3       THE WITNESS:  Can I think of a scenario
4  where -- sorry.  Say that again.
5       Q.  (By Mr. Spear) Why is it relevant that it is
6  not possible to evaluate gains or losses on an aggregate
7  basis?
8       A.  Well, in -- in this case, it's talking about
9  all possible -- aggregate as in all possible purchasers
10  and sellers; right?  I mean, if you -- if you look at --
11  you know, if you look at -- at certain markets, for
12  example, and you've been asking a lot about securities
13  markets, so you might have the market capitalization of
14  a company that changes from day to day, and that tells
15  you -- that gives you one measure of gain or loss to
16  investors in that company on an aggregate basis.
17      But that's different than, kind of, all
18  purchasers over a period -- long period of time
19  calculating gains or losses for them on an aggregate
20  basis.
21      Q.  Let's look at Paragraph 24 of your opinion.
22  This is on Page 12.
23      A.  Yes.
24      Q.  You say, at the end of that paragraph,
25  "However, if no information is available on purchase and

**132**

1  sale prices and the currency used to purchase or sell
2  XRP, it is not possible to determine whether a purchaser
3  earned a gain or incurred a loss, even in this simple
4  situation."
5       Do you see that?
6       A.  Yes.
7       Q.  If you had that information, you would be able
8  to determine whether a purchaser earned a gain or
9  incurred a loss; correct?
10      A.  In the simple situation, yes.
11      Q.  And how would you determine whether that person
12  earned a gain or incurred a loss?
13      A.  Well, so this is where they purchased and sold
14  in the -- in the same currency.  So then you could
15  subtract the purchase price from the sale price, and
16  you'd have the gain or loss in that currency.
17      Q.  So let's go to Paragraph 25.  You say, "In
18  other words," this is the last sentence, "if XRP is
19  purchased and sold over multiple transactions across
20  multiple days (or even different times of the same day),
21  an assessment of the relevant purchase and sales must
22  account for the price of each transaction with a
23  corresponding portion of purchase and sale quantities."
24      Do you see that?
25      A.  Yes.

### Page 145

    1       MR. MICHAELSON: Objection. Form. Asked and
    2   answered.
    3       THE WITNESS: Again, as I noted, there are
    4   multiple approaches that can be used.
    5       Q. (By Mr. Spear) But you're not offering an
    6   opinion on any specific one; correct? Or about the
    7   propriety of any specific one; correct?
    8       MR. MICHAELSON: Same objections.
    9       THE WITNESS: I don't know what "propriety"
    10  means in this kind of setting.
    11      Q. (By Mr. Spear) You're not offering an opinion
    12  that one methodology is more appropriate than another
    13  methodology; correct?
    14      MR. MICHAELSON: Same objections.
    15      THE WITNESS: I am stating that there are
    16  multiple approaches that can be used that will give
    17  different answers.
    18      Q. (By Mr. Spear) But you're not saying that one
    19  is more appropriate to be used than another; is that
    20  fair?
    21      MR. MICHAELSON: Same objections.
    22      THE WITNESS: I mean, that, ultimately, will
    23  depend on the -- on the information that becomes
    24  available.
    25      Q. (By Mr. Spear) But that's not an opinion you

### Page 146

    1   are offering now; correct?
    2       MR. MICHAELSON: Same objections.
    3       THE WITNESS: It's -- there are multiple
    4   approaches; that's what I'm saying. Is one better than
    5   the other? No, I'm not saying one is better than the
    6   other.
    7       MR. SPEAR: Fair enough. I am done.
    8       Anyone else have any questions?
    9       MR. MICHAELSON: Can we -- can we just break
    10  for a moment for us to consider redirect? Just be five
    11  minutes.
    12      MR. SPEAR: Sure.
    13      MR. MICHAELSON: Thanks.
    14      THE VIDEOGRAPHER: The time is 3:18 p.m., and
    15  we are going off the record.
    16      (Recess taken from 3:18 p.m. to 3:24 p.m.)
    17      THE VIDEOGRAPHER: The time is 3:24 p.m., and
    18  we are back on the record.
    19      MR. MICHAELSON: So Defendants would like to
    20  designate the entirety of this transcript confidential.
    21      We do not have any redirect or further
    22  questions at this time.
    23      MR. SPEAR: Thank you, all.
    24      Dr. Attari, I really appreciate it.
    25      THE WITNESS: Thank you.

### Page 147

    1       THE STENOGRAPHER: Okay.
    2       Counsel, before we go off the record, Mr.
    3   Michaelson, would you like to order a copy of today's
    4   transcript?
    5       MR. MICHAELSON: Yes.
    6       THE STENOGRAPHER: Thank you.
    7       THE VIDEOGRAPHER: All right.
    8       The time is 3:25 p.m., and we are going off the
    9   record.
    10      (Whereupon, the videotaped deposition of
    11  MUKARRAM ATTARI, Ph.D., concluded at 3:25 p.m.)

### Page 148

    1       I, HEATHER J. BAUTISTA, CSR No. 11600, Certified
    2   Shorthand Reporter, certify:
    3       That the foregoing proceedings were taken before
    4   me at the time and place therein set forth, at which
    5   time the witness declared under penalty of perjury; that
    6   the testimony of the witness and all objections made at
    7   the time of the examination were recorded
    8   stenographically by me and were thereafter transcribed
    9   under my direction and supervision;
    10      That the foregoing is a full, true, and correct
    11  transcript of my shorthand notes so taken and of the
    12  testimony so given;
    13      ( ) Reading and signing was requested/offered.
    14      (XX) Reading and signing was not requested/offered.
    15      ( ) Reading and signing was waived.
    16      I further certify that I am not financially
    17  interested in the action, and I am not a relative or
    18  employee of any attorney of the parties, nor of any of
    19  the parties.
    20      I declare under penalty of perjury under the laws
    21  of California that the foregoing is true and correct.
    22
    23      Dated:   March 14, 2023
    24
    25      _____
            HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR