DAMIEN J. MARSHALL
(admitted *pro hac vice*)
dmarshall@kslaw.com
ANDREW MICHAELSON
(admitted *pro hac vice*)
amichaelson@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Tel: (212) 556-2100; Fax: (212) 556-2222

LISA BUGNI (SBN 323962)
lbugni@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Tel: (415) 318-1200; Fax: (415) 318-1300

ANDREW J. CERESNEY
(admitted *pro hac vice*)
aceresney@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000; Fax: (212) 909-6836

MICHAEL K. KELLOGG
(admitted *pro hac vice*)
mkellogg@kellogghansen.com
REID M. FIGEL
(admitted *pro hac vice*)
rfigel@kellogghansen.com
GREGORY G. RAPAWY
(admitted *pro hac vice*)
grapawy@kellogghansen.com
BRADLEY E. OPPENHEIMER
(admitted *pro hac vice*)
boppenheimer@kellogghansen.com
BETHAN R. JONES
(admitted *pro hac vice*)
bjones@kellogghansen.com
JUSTIN B. BERG
(admitted *pro hac vice*)
jberg@kellogghansen.com

KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900

*Attorneys for Defendants Ripple Labs Inc.,*
*XRP II, LLC, and Bradley Garlinghouse*

*Counsel for Defendant Ripple Labs Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| In re RIPPLE LABS INC. LITIGATION<br><br>_____<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 4:18-cv-06753-PJH<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED**<br><br><br>Date:      May 30, 2024<br>Time:      1:30 p.m.<br>Ctrm:      3 |

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

BACKGROUND ................................................................................................4

    I.    The Creation of the XRP Ledger and XRP..................................................4

    II.   Ripple's Business and the Cross-Border Remittance Market...............................6

    III.   Ripple's Distributions of XRP ...............................................................8

    IV.   Plaintiff's Claims and Allegations ........................................................11

    V.   The SEC Action ............................................................................13

LEGAL STANDARD ........................................................................................15

ARGUMENT ...................................................................................................15

    I.    Plaintiff's Federal Claims Are Barred by the Statute of Repose ........................15

    II.   All of Plaintiff's Claims Fail Because Defendants Did Not Sell Securities.....................20

        A.  XRP Itself Is Not an Investment Contract ................................................21

        B.  Defendants' Sales of XRP Were Not Sales of Investment Contracts Under the *Howey* Test...........................................................................................23

        C.  California's "Risk Capital" Test Does Not Save Plaintiff's State Law Claims..........39

    III.   Plaintiff's Claims Fail Because They Are Brought By Downstream Purchasers.............41

    IV.   Plaintiff's Claims Regarding Foreign Transactions Fail ..................................45

CONCLUSION .................................................................................................46

i

1

**TABLE OF AUTHORITIES**

2

**CASES**                                                                          **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ........................................................................ 46

*Aldrich v. McCulloch Props., Inc.*,
  627 F.2d 1036 (10th Cir. 1980) ................................................................. 34

*Alunni v. Dev. Res. Grp., LLC*,
  445 F. App'x 288 (11th Cir. 2011) ............................................................ 38

*Ass'n of Am. R.Rs. v. United States*,
  603 F.2d 953 (D.C. Cir. 1979) .................................................................. 30

*Bobrowski v. Red Door Grp., Inc.*,
  2011 WL 3875424 (D. Ariz. Aug. 31, 2011) ............................................. 29

*Brodt v. Bache & Co.*,
  595 F.2d 459 (9th Cir. 1978) ..................................................................... 32

*In re Century Alum. Co. Secs. Litig. Co. Secs. Litig.*,
  749 F. Supp. 2d 964 (N.D. Cal. 2010) ...................................................... 42

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) .............................................................. 42

*Collins v. Signetics Corp.*,
  605 F.2d 110 (3d Cir. 1979) ...................................................................... 42

*Cortec Indus. Inc. v. Sum Holdings L.P.*,
  949 F.2d 42 (2d Cir. 1991) ........................................................................ 42

*De Luz Ranchos Investment, Ltd. v. Coldwell Banker & Co.*,
  608 F.2d 1297 (9th Cir. 1979) ................................................................... 33

*Demarco v. LaPay*,
  2009 WL 3855704 (D. Utah Nov. 17, 2009) ............................................. 34

*Diamond S.J. Enter., Inc. v. City of San Jose*,
  430 F. Supp. 3d 637 (N.D. Cal. 2019) ...................................................... 23

*Foster v. Jesup & Lamont Sec. Co., Inc.*,
  759 F.2d 838 (11th Cir. 1985) ................................................................... 42

*In re Gap Stores Secs. Litig.*,
  79 F.R.D. 283 (N.D. Cal. 1978) ................................................................ 43

*Garcia v. Santa Maria Resort, Inc.*,
  528 F. Supp. 2d 1283 (S.D. Fla. 2007) ..................................................... 38

*Glen-Arden Commodities, Inc. v. Costantino*,
  493 F.2d 1027 (2d Cir. 1974) .................................................................... 22

*Hall v. Hall*,
  138 S. Ct. 1118 (2018) .............................................................................. 21

ii

*Handley v. Melza,,*
 2022 WL 3640203 (C.D. Cal. Feb. 15 2022) ............................................................. 18

*Happy Inv. Grp. v. Lakeworld Props., Inc.,*
 396 F. Supp. 175 (N.D. Cal. 1975) ........................................................................... 33

*Harman v. Harper,*
 914 F.2d 262 (9th Cir. 1990) .................................................................................... 32

*Healy v. Beer Inst., Inc.,*
 491 U.S. 324 (1989) ................................................................................................... 45

*Hedden v. Marinelli,*
 796 F. Supp. 432 (N.D. Cal. 1992) ........................................................................... 17

*Hertzberg v. Dignity Partners, Inc.,*
 191 F.3d 1076 (9th Cir. 1999) ........................................................................... 42, 43

*Hill York Corp. v. Am. Int'l Franchises, Inc.,*
 448 F.2d 680 (5th Cir. 1971) .................................................................................... 42

*Hocking v. Dubois,,*
 885 F.2d 1449 (9th Cir. 1989) ................................................................. 27, 29, 30, 31

*In re Itel Secs. Litig.,*
 89 F.R.D. 104 (N.D. Cal. 1981) ................................................................................ 42

*Int'l Bhd. of Teamsters v. Daniel,*
 439 U.S. 551 (1979) ................................................................................................... 26

*Jedrzejczyk v. Skillz Inc.,*
 2022 WL 2441563 (N.D. Cal. July 5, 2022) ............................................................. 42

*Johnson v. Nationwide Indus., Inc.,*
 450 F. Supp. 948 (N.D. Ill. 1978) ............................................................................ 33

*Joseph v. Wiles,*
 223 F.3d 1155 (10th Cir. 2000) ................................................................................ 42

*Kennedy v. U.S. Citizenship & Immigration Servs.,*
 871 F. Supp. 2d 996 (N.D.Cal. 2012) ...................................................................... 15

*Klein v. King,*
 1990 WL 61950 (N.D. Cal. Mar. 26, 1990) .............................................................. 43

*Landreth Timber Co. v. Landreth,*
 471 U.S. 681 (1985) ................................................................................................... 21

*Lee v. Ernst & Young, LLP,*
 294 F.3d 969 (8th Cir. 2002) .................................................................................... 42

*In re Levi Strauss & Co. Secs. Litig.,*
 527 F. Supp. 2d 965 (N.D. Cal. 2007) ..................................................................... 43

*Marine Bank v. Weaver,*
 455 U.S. 551 (1982) ................................................................................................... 20

iii

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011) ............................................................... 32

*McFarland v. Memorex Corp.*,
493 F. Supp. 631 (N.D. Cal. 1980) .................................................................... 43

*Mendelsohn v. Cap. Underwriters, Inc.*,
490 F. Supp. 1069 (N.D. Cal. 1979) .................................................................. 42

*Moore v. Kayport Package Exp., Inc.*,
885 F.2d 531 (9th Cir. 1989) ............................................................................. 42

*Mordaunt v. Incomco*,
686 F.2d 815 (9th Cir. 1982) ................................................................. 27, 28, 31

*Moreland v. Dep't of Corps.*,
194 Cal. App. 3d 506 (Cal. Ct. App. 1987) ....................................................... 40

*Morissette v. United States*,
342 U.S. 246 (1952) ........................................................................................... 21

*Morley v. Cohen*,
610 F. Supp. 798 (D. Md. 1985) ........................................................................ 17

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ........................................................................................... 45

*Noa v. Key Futures, Inc.*,
638 F.2d 77 (9th Cir. 1980) ............................................................................... 35

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004) ................................................................................ 15

*Pinter v. Dahl*,
486 U.S. 622 (1988) ............................................................................... 41, 42, 44

*Powell v. Cnty. of Orange*,
2022 WL 3574282 (C.D. Cal. July 7, 2022) ..................................................... 23

*Primo v. Pac. Biosciences of Cal., Inc.*,
940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................. 43

*Revak v. SEC Realty Corp.*,
18 F.3d 81 (2d Cir. 1994) .................................................................................. 28

*Rodriguez v. Banco Cent. Corp.*,
990 F.2d 7 (1st Cir. 1993) ............................................................................ 22, 33

*Russello v. United States*,
464 U.S. 16 (1983) ............................................................................................. 43

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) ................................................................. 34, 38, 39

*Salameh v. Tarsadia Hotels*,
2010 WL 3339439 (S.D. Cal. Aug. 4, 2010) ..................................................... 40

iv

*Salameh v. Tarsadia Hotels*,
   2011 WL 1044129 (S.D. Cal. Mar. 22, 2011) ........................................................ 38

*SEC v. Ahmed*,
   308 F. Supp. 3d 628 (D. Conn. 2018) ................................................................... 46

*SEC v. Belmont Reid & Co.*,
   794 F.2d 1388 (9th Cir. 1986) ...................................................................... 22, 35

*SEC v. Dalius*,
   2023 WL 3988425 (C.D. Cal. May 24, 2023) ......................................................... 35

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ............................................................................... 20

*SEC v. Mut. Benefits Corp.*,
   408 F.3d 737 (11th Cir. 2005) .............................................................................. 35

*SEC v. Pac. W. Cap. Grp., Inc.*,
   2015 WL 9694808 (C.D. Cal. June 16, 2015) ......................................................... 38

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) .............................................................................. 15

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1953) ............................................................................................. 17

*SEC v. Rubera*,
   350 F.3d 1084 (9th Cir. 2003) .............................................................................. 26

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................ 3, 21, 28, 34

*Shaw v. Digit. Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ................................................................................ 42

*Silver Hills Country Club v. Sobieski*,
   55 Cal. 2d 811 (1961) ................................................................................... 40, 41

*Slagell v. Bontrager*,
   616 F. Supp. 634 (W.D. Pa. 1985) ....................................................................... 17

*Stack v. Lobo*,
   903 F. Supp. 1361 (N.D. Cal. 1995) ..................................................................... 43

*Svets v. Osborne Precious Metals Co.*,
   1992 WL 281413 (N.D. Cal. June 8, 1992) ............................................................ 35

*Taddeo v. Am. Invsco Corp.*,
   2012 WL 1947897 (D. Nev. May 30, 2012) ........................................................... 17

*In re Violin Memory Secs. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ......................................................... 42

*In re Valence Tech. Secs. Litig.*,
   1996 WL 37788 (N.D. Cal. Jan. 23, 1996) ............................................................ 43

v

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

*Viterbi v. Wasserman*,
  191 Cal. App. 4th 927 (2011) ................................................................. 20

*Wals v. Fox Hills Dev. Corp.*,
  24 F.3d 1016 (7th Cir. 1994) ................................................................. 30

*Warfield v. Alaniz*,
  569 F.3d 1015 (9th Cir. 2009) ......................................................... 26, 42

*Water Island Event-Driven Fund, LLC v. Tribune Media Co.*,
  39 F.4th 402 (7th Cir. 2022) ................................................................. 42

*Weinstein v. Jain*,
  1995 WL 787549 (N.D. Cal. 1995) ....................................................... 43

*Welgus v. TriNet*,
  2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ......................................... 42

*In re Wells Fargo Mortg. Backed Certificates Litig.*,
  712 F. Supp. 2d 958 (N.D. Cal. 2010) .................................................. 43

*Wis. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018) .......................................................................... 21

*Woodward v. Terracor*,
  574 F.2d 1023 (10th Cir. 1978) ............................................................ 33

*Wright v. Schock*,
  571 F. Supp. 642 (N.D. Cal. 1983) ...................................................... 32

*Yates v. Municipal Mortg. & Equity LLC*,
  744 F.3d 874 (4th Cir. 2014) ................................................................ 42

*Zacharias v. SEC*,
  569 F.3d 458 (D.C. Cir. 2009) ......................................................... 26, 42

**STATUTES**

15 U.S.C. § 77 ........................................................ 4, 13, 15, 41, 42, 43

Cal. Corp. Code § 25019 ......................................................................... 20

Cal. Corp. Code § 25110 .................................................................. 13, 45

**RULES AND REGULATIONS**

Fed. R. Civ. P. 56(a) ............................................................................... 15

*Remittance Transfers Under the Electronic Fund Transfer Act*,
  85 Fed. Reg. 34,870 (June 5, 2020) ....................................................... 6

**OTHER AUTHORITIES**

*American Diamond Co.*,
  SEC Staff No-Action Letter, 1977 WL 10907 (Aug. 15, 1977) ............... 33

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No. 4:18-cv-06753-PJH

1

*Future Sys. Inc.,*
     SEC Staff No-Action Letter, 1973 WL 9653 (June 8, 1973).........................................33

*The London Diamond Exch.,*
     SEC Staff No-Action Letter, 1972 WL 8488 (Oct. 3, 1972).........................................33

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                          Case No. 4:18-cv-06753-PJH

1

## INTRODUCTION

2      Defendant Ripple Labs Inc. ("Ripple") is a privately held financial technology company

3  that employs more than 1,000 people in 16 offices worldwide.  Defendant Bradley Garlinghouse

4  is its current Chief Executive Officer.  Defendant XRP II, LLC is a former subsidiary of Ripple

5  that was formed to make sales of XRP exclusively to well-capitalized corporations and wealthy

6  individuals.  XRP is a digital asset associated with the XRP Ledger – a publicly accessible

7  blockchain enabled by open-source software that can securely record transactions at lightning-

8  fast speeds.  Ripple did not create and does not control XRP or the XRP Ledger, nor was all XRP

9  ever owned by Ripple.  Instead, after Ripple's formation in 2012, it was gifted 80% of the total

10  amount of XRP from the founders of the XRP Ledger.  Since 2013, Ripple has distributed XRP

11  in various different ways – including giving it away for free, donating it to charities, paying

12  employees with it, using it to pay for services, and selling it.

13      Lead Plaintiff Bradley Sostack is a cryptocurrency day trader who, during a price spike in

14  the broader cryptocurrency market, bought and sold numerous digital assets, including XRP, on

15  anonymous online digital asset exchanges.  His XRP purchases and sales mostly occurred during

16  a two-week period in January 2018.  Plaintiff did not know (or care) at the time of his purchases

17  who he was buying from and did not know (or care) whether he was buying XRP from Ripple

18  specifically.  Nearly two years later, Plaintiff filed this action and then bought and sold more

19  XRP shortly thereafter.

20      Plaintiff claims, on behalf of two classes, that XRP is a security under federal and

21  California securities laws because it is an "investment contract."  Plaintiff then claims that,

22  because XRP was not registered with the SEC or California securities regulators, Defendants are

23  liable under federal and California law for selling unregistered securities.  Under Plaintiff's

24  theory, it does not matter whether class members bought XRP directly from Defendants (or

25  market makers) or from completely unaffiliated sellers (including other class members).  Instead,

26  under Plaintiff's theory, even XRP that Defendants did not create or control and never owned,

27  sold on exchanges to a series of buyers who each sold to other buyers across the globe, who did

28

1

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No. 4:18-cv-06753-PJH

1  not know about Defendants and who Defendants did not know about, somehow results in

2  Defendants being liable to all of those buyers, who are otherwise strangers with no relationship

3  to them.  Not so.

4        At the outset, Plaintiff's federal claim is foreclosed by the Securities Act's three-year

5  statute of repose.  The statute of repose bars claims for the sale of unregistered securities brought

6  more than three years after the security was first offered to the public.  Even assuming that XRP

7  was sold as a security (it was not), it was clearly offered and sold to the public more than three

8  years before this case was brought.  The undisputed evidence shows that *billions* of units of XRP

9  were in the hands of the general public long before the applicable repose date here.  And

10  Plaintiff's California state law claim fails on the facts because Plaintiff has not shown that he

11  purchased XRP from Defendants, as the statute requires.  Accordingly, Plaintiff's entire case

12  fails even assuming he could prove that XRP is an "investment contract."

13        But should the Court reach the "investment contract" question, Plaintiff cannot prevail

14  there either.  Plaintiff's claims are squarely foreclosed by relevant case law, including Judge

15  Torres's (S.D.N.Y.) July 2023 summary judgment decision in a parallel action brought by the

16  U.S. Securities and Exchange Commission (the "SEC Action") in which Judge Torres considered

17  the same fundamental question presented by Plaintiff here.  This Court should follow the existing

18  authorities and grant summary judgment in Defendants' favor.

19        As Judge Torres rightly held, "XRP, as a digital token, is not in and of itself a 'contract,

20  transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract."

21  Order at 15, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. July 13, 2023), ECF

22  No. 874 ("SEC SJ Order").  Indeed, XRP itself is not a contract at all.  It is simply an asset, and

23  many cases (including the SEC's case against Ripple) stand for the proposition that assets

24  standing alone are not investment contracts, even if bought for an investment purpose.  That

25  precedent is fatal to Plaintiff's claims.

26        Nor were Defendants' distributions of XRP offers and sales of investment contracts.  Any

27  XRP holders who lost money on their sales of XRP (and therefore qualify as class members)

28  

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                 Case No. 4:18-cv-06753-PJH

almost certainly purchased XRP on digital asset exchanges.  As Judge Torres also correctly held, on an identical factual record (because the record in the SEC Action has been reproduced in full here), purchases and sales of XRP on digital asset exchanges were not investment contracts. That is because (among other things) there was no contractual relationship between buyers and sellers on those exchanges; buyers did not know who was selling to them in the first place and therefore could not have entered into investment contracts with Defendants.  In reaching this conclusion, Judge Torres recognized that exchange-based buyers, like Mr. Sostack,[1] might have purchased XRP hoping to make money, but held that those buyers "did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)."  *Id.* at 24.

This Court need not go further than follow Judge Torres's core holding to grant summary judgment in Defendants' favor.  But if it chooses to evaluate this issue anew, none of the features of an "investment contract" that the Supreme Court recognized in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), are present here, and that means no class member can show that XRP was sold as a security under federal or California law.  Few class members actually bought XRP from Defendants, defeating the "investment of money" prong of the *Howey* test, which requires that buyers' money was "invested" into an enterprise that Defendants controlled.  Buying XRP (via a digital asset exchange or otherwise) also did not transform XRP purchasers into members of any common business enterprise.  It is undisputed that Ripple's value can increase even as the price of XRP falls, and vice versa; indeed, it is undisputed that the price of XRP can increase even if Ripple ceases to exist entirely.  That defeats the "common enterprise" prong of the *Howey* test. Nor could purchasers of XRP have expected to obtain profits based on Ripple's efforts:  as Judge Torres held, Ripple made no promises to XRP purchasers, many of whom were unaware of its

---

[1] Indeed, Judge Torres reached her decision with Mr. Sostack's allegations specifically before her: he submitted a declaration concerning his alleged expectations in support of the SEC's motion for summary judgment.  *See* SEC Mot. for Summ. J., PX 544, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. June 13, 2023), ECF No. 840-111.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

existence.  In short, XRP lacks the economic reality of an "investment contract" or of a security, and that is fatal to all of the claims here.

Finally, even if Plaintiff could prove that XRP was sold as a security, and even if his claims were timely, his claims would still fail for two additional, independent reasons.

*First*, federal law creates liability for a seller of an unregistered security only "to *the person* purchasing such security *from him*."  15 U.S.C. § 77*l*(a)(1) (emphasis added).  As noted above, the overwhelming majority of class members did not purchase XRP from Ripple (or market makers selling on its behalf); therefore, Ripple is not liable to those class members.  And Plaintiff has offered no means of identifying the tiny fraction of class members who did purchase XRP from Ripple.  The same evidentiary shortcoming is also fatal to Plaintiff's California law claim because California law expressly limits liability to a seller's direct purchasers.

*Second*, domestic securities laws do not reach foreign securities transactions, and Plaintiff bears the burden of proving that each transaction at issue is domestic.  Transactions that take place on exchanges occur where the exchange is domiciled.  Yet Plaintiff expressly contends that some class members purchased XRP on foreign-domiciled exchanges, and appears to seek liability for foreign transactions.  Remedies for those transactions are not available under U.S. or California law.  Accordingly, under the transaction-by-transaction analysis required by the case law, Plaintiff's claims will fail for many of the transactions he seeks to put at issue.

For all these reasons, the Court should grant summary judgment in favor of Defendants and reject Plaintiff's request to inject turmoil into a well-functioning multi-billion-dollar market by issuing a decision in conflict with Judge Torres's decision in the SEC Action.

## BACKGROUND

### I.   The Creation of the XRP Ledger and XRP

The digital asset at issue in this case, XRP, is the "native token" of the XRP Ledger, an example of blockchain technology.  Ex. 1,[2] A. Birla SEC Dep. Tr. 248:23-25; SEC SJ Order at 2.

---

[2] Citations to "Ex. __" refer to the exhibits attached to the Declaration of Bethan R. Jones, filed contemporaneously with this motion.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

A "blockchain" periodically records "blocks" of transactions and organizes them into a "chain" leading from one block to another.  Blockchains store an immutable history of transactions that can allow users to verify the ownership of an asset, or to transfer ownership to other people.

The first blockchain ledger, Bitcoin, launched in 2009.  In 2011 and early 2012, three individuals – Jed McCaleb, Arthur Britto, and David Schwartz – developed an alternative blockchain, now known as the XRP Ledger, to increase the speed of transactions, reduce their cost, and minimize energy consumption.  Ex. 2, D. Schwartz SEC Decl. ¶ 3; Ex. 3, C. Larsen SEC Dep. Tr. 232:18-21; SEC SJ Order at 2.  From the time a user initiates a Bitcoin transaction, it ordinarily takes about 10 minutes to process and about an hour to become irreversible; transactions on the XRP Ledger ordinarily settle in 3 to 5 seconds.  Ex. 2, D. Schwartz SEC Decl. ¶ 5; Ex. 4, J. Clark Tr. 106:1-108:10.  And in any given second, the XRP Ledger can process thousands of transactions, whereas Bitcoin can process fewer than 10.  Ex. 2, D. Schwartz SEC Decl. ¶ 5; Ex. 4, J. Clark Tr. 109:12-19.  Transactions on the XRP Ledger also use less than 0.002% of the computing power needed for Bitcoin transactions.  Ex. 2, D. Schwartz SEC Decl. ¶ 5.  The XRP Ledger thus allows for seamless, lightning-fast transfers of value.  It can also be used to record transactions not just in XRP, but in practically any asset, including Bitcoin, Ethereum, U.S. dollars, Euros, or gold.  Ex. 5, D. Schwartz Tr. 30:4-31:15.

When the XRP Ledger launched in 2012, its code automatically generated a fixed supply of 100 billion XRP.  Ex. 2, D. Schwartz SEC Decl. ¶ 6; SEC SJ Order at 2.  Ripple's founders – Christian Larsen, Jed McCaleb, and Arthur Britto – then gave 80 billion XRP to a newly formed corporate entity, now called Ripple, retaining 20 billion among themselves.  Ex. 2, D. Schwartz SEC Decl. ¶ 6; SEC SJ Order at 2.  No XRP was sold before the launch of the XRP Ledger.  Ex. 2, D. Schwartz SEC Decl. ¶ 6; SEC SJ Order at 3.

XRP is necessary to operate the XRP Ledger.  *See* SEC SJ Order at 2.  As a security mechanism to prevent malicious attacks on the XRP Ledger (such as submitting overwhelming numbers of "spam" transactions), a small amount of XRP is "burned" with every transaction, meaning users seeking to write transactions on the XRP Ledger must use some XRP to do so.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

1   Ex. 2, D. Schwartz SEC Decl. ¶ 5; Ex. 6, P. Rapoport SEC Dep. Tr. 125:17-19.[3]  From the

2   moment the XRP Ledger was launched in late 2012, XRP has been used and usable for this

3   purpose.  Ex. 7, D. Schwartz SEC Dep. Tr. 35:16-36:19; Ex. 2, D. Schwartz SEC Decl. ¶ 9.

4   **II.     Ripple's Business and the Cross-Border Remittance Market**

5          Ripple is a financial technology company founded in 2012, after the core code for the

6   XRP Ledger was completed.  Ex. 2, D. Schwartz SEC Decl. ¶ 8.  Ripple raised its investment

7   capital through multiple funding rounds in which it sold stock (not XRP) to investors.  Ex. 8, A.

8   Ferrell Rep. ¶¶ 20-21.  Accordingly, the only people who have invested in Ripple are those

9   shareholders; XRP holders have no claims or rights comparable to those of Ripple's

10  investors.  ███████████████████████   Since its early days, Ripple's mission

11  has been to realize an "Internet of Value" – using technology to enable value to move as

12  seamlessly as information does today over the Internet.  Ex. 3, C. Larsen SEC Dep. Tr. 232:19-

13  234:9; SEC SJ Order at 3.

14         One area that Ripple has expressly targeted is the payments industry, and the cross-border

15  payments industry in particular, Ex. 3, C. Larsen SEC Dep. Tr. 234:5-9; SEC SJ Order at 3 – a

16  market that has annual revenues expected to top $2 trillion in the near future.  Markus

17  Ampenberger et al., *Investor Scrutiny Provokes a Moment of Truth: Global Payments Report*

18  *2023*, BOSTON CONSULTING GROUP (Sept. 12, 2023), https://perma.cc/CA5L-W4FE.  Traditional

19  cross-border payments are plagued by "high costs, low speed, limited access and insufficient

20  transparency."  Financial Stability Board, *Enhancing Cross-border Payments* (Oct. 13, 2020),

21  https://perma.cc/G7BF-9P9F.  Ripple has developed financial technology solutions that address

22  those problems, as an array of industry and government authorities have recognized.  *See, e.g.*,

23  Final Rule, Remittance Transfers Under the Electronic Fund Transfer Act, 85 Fed. Reg. 34,870,

24  34,880 (June 5, 2020) (U.S. Consumer Financial Protection Bureau stating it "believe[d] that

25

26  [3] This burning distinguishes the XRP Ledger from other blockchain ledgers, such as Ethereum,
    in which major contributors to the blockchain receive fees that users pay to record transactions.

27  Ex. 4, J. Clark Tr. 112:4-12.

28  ────────────────────────────────────────
                                             6
    DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                              Case No. 4:18-cv-06753-PJH

expanded adoption of . . . Ripple's suite of products could . . . allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent," contrary to the current state of play).[4]

One of Ripple's most popular offerings is On-Demand Liquidity, or "ODL."[5]  ODL uses XRP as a bridge currency for near-instant cross-border transactions, allowing settlement significantly faster than on traditional cross-border payment rails and at times when traditional payment servicers (like banks) are closed.  Ex. 1, A. Birla SEC Dep. Tr. 43:10-17; Ex. 10, Samarasinghe SEC Dep. Tr. 230:21-231:1-5; *see also* SEC SJ Order at 3; Br. of *Amicus Curiae* I-Remit, Inc., *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. Oct. 22, 2022). ODL customers hold XRP only for seconds as part of the overall currency conversion process, Ex. 8, A. Ferrell Rep. ¶ 69; Ex. 11, SEC's Mot. for Summ. J., PX 192, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. June 13, 2023), ECF No. 871-7 ("2020 All-Hands Ripple Engineers Meeting Tr.") at 24:20-25, and their contracts with Ripple expressly insulate them from any changes in the price of XRP during that short time.  Ex. 12, L. Angelilli SEC Decl. ¶¶ 14, 22; Ex. 13, MoneyGram Work Order (RPLI_00180446); Ex. 14, ODL Work Order for Send Friend Inc. (RPLI_00254781).  As a result, ODL customers face no risk of loss (and have no opportunity for gain) from price changes of the XRP that they hold for a few seconds to complete their cross-border transactions.  Billions of dollars, or the equivalent, have been transferred between currencies using ODL.  Ex. 15, M. Long SEC Decl. ¶ 3.

---

[4] *See also* Michael del Castillo, *Blockchain 50:  Billion Dollar Babies*, FORBES (Apr. 16, 2019), https://perma.cc/99AP-LEZ5 (recognition in Forbes FinTech 50); BusinessWire, *CB Insights Reveals the Fintech 250 List at Future of Fintech*, BLOOMBERG (June 29, 2017), https://perma.cc/Z56N-6CSN (recognition in CB Insights Fintech 250); Ripple, *Ripple Labs Awarded as Technology Pioneer by World Economic Forum* (Aug. 5, 2015), https://perma.cc/NLL6-PRY5 (recognition by World Economic Forum); American Banker, *20 Fintech Companies to Watch* (Oct. 12, 2015), https://perma.cc/CN7E-URWX (recognition by American Banker magazine).

[5] ODL was formerly known as "xRapid," and is part of the Ripple Payments product suite.  The description here concerns the typical structure of ODL transactions using XRP as a bridge currency, but the product can be configured to use other digital assets instead.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                           Case No. 4:18-cv-06753-PJH

1   Although ODL uses the XRP Ledger, other Ripple products and services do not rely on

2   XRP or the XRP Ledger at all.  Ex. 1, A. Birla SEC Dep. Tr. 49:20-50:8; SEC SJ Order at 3. ███

3   ████████████████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████  Likewise,

5   although Ripple offers products that use the XRP Ledger, neither Ripple nor anyone else owns

6   the Ledger.  The XRP Ledger's code is "open source," so anyone can use the XRP Ledger,

7   submit transactions to it, propose changes to its source code, or develop applications that run on

8   it.  Ex. 2, D. Schwartz SEC Decl. ¶ 9; SEC SJ Order at 3; *id.* at 32 ("Ripple did not manage,

9   operate, or control the XRP Ledger").  Other users can implement changes to the XRP Ledger's

10  code without Ripple's input and even over Ripple's express objections – and have done so in

11  practice, such as when a code change was approved over Ripple's objection in 2020.  Ex. 16, D.

12  Schwartz SEC Dep. Ex. DS-70; Ex. 7, D. Schwartz SEC Dep. Tr. 151:10-22.

13      Ripple also does not control the supply of XRP.  As noted above, Ripple's founders

14  retained 20 billion XRP; Ripple never owned those units.  Ex. 2, D. Schwartz SEC Decl. ¶ 7;

15  SEC SJ Order at 3.  Whenever those individuals have sold XRP, whether before, during, or after

16  the class period, the sales proceeds have never been held by Ripple or commingled in Ripple's

17  accounts.  Ex. 2, D. Schwartz SEC Decl. ¶ 7; Ex. 3, C. Larsen SEC Dep. Tr. 67:18-69:2.  It

18  follows that many class members bought and sold XRP that Ripple never owned at any time.

19  **III.   Ripple's Distributions of XRP**

20      Ripple's founders initially gave Ripple 80 billion units of XRP.  Ex. 2, D. Schwartz SEC

21  Decl. ¶ 6; SEC SJ Order at 3.  Since then, Ripple has distributed its XRP in various ways that did

22  not involve sales.  It has given away XRP for free and donated XRP to charities.  Ex. 15, M.

23  Long SEC Decl. ¶¶ 8-9.  It has also used XRP, for example, to pay vendors who accepted XRP

24  in lieu of dollars or other fiat currencies, and to pay employees who wanted to receive XRP

25

26

27

28

8

instead of dollars.  Ex. 17, A. Schwartz Rep. ¶ 37 & Ex. E.[6]  Accordingly, anyone who later bought these units of XRP, on exchanges or otherwise, has no link back to a sale by Ripple.

Before the start of the class period in July 2017, Ripple announced that it would place most of its XRP into a cryptographic escrow that would limit Ripple's access to one billion units per month.  *See, e.g.*, Michael del Castillo, *Ripple Pledges to Lock Up $14 Billion in XRP Cryptocurrency*, CᴏɪɴDᴇꜱᴋ (May 16, 2017), https://perma.cc/BC8U-CMZT.  Since launching the escrow in December 2017, Ripple has placed unused portions of each month's XRP allowance back into escrow.  Ex. 1, A. Birla SEC Dep. Tr. 183:12-23; Ex. 5, D. Schwartz Tr. 205:19-23.  By June 30, 2023, the last day of the class period, more than 52.5 billion XRP was held by persons other than Ripple, while Ripple held just 5.5 billion XRP out of escrow; the remaining 42 billion XRP was contained in the escrow.  *See* Ripple, *Q2 2023 XRP Markets Report* (July 31, 2023), https://perma.cc/DA79-2R22.

Ripple has also sold some of its XRP.  Most of those sales have gone through one of two avenues.  *First*, from years before the start of the class period until September 2019, Ripple sold XRP on digital asset exchanges, which provide a platform to buy and sell all types of digital assets.  XRP has been available for members of the public to buy and sell on online digital asset exchanges since at least 2013.  ███████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████  Ex. 20, Mar. 27, 2023 Bittrex Production Letter (stating that XRP has been listed for trading on the publicly accessible digital asset exchange Bittrex since December 2014); *see also* █████████████████████████████

██████████████████████████████████████████

████████  Ex. 21, C. Dicharry Tr. 73:23-74:11-13 ("XRP was available on exchanges" as of

---

[6] Defendants do not understand recipients of XRP from such transactions to be class members. If they were, Judge Torres's holding in the parallel SEC Action demonstrates why such class members would have no viable claims, as there was no "investment of money" under *Howey*.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

2015).  Prior to the SEC's filing its parallel action in December 2020, XRP was listed on more than 200 exchanges worldwide.  Ex. 15, M. Long SEC Decl. ¶ 4.

It is undisputed that transactions on digital asset exchanges are blind bid/ask trades, meaning buyers and sellers do not know who their counterparty is at the time of the transaction. Ex. 22, Y. Yadav Rep. ¶¶ 81-82, 86; ███████████████████████ Ex. 23, C. Gil SEC Dep. Tr. 297:25-298:7; SEC SJ Order at 4.  There is no communication between them. ████████████████████████ By extension, there is no contract between them. Ripple thus undertook no contractual obligations to exchange-based purchasers, and exchange-based purchasers received no rights in Ripple's business or right to demand anything from Ripple.  Ex. 17, A. Schwartz Rep. ¶¶ 34, 36.

*Second*, Ripple sold XRP through bespoke, arm's-length, negotiated sales contracts.  *Id*. ¶¶ 18-31 & Ex. C.  Ripple's subsidiary, Defendant XRP II, LLC, was formed to distribute XRP via contracts to "accredited investors" (sales to whom are exempt from registration under the federal securities laws even if a security is sold).  Ex. 24, RPLI_00748214.  Unaccredited investors were unable to purchase XRP from XRP II, LLC.  Ex. 25, A. O'Gorman SEC Dep. Tr. 345:22-346:11; Ex. 26, R. Zagone SEC Dep. Tr. 80:25-81:8.  During the class period, Ripple (primarily through XRP II, LLC) entered into (non-ODL) sale contracts with 23 specific counterparties.  Ex. 27, Jan. 8, 2023 Declaration of Carolyn Dicharry ("C. Dicharry Decl.") ¶¶ 2-3.  The contracts governing these transactions gave the purchaser of XRP no interest in Ripple's business; imposed no obligations on Ripple to take any actions to benefit the purchaser; and gave the purchaser no right to demand or receive anything from Ripple beyond delivery of the purchased XRP.  Ex. 17, A. Schwartz Rep. ¶¶ 18-31 & Ex. C.  Instead, they expressly disclaimed any such obligations.  *Id*.  Ripple (or its subsidiaries) also entered into arm's length contracts with ODL customers, as described above.

Ripple's exchange-based (also referred to as "programmatic") XRP sales were a tiny fraction of XRP's trading volume.  From the start of the class period in July 2017 through September 2019, Ripple's XRP sales were less than 1% of global trading volumes, and usually

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

far less.  *See* SEC SJ Order at 23.[7]  In Q1 2018, for example, Ripple's XRP sales were less than one-tenth of one percent of the global XRP trading volume.  *See* Ripple, *Q1 2018 XRP Markets Report* (Apr. 25, 2018), https://perma.cc/7HFD-YFNE (reporting sales of "0.095 percent" of global trading volume).  Ripple stopped selling XRP on exchanges entirely by September 2019; accordingly, its programmatic sales were 0% of trading for a majority of the class period.  Ex. 27, C. Dicharry Decl. ¶ 4.  After September 2019, Ripple sold XRP only via bespoke, bilateral wholesale or ODL contracts, and from May 2020 until the end of the class period here, essentially all of Ripple's sales were to ODL customers who sourced XRP directly from Ripple for cross-border transactions and not for any investment purpose.  *Id.* ¶¶ 3-4; Ex. 15, M. Long SEC Decl. ¶ 10.

## IV.    Plaintiff's Claims and Allegations

Lead Plaintiff Bradley Sostack is an individual who bought and sold XRP mostly over a two-week period in January 2018.  Ex. 28, B. Sostack Decl. ¶ 3.  ███████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████  Plaintiff alleges that he lost about $118,100 trading XRP.[8]  Ex. 28, B. Sostack Decl. ¶ 3.  ████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[7] *See also* Ripple, Q3 2017 XRP Markets Report (Oct. 19, 2017), https://perma.cc/MME5-XXDR; Ripple, Q4 2017 XRP Markets Report (Jan. 24, 2018), https://perma.cc/WP38-E4V2; Ripple, Q1 2018 XRP Markets Report (Apr. 25, 2018), https://perma.cc/7HFD-YFNE; Ripple, Q2 2018 XRP Markets Report (July 24, 2018), https://perma.cc/F9V9-KHW2; Ripple, Q3 2018 XRP Markets Report (Oct. 25, 2018), https://perma.cc/FQ5K-M84Q; Ripple, Q4 2018 XRP Markets Report (Jan. 24, 2019), https://perma.cc/6VPU-VW48; Ripple Q2 2019 XRP Markets Report (July 24, 2019), https://perma.cc/5VCS-GR8C; Ripple Q4 2019 XRP Markets Report (Jan. 22, 2020), https://perma.cc/5XFP-DALD.

[8] Defendants do not concede that the records Plaintiff has produced in discovery show that he sustained net losses from his arbitrage strategy, but do not seek summary judgment on this issue.

11

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                          Case No. 4:18-cv-06753-PJH



20  Plaintiff filed his first consolidated complaint in this lawsuit on August 5, 2019. ECF No.

21  63. On June 30, 2023, the Court certified two classes of XRP purchasers: a Federal Class of

22  persons who purchased XRP from any source between July 2017 and June 2023, and a California

23  Class of persons who purchased XRP directly from Defendants during that same time period.[10]

24

25

26  [10] Both classes are subject to certain further exclusions: they include only those persons who

27  sustained losses from their XRP trades or still hold their XRP; they exclude certain affiliates of
Defendants; and they exclude XRP traders in non-U.S. jurisdictions. *See* ECF No. 264 at 2, 14.

28  DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No. 4:18-cv-06753-PJH

The Federal Class is pursuing a claim that XRP was an unregistered security under Section 5 of the Securities Act, 15 U.S.C. § 77e, and the California Class is pursuing a claim that XRP was an unregistered security under the analogous California law, Cal. Corp. Code § 25110.  Neither class is pursuing a fraud claim and there is no class-wide claim that Defendants made any misrepresentations about XRP.[11]

## V.    The SEC Action

After Plaintiff filed his lawsuit, on December 22, 2020, the SEC filed an enforcement action against Ripple, Mr. Garlinghouse, and Ripple's Executive Chairman, Christian Larsen.  The SEC similarly alleged that "XRP was an investment contract" and that all Defendants' sales of XRP from 2013 to 2020 were securities subject to registration under Section 5 of the Securities Act.  Am. Compl. ¶ 231, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. Feb. 18, 2021), ECF No. 46.  The SEC brought that enforcement action despite widespread market uncertainty regarding the legal status of digital assets, much of which was caused by the SEC's limited (and contradictory) guidance in the field.  *See* Defs.' Opp'n to SEC Mot. for Summ. J. at 47-52, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. June 13, 2023), ECF No. 828.  As to XRP in particular, a multi-billion-dollar trading market had believed that XRP was *not* a security, and had even communicated that view directly to the SEC.  *See id.*  The SEC's filing of its enforcement action with contrary allegations caused an overnight loss of $15 billion in value among XRP holders.  *Id.* at 52.  Virtually all exchanges accessible to U.S purchasers delisted XRP in the wake of that filing.  *Id.*

Following nearly two years of intensive fact and expert discovery, the parties in the SEC Action cross-moved for summary judgment.  On July 13, 2023, Judge Torres resolved those motions.  Judge Torres first found that "XRP, as a digital token, is not in and of itself" an investment contract.  SEC SJ Order at 15.  In addition, Judge Torres found that Defendants'

---

[11] Sostack is pursuing fraud-related claims in his individual capacity.  Because those claims are predicated on the sale of a security, they fail for the same reasons as the class claims, described in greater detail below.

"Programmatic Sales" (*i.e.*, sales of XRP on digital asset exchanges) were not investment contracts. *See id.* at 22-25.  Likewise, Judge Torres found that Ripple's "Other Distributions," including XRP that Ripple distributed to charitable organizations, vendors, and employees as compensation, also were not investment contracts.  *Id.* at 26-27.  The only sales that Judge Torres found were "investment contracts" were "Institutional Sales" – a specific set of sales to a small number of sophisticated counterparties pursuant to written contracts before December 2020 – based on the particular facts and circumstances of those sales, including negotiated terms and representations made directly to those counterparties.  *See id.* at 16-22.

Judge Torres's decision was widely reported in the media as offering clarity regarding the regulatory status of XRP.  *E.g.*, Brady Dale, *From NFTs to XRP: the biggest crypto stories of 2023*, Axios (Dec. 20, 2023), https://www.axios.com/2023/12/20/crypto-2023-ftx-binance-biggest-stories; Albert Brown, *XRP Wins Against SEC, Rallies 30%, Becomes Only Crypto With Regulatory Clarity in US*, The Crypto Basic (July 13, 2023), https://perma.cc/9GP5-W67X; Crypto News, *Clear Victory for XRP: Court Further Solidifies XRP Position as Only Altcoin with Legal Clarity in U.S.* (Oct. 5, 2023), https://perma.cc/LAH8-8BZ2; Nidhi Kolhapur, *Ripple Wins Big: XRP Is Now the Only Digital Asset With Legal Clarity In the USA!*, CoinPedia (Oct. 5, 2023), https://perma.cc/TYG7-ENW4; Lele Jima, *XRP Only Altcoin With Legal Clarity As Court Ruled Ethereum Has No Protection As Non-Security*, The Crypto Basic (Aug. 3, 2023), https://perma.cc/UW4M-DCC9; Ikemefula Aruogu, *XRP Is the Only Crypto In the US With Legal Clarity: Opinion*, Coin Edition (Sept. 24, 2023), https://perma.cc/KX2R-3DPG.

In reliance on Judge Torres's holding, XRP was immediately relisted on several exchanges, effectively reopening the multi-billion-dollar XRP trading market to U.S. purchasers.  *See, e.g.*, Katherine Ross, *Coinbase, Kraken will relist XRP following Ripple summary judgement*, BLOCKWORKS (July 13, 2023), https://perma.cc/99KA-4SNB; Binance.US, *Binance.US Lists XRP - Deposit & Trade Now* (2023), https://support.binance.us/hc/en-us/articles/16014822528663; Bitstamp, *XRP is back in the U.S. - Start trading today!* (July 13, 2023), https://perma.cc/4UEA-KYSS.  Trading volume of XRP also increased substantially

14

1  following the ruling, and daily trading volumes of XRP were typically well in excess of $1

2  billion in the weeks that followed.  *See, e.g.*, CoinMarketCap, *XRP*, https://coinmarketcap.com/

3  currencies/xrp/.

4  <center>**LEGAL STANDARD**</center>

5       "A motion for summary judgment should be granted if 'there is no genuine dispute as to any

6  material fact and the movant is entitled to a judgment as a matter of law.' " *Kennedy v. U.S.*

7  *Citizenship & Immigration Servs.*, 871 F. Supp. 2d 996, 1006 (N.D. Cal. 2012) (quoting Fed. R.

8  Civ. P. 56(a)).  "Summary judgment must be granted where a party 'fails to make a showing

9  sufficient to establish the existence of an essential element to that party's case, on which that party

10  will bear the burden of proof at trial.' " *Id.* (citation omitted).

11  <center>**ARGUMENT**</center>

12  **I.    Plaintiff's Federal Claims Are Barred by the Statute of Repose**

13       The Court need not reach the question whether XRP was an investment contract to conclude

14  that Plaintiff's federal claims fail.  Those claims are subject to the Securities Act's statute of repose,

15  which bars any action brought "more than three years after the security was bona fide offered to the

16  public."  15 U.S.C. § 77m.  The three-year repose period "is an absolute limitation which applies

17  whether or not the investor could have discovered the violation."  *P. Stolz Family P'ship L.P. v.*

18  *Daum*, 355 F.3d 92, 102-03 (2d Cir. 2004) (citation omitted).  This Court has already determined

19  that, here, the repose period runs from "three years prior to plaintiff's filing of his federal securities

20  claims in this action on August 5, 2019" (*i.e.*, from August 5, 2016).  ECF No. 85 at 15.

21       This Court has also determined that the "first offered" rule articulated by *Stolz* controls.

22  *See* ECF No. 85 at 10-15 (citing *Stolz*, 355 F.3d at 95, 100-107).  The test for determining when

23  alleged securities were first bona fide offered to the public involves "the genuineness of the offer

24  to the public."  *Stolz*, 355 F.3d at 99.  That is, a bona fide public offering occurs when the asset

25  was "really and truly (genuinely) being offered to the public, as opposed to, say, a simulated

26  offering."  *Id.*; *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085-86 (9th Cir.

27  2010) (securities laws are aimed at the "financially unsophisticated public" and a sale of

28  <center>15</center>

1  unregistered securities "generally to the public" triggers such laws).  Here, XRP was bona fide

2  offered to the public before August 5, 2016, in at least three ways.

3       *First*, XRP was offered to the public through centralized exchanges.  ██████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████  ████████████████

10 ██████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████

14 █████████████████████████████████████████

15      These exchanges were open to the public and signing up for an account was easy.  *See*

16 Ex. 38, SP Kothari Rep. ¶ 25 ████████████████████████████████████████████

17 ██████████████████████████████████  No special qualifications were required.  ████████

18 ████████████████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23

24 ──────────────────

   <sup>12</sup> ██████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████

27 <sup>13</sup> Other international exchanges likewise listed XRP as early as 2013 and experienced high
   trading volumes in XRP long before August of 2016.  Ex. 34, RPLI_00091284.

28
   DEFENDANTS' MOTION FOR
   SUMMARY JUDGMENT                                Case No. 4:18-cv-06753-PJH

1    Purchases of millions of units of XRP through centralized exchanges far exceed what

2    courts have found to constitute bona fide public offerings.  *See, e.g.*, *Taddeo v. Am. Invsco Corp.*,

3    2012 WL 1947897, at *2 (D. Nev. May 30, 2012) (finding a bona fide offer to the public on the

4    day a "few Plaintiffs purchased their units"); *Slagell v. Bontrager*, 616 F. Supp. 634, 636-37

5    (W.D. Pa. 1985) (approaching a single investor about an investment opportunity was sufficient to

6    establish that the investment was bona fide offered to the public); *Morley v. Cohen*, 610 F. Supp.

7    798, 816 (D. Md. 1985) (assuming that the plaintiffs "were the first [public] investors" in the

8    securities, and holding that the limitations period began on the date of their purchase).

9    *Second*, XRP was available to the public on the XRP Ledger in several ways.  ██████

10   ████████████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████  Like centralized

12   exchanges, the decentralized exchange uses a central limit order book to match anonymous

13   orders to sell XRP with anonymous orders to buy XRP.  But unlike centralized exchanges, it is

14   not controlled by any central authority.  There are no meaningful restrictions on who can transact

15   on the decentralized exchange.  ████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████

17   ████████████████████████████

18   XRP can also be bought and sold directly on the XRP Ledger by anyone who opens an

19   XRP Ledger "wallet."  Ex. 40, Jan. 8, 2023 Declaration of D. Schwartz ("D. Schwartz Decl.")

20   ¶ 10.  In 2014, Ripple launched Ripple Trade, a user-friendly interface designed to make it easier

21   for individuals without technical expertise to do just that.  Ex. 21, C. Dicharry Tr. 86:6-86:20;

22   *see also Hedden v. Marinelli*, 796 F. Supp. 432, 437 (N.D. Cal. 1992) (citing *SEC v. Ralston*

23   *Purina Co.*, 346 U.S. 119, 125 (1953)) (holding that offerings are generally considered "public"

24   if the buyers are ordinary people without financial sophistication).  By June 2016, there were

25   more than 20,000 accounts on Ripple Trade, including over 3,600 accounts in the U.S. alone.

26   Ex. 41, RPLI_00376599; Ex. 42, RPLI_00376600.  More broadly, prior to August 5, 2016, more

27   than 200,000 wallets were created on the XRP Ledger between April 15, 2013 and August 5,

28
17

2016, and a daily average of more than 1,000 wallets were used to make or receive payments. Ex. 40, D. Schwartz Decl. ¶ 11.  And by August 2016, Ripple itself had sold more than 1.8 billion units of XRP to the general public through programmatic sales on the XRP Ledger.  *See* Ex. 43, RPLI_00282872.  An independent third party estimated that "the best approximation of the number of [XRP units] that are circulating . . . in the general public's hands" by August 2016 was more than 35 billion.  *See* CoinMarketCap, *Historical Snapshot - 28 August 2016*, https://perma.cc/WF35-JQ9T; CoinMarketCap, *Supply (Circulating, Total, Max)*, https://support.coinmarketcap.com/hc/en-us/articles/360043396252-Supply-Circulating-Total-Max; *see also, e.g.*, *Handley v. Melza*, 2022 WL 3640203, at *4 (C.D. Cal. Feb. 15, 2022) (citing CoinMarketCap historical snapshots as evidence).

   *Third*, Ripple distributed XRP to the public through other means, including free giveaways, prior to the repose date.  From February 2013 to August 2016, Ripple gave away more than 600 million XRP to members of the public in transactions involving more than 50,000 unique accounts or recipients.  *See* Ex. 44, RPLI_03680719.

   Through the above types of transactions, billions of XRP traded hands before August 5, 2016.  The record in this case is replete with evidence of individuals who acquired XRP prior to the repose date.  *See* Defs.' Opp'n to SEC 56.1 Statement, Exhibit 167, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. June 13, 2023), ECF Nos. 831-001 through 831-026 ("Purchaser Affidavits") (containing 21 affidavits showing purchase of XRP before August 2016); *see also* Ex. 45, RPLI_00755223 (showing individual who bought 70,000 XRP in 2013); Ex. 46, RPLI_03582634 (showing individual purchasing XRP in 2014); Ex. 47, RPLI_03582662 (discussing buying XRP with bitcoin in 2014: "it is so easy now"); Ex. 48, RPLI_03582852 (discussing ways to buy XRP in 2014); Ex. 49, RPLI_03587543 (discussing purchase of XRP in 2013 and use cases); Ex. 50, RPLI_00089958 (FinCEN Settlement stating Ripple had been selling XRP to third parties since 2013).  There is no genuine dispute about the material facts that show that XRP was first bona fide offered to the public well before August 5, 2016.  The statute of repose therefore bars Plaintiff's claim.  And, as set out in greater detail below, *see infra* p. 44,

18

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No. 4:18-cv-06753-PJH

1   Plaintiff's state law claim fails because he cannot prove that he purchased XRP directly from

2   Defendants.  Accordingly, Plaintiff has no case to bring to trial.

3   ███████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████   There is no evidence that

6   would permit a reasonable jury to find that such separate offerings occurred.

7           *First*, XRP is fungible.  Unlike separate stock offerings, where stocks can be assigned to

8   different classes and different issuances with different identifiers, every unit of XRP is identical

9   to every other unit.  ██████████████████████████   People buying XRP after

10  the repose date bought the same asset that was available before that date and could not even tell

11  whether they were buying "old" or "new" XRP.  As a concrete example, Plaintiff himself

12  purchased roughly 129,000 units of XRP during the period from January 1, 2018 to January 16,

13  2018.  ECF No. 87 ("Am. Compl.") ¶ 13.  ████████████████████████████

14  ██████████████████████████████████████████████████████

15  █████████████████████████████████████████████   Plaintiff

16  can point to no evidence to show whether (1) Ripple initially sold or distributed them before the

17  repose date, (2) Ripple initially sold or distributed them after the repose date, or (3) Ripple never

18  sold or distributed them at all, because they instead came from the 20 billion units that Ripple

19  never owned.

20          *Second*, Plaintiff cannot identify any meaningful differences between the alleged separate

21  offerings.  To determine whether sales of securities are part of separate offerings or of a single

22  integrated offering, courts in this Circuit look to "five factors" derived from SEC guidance:

23          (a) whether the offerings are part of a single plan of financing; (b) whether the
            offerings involve issuance of the same class of securities; (c) whether the offerings
24          are made at or about the same time; (d) whether the same kind of consideration is to
            be received; and (e) whether the offerings are made for the same general purposes.
25

26  ─────────────────────
    [14] As noted above, *supra* p. 12, ████████████████████████████████████████

27  ███████████████████████████████████████████

28  DEFENDANTS' MOTION FOR                              19
    SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

1   *SEC v. Murphy*, 626 F.2d 633, 645 (9th Cir. 1980).  Here, undisputed facts rule out any

2   contention that pre- and post-repose sales involve different "class[es] of securities" or that Ripple

3   sold XRP for different "kind[s] of consideration."  *Id.*  As for timing, Ripple sold XRP on an

4   essentially continuous basis from well before August 2016 through September 2019 (when it

5   stopped selling on exchanges).  Ex. 27, C. Dicharry Decl. ¶ 5.  Nor could a reasonable jury

6   conclude that Ripple adopted separate "plan[s] of financing" or "general purposes" before or

7   after the repose date.  *Murphy*, 626 F.2d at 645.  ████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████   Although he is incorrect in contending that such deposits establish

10  "pooling" with respect to the legal requirement of horizontal commonality, *see infra* pp. 29-31,

11  he can hardly dispute as a factual matter that the funds went to the same place and were used for

12  the same purpose.  Accordingly, Plaintiff cannot show that Defendants engaged in separate

13  offerings, so the statute of repose is fatal to the Federal Class's claim.

14  **II.    All of Plaintiff's Claims Fail Because Defendants Did Not Sell Securities**

15          Plaintiff's claims are all predicated on the presence of a security.  Plaintiff alleges, and

16  thus must prove, that XRP itself is the "security" his claims require.  *E.g.*, Am. Compl. ¶ 129

17  ("XRP is a security"); *id.* at 32, 44 (same).  This allegation is contrary to undisputed facts and

18  well-established law, which is fatal to all of Plaintiff's claims.

19          Federal and California state law both define the term "security" using a list of specific

20  written instruments.  *See* 15 U.S.C. §77b(a)(1); Cal. Corp. Code § 25019; *see also Marine Bank

21  v. Weaver*, 455 U.S. 551, 559 (1982) ("[T]he securities laws . . . cover those instruments

22  ordinarily and commonly considered to be securities in the commercial world.").[15]  From that

23  list, the only instrument relevant to this case is "investment contract."  *See* Am. Compl. ¶¶ 8,

24

---

25  [15] Because California's statute was modeled on the Securities Act of 1933, "federal cases
    construing federal securities laws are persuasive authority when interpreting [California] state
26  law."  *Viterbi v. Wasserman*, 191 Cal. App. 4th 927, 937 (2011); *see also* Am. Compl. ¶ 159
    ("[California] courts have interpreted the term 'security' to be synonymous in scope with . . .
27  federal securities law.").

28                                                    20
    DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                                  Case No. 4:18-cv-06753-PJH

127, 159.  Neither the Securities Act nor California's Corporate Securities Law defines the term "investment contract."  But it is "a 'fundamental canon of statutory construction' that words generally should be interpreted as taking their ordinary, contemporary, common meaning . . . at the time" a statute was enacted.  *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (citation omitted).  For "terms of art," courts further presume that legislators "know[] and adopt[] the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."  *Morissette v. United States*, 342 U.S. 246, 263 (1952) *see also Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) ("if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it") (citation omitted).

"Investment contract" is one such term of art.  In *Howey*, the Supreme Court found that the meaning of the term "investment contract" was "crystallized" by a series of state cases interpreting state "blue sky" laws.  328 U.S. at 298.  It then summarized the term's meaning as:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person [1] invests his money in [2] a common enterprise and is [3] led to expect profits solely from the efforts of the promoter . . . it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298-99.  This passage of *Howey* has over time come to be called the "*Howey* test."  *E.g.*, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985).

For the reasons set out below, Plaintiff cannot prove that an investment contract was present, whether under the *Howey* test or otherwise.

**A.      XRP Itself Is Not an Investment Contract**

Judge Torres's reasoning in the parallel SEC Action, along with Ninth Circuit law applying the *Howey* test, confirms that Defendants are entitled to summary judgment.  Plaintiff's theory is that XRP itself – that is, the digital token – is "an unregistered security."  Am. Compl.

21

¶ 1.[16] That theory fails because ordinary assets are not themselves investment contracts, even if bought with a speculative profit motive. *See, e.g.*, *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (gold not a security); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) (land); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1033-34 (2d Cir. 1974) (commodities). As Judge Torres explained, "XRP, as a digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract." SEC SJ Order at 15. She further concluded that XRP sales to "public buyers . . . on digital asset exchanges" – like Plaintiff here – "did not constitute the offer and sale of investment contracts." *Id.* at 22, 25 (discussing such "Programmatic Sales"). The Court need go no further than that correct conclusion to grant summary judgment for Defendants and reaffirm that XRP, in and of itself, is not an investment contract.

To be sure, Judge Torres also concluded that Ripple did offer and sell investment contracts to a small subset of purchasers via direct, bilateral contracts based on Ripple's contractual relationships with those purchasers prior to December 2020. *See id.* at 16-22 (ruling that Ripple's offers and sales to "Institutional Buyers" satisfied the *Howey* test). That reasoning does not help Plaintiff here. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

[16] *See also* Am. Compl. ¶¶ 12 ("Defendants did not register XRP with the SEC"), 129 ("XRP is a security under the *Howey* test"), 160 ("[XRP] meet[s] the definition of a 'security'"), 177 ("XRP are securities within the meaning of Section 2(a)(1) of the Securities Act"), 191 ("XRP are securities within the meaning of the California Corporations Code"); ████████████████

████████████████████████████████████████████████████

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No. 4:18-cv-06753-PJH

Further, to obtain class certification, Plaintiff committed himself to a theory under which the question whether XRP is a security does not depend on individualized facts such as whether a contractual relationship existed or what the particular terms of a given sale were. *See* ECF No. 218-1, at 4-5 (contending that "the *Howey* test" does not "require[] the analysis of the circumstances" surrounding particular transactions); *cf.* SEC SJ Order at 21-22 (analyzing specific representations made in connection with bilateral contracts). That is why he relies solely on the theory that XRP, as a digital asset independent of any contracts, is a security, *see* Ex. 53, Pl.'s Resp. to Ripple RFA No. 9 – a theory that fails under settled law.

It is too late for Plaintiff to adopt a new theory now. *See Powell v. Cnty. of Orange*, 2022 WL 3574282, at *3 (C.D. Cal. July 7, 2022) ("plaintiff may not add new claims or theories of liability in an opposition brief to a motion for summary judgment."); *Diamond S.J. Enter., Inc. v. City of San Jose*, 430 F. Supp. 3d 637, 653 (N.D. Cal. 2019) ("courts may decline to consider new theories [of liability] during summary judgment."). But even if the Court were to allow Plaintiff to do so, by pivoting to a theory that the *way Defendants offered and sold XRP* created investment contracts, that theory would still fail, for the reasons set out below.

**B.    Defendants' Sales of XRP Were Not Sales of Investment Contracts Under the *Howey* Test**

**1.    Class Members Who Purchased XRP on Digital Asset Exchanges Did Not Purchase an Investment Contract with Ripple**

█████████████████████████████████████████████████████████

███████████████████████████████████████ Digital asset exchanges resemble traditional financial exchanges (like the Chicago Mercantile Exchange) and allow individuals to buy and sell various digital assets with ease. Ex. 22, Y. Yadav Rep. ¶¶ 61-63. Like traditional exchanges, digital asset exchanges match blind offers to buy with blind offers to

─────────────────────────────

[17] Ripple entered into direct, non-ODL wholesale contracts with just 23 counterparties during the class period. Ex. 27, C. Dicharry Decl. ¶¶ 2-3.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                          Case No. 4:18-cv-06753-PJH

sell; when a buy offer and sell offer with a mutually acceptable price and quantity match with one another, the exchange executes the trade and adjusts the buyer's and seller's accounts accordingly.  *Id*. ¶¶ 67, 69.[18]  It is undisputed that in exchange-based transactions, XRP buyers do not know from whom they are buying, XRP sellers do not know to whom they are selling, and no communications between buyer and seller occur.  ██████████████████████████████

███  Ex. 22, Y. Yadav Rep. ¶ 86.  This means purchasers on exchanges do not know (or care) who they are buying XRP from, and there is no opportunity for sellers to offer any sort of promises to or shape any expectations for their buyers.  Accordingly, no contracts between buyers and sellers are formed on exchanges in the first place – and certainly not "investment contracts" that satisfy the *Howey* test.  *See* SEC SJ Order at 23.

In concluding that Ripple's exchange-based sales ("Programmatic Sales") of XRP were not sales of investment contracts in the SEC Action, Judge Torres relied on eight specific facts, each of which is undisputed in this case as well.[19]

(1) "Ripple's Programmatic Sales were blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to Ripple," SEC SJ Order at 23;

████████████████████████████████████

(2) "Ripple's Programmatic Sales represented less than 1% of the global XRP trading volume," SEC SJ Order at 23; *see* Ex. 8, A. Ferrell Rep. ¶ 47; *supra* pp. 10-11;

---

[18] Typically, a central limit order book matches buy and sell orders based on a matching algorithm, such as a price/time priority matching system.  Ex. 22, Y. Yadav Rep. ¶¶ 67, 69; Ex. 23, C. Gil SEC Dep. Tr. 289:22-290:2, 291:17-21.  Once matched, the buy and sell orders become final and binding in the exchange's trading system.  Ex. 22, Y. Yadav Rep. ¶¶ 67-68.  The exchange then typically implements the trade by moving cash and assets between user accounts.  *Id.* ¶ 71.

[19] As to transactions on exchanges, the SEC alleged a narrower theory than Plaintiff here – that sales of XRP *by Ripple and certain of its executives* on exchanges constituted investment contracts with Ripple.  Here, Plaintiff claims *every* sale of XRP on exchanges, *by anyone*, is an investment contract with Ripple.  This broader theory fails for the same reasons as the SEC's theory, and more: it is nonsensical to say that a seller with no legal relationship to Ripple can nonetheless somehow sell an investment contract with Ripple.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

(3) "Ripple did not make any promises or offers [to the Programmatic Buyers] because Ripple did not know who was buying the XRP," SEC SJ Order at 24; ████████████ ████████████

(4) "[M]any Programmatic Buyers were entirely unaware of Ripple's existence," SEC SJ Order at 24; Purchaser Affidavits;

(5) "[T]he Programmatic Sales were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose," SEC SJ Order at 24; ████████████████████████████

(6) The SEC failed to provide evidence that "Ripple's promotional materials . . . were distributed more broadly to the general public, such as [to Programmatic Buyers]," SEC SJ Order at 24-25;

(7) The SEC failed to provide evidence that objective, reasonable "Programmatic Buyers understood that statements made by Larsen, [Ripple chief cryptographer David] Schwartz, Garlinghouse, and others were representations of Ripple and its efforts," SEC SJ Order at 25; and

(8) The SEC failed to provide evidence that an objective, reasonable Programmatic Buyer "could parse through the multiple documents and statements . . . (sometimes inconsistent) across many social media platforms and news sites from a variety of Ripple speakers (with different levels of authority) over an extended eight-year period" to discern "Ripple's marketing campaign and public statements connecting XRP's price to its own efforts." SEC SJ Order at 25.

There is no dispute (or, at a minimum, no genuine dispute) that the same facts hold true here; as noted above, the entire record from the SEC Action was reproduced in full here. Accordingly, this Court should conclude that Defendants' XRP transactions on digital asset exchanges were not sales of investment contracts.[20]  The Court need go no further than the analysis in Judge

---

[20] Because she concluded that exchange-based XRP buyers had no reasonable expectation of profits, Judge Torres did not address the first two prongs of *Howey* for those purchasers:

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                      Case No. 4:18-cv-06753-PJH

Torres's opinion; but should it wish to, this brief also proceeds through the *Howey* factors in the order they appear in *Howey*.

### a.    Exchange-Based Purchasers Did Not Invest Money in Any Enterprise

*Howey*'s "investment of money" prong "requires that the investor commit his assets *to [an] enterprise*." *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (internal quotation marks omitted, emphasis added); *see also SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (same); *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979); SEC SJ Order at 23 (finding that Ripple's "Other Distributions" of XRP did not satisfy Howey's "investment of money" prong "because Ripple never received the payments from these XRP distributions.").[21] Individuals who purchased XRP on digital asset exchanges did not commit their assets to an enterprise.  The vast majority made no "investment of money" in or with Ripple (or any other Defendant) at all because it is undisputed that Ripple's sales of XRP have represented less than 1% of the overall market since at least 2017 (*i.e.*, throughout the entirety of the class period), and indeed 0% (no exchange sales at all) since September 2019.  *See* SEC SJ Order at 23; Ex. 8, A. Ferrell Rep. ¶ 47 (describing Ripple's aggregate distributions); *supra* pp. 10-11.  Thus, for virtually all XRP purchasers on the secondary market, and for literally all of them after September 2019, any money they paid for XRP went to someone other than Defendants. Because that money never went into any "enterprise" controlled by any Defendants, Plaintiff's case fails under *Howey*'s "investment of money" prong.

---

whether they invested money in a common enterprise.  *See* SEC SJ Order at 25 n.17.  Defendants in the SEC Action also raised a fair notice defense against the SEC's parallel claims.  Because she held that Ripple's programmatic sales of XRP were not investment contracts, Judge Torres declined to decide Ripple's fair notice defense as to those sales, but noted that "the SEC's theories as to [programmatic sales] in this case are potentially inconsistent with its enforcement in prior digital asset cases."  *Id*. at 29 n.20.

[21] Although Judge Torres did not reach the "investment of money" prong as to Defendants' programmatic sales, she did reach it with respect to Ripple's "Other Distributions," and held that the undisputed fact that payments did not go to Ripple meant there was no investment of money in that context.  SEC SJ Order at 23.  That same reasoning means Defendants' programmatic sales also fail the "investment of money" prong of the *Howey* test.

26

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No. 4:18-cv-06753-PJH

1    Plaintiff's own transactions illustrate the point. ████████████████████████

2 ███████████████████████████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████  Accordingly, those buyers,

5 like nearly all others, did not invest money into any alleged enterprise run by Defendants.

6      ███████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████  Indeed, many

9 did not know about Ripple's existence in the first place.  *See* Purchaser Affidavits (collection of

10 more than 3,000 affidavits by individual XRP purchasers, more than 1,300 of which state that the

11 affiant was "completely unaware of a company called Ripple" at the time the affiant purchased

12 XRP); ██████████████████████████████  As such, they could not have been making an

13 "investment" in Ripple's (or any other Defendant's) alleged efforts and the first prong of *Howey*

14 cannot be met.

15          **b.      Exchange-Based Purchasers Did Not Join a Common Enterprise**

16    *Howey*'s second prong requires that the investment of money be in a "common

17 enterprise."  In the Ninth Circuit, a common enterprise can be established by showing either

18 "horizontal commonality" or a "strict version of vertical commonality."  *Hocking v. Dubois*, 885

19 F.2d 1449, 1459 (9th Cir. 1989).  Horizontal commonality occurs where investors "pool their

20 assets [and] give up any claim to profits or losses attributable to their particular investments in

21 return for a pro rata share of the profits of the enterprise."  *Id*.  Strict vertical commonality occurs

22 where there is a "direct relation between the success or failure of the promoter and that of his

23 investors."  *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982).  Broad vertical

24 commonality – a mere showing that "the success or failure of the investments *collectively* is

25 essentially dependent upon promoter expertise" – is not sufficient.  *Id.* (emphasis added); *see*

26 *generally* 1 Law Sec. Reg. § 1:52 (discussing the distinction between strict and broad vertical

27

28

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                              Case No. 4:18-cv-06753-PJH

1  commonality and identifying the Ninth Circuit as "adopt[ing] a narrow test of vertical

2  commonality").

3  ████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████   The argument that the enterprise itself is

8  "Defendants' efforts" fails as a matter of law, because "the mere showing that the fortunes of

9  investors are tied to the efforts of the promoter" is nothing more than "broad vertical

10 commonality," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994), which is inadequate in

11 this Circuit, *Mordaunt*, 686 F.2d at 817.

12         Moreover, the "XRP ecosystem" is not a "profit-seeking business venture" that Ripple

13 can "manage, control and operate," *Howey*, 328 U.S. at 300, and therefore is not a cognizable

14 "common enterprise" under *Howey*.   To the contrary, any reasonable definition of the XRP

15 ecosystem would include the open-source XRP Ledger (publicly available computer code that

16 Ripple does not own), independent developers, exchanges, and myriad holders and users of XRP.

17 Plaintiff's own expert has admitted that changes to the XRP Ledger's code are principally in the

18 hands of the XRP Ledger Foundation, an independent nonprofit.  Ex. 4, J. Clark Tr. 114:19-

19 115:8, 145:15-146:2, 173:20-174:9, 178:5-12. ██████████████████████████

20 ████████████████████████████████████████████████████████

21 ███████████████████████████   *see also, e.g.*, Decl. of J. Kambo, *SEC v. Ripple*

22 *Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. Oct. 21, 2022), ECF No. 676-1 (describing

23 XRP Ledger application developed by independent fintech company SPENDTHEBITS using the

24 XRP Ledger); Decl. of V. Bono, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y.

25 Nov. 11, 2022), ECF No. 700-2 (same for payment processor Cryptillian); Decl. of J. Vallee,

26 *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. Oct. 31, 2022), ECF No. 689-2

27 (same for energy company Deltawave); Br. of *Amicus Curiae* TapJets, *SEC v. Ripple Labs, Inc.*,

28
                                                  28

1   No. 1:20-cv-10832-AT-SN (S.D.N.Y. Nov. 18, 2022), ECF No. 722 (same for travel company

2   TapJets).  An "ecosystem" that relies on code controlled by someone other than Defendants,

3   filled with products being developed by people other than Defendants, cannot be a common

4   enterprise that *Defendants* managed, operated, and controlled – much less a "profit-seeking

5   business venture" that they controlled.

6          Consider what could equally well be called the "gold ecosystem."  Many individuals and

7   firms seek to profit from the purchase, sale, or use of gold.  The "gold ecosystem" would thus

8   consist of gold miners, refiners, metalworkers, wholesalers, jewelers, industrial manufacturers,

9   commodity traders, investors, e-commerce platforms, jewelry collectors, and wearers.  Plenty of

10  participants in that "ecosystem" may well be for-profit businesses.  But the "ecosystem" as a

11  whole is not a business venture.  Buying a gold ring (or a gold bar or a gold futures contract)

12  does not put the purchaser into a "common enterprise" with any other jewelry owners, with

13  anyone who invests in gold as a hedge against inflation, with any electronics company that

14  maintains an inventory of gold to use in microchips, or with any other participant in the gold

15  market "ecosystem" – and certainly not with all of them at once.  Some may profit or lose money

16  from price swings, and some may simply wear the gold they bought or use it in other products.

17  The only thing they have in common is that they face the same market price for gold.  Because

18  that is precisely the same relationship that holders of XRP have in the supposed "XRP

19  ecosystem," it is not a common enterprise.

20         Further, undisputed facts show that Plaintiff cannot establish commonality using either

21  the horizontal or the strict vertical test.  He cannot establish *horizontal* commonality because

22  exchange-based purchasers did not (and do not) pool their assets, as *Hocking* requires.  *See* 885

23  F.2d at 1459.  "Pooling" means combining investors' funds into an undifferentiated mass in

24  which the investors maintain determinable participatory financial interests and from which the

25  promoter conducts the operations of a common enterprise and distributes profits to investors.

26  *See id.*; *see also Bobrowski v. Red Door Grp., Inc.*, 2011 WL 3875424, at *1 (D. Ariz. Aug. 31,

27  2011) (no horizontal commonality where "neither the express contractual terms nor economic

28

29

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                      Case No. 4:18-cv-06753-PJH

1    reality provided plaintiff a pro rata share of the enterprise's profits.").  The touchstone is whether

2    alleged investors are offered the economic equivalent of stock in a business enterprise.  *See Ass'n*

3    *of Am. R.Rs. v. United States*, 603 F.2d 953, 971-72 (D.C. Cir. 1979) (once "'an investment of

4    money in a common enterprise with profits to come solely from the efforts of others' . . . is

5    shown," "the 'evidence of interest in or indebtedness of the [holder]' would be substantially

6    similar to the stocks and bonds expressly mentioned in [the Interstate Commerce Act] and would

7    thereby harmonize with the doctrine of *ejusdem generis*").

8          Exchange-based XRP purchasers had no interest in any common pool of assets that was

9    economically similar to a shareholder's interest in a company.  When such purchasers sold their

10   XRP, they were entitled to the proceeds of their own XRP, not anyone else's and not anything

11   else. █████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████    Again, unrebutted evidence shows that many exchange-

18   based purchasers were unaware even of Ripple's existence.  Purchaser Affidavits; ████████

19   ██████████████████

20          █████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ██████████████████████████    That interpretation of "pooling" – a single

23   seller putting its own proceeds in its own bank account, regardless of what other sellers do – is

24   foreclosed by *Hocking*, which requires that the purchaser "give up any claim to profits or losses

25   attributable to their particular investments in return for a pro rata share of the profits of the

26   enterprise."  885 F.2d at 1459; *see also Wals v. Fox Hills Dev. Corp*., 24 F.3d 1016, 1018 (7th

27   Cir. 1994) (investment contract must represent "an undivided interest in an enterprise, entitling

28
                                                        30

1  the owner to a pro rata share in the enterprise's profits").[22]  It also is inconsistent with the facts:

2  whatever Ripple may have done with the money that it received, it is undisputed that the vast

3  majority of money paid in exchange-based purchases did not go to Ripple in the first place.  *See*

4  *supra* pp. 10-11.  And even for that tiny fraction of a percentage of sale proceeds that did go to

5  Ripple, exchange-based purchasers of XRP obtained no right to a share of Ripple's bank

6  accounts, pro rata or otherwise. ███████████████████████████████████

7          Plaintiff also cannot establish *strict vertical* commonality because Ripple's alleged efforts

8  to create a use and demand for XRP and the XRP ecosystem do not create a "direct relation

9  between the success and failure of" Defendants and exchange purchasers.  *Mordaunt*, 686 F.2d

10  at 817.  Any such efforts would at most increase the value of XRP tokens "collectively," *id.*,

11  which equates to a broad vertical commonality theory that runs afoul of Ninth Circuit law.  *See*

12  *Hocking*, 885 F.2d at 1459 (Ninth Circuit accepts only "traditional horizontal commonality or,

13  when no pooling among investors is present, a strict version of vertical commonality").

14  Plaintiff's own trading strategy illustrates the point. ████████████████████████████

15  ███████████████████████████████████████  it is implausible for him to claim that

16  the success or failure of his trading strategy was directly related to Ripple's success or failure in

17  developing the broader XRP ecosystem.  *Supra* p. 12. ████████████████████████

18  ███████████████████████████████████████████████████████████████

19  ███████████████████████████  Ex. 38, SP Kothari Rep. ¶ 64, ██████████████

20  ███████████████████████████████████████████████████████████████

21  █████████████████  *Id.* Fig. 3.

22          It is well settled that strict vertical commonality is lacking where the alleged promoter

23  can profit even when an investor suffers a loss – for example, a broker may profit from

24  commissions even as her clients incur losses on their investments.  *See Brodt v. Bache & Co.*,

25  ────────────────

26  [22] Indeed, this "bank account" theory would equally apply to practically any seller of any asset –
   including, for example, ███████████████████████████████████████████████████

27  ███████████████████████

28
    DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                                              Case No. 4:18-cv-06753-PJH

595 F.2d 459, 461 (9th Cir. 1978); *see also, e.g.*, *Marini v. Adamo*, 812 F. Supp. 2d 243, 256

(E.D.N.Y. 2011) ("[S]trict vertical commonality" requires a "one-to-one relationship between the

investor" and the promoter such that there is "an interdependence of *both profits and losses* of

the investment."). It is undisputed that exchange purchasers can experience losses on their XRP

holdings even when Ripple has positive income, and Ripple's equity can increase in value even

as XRP decreases in price. ██████████████████ The opposite is also

true: Ripple can experience losses or decreases in equity while XRP increases in price and XRP

holders experience profits. ██████████████ It is further undisputed that

Ripple offers products that do not rely on XRP at all, which necessarily means its business can

succeed if its products and services achieve commercial success, even if the price of XRP falls.

*See* Ex. 1, A. Birla SEC Dep. Tr. 49:20-50:8. Indeed, it is undisputed that XRP holders can

succeed (via increases in the price of XRP) even if Ripple ceases to exist entirely – the ultimate

divergence between the success or failure of XRP holders on one hand and Ripple on the other.

██████████████ Each of those facts independently precludes

Plaintiff from establishing strict vertical commonality.

### c. Exchange-Based Purchasers Did Not Have a Reasonable Expectation of Profits Based on Defendants' Efforts

Finally, as to the last *Howey* prong, as Judge Torres held in the SEC Action, exchange

purchasers did not reasonably expect profits from the efforts of Defendants. Two undisputed

facts establish this point. *First*, it is undisputed that Defendants have no obligation – in a

contract or otherwise – to make efforts that return a profit to XRP holders. ████████

██████████████ As a matter of law, no purchaser can reasonably

expect profits to come from the efforts of someone who has no obligation to expend efforts on

their behalf. *See Harman v. Harper*, 914 F.2d 262 (9th Cir. 1990) (no investment contract where

promoters "made no promises to develop or otherwise manage the properties"); *Wright v.

Schock*, 571 F. Supp. 642, 649 (N.D. Cal. 1983) (requiring "[s]ome form of guarantee linking the

expectations of the investor to the fate of the promoter"), *aff'd*, 742 F.2d 541 (9th Cir. 1984);

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                    Case No. 4:18-cv-06753-PJH

1  *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) (no

2  investment contract where "literature and handouts" made "promises of [a] general nature" but

3  "no actual commitments to perform specific services").[23]

4      *De Luz Ranchos Investment, Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir.

5  1979), is instructive.  In that case, the alleged promoter had given potential land purchasers

6  marketing materials promoting the land as "a passive investment" that "would appreciate in

7  value as a result of [the promoter's] development of common facilities."  *Id.* at 1300.  Even so,

8  the Ninth Circuit held that purchasers did not have a reasonable expectation of profits from the

9  defendant's efforts because "it [was] undisputed that the land sale contracts obligate[d] [the

10  defendant] to do no more than transfer title," *id.* at 1299-1301.[24]  Here, as in the SEC Action, it is

11  undisputed that "Ripple did not make any promises or offers" to buyers ███████████ who

12

13  ————————————

    [23] The SEC has taken this same position in numerous no-action letters (a form of sub-regulatory
14  agency guidance in which the SEC promises not to take enforcement action in light of particular
    fact patterns).  *See, e.g.*, *American Diamond Co.*, SEC Staff No-Action Letter, 1977 WL 10907,
15  at *4-5 (Aug. 15, 1977) (taking no action where seller intended to advertise "the value of
    diamonds as an investment," but was "not contractually bound to provide any further services to
16  the Buyer" after the transaction); *The London Diamond Exch.*, SEC Staff No-Action Letter, 1972
    WL 8488, at *2-3 (Oct. 3, 1972) (taking no action where seller would offer diamonds for
17  "investment purposes only" to "accrue in value in the future," but made "no[ ] guarantee or . . .
    represent[ation] that a profit will be made," and would not "enter into any contractual or other
18  arrangements with prospective purchasers" following sales); *Future Sys. Inc.*, SEC Staff No-
    Action Letter, 1973 WL 9653, at *3 (June 8, 1973) (taking no action in connection with sales of
19  silver where seller, aside from storing the silver, "would have no other relationship with the
20  purchaser after the initial sale").

21  [24] Courts in other circuits have held the same.  *See Woodward v. Terracor*, 574 F.2d 1023,
    1025 (10th Cir. 1978) (affirming summary judgment for land developer because extra-contractual
22  representations about "shopping centers, health and cultural facilities, transportation facilities,
    and abundant recreational opportunity" did not establish an investment contract where developer
23  had "no contractual obligation to the plaintiffs other than to deliver title"); *Rodriguez*, 990 F.2d at
    10 (no investment contract because, "apart from the promise of an existing lodge or a new country
24  club, the evidence did not show that the promoter or any other obligated person or entity was
    promising the buyers to build or provide anything."); *Johnson v. Nationwide Indus., Inc.*, 450
25  F. Supp. 948, 953 (N.D. Ill. 1978) (granting motion to dismiss where extra-contractual
    statements that "dr[ew] in [purchasers] by an expectation of appreciation in value" did not
26  include a contractual "arrangement" requiring the seller to effect that increase in value), *aff'd*,
27  715 F.2d 1233 (7th Cir. 1983).

28
    DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                         Case No. 4:18-cv-06753-PJH

1   purchased XRP on digital asset exchanges.  SEC SJ Order at 24; Ex. 29, ████████

2   ██████  Ex. 22, Y. Yadav Rep. ¶¶ 81-82, 86 (no communication occurs on exchanges other

3   than naming price and quantity).  Again, the vast majority did not buy XRP from Ripple at all,

4   and many were "entirely unaware of Ripple's existence."  SEC SJ Order at 23.

5       Judge Torres has persuasively explained why exchange-based purchasers were not "led to

6   expect profits solely from the efforts of" Defendants, *Howey*, 328 U.S. at 298-99:

7           Consider, for example, a Programmatic Buyer who, while browsing on a digital
            asset exchange, sees the price of XRP dramatically increase but is unaware of
8           Ripple's existence.  If the Programmatic Buyer then purchases XRP from the
            exchange with the intention of later selling XRP for a profit, she would have
9           purchased XRP "with an expectation of profit," but that motive was not "derived
            from the entrepreneurial or managerial efforts of others," as required under *Howey*.
10

11  Order at 8 n.5, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. Oct. 3, 2023),

12  ECF No. 917.  Although Plaintiff (like the SEC) points to Ripple's public statements – including

13  Tweets, YouTube videos, digital asset discussion boards, and other promotional material

14  "tout[ing]" Ripple's efforts related to XRP – Plaintiff does not identify any statement

15  (contractual or otherwise) in which Defendants undertook an affirmative obligation to increase

16  the price of XRP for the benefit of XRP holders.  *See Demarco v. LaPay*, 2009 WL 3855704, at

17  *8 (D. Utah Nov. 17, 2009) ("[M]arketing and advertising hooks do not change the character of

18  the transaction, nor are they generally representations upon which a purchaser can reasonably

19  rely especially in the face of clear [contractual] language to the contrary.").

20      Nor is there evidence that exchange-based purchasers "could parse through the multiple

21  documents and statements . . . (sometimes inconsistent) across many social media platforms and

22  news sites from a variety of Ripple speakers (with different levels of authority)" to discern

23  "Ripple's marketing campaign and public statements connecting XRP's price to its own efforts."

24  SEC SJ Order at 25.  Defendants' public statements are not relevant unless they formed part of

25  "the basis of the sale," and there is no evidence that they did.  *Aldrich v. McCulloch Props., Inc.*,

26  627 F.2d 1036, 1039 (10th Cir. 1980); *accord Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-

27  32 (9th Cir. 2013) (extra-contractual representations that were not made *to the purchasers* before

28                                         34

    DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                                 Case No. 4:18-cv-06753-PJH

the sale were "irrelevant"); *SEC v. Dalius*, 2023 WL 3988425, at \*7-8 (C.D. Cal. May 24, 2023) (evaluating "the promotional materials *surrounding the transaction*" where "investors committed their assets *based on those promises*") (emphasis added).  Plaintiff has made no effort to show that exchange-based XRP purchasers even saw Defendants' various social media posts; nor can he, as his class theory depends on asserting that no facts specific to individual purchasers (such as which, if any, social media posts each one saw) are relevant to deciding whether Defendants sold securities.  ECF No. 218-1, at 4-5; Ex. 53, Pl.'s Resp. to Ripple RFA No. 9.  Indeed, the evidence that does exist on this point demonstrates beyond dispute that many XRP purchasers did *not* see the social media posts Plaintiff invokes and did *not* have any subjective belief that they would receive profits based on Ripple's efforts.  *See* Purchaser Affidavits; ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

        *Second*, it is well established that, "[i]f the realization of profits depends significantly on the post-investment operation of market forces," the purchaser could not reasonably have expected profits from the promoter's efforts.  *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005); *see also Belmont Reid*, 794 F.2d at 1391 (promoter's sales of gold coins through a prepayment system were not investment contracts because "the purchasers were speculating in the world gold market" rather than on the success of this particular coin-minting operation).[25]  Plaintiff's claim as to exchange-based purchasers fails for this reason as well.  It is undisputed that, throughout the class period, the price of XRP correlates more closely with the prices of Bitcoin and Ether – that is, the cryptocurrency market as a whole – than with any action

---

[25] *See also Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (no investment contract where, "[o]nce the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of" the alleged promoter); *Svets v. Osborne Precious Metals Co.*, 1992 WL 281413, at \*2 (N.D. Cal. June 8, 1992) ("[O]nce the plaintiffs made their investment, their profits depended upon the fluctuations of the market [for precious metals], not the managerial effort of defendants.").

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                          Case No. 4:18-cv-06753-PJH

1   or statement of Ripple.  Ex. 8, A. Ferrell Rep. ¶¶ 27-45.  Thus, as Judge Torres held, "[i]t may

2   certainly be the case that many Programmatic Buyers purchased XRP with an expectation of

3   profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors,

4   such as general cryptocurrency market trends) – particularly because none of the Programmatic

5   Buyers were aware that they were buying XRP from Ripple."  SEC SJ Order at 24.

6           Again, Plaintiff's own purchases of XRP exemplify this.  Plaintiff made essentially all of

7   his purchases and sales of XRP in a two-week period in January 2018,[26] Ex. 28, B. Sostack Decl.

8   ¶ 3, ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ██████████████████████████████     That trading strategy is not consistent with a belief that

11  returns would come from Ripple's efforts to develop new uses for XRP or a "more liquid"

12  trading market.  ████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ███████████████████████████████████

16          **2. Class Members (If Any) Who Purchased XRP Pursuant to Bilateral Contracts
17              Did Not Purchase Investment Contracts**

18          In the SEC Action, Judge Torres determined that a specific set of Ripple's bilateral sales

19  pursuant to contracts with a handful of counterparties between 2013 and 2020 – which she called

20  "Institutional Sales" – were investment contracts.  On this issue, the arguments raised by the

21  parties and record made in discovery are materially different from the record before Judge

22  Torres; her reasoning does not support permitting any claims to proceed in this case.

23  ──────────────


26 ████████████████████████████████████████████████████

28  DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

1    *First*, there is no reason to believe that any "Institutional Buyers" are class members in

2    the first place.  Both classes are limited to entities who purchased XRP *and sold it at a loss* (or

3    never sold it).  Plaintiff has introduced no evidence that any Institutional Buyer sustained such a

4    loss or elected not to sell its XRP for years.[27]  Nor is there any reason to think that is the case.

5    As to the 23 non-ODL Institutional Buyers, many of their contracts contained discounts below

6    the market value of XRP, so those purchasers would not likely have experienced a loss.  *See*,

7    *e.g.*, Ex. 54, RPLI_00000943 (contract to purchase XRP at a discount); Ex. 55, RPLI_00517479

8    (same).  In the parallel SEC action, even the SEC conceded that such buyers most likely earned

9    profits, not losses, from buying XRP.  *E.g.*, Ex. 56, Defs.' Mot. for Summ. J., DX 39, *SEC v.*

10   *Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. June 13, 2023), ECF No. 827-39 at 14.

11   The remaining buyers pursuant to bilateral contracts during the class period are users of Ripple's

12   ODL product.[28]  As a matter of contract, those ODL purchasers were *obligated* to use their XRP

13   as a bridge asset in a cross-border transaction, which resulted in the sale of that XRP within

14   seconds, and were contractually insulated from XRP price changes during that short time.  Such

15   purchasers were thus *guaranteed* to suffer no losses (or gains) from their purchases of XRP.  *See*

16   Ex. 57, L. Angelilli SEC Dep. Tr. 113:6-21 ("window" of holding XRP is "so short" that those

17   institutions face virtually no "volatility risk"); Ex. 12, L. Angelilli SEC Decl. ¶¶ 14, 22 (ODL

18   users were contractually insulated against XRP price slippage during pendency of ODL

19   transactions); Ex. 13, MoneyGram Work Order (RPLI_00180446) (same); Ex. 14, Send Friend

20   Inc. Work Order (RPLI_00254781) (same).  Plaintiff has adduced no evidence to show that there

21   are any Institutional Buyers in the class, and the available evidence suggests there are none.

---

23   [27] ████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   [28] Defendants assume *arguendo* that ODL sales are a subset of "Institutional Sales"; the SEC
     took inconsistent positions on that point before Judge Torres.  *E.g.*, SEC Rule 56.1 Statement

26   ¶ 614(a), *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN (S.D.N.Y. June 13, 2023), ECF
     No. 838 (definition excluding ODL sales); *id.* ¶ 716 (conflicting definition including ODL-

27   related sales).

28   DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT                                        Case No. 4:18-cv-06753-PJH

1    *Second*, even assuming some Institutional Buyers are class members, Plaintiff has

2    committed himself to a theory under which the digital token XRP itself is a security, so that his

3    own (exchange-based) claims can be resolved together with the claims of all other class

4    members.  *Supra* p. 23.  In other words, Plaintiff has disclaimed reliance on the specific

5    representations and other facts and circumstances surrounding each individual sale of XRP –

6    precisely the facts that Judge Torres relied on in reaching her conclusion as to Institutional

7    Buyers.  SEC SJ Order at 16-22.  Plaintiff cannot now contend that bilateral contracts should be

8    treated differently, so the Court need not analyze Institutional Buyers independently.

9    *Third*, even if he could now undertake a contract-by-contract analysis, ████████████

10   ███████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████

12   ████████████████████   Nor could he.  The undisputed terms of Ripple's contracts are instead

13   fatal to Plaintiff's case because they expressly disclaim any expectation of profit.  *See* Ex. 17, A.

14   Schwartz Rep. ¶ 60 (describing disclaimers); *SEC v. Pac. W. Cap. Grp., Inc.*, 2015 WL 9694808,

15   at *6 (C.D. Cal. June 16, 2015) (no investment contract because seller "expressly disclaimed that

16   its investors' profits derived from its efforts or expertise").[29]  The contracts also contained

17   integration clauses, precluding Plaintiff from reaching beyond the contracts to try to fill the gaps

18   in his case.  *See* Ex. 17, A. Schwartz Rep. ¶¶ 16, 65, 83, 93, 119, 139, 154, 174, 184, 194

19   (discussing integration clauses); *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 298 (11th Cir.

20   2011) (per curiam) (explaining that, although the court "must consider 'the promises and

21   inducements held out to investors . . . in determining whether or not a particular transaction is a

22   security,'" an integration clause excludes "oral representations" from qualifying as "promises

23   [or] inducements") (citation omitted; ellipsis in original).

24

25   ───────────────────────────
     [29] *Accord Salameh v. Tarsadia Hotels*, 2011 WL 1044129, at *7 (S.D. Cal. Mar. 22, 2011) (sales
26   at issue not investment contracts "[i]n light of the representations and disclaimers set out in the
     parties' contracts"), *aff'd*, 726 F.3d 1124 (9th Cir. 2013); *Garcia v. Santa Maria Resort, Inc.*,
27   528 F. Supp. 2d 1283, 1292-93 (S.D. Fla. 2007) (same).

28                                                    38
     DEFENDANTS' MOTION FOR
     SUMMARY JUDGMENT                              Case No. 4:18-cv-06753-PJH

1    In finding that certain "Institutional Buyers" reasonably expected profits from Ripple's

2    efforts – because Ripple made promises to those purchasers that it did not make to exchange

3    purchasers – Judge Torres relied heavily on a series of brochures that Ripple distributed to

4    prospective customers in 2013 and 2014.  *See* SEC SJ Order at 19.  ███████████████

5    ██████████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████

8    *with* SEC SJ Order at 19 ("Starting in 2013, Ripple marketed XRP to potential investors"); *see*

9    *also supra* pp. 15-20 (discussing repose bar against federal claims).

10   ████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████    Plaintiff cannot prevail unless he can first show that the

13   few members of the class who purchased XRP via bilateral contracts with Ripple starting in 2017

14   actually received representations from Ripple leading them to expect profits from Ripple's

15   efforts.  *See Salameh*, 726 F.3d at 1131-32 (extra-contractual representations that were not made

16   *to the purchasers* before the sale were "irrelevant").  Plaintiff cannot do that.  ███████████

17   ██████████████████████████████████████████████████████████████████████████

18   ██████████████████████████████████    There is no evidence in the record

19   that any purchaser that had a bilateral contract with Ripple even *saw* those posts, let alone

20   credited them and expected profits based on them.  Accordingly, Plaintiff has a failure of proof:

21   even assuming that his grab bag of public statements *could* lead someone to expect profits, he

22   has put forward no evidence that any of those statements *did* lead any purchaser to expect profits,

23   and indeed no evidence that any purchaser ever encountered those statements at all.

24   **C.    California's "Risk Capital" Test Does Not Save Plaintiff's State Law Claims**

25   Plaintiff also advances claims on behalf of a class under California law.  The result is no

26   different there.  California law offers two ways to show an "investment contract":  (1) the federal

27   *Howey* test, which Plaintiffs fail for the reasons shown above, and (2) the "risk capital" test.  *See,*

28
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                          Case No. 4:18-cv-06753-PJH

1  *e.g.*, *Salameh v. Tarsadia Hotels*, 2010 WL 3339439, at *2 (S.D. Cal. Aug. 4, 2010).  Here,

2  Plaintiff proffers that the "risk capital" test leads to the same conclusion as the *Howey* test.  Am.

3  Compl. ¶ 159 ("[C]ourts have interpreted the [California law] term 'security' to be synonymous

4  in scope with the term 'investment contract' in federal securities law cases.").  Because Plaintiff

5  cannot satisfy the *Howey* test, the Court need go no further to determine that Defendants sold no

6  securities under California law, under Plaintiff's own approach.

7          Should the Court choose to apply the "risk capital" test anyway, Plaintiff cannot satisfy

8  that test either.  The "risk capital" test describes "[1] an attempt by an issuer to raise funds for a

9  business venture or enterprise; [2] an indiscriminate offering to the public at large where the

10  persons solicited are selected at random; [3] a passive position on the part of the investor; and [4]

11  the conduct of the enterprise by the issuer with other people's money."  *Silver Hills Country*

12  *Club v. Sobieski*, 55 Cal. 2d 811, 815 (1961) (citations omitted).

13          Defendants did not raise "funds solicited indiscriminately from the public at large [to] be

14  used for a business venture or enterprise."  *Moreland v. Dep't of Corps.*, 194 Cal. App. 3d 506,

15  522 (Cal. Ct. App. 1987).  In *Moreland*, the court found an entity's use of proceeds from sales of

16  gold ore to construct gold refining facilities did not "change[] the essential transaction from an

17  ordinary sale of a commodity to capital participation in a business" because "[t]he only profit

18  [purchasers] contemplate making will come, if at all, from resale of the gold . . . at a market price

19  that exceeds what they paid."  *Id.*  The same reasoning applies here.  XRP holders did not

20  purchase any interest in – and the "XRP ecosystem" does not constitute – a business venture.

21  XRP holders purchased a digital asset that they could either use or resell.  Like the purchasers of

22  ore in *Moreland*, XRP purchasers' contemplated profit came (if at all) from the expectation that

23  they could resell XRP at a higher price, not the expectation of any distributions from Ripple's

24  business operations.

25          As to holders who purchased XRP on digital asset exchanges, again, the overwhelming

26  majority of class members did not transact with Defendants at all.  And even those who did buy

27  XRP from Defendants were unaware that they were doing so.  *Supra*, pp. 10-11.  Thus, as Judge

28                                                    40

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                      Case No. 4:18-cv-06753-PJH

1    Torres held, "the reasonable Programmatic Buyer would not believe that sales from purchases of

2    *all* [XRP] . . . would be fed back into [Ripple and the XRP Ledger] and would generate

3    additional profits for *all* [XRP] holders."  Order at 11, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-

4    10832-AT-SN (S.D.N.Y. Oct. 3, 2023), ECF No. 917 (alterations in original) (citation omitted).

5            As to the few XRP buyers who purchased XRP pursuant to a bilateral agreement,

6    Plaintiff's claim also fails because those purchasers were neither "selected at random" nor "the

7    public at large."  *Silver Hills*, 55 Cal. 2d at 815.  These entities were sophisticated institutions

8    and accredited investors who generally approached Ripple.  Ex. 10, Samarasinghe SEC Dep. Tr.

9    302:9-303:19.  They in no way represent "random" members of "the public at large."

10   **III.    Plaintiff's Claims Fail Because They Are Brought By Downstream Purchasers**

11           Plaintiff's federal claims are brought under Section 12 of the Securities Act.  Section 12's

12   text – and binding authority interpreting it – establish that Section 12 is unavailable to purchasers

13   who did not buy XRP from Defendants or their agents or underwriters.  That rule forecloses the

14   claims by nearly all members of the Federal Class.[30]

15           Section 12(a)(1) states that "[a]ny person who . . . offers or sells a security in violation of

16   [Section 5 of the Securities Act] . . . shall be liable . . . to *the person* purchasing such security

17   *from him*."  15 U.S.C. § 77*l*(a)(1) (emphases added).  Section 12(a)(2) – which addresses

18   material misstatements and omissions instead of Section 5 violations – is structured identically.

19   *See id.* § 77*l*(a)(2).  This statutory language presents two distinct questions:  (1) who counts as a

20   "seller" under Section 12; and (2) who has standing to sue a "seller" under Section 12.  The

21   Court addressed the first question, who is a "seller," at the motion to dismiss stage.  *See* ECF No.

---

[30] This restriction is distinct from a separate issue that the parties briefed and the Court decided at
the motion to dismiss stage.  Specifically, Defendants argued that they should not be considered
sellers for purposes of Section 12, citing *Pinter v. Dahl*, 486 U.S. 622 (1988).  *See* ECF No. 70.
The Court rejected that argument and held that Defendants could be considered "statutory sellers"
even if agents sold XRP on their behalf.  *See* ECF No. 85, at 21-23.  For this motion, Defendants
assume *arguendo* they may qualify as "statutory sellers."  That does not end the analysis under
Section 12, however.  As explained below, a separate restriction in Section 12 precludes Plaintiff's
claims:  federal law does not allow a purchaser to recover if she did not purchase XRP from
Defendants or from agents selling on their behalf.  The Court has not yet decided that issue.

41

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                              Case No. 4:18-cv-06753-PJH

85, at 21-23.  The second question, by contrast, has not yet been addressed in this case, and it depends on the limiting phrase at the end of Section 12:  "shall be liable . . . to *the person purchasing such security from him*."  15 U.S.C. § 77*l*(a).

The Supreme Court has confirmed that this plain language means what it says: "§ 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers."  *Pinter*, 486 U.S. at 644 n.21 ("[A] buyer cannot recover against his seller's seller.").[31]  So has every Circuit to address the question,[32] including the Ninth.  *See Hertzberg*, 191 F.3d at 1081 ("Section 12 . . . permits suit against a seller . . . only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have purchased the security directly from the issuer . . . .") (citation omitted).  So have a long line of decisions from this District.[33]  And so have leading treatises – including one by Plaintiff's own proffered

---

[31] *Pinter* discussed § 12(a)(1), but "the Ninth Circuit has clarified that the same inquiry governs claims under Section 12(a)(2)."  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 548 n.2 (N.D. Cal. 2009) (citing *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 535-36 (9th Cir. 1989)).  That is because the "pertinent language" setting forth § 12's scope – "from him" and "the person" – is "identical" in both subsections.  *Moore*, 885 F.2d at 535-36.

[32] *See Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996); *Cortec Indus. Inc. v. Sum Holdings L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Collins v. Signetics Corp.*, 605 F.2d 110, 113 (3d Cir. 1979); *Yates v. Municipal Mortg. & Equity LLC*, 744 F.3d 874, 899 (4th Cir. 2014); *Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 692 (5th Cir. 1971); *Water Island Event-Driven Fund, LLC v. Tribune Media Co.*, 39 F.4th 402, 405-06 (7th Cir. 2022); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 977 (8th Cir. 2002); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999); *Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000); *Foster v. Jesup & Lamont Sec. Co., Inc.*, 759 F.2d 838, 845 (11th Cir. 1985); *Zacharias v. SEC*, 569 F.3d 458, 468-69 (D.C. Cir. 2009).

[33] *See, e.g.*, *In re Itel Secs. Litig.*, 89 F.R.D. 104, 116 (N.D. Cal. 1981) ("The purchaser can recover [under § 12] only from his immediate seller."); *In re Century Alum. Co. Secs. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) ("Section 12(a) does not apply to aftermarket purchases."); *Mendelsohn v. Cap. Underwriters, Inc.*, 490 F. Supp. 1069, 1081 (N.D. Cal. 1979) ("[I]t appears settled that a purchaser [using § 12] may recover only from his immediate seller[.]"); *Welgus v. TriNet*, 2017 WL 167708, at *18 (N.D. Cal. Jan. 17, 2017) (holding that "aftermarket purchasers—*i.e.*, those who did not purchase shares directly . . .—" could not bring a claim under § 12, citing *Pinter*'s "stat[ement] that § 12 'imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers' " (quoting *Pinter*, 486 U.S. at 643 n.21)); *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *7 (N.D. Cal. July 5, 2022) (Section 12 "does not extend to after market transactions"); *accord In re Violin Memory Secs. Litig.*, 2014 WL 5525946, at *18 (N.D. Cal. Oct. 31, 2014); *Primo v. Pac.*

42

expert.[34]

If there were any question about the meaning of Section 12(a)'s textual limits, a comparison to the text of Section 11 makes the restriction clear.  Unlike Section 12(a), Section 11(a) provides a remedy to "*any* person acquiring such security," 15 U.S.C. § 77k(a), a broader phrase than that used in Section 12.  In *Hertzberg*, the Ninth Circuit held that this broader language showed that Section 11 (unlike Section 12) includes downstream purchasers.  *See* 191 F.3d at 1081 ("[W]hile Section 11 and Section 12 are indeed parallel statutes, their wording is significantly different as to who can bring a suit. . . .  Congress's decision to use 'from him' in Section 12 but not in Section 11 must mean that Congress intended a different meaning in the two sections.").  Congress's decision to use broader language in Section 11 than in Section 12 shows that it knew how to extend a remedy to downstream purchasers when it wanted to – and that it chose not to do so in Section 12.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).  Extending liability under Section 12 to downstream purchasers would – in addition to running afoul of controlling Supreme Court and Ninth Circuit authority – nullify Congress's difference in phrasing between Sections 11 and 12.

---

*Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1123-24 (N.D. Cal. 2013); *In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010); *In re Levi Strauss & Co. Secs. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007); *In re Valence Tech. Secs. Litig.*, 1996 WL 37788, at *4 (N.D. Cal. Jan. 23, 1996); *Stack v. Lobo*, 903 F. Supp. 1361, 1375 (N.D. Cal. 1995); *Weinstein v. Jain*, 1995 WL 787549, at *2 (N.D. Cal. 1995); *Klein v. King*, 1990 WL 61950, at *19 (N.D. Cal. Mar. 26, 1990); *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 648 (N.D. Cal. 1980); *In re Gap Stores Secs. Litig.*, 79 F.R.D. 283, 307 (N.D. Cal. 1978).

[34] *See* IX Louis Loss, Joel Seligman, Troy Paredes, SECURITIES REGULATION at 334 (6th ed. 2014) (explaining that the limiting phrase "from him" makes it "quite clear that § 12 contemplates only an action by a buyer against *his or her immediate seller*" (emphasis in original)); *id.* at 334 n.122 (collecting cases); 2 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 7:52 (June 2023 ed.) (this language "makes it clear that . . . remote purchasers do not have standing to bring section 12 claims against remote sellers").

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                    Case No. 4:18-cv-06753-PJH

1    Nor can Plaintiff invoke the concept of solicitation to save his claims.  A "solicitation

2    theory," which the Court addressed in its ruling at the motion-to-dismiss stage, addresses only

3    the first question implicated by Section 12 which parties "qualify as 'sellers.'"  ECF No. 85 at

4    21-23 (linking "solicitation theory" to issue of who constitutes a statutory seller); *see also Pinter*,

5    486 U.S. at 641-42 (explaining that a "seller" can include either (1) the defendant passing title of

6    a security or (2) an agent soliciting the purchase on behalf of the direct seller).  A solicitation

7    theory does not answer the second question:  whether a buyer has standing to recover from a

8    *remote* seller.  Extending such a theory to hold Ripple liable to anyone who purchased XRP from

9    anyone would be a radical departure from the statutory text and precedent discussed above.

10    For virtually all of the members of the Federal Class, there is no evidence that they

11    purchased any XRP from Defendants or their agents or underwriters.[35]  And even for the small

12    minority that may have bought from Defendants or other statutory sellers directly, Plaintiff has

13    offered no way to tell who they are and which of their purchases allow recovery.  Accordingly,

14    the plain text of Section 12, together with controlling case law from the Supreme Court and

15    Ninth Circuit, forecloses the claim advanced by the Federal Class.

16    The same failure of proof forecloses the claim advanced by the California Class:  though

17    it uses a different legal mechanism, California law also limits recovery to direct purchasers, as

18    this Court has previously noted, *see* ECF No. 85 at 26-27, and Plaintiff has offered no way to

19    determine who those direct purchasers actually are or what damages they sustained.

20    Importantly, any other result would contradict the *Howey* test, which requires the

21    purchaser to make an investment of money in an enterprise.  *See supra* pp. 26-27.  There is no

22    genuine dispute that downstream XRP purchasers made no investment of money in any

23    enterprise controlled by Defendants; they paid their money to whoever sold their XRP to them,

24    not to any Defendant, defeating the first prong of the *Howey* test.  Accordingly, even if Section

25

26

27    [35] As noted above, there is no reason to believe that any of the 23 entities who bought XRP via
      bilateral contracts are class members in the first place.  *Supra* p. 37.

28

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                              Case No. 4:18-cv-06753-PJH

12 could countenance an action by downstream purchasers (and it cannot), those downstream

purchases would not be investment contracts in the first place.  Either way, the claim fails.

## IV.    Plaintiff's Claims Regarding Foreign Transactions Fail

Plaintiff has never disclaimed the contention that his putative class extends to

transactions that occurred outside the United States.  But domestic securities laws do not extend

so far.  They reach only offers and sales that occurred within the United States.  *See Morrison v.*

*Nat'l Australia Bank Ltd.*, 561 U.S. 247, 264 (2010).[36]

Transactions on a centralized cryptocurrency exchange occur where that exchange is

located.  This point is undisputed:  Defendants introduced an expert report from Professor Yesha

Yadav, a leading expert in market microstructure, who explained as much, *see generally* Ex. 22,

Y. Yadav Rep., and Plaintiff made no serious attempt to rebut that report's substance.[37]

Accordingly, transactions on exchanges located outside of the United States cannot give rise to

liability in this case.  Of the 25 exchanges on which Defendants sold XRP, ███████████

███████████████ Professor Yadav identifies at least 20 domiciled outside the United

States.  *See* Ex. 22, Y. Yadav Rep. ¶ 117 & tbl. A.[38]  That list of non-U.S. exchanges is likewise

undisputed.

---

[36] Defendants are unaware of any case law applying *Morrison* to California Corp. Code § 25110 specifically.  But the same international comity principles that animate *Morrison* in the context of the federal securities laws apply with even more force to California law.  Indeed, if the California statute did purport to regulate securities transactions conducted in foreign jurisdictions, that would likely infringe on Congress's exclusive authority to regulate international commerce and therefore be invalid.  *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("[T]he Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders . . . .") (citation omitted).

[37] Plaintiff introduced a rebuttal report from a computer science professor as a purported "rebuttal," but at his deposition he confirmed that he affirmatively *agreed* with most of Yadav's points and that he had no basis to disagree with *any* of the three opinions in her report. Ex. 4, J. Clark Tr. 53:15-17, 54:6-56:7.

[38] There are many other exchanges domiciled outside the United States on which XRP was traded but on which Defendants never sold any XRP.  Plaintiff has never expressly disclaimed any alleged liability arising from trades on such exchanges.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                              Case No. 4:18-cv-06753-PJH

1

2

3

4 ██████████ *Morrison* and its progeny foreclose that claim.  It is Plaintiff's burden to prove

5 domesticity as to every transaction at issue.  *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 660 (D.

6 Conn. 2018); *see also, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66-

7 70 (2d Cir. 2012).  Plaintiff has not proffered competent evidence to show that *any* transaction is

8 domestic, and he could not possibly do so as to transactions conducted on foreign exchanges.

9 Accordingly, even if Plaintiff's claim were timely, even if Defendants' offers and sales of XRP

10 were offers and sales of securities, and even if Plaintiff could adduce evidence of sales to class

11 members by Defendants, the Court should still grant summary judgment in favor of Defendants

12 to the extent Plaintiff's claims are based on transactions that occurred on exchanges domiciled

13 outside the United States.

14 <p align="center">**CONCLUSION**</p>

15 The Court should grant summary judgment in favor of Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                                      Case No. 4:18-cv-06753-PJH

1  Dated: January 9, 2024                    By: */s/ Michael K. Kellogg*

2                                            MICHAEL K. KELLOGG (admitted *pro hac vice*)
                                             mkellogg@kellogghansen.com
3                                            REID M. FIGEL (admitted *pro hac vice*)
                                             rfigel@kellogghansen.com
4                                            GREGORY G. RAPAWY (admitted *pro hac vice*)
                                             grapawy@kellogghansen.com
5                                            BRADLEY E. OPPENHEIMER
                                             (admitted pro hac vice)
6                                            boppenheimer@kellogghansen.com
                                             BETHAN R. JONES (admitted *pro hac vice*)
7                                            bjones@kellogghansen.com
                                             JUSTIN B. BERG (admitted *pro hac vice*)
8                                            jberg@kellogghansen.com
                                             KELLOGG, HANSEN, TODD, FIGEL,
9                                            & FREDERICK, P.L.L.C.
                                             Sumner Square
10                                           1615 M Street, N.W., Suite 400
                                             Washington, D.C. 20036
11                                           +1 (202) 326-7900

12                                           *Counsel for Defendant Ripple Labs Inc.*

13                                           DAMIEN J. MARSHALL (admitted *pro hac vice*)
                                             dmarshall@kslaw.com
14                                           ANDREW MICHAELSON (admitted *pro hac vice*)
                                             amichaelson@kslaw.com
15                                           KING & SPALDING LLP
                                             1185 Avenue of the Americas, 34th Floor
16                                           New York, NY 10036
                                             Tel: (212) 556-2100; Fax: (212) 556-2222
17
                                             LISA BUGNI (SBN 323962)
18                                           lbugni@kslaw.com
                                             KING & SPALDING LLP
19                                           50 California Street, Suite 3300
                                             San Francisco, CA 94111
20                                           Tel: (415) 318-1200; Fax: (415) 318-1300

21                                           ANDREW J. CERESNEY (admitted *pro hac vice*)
                                             aceresney@debevoise.com
22                                           DEBEVOISE & PLIMPTON LLP
                                             919 Third Avenue
23                                           New York, NY 10022
                                             Tel: (212) 909-6000; Fax: (212) 909-6836
24
                                             *Attorneys for Defendants Ripple Labs Inc.,*
25                                           *XRP II, LLC, and Bradley Garlinghouse*

26

27
                                             47
28  DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT                                        Case No. 4:18-cv-06753-PJH