Marc M. Seltzer (54534)
mseltzer@susmangodfrey.com
Steven G. Sklaver (237612)
ssklaver@susmangodfrey.com
Oleg Elkhunovich (269238)
oelkhunovich@susmangodfrey.com
Krysta Kauble Pachman (280951)
kpachman@susmangodfrey.com
Nicholas N. Spear (304281)
nspear@susmangodfrey.com
Michael Tayag (350113)
mtayag@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

James Q. Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4944
Facsimile: (619) 566-4341

*Counsel for Lead Plaintiff Bradley Sostack*
*and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| In re RIPPLE LABS, INC. LITIGATION<br><br>This Document Relates to:<br><br>All Actions | Case No. 4:18-cv-06753-PJH (RMI)<br>Formerly Consolidated/Related<br>Case No. 4:21-cv-06518 (Closed 9-27-21)<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: May 30, 2024<br>TIME: 1:30 p.m.<br>PLACE: Courtroom 3<br><br>Consolidated First Amended Complaint<br>Filed: March 25, 2020<br><br>**REDACTED** |

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. STATEMENT OF ISSSUES TO BE DECIDED ........ 5

III. BACKGROUND ........ 5

A. Ripple Creates and Controls XRP and the XRP Ledger ........ 5

B. Defendants Pivot and Promote XRP as an Investment Opportunity to the Public ........ 6

C. Defendants Do Not Register Their Offers and Sales of XRP Despite Earnings Billions ........ 10

IV. EVIDENTIARY OBJECTION TO "PURCHASER AFFIDAVITS" ........ 11

V. ARGUMENT ........ 12

A. Legal Standard ........ 12

B. Disputed Questions of Fact Preclude Summary Judgment on the Statute of Repose and Defendants Use the Wrong Repose Date ........ 13

C. Disputed Questions of Fact Preclude Summary Judgment on whether Defendants Offered and Sold an Investment Contract to Class Members ........ 19

1. Whether "XRP Itself is Not an Investment Contract" is Irrelevant ........ 20

2. Defendants Mischaracterize the Howey Test and the Record Evidence ........ 21

a. Howey Prong 1 – Investment of Money ........ 21

b. Howey Prong 2 – Common Enterprise ........ 24

c. Howey Prong 3 – Expectation of Profits Produced by the Efforts of Others ........ 29

d. The Court Should Disregard the SEC Action Orders ........ 35

1) The SEC Action Orders are Incompatible with Binding Caselaw ........ 35

2) Factual Issues Preclude Summary Judgment ........ 39

D. Defendants' "Downstream Purchasers" Arguments Mischaracterize the Law ........ 45

VI. CONCLUSION ........ 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 12

*Ass'n of Am. R.R.s. v. United States*,
603 F.2d 953 (D.C. Cir. 1979) .......... 28

*Bobrowski v. Red Door Grp., Inc.*,
2011 WL 3875424 (D. Ariz. Aug. 31, 2011) .......... 29

*Brodt v. Bache & Co., Inc.*,
595 F.2d 459 (9th Cir. 1978) .......... 27

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
608 F.2d 1297 (9th Cir. 1979) .......... 31, 32

*Demarco v. LaPay*,
2009 WL 3855704 (D. Utah Nov. 17, 2009) .......... 32

*Diamond S.J. Enter., Inc. v. City of San Jose*,
430 F. Supp. 3d 637 (N.D. Cal. 2019) .......... 21

*Dorchester Inv'rs v. Peak Trends Tr.*,
2003 WL 223466 (S.D.N.Y. Feb. 3, 2003) .......... 49

*El Khadem v. Equity Secs. Corp.*,
494 F.2d 1224 (9th Cir. 1974) .......... 21

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995) .......... 49, 50

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
396 F. Supp. 175 (N.D. Cal. 1975) .......... 32

*Harman v. Harper*,
914 F.2d 262 (9th Cir. 1990) (unpublished) .......... 32

*Hedden v. Marinelli*,
796 F. Supp. 432 (N.D. Cal. 1992) .......... 18

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999) .......... 49

*Hill v. Quicken Loans Inc.*,
2020 WL 5358394 (C.D. Cal. Aug. 5, 2020) .......... 34

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989)........................................................................*passim*

*Holak v. Kmart*,
2014 WL 2565902 (E.D. Cal. June 6, 2014)............................................................... 12

*Houghton v. Leshner*,
2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) ............................................................ 33

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
2021 WL 5530949 (D. Or. Nov. 24, 2021)................................................................. 13

*In re Ripple Labs, Inc.*,
2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ..........................................................*passim*

*In re Ripple Labs, Inc.*,
2023 WL 4303644 (N.D. Cal. June 30, 2023) .........................................................*passim*

*In re Tesla Sec. Litig.*,
477 F. Supp. 3d 903 (N.D. Cal. 2020) ................................................................. 44, 45

*In re Worlds of Wonder Sec. Litig.*,
1990 WL 61951 (N.D. Cal. Mar. 23, 1990)................................................................. 48

*Johnson v. Nationwide Indus., Inc.*,
450 F. Supp. 948 (N.D. Ill. 1978) ............................................................................. 32

*Lift-U v. Ricon Corp.*,
2011 WL 5118634 (N.D. Cal. Oct. 28, 2011)............................................................. 34

*Marini v. Adamo*,
812 F. Supp. 2d 243 (E.D.N.Y. 2011) ....................................................................... 27

*McPherson v. Haemonetics Corp., Inc.*,
1994 WL 184592 (N.D. Cal. Apr. 25, 1994) .............................................................. 20

*Mordaunt v. Incomco*,
686 F.2d 815 (9th Cir. 1982)..................................................................................... 26

*Owen v. Elastos Found.*,
2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ................................................... 46, 48, 50

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)..................................................................................... 14, 15

*Patterson v. Jump Trading LLC*,
2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ..............................................................*passim*

*Petrone v. Werner Enters., Inc.*,
2014 WL 2965250 (D. Neb. July 1, 2014)................................................................... 12

*Pino v. Cardone Capital, LLC*,
55 F.4th 1253 (9th Cir. 2022) ........ *passim*

*Pinter v. Dahl*,
486 U.S. 622 (1988) ........ *passim*

*Powell v. Cnty. of Orange*,
2022 WL 3574282 (C.D. Cal. July 7, 2022) ........ 20

*Rodriguez v. Banco Cent. Corp.*,
990 F.2d 7 (1st Cir. 1993) ........ 32

*SEC v. Barry*,
670 F. Supp. 3d 976 (C.D. Cal. 2023) ........ 30

*SEC v. Blockvest, LLC*,
2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ........ 3, 22, 29, 37

*SEC v. Dalius*,
2023 WL 3988425 (C.D. Cal. May 24, 2023) ........ 33

*SEC v. Edwards*,
540 U.S. 389 (2004) ........ 20

*SEC v. Glenn W. Turner Enters., Inc.*,
474 F.2d 476 (9th Cir. 1973) ........ 21

*SEC v. Howey*,
328 U.S. 293 (1946) ........ 19, 20

*SEC v. Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) ........ *passim*

*SEC v. LBRY, Inc.*,
639 F. Supp. 3d 211 (D.N.H. 2022) ........ 3, 4, 30, 31

*SEC v. Murphy*,
626 F.2d 633 (9th Cir. 1980) ........ 19

*SEC v. NAC Found., LLC*,
512 F. Supp. 3d 998 (N.D. Cal. 2021) ........ *passim*

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ........ 2, 3, 39

*SEC v. R.G. Reynolds Enters., Inc.*,
952 F.2d 1125 (9th Cir. 1991) ........ 24, 27

*SEC v. Ripple Labs, Inc.*,
2023 WL 4507900 (S.D.N.Y. July 13, 2023) ........ *passim*

*SEC v. Ripple Labs, Inc.*,
2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) .......... 36, 38

*SEC v. Ripple Labs, Inc., et al.*,
Case No. 1:20-cv-10832-AT-SN (S.D.N.Y.) .......... 1, 37

*SEC v. Telegram Group Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......... *passim*

*SEC v. Terraform Labs Pte. Ltd.*,
2023 WL 4858299 (S.D.N.Y. July 31, 2023) .......... *passim*

*SEC v. Terraform Labs Pte. Ltd.*,
2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) .......... 3, 31

*SEC v. Wahi*,
2024 WL 896148 (W.D. Wash. Mar. 1, 2024) .......... *passim*

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996) .......... 48

*Silver Hills Country Club v. Sobieski*,
55 Cal. 2d 811 (1961) .......... 45

*Takiguchi v. MRI Intern., Inc.*,
47 F. Supp. 3d 1100 (D. Nev. 2014) .......... 18

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975) .......... 29, 30

*Warfield v. Alaniz*,
569 F.3d 1015 (9th Cir. 2009) .......... *passim*

*Welgus v. TriNet Grp., Inc.*,
2017 WL 167708 (N.D. Cal. Jan. 17, 2017) .......... 50

*Wildes v. BitConnect Int'l PLC*,
No. 20-11675-AA, 2020 WL 3958534 (11th Cir. July 8, 2020) .......... 38

*Wildes v. BitConnect Int'l PLC*,
25 F.4th 1341 (11th Cir. 2022) .......... 38

*Woodward v. Terracor*,
574 F.2d 1023 (10th Cir. 1978) .......... 32

*Wright v. Schock*,
571 F. Supp. 642 (N.D. Cal. 1983) .......... 32

*Yeti by Molly, Ltd. V. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) .......... 12

**Statutes**

15 U.S.C. §12(a) ........................................ *passim*

15 U.S.C. § 77m ........................................ 13

**Rules**

N.D. Cal. Civ. L.R. 7-3(a) ........................................ 11

Fed. R. Civ. P. 26(a)(1) ........................................ 12

Fed. R. Civ. P. 56(a) ........................................ 12

**SEC Materials**

*Am. Diamond Co.*, 1977 WL 10907 (Aug. 15, 1977) ........................................ 32

*The London Diamond Exch.*, 1972 WL 8488 (Otc. 3,1972) ........................................ 32

**Other Authorities**

2 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 7:52 (June 2023 ed.) ........................................ 49

Ann Lipton, So, Ripple, Business Law Prof Blog (July 13, 2023), https://lawprofessors.typepad.com/business_law/2023/07/so-ripple.html# ........................................ 2

Lee Reiners, Reflections on the Ripple Decision, The FinReg Blog (July 17, 2023), https://sites.duke.edu/thefinregblog/2023/07/17/reflections-on-the-ripple-decision/ ........................................ 2, 37

Louis Loss, Joel Seligman, Troy Paredes, SECURITIES REGULATION at Ch. 11, C(2)(c) n.122 (7th ed. 2024) ........................................ 49

*Ripple: Everyone Loses*, CLS Blue Sky Blog (July 18, 2023), https://clsbluesky.law.columbia.edu/2023/07/18/sec-v-ripple-everyone-loses/; ........................................ 37

## I. INTRODUCTION

Defendants' motion hinges on trying to obtain a ruling that their offers and sales of XRP cannot be found, as a matter of law, to be securities under the Supreme Court's governing *Howey* test. Under the securities laws an investment contract is a form of security and subject to regulation for the protection of investors. The *Howey* test for an investment contract applies to "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009). Under well-established Supreme Court and Ninth Circuit precedent, Defendants' offers and sales of XRP can readily be found to be a security by the trier of fact. These are the key facts. Defendants engaged in a multimedia promotional and marketing campaign, including a significant presence on social media, that was intentionally designed to pitch XRP to the public as an investment that would gain in value due to their efforts. Defendants told the public that they were "aligned" with other XRP purchasers and that Ripple's value, the company Defendants controlled, was "tied" to XRP's value. And Defendants repeatedly told the public that XRP's price would increase due to Ripple's work and efforts. These facts strongly show that Defendants' offers and sales of XRP fit the definition of a security; at least a reasonable jury could conclude as much.

Defendants' argument to the contrary is based almost entirely on Judge Torres' rulings in the *SEC Action*.[1] There, Judge Torres held as a matter of law that XRP was an investment contract when it was sold to sophisticated institutional purchasers, but was not when sold to unsophisticated members of the public at large. That highly controversial, "split the baby," and non-binding interlocutory ruling by a sister district court in another circuit is wrong on the law and distinguishable on the facts. Judge Torres' *Howey* analysis has been widely criticized as incorrect. Judge Rakoff—one of the country's most experienced and knowledgeable experts on securities law—"reject[ed]" Judge Torres' approach and created an intra-district split within a month of Judge Torres' ruling. Judge Rakoff wrote that "*Howey* makes no such distinction between purchasers" and "it makes good sense that it did not" because how "a purchaser bought the coins . . . has no impact on whether a reasonable individual would objectively view the defendants' actions and

---

[1] *SEC v. Ripple Labs, Inc., et al.*, Case No. 1:20-cv-10832-AT-SN (S.D.N.Y.).

statements as evincing a promise of profits based on their efforts." *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023). This objective test doesn't turn on the subjective beliefs of a purchaser regarding the nature of his or her investment. The Ninth Circuit expressly follows the "objective" test, as this Court held at class certification. *In re Ripple Labs, Inc.*, 2023 WL 4303644, at *3–4 (N.D. Cal. June 30, 2023). Unsurprisingly, courts in this circuit have followed Judge Rakoff, not Judge Torres. *See SEC v. Wahi*, 2024 WL 896148, at *6 (W.D. Wash. Mar. 1, 2024) (citing *Terraform*); *Patterson v. Jump Trading LLC*, 2024 WL 49055, at *11–12 (N.D. Cal. Jan. 4, 2024) (same).

Even if there were somehow a reason to treat private institutional purchasers differently than public retail purchasers—and as Judge Rakoff explained, there is not—that disparate treatment should benefit, not burden, the public. The Ninth Circuit explained in *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010), that the securities laws are designed to protect the "financially unsophisticated" public. But Judge Torres held public purchasers' lack of sophistication against them—they were not sold investment contracts, she said, because there was no evidence they "shared similar 'understandings and expectations' and could parse through [] multiple documents and statements." *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *12 (S.D.N.Y. July 13, 2023). As commentators rightly observed, this analysis "subverts the purpose of the securities laws (to protect less sophisticated investors)" and "flips securities law on its head."[2]

Defendants do not even try to explain how Judge Torres' *Howey* analysis is consistent with binding Ninth Circuit law. It is not. Judge Torres' focus on the purported *subjective* beliefs of individual class members does not comply with the "*objective*" test set forth in *Warfield*. Judge Torres' focus on direct contact and relationships between Ripple and public retail purchasers is also at odds with *Pino v. Cardone Capital*, *LLC*, 55 F.4th 1253, 1260 (9th Cir. 2022), where the Ninth Circuit held that "mass communications to potential investors through social media posts and online videos" can constitute an offer or sale of a security. And as explained above, Judge Torres'

---

[2] Ann Lipton, So, Ripple, Business Law Prof Blog (July 13, 2023), https://lawprofessors.typepad.com/business_law/2023/07/so-ripple.html#; Lee Reiners, Reflections on the Ripple Decision, The FinReg Blog (July 17, 2023), https://sites.duke.edu/thefinregblog/2023/07/17/reflections-on-the-ripple-decision/.

demotion of the rights and interests of public buyers is contrary to *Platforms*, 617 F.3d at 1085, which held that registration requirements are designed to protect unsophisticated investors.

Defendants also do not tell this Court that Judge Torres' decision is an outlier. Defendants, in fact, ***do not even mention*** the substantial and growing body of case law in this circuit and across the country finding that digital assets satisfy the *Howey* test for investment contracts. *See, e.g.*, *Wahi*, 2024 WL 896148 (granting the SEC's motion for default judgment); *Patterson*, 2024 WL 49055 (holding that plaintiff adequately alleged that the tokens were securities); *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) (granting SEC's motion for summary judgment); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. 2022) (granting SEC's motion for summary judgment); *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 998 (N.D. Cal. 2021) (denying motion to dismiss SEC's claims); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (granting SEC's motion for summary judgment); *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (granting SEC's motion for a preliminary injunction); *SEC v. Blockvest, LLC*, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) (granting SEC's motion for a preliminary injunction).

Summary judgment is improper even under Judge Torres' incorrect *Howey* analysis. Plaintiff here submitted evidence he developed — not previously submitted by the SEC — that shows there are genuine factual disputes for factors Judge Torres considered dispositive. And so, while Judge Torres believed the SEC had substantial gaps of proof in its case, Plaintiff here filled in those evidentiary gaps. A decision in a different case based on a different evidentiary record is not binding on the second Court under different governing law involving different arguments.

Defendants' other arguments in support of summary judgment are equally meritless. *First*, factual disputes preclude summary judgment on repose. The Court held at the motion-to-dismiss stage that a "bona fide" public offer occurs when XRP is "really and truly (geniunely)" offered to the public and the analysis considers a defendant's "clear objective attempts to secure purchases." *In re Ripple Labs, Inc.*, 2020 WL 922815, at *9 (N.D. Cal. Feb. 26, 2020). Defendants' claim that a "bona fide" public offering occurred before August 5, 2016 (three years before the consolidated complaint). That is the wrong repose date—the first federal claims were filed on July 3, 2018, so the correct date is July 3, 2015. *See In re Ripple Labs*, 2023 WL 4303644, at *8 (stating that

*Greenwald*, filed on July 3, 2018, was "the first complaint to bring federal claims against Ripple"). Regardless, there is a disputed factual issue under either date. Record evidence shows that Defendants' promotional and marketing efforts for XRP were part of a change in corporate focus and were not implemented until *after* August 5, 2016. Defendants argue that they sold some XRP to the public before August 2016, but rely on the same types of arguments that the Court previously found insufficient. *In re Ripple Labs*, 2020 WL 922815, at *9–10. They fare no better now.

*Second*, factual disputes preclude summary judgment on whether XRP is an "investment contract" under the *Howey* test. There is an abundance of evidence that establishes that Defendants pitched XRP as an investment whose value would depend on their efforts, *see, e.g.*, Ex. 96 (Ripple's CEO stating in a public interview that he is "very long XRP as a percentage of [his] personal balance sheet"); described themselves "aligned" with other XRP purchasers in developing and profiting off of XRP, *see, e.g.*, Ex. 103 (2019 XRP Market Report); and repeatedly told the public that XRP will increase in value due to Ripple's efforts, *see, e.g.*, Ex. 97 (Ripple's CEO Garlinghouse stating in a public interview: "if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP").[3] This evidence is more than sufficient to create triable issues on whether XRP purchasers (1) invested money, (2) in a common enterprise, (3) with an expectation of profits produced by Defendants' efforts. Courts addressing digital assets found similar evidence sufficient to ***grant summary judgment against the defendant***. *See Terraform*, 2023 WL 4858299, at *11–12; *LBRY, Inc.*, 639 F. Supp. 3d at 220–21; *Kik*, 492 F. Supp. 3d at 179–80.

*Finally*, Defendants' concession that they are statutory sellers is dispositive for this motion. Defendants argue that Plaintiffs lack "standing" under Section 12(a)(1) if they did not purchase XRP from Defendants or their agents. But that argument is foreclosed by *Pinter v. Dahl*, 486 U.S. 622 (1988), and this Court's prior orders, *see In re Ripple Labs*, 2023 WL 4303644, at *4; *In re Ripple Labs*, 2020 WL 922815, at *12. Defendants' attempt to mischaracterize those rulings or attack them in a new way fail.

---

[3] All exhibits are attached to the declaration of Nicholas N. Spear.

## II. STATEMENT OF ISSSUES TO BE DECIDED

1. Whether factual issues preclude summary judgment on the statute of repose.
2. Whether factual issues preclude summary judgment on the *Howey* test.
3. Whether Defendants have mischaracterized the holdings of *Pinter* and its progeny.

## III. BACKGROUND

### A. Ripple Creates and Controls XRP and the XRP Ledger

[redacted] Ex. 2 (McCaleb Depo.) at 75:21–76:3, 76:16–24. The XRP Ledger "[redacted]." Ex. 1 (Schwartz Depo.) at 27:23–28:5. Information about transactions on the XRP Ledger is stored in blocks added to the XRP Ledger blockchain over time through a "consensus" process. Ex. 62 ("Ripple Protocol" Document) at RPLI_00132775. The consensus process uses a network of connected computer servers called "validators" to decide which transactions should be included within each new block. *Id.*; Ex. 11 (Schwartz SEC Depo.) at 30:1–19, 143:8–20. [redacted] Ex. 22 (7/31/17 Email Chain) at HATCH0176168 ([redacted]).

[redacted] Ex. 2 (McCaleb Depo.) at 77:11–24 [redacted]). All units of XRP are fungible with and have the same value and currency conversion rates as all other XRP units. Ex. 95 (Def. SEC RFAs) at Resp. 24–25; Ex. 104 (CoinMarketCap XRP Page). XRP is "native" to the XRP Ledger because it "[redacted]" the XRP Ledger and transactions on the XRP Ledger require the destruction of a small amount of XRP (to prevent spam attacks). Ex. 62 ("Ripple Protocol" Document) at RPLI_00132776, 78.

Ripple created the XRP Ledger and the 100 billion XRP when McCaleb and David Schwartz (Ripple's original developer and current Chief Technology Officer) ran the software code

on three validators they controlled. Ex. 1 (Schwartz Depo.) at 101:13–103:9; Ex. 2 (McCaleb Depo.) at 76:11–77:17.

Ripple has maintained control over XRP and the XRP Ledger since their creation. Ripple held the majority of XRP through at least [redacted] and [redacted]. Ex. 10 (30(b)(6) Binder) at 3. Although the XRP Ledger software is nominally open source, [redacted]. Ex. 133 (Defs. Supp. Resp. to Set 3 Rogs) at Resp. 7; *see also* Ex. 119 (11/14/17 Schwartz Reddit Post: "One thing we're definitely missing is a robust and inspired community of developers."). The XRP Ledger code also requires a "central entity [to] maintain coordination between validators" in the consensus process. Ex. 137 (Clark Report) at pp. 7–10, 24–28, 31–35. Ripple "has played this role historically," *id.* at 8–9, and until July 2018 controlled all validators on the network. *Id.* at 37–38.

Defendants routinely refer to Ripple as a "steward of XRP." *See, e.g.*, Ex. 105 (12/7/17 Ripple.com Insights Article stating: "Ripple has proved to be a responsible steward of XRP supply for almost five years – and has clearly demonstrated a tremendous track record of investing in and supporting the XRP ecosystem"); Ex. 25 (6/5/17 Investor and Adviser Update) at RPLI_01409412 (Garlinghouse stating that [redacted]). Schwartz—who is an "[redacted]" and "[redacted]," *see* Ex. 18 (Garlinghouse Inv. Tr.) at 47:8–12—wrote that what "set[s] XRP apart from any other digital asset" was "the amazing team of dedicated professionals that Ripple has managed to amass to develop an ecosystem around XRP," Ex. 120 (2/27/18 Reddit Post), and that "only Ripple is positioned . . to finance the effort," Ex. 121 (7/24/17 Reddit Post).

**B. <u>Defendants Pivot and Promote XRP as an Investment Opportunity to the Public</u>**

Ripple remained in a start-up phase for years after its incorporation in 2012. Ex. 18 (Garlinghouse Inv. Tr.) at 30:12–22, 33:10–12. Garlinghouse testified that when he joined Ripple as COO in April 2015, [redacted]" *Id.* Garlinghouse, a seasoned technology executive who had been the president of consumer applications at AOL and a senior VP at Yahoo, testified that he was hired to [redacted]

[redacted]." Ex. 3 (Garlinghouse Depo.) at 16:14–17:6, 30:13–21. [redacted]. *Id.* at 33:24–35:2. [redacted] *Id.* at 34:9–18. Ripple spent the next several years developing software products related to cross-border payments. *Id.* at 70:19–72:8 ([redacted]). This included xRapid, which used XRP. Ex. 4 (Vias Depo.) at 88:18–89:11. Miguel Vias, Ripple's former Head of XRP Markets, testified that "[redacted]." *Id.* at 89:12–18. But the XRP markets in late 2016 were not liquid. Ex. 12 (Via SEC Depo.) at 24:19–25:4 [redacted]); Ex. 5 (Samarasinghe Depo.) at 63:21–24 ("[redacted]"). Vias testified that he was hired in November 2016 to "[redacted]." Ex. 4 (Vias Depo.) at 26:3–10.

Defendants therefore began a multimedia promotional and marketing campaign to create a functioning marketplace for XRP. A liquid market includes [redacted]. Ex. 4 (Vias Depo.) at 29:14–21. [redacted]. *Id.* at 73:21–74. In early, 2017, [redacted] Ex. 26 (3/22/27 Email Chain) at RPLI_00486021. Ripple specifically sought to identify "[redacted]. *Id.*; *see also, e.g.*, Ex. 27 (3/26/18 Email Chain) at RPLI_00379699 ("[redacted]"); Ex. 28 (11/9/17 Email) at RPLI_00327099 ("[redacted]"); Ex. 65 ([redacted]) at RPLI_01022302 ("[redacted]"); Ex. 29 (4/19/17 Email to "Leadership") at RPLI_00552519 [redacted]); Ex. 30 (3/26/17 Email) at RPLI_00537207 ([redacted]").

Defendants identified "[redacted]" as a priority, Ex. 30 at RPLI_00537207, and [redacted]

[redacted]” Ex. 66 at RPLI_00915782; *see also* Ex. 57 at RPLI_0053352 [redacted]). It was critical for Ripple to connect the success of XRP to the success of the company because there was no “consumer use case” at the time. Ex. 101 (10/29/19 Fintech Beat Garlinghouse Interview) at 23:02 (“You know, on XRP itself, and really I would say crypto broadly, I have publicly said before, you know, 99.9 percent of all crypto trading is speculation today. The amount of real utility you’re talking about is very, very low and I – that’s true within the XRP community, as well.”); Ex. 102 (10/8/19 Economic Club Garlinghouse Interview) at 8 (“XRP, in my judgment, and really any crypto, I don’t think the use case is a consumer use case today.”). Garlinghouse acknowledged that “[redacted].” Ex. 58 at RPLI_00348277.[4] Ripple thus sought to “[redacted]” by “[redacted]” Ex. 71 at RPLI_01018075.

Defendants targeted “[redacted]” investors largely through social media. This included regular tweeting by Ripple and its executives, frequent posts on Reddit forums by Schwartz, Exs. 119-122, 124-125, and 127-132, numerous public interviews by Garlinghouse after he became CEO in 2017 (often posted on YouTube), Exs. 97, 98, and 100, and articles on Ripple’s website, Exs. 103, 105, and 106. This promotional campaign trumpeted XRP’s increasing price and tied it to Ripple’s current (and continued) efforts to manage XRP and the XRP Ledger. *See, e.g.*, Ex. 124 (3/31/17 Garlinghouse Tweet stating “Exciting week in crypto markets. XRP at two year high!”); Ex. 97 (10/18/17 Garlinghouse Interview: “I have no qualms saying definitively if we continue to drive the success we’re driving, we’re going to drive a massive amount of demand for XRP, because we’re solving a multi-trillion dollar problem.”); Ex. 123 (8/11/17 XRP Chat with Vias: “Our vision is literally world changing, and the last thing we are worried about is the price going up. That’s a

---

[4] All emphasis added unless otherwise noted.

forgone conclusion if we continue to focus on the work, which is exactly what we're doing."). Schwartz testified: "[redacted]" Ex. 11 (Schwartz SEC Depo.) at 359:5–12. Ripple's website included instructions on how to purchase XRP with links to exchanges and the current "XRP Price and Volume." Ex. 106 (1/18/18 Ripple.com Article listing "How Do I Buy" as the number one "Frequently Asked Questions about Ripple and XRP and providing information about how to purchase it"). Defendants' social media presence had a wide reach. [redacted]. Ex. 83 at RPLI_00450324.

Defendants engaged in additional efforts to promote public investment in XRP. Defendants worked to make it easier for retail purchasers to buy XRP by getting XRP listed on third-party digital asset exchanges (such as Coinbase). *See, e.g.*, Ex. 31 (7/5/19 Beard Email) at RPLI_035725334 [redacted]); Ex. 39 (Griffin Inv. Tr.) at 217:6–9 ([redacted]). Ripple's markets team put forth extensive efforts to increase the number of exchanges, including providing "volume incentives" and other payments to exchanges. *See, e.g.*, Ex. 3 (Garlinghouse. Tr.) at 308:12–20 ([redacted]); Ex. 91 (Spreadsheet) at RPLI_00295839 ([redacted]; Ex. 32 (7/27/17 Email) at RPLI_00067173 [redacted]). Defendants were successful—XRP was listed on over 100 exchanges by November 2020, a more than 10x increase from the beginning of 2017. Ex. 5 (Samarasinghe Depo.) at 18:14–19, 81:21–82:5. Defendants used social media to tout their success. *See, e.g.*, Ex. 124 (12/21/17 Garlinghouse tweet: "$XRP is now on 50 exchanges around the world! Team Ripple will continue to champion additional listings to foster a vibrant and healthy XRP ecosystem and help deepen liquidity across fiat currencies."); Ex. 125 (11/22/17 Garlinghouse tweet: "Holiday, schmoliday! Team Ripple is absolutely committed to building XRP liquidity – and in that

context...Very excited to share that @HUOBI_Pro (3rd largest exchange in China) is listing XRP / BTC tomorrow."). Ripple provided a list of exchanges on its website. Ex. 106 (1/18/18 Article).

Ripple also began publishing quarterly "XRP Market Reports" in 2017 that were designed "[redacted]" and were specifically [redacted]. Ex. 20 (Vias Inv. Tr.) at 178:18-179:5; Ex. 78 ([redacted]) at RPLI_01017858, 62, 77; *see also* Ex. 33 (Ripple's April 2017 Investor Update) at RPLI_01425598 ([redacted]"). Defendants announced an escrow of their XRP holdings in May 2017, Ex. 106 (5/16/17 Coindesk Article), which was implemented in December 2017, Ex. 4 (Vias Depo.) at 107:2–4.[5] The escrow was "[redacted] Ex. 5 (Samarsinghe Depo.) at 110:6–12; *see* Ex. 34 (4/17/17 Griffin Email) at RPLI_01398626 (stating that [redacted]). Ripple promoted the escrow to the public as an example of its "steward[ship] of XRP supply." *See, e.g.*, Ex. 105 (12/7/17 Ripple Insights). Defendants also engaged in lobbying efforts with the White House, Congress, and the Securities and Exchange Commission to promote XRP-friendly governmental action. *See, e.g.*, Ex. 16 (Garlinghouse SEC Depo.) at 46:16–49:8; Ex. 13 (Zagone SEC Depo.) at 51:3–52:8.

**C. <u>Defendants Do Not Register Their Offers and Sales of XRP Despite Earnings Billions</u>**

Defendants' promotional and marketing campaign coincided with a dramatic increase in the price and trading volume of XRP. Schwartz and Vias wrote in a presentation that XRP went through [redacted]. Ex. 79 ([redacted]) at RPLI_00002343, 77. For example, on August 1, 2016 XRP's price was $0.006 and its 24-hour trading volume was 1.55M. Ex. 110. Less than two years

[5] [redacted]. Ex. 36 (9/11/17 Email) at RPLI_00081932; Ex. 35 (9/1/17 Ripple Amendments Cryptographic Review: Ripple Labs Inc.—Ripple developed and launched three amendments to the XRP Ledger that would allow Ripple to cryptographically escrow its XRP); Ex. 6 (Clark Tr.) at 225:1-15. These changes fundamentally altered XRP and the XRP Ledger.

later, on July 31, 2018, XRP's price was $.44 and its 24-hour trading volume was 320.20M. *Id.* Garlinghouse acknowledged that in April 2017, [redacted]" Ex. 36 (4/7/2017 email) at RPLI_00161707.

Defendants have directly and significantly benefited from these new market dynamics. In February 2017, Ripple retained [redacted]. Ex. 37 ([redacted]) at RPLI_00240896. [redacted]. Ex. 80 ([redacted]) at RPLI_00533134. Ripple also engaged market makers [redacted] to sell XRP on third-party exchanges. Ex. 38 (6/1/17 Vias Email) at RPLI_01424808 ("[redacted]"); Ex. 67 (Programmatic Market Activity Agreement) at RPLI_01931610. To avoid flooding the market with XRP and negatively impacting price, Ripple's sales targets were based on the total trading volume of XRP. Ex. 35 (Gil Depo.) at 74:7–76:25; Ex. 38 (Vias Inv. Tr.) at 51:8–15 (Defendants' "[redacted]"). Because every sale of XRP (regardless of seller or buyer) increases the trading volume of XRP, Defendants directly benefit from all XRP sales. In 2018 and 2019 alone, [redacted]. Ex. 13 ([redacted]) at RPLI_01673352, 56 ([redacted]). Defendants, however, have never registered XRP with any securities regulator, including the Securities and Exchange Commission or the California Commissioner of Corporations. Dkt. 117 (Answer) ¶ 12.

Plaintiff and the certified classes he represents, by contrast, have been severely harmed by Defendants offers and sales of XRP. Plaintiffs' damages expert Dr. Steven P. Feinstein conservatively estimates damages for the Federal Securities Claims class to be $612,412,080. Ex. 150 (Feinstein Rebuttal Report) at ¶¶ 38–60.

## IV. EVIDENTIARY OBJECTION TO "PURCHASER AFFIDAVITS"

Pursuant to N.D. Cal. Civ. L.R. 7-3(a), Plaintiffs object to Defendants' citation to and reliance on "Purchaser Affidavits." MSJ at 18, 25, 27, 30, 35. This is a reference to 3,500 "affidavits" that were submitted in the *SEC Action* at Dkt. 831-001 through 831-026. Defendants rely on these affidavits for the purported subjective understanding of individual XRP purchasers.

The Court should exclude the affidavits. *First*, Defendants failed to disclose these new witnesses in violation in Rule 26(a)(1). Defendants' catch-all inclusion of "absent class members," *see* Ex. 134 (Amended Disclosures), does not come close to meeting this standard.[6] Sanctions for violating Rule 26(a) are "self-executing." *Yeti by Molly, Ltd. V. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). *Second*, the affidavits are irrelevant under the objective standard of *Howey*. The Court previously found these affidavits inapposite at class certification for this reason. *In re Ripple Labs*, 2023 WL 4303644, at *4. *Third*, the affidavits are unreliable. Defendants do not authenticate them. *See* Dkt. 339-1 (Jones Declaration). The affidavits also include provably false statements. For example, one individual submitted two different affidavits, one that stated "The first time I purchased XRP I was completely unaware of a company called Ripple and its use of XRP," and another that stated "When I first acquired XRP, I was aware of the company Ripple and that it sold software products." Ex. 76, 77.

## V. ARGUMENT

### A. Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must view "the evidence in the light most favorable to [non-moving party]," and "must determine whether the defendants have shown that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law." *Hocking v. Dubois*, 885 F.2d 1449, 1454 (9th Cir. 1989) (en banc) (reversing grant of summary judgment in a *Howey* case). Summary judgment must be denied if the dispute about a material fact is "genuine"—that is, if based on the evidence a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *See Holak v. Kmart*, 2014 WL 2565902, at *7 (E.D. Cal. June 6, 2014) (the use of such broad identifiers "is insufficient" when it would be "practically impossible" for a party "to determine which, among [many thousands of] putative class members, [Defendants] intended to use to support [their] allegations"); *Petrone v. Werner Enters., Inc.*, 2014 WL 2965250, at *1 (D. Neb. July 1, 2014) (finding a disclosure "entirely too vague" when the "group of people plaintiffs purport to have disclosed included over 50,000 individuals . . . [w]ithout specific identification of the individuals that plaintiffs believed had information that might be used to support their claims.").

**B. Disputed Questions of Fact Preclude Summary Judgment on the Statute of Repose and Defendants Use the Wrong Repose Date**

The statute of repose states that "[i]n no event shall any such action be brought to enforce a liability created under [Section 12(a)(1)] more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. [redacted]. Ex. 3 (Garlinghouse Depo.) at 84:18–21 ([redacted]); Ex. 15 (Larsen SEC Depo.) at 174:22–175:8 ([redacted]). Defendants nevertheless argue that its [redacted] should somehow be ignored and the statute of repose bars all federal claims, as a matter of law, because XRP was "bona fide offered to the public before August 5, 2016." Ripple MSJ at 15–20. Whether that is so is a hotly disputed question of fact.

As a threshold matter, Defendants use the wrong repose date. The federal securities claims were "brought" in *Greenwald*, which was filed on July 3, 2018. *In re Ripple Labs, Inc.*, 2023 WL 4303644, at *8 (starting the class period one year before the filing of *Greenwald* because that "was the first complaint to bring federal claims against Ripple"). The correct repose date is therefore three years before *Greenwald*'s filing—July 3, 2015. Defendants argue that the repose date is instead August 5, 2016, which is three years before the filing of Lead Plaintiff's consolidated complaint (Dkt. 63) on August 5, 2019. MSJ at 15. But the filing of a complaint by a PSLRA Lead Plaintiff does not affect the repose period. *See In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *18 (D. Or. Nov. 24, 2021) ("Lexin does not cite any authority for the proposition that the appointment of a lead plaintiff in a putative class action turns the case into one so separate from the original that the lead plaintiff may not rely on the originally brought claims to satisfy the statute of repose."). As Defendants are silent regarding Ripple's sales before July 3, 2015, their failure to use the proper repose date mandates rejection their arguments.[7]

---

[7] Defendants incorrectly claim that "[t]his Court has already determined that" the repose period runs from August 5, 2016. MSJ at 16. Because the Court could not "conclude that the allegations support finding a bona fide public offer before August 5, 2016," it did not address the question of whether an earlier repose date was appropriate. 2020 WL 922815, at *10 n.5.

Even using Defendants' (incorrect) repose date, summary judgment should still be denied. The "bona fide" public offering requirement asks "when was the [security] really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering." *In re Ripple Labs*, 2020 WL 922815, at *9 (quoting *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 99 (2d Cir. 2004)). The use of "bona fide" shows that the repose statute's "emphasis was on 'public.'" *Stolz*, 355 F.3d at 99. A court "may find a first bona fide offer based upon a defendant's 'clear objective attempts to secure purchasers[.]'" *In re Ripple Labs*, 2020 WL 922815, at *9 (quoting *Stolz*, 355 F.3d at 104 n.7). *Stolz* relied on "an insightful amicus brief" from the SEC, 355 F.3d at 105, which stated that "[t]he explicit reference to a 'bona fide' offer 'to the public' in Section 13 indicates that Congress did not intend those who act in a manner consistent with a private offering to benefit from the three-year period of repose when so acting" and that the statute "delay[s] the start of the three-year period in situations where the public lacks notice that a public offering has commenced." Ex. 108 (SEC Amicus Brief) at 13. The Court denied Defendants' motion to dismiss because "the substance of the actual sales activity alleged and judicially noticeable" did not support that a bona fide public offer "occurred outside the three-year statute of repose." 2020 WL 922815, at *10.

A reasonable jury can conclude that Defendants did not engage in a "bona fide" public offering of XRP until after August 5, 2016 (the later of the two dates). After years of operating as a start-up, Ripple had begun focusing on developing software products related to cross-border payments, some of which (such as xRapid) allowed XRP to be used as a bridge asset. Section III.B., *supra*. For these products to work and financial institutions to use them, Ripple needed an active and liquid market for XRP, which did not yet exist. *Id.* Defendants thereafter began engaging in concerted efforts to encourage the public to invest in XRP. *Id.*

*First*, Ripple began publishing quarterly "XRP Markets Reports" in January 2017. Section III.B, *supra*; Ex. 86 (Q4 2016 XRP Markets Reports) at RPLI_00308342. Ripple intended these reports to provide [redacted] to the public about Ripple's market activities, Ex. 20 (Vias Inv. Tr.) at 178:18–180:8, and [redacted]. Ex. 78 ([redacted]) at

RPLI_01017858, 62, 77. The July 2017 quarterly markets report disclosed for the first time information about XRP's programmatic sales. Section III.C., *supra*; Ex. 87 (Q2 2017 XRP Markets Report) at RPLI_00308325. Prior to publishing the XRP market reports, Ripple did not "[redacted]" or do anything "[redacted]," Ex. 7 (Long Depo.) at 69:11–70:3, 75:17–17, and there was thus no way "[redacted]," Ex. 8 (Ripple 30(b)(6) Depo.) at 129:7–130:3 ([redacted]). "[T]he start of the three-year period" does not commence "in situations where the public lacks notice that a public offering has commenced." Ex. 108, SEC *Stolz* Brief at 13.

*Second*, Defendants worked to get XRP on third-party exchanges because that is where the investing public, which Ripple sometimes refers to as speculators, purchased digital assets. Section III.B., *supra*; Ex. 5 (Samarasinghe Depo.) at 113:8–14 [redacted]. Vias acknowledged in a January 2017 email that "XRP is not significantly listed on off ledger exchanges." Ex. 39 RPLI_00374207; *see also* Ex. 81 [redacted]) at RPLI_00168590 ([redacted]). Vias further testified that Kraken was the sole U.S. exchange listing XRP by February 2017 and only allowed users to purchase XRP using Bitcoin. Ex. 4 (Vias Depo.) at 63:16–64:18. Ripple's markets team put forth extensive efforts to increase the number of exchanges. Section III.B., *supra*. These efforts paid off and by November 2020 over 100 exchanges listed XRP. Ex. 5 (Samarasinghe Depo.) at 81:21–82:5. Defendants made sure to communicate this success to the public. Section III.B., *supra*; *see, e.g.*, Ex. 106 (1/18/18 Ripple.com Article providing information about how to purchase XRP).

*Third*, Defendants, for the first time, engaged market makers to sell Defendants' XRP to the public on the third-party exchanges long after the repose date. Section III.C., *supra*; Ex. 5 (Samarasinghe Depo.) at 112:8–12 [redacted]). Pre-2017, Defendants XRP sales were focused on the XRP Ledger. Ex. 4 (Vias Depo.) at 65:13–25. In February 2017, Ripple retained [redacted] to sell

programmatically on third-party exchanges. Ex. 37 at RPLI_00240896. Selling for Ripple on third-party exchanges was a "[redacted]." Ex. 17 (Samarasinghe SEC Depo.) at 115:23–116:7. [redacted]. Ex. 80 ([redacted]) at RPLI_00533134. Ripple also engaged market makers [redacted] to sell XRP on exchanges, with sales beginning in June and August of 2017. Section III.C., *supra*. [redacted]s representative testified that "[redacted]." Ex. 14 (Gil SEC Depo.) at 128:23–129:4.

*Fourth*, Defendants announced their XRP escrow in May 2017 and implemented it in December 2017. Section III.B., *supra*. The escrow was put in place to "[redacted]" Ex. 5 (Samarsinghe Depo.) at 110:6–12. Ripple's 30(b)(6) witness testified that the escrow "[redacted]." Ex. 8 at 61:14–24. Ripple publicly promoted the escrow. Ex. 105 (12/7/17 Ripple Insights) ("While Ripple has proved to be a responsible steward of XRP supply for almost five years – and has clearly demonstrated a tremendous track record of investing in and supporting the XRP ecosystem – this lockup eliminates any concern that Ripple could flood the market[.]"). XRP Markets Director Samarasinghe agreed that there "[redacted]" November 2016. Ex. 5 (Samarsinghe Depo.) at 78:4–8.

*Fifth*, Defendants launched a multimedia marketing campaign to promote XRP to the public in 2017. In March 2017, Long (Ripple's then-head of marketing) noted that she was "[redacted]" Ex. 26 at RPLI_00486020. Just days later, Long emailed Ripple's CEO regarding a one-on-one meeting agenda and identified [redacted]. Ex. 30 at RPLI_00537207. Before this time promoting XRP speculation was not an "[redacted]," Ex. 7 (Long Depo.) at 91:23–92:16, 95:24-96:24, and Garlinghouse has "[redacted]. Ex. 3 (Garlinghouse Depo.) at 147:2–9. That changed in 2017. Defendants participated extensively in public interviews (many of which were uploaded to YouTube); posted

repeatedly on social media, including Twitter and Reddit; and provided quotes for digital asset publications, including CoinDesk. Section III.B., *supra*.

Defendants' efforts coincided with a massive increase in XRP trading volumes. The following chart shows that XRP's price did not begin to meaningfully rise until mid-2017:




Ex. 109 (3/4/24 CoinMarketCap XRP data). Schwartz testified that "[redacted]. Ex. 21 (Schwartz Inv. Tran.) at 33:3–11. That was not achieved until [redacted]. Ex. at RPLI_03680630; Ex. 16 (Garlinghouse SEC Tr.) at 34:7–20 ([redacted]). Defendants tied these price increases to their efforts. Section III.B., *supra*.

This evidence shows that a reasonble jury could conclude that Defendants did not "really and truly (geniunely)" offer XRP to the public before August 5, 2016 because Defendants did not make "clear objective attempts to secure purchasers" until ***after*** that date. Defendants argue that XRP was available on the XRP Ledger and certain exchanges before August 5, 2016. MSJ at 16–19. But the Court already rejected the argument that pre-repose availability of XRP is sufficient to establish a "bona fide" public offering. 2020 WL 922815, at *9–10. Instead, Defendants needed to show that they "targeted the general public when offering to sell XRP." *Id.* at *9.

Defendants do not come close to making this showing, and certainly not undisputedly so. Defendants sole argument about *their* efforts are that they sold "more than 1.8 billion units of XRP to the general public through programmatic sales on the XRP Ledger" by August 2016 and that

they "distributed XRP to the public through other means, including free giveaways." MSJ at 18. Defendants do not provide any evidence that they specifically targeted the public or contest Plaintiffs' evidence that targeting did not occur until after August 5, 2016.[8] Rather, Ripple represented that it [redacted] Ex. 88 (8/16/16 Ripple Support) at RPLI_03605890; Ex. 40 (1/27/17 Email) at RPLI_00555888, 90 ([redacted]).

The mere fact that some of Ripple's XRP sales ended up in public hands is insufficient to show a "bona fide" public offer, particularly when compared to the substantial increase in XRP's volume and price after 2016. Section III.C., *supra*. XRP went through a period of [redacted] *Id.*; Ex. 79 (Markets Team Presentation) at RPLI_00002343, 77; *cf. In re Ripple Labs*, 2020 WL 922815, *10 (Post-August 2016 "volumes of sales are greater than the handful of one-off multi-thousand-dollar transactions and $1.3 million in monthly sales detailed in the May 2015 settlement. Such a material change supports the inference that the defendants did not make their first genuine attempt to sell to the public until 2017"). Defendants' contention that "individuals without technical expertise" could easily purchase XRP before August 5, 2016, MSJ at 17, is also disputed. *See, e.g.*, Ex. 41 (8/28/16 Long email) at RPLI_01413371 ("[redacted]."). Defendants have at most shown that there is a geniune dispute of fact as to repose. That is insufficient to support summary judgement.[9]

Whether Defendants' post-August 5, 2016 sales of XRP are a separate offering is also a disputed fact question. *See Takiguchi v. MRI Intern., Inc.*, 47 F. Supp. 3d 1100, 1117 (D. Nev. 2014) (holding that the plaintiffs § 12(a)(1) claims were not time barred because defendants engaged in a separate securities offering each year). The Ninth Circuit considers five factors to determine whether securities sales are separate or integrated offerings: "(a) whether the offerings

[8] Defendants cannot plead ignorance of Plaintiffs' repose evidence because they served interrogatories seeking it. *See* Ex. 135 (Pltfs. 4/10/23 1st Rog Resps.) at Resp. 7.

[9] Defendants' citation to cases where small sales triggered the repose period, MSJ at 17, does not address the question here—whether a dramatic change in sales tactics and volumes shows that older sales were not a "bona fide" public offering. Defendants' other cited case, *Hedden v. Marinelli*, 796 F. Supp. 432, 437–38 (N.D. Cal. 1992), does not address "bona fide" offerings.

are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offerings are made for the same general purposes." *SEC v. Murphy*, 626 F.2d 633, 645 (9th Cir. 1980).

There is a mountain of record evidence that establishes that Defendants' XRP sales after August 5, 2016 were for a different purpose (increased liquidity for in-development software products) using different methods (a public, multimedia promotional and marketing campaign targeting public retail investors) and sold in new locations (programmatic sales on third-party exchanges) at substantially higher prices and volumes (price of $0.006 and 24h volume of 1.55M on 8/1/16 compared to $.44 and 24 volume of 320.20M on 7/31/18, Ex. 110) than Defendants' pre-August 5, 2016 sales. This is consistent with industry practice for start-up companies. Professor Joel Seligman, Plaintiffs' securities industry expert, opined that start-up companies usually engage in years of exempt private securities transactions before engaging in public offerings with more onerous registration requires. Ex. 138 (Seligman Report) at ¶¶ 39–66. Defendants argue that "Ripple sold XRP on an essentially continuous basis from well before August 2016 through September 2019," MSJ at 20, but Ripple said [redacted] Ex. 73 (1/24/19 Ltr.) at RPLI_00296039. Defendants also argue, without citation to *any* evidence, that no "reasonable jury" could conlude that Ripple adopted separate plans of financing or general purposes post-August 2016. MSJ at 20. The "kind of consideration" exchanged for XRP also shifted as before 2017, XRP could not be purchased with U.S. dollars. Ex. 4 (Vias Inv. Tr.) at 63:16–64:18. Finally, while XRP is fungible, MSJ at 19, [redacted]. Ex. 68 ([redacted]) at RPLI_03071260. There is thus a material dispute of fact regarding whether XRP sold before that XRP Ledger upgrade are the same class of securities as those sold afterwards.

### C. <u>Disputed Questions of Fact Preclude Summary Judgment on whether Defendants Offered and Sold an Investment Contract to Class Members</u>

Plaintiffs contend that Defendants offered and sold XRP as an investment contract. "The test for what qualifies as a 'security' originally comes from the 1946 Supreme Court case of *SEC*

*v. Howey*, and was interpreted and 'distilled' by the Ninth Circuit in *Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009)." *In re Ripple Labs*, 2023 WL 4303644, at *3. *Warfield* set forth the three-part *Howey* test used in the Ninth Circuit: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." 569 F.3d at 1020. The "*Howey* test is an objective one." *In re Ripple Labs*, 2023 WL 4303644, at *4.

Defendants contend that "[a]ll of Plaintiff's Claims Fail Because Defendants Did Not Sell Securities." MSJ at 21–41. Defendants' arguments misapply the law, mischaracterize Plaintiffs' positions, and ignore record evidence. Under the proper application of the *Howey* test, genuine disputes of fact preclude summary judgment.

**1. Whether "XRP Itself is Not an Investment Contract" is Irrelevant**

Defendants claim that "Plaintiff's theory is that XRP itself – that is, the digital token – is 'an unregistered security.'" MSJ at 21–23. That is an incorrect statement of Plaintiffs' position. Plaintiffs' position is that Defendants offered and sold XRP as an "investment contract" under the *Howey* test. *See, e.g.*, Dkt. 87 (Am. Compl.) at ¶ 10, 127–58; Dkt. 181 (Mtn. for Class Cert.) at 2–3, 14–21; Dkt. 135 (Defs. Ex. 32 – Pltfs. Supp. Rog Resp.) at Resps. 9, 10, 11, 14, 15, 16–23. In *Howey*, the Supreme Court held that the circumstances surrounding the sale and development of citrus groves constituted the sale of an "investment contract." 328 U.S. at 294–301. Courts applying *Howey* have found that circumstances surrounding the sale of a variety of assets could constitute the sale of an investment contract. *See, e.g.*, *SEC v. Edwards*, 540 U.S. 389, 391–97 (2004) (sale of payphones); *Hocking*, 885 F.2d at 1455–62 (condominium sale). That's exactly what Plaintiffs contend here—the circumstances surrounding Defendants' offers and sales of XRP constituted the offer and sale of an investment contract. Whether XRP is "itself a security" is irrelevant to Plaintiffs' unregistered securities claims. *See* Dkt. 136 (Defs. Ex. 53 – Pltfs. RFA Resp. at Resp. 9 (objecting on relevance grounds)).[10]

[10] Defendants also ignore that plaintiffs are not bound by the exact legal theories in their pleadings. *See McPherson v. Haemonetics Corp., Inc.*, 1994 WL 184592, at *3 (N.D. Cal. Apr. 25, 1994) ("[S]o long as a defendant is on notice of the nature of a plaintiff's claim, the complaint need not specifically allege the legal theory on which recovery is sought."). Defendants' cited cases (MSJ at 23)—in which the plaintiff added entirely new causes of action and grounds for liability in its opposition to summary judgment—are inapposite. *See Powell v. Cnty. of Orange*, 2022 WL

### 2. Defendants Mischaracterize the *Howey* Test and the Record Evidence

For each part of the three-part *Howey* test, Defendants mischaracterize the law and gloss over myriad disputed factual issues. This includes Defendants' misplaced reliance on Judge Torres' decisions in the *SEC Action*, which cannot be squared with binding Ninth Circuit precedent, the Securities Act more generally, and which cited to evidentiary gaps in the SEC's submissions that do not exist here. Defendants also draw irrelevant distinctions between XRP purchases by institutional and retail investors. Genuine disputes of fact preclude summary judgment for each *Howey* prong for all XRP purchasers.

a. *Howey* Prong 1 – Investment of Money

Contrary to Defendants' assertions, MSJ at 26–27, the "investment of money" prong does not require that Plaintiffs invest money in Defendants or in an enterprise Defendants control. The Ninth Circuit has long held that the defendant does not need to be, or be in control of, the enterprise: "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment ***or of third parties***." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). In *El Khadem v. Equity Securities Corporation*, 494 F.2d 1224, 1226–29 & n.3 (9th Cir. 1974), the Ninth Circuit affirmed the denial of a motion to dismiss a Section 12(a)(1) claim where the "investment of money" did not go to the defendant or any enterprise the defendant controlled and instead went to a third party with "no connection" to the defendant "other than the fact that defendants recommended the Nationwide investment plan to plaintiff."[11]

Summary judgment is improper under the correct analysis for the first *Howey* prong. The "investment of money" analysis is "an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *Warfield*, 569 F.3d at 1021. The "first prong requires only 'that the investor commit his assets to the enterprise in such a manner

---

3574282, at *3 (C.D. Cal. July 7, 2022) (rejecting entirely new causes of action added in a summary judgment opposition); *Diamond S.J. Enter., Inc. v. City of San Jose*, 430 F. Supp. 3d 637, 653–54 (N.D. Cal. 2019) (rejecting new theory of liability raised for the first time).

[11] Defendants argue that Judge Torres required that Ripple receive the "investment of money." MSJ at 26 & n.21. That's a mischaracterization, but in any event binding Ninth Circuit precedent contains no such requirement.

as to subject himself to financial loss.'" *Patterson*, 2024 WL 49055, at *11 (quoting *Warfield*, 569 F.3d at 1021). Plaintiffs did that here because the class definition is XRP purchasers "who have (a) retained the XRP, and/or (b) sold the XRP at a loss." *In re Ripple Labs*, 2023 WL 4303644, at *1–2. Courts routinely find that the purchase of digital assets constitutes an "investment of money." *See, e.g.*, *Patterson*, 2024 WL 49055, at *11; *Wahi,* 2024 WL 896148, at *4–5; *Kik*, 492 F. Supp. 3d at 177–78; *Telegram*, 448 F. Supp. 3d at 368–69.

Courts "frequently examine[] the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." *Warfield*, 569 F.3d at 1021. In *Blockvest*, 2019 WL 625163, at *7, the court found that website and promotional materials that "invited or enticed potential investors to provide digital or other currency in exchange for BLV tokens," as well as a "Buy Now" button on the defendant's website, satisfied this prong.

Ripple's promotional statements and materials show that Ripple actively promoted XRP as an investment. Ripple and its spokespeople frequently highlighted in public forums XRP's rising value and tied this to their continued efforts to develop XRP and the XRP Ledger. Section III.B., *supra*; *see, e.g.*, Ex. 97 (10/18/17 Garlinghouse Interview: Ripple's "success" would "drive a massive amount of demand for XRP"). Ripple also produced quarterly XRP Markets Reports that highlighted XRP's success and Ripple's role in it. Section III.B., *supra*. Garlinghouse stated in a 2017 Bloomberg News interview that he himself was "very, very long XRP as a percentage of [his] personal balance sheet," Ex. 96 at 7:49, which he admitted "[redacted]," Ex. 3 (Garlinghouse Depo.) at 281:3–14. Ripple's website included instructions on how to purchase XRP. Section III.B., *supra*. [redacted]. Section III.B., *supra*.

Factual disputes preclude summary judgment even under Defendants' incorrect application of the "investment of money" prong because Ripple routinely conflated investment in XRP with investment in Ripple. [redacted] Ex. 66 at RPLI_00915782. Evidence shows that Ripple did exactly that. As will be discussed in more detail in the following section, Ripple made repeated public

statements directly linking itself with the XRP, including touting its management of and stewardship over XRP. Schwartz has publicly acknowledged on Reddit that "the price of XRP is often seen as a measure of Ripple's success." Ex. 103. Ripple also publicly stated in its XRP Markets Reports that it sold XRP programmatically as a percentage of the total XRP trading volume. *See, e.g.*, Ex. 103 (Q3 2019 XRP Markets Report). Because every purchase of XRP would increase the total XRP trading volume, Ripple was publicly communicating that investment in XRP, even if not directly purchased from Ripple, would increase Ripple's XRP sales and thus its revenues. Section III.C., *supra*.

Defendants argue that Ripple did not create, control, or manage XRP or the XRP Ledger. *See, e.g.*, MSJ at 1, 3–6, 8, 26–29. That is a disputed question of fact that is in direct tension with record evidence including: (1) [redacted], Section III.A., *supra*; (2) [redacted] *id.*; (3) [redacted], *see, e.g.*, Ex. 74 at RPLI_00623269 ([redacted]); (4) expert testimony that Ripple plays a central—and necessary—role in the operation of the XRP Ledger, Ex. 137 (Clark Report) at 8–11, 24–38; (5) Ripple's possession of the majority of XRP through at least [redacted], Section III.A., *supra*; (6) Ripple's XRP escrow, which was designed to [redacted] over Ripple's control over the XRP supply, Section III.B., *supra*; (7) Defendants' repeated public statements about its stewardship over the XRP Ledger, Section III.A., *supra*; (8) public statements by Schwartz that the XRP Ledger lacks a community of independent developers, *id.*; and (9) Defendants' repeated public statements about their efforts to improve the XRP ecosystem and the centrality of those efforts to XRP's price, Section III.B., *supra*.

Finally, the Court should disregard Defendants' meritless argument that Lead Plaintiff's personal purchases and the purported purchasing experiences of 1,300 "individual XRP purchasers" establishes that no "investment of money" was made into Defendants or an enterprise

Defendants' control. MSJ at 27. The Court already rejected Defendants' attempts to use the subjective experiences of individual purchasers to circumvent the objective *Howey* analysis. *In re Ripple Labs*, 2023 WL 4303644, at *4 (dismissing Defendants' argument about "differing expectations" of class members); *id.* at *5 (dismissing Defendants' arguments about Lead Plaintiff's personal experiences); *see also* Section IV, *supra* (exclusion of purchaser affidavits). [12]

b. *Howey* Prong 2 – Common Enterprise

"In the Ninth Circuit, a common enterprise exists where the investment scheme involves either 'horizontal commonality' or 'strict vertical commonality.'" *NAC Found*, 512 F. Supp. 3d at 996–97 (quoting *Hocking*, 885 F.2d at 1459). Factual disputes—which Defendants completely ignore—preclude summary judgment for both strict vertical and horizontal commonality.

Strict vertical commonality requires a "showing that the fortunes of the investors are linked with those of the promoters." *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991) (quotations omitted). In *NAC Foundation*, the court held that the plaintiff sufficiently alleged that an "Initial Coin Offering" satisfied strict vertical commonality because "the 'fortunes' of ICO participants—as measured by either the trading value of their ABTC tokens or the future trading value of AML BitCoin—were 'linked' to the 'fortunes' of defendants—as measured by the trading value of their ABTC tokens, the future trading value of AML BitCoin, or the general success of their enterprise (which would, as a matter of efficient market theory, drive the price of both digital assets)." 512 F. Supp 3d at 993, 996; *see also Wahi*, 2024 WL 896148, at *5 (the issuers retained substantial tokens for their management teams); *Patterson*, 2024 WL 49055, at *11 (issuer "invested proceeds to grow and expand the Terra ecosystem and held significant amounts of Luna"); *Telegram*, 448 F. Supp. 3d at 370 (SEC made "a substantial showing of strict vertical commonality" because "[e]ach Initial Purchaser's anticipated profits were directly dependent on Telegram's success in developing and launching the TON Blockchain" and "Telegram's own fortunes were similarly dependent on the successful launch of the TON Blockchain.").

---

[12] Nevertheless, Lead Plaintiff's testimony is that he purchased XRP with the expectation that he would be able to profit by selling it at a higher price, and that this expectation "was based on Ripple's promotional activity, including its repeated representations that adoption of XRP by financial institutions would increase demand for XRP." Dkt. 181-66 at ¶5-6.

Record evidence establishes that Plaintiffs fortunes were linked to Defendants' fortunes. XRP is a fungible digital asset, so any price fluctuation in XRP would affect all XRP holders (including both Plaintiffs and Defendants) in the same manner. Section III.A. & C., *supra*; *see NAC Found.*, 512 F. Supp 3d at 996; *Wahi*, 2024 WL 896148 at * 6. Defendants thus made repeated public pronouncements linking their fortunes with those of all other XRP Holders. Section III.B., *supra*. For example, in June 2017, Ripple CTO David Schwartz wrote on Reddit.com: "It's that Ripple's future value and revenue is directly tied to the future value and liquidity of XRP. For some time, Ripple will be the largest holder of XRP and it will dominate over every other source of value Ripple has. . . . I think most others do realize that the success of Ripple and the success of XRP are tightly tied." Ex. 89. Garlinghouse stated in a March 2018 interview: "I am the most interested person, as CEO of Ripple, in making sure the XRP ecosystem is successful . . . I feel very comfortable about the opportunity to continue to grow the value of the XRP ecosystem, which is good for all of the participants in the XRP ecosystem." Ex. 98 at 18:47. As Ripple's revenues from XRP sales increased, [redacted] Ex. 73 at RPLI_00296057, [redacted]. Ex. at 21.

XRP purchasers were also dependent on Defendants' success in developing the XRP Ledger. *See Telegram*, 448 F. Supp. 3d at 370.[13] Ripple created and controlled the XRP Ledger and has always been the largest XRP holder. Section III.A., *supra*. Defendants repeatedly touted their investments in XRP and the XRP Ledger. Section III.A–B., *supra*. For example, a July 2017 Ripple XRP Markets Report stated that "we are accelerating the pace of our investment in the XRP Ledger to build on its speed, uptime, and scalability, to ensure XRP is the most trusted enterprise-grade digital asset." Ex. 87 at RPLI_00308325; *see also* Ex. 103 (2019 XRP Market Report stating Ripple was "aligned with other XRP stakeholders and focused on supporting a healthy XRP community."). Defendants also referred to themselves as "stewards" of XRP and highlighted their central role in managing the XRP ecosystem. Section III.A., *supra*. Schwartz wrote on Reddit in

[13] The Second Circuit, unlike the Ninth Circuit, has not held that strict vertical commonality suffices under the *Howey* test. *See Kik*, 492 F. Supp. 3d at 178.

July 2017 that only "Ripple could justify" the expense of investing $50 million into the XRP ecosystem to raise the value of XRP by one penny "by the value of the increase in the value of the XRP it holds" and that "[n]obody else today or on the horizon could make such a revenue model work." Ex. 121. This evidence is more than sufficient to preclude summary judgment on strict vertical commonality.

Defendants incorrectly argue that Plaintiffs' common enterprise "fails as a matter of law" because "Ripple's alleged efforts to create a use and demand for XRP and the XRP ecosystem . . . at most increase the value of XRP tokens 'collectively,' [] which equates to a broad vertical commonality theory that runs afoul of Ninth Circuit law." MSJ at 31 (citing *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982)); *see also id.* at 28 (similar argument). The *Mordaunt* court rejected the argument that "vertical commonality exists by reason of the fact that the success or failure of the investments collectively is essentially dependent upon promoter expertise." 686 F.2d at 817. Defendants focus on the word "collectively," but that mischaracterizes the opinion. The *Mordaunt* plaintiff argued that discretionary commodities trading accounts opened with the defendant were a common enterprise. *Id*. The Ninth Circuit held that "[m]erely furnishing investment counsel to another for a commission" does not amount to a common enterprise, even if the success or failure of the account depended on the defendant's expertise. *Id.* The driver instead was whether there is a "direct relation" between the success or failure of the investor and that of the promotor. *Id.*; *see NAC Found.*, 512 F. Supp 3d at 996; *Telegram*, 448 F. Supp. 3d at 370. That's what Plaintiffs contend here—that a direct relationship between Plaintiffs' and Defendants' success or failure exists because Defendants' investments in and management of XRP will similarly affect the value of XRP held by both Plaintiffs *and* Defendants.

Defendants' argument that the "'XRP ecosystem' is not a 'profit-seeking business venture' that Ripple can 'manage, control and operate,'" MSJ at 28–29, is a disputed factual issue that cannot be adjudicated at summary judgment. Defendants contend that they did not create or control XRP or the XRP Ledger and that there is a robust community of developers. MSJ at 28–29. But Defendants did create, do control, and remain the primary developers of the "XRP ecosystem." Section III.A., *supra*. Defendants' "gold ecosystem" argument underscores this point. MSJ at 29.

Defendants describe a vast, distributed ecosystem of unrelated players and claim that it is not a "common enterprise." *Id.* Regardless of whether that legal analysis is correct, a core factual dispute *in this case* is whether the XRP ecosystem is similar to the purported gold ecosystem (Defendants' position) or completely different (Plaintiffs' position). That cannot be adjudicated at this juncture.

Defendants also misleadingly argue that strict vertical commonality cannot exist because Defendants "can profit even when [Plaintiffs] suffer[] a loss." MSJ at 31–32. Defendants contend that Ripple can have positive income or increases in equity value even if XRP decreases in price, Ripple has products that do not use XRP, and that XRP could increase in value even if Ripple ceased to exist. *Id.* at 32. This is factually inaccurate as Ripple acknowledges that "XRP is our 'North Star' – and THE key driver of Ripple valuation." Ex. 50 at RPLI_00276363; Ex. 60 at RPLI_01931261, 62 ("[redacted]."); Ex. 20 Vias Inv. Tr. at 353:22-24 ("[redacted].").

This argument also misses the point: "strict vertical commonality" looks to a link in fortunes related ***to the investment***, not fortunes generally. For example, the Ninth Circuit in *Reynolds* held that evidence that "Reynolds told investors that he would take a management fee based on a percentage of the profits, thus making his own profit contingent on the profit of his investors" was "sufficient to show vertical commonality." 952 F.2d at 1130-31. The court did not analyze whether Reynolds (the defendant) had some other way to make or lose money. Indeed, it would have been absurd for the court to do so, as it would mean that anyone with multiple streams of income (or an issuer of multiple unregistered securities) cannot be liable for offering or selling an unregistered investment contract. Defendants own cited case (MSJ at 32), *Marini v. Adamo*, recognizes this when it states that there is "an interdependence of both profits and losses ***of the investment***." 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (emphasis added). Defendants' citation to *Brodt v. Bache & Co., Inc.*, (MSJ at 32), is similarly inapposite. 595 F.2d 459, 461–62 (9th Cir. 1978). The Ninth Circuit found no vertical commonality because the investor's and promotor's fortunes *as it related to the investment* were not linked, as the defendant (a brokerage house) could reap large

commissions on the investments even if the investor's account flopped. *Id.*[14]

Summary judgment is also inappropriate for horizontal commonality. "Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments." *NAC Found.*, 512 F. Supp. 3d at 996 (quoting *Hocking*, 839 F.2d at 566 (9th Cir. 1988)). Courts have held that digital asset schemes can establish horizontal commonality. In *Wahi,* the court held that horizontal commonality existed because "investors' fortunes were all equally dependent on the success of the same common enterprise—maintaining the value of tokens collectively and nurturing the development of the cryptocurrency ecosystem." 2024 WL 896148, at *5. In *Telegram*, the court held there was horizontal commonality where Telegram pooled money received from purchases of tokens and used it to develop the blockchain. 448 F. Supp. 3d at 369. In *Kik*, the court held that horizontal commonality existed because money from the sale of the Kin tokens was pooled and used to create infrastructure for Kin. 492 F. Supp. 3d at 179.

As described above, Ripple routinely portrayed XRP and the XRP Ledger as a shared ecosystem in which all XRP holders—including Plaintiffs and Defendants—had a stake. Ripple received money from all purchases of XRP because Ripple's programmatic sales were a percentage of daily XRP trading volume, Section III.C., *supra*, and [redacted]. Ripple used these pooled funds to further develop the XRP Ledger. *See, e.g.*, Ex. 120 (Feb. 2018 Schwartz Reddit post describing the Ripple-financed team "develop[ing] the ecosystem around XRP"); Ex. 121 (July 2017 Schwartz Reddit post stating that Ripple used proceeds from the sale of XRP to further develop the XRP Ledger). Because XRP is fungible, all XRP holders will profit from any increase in the price of XRP based on the number of units of XRP that they hold. *See* Section III.A., *supra*.

Defendants' other arguments are equally meritless. Defendants, citing *Association of American Railroads. v. United States*, 603 F.2d 953, 971–72 (D.C. Cir. 1979), claim summary

---

[14] Defendants also argue that Lead Plaintiff's "own trading strategy" undercuts strict vertical commonality. MSJ at 31. Defendants again ignore the Court's class certification order, which held that Lead Plaintiff's "status as a day trader will not affect the analysis one way or the other." *In re Ripple Labs, Inc.*, 2023 WL 4303644, at *5.

judgment is appropriate because "[t]he touchstone is whether alleged investors are offered the economic equivalent of stock in a business enterprise." MSJ at 30. But that is exactly how Ripple wanted speculative investors to view XRP purchases. *See* Ex. 66 at RPLI_00915782 ([redacted]). Defendants also argue that Plaintiffs were not entitled to profits or dividends from Ripple. MSJ at 30. They are again undercut by their own cited caselaw. In *Bobrowski v. Red Door Group, Inc.*, 2011 WL 3875424, at *1 (D. Ariz. Aug. 31, 2011) (cited at MSJ at 29–30), the court held that horizontal commonality exists "where []either the express contractual terms []or ***economic reality*** provided plaintiff a ***pro rata share of the enterprise's profits***," but granted summary judgment because the plaintiff only provided evidence that he used the same management company as others in the alleged enterprise. There is no requirement that Plaintiffs receive a dividend or the equivalent directly from the promoter, and as described above whether the "economic reality" of the enterprise provided Plaintiffs with a *pro rata* distribution of the enterprise's profits is a disputed fact question. Finally, the Court should again reject arguments (MSJ at 29) related to the purported purchaser affidavits. *See* Section IV, *supra*.

c. <u>*Howey* Prong 3 – Expectation of Profits Produced by the Efforts of Others</u>

The third *Howey* prong is "an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect" and considers how an "objectively reasonable [] purchaser" would view the transaction and "promotional materials associated with" it. *NAC Found.*, 512 F. Supp. 3d at 996–97 (quoting *Warfield*, 569 F.3d at 1020–21); *see also Blockvest*, 2019 WL 625163, at *7 (third *Howey* prong is "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others" (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975))). Defendants incorrectly claim that "[t]wo undisputed facts establish" that "exchange purchasers did not reasonably expect profits from the efforts of Defendants." MSJ at 32.

*First*, Defendants argue that "[a]s a matter of law, no purchaser can reasonably expect profits to come from the efforts of someone who has no obligation to expend efforts on their behalf" and "it is undisputed that Defendants have no obligation—in a contract or otherwise—to make

efforts that return a profit to XRP holders." MSJ at 32. This is an incorrect statement of the law because an "investment contract" does not require that the promoter have post-sale "obligation[s]." *Hocking* rejected the argument that the *Howey* analysis is limited to binding contractual terms because an investment contract can be a "general 'scheme' of profit seeking activities." 885 F.2d at 1457. The Ninth Circuit held that "emphasis should be on the *economic reality*" of the transaction or scheme, which requires a "thorough examination of the representations made by the defendants as the basis of the sale" including "[p]romotional materials, merchandising approaches, oral assurances and contractual agreements." *Id.* (quoting *Forman*, 421 U.S. at 848); *see also Terraform*, 2023 WL 4858299, at *33 ("[T]here need not be – contrary to defendants' assertions – a formal common-law contract between transacting parties for an 'investment contract' to exist."). In *SEC v. Barry*, 670 F. Supp. 3d 976, 983–86 (C.D. Cal. 2023), the court canvassed the case law and held that the *Howey* does not require post-sale obligations and an "investment contract" can be established by "pre-purchase managerial efforts."

Courts routinely find that the "economic realit[ies]" of token/blockchain ecosystems—akin to those here—establish the third *Howey* prong even in the absence of a binding "obligation" for the promoter to develop the ecosystem. In *LBRY*, the court granted the SEC summary judgment and held that "a reasonable purchaser of LBC would understand that the tokens being offered represented investment opportunities - even if LBRY never said a word about it" because "by retaining hundreds of millions of LBC for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers." 639 F. Supp. 3d at 220. The court wrote that "by intertwining LBRY's financial fate with the commercial success of LBC, LBRY made it obvious to its investors that it would work diligently to develop the Network so that LBC would increase in value." *Id.* More so here, where through at least September 2022, Ripple held the majority of all XRP and has touted that its "financial fate" was intertwined with XRP and that Ripple had spent and would continue to expend significant resources to develop the XRP ecosystem. Section III.A–B., *supra*; *see, e.g.*, Ex. 90 at RPLI_03576455 (Schwartz: "[redacted]"). Indeed, throughout the Class Period ***the only reason*** for an objectively reasonable purchaser to buy

XRP was the expectation of profits from Ripple's efforts as there was no "consumer use case." *See* Section III.B, *supra*; Ex. 101 (10/29/19 Fintech Beat Garlinghouse Interview) at 23:02.

The court in *Terraform*, in granting the SEC's motion for summary judgment, analyzed statements of the defendant and its employees, including public interviews and tweets, and held that "Kwon and others made specific, repeated statements that would lead a reasonable investor in LUNA to expect a profit based on defendants' efforts to further develop the Terraform blockchain." 2023 WL 8944860, at *14. Similarly, in *Patterson,* the Court found that allegations that "TFL and Mr. Kwon, through social media, blog posts, and marketing materials . . . promoted LUNA as an investment that would 'increase in value with the increased usage of the Terraform blockchain that could result from their continued development and maintenance,' was sufficient 'to satisfy the third prong.'" *Patterson*, 2024 WL 49055, at *12. The court in *Wahi* stated that the "issuers promoted the tokens based on their potential for investment returns, which they claimed derived from the promised efforts of the promoter's management team to create, develop, and maintain an ecosystem that would increase the demand for a token, and thus its price." 2024 WL 896148, at *6. In *NAC Foundation*, the court analyzed the token's "white paper" and a "parallel marketing campaign comprising press releases, social media posts, and other forms of AML BitCoin-friendly online content" and held that defendants could not "brush away the inference that an objectively reasonable ABTC purchaser likely viewed his or her prospective trading success as a function of the defendants' efforts: after all, the demand for ABTC or AML BitCoin, as reflected in those assets' pricing, would rely almost exclusively on market perception of defendants' work product." 512 F. Supp. 3d at 992, 997 (denying motion to dismiss). Defendants here similarly engaged in a multimedia promotional campaign for XRP that touted their essential role in the current and future success of XRP. Section III.B., *supra*; *see, e.g.*, Ex. 97 (Garlinghouse stating: "if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP"). Neither *LBRY*, *Terraform*, *Patterson*, *Wahi*, nor *NAC Foundation* included post-sale obligations. Defendants do not even mention these cases.

These cases establish that summary judgment is improper for the third *Howey* prong because there are, at a minimum, genuine disputes of fact about how a reasonable investor would

view the "economic reality" of their investment in XRP and Defendants' role in XRP's future value. Defendants cited cases, none of which involve sales of digital assets, MSJ at 32–34, are not to the contrary. In *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, the Ninth Circuit held that a land sale agreement was not an "investment contract." 608 F.2d 1297, 1299–1301 (9th Cir. 1979). Defendants misleadingly state that the decision turned on the absence of post-sale obligations in the "land sale contracts." MSJ at 33. However, the Ninth Circuit explicitly stated that it "consider[ed] all the circumstances," including that the purchaser obtained "complete control" over the development of the land and therefore could "develop or improve as it chose." *Id.* at 1031. The court ultimately determined that the plaintiff "failed to show the existence of an investment contract" in "light of the tenuous relationship between the value of the purchased land and Kaiser's promotional representations." *Id.* Defendants quote *Wright v. Schock*, 571 F. Supp. 642, 649 (N.D. Cal. 1983), for the proposition that "[s]ome form of guarantee linking the expectations of the investor to the fate of the promoter" is required, but the *Wright* court ***rejected*** the argument that a "guarantee" is "necessarily determinative," noting that courts look at "a much broader range of factors." *Id.* at 650. The court in fact found the third *Howey* prong satisfied because "there appears to be evidence from which the trier of fact could conclude that the Wrights represented the classic type of the small, naive, passive investor, completely dependent on the superior knowledge and expertise of the promoter." *Id.* at 653.

None of Defendants' other cited cases—which primarily involve real estate and diamond transactions—state that the existence of post-sale obligations is a requirement for an investment contract and instead considered post-sale obligations as part of a broader analysis of the "economic reality" of the transaction.[15]

---

[15] *See Harman v. Harper*, 914 F.2d 262, *4–6 (9th Cir. 1990) (unpublished) (considering the "economic realities" of joint venture agreement); *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) ("the record . . . simply shows the purchase . . . of lots in a real estate development"); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 9–12 (1st Cir. 1993) ("In this case, however, the most that can be said is that the promoter left the distinct, and distinctly false, impression that a community was going to develop through natural forces."); *Happy Inv. Group v. Lakeworld Properties, Inc.*, 396 F. Supp. 175, 180–81 (N.D. Cal. 1975) ("House building cannot be considered a 'passive' activity, requiring only a 'modicum of effort[.]'"); *Demarco v. LaPay*, 2009 WL 3855704, at *9 (D. Utah Nov. 17, 2009) (finding no investment contract due to lack of

Defendants' arguments that there is no evidence "that exchange-based purchasers 'could parse through the multiple documents and statements . . . (sometimes inconsistent) across many social media platforms and news sites from a variety of Ripple speakers (with different levels of authority)" and that "Defendants' public statements are not relevant unless they formed part of 'the basis of the sale,' and there is no evidence that they did," MSJ at 34–35, are immaterial and incorrect. Reliance is not an element of a Section 12(a) claim. *See Pino*, 55 F.4th at 1260 ("To state a claim under § 12(a)(2), Pino need not have alleged that he specifically relied on any of the alleged misstatements identified in the FAC."); *Houghton v. Leshner*, 2023 WL 6826814, at *4 n.5 (N.D. Cal. Sept. 20, 2023) (reliance allegations "are not required for a Section 12 claim"). Under *Warfield*'s objective approach, the question is how a reasonable investor would view circumstances surrounding the transaction, not what any individual purchaser knew, thought, or relied upon. 569 F.3d at 1021-22. Defendants do not—and cannot—seriously contest that they engaged in a multimedia promotional and marketing campaign for XRP and that the evidence Plaintiffs cite, including social media and public interview statements, were part of that campaign. Defendants cited cases, MSJ at 34–35, which simply state that courts look to the promotional materials and statements related to the transaction, are inapposite.[16]

In any event, whether "exchange-based purchasers 'could parse through the multiple documents and statements" ***is*** a disputed factual statement. MSJ at 34-35. Ripple explicitly targeted its marketing and promotional efforts at the investing public. Section III.B., *supra*; *see, e.g.*, Ex.

---

post-sale obligations and the plaintiffs' retention of complete "ownership and control of the property"); *Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 953–54 (N.D. Ill. 1978) ("At most plaintiffs have alleged that many purchasers were induced to buy their units by the representation that they would be a good 'investment', and that some purchasers bought their units purely as an investment, that is, not to live in, but to rent out."); *Am. Diamond Co.*, 1977 WL 10907, at *4 (Aug. 15, 1977) (SEC No-Action Letter) (diamond transaction); *The London Diamond Exch.*, 1972 WL 8488, at *3 (Oct. 3,1972) (SEC No-Action Letter) (same).

[16] Defendants mischaracterize *SEC v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023), as imposing a reliance requirement. MSJ at 34–35. The court, applying *Warfield*'s objective test, wrote that "courts have found [the investment of money] prong satisfied where the promotional materials surrounding the transaction promised financial gain and investors committed their assets based on those promises." *Id.* The court then analyzed the "economic reality" of a "Cashback Membership program," including promotional materials related to the program, for all three *Howey* prongs. *Id.* at *7–10. The court did not analyze whether any specific investor based his or her participation in the Cashback Membership program in reliance on the promoter's statements.

78 [redacted]) at RPLI_01017907 ([redacted]). Ripple's own key executives understand that their statements impact retail purchasing decisions. Schwartz stated in an interview as recently as January that he needs to be "careful" about what he says because "[s]omeone's gonna buy or sell some digital asset on the *basis of my statement*." Ex. 111.

*Second*, Defendants argue that "it is well established that, '[i]f the realization of profits depends significantly on the post-investment operation of market forces,' the purchaser could not reasonably have expected profits from the promoter's efforts." MSJ at 35. Defendants, citing the report of their expert Allen Ferrell, claim "[i]t is undisputed that, throughout the class period, the price of XRP correlates more closely with the prices of Bitcoin and Ether – that is, the cryptocurrency market as a whole – than with any action or statement of Ripple," *id.* at 35–36, but ***this is a disputed fact***. Ferrell did not find any relationship between Bitcoin and Ethereum prices and XRP prices during the Class Period. Ex. 9 (Ferrell Depo.) at 134:25-135:16. While Ferrell claims to find some relationship between the price of XRP and the broader market for digital assets, he acknowledged that his analysis does not tell "[redacted]". *Id.* at 162:12–23. His analysis also would not capture "[redacted]," such as "[redacted]" that was "[redacted]." *Id.* at 41:15–42:18, 162:24–163:5. Plaintiffs rebuttal expert Dr. Ammous critiqued Ferrell for failing to consider the myriad ways in which Ripple's efforts and public statements impacted XRP's price. Ex. 139 (Ammous Rebuttal Report) at ¶ 49–69. Dueling expert testimony "further underscore[s] the factual dispute[s]." *See Hill v. Quicken Loans Inc.*, 2020 WL 5358394, at *6 n.7 (C.D. Cal. Aug. 5, 2020); *Lift-U v. Ricon Corp.*, 2011 WL 5118634, at *5 (N.D. Cal. Oct. 28, 2011) (same).

Defendants, in public and in private, expressed their belief that their efforts impacted XRP's price. Garlinghouse publicly stated that "a significant rally in XRP prices" was "reflective of a lot of work we have done to make Ripple a very compelling solution." Ex. 112 (4/6/17 CoinDesk Article). He also testified that "[redacted]," including "[redacted]

[redacted]" he believed "[redacted]." Ex. 3 (Garlinghouse Depo.) at 351:14–352:11; *see also* Ex. 7 (Long Depo.) at 176:11–14 ("[redacted]"). Ripple's XRP Markets Director wrote in a December 2017 email that "[redacted]. Ex. 43 (12/29/17 Email) at RPLI_00379500; Ex. 5 (Samarasinghe Depo.) at 107:14–19. Schwartz similarly ventured that XRP could go to "$120," a return of over 40,000% on the $0.30 price at the time, "if Ripple captures the value of an increasing volume of International payments driven by the reduction in friction." Ex. 128 (6/22/2017 Reddit Comment). More broadly, Ripple's central role in XRP belies Defendants' argument that their efforts were immaterial to XRP's price. *See Kik*, 492 F. Supp. 3d at 180 ("Kik's insistence in its briefs that 'market forces' would drive the value of Kin ignores the essential role of Kik in establishing the market.").

*Finally*, for the reasons set forth in the following section, the Court should not follow Judge Torres' analysis of the third *Howey* prong in the *SEC Action* orders.

d. <u>The Court Should Disregard the *SEC Action* Orders</u>

*1) The SEC Action Orders are Incompatible with Binding Caselaw*

Defendants argue that the Court should follow Judge Torres' decisions in the *SEC Action* and grant summary judgment against all Class Members who purchased XRP on exchanges. MSJ at 23–26, 34. Defendants are wrong—Judge Torres' decisions cannot be squared with binding Ninth Circuit case law, and genuine disputes of fact preclude summary judgment even under the incorrect *Howey* framework set forth in her decisions.

Judge Torres issued her order granting in part and denying in part the parties' cross-motions for summary judgment on July 13, 2023. *SEC Action*, 2023 WL 4507900, at *1 (*SEC Action 7/23 Order*). Judge Torres held that Ripple's sales of XRP "to sophisticated individuals and entities . . . pursuant to written contracts—were sales of unregistered investment contracts. *Id.* at *8–11. Judge Torres, however, held that programmatic sales of XRP—*i.e.*, Ripple's sales of XRP "to public buyers . . . on digital asset exchanges"—were not sales of investment contracts. *Id.* at *11–13.

Judge Torres' analysis for exchange buyers focused entirely on the third *Howey* prong ("expectation of profits produced by the efforts of others"). Judge Torres wrote that exchange buyers could not have expected profits from Ripple's efforts because "none of the Programmatic Buyers were aware that they were buying XRP from Ripple" and "Ripple did not make any promises or offers because Ripple did not know who was buying the XRP, and the purchasers did not know who was selling it." *Id.* at *12. Judge Torres also differentiated between institutional and exchange buyers, writing that while the sophisticated "Institutional Buyers, would have been aware of Ripple's marketing campaign and public statements connecting XRP's price to its own efforts," there was "no evidence that a reasonable Programmatic Buyer, who was generally less sophisticated as an investor, shared similar 'understandings and expectations' and could parse through the multiple documents and statements that the SEC highlights." *Id.*

On October 3, 2023, Judge Torres denied the SEC's motion to certify an interlocutory appeal. *SEC v. Ripple Labs, Inc.*, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) ("*SEC Action* 10/23 Order"). Judge Torres wrote her analysis was "based on the totality of the circumstances in *this* case, including an examination of the facts, circumstances, and economic realities of the transactions, Ripple's Programmatic Sales could not lead investors to reasonably expect profits from Ripple's efforts." *Id.* at *4 (emphasis in original). Judge Torres listed eight specific factors that she considered when determining in her July 2023 order that exchange purchasers did not have an expectation of profits from Ripple's efforts. *Id.*

Judge Torres' *Howey* analysis has been strongly criticized. In *SEC v. Terraform Labs Pte. Ltd.*, issued less than a month later, Judge Rakoff "reject[ed] the approach recently adopted" by Judge Torres because *Howey* analyzes "whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts" and "makes no [] distinction" between institutional and exchange purchasers:

> But *Howey* makes no such distinction between purchasers. And it makes good sense that it did not. That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts. Indeed, if the Amended Complaint's allegations are taken as true -- as, again, they must be at this stage --

> the defendants' embarked on a public campaign to encourage both retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial and technical skills that would allow the defendants to maximize returns on the investors' coins.

2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023). Judge Rakoff held that the SEC sufficiently alleged that Defendants offered and sold investment contracts to all purchasers. *Id.* at *12–15. Commentators have similarly criticized Judge Torres' analysis because it "subverts the purpose of the securities laws (to protect less sophisticated investors)," "misconstrues basic principles underlying our markets and securities regulations," and "flips securities law on its head."[17]

Binding Ninth Circuit precedent forecloses reliance on Judge Torres' two orders. *First*, Judge Torres' analysis does not comply with *Warfield*'s objective test. Courts applying this objective test analyze how a reasonable investor would view the investment scheme, including by considering promotional materials and statements surrounding the transaction. *See, e.g.*, *Warfield*, 569 F.3d at 1022–23 (considering how an objective investor would understand promotional brochures); *NAC Found.*, 512 F. Supp. 3d at 996–97 (considering how an "objectively reasonable ABTC purchaser" would view a white paper and the relationship between "defendants' efforts" and "his or her prospective trading success"); *Blockvest*, 2019 WL 625163, at *7 (considering statements on Defendants' webpage and in a white paper). The court relied on *Warfield*'s objective test in rejecting Defendants' arguments at class certification about the subjective understandings of individual class members. *In re Ripple Labs*, 2023 WL 4303644, at *3–5.

Judge Rakoff in *Terraform* criticized Judge Torres' analysis for this precise reason. Although Judge Torres claimed to be applying *Warfield*'s objective approach, the orders are devoid of analysis of how a reasonable investor would view the transaction or Defendants' promotional statements and marketing materials and instead focused on what specific purchasers or groups of purchasers may or may not know about Ripple. *See, e.g.*, *SEC Action 7/23 Order*, 2023 WL

---

[17] Ann Lipton, *So, Ripple*, Business Law Prof Blog (July 13, 2023), https://lawprofessors.typepad.com/business_law/2023/07/so-ripple.html#; Edwin Hu, *SEC v. Ripple: Everyone Loses*, CLS Blue Sky Blog (July 18, 2023), https://clsbluesky.law.columbia.edu/2023/07/18/sec-v-ripple-everyone-loses/; Lee Reiners, *Reflections on the Ripple Decision*, The FinReg Blog (July 17, 2023), https://sites.duke.edu/thefinregblog/2023/07/17/reflections-on-the-ripple-decision/.

4507900, at *11–13; *SEC Action 10/23 Order*, 2023 WL 6445969, at *4–6. Judge Torres' analysis is the opposite of the *Warfield* approach.

*Second*, Judge Torres' analysis is incompatible with *Pino*, which held that a person can be liable under Section 12 "by promoting the sale of a security in a mass communication." 55 F.4th at 1260. The *Pino* plaintiffs alleged that the defendant solicited the sale of securities over social media, including Youtube videos and Instagram posts. The Ninth Circuit rejected the argument that Section 12(a) requires "contractual privity" or "a solicitation . . . directed or targeted to a particular plaintiff[.]" *Id.* at 1259–60. The Court thus held that "mass communications to potential investors through social media posts and online videos" constituted solicitation under Section 12(a)(2). *Id.* at 1258. The Ninth Circuit cited the Eleventh Circuit's decision in *Wildes v. BitConnect Int'l PLC*, which addressed a Section 12(a)(1) unregistered securities claim alleging that the Bitconnect digital asset was an investment contract, and similarly held that, "[b]ecause the Securities Act provides no free pass for online solicitations," mass communications through online videos could constitute a solicitation. 25 F.4th 1341, 1345–46 (11th Cir. 2022).[18]

Judge Torres' insistence on a direct relationship between purchasers and Ripple violates *Pino*. Judge Torres wrote that programmatic buyers "could not reasonably expect" profits from Ripple's efforts because "the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all" and distinguished them from institutional buyers who "purchased XRP directly from Ripple pursuant to a contract." *SEC Action 7/23 Order*, 2023 WL 4507900, at *11. *Pino*, however, does not require contractual privity for a Section 12(a)(1) claim. 55 F.4th at 1259–60. Judge Torres also wrote that "Ripple did not make any promises or offers because Ripple did not know who was buying the XRP." *SEC Action 7/23 Order*, 2023 WL 4507900, at *12; *SEC Action 10/23 Order*, 2023 WL 6445969, at *4. *Pino*'s allowance of solicitation via mass communication means that a seller or solicitor does not need to know the identity of the purchaser to be liable under Section 12(a)(1). 55 F.4th at 1260. Defendants may argue that *Pino* specifically addressed *Pinter*, not *Howey*, but *Bitconnect*, on which *Pino* relied,

[18] *See also* Brief of Plaintiffs/Appellants, *Wildes v. BitConnect Int'l PLC,* No. 20-11675-AA, 2020 WL 3958534, at *30 (11th Cir. July 8, 2020) (describing the Section 12(a)(1) claim).

came to the same conclusion in a *Howey* case. Judge Torres' approach would bar Section 12(a)(1) claims that *Pino* and *Bitconnect* would expressly permit.

*Third*, Judge Torres' analysis is inconsistent with *Platforms*' recognition that the Securities Act's registration provisions are designed to protect the "financially unsophisticated public." 617 F.3d at 1085. Judge Torres, however, explicitly held that exchange purchasers did not purchase investment contracts—and were not protected by the registration requirements—***because they were unsophisticated*** and did not understand what they were buying. 2023 WL 4507900, at *12. Judge Torres' approach, which protects sophisticated institutional investors but not unsophisticated exchange investors, cannot be squared with the design of the registration provisions in the Securities Act or binding Ninth Circuit precedent. *See Platforms*, 617 F.3d at 1085.

It is thus unsurprising that two district courts in the Ninth Circuit have followed Judge Rakoff's ruling and declined to draw a distinction between institutional and exchange purchasers. In *Paterson*, the Court held that investors who acquired LUNA Tokens on U.S. based digital asset "exchanges like Binance US and Kraken" adequately alleged "that their purchases of Terra Tokens were investment contracts constituting securities under federal law." 2024 WL 49055, at *12. Similarly, *Wahi*, which involved assets traded on Coinbase, stated that the *Howey* "analysis remains the same even to the extent Ramani traded tokens on a secondary market" because "[t]he promotional statements and managerial promises set forth in the FAC apply equally to tokens that an investor may have bought from the issuer directly or from another investor, including on a crypto asset trading platform." 2024 WL 896148, at 6.

*2) Factual Issues Preclude Summary Judgment*

Defendants incorrectly state that undisputed facts require summary judgment under Judge Torres' analysis. MSJ at 24–25. Defendants try to short-circuit the analysis by claiming that the "same facts hold true here" because "the entire record from the SEC Action was reproduced in full here." *Id.* at 25. That's not true; additional depositions, for example, were taken in this matter. But it is also irrelevant because the entire record was not in front of Judge Torres. As discussed in more detail below, record evidence—including a significant amount of evidence that the SEC *did not present* in their summary judgment motion—establishes that genuine disputes preclude

summary judgment for each of the eight factors Judge Torres identified.

*First,* contrary to Judge Torres' Orders, programmatic buyers did know that their payments went to Ripple. In July 2017, Ripple began publicly disclosing that it sold "programmatically as a small percentage of overall exchange volume." Ex. 113 (Q4 2017 XRP Markets Report). Schwartz publicly confirmed that "every penny" of these programmatic sales went to Ripple to grow and operate the company. Ex. 129 (Schwartz, 11/17/17 Reddit Comment). Buyers thus knew that their purchases of XRP would lead to an increase in Ripple's purchases. Section III.C., *supra*.

Ripple implemented an "[redacted]" on its "[redacted]" page "[redacted]," Ex. 114 at RPLI_00753887, and sought "[redacted]." Ex. 146 at RPLI_00303338. Ripple received [redacted]. Ex. 144, RPLI_00753887. [redacted]. Ex. 141 at RPLI_00775740; Spear Decl. ¶ 154. ([redacted]); Ex. 140 at RPLI_03468621, Spear Decl. 154 ([redacted]); Ex. 142 at RPLI_00762948 ([redacted]). Another individual purchased XRP on an exchange on [redacted] RPLI_00758013; Spear Decl. 154.

A popular XRP blog run by "Hodor" (who [redacted] *see* Ex. 149, RPLI_00452686) wrote that: "XRP SALES: A CAPITAL INFUSION FOR RIPPLE . . . XRP sales, whether to institutional investors, or directly to retail investors, has provided an enormous sum of working capital for Ripple." Ex. 149. Shortly thereafter, Ripple published an article written by the same person on its official blog. [redacted]

[redacted]" Ex. 145 at RPLI_00561862.

*Second*, contrary to Judge Torres' finding, Ripple's programmatic sales represented more than 1% of global XRP trading volume because Ripple's data relied on incorrect market volumes. Ripple knew the actual percentage of market volume was much higher. Ripple's XRP Markets Director wrote "[redacted]" Ex. 44 at RPLI_00563720. In June 2019, Ripple publicly acknowledged it had been misreporting its programmatic sales volumes for years, using data with "overall inaccuracy…by up to 95 percent" and temporarily suspended those sales. Ex. 114(Team Ripple, *Raising the Bar: Reporting on Volume and Sales of XRP*, June 3, 2019).

*Third*, contrary to Judge Torres' finding, Ripple went to great lengths to know who was buying XRP on exchanges. For example, in November 2017, [redacted] Ex. 78 at RPLI_01017858. The presentation noted that [redacted]. Ripple ultimately determined it would [redacted]. *Id.* at 864. These investors were important to [redacted] *Id.* at 868–72.

Ripple was in [redacted]. Ex. 46 at HATCH0183588; Ex. 47 at RPLI_00777951 ([redacted]). Retail purchasers also communicated directly with Ripple via Ripple's and Garlinghouse's social media accounts, discussing how to buy XRP. Ex. 46 at HATCH0183588. [redacted] *Id*. Ex. 46 at HATCH0183587-88. Ripple additionally took a "[redacted]

[redacted]" and [redacted]" Ex. 48 at RPLI_00372078. Ripple's PR firm also [redacted]. Ex. 92 at HATCHRLL0202894. Ripple also purchased "[redacted]. Ex. 61 at RPLI_00713739. That message resonated. Ex. 149 (popular XRP blog observing: "One of the reasons I am so overwhelmingly confident in my XRP investment is the recent history behind Ripple's promotion of XRP.").

*Fourth*, there is ample evidence that XRP purchasers on U.S. exchanges were not "entirely unaware of Ripple's existence." Ex. 50 at RPLI_00283387 ([redacted]). Ripple would receive "[redacted]" Ex. 51 at RPLI_00131393. [redacted] Ex. 51 at RPLI_00131393–94.

Nearly every exchange calls XRP "Ripple" and/or informs their customers of the ties between Ripple and XRP. Kraken ***to this day*** calls XRP "Ripple" and states that "Ripple is the company behind the cryptocurrency XRP. Ripple created XRP… Ripple (the company) now acts as principal steward in the funding and development of the XRP Ledger and plays an important role in its development and digital economy." Ex. 115. Coinbase similarly describes XRP as a cryptocurrency that is "developed and maintained by Ripple Labs," discloses that Ripple "created 100 billion XRP tokens . . . [and] controls the release of XRP." Ex. 116 ("How is XRP different from Bitcoin and Ethereum"). Coinbase also provides a link to the "official website" that links to Ripple.com and a newsfeed with articles linking XRP with Ripple. *Id.* Binance.US lists XRP as "Ripple." Ex. 117. Poloniex also refers to XRP as "XRP Ripple," and lists the official website as ripple.com and links to Ripple's Twitter. Ex. 118 (clicking the "XRP" link under trading pair).

*Fifth*, Judge Torres held that Ripple's sales of XRP to institutional investors were securities,

noting their lock-up provisions and resale restrictions.[19] However, many of these institutional investors purchased XRP pursuant to contracts [redacted]. Ex. 52 (3/26/20 Email) at RPLI_00517165 ([redacted]); Ex. 69 at RPLI_00252108 ([redacted]). Moreover, Ripple intended for all XRP buyers to view their investment as a direct investment in Ripple, by "[redacted]" Ex. 66 at RPLI_00915782. Ripple also understood that locking up their own XRP cryptographically would change [redacted] Ex. 147 at RPLI_00083474. And as discussed previously, a contract is not required under *Howey*. See Section V.C.2.c, *supra*.

*Sixth*, Ripple went to great lengths to ensure its promotional efforts were distributed to the general public, including to buyers on exchanges. Ripple heavily published on social media, see Section III.B., *supra*, "[redacted]," Ex. 53 at HATCH0156147. [redacted]. *Id*. For example, Schwartz did a live "Ask Me Anything" in December 2017, published on Youtube, that has over 46,000 views. Ex. 99. Schwartz affirmatively stated that the "recent more increase in attention that Ripple's getting, largely due to the price in XRP, it will be easier to attract stakeholders." *Id*. at 6:28–6:39. Garlinghouse did a similar "Ask Me Anything" (which received over 52,000 views) and publicly attributed "the huge jump in price for XRP and all the market cap jump over the last three days" to "Ripple [remaining] focus[ed]… on making the XRP ecosystem as successful as possible… I think it's also clear that one of the things that happened is, you know we [Ripple] have done I think a better job of really articulating and comparing the performance of XRP from a technical point of view as compared to other digital assets." Ex. 100. Ripple marketed

[19] Defendants try to draw a distinction between institutional purchasers and exchange purchasers. Mtn. at 36–39. However, as set forth in *Terraform* and *Wahi*, the *Howey* analysis is identical for both groups because the "promotional statements and managerial promises set forth" in this Section "apply equally to tokens that an investor may have bought from the issuer directly or from another investor, including on a crypto asset trading platform." Section V.C.2.d.1., *supra*.

these videos on Twitter and Ripple's own website. *See, e.g.*, Exs. 130-131.[20]

*Seventh*, Ripple knew that XRP buyers would understand the representations made by its executives and employees, including Garlinghouse and Schwartz, as representations of Ripple and its efforts. *See In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 925-27 (N.D. Cal. 2020) (CEO's public statements, such as Tweets, are attributable to (and speaks for) corporation). [redacted]. Ex. 54 (11/22/16 email) at HATCHRLL0276574. Ripple used its executives and employees as [redacted] Ex. 48 at RPLI_00372078. These spokespeople included Schwartz and Vias who would [redacted] *Id*. Schwartz identifies himself on Reddit as "Ripple – David Schwartz" and frequently posted on the Ripple subreddit, linking Ripple's efforts directly to the price of XRP. Ex. 132 (Schwartz, 9/27/17 Ripple.com comment: The "price of XRP is often seen as a measure of Ripple's success.").

[redacted] Ex. 70 at RPLI_00594240 ([redacted]); Ex. 55 (8/22/18 Email) at RPLI_00561329 [redacted]). Ripple also maintained a detailed list of "[redacted]" Ex. 93 at RPLI_00977153.

*Finally*, Ripple sought to deliver a consistent message aimed directly at encouraging

[20] The first tweet received 661 likes, 303 retweets, 82 comments. Comments included, "How can I buy ripple" from user S. Hawking @acslater90210, and "xrpthestandard #xrp #ripple be smart by investing in ripple" from user Ripple is Life @xrp_is_life. The second tweet received 590 likes, 290 retweets, and 57 comments (including from Garlinghouse himself promising XRP investors "I'll make sure the team gets you all taken care of!"

exchange buyers to purchase XRP by tying XRP to Ripple. [redacted]. Ex. 94 (4/17) at HATCHRLL0316803. [redacted] *Id.* [redacted] *Id.* (12/17, 1/18). [redacted]. *Id.* (1/18). [redacted]. Ex. 82 at RPLI_00989551 ("[redacted]"); Ex. 82 at RPLI_0098558 ("[redacted]."); Ex. 82 at RPLI_00989562 ("[redacted]). Every week Ripple would [redacted]." *Id.* at RPLI_00989556.[21]

**D. <u>Defendants' "Downstream Purchasers" Arguments Mischaracterize the Law</u>**

Securities Act Section 12(a)(1) states: "Any person who--(1) offers or sells a security in violation of [Section 5] of this title . . . shall be liable . . . to the person purchasing such security from him[.]" Defendants incorrectly argue that "Section 12 is unavailable to purchasers who did not buy XRP from Defendants or their agents or underwriters." MSJ at 41–45.

This is the third time that Defendants have argued that Section 12(a)(1) does not apply to

---

[21] An investment is security under California law if it meets either the *Howey* test or the risk capital test. MSJ at 39–41. Defendants' sales of XRP are the very "inventive substitutes for conventional means of raising risk capital" described in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815 (1961). As outlined above, Ripple (1) raised capital for a business venture or enterprise; (2) sold XRP indiscriminately to the public since 2017, (3) investors are substantially powerless to affect the success of the enterprise, and (4) investors' money is at risk.

sales of XRP on the secondary market. Defendants argued in their motion to dismiss that "Plaintiff's Securities Act claims fail because he does not plausibly allege that he purchased XRP from any Defendant." Dkt. 70 at 11–14 (lowercased). The Court, citing *Pinter v. Dahl*, 486 U.S. 622 (1988), rejected that argument, explaining that Plaintiff's allegations were "more than sufficient to establish [Defendants'] status as sellers under a solicitation theory" and that Plaintiff therefore "alleges sufficient facts that defendants qualify as sellers for purpose of plaintiff's § 77*l*(a)(1) claim." *In re Ripple Labs, Inc.*, 2020 WL 922815, at *12. Since then, the Ninth Circuit and Eleventh Circuits have confirmed that "mass communication to potential investors through social media posts and online videos" can constitute solicitation and rejected Defendants' contention that "a plaintiff must allege a relationship 'not unlike contractual privity.'" *Pino*, 55 F.4th at 1258-60.

The Court again rejected this argument at class certification because "defendants have not presented any reason why plaintiff's indirect purchases render his claims weaker than those of other class members[.]" 2023 WL 4303644, at *4. The Court explained: "[D]efendants have no controlling case law that draws such a distinction between direct purchasers and indirect purchasers. . . . To the contrary, this court and others have held that a plaintiff can bring an unregistered securities claim against solicitor sellers." *Id.* (citing *Owen v. Elastos Found.*, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021)).

Defendants take a different approach for their third attempt. Defendants state that "[f]or this motion, Defendants assume *arguendo* that they may qualify as 'statutory sellers.'" MSJ at 41 n.30.[22] But they argue that this does "not end the analysis under Section 12" because "federal law does not allow a purchaser to recover if she did not purchase XRP from Defendants or from agents selling on their behalf." Defendants argue that Section 12(a)(1) only imposes liability on a "buyer's immediate seller" and therefore precludes liability for exchange purchasers. *Id.* at 41–43.

This is a blatant mischaracterization of the law. *Pinter* directly addresses this issue. An investor (Dahl) invested in properties held in the name an oil and gas producer (Pinter). 486 U.S. at 625. Dahl told others about this venture and "[b]ecause of Dahl's involvement in the venture,

[22] In any event, as detailed in Section III.B–C., the record bears out Plaintiff's allegations that Defendants are solicitor sellers. *In re Ripple Labs, Inc.*, 2020 WL 922815, at *12, 16.

each of the other respondents decided to invest about $7,500." *Id.* at 625–26. Dahl and the others sued Pinter after the venture failed. *Id.* at 627. Pinter counterclaimed against Dahl. *Id.* On appeal, the Supreme Court considered whether Dahl "may be deemed a 'seller' for purposes of § 12(1), such that he may be held liable for the sale of unregistered securities to the other investor-respondents." *Id.* at 641. The Court held that the "the range of persons potentially liable under § 12(1) is not limited to persons who pass title. The inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12." *Id.* at 642 –643.

But the Supreme Court stated that this was only "half of the analysis" because Section 12(a) "provides that only a defendant 'from' whom the plaintiff 'purchased' securities may be liable." *Id.* at 643–44. This is Defendants' "second question." MSJ at 41. The Supreme Court noted that "[s]everal courts and commentators have stated that the purchase requirement necessarily restricts § 12 primary liability to the owner of the security." *Pinter*, 486 U.S. at 644. That is Defendants' position. MSJ at 41–43. But the Supreme Court rejected this position in *Pinter*: ***"We do not read § 12(1) so restrictively."*** *Id.* at 644. The Supreme Court wrote that it "long has been 'quite clear,' that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller." *Id.* at 646. The Court explained that "[a]n interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities." *Id.* The Court therefore held that "Congress intended § 12(1) liability to extend to those who solicit securities purchases." *Id.* at 647.

Defendants' concession that they are "statutory sellers" is dispositive for this motion. Under *Pinter*, a "statutory seller" ***is*** "a person from whom the buyer purchases," 486 U.S. at 644–46, and Defendants are therefore liable under Section 12(a) to the Federal Securities Claims class. Defendants admit that the Court "addressed" the first question when the Court "held that Defendants could be considered 'statutory sellers'" under a solicitation theory. The Court's answer to the first question also answers the purported "second question" because *Pinter* explicitly states

that statutory sellers are liable to purchasers. *Id.* at 641. Defendants' argument that this Court could hold that Defendants are statutory sellers, but that purchasers nonetheless do not have "standing" to sue them, is fundamentally inconsistent with the *Pinter*.

Defendants' arguments in support of their position are meritless. *First*, Defendants' claimed case law support is nonexistent. Defendants cite *Pinter* for the proposition that "§ 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." MSJ at 42 (citing 486 U.S. at 644 n.21). But *Pinter* holds that a solicitor is a "seller" in the immediate sale and that Section 12(a) is not limited to those who "pass title." 486 U.S. at 643-44 ("The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place. . . . The requirement, however, does not exclude solicitation from the category of activities that may render a person liable when a sale has taken place."). ***The Court rejected this exact same argument at the motion-to-dismiss stage***. *In re Ripple Labs*, 2020 WL 922815, at *12, n.6.[23] Defendants completely ignore this.

Defendants also cite *Pinter* for the proposition that "[A] buyer cannot recover against his seller's seller." MSJ at 42 (citing 486 U.S. at 644 n.21). "But Section 12(a)(1) also extends liability to those who actively solicit the sale of securities with a motivation to serve his or her own financial interest or those of the securities owner." *Owen v. Elastos Found.*, 2021 WL 5868171, at *14 (S.D.N.Y. Dec. 9, 2021. *Owen*—which relied on this Court's motion-to-dismiss decision and was in turn relied on by this Court at class certification—addressed the exact situation here. The *Owen* defendants argued that they were not liable for sales on the secondary market of digital assets they issued under *Pinter*'s "seller's seller" language. *Id.* The court rejected this argument because defendants were being sued as "solicitors," not as the "seller's seller," and "the Amended Complaint is replete with allegations describing the Individual Defendants' efforts to solicit purchases of ELA Tokens on the secondary market." *Id.* at *15–16. Defendants' own cited caselaw agrees that the "seller's seller" language does not bar liability for a solicitor seller: "***Absent such solicitation***, DEC can be viewed as no more than a 'seller's seller,' whom plaintiffs would have no

[23] *Accord In re Worlds of Wonder Sec. Litig.*, 1990 WL 61951, at *7 (N.D. Cal. Mar. 23, 1990) (citing *Pinter*'s "immediate seller" language and stating Section 12 liability extends to "the person who successfully solicits the purchase" under *Pinter*).

right to sue under Section 12(2)." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996).

The 26 cases Defendants cite, MSJ at 42–43 n.32–33, do not support Defendants' erroneous reading of *Pinter*. None of the cited cases holds, or even suggests, that a purchaser of a security lacks standing to sue a statutory seller under Section 12(a)(1). None holds, or even suggests, that a defendant can be a "statutory seller" under Section 12(a)(1) but nonetheless not be liable because the purchaser did not buy the security "from him." And none holds, or even suggests, that a statutory seller under a solicitation theory is not liable under Section 12(a)(1) for purchases the statutory seller solicited. The same flaw affects Defendants' treatise citations (MSJ at 43 n. 34)—both agree that a statutory seller under a solicitation *is liable* to purchasers under Section 12(a)(1). *See* Louis Loss, Joel Seligman, Troy Paredes, SECURITIES REGULATION at Ch. 11, C(2)(c) n.122 (7th ed. 2024); 2 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 7:52 (Nov. 2023). Defendants' argument that "hold[ing] Ripple liable" under a solicitation theory "to anyone who purchased XRP from anyone would be a radical departure from the statutory text and precedent discussed above," MSJ at 44, ignores that Plaintiffs are not claiming that Defendants are liable as "remote seller[s]"; Defendants, as conceded statutory sellers, *are* the sellers in each of these XRP purchases. *See Dorchester Inv'rs v. Peak Trends Tr.*, 2003 WL 223466, at *2 n.3 (S.D.N.Y. Feb. 3, 2003) Defendants have not cited any contrary authority.

*Second*, Defendants' statutory analysis, MSJ at 43, is irrelevant and unnecessary. *Pinter* performed a detailed statutory analysis and held that solicitation falls squarely within the Section 12(a)(1). 486 U.S. at 641–47 (explaining that solicitation fall within Section 12 because "[a] natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase."). Defendants' references to Section 11 and *Hertzberg v. Dignity Partners, Inc.*, are also inapposite. 191 F.3d 1076, 1080–81 (9th Cir. 1999). In *Hertzberg*, the Ninth Circuit considered whether Section 11 applied to purchases outside the initial public offering. The *Hertzberg* defendant argued that the Supreme Court's decision in *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995), which held that Section 12(a)(2) misrepresentation claims are limited to the initial public offering, should similarly restrict Section 11 claims to the securities bought in the initial public offering. 191 F.3d at 1080–81. The Ninth Circuit held that *Gustafson*'s interpretation of

Section 12(a)(2) does not control the interpretation of Section 11 because the two statutes have different statutory language. *Id.* Defendants' attempt to port *Hertzberg*'s analysis to this case ignores that this Court already held that *Gustafson* does not apply to Plaintiffs' 12(a)(1) claims and that the scope of Section 12(a)(2) *does not* dictate the scope of Section 12(a)(1): "[D]efendants' reliance upon *Gustafson* is misplaced. . . . Because subsection (a)(1) provides a broader basis for assigning liability than its subsection (a)(2) counterpart, the court further rejects defendants' position and concludes that it may consider a § 77l(a)(1) claim premised upon a purchase outside the initial distribution context." *In re Ripple Labs, Inc.*, 2020 WL 922815, at *12.[24]

*Third*, the Court should reject Defendants' attempt to limit *Pinter* to sales by "Defendants or their agents or underwriters." MSJ at 44. That limit is not in *Pinter*. *See, e.g.*, 486 U.S. at 646 (stating that "[a]n interpretation of statutory seller that includes brokers ***and others*** who solicit offers to purchase securities" is consistent with the purpose of the Securities Act) (emphasis added). Nor could the Supreme Court have done so because Pinter and Dahl—the two purported sellers—were not each other's' agents or underwriters . *Id.* at 625–32. Courts routinely hold that a defendant can be a statutory seller under a solicitation theory without requiring allegations or evidence of agency or underwriting. *See In re Ripple Labs, Inc.*, 2020 WL 922815, at *12; *In re Ripple Labs, Inc.*, 2023 WL 4303644, at *4; *Owen*, 2021 WL 5868171, at *14–16.

Finally, Defendants' argument that "any other result would contradict the *Howey* test" because class members "made no investment of money in any enterprise controlled by Defendants," MSJ at 44–45, is a variant on Defendants' flawed *Howey* Prong 1 arguments and fails for the reasons addressed previously. *See* Section V.C.2.a., *supra*.[25]

## VI. CONCLUSION

The Court should deny Defendants' motion for summary judgment.

---

[24] For this reason, Defendants' reliance on cases discussing standing in the context of Section 12(a)(2)'s "by means of a prospectus or oral communication" requirement is misplaced. *See, e.g.*, *Welgus v. TriNet Group, Inc.*, 2017 WL 167708, at *18 (N.D. Cal. Jan. 17, 2017).

[25] After this motion was filed, the Court ruled that the Federal and State Securities Classes are limited to U.S. residents purchasing on U.S. exchanges, Dkt. 335 (Class Notice Order) at 1–2; *see also In re Ripple*, 2023 WL 4303644, at *8 (Class Cert order), which is the relief Defendants request, MSJ at 45–46. That issue is therefore moot.

Dated: March 8, 2024

SUSMAN GODFREY L.L.P.

By */s/ Nicholas N. Spear*

Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
Oleg Elkhunovich (269238)
Krysta Kauble Pachman (280951)
Nicholas N. Spear (304281)
Michael Tayag (350113)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
oelkhunovich@susmangodfrey.com
kpachman@susmangodfrey.com
nspear@susmangodfrey.com
mtayag@susmangodfrey.com

James Q. Taylor-Copeland (284743)
Max Ambrose (320964)
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
james@taylorcopelandlaw.com
maxambrose@taylorcopelandlaw.com
Telephone: (619) 400-4944
Facsimile: (619) 566-4341

*Counsel for Lead Plaintiff Bradley Sostack and Class Counsel*