# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VLADI ZAKINOV, et al.,

        Plaintiffs,

    v.

RIPPLE LABS, INC., et al.,

        Defendants.

Case No. 18-cv-06753-PJH

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Re: Dkt. No. 70

      Defendant Ripple Labs, Inc.'s ("defendant Ripple"), defendant XRP II, LLC's ("defendant XRP II"), and defendant Ripple's Chief Executive Officer, Bradley Garlinghouse ("defendant Garlinghouse") (collectively, "defendants") motion to dismiss plaintiff Vladi Zakinov's ("plaintiff") consolidated class action complaint came on for hearing before this court on January 15, 2020. Plaintiff appeared through his counsel, James Taylor-Copeland and Oleg Elkhunovhich. Defendants appeared through their counsel, Damien Marshall, Kathleen Hartnett, and Menno Goedman. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby **GRANTS IN PART** and **DENIES IN PART** defendants' motion for the following reasons.

<strong>BACKGROUND</strong>

      This consolidated putative class action ("In re Ripple") arises out of the creation, dispersal, circulation, and sale of "XRP," a sort of digital units often referred to as a "cryptocurrency." In re Ripple comprises various actions alleging both violations of federal and California state securities laws. Such actions include Coffey v. Ripple et al., 18-3286, Greenwald v. Ripple et al., 18-4790, Zakinov v. Ripple et al., 18-CIV-2845 (Cal.

Super. Ct. San Mateo Cty.), and <u>Oconer v. Ripple Labs, Inc.</u>, 18-CIV-3332 (Cal. Super. Ct. San Mateo Cty.). The procedural posture of this action is complex and its restatement here is largely unnecessary. The court need note only that this action is the only ongoing matter of those referenced above. For more information, the court directs readers to its February 28, 2019 order denying remand. Dkt. 33.

On August 5, 2019, plaintiff filed the operative consolidated complaint against defendants. In it, plaintiff alleges the following claims:

1. Violation of Section 12(a)(1) of the Securities Act (Title 15 U.S.C. § 77l(a)(1)) against defendants for the unregistered offer and sale of securities. Compl. ¶¶ 169-175;

2. Violation of Section 15 of the Securities Act (Title 15 U.S.C. § 77o) against defendant Ripple and defendant Garlinghouse for control person liability for the primary violation of Title 15 U.S.C. § 77l(a)(1). <u>Id.</u> ¶¶ 176-183 (together with U.S.C. § 77l(a)(1), the "federal securities claims");

3. Violation of California Corporations Code § 25503 against defendants for a primary violation of § 25110's restriction on the offer or sale of unregistered securities. <u>Id.</u> ¶¶ 184-190.

4. Violation of California Corporations Code § 25504 against defendant Ripple and defendant Garlinghouse for control person liability in connection with defendants' primary violation of § 25110. <u>Id.</u> ¶¶ 201-207;

5. Violation of California Corporations Code § 25501 against defendant Ripple and defendant XRP II, as well as a parallel material assistance claim under § 25504.1 against defendant Ripple and defendant Garlinghouse, for misleading statements in connection with the offer or sale of securities in violation of § 25401. <u>Id.</u> ¶¶ 191-200;

6. Violation of California Business & Professions Code § 17500 against defendants for misleading advertisements concerning XRP. <u>Id.</u> ¶¶ 208-212;

7. Violation of California Business & Professions Code § 17200 against

2

United States District Court
Northern District of California

defendants for their unregistered offer or sale of securities in violation of federal and state law, false advertising practices, misleading statements, and offense to established public policy. Id. ¶¶ 212-222.

Defendants filed the instant motion to dismiss for failure to state a claim under Rule 12(b)(6). Dkt. 70. At the core of plaintiff's claims is that XRP qualifies as a security under California state and federal law. While plaintiff alleges this legal theory at length in his complaint, Compl. ¶¶ 121-159, defendants save their dispute with that theory for another day and assume—solely for the instant motion—plaintiff's legal position that XRP qualifies as a security. Dkt. 70 at 11; Dkt. 74 at 9; Dkt. 75 at 7 n.1. Instead, defendants challenge the complaint on grounds of Title 15 U.S.C. § 77m's three-year statute of repose and traditional Rule 12(b)(6) failure to state a claim grounds. Below, the court provides a summary of the relevant allegations and judicially noticeable facts.

**A.     The Court Partially Grants Defendants' Unopposed Requests for Judicial Notice**

As an initial matter, defendants request that the court take judicial notice of the following documents:

- The Statement of Facts from the federal government's May 2015 settlement with defendants Ripple Labs and defendant Ripple XRP II (predecessor to defendant XRP II, LLC). Dkt. 70-3. This document is cited or referenced in the complaint at paragraphs 2 n.2, 25, and 112.

- The "Ripple Credits" page from defendant Ripple's Wiki website. Dkt. 70-4. This document is cited or referenced in the complaint at paragraphs 24 n.7, 130 n.91, and 145 n.99.

- A Quarter One 2018 XRP Markets Report. Dkt. 70-5. This document is cited at complaint paragraph 36 n.16.

- An article titled "Ripple is sitting on close to $80 billion and could cash out hundreds of millions per month—but it isn't." Dkt. 70-6. This document is cited at complaint paragraph 52 n.31.

1    Here, the court need not consider the fourth request for judicial notice (Dkt. 70-6)

2    to resolve defendants' motion. As a result, the court denies that request. Otherwise,

3    because plaintiff does not oppose the remaining requests and their underlying documents

4    are sufficiently cited at the complaint sections noted immediately above, the court grants

5    defendants' request for judicial notice of those three documents and will incorporate their

6    contents by reference in its analysis below.

7    **B.    The Parties**

8        **1.    Defendant Ripple**

9        Defendant Ripple is a Delaware corporation with its principal place of business in

10   San Francisco. Compl. ¶ 14. While defendant Ripple sells certain enterprise software

11   products, the primary source of its income is the sale of XRP. Id. ¶ 28.

12       **2.    Defendant XRP II**

13       Defendant XRP II is a New York limited liability company with its principal place of

14   business in San Francisco. Id. ¶ 15. Defendant XRP II's predecessor is XRP Fund II,

15   LLC, which was incorporated in South Carolina on July 1, 2013. Dkt. 70-3 ¶ 22.

16   Defendant XRP II was created to "engage in the sale and transfer of" XRP to "various

17   third parties on a wholesale basis." Id.

18       **3.    Defendant Garlinghouse**

19       Defendant Garlinghouse is the Chief Executive Officer of defendant Ripple.

20   Defendant Garlinghouse has held that position since January 2017. Compl. ¶ 16.

21   Previously, Garlinghouse served as Ripple's Chief Operating Officer from April 2015

22   through December 2016. Id.

23       **4.    Plaintiff**

24       On June 21, 2019, the court appointed Bradley Sostack as lead plaintiff. Dkt. 60.

25   Plaintiff is a Florida resident. Id. ¶ 13. Between January 1, 2018 and January 16, 2018,

26   plaintiff purchased roughly 129,000 units of XRP for approximately $307,700 in other

27   cryptocurrencies. Id. Plaintiff alleges that he purchased such XRP "from defendants," id.

28   ¶¶ 172, 187, although he does not specify whether he made such purchase directly from

United States District Court
Northern District of California

defendants or incidentally on a cryptocurrency exchange.  Plaintiff sold his XRP between January 9, 2018 and January 17, 2018 for $189,600 in other cryptocurrency, representing a $118,100 loss in XRP value.  Id. ¶ 163.  Plaintiff seeks to certify a Rule 23(b)(3) class that generally includes all persons or entities who purchased XRP.  Id. ¶ 160.

**C.     Relevant Allegations**

In 2013, defendant Ripple generated 100 billion units of XRP. Compl. ¶ 2. Following their creation, defendant Ripple gave 20 billion XRP to its founders and retained the remaining 80 billion XRP.  Id. ¶¶ 2, 22, 23.

**1.     XRP Escrow Program**

Since the XRP's creation, defendant Ripple has placed a substantial percentage of XRP that it owns in escrow and developed a plan for when and in what quantities XRP should be sold.  Id. ¶ 5.  As of May 2017, defendant Ripple maintained 62 billion XRP. Id. ¶ 84.  At that time, defendant Ripple stated that it would place 55 billion XRP in a secured escrow account and would only offer and sell limited amounts of XRP at defined intervals.  Id.  In an article, defendant Garlinghouse publicly stated that "[o]ur goal in distributing XRP is to incentivize actions that build trust, utility, and liquidity."  Id. ¶ 86.  In that same publication, Garlinghouse subsequently characterized the XRP distribution as "ongoing."  Id.  Defendants adopted the escrow plan to allow investors "to mathematically verify the maximum supply of XRP that can enter the market."  Id. ¶ 87.

**2.     Alleged Offers or Sales of XRP by Defendants**

**a.     Sales Acknowledged in Defendants' May 2015 Settlement Agreement**

In May 2015, defendant Ripple and defendant XRP II entered a settlement agreement with the United States Attorney's Office for the Northern District of California ("USAO") for violation of the Bank Secrecy Act, Title 31 U.S.C § 5330.  Id. ¶ 25; Dkt. 70-3.  Significantly, plaintiff alleges that, as part of that agreement, defendants "acknowledged that they sold XRP to the ***general public***."  Compl. ¶ 25 (emphasis added).  The parties' characterization of the agreement aside, its statement of facts and

violations section identifies the following XRP sale-related conduct by defendants since 2013:

- As of the date of the agreement, defendant Ripple "facilitated transfers of virtual currency and provided virtual currency exchange transaction services." Dkt. 70-3 ¶ 2.

- "From at least March 6, 2013, through April 29, 2013, Ripple Labs sold convertible virtual currency known as 'XRP.'" Id. ¶ 17.

- "Throughout the month of April 2013, Ripple Labs effectuated multiple sales of XRP currency totaling over approximately $1.3 million U.S. dollars." Id. ¶ 20.

- "By on [sic] or about August 4, 2013, XRP II was engaged in the sale of XRP currency to third-party entities." Id. ¶ 23.

- Prior to September 26, 2013, defendant XRP II had "engag[ed] in numerous sales of virtual currency to third parties." Id. ¶ 26(a).

- On September 30, 2013, defendant XRP II "negotiated an approximately $250,000 transaction . . . for a sale of XRP virtual currency with a third-party individual." Id. ¶ 28(a).

- In November 2013, defendant XRP II considered and rejected a roughly $32,000 transaction. Id. ¶ 28(b).

- In January 2014, defendant XRP II considered and rejected an offer from foreign-based customer who sought to purchase XRP. Id. ¶ 28(c).

Lastly, as part of the settlement, defendant XRP II is described as "created to engage in the sale and transfer of the convertible virtual currency, XRP, to various third parties **on a wholesale basis**." Id. ¶ 22 (emphasis added).

### b.    Pre-2017 XRP Sales and Circulation Rates

On or before July 12, 2014, defendant Ripple stated on its website that it "sells XRP to fund its operations and promote the network." Compl. ¶ 24; Dkt. 70-4 at 4 (webpage "last modified" on "12 July 2014"). Between December 2014 and July 2015,

defendant Ripple also disclosed the amount of XRP that it held and that in circulation. Compl. ¶ 26. As of June 30, 2015, defendant Ripple held approximately 67.5 billion XRP. Id. Of the remaining 32.5 billion XRP in circulation, 20 billion was held by defendants' founders and some other undisclosed amount was used for "business development agreements." Id.

In 2016, defendant Ripple promised but did not execute an agreement with a third-party vendor an option to purchase 5 billion XRP in exchange for access to the vendor's consortium of financial institutions. Id. ¶ 104. Aside from this potential transaction, neither plaintiff nor defendants alleged or proffered any judicially noticeable fact showing any other specific instances of XRP sales between December 2014 and 2016.

### c. Defendants' Increase Their XRP Sales to the Public in 2017

Defendants sell XRP to retail consumers in exchange for legal tender or other cryptocurrencies. Id. ¶ 4. Defendants also sell XRP "wholesale to larger investors" as well as "significant quantities of XRP directly to the general public on cryptocurrency exchanges." Id. ¶¶ 30, 127, 156. The earliest indication of XRP's listing on an exchange that plaintiff alleges is May 18, 2017. Id. ¶ 44.

Significant to the instant motion, in 2017 and early 2018, defendants rapidly accelerated their sale of XRP to the public. Id. ¶ 30. During that period, Ripple increased its efforts to engage in distribution strategies aimed at the general public that would result in stabilizing or strengthening XRP exchange rates against other currencies. Id. ¶ 5. Since 2017, defendants have "earned over $1.1 billion through the sale of XRP." Id. ¶ 30.

Plaintiff alleges that defendants, primarily through defendant XRP II, sold the following amounts of XRP per quarter:

| **Annual Quarter** | **Amount Allegedly Sold (in USD)** |
| --- | --- |
| Q2 2017 | $31 million |
| Q3 2017 | $52 million |
| Q4 2017 | $91 million |

United States District Court
Northern District of California

| Q1 2018 | $167 million |
| Q2 2018 | $154 million |
| Q3 2018 | $81 million |
| Q4 2018 | $129 million |
| Q1 2019 | $169 million |
| Q2 2019 | $251 million |

Id. ¶¶ 31-39.

Plaintiff alleges that such sales occurred through some combination of direct, exchange, institutional, or programmatic sales. Id. As of August 5, 2019, defendant has not registered XRP with the Securities and Exchange Commission ("SEC") or qualified it with the California Commissioner of Corporations. Id. ¶ 12.

### 3. Public Access to XRP

Defendant Ripple's website provides advice on "How to Buy XRP" and includes hyperlinks to exchanges trading XRP. Id. ¶¶ 4, 43, 135. In 2017, defendant Ripple, as well as its various officers, published tweets concerning or including hyperlinks to such exchanges. Id. ¶¶ 44-45. As of December 21, 2017, XRP was available for purchase or sale at over 50 exchanges. Id. ¶¶ 45, 128.

### 4. Alleged Misstatements concerning XRP

Plaintiff alleges numerous purported misstatements by defendants concerning XRP, its value, and its status as a non-security. Id. ¶¶ 42-83, 95-97. The court details those misstatements in its analysis below.

### DISCUSSION

## A. Legal Standard

### 1. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8 requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is

United States District Court
Northern District of California

1   proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege

2   sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953,

3   959 (9th Cir. 2013). While the court is to accept as true all the factual allegations in the

4   complaint, legally conclusory statements, not supported by actual factual allegations,

5   need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint

6   must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell

7   Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

8       As a general matter, the court should limit its Rule 12(b)(6) analysis to the

9   contents of the complaint, although it may consider documents "whose contents are

10  alleged in a complaint and whose authenticity no party questions, but which are not

11  physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th

12  Cir. 2005); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a

13  document on which the complaint relies if the document is central to the plaintiff's claim,

14  and no party questions the authenticity of the document"). The court may also consider

15  matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668,

16  688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v.

17  Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents

18  referenced extensively in the complaint and documents that form the basis of the

19  plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding

20  Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

21      Lastly, a district court "should grant the plaintiff leave to amend if the complaint

22  can possibly be cured by additional factual allegations," however, dismissal without such

23  leave "is proper if it is clear that the complaint could not be saved by amendment."

24  Somers, 729 F.3d at 960.

25      **2.     Rule 9(b)**

26      For actions alleging fraud, "a party must state with particularity the circumstances

27  constituting fraud or mistake." Fed. R. Civ. Pro. 9(b). To satisfy Rule 9(b), a plaintiff

28  must allege "the 'time, place, and specific content of the false representations as well as

the identities of the parties to the misrepresentations.'" <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764 (9th Cir. 2007).  "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged," and "a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis in the original).  Plaintiff's allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  <u>Swartz</u>, 476 F.3d at 764.

**B.    Analysis**

**1.    Plaintiff's Claims under the Federal Securities Laws Are Not Barred by the Statute of Repose**

Here, whether Title 15 U.S.C § 77(m)'s three-year statute of repose bars plaintiff's federal securities law claims depends upon two distinct issues: (1) the controlling rule for measuring when the statute of repose commences for purpose of Title 15 U.S.C § 77*l*(a)(1); and (2) when the alleged (or judicially noticeable) sales of XRP first qualified as a "bona fide" public offering within the meaning of Title 15 U.S.C. § 77*l*(a)(1).

The court analyzes each issue in turn.

**a.    The First Offered Rule Articulated by the Second Circuit in <u>Stolz Family</u> Controls**

Title 15 U.S.C § 77m provides the following in relevant part:

> "No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based. ***In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public***, or under section 77*l*(a)(2) of this title

United States District Court
Northern District of California

more than three years after the sale." 15 U.S.C. § 77m (emphasis added).

Defendants argue that the statute of repose's commencement is controlled by the so-called "first-offered" rule articulated by the Second Circuit in Stolz Family Partnership L.P. v. Daum, 355 F.3d 92 (2d Cir. 2004) ("Stolz"). Under that rule, "the three-year period begins when the security is *first* bona fide offered." Stolz, 355 F.3d at 100 (italics in the original) (bold added).

In his briefing, plaintiff primarily argues that when the statute of repose commences is controlled by the so-called "last-offered" rule stated by the district court In re Bestline Products Securities and Antitrust Litigation, 1974 WL 386 (S.D. Fla. 1975) and subsequently adopted by a court in this district in Hudson v. Capital Mgmt. Int'l, Inc., 1982 WL 1384 (N.D. Cal. Jan. 6, 1982). Under that rule, the three-year period begins "on the date the alleged security was last offered to the public." In re Bestline, 1975 WL 386 at *2. Explained below, the court adopts the first-offered rule as controlling here.[1]

In Stolz, the Second Circuit considered two federal securities claims against a defunct company, one of which was a claim for sale of unregistered securities (labeled "membership units") under § 77l(a)(1). 355 F.3d at 95. Plaintiff filed his initial complaint in February 2001 and his operative pleading on November 19, 2001. Id. In it, plaintiff alleged that "beginning in or about July, 1997 [sic] and continuously through the bankruptcy filing . . . [defendant] engaged in a 'public offering.'" Id. The district court held that plaintiff's original complaint was filed "more than three years after the membership interests were 'bona fide offered to the public'" and the claim was therefore time barred under § 77m. Id. at 96.

On appeal, the Second Circuit focused its analysis on the core legal question

---

[1] At oral argument, plaintiff's counsel effectively abandoned the argument that the last-offered rule controls. Instead, counsel only briefly mentioned Hudson as "the only in district decision" and then went on at length to discuss Stolz "if the court was to find the reasoning of the Second Circuit in Stolz persuasive." Despite plaintiff's apparent concession, because of the significance of selecting the proper doctrine to dispose of defendants' statute of repose challenge in this motion and to guide the parties in this litigation going forward, the court will explain its decision to choose and apply the first-offered rule here.

United States District Court
Northern District of California

1   here—namely, "at what point during the bona fide offer does the repose period begin?"

2   355 F.3d at 98-99.  While the Second Circuit advanced several reasons in support of its

3   determination that the statute of repose is triggered by a defendant's **_first_** bona fide offer

4   to the public of its allegedly unregistered securities—including the weight of precedent,

5   statutory interpretation, historical function of statutes of repose, and policy

6   considerations, 355 F.3d at 100-107—the court finds <u>Stolz</u>'s statutory construction

7   justification most persuasive.

8          Significantly, § 77m includes both a three-year statute of repose and a one year-

9   statute of limitations for claims brought under § 77l(a)(1).  If the court were to interpret the

10  statute of repose to commence at the time of the last bona fide public offer, such

11  interpretation would effectively nullify its effect because "every potential plaintiff

12  purchasing a defendant's security during an offering period would have at least three

13  years before being constrained by the repose period, since each day during which the

14  offer continued would delay the start of the repose period. Therefore, the statute would

15  fail to enforce final repose with respect to any plaintiff, with one exception—a plaintiff

16  whose one-year limitations period was tolled not only for the duration of the offer, but for

17  the three years subsequent to the end of the offering period." <u>P. Stolz</u>, 355 F.3d at 105

18  n.9.  Stated differently, under the last-offered rule, the statute of repose would generally

19  bar a § 77l(a)(1) claim **_only if_** such claim fell within a tolling exception to § 77m's one-

20  year statute of limitations.  Absent such an exception, the one-year statute of limitation

21  would bar the § 77l(a)(1) claim two years before the statute of repose could take effect.

22  Plaintiff failed to explain how the last-offered rule would not result in such an eviscerating

23  effect upon the statute of repose, and the court does not see a way to adopt such

24  construction without rendering the statute of repose "surplusage." <u>Stolz</u>, 355 F.3d at 105

25  n.9.  Given such inability, the court concludes that the only reasonable way to construe

26  the statute of repose is by adopting the first-offered construction.

27         Separately, the court further finds that the authorities urged by plaintiff here in

28  support of the last-offered rule are unpersuasive.  Significantly, as the Second Circuit

                                    12

correctly noted, <u>Hudson</u> stems from <u>In re Bestline</u> and itself offers no analytical

justification for adopting last-offered rule.[2]  To support its articulation of the last-offered

rule, the court in <u>In re Bestline</u> provides only the following:

> "The defendants' interpretation of the statute [arguing the first-offered approach] is simply at odds with the remedial purposes of the Securities Act of 1933. To hold as the defendants suggest would be to give individuals a license to sell unregistered securities to whomsoever they wished if they first offered the security to a group of people and, so to speak, 'ran the gauntlet' for three years. It is doubtful that Congress intended the 1933 Act's goals of registration, disclosure, and private enforcement to be so easily frustrated. As a result, the defendants' interpretation of [Title 15 U.S.C. § 77(m)] must be rejected in favor of the plaintiffs' interpretation, according to which the limitations period began on the date the alleged 'security' was last offered to the public."  <u>Stolz</u>, 355 F.3d at 102 citing <u>In re Bestline</u>, 1975 WL 386 at *2.

While the court appreciates the policy concern identified above, such a concern

does not overcome the statutory interpretation-based justification articulated by <u>Stolz</u> in

support of the first-offered rule.  Moreover, as the Second Circuit correctly noted, a

statute of repose is a creature of legislative supremacy that operates independent of

equitable concerns.  <u>Stolz</u>, 355 F.3d at 102-03 ("[A] statute of repose begins to run

without interruption once the necessary triggering event has occurred, even if equitable

considerations would warrant tolling or even if the plaintiff has not yet, or could not yet

have, discovered that she has a cause of action.") (internal citations omitted).  By making

§ 77m's statute of repose applicable to § 77l(a)(1) claims, Congress decided to limit the

availability of such statutory claims.  Such decision is contrary to <u>In re Bestline</u>'s doubt

about congressional intent and assertion that the first-offered rule would improperly

undermine § 77l(a)(1)'s remedial purposes.

Further, when articulating the last-offered rule, the court in <u>In re Bestline</u>

incorrectly characterized § 77m's three-year statute of repose as a "statute of limitations."

<u>In re Bestline</u>, 1975 WL 386, at *1 ("One of the more hotly contested issues is whether

---

[2] <u>Hudson</u>, 1982 WL 1384, at *3 n. 3 ("The relevant offering is the last offering of the security [citing <u>In re Bestline</u>] . . . That date should be pled.").

the claims of the plaintiff class under section 12(1) of the Securities Act of 1933 are barred by the Statute of Limitations contained in section 13 of the Act. In pertinent part, section 13 reads: No action shall be maintained to enforce any liability created under . . . section 12(1), unless it is brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under . . . section 12(1) *more than three years after the security was bona fide offered to the public. . .* The defendants take the position that **the underscored language** should be interpreted to mean that an action under section 12(1) may not be brought more than three years after the security was *first* offered to the public.") (italics in the original) (bold italics added).  As explained in <u>Stolz</u>, Congress recognizes a significant distinction between the function of a statute of repose and a statute of limitation.[3]  Because the court in <u>In re Bestline</u> incorrectly characterized § 77m's statute of repose as a statute of limitations, it appears to have failed to account for the absolute nature of the three-year statute of repose when advancing its "remedial purposes" policy critique.  Given this shortcoming, too, the court rejects the last-offered rule.

Lastly, plaintiff cites the Supreme Court in <u>Cal. Public Employees' Retirement Sys. v. ANZ Sec., Inc.</u>, 137 S. Ct. 2042 (2017) for the proposition that § 77m's statute of repose "runs from the defendants' last culpable act (the offering of the securities) . . ." <u>Id.</u> at 2049.  This citation fails to provide any guidance on the critical issue here: namely, whether the subject offering means first- or last-bona fide offering.  Further, the Supreme Court in <u>ANZ Securities</u> did not consider the application of § 77m's statute of repose to an unregistered securities claim under § 77l(a).  Instead, it considered the applicability of that section to a subsequent suit alleging a misrepresentation claim initiated by a plaintiff

---

[3] <u>Stolz</u>, 355 F.3d at 102 ("Statutes of limitations bear on the availability of remedies and, as such, are subject to equitable defenses . . . the various forms of tolling, and the potential application of the discovery rule. In contrast, statutes of repose affect the availability of the underlying right: That right is no longer available on the expiration of the specified period of time. In theory, at least, the legislative bar to subsequent action is absolute, subject to legislatively created exceptions . . . set forth in the statute of repose.") citing Calvin W. Corman, <u>Limitation of Actions</u>, § 1.1, 4-5 (1991).

14

1    who was previously a member of a putative class action brought within the period of

2    repose.  137 S. Ct. at 2047.  If the Supreme Court sought to reject the first-offered rule—

3    much less overrule a "vast majority" of lower court's adopting the first-offered rule, Stolz,

4    355 F.3d at 100—it would not have done so by vague reference in an inapposite case.

5        In short, in the absence of controlling Ninth Circuit or Supreme Court authority, the

6    court has discretion to choose the applicable rule for determining when § 77m's statute of

7    repose commences.  Because the first-offered rule is better reasoned than its last-offered

8    counterpart, the court adopts it as controlling here.

9              **b.    The First Offered Rule Does Not Bars Plaintiff's Federal**

10                     **Securities Claims**

11       Having decided the controlling rule for determining when the statute of repose

12   commences, the next issue is its application.  Based on the allegations and judicially

13   noticeable facts, the court concludes that defendants did not make their first bona fide

14   public offering of XRP before August 5, 2016 (three years prior to plaintiff's filing of his

15   federal securities claims in this action on August 5, 2019).

16       As a preliminary matter, defendants assert that "plaintiff must allege facts to show

17   compliance with Section 13 [Title 15 U.S.C. § 77m]."  Dkt. 70 at 16.  In support,

18   defendants cite Toombs v. Leone, 777 F.2d 465, 469 (9th Cir. 1985).  Plaintiff responds

19   that the Ninth Circuit in Johnson v. Aljian, 490 F.3d 778 (9th Cir. 2007) "criticized"

20   Toombs, "observed" that a plaintiff does not need to allege facts that negate a potentially

21   applicable affirmative defense to survive an attack on the pleadings, and "urged" courts to

22   discard such a requirement.  Dkt. 74 at 11 n.2.  Defendants fail to address plaintiff's

23   response in their reply.  Both parties overstate their respective authority.

24       Plaintiff is correct that the Ninth Circuit in Johnson subsequently criticized Toombs

25   and urged disregarding its requirement. Johnson v. Aljian, 490 F.3d 778, 782 (9th Cir.

26   2007) ("We followed such general rule in Toombs v. Leone, 777 F.2d 465 (9th Cir.1985),

27   holding that 'the plaintiff must affirmatively plead sufficient facts in his complaint to

28   demonstrate conformity with the statute of limitations' if he is to make out a violation of

United States District Court
Northern District of California

Section 12 of the Securities Act of 1933. . . . This rule has incurred forceful, and we think justified, criticism.").  However, Johnson does not stand for the proposition that "it is not the plaintiff's burden to negate an affirmative defense on the pleadings."  Rather, Johnson expressly recognized that Toombs' "disapproved pleading rule *may* survive in this circuit with respect to Section 12."  490 F.3d at 782 n.13 (emphasis added).

Contrary to defendants' suggestion, Toombs does not require that plaintiff allege facts showing compliance with § 77m's *statute of repose*.  Instead, Toombs requires only that a plaintiff alleging a §77l claim must plead compliance with § 77m's *statute of limitations*.  Toombs, 777 F.2d 465, 468 (9th Cir. 1985) ("In asserting a violation of Section 12, the plaintiff must affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations.").  Defendants failed to offer any authority in support of extending Toombs's pleading requirement to the statute of repose.

Given the Ninth Circuit's more recent criticism of that requirement in Johnson, the court concludes that plaintiff need not affirmatively allege that his federal securities claims comply with the statute of repose.  This conclusion is further supported by the general rule that a plaintiff need not anticipate or negate an affirmative defense in his or her pleadings.  Perry v. Merit Sys. Prot. Bd., 137 S. Ct. 1975, 1987 (2017) ("In civil litigation, a release is an affirmative defense to a plaintiff's claim for relief, not something the plaintiff must anticipate and negate in her pleading.").  The court now turns to whether plaintiff alleged sufficient facts showing a timely first bona fide public XRP offering.

In Stolz, the Second Circuit interpreted § 77m's "bona fide" public offering requirement to mean "when was the stock really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering."  Id. at 99.  The Second Circuit emphasized that the phrase "bona fide" qualified "public," rather than "first," offering to the public, id. citing Louis Loss & Joel Seligman, Securities Regulation § 2–B–6, n.285 (3d ed.1996), and passingly footnoted that courts may find a first bona fide offer based upon a defendant's "clear objective attempts to secure purchasers," id. at 104 n.7.  Aside from the above, the Second Circuit offered no explanation about what sort of offers may

qualify as "bona fide" public offers and its application of the bona fide offer standard provides no insight. 355 F.3d at 95, 106 (concluding that defendant "bona fide offered to the public the security at issue . . . in July 1997" based upon the allegation "in paragraph 16 that beginning in or about July 1997 and continuously through the bankruptcy filing.").

Here, based on plaintiff's complaint and the judicially noticeable facts proffered, the court cannot conclude that defendants' first bona fide public offer to sell XRP occurred before August 5, 2016. While defendants did acknowledge various 2013 offers and sales in their May 2015 settlement with the USAO, the sales activity identified in that settlement does not show that defendants targeted the general public when offering to sell XRP. Instead, the activity identified in that agreement either shows that defendants attempted or consummated particular transactions with specific third-party individuals or entities, Dkt. 70-3 ¶¶ 23, 26(a), 28(a), 28(c), or generally refers to the existence of defendants' sales activity without defining the scope of the market for such sales, id. ¶¶ 17, 20.

Similarly, the complaint's reference to an unexecuted agreement between defendants and a third-party vendor in 2016, Compl. ¶ 104, is no different than the handful of person-specific transactions noted in defendants' May 2015 settlement. Moreover, the limited nature of defendants' pre-settlement agreement sales activity is further shown by the settlement's description of defendant XRP II as "created to engage in the sale and transfer of the convertible virtual currency, XRP, to various third parties **on a wholesale basis**." Dkt. 70-3 ¶ 22 (emphasis added).

At oral argument, defendants reiterated that plaintiff, by his own pleading, admitted the public nature of their pre-2017 sales. To support that assertion, defendants cite paragraph 25 of the complaint, which alleges that defendants "acknowledged that they sold XRP to the general public," Dkt. 70 at 17, and the heading to Section IV of the complaint, which is titled "XRP Genesis and Public Offerings," Dkt. 70 at 17. Plaintiff's counsel then fell on that sword, acknowledging that the term "general" in paragraph 25 is mistaken and representing that the purpose of that paragraph was to summarize the

handful of transactions detailed in the May 2015 settlement.

While the court agrees with defendants that plaintiff's own apparently mistaken characterization of defendants' pre-May 2015 sales activities as involving the "general public" tend to belie his subsequent assertion that such activities did not qualify as a bona fide public offering, the court finds that plaintiff's aberrational use of the terms "public offering" and "general public" are the sort of conclusory labels that it need not accept as true on a motion to dismiss.  Heimrich v. Dep't of the Army, 947 F.3d 574, 577 (9th Cir. 2020) ("The complaint 'does not need detailed factual allegations,' but the plaintiff must provide more than 'labels and conclusions' to withstand scrutiny under Rule 12(b)(6).").  Instead, the court examines the substance of the actual sales activity alleged and judicially noticeable.  Based on that examination, the court cannot conclude that defendants made their first bona fide public offer before August 5, 2016.

Such conclusion is separately supported by the substantial volume of XRP sales that allegedly occurred *after* August 5, 2016.  Significantly, the first date alleged detailing when defendants listed XRP on a cryptocurrency exchange is May 18, 2017.  Compl. ¶ 44.  Around this same time, individuals purchased $31 million worth of XRP, comprising $21 million in sales to "market participants" directly and $10 million in exchange sales. Id. ¶ 39.  From 2017 Q2 onward, purchases by direct market participants, exchange participants, programmatic participants, and institutions rose from tens of millions to over $250 million quarterly.  Id. ¶¶ 31-39.  Such volumes of sales are greater than the handful of one-off multi-thousand-dollar transactions and $1.3 million in monthly sales detailed in the May 2015 settlement.  Such a material change supports the inference that the defendants did not make their first genuine attempt to sell to the public until 2017.

Lastly, at oral argument, defendants contended that the court could find a bona fide public offer prior to the May 2015 settlement agreement based upon the fact that the government investigated and prosecuted defendants for sales-related activities prior to such agreement.  Defendants failed to proffer any authority in support of such a categorical position and, in any event, the May 2015 settlement agreement—which

18

1    ***defendants*** requested this court take judicial notice of—speaks for itself.  Already

2    discussed at length above, that agreement specifies only a handful of individualized

3    transactions and does not describe the culpable sales activities as public in nature.

4        The court cautions that, once the parties have developed a factual record, it may

5    revisit its determination on whether defendant made their first bona fide XRP offer to the

6    public before or after August 5, 2016.  However, based upon the allegations and judicially

7    noticeable facts properly before this court on this motion, the court cannot find that such

8    offer occurred outside the three-year statute of repose.[4]  As a result, the court concludes

9    that § 77m does not bar plaintiff's federal securities claims at this juncture.[5]

10       **2.    Plaintiff Adequately Alleged the Federal Securities Claim Against**

11           **Defendants**

12       Title 15 U.S.C § 77l(a)(1) provides the following in relevant part:

13           "Any person who—

14           **(1)** offers or sells a security in violation of section 77e of this
                 title, or

15

16           **. . .**

17           shall be liable, subject to subsection (b), to the person
             purchasing such security from him . . ." 15 U.S.C § 77l(a)(1).

18       Title 15 U.S.C § 77e(a)(1) provides the following:

19           "Unless a registration statement is in effect as to a security, it
             shall be unlawful for any person, directly or indirectly—

20

21           . . .

22           **(1)** to make use of any means or instruments of transportation
                 or communication in interstate commerce or of the mails to sell

23

---

24   [4] Even if <u>Toombs</u> required plaintiff to include allegations negating the statute of repose's
     application here, defendants' two-line challenge on this issue fails to explain how
25   plaintiff's allegations of increased sales activities starting in 2017, Compl. ¶¶ 5, 30-39, 45,
     128, does not satisfy such obligation.
26   [5] Because the court cannot conclude that the allegations support finding a bona fide
     public offer before August 5, 2016, it need not determine whether defendants' sale of
27   XRP qualified as multiple separate offerings, Dkt. 74 at 12-15, as opposed to a so-called
     "slow offer" of the same security over a prolonged period, Dkt. 70 at 19, whether applying
28   the statute of repose here would be inequitable, Dkt. 74 at 16-17, or whether his
     complaint relates back to the <u>Coffey</u> action, <u>id.</u> at 17 n.7.

United States District Court
Northern District of California

such security through the use or medium of any prospectus or otherwise;" 15 U.S.C. § 77e.

Here, defendants argue that plaintiff failed to state a claim under § 77l(a)(1) on the following two grounds: (1) he failed to allege that he purchased his XRP as part of an "initial distribution"; and (2) he failed to allege that defendants qualify as "sellers" within the meaning of that section. The court analyzes each challenge in turn.

### a. Title 15 U.S.C § 77l(a)(1) Does Not Require Plaintiff to Have Purchased His XRP in an "Initial Distribution"

Here, defendants contend that, to state a claim under § 77l(a)(1), plaintiff must allege that he purchased his XRP as part of an "initial distribution" of stock, as opposed to on the "secondary open market." Dkt. 70 at 20. In support of that contention, defendants primarily rely upon Gustafson v. Alloyd Co., 513 U.S. 561 (1995).

In Gustafson, the Supreme Court interpreted the scope of the term "prospectus" as used in Title 15 U.S.C. § 77l(a)(2). Gustafson, 513 U.S. at 564 ("Under § 12(2) of the Securities Act of 1933 buyers have an express cause of action for rescission against sellers who make material misstatements or omissions 'by means of a prospectus.' The question presented is whether this right of rescission extends to a private, secondary transaction, on the theory that recitations in the purchase agreement are part of a 'prospectus.'"). It held that that term "refer[s] to a document that describes a public offering of securities by an issuer or controlling shareholder." Id. at 584. While Gustafson might suggest that claims under § 77l(a)(2) are limited to misrepresentations made only in connection with initial distributions of securities, id. at 573 ("[plaintiff purchaser], as well as Justice THOMAS in his dissent, respond that if Congress had intended § 12(2) to govern only initial public offerings, it would have been simple for Congress to have referred to the § 4 exemptions in § 12(2)"), such suggestion is unclear and, in any event, would be limited to the § 77l(a)(2) claims at issue there.

In support of their proffered position, defendants further rely upon Gustafson's citation to another Supreme Court case, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). Contrary to defendants' characterization of that citation, the Supreme

20

Court in <u>Gustafson</u> did not cite <u>Blue Chip Stamps</u> "for [the] proposition that [the] Securities Act extends **only** to 'initial distributions of newly issued stock from corporate issuers.'" Dkt. 75 at 13 (emphasis added). Instead, the Supreme Court in <u>Gustafson</u> cited <u>Blue Chips Stamps</u> for the following proposition:

> "The primary innovation of the 1933 Act was the creation of federal duties—for the most part, registration and disclosure obligations—in connection with public offerings. <u>See, e.g.,</u> . . . <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 752, 95 S.Ct. 1917, 1933, 44 L.Ed.2d 539 (1975) ("The 1933 Act is a far narrower statute [than the Securities Exchange Act of 1934 (1934 Act)] chiefly concerned with disclosure and fraud in connection with offerings of securities—***primarily, as here,*** initial distributions of newly issued stock from corporate issuers")." <u>Gustafson</u>, 513 U.S. at 571-72 (emphasis added) (brackets in the original).

Given that "primary" is less restrictive than "only," defendants' position—again—overreaches. As a result, defendants' reliance upon <u>Gustafson</u> is misplaced.

Such mistake is further shown by the text of § 77l(a)(1) and its incorporated reference to § 77e. Unlike § 77l(a)(2), which applies to certain sale of securities "by means of prospectus or oral communication," § 77e(a)(1) prohibits the sale of an unregistered security "through the use or medium of any prospectus **or otherwise**." 15 U.S.C. § 77e(a)(1) (emphasis added). Because subsection (a)(1) provides a broader basis for assigning liability than its subsection (a)(2) counterpart, the court further rejects defendants' position and concludes that it may consider a § 77l(a)(1) claim premised upon a purchase outside the initial distribution context. Given the above, plaintiff's § 77l(a)(1) claim does not fail for want of purchasing his XRP in an initial distribution.

### b. Plaintiff Has Alleged that Defendants Qualify as "Sellers" for Purpose of His Federal Securities Claims

Next, while the parties agree that a "seller" within the meaning of § 77l(a)(1) extends to a person who either (1) passes title of the security to the buyer or (2) solicits the purchase with a self-interested financial motive, Dkt. 70 at 22; Dkt. 74 at 18-19 (both citing <u>Pinter v. Dahl</u>, 486 U.S. 622, 641-42 (1988)), they disagree about such standard's

1   application to defendants.[6]  With respect to showing seller status under a solicitation

2   theory, courts acknowledge that "any person who engaged in steps necessary to the

3   distribution of the unregistered security is liable."  Balestra v. ATBCOIN LLC, 380 F.

4   Supp. 3d 340, 357-58 (S.D.N.Y. 2019).

5          Here, plaintiff argues that defendants respectively qualify as "sellers" under the

6   solicitation theory.  Significantly, plaintiff alleges that defendants systematically marketed

7   XRP and financially benefited from such efforts.  On the latter point, plaintiff alleges that

8   from early 2017 to 2018 alone, defendants "have earned over $1.1 billion through the

9   sale of XRP."  Compl. ¶ 30.  On the former point, plaintiff alleges that defendants

10  published various tweets, interviews, and articles pushing the adoption of XRP, id. ¶¶ 44,

11  45, 48-52, hosted conferences concerning XRP's use, id. ¶ 46, explained on its website

12  how to purchase XRP and included a link to cryptocurrency exchanges for such

13  purchases, id. ¶ 43, and even began to lobby Congress and the SEC to adopt

14  cryptocurrency friendly laws, id. ¶ 54.  Such alleged efforts by defendants, if proven, are

15  more than sufficient to establish their status as sellers under a solicitation theory.

16  Balestra, 380 F. Supp. 3d at 358 ("These promotional statements trumpeting the potential

17  of the ATB Coin and the ongoing opportunity to invest in the ATB ICO [initial coin offering]

18  . . . clearly reflect both [defendants'] efforts to solicit the sale of ATB Coins. . . . I therefore

19  conclude that the allegations set forth in the Complaint plausibly allege that both

20  [defendants] engaged in steps necessary to the distribution of the unregistered security . .

21  ."). Given that, plaintiff alleges sufficient facts that defendants qualify as sellers for

22  _____

23  [6] In their reply, defendants cite a footnote from Pinter stating that "§ 12(1) imposes liability
    on only the buyer's immediate seller; remote purchasers are precluded from bringing
24  actions against remote sellers. Thus, a buyer cannot recover against his seller's seller."
    Dkt. 75 at 16 citing Pinter, 486 U.S. at 644 n.21.  Defendant failed to explain how this
25  statement (tucked away in a footnote to a section discussing which sellers may be held
    liable for passing title to a security) limits its recognition that a person may separately be
26  found liable under a solicitation theory.  Id. at 644 ("The [actual purchase of a security]
    requirement, however, does not exclude solicitation from the category of activities that
27  may render a person liable after a sale has taken place.").  Without more, the court
    rejects any suggestion that defendants may not be held liable under a solicitation theory
28  because they are remote sellers.

purpose of plaintiff's § 77l(a)(1) claim.  As a result, plaintiff sufficiently alleged his §

77l(a)(1) claims against defendants.

        **c.**      **Plaintiff Adequately Alleged a Title 15 U.S.C. § 77o Claim**

                     **Against Defendant Ripple and Defendant Garlinghouse**

Title 15 U.S.C. § 77o provides the following:

> "Every person who, by or through stock ownership, agency, or
> otherwise, or who, pursuant to or in connection with an
> agreement or understanding with one or more other persons by
> or through stock ownership, agency, or otherwise, controls any
> person liable under sections 77k or 77l of this title, shall also be
> liable jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled
> person is liable, unless the controlling person had no
> knowledge of or reasonable ground to believe in the existence
> of the facts by reason of which the liability of the controlled
> person is alleged to exist." 15 U.S.C. § 77o(a).

"To establish a prima facie case of control-person liability, a plaintiff must prove a

primary violation of the federal securities laws, and that the defendant exercised actual

power or control over the primary violator." In re Harmonic, Inc., Sec. Litig., 2006 WL

3591148, at *5 (N.D. Cal. Dec. 11, 2006).  "Control means the 'possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a

person, whether through the ownership of voting securities, by contract, or otherwise.'"

Maine State Ret. Sys. v. Countrywide Fin. Corp., 2011 WL 4389689, at *12 (C.D. Cal.

May 5, 2011).

      Here, plaintiff alleges that defendant Ripple and defendant Garlinghouse "directly

or indirectly controlled the primary violator," defendant XRP II.  Compl. ¶¶ 14-16, 177-83.

Defendants do not dispute that such allegations suffice to establish control person liability

under § 77o.  Dkt. 70 at 24-25 (focusing their single paragraph analysis on defendant

Garlinghouse's control person liability on only plaintiff's purported failure to state a

primary violation); Dkt. 75 at 16 (contending only that plaintiff does not dispute that the

statute of repose equally applies to this claim as well, and that "this claim is derivative of

and dependent on his Section 12(a)(1) claim.").  Because plaintiff has stated an

actionable claim for a primary violation of §77l(a)(1) and defendants failed to challenge

the viability of plaintiff's allegations that defendant Garlinghouse controlled such

defendants, the court concludes that plaintiff adequately alleged his § 77o claims against

defendant Ripple and defendant Garlinghouse.

**3. Plaintiff Adequately Alleged Unqualified Securities Claims under California Corporations Code §§ 25110, 25503, and 25504**

**a. Plaintiff Alleged a Claim under California Corporations Code § 25503 for Violation of § 25110's Qualified Securities Requirement**

"Among other things, the [California Securities Law of 1968] Act prohibits the sale

of securities in an issuer transaction unless the sale has been 'qualified' in accordance

with statutory requirements." Apollo Capital Fund, LLC v. Roth Capital Partners, LLC,

158 Cal. App. 4th 226, 249 (2007) (citing California Corporations Code § 25110). § 25110

makes it "unlawful for any person to offer or sell in this state any security in an issuer

transaction . . . whether or not by or through underwriters," unless such sale satisfies

certain qualifications (which defendants here do not contest). Cal. Corp. Code § 25110.

California Corporations Code § 25503 further provides the following:

> "[a]ny person who violates Section 25110 . . . shall be liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate . . . or for damages, if he no longer owns the security, or if the consideration given for the security is not capable of being returned." Cal. Corp. Code § 25503.

Here, defendants argue that plaintiff failed to state a claim for violation of § 25110

on the following three grounds: (1) he failed to allege that he purchased his XRP as part

of an "issuer transaction"; (2) he failed to allege that he purchased his XRP from

defendants, in satisfaction of § 25503's purported privity requirement; and (3) he failed to

allege that defendants offered or sold XRP in California. The court analyzes each in turn.

### i. Plaintiff Has Adequately Alleged an "Issuer Transaction" for Purpose of His California Corporations Code § 25503 Claim

Here, defendants argue that § 25110 requires that plaintiff purchase the subject security from defendants directly as part of an "issuer transaction," which, they contend, "are sales of securities purchased from the issuing corporation in a public offering." Dkt. 70 at 25. In support of their position, defendants primarily rely upon Mirkin v. Wasserman, 5 Cal. 4th 1082, 1104 (1993) and California Corporation Code § 25011.

In Mirkin, the California Supreme Court implied a distinction between an "issuer transaction" under § 25110 and certain "aftermarket transactions," which it generally defined as "resales of securities after they have been purchased from the issuing corporation in a public offering." Mirkin, 5 Cal. 4th at 1104. Although the California Supreme Court subsequently characterized its discussion in Mirkin about the California Corporation Code as dicta,[7] the court in Mirkin noted that § 25110 is limited to the sale of unqualified securities made as part of an "issuer transaction." Mirkin, 5 Cal. 4th at 1104 (citing § 25110 for the proposition that "the Legislature knew how to write a statute that addressed *only issuer transactions* when that was what it intended to do.") (emphasis added). Based on Mirkin's dicta, then, defendants are correct that, to state a claim under § 25110, a plaintiff must have purchased his security as part of an "issuer transaction."

However, the question remains whether plaintiff's alleged subsequent purchases on an exchange that defendants sold to nonetheless qualifies as an "issuer transaction" for purpose of stating a claim for violation of § 25011. Significantly, § 25011 provides the following in its entirety:

> "'Nonissuer transaction' means any transaction not directly or indirectly for the benefit of the issuer. A transaction is indirectly

_____

[7] Diamond Multimedia Sys., Inc. v. Superior Court, 19 Cal. 4th 1036, 1044–45 (1999) ("Mirkin is not dispositive, however, as the quoted statement was dictum and was not made with reference to the place at which a section 25500 plaintiff bought or sold stock. . . . Liability under [California Corp. Code] sections 25400 and 25500 was not in issue.").

> for the benefit of the issuer if any portion of the purchase price of any securities involved in the transaction will be received indirectly by the issuer. ***An offering which involves both an issuer transaction and a nonissuer transaction shall be treated for the purposes of Chapters 2 (commencing with Section 25110)*** and 4 (commencing with Section 25130) of Part 2 of this division ***as an issuer transaction***, but for the purposes of Chapter 1 (commencing with Section 25100) of Part 2 of this division they shall be treated as separate transactions." Cal. Corp. Code § 25011 (emphasis added).

Plaintiff's § 25503 claim arises under § 25110, which is codified at California Corporations Code Chapter 2, Part 2 of Division 1. As a result, § 25011 definition of "issuer transaction" applies. Defendants do not contest that their decision to initially list XRP on an exchange would qualify as an offering that, under their own proffered definition of an issuer transaction (Dkt. 70 at 25), gives rise to a qualifying transaction. Plainly, the purpose of listing XRP on an exchange is for market participants (like plaintiff) to then purchase such XRP. Absent such subsequent purchases, defendants' listings would fail. Whether such subsequent purchases qualify as an "issuer transaction" (under defendants' proffered definition) or instead fall outside that definition as "nonissuer" transactions is therefore beside the point here: because defendants' XRP exchange listings depended upon subsequent third-party purchases, it necessarily "involved" such transactions. As a result, any purchase of XRP by plaintiff on an exchange qualifies as an issuer transaction under § 25011 and, therefore, for purpose of his § 25503 claim.

### ii.     Plaintiff Adequately Alleged Privity with Defendants

Next, defendants contend that § 25110 includes a privity requirement and that plaintiff failed to allege facts satisfying such requirement. While the court agrees that, to state a claim under § 25503 for violation of § 25110, plaintiff must allege privity with defendants, the court concludes that plaintiff satisfied that requirement.

California Corporations Code § 25503 provides the following in relevant part:

> "Any person who violates Section 25110 . . . shall be liable to any person acquiring from him the security sold in violation of such section . . ." Cal. Corp. Code § 25503 (emphasis added).

To support their interpretation of this section, defendants primarily rely upon Bowden v. Robinson, 67 Cal. App. 3d 705 (1977). The court in Bowden interpreted §

United States District Court
Northern District of California

25503 and § 25110 to "create liability affording the **immediate purchaser** several specific remedies." 67 Cal. App. 3d at 712 (emphasis added). The court in <u>Bowden</u> explained that "[t]he Legislature, in section 25503, by the words 'any person acquiring from him' has required privity, with some exceptions, as a condition of recovery." <u>Id.</u>

      To support his competing interpretation, plaintiff primarily relies upon <u>Moss v. Kroner</u>, 197 Cal. App. 4th 860 (2011), which, according to plaintiff, stands for the proposition that whether privity is required depends upon which remedy is available against the primary violator of the statute. Dkt. 74 at 24. Contrary to plaintiff's suggestion, the court in <u>Moss</u> did not consider the privity requirement for primary liability claims pursuant to § 25503. Instead, the court in <u>Moss</u> considered whether California Corporation Code's **secondary liability** sections (§ 25504 and §25504.1) required privity between plaintiff and secondary violators. <u>Moss</u>, 197 Cal. App. 4th at 871-72. While the court in <u>Moss</u> recognized that privity is not required to recover damages against a defendant on a secondary liability theory under § 25504 and § 25504.1, it acknowledged that, to state a primary violation claim under § 25503, plaintiff must show privity with the primary violator. <u>Moss</u>, 197 Cal. App. 4th at 878 ("While we agree . . . that ordinary principles of rescission require strict privity in order to rescind contracts . . . we conclude that the Legislature, when it enacted sections 25504 and 25504.1, intended to depart from those principles by placing these certain secondary actors in the shoes of the principal violator for the purpose of civil liability **as long as the original direct violator was in privity with the plaintiff**.") (emphasis added).

      Plaintiff's remaining authority (<u>Openwave Systems, Inc. v. Fuld</u>, 2009 WL 1622164 (N.D. Cal. June 6, 2009)) similarly does not consider privity in the context of primary liability claims brought under § 25503. <u>Id.</u> at *5-9. Based on <u>Bowden</u>, the court concludes that plaintiff must allege privity to state a claim under § 25503.

      The court finds that plaintiff plausibly alleged that he purchased his XRP from defendants for purpose of stating a primary violation claim under § 25503. As an initial matter, plaintiff alleges that he, along with members of the putative class, "purchased

XRP securities from defendants." Compl. ¶¶ 172, 187. While the court recognizes that the above allegations do not specify a direct purchase, they also do not foreclose any inference of such purchase. Significantly, as plaintiff pointed out at oral arguments its 129,000 XRP unit purchase during 2018 Q1, when compared to defendants sale of 0.095 percent of the XRP traded on the market that quarter, supports the inference that plaintiff purchased approximately 122 XRP units from defendant (or approximately 19 XRP units, discounting for plaintiff's two week trading period and reasonably assuming uniform distribution of sale by defendant during that period).

This conclusion is further supported by the more glaring (but largely unaddressed) issue presented by this claim—namely, to what extent may defendants be considered in privity with an exchange purchaser when a subsequent purchase qualifies as part of an issuer transaction under § 25011. In any event, at this stage in the litigation, where the court may draw reasonable inferences and the relationship between defendants, subsequent purchasers, and the exchange is unclear, the court concludes that plaintiff has adequately alleged privity in support of his § 25503 claim, though he may ultimately be unable to prove it.

### iii. Plaintiff Adequately Alleged that Defendants Offered the Subject Securities in California

To state a claim premised upon a violation of § 25110, a plaintiff must allege that the subject securities were offered or sold in California. Diamond Multimedia Sys., Inc., 19 Cal. 4th at 1053. California Corporations Code § 25008(a) provides that an offer or sale of a security is made in California under any of the following conditions:

- When an offer to sell is made in this state;
- When an offer to buy is accepted in this state; or
- If both the seller and purchaser are domiciled in this state, the security is delivered to the purchaser in this state. Cal. Corp. Code § 25008(a).

The California Supreme Court has acknowledged that an advertisement may qualify as an offer if it "invite[s] the performance of a specific act without further

United States District Court
Northern District of California

communication and leave nothing for negotiation." Donovan v. RRL Corp., 26 Cal. 4th 261, 271 (2001), as modified (Sept. 12, 2001).

Here, plaintiff adequately alleged that defendants offered to sell XRP in California. Significantly, plaintiff alleges that defendant Ripple "has an entire section of its website dedicated to providing advice on 'How to Buy XRP,'" and that such section "provides links to exchanges and instructions on 'how to buy XRP' on those exchanges," Compl. ¶¶ 43, 135. The court concludes that this information qualifies as an offer via advertisement because the link invites the performance of a specific act (the purchase of XRP on an exchange) without any further communication (because the guide explains how to complete the purchase). Given the nature of exchanges, the court may reasonably infer that the conversion rate (e.g., USD to XRP) is set by the market and therefore not subject to particularized negotiation. Such inference is further supported by the "fungible" (i.e., interchangeable or non-unique) nature of each XRP unit exchanged. Further, because defendant Ripple allegedly posted the guide and hyperlink on its website, the court may reasonably infer that such materials were accessible to individuals in this state. As a result, plaintiff has adequately alleged that defendants offered the subject unregistered securities "in this state" for purpose of his § 25503 claim.[8]

**b.** **Plaintiff Adequately Alleged California Corporate Code § 25504 Control Person Liability Claims against Defendant Ripple and Defendant Garlinghouse for Violation of § 25110**

California Corporations Code § 25504 provides the following:

> "Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the

---

[8] Defendants also fail to provide any authority interpreting Code § 25110's "in this state" requirement to apply to only an offer or sale of a security purchased *by plaintiff* (as opposed to similar such securities sold/offered to other third parties in California more generally). Given that failure, defendants' suggestion that such requirement applies, Dkt. 70 at 26, does not alter this conclusion.

violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist." Cal. Corp. Code § 25504.

This section "imposes 'control person' liability on those who assist others in primary violations under the California Securities Act." Jackson v. Fischer, 931 F. Supp. 2d 1049, 1064 (N.D. Cal. 2013). "[I]n the absence of a viable claim of primary liability, plaintiff cannot state a claim against the D & O defendants for control person liability under § 25504." Id. at 1064.

Here, defendants contend only that "[b]ecause Plaintiff's unqualified securities claim fails, his control person liability claim also fails." Dkt. 70 at 27. Defendants do not contest that plaintiff's allegations that defendant Ripple and defendant Garlinghouse "directly or indirectly controlled the primary violator" defendant XRP II, Compl. ¶¶ 14-16, 177-83, suffice to establish control person liability. As analyzed above, plaintiff alleged a primary liability claim under § 25503 for violation of § 25110. As a result, plaintiff has alleged control person liability claims under § 25504 against defendant Ripple and defendant Garlinghouse for violation of § 25110.

## 4. Plaintiff Failed to Allege Misrepresentation Claims Against Defendants under California Corporations Code §§ 25401, 25501, and 25504.1

### a. Plaintiff Failed to Allege a California Corporations Code § 25501 Claim for Violation of § 25401

California Corporations Code § 25401 makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Cal. Corp. § 25401. In relevant part, California Corporations Code § 25501 provides the following:

"Any person who violates Section 25401 shall be liable to the

30

> person who purchases a security from him or sells a security to him . . . unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission." Cal. Corp. Code § 25501.

Here, defendants argue that plaintiff failed to state a claim for violation of California Corporations Code § 25401 on the following four grounds: (1) he failed to allege that he purchased his XRP from defendants directly, in satisfaction of § 25501's purported privity requirement; (2) he failed to allege that defendants offered or sold XRP in California; (3) he failed to allege that the misstatements complained of were directed at plaintiff; and (4) he failed to allege any misstatement by defendants with the requisite specificity.

Because the court has already disposed of defendants first and second challenges in its analysis above concerning the viability of plaintiff's § 25503 claim, the court analyzes only defendants' third and fourth challenges.

### i. California Corporations Code § 25401 Does Not Require that a Defendant Direct Its Purported Misstatement to Plaintiff to Be Actionable

In support of their position, defendants primarily rely upon SIC Metals, Inc. v. Hyundai Steel Co., 2018 WL 6842958 (C.D. Cal. Nov. 14, 2018), which, they claim, "rejected a Section 25401 claim where the plaintiffs 'failed to allege any facts that indicate [defendant] made a false or misleading statement to Plaintiffs when negotiating the purchase of . . . stock' from them." Dkt. 75 at 18. The court in SIC Metals, Inc. offers no reasoning in support of limiting actionable statements to those made expressly to a plaintiff in his or her particular purchase of securities. 2018 WL 6842958 at *5.

In support of their position to the contrary, plaintiff primarily relies upon Mausner v. Marketbyte LLC, 2013 WL 12073832, at *10 (S.D. Cal. Jan. 4, 2013), for the proposition that "[t]o adequately plead that Defendants' misrepresentations and omissions were made 'in connection with the purchase or sale of a security,' Plaintiff must plead facts demonstrating that the statements or omissions 'coincided' with the purchase or sale." Dkt. 74 at 27. This proposition is uncontroversial and does not address the critical issue

31

of whether the challenged statement must target plaintiff specifically.

In the absence of any controlling circuit authority, the court concludes that § 25401 does not require that a defendant direct the alleged misstatement to the complaining plaintiff. The text of that section does not include any such requirement. Indeed, when construing that section, the court in Apollo Capital read-in the phrase "in connection with the purchase or sale of securities" without any citation or reason in support. 158 Cal. App. at 249. Absent justification, the court refuses to further tighten the requirements to state a claim under that section. As a result, plaintiff's § 25501 and § 25504.1 claims survive defendants' third challenge.

### ii. Plaintiff Failed to Adequately Allege an Actionable Misstatement under Rule 9(b)

As a preliminary matter, plaintiff suggests that Rule 9(b) does not necessarily apply to his claims for violation of § 25401 because they might sound in negligence (as opposed to fraud). Dkt. 74 at 27. Plaintiff fails to develop that potential distinction. In any event, because Rule 9(b) applies to negligent misrepresentation claims,[9] plaintiff's underdeveloped suggestion to the contrary is misplaced. As a result, the court applies Rule 9(b) to plaintiff's § 25501 and § 25504.1 claims for violation of § 25401.

Here, plaintiff failed to satisfy Rule 9(b)'s heightened pleading standards with respect to defendants' allegedly fraudulent misstatements. To satisfy such showing, plaintiff relies upon the following sets of allegations. The court analyzes each below.

*First* – "Ripple claims that XRP has utility—like currency—in its use as a 'bridge currency' for international payments. But, as discussed above, more than 60 percent of XRP is owned by Ripple and none of that XRP is used for anything at all, other than to be sold in the future to investors. Moreover, as for the XRP that was already sold or otherwise distributed by Defendants, the vast majority of it is not used for bridging

---

[9] Atl. Richfield Co. v. Ramirez, 176 F.3d 481 (9th Cir. 1999) ("The district court also properly dismissed [defendant counter-claimant's] first and second counterclaims, for fraud **and negligent misrepresentation respectively**, because they did not comply with Federal Rule of Civil Procedure 9(b)'s particularity requirement.") (emphasis added).

United States District Court
Northern District of California

1   international transactions, but for investment purpose. Accordingly, Defendants' claim

2   that XRP has a utilitarian purpose is nothing but a red herring attempt to avoid the

3   application of securities laws." Compl. ¶ 41.

4          Here, plaintiff fails to specify (1) who among defendants' employees made the

5   statement, (2) when it was made, (3) where it was made, and (4) how it was

6   communicated.  As a result, the misstatement alleged above fails Rule 9(b).

7          ***Second*** – "Similarly, on or about December 21, 2017, Ripple tweeted in Japanese

8   that XRP was now available on over 50 exchanges. That tweet linked to an article on

9   Ripple's website which described XRP as 'the fastest and most scalable [digital] asset on

10  the market.' It continued, '[t]he market is taking notice of XRP's speed, reliability and

11  scalability — which has strengthened the demand for XRP and where it's listed. In fact,

12  we're proud to announce that XRP has gone from being listed on six exchanges earlier

13  this year to more than 50 worldwide.' The article also linked to a number of exchanges

14  where XRP could be purchased, and stated that 'XRP's long-term value is determined by

15  its utility—including its ability to help financial institutions source liquidity for payments

16  into and out of emerging markets.'" Id. ¶ 45.

17         Here, plaintiff fails to explain how or why the above statement is false.  As a result,

18  the misstatement alleged above fails Rule 9(b).

19         ***Third*** – "Ripple's CEO, Brad Garlinghouse, has also been a vocal advocate for

20  investing in XRP. In a December 14, 2017 interview with BNN, when asked if he is

21  personally invested in XRP, the CEO stated 'I'm long XRP, I'm very, very long XRP as a

22  percentage of my personal balance sheet.' He continued, stating that he is 'not long on

23  some of the other [digital] assets, because it is not clear to me what's the real utility, what

24  problem are they really solving.' He ended by reiterating, 'if you're solving a real problem,

25  if it's a scaled problem, then I think you have a huge opportunity to continue to grow that.

26  We have been really fortunate obviously, ***I remain very, very, very long XRP***, there is

27  an expression in the industry HODL, instead of hold, it's HODL . . . I'm on the HODL

28  side.'" (emphasis in the original). Id. ¶ 49.

United States District Court
Northern District of California

1  Here, plaintiff fails to explain how or why the above statement is false.  As a result,

2  the misstatement alleged above fails Rule 9(b).

3  **Fourth** – "52. On or about January 17, 2018, Garlinghouse tweeted a CNBC

4  article titled, "*Ripple is sitting on close to $80 billion and could cash out hundreds of*

5  *millions per month – but it isn't*," with the caption, "A good read on why fostering a healthy

6  $XRP ecosystem is a top priority at @Ripple." . . . 53. However, the reality was that

7  Ripple was doing exactly the opposite of what CNBC reported. As laid out in Section

8  IV(B), Defendants issued and sold at least $167.7 million worth of XRP between January

9  1, 2018 and March 31, 2018."  Id. ¶¶ 52-53.

10  Here, plaintiff fails to explain how or why the alleged caption and accompanying

11  statements tweeted by defendant Garlinghouse are false.  Plaintiff's allegation that

12  "defendants issued and sold at least $167.7 million worth of XRP" during 2018 Q1 is not

13  necessarily inconsistent with (1) cashing-out **hundreds of millions per month** ($167

14  million quarterly divided by three months equals appx. $56 million per month) or (2)

15  fostering a healthy XRP ecosystem.  Relatedly, paragraph 53's cross-reference to

16  Section IV(B) does not alter that conclusion.  Significantly, that section, at paragraph 36,

17  merely provides the figures for the $167.7 million in alleged sales during 2018 Q1.

18  Compl. ¶ 36.  As a result, the misstatement alleged above fails Rule 9(b).

19  **Fifth** – "On April 26, 2017, Ripple tweeted a link to an article on its own site,

20  proclaiming: '#Ripple welcomes 10 additional customers to our #blockchain #payments

21  network.' Neither this tweet nor the article it linked to informed readers that the blockchain

22  payments network did not refer to the XRP Ledger, but rather Ripple's xCurrent

23  enterprise solution." Id. ¶ 62.

24  Here, plaintiff fails to explain how or why defendants' purported failure to specify

25  that the referenced network related to the enterprise solution creates an improper

26  impression that such solution is the same as XRP.  Defendants raise this exact argument

27  in their motion, Dkt. 70 at 30, and plaintiff offers no response, Dkt. 74 at 27-28.  As a

28  result, the misstatement alleged above fails Rule 9(b).

*Sixth* – Various statements (mostly tweets) by defendants on specified dates concerning public interest in XRP (Compl. ¶ 63), advantages over Bitcoin (id. ¶ 64), the growth and potential value of XRP (id. ¶¶ 65-66), the future use of XRP by American Express, the Japan Bank Consortium, as well as other "banks and payment providers" (id. ¶¶ 67, 68, 73), how XRP is more than "bank software" (id. ¶ 74), a partnership with MoneyGram (id. ¶¶ 102-103), defendants' intent to develop the infrastructure necessary for banks to directly use XRP (id. ¶ 102), and how XRP's value depends upon the XRP Ledger's use for cross-border payments as well as its adoption by enterprises (id. ¶ 149).

Again, plaintiff fails to explain how or why any of the misstatements alleged in the above paragraphs are false. In their motion, defendants challenged the sufficiency of various of these alleged misstatements. Dkt. 70 at 31. Plaintiff failed to respond to such challenges. Dkt. 74 at 27-28. As a result, the misstatements alleged at paragraphs 63-68, 70, 73-74, 102-03, and 149 all fail Rule 9(b).

*Seventh* – "95. Defendants made numerous statements to the public falsely claiming XRP is not a security to prop up demand and its value. . . . 96. For example, on approximately April 11, 2018, Ripple's Chief Market Strategist, Cory Johnson, told CNBC: 'We absolutely are not a security. We don't meet the standards for what a security is based on the history of court law.' Mr. Johnson also said, 'Coinbase never ever raised the issue of whether or not XRP is a security in our discussions about listing XRP. We're 100 percent clear, it's not a security. We don't meet the standards.' . . . 97. Ripple's CEO Garlinghouse made similar comments, claiming XRP is not a security, to the public through a variety of avenues and media channels, including at the CB Insights Future of Fintech, live-streamed by Yahoo Finance." Id. ¶¶ 95-97.

Here, a statement that XRP does not qualify as a "security" is a position on a legal question, ***not*** an actionable misstatement. Indeed, the rest of the statement alleged at paragraph 96 ("We don't meet the standards for what a security is based on the history of court law") further clarifies the basis for such stated opinion. The alleged misstatement by defendant Garlinghouse at paragraph 97 separately fails Rule 9(b)'s what, when, why,

1    and how requirements.  Significantly, such allegation also fails to specify the exact claims

2    made by defendant Garlinghouse concerning XRP's status as a non-security.  As a

3    result, the misstatements alleged at paragraph 96-97 fail Rule 9(b).

4         In addition to shortcomings detailed above, plaintiff also fails to identify the

5    respective involvement of each defendant in the alleged fraud.  Compl. ¶ 198

6    ("Defendants, *separately or together*, had knowledge of the falsity or misleading nature

7    of a statement or omission made in connection with the offers or sales of XRP.

8    Alternatively, Defendants, *separately or together*, were negligent in failing to investigate

9    and discover the falsity of the statement or omission.") (emphasis added).  Such a failure

10   to differentiate which allegations of fraud apply to which defendants is separately

11   improper under Rule 9(b).  Swartz, 476 F.3d at 764-65.

12        Lastly, to the extent plaintiff bases his § 25501 upon any purported misstatement

13   not analyzed above, Dkt. 74 at 27 (characterizing the seven sets of allegations analyzed

14   above as "examples" of the misstatements alleged), such claim fails Rule 9(b) because

15   plaintiff did not expressly identify such misstatements as the basis for this claim in his

16   complaint or opposition.

17        **b.    Plaintiff Failed to State a California Corporations Code § 25504.1**

18             **Claim Against Defendant Ripple Labs and Defendant**

19             **Garlinghouse**

20   California Corporate Code § 25504.1 provides the following in relevant part:

21        "Any person who materially assists in any violation of Section
          25110 . . . or 25401 . . .  with intent to deceive or defraud, is
22        jointly and severally liable with any other person liable under
          this chapter for such violation." Cal. Corp. Code § 25504.1.
23
24   Here, plaintiff has failed to allege a predicate violation of § 25401.  Absent such

25   showing, plaintiff cannot allege joint and several liability under § 25504.1 against

26   defendant Ripple or defendant Garlinghouse.  SIC Metals, Inc., 2018 WL 6842958, at *5

27   ("Plaintiffs nevertheless fail to sufficiently allege joint and several liability here. First . . .

28   Plaintiffs have failed to state an underlying violation of section 25401.").

United States District Court
Northern District of California

**5.    Plaintiff Failed to State Claims under California's Consumer Protection Statutes**

California Business & Professions Code § 17200 "prohibits business acts that are (1) fraudulent, (2) unfair, or (3) unlawful." <u>Siegal v. Gamble</u>, 2016 WL 1085787, at *7 (N.D. Cal. Mar. 21, 2016).  California Business & Professions Code § 17500 makes it "unlawful for any company or employee thereof to make or disseminate any statement concerning real or personal property or professional services, which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." <u>Castro Valley Union 76, Inc. v. Vapor Sys. Techs., Inc.</u>, 2012 WL 5199458, at *9 (N.D. Cal. Oct. 22, 2012).

Here, defendants argue that plaintiff failed to state claims under § 17200 and § 17500 on the following three grounds: (1) California's consumer protection statutes do not apply to claims alleging securities-related violations; (2) those statutes include a legislative safe harbor, which applies here given that plaintiff's federal securities claims are barred by Title 15 U.S.C. § 77m's statute of repose; and (3) plaintiff failed to allege statements or conduct in support of these claims with the requisite Rule 9(b) specificity. Because the court has already found that the statute of repose does not bar plaintiff's federal securities claims, the court analyzes only defendants first and third challenges.

**a.    California Business and Professions Code § 17200 and § 17500 Do Not Apply to Securities-Related Violations**

Defendants are correct that § 17200 and § 17500 do not extend to actions that relate to securities transactions.  In support of that position, defendants primarily rely upon <u>Bowen v. Ziasun Techs., Inc.</u>, 116 Cal. App. 4th 777 (2004), <u>as modified on denial of reh'g</u> (Apr. 7, 2004).

In <u>Bowen</u>, the court ruled that "Section 17200 does not apply to securities transactions." <u>Id.</u> at 788.  In support of its adoption of that rule, the <u>Bowen</u> court looked to the reasoning proffered by the Ninth Circuit in <u>Spinner Corp. v. Princeville Dev. Corp.</u>, 849 F.2d 388 (9th Cir. 1988), <u>Bowen</u>, 116 Cal.App.4th at 788, which interpreted a Hawaii

1   consumer-protection statute similar to § 17200 not to extend to actions involving

2   securities, Spinner Corp., 849 F.2d at 392-93. The Bowen court found that the legislative

3   intent of § 17200 was no different than that of the Hawaii statute at issue in Spinner,

4   Bowen, 116 Cal. App. 4th at 788, and reasoned that, because California courts treat

5   federal court decisions interpreting federal counterpart statutes as extraordinarily

6   persuasive, and "the FTC has never applied the FTC Act to securities transactions," §

7   17200 "should also not reach [securities] transactions," id. at 788-89.

8       In response, plaintiff primarily relies upon Overstock.com, Inc. v. Gradient

9   Analytics, Inc., 151 Cal. App. 4th 688 (2007). While plaintiff is correct that the court in

10  Overstock limited Bowen, it expressly recognized the ongoing validity of Bowen's ruling

11  that § 17200 does not extend to securities transactions. 151 Cal. App. 4th at 715

12  ("Whether one agrees with Bowen or not ***its holding that securities transactions are***

13  ***not covered under the UCL bars lawsuits based on deceptive conduct in the sale***

14  ***and purchase of securities, nothing more***. *Overstock's claims do not arise from any*

15  *stock transactions between the parties.* Rather, they arise from the allegedly defamatory

16  reports . . .") (italics in the original) (bold italics added) (footnote omitted).

17      Various courts in this district have commented on the reasoning and reach of

18  Bowen's rule,[10] however, the only potential criticism of Bowen by the California Supreme

19  Court—itself contained in a footnote—states only that: "Whatever the scope and merits of

20  that holding may be . . . it does not apply here." Rose v. Bank of America, 57 Cal. 4th

21  390, 399 n.8 (Cal. 2013). Whatever its merits, then, Bowen remains California law.

22      As a result, the court concludes that Bowen bars plaintiff's § 17200 claim to the

23  extent plaintiff premises that claim on the theory that XRP is a security. Further, because

24

25  _____

    [10] Siegal v. Gamble, 2016 WL 1085787, at *7-8 (N.D. Cal. Mar. 21, 2016) (citing In re
26  Charles Schwab Corp. Secs. Litig., 257 F.R.D. 534 (N.D. Cal. 2009) and Strigliabotti v.
    Franklin Resources, Inc., 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) in support of the
27  proposition that courts have "narrowly limited" Bowen to securities transactions and
    "questioned the validity of its conclusion," but ultimately acknowledging that "[t]he fact
28  remains, however, that California courts, not a federal court interpreting California law,
    must decide whether to overturn Bowen's holding. Until that day, Bowen endures.").

1  plaintiff's § 17500 is based on the same securities-related allegations supporting its §

2  17200 counterpart, the court concludes that <u>Bowen</u> likewise bars that claim.

### b. Plaintiff's Business and Professions Code § 17200 and § 17500 Claims Also Fail Rule 9(b)'s Heightened Pleading Requirements

5  Here, plaintiff does not dispute that Rule 9(b)'s heightened pleading standard

6  generally applies to § 17200 and § 17500 claims in federal court. Dkt. 74 at 32.  In

7  plaintiff's three-paragraph opposition to defendants' challenge that his § 17200 and §

8  17500 claims fail Rule 9(b), plaintiff relies solely upon the same seven categories of

9  purported misstatements that he identified in support of his misrepresentation claims

10  under California Corporations Code § 25401 and § 25504.  Dkt. 74 at 32.  As decided

11  above, such alleged misstatements fail Rule 9(b)'s heightened pleading requirements.

12  As a result, plaintiff's § 17200 and § 17500 claims similarly fail those requirements.[11]

13  As previously stated, the court concludes that <u>Bowen</u> bars plaintiff's § 17200 and §

14  17500 claims to the extent such claims depend upon XRP's factual status as a security.

15  However, the statements that plaintiff's § 17200 and § 17500 claims rely upon do not,

16  themselves, require a finding of such status to be actionably misleading.  Identified in his

17  opposition brief, such statements instead reflect efforts at publicizing XRP's usefulness

18  and scope of adoption, as well as defendants' XRP sales activities.  Dkt. 74 at 27-28

19  (bullets one through six).  In the event XRP were factually determined ***not*** to be a

20  security (like any other non-security good subject to California consumer protection

21  statutes) and plaintiff alleged the above referenced misstatements with requisite Rule

22  9(b) specificity, those statements may still be actionable under § 17200 or § 17500 under,

23  for example, a theory of false advertising.  As a result, the court allows plaintiff leave to

---

[11] Although plaintiff argues that defendants' alleged misstatements "are the crux of [his] FAL and UCL claims," Dkt. 74 at 32, plaintiff also alleges that their "acts and practices" violated § 17200 by offending "established public policy," Compl. ¶ 218.  Plaintiff fails to allege the established public policy offended in both his complaint and opposition.  As a result, to the extent plaintiff bases his § 17200 claim upon a theory of conduct distinct from the purported misrepresentations rejected on Rule 9(b) grounds above, the court concludes that such alternative theory does not salvage his § 17200 claim.

amend his § 17200 and § 17500 claims to satisfy Rule 9(b) but **only** both under the alternative theory that XRP is not a security and with respect to the above referenced misstatements identified in plaintiff's opposition brief.

### CONCLUSION

For the above reasons, the court grants in part and denies in part defendants' motion to dismiss. The motion to dismiss the first and second causes of action for violation of Title 15 U.S.C. § 77l(a)(1) and § 77o is **DENIED**. The motion to dismiss the third and fifth causes of action for violation of California Corporations Code § 25503, § 25504, and § 25110 is **DENIED**. The motion to dismiss the fourth cause of action for violation of California Corporations Code § 25501, § 25504.1, and § 25401 is **GRANTED** with leave to amend. The motion to dismiss the sixth and seventh causes of action for violations of California Business and Professions Code § 17200 and § 17500 is **GRANTED** with prejudice, except as narrowly provided immediately above.

The court allows plaintiff **28 days** from the date of this order to file an amended consolidated complaint accounting for the deficiencies in the claims dismissed without prejudice. In it, plaintiff must specifically set forth any alleged misrepresentation used to support any amended claim. Failure to do so will result in dismissal of such claim with prejudice. Plaintiff may not otherwise amend his complaint absent leave of court or consent of defendants. Upon the filing of any amended complaint, plaintiff must also file a redline clearly demarcating its changes from the existing complaint.

**IT IS SO ORDERED.**

Dated: February 26, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California